R. Jeremy Adamson (12818)
Chad S. Pehrson (12622)
Taylor Smith (17537)
KUNZLER BEAN & ADAMSON, PC
50 West Broadway Ste 1000
Salt Lake City Utah 84101
Telephone: (801) 994-4646

*Attorneys for Defendants*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CAPANA SWISS ADVISORS AG, a Swiss corporation, and Amerimark Automotive AG, a Swiss Corporation<br><br>Plaintiff,<br><br>vs.<br><br>RYMARK, INC., a Utah corporation; and NICHOLAS THAYNE MARKOSIAN, an individual; JOHN KIRKLAND, an individual; and VICKY SMALL, an individual,<br><br>Defendants. | **ANSWER**<br><br>Civil Case No. 2:23-cv-00467<br><br>The Honorable Judge Robert Shelby<br><br>Magistrate Judge Cecilia M. Romero |

## ANSWER

### I.  Introduction

Plaintiffs' Complaint contains some half-truths but tells an inaccurate story.  The

presently known facts may be concisely summarized as follows:

- Mr. Markosian owns, and Ms. Small and Mr. Kirkland work for, a used car sales business on Redwood Road in Taylorsville, Utah.  They did not attend college.  They are naïve and do not understand securities transactions.

- Mr. Markosian trusted Mr. Hesterman, whom he met through a neighborhood and church relationship.  Mr. Hesterman insisted that he and Mr. Leshem could help the car dealership find investors in Europe.  Once such investors were located, a bargain would be struck regarding funds to be conveyed to Rymark in exchange for equity, or, alternatively, a business loan. Mr. Markosian believed that Mr.

Hesterman's and Mr. Leshem's work and communications were scouting work to find that investor who would then negotiate with him.

- Neither Mr. Markosian nor Rymark ever received any money whatsoever, including any money for the Markosian equity that Plaintiffs allege was transferred and then promptly diluted.

- In Summer 2020, Mr. Markosian learned that those engaged in the shell entity penny stock scheme apparently tried to transfer the majority of his car dealership away from him to a party he never heard of, all without notice and consent. Mr. Markosian communicated clear disavowal of any such transaction.

- Plaintiff Swiss entities are either complicit with the fraudsters or a victim of their fraud. But in any event, Capana does not own any equity in any of the Swiss shell entities, or Rymark, including because no such equity was ever transferred to a shell entity with which Capana eventually transacted.

A principle valued in society is that to acquire something, one must convey bargained-for exchange. In science and nature, this is sometimes referred to in shorthand as "no free lunch." And yet Plaintiffs' entire lawsuit seeks a free lunch. They do not allege—because they cannot—that they paid a single dollar for the car dealership. Plaintiffs also do not allege—because they cannot—that Mr. Markosian received a single dollar in exchange for allegedly transferring his car dealership. Instead, behind the rhetoric, the story appears to be that Plaintiffs obtained the putative ownership rights they describe by being the last folks standing in a foreign shell entity penny stock scheme. The extent to which Plaintiffs are victims or perpetrators of that scheme will be determined in discovery.

## II. General Denial

Defendants deny all the allegations except as specifically admitted herein.

## III. Specific Responses to Allegations in the Complaint

1. Lack of knowledge and therefore deny.

2. Deny.

3. Deny.

4.      Admit only that Rymark is a Utah corporation having its principal place of business in Taylorsville, Utah; deny the remainder.

5.      Admit only that Markosian is a citizen of the state of Utah; Deny the remainder. Mr. Markosian has never been to Switzerland.  Plaintiffs' verified allegations and submitted documentation—purporting to show that Mr. Markosian chaired board meetings in-person in Zug, Switzerland—are a physical impossibility.

6.      Admit only that Mr. Kirkland is a citizen of the state of Utah; deny the remainder.

7.      Admit.

8.      Admit.

9.      Admit.

10.     Admit.

11.     Admit.

12.     Deny.

13.     Deny.  Plaintiffs' allegations do not find support in law or common sense, namely that Mr. Markosian voluntarily exchanged 100% of Rymark for 32% of an entity whose only purported business is to own Rymark.

14.     Deny. Capana does not allege and has refused to address how it obtained the shares it purports to own.

15.     Deny.   These allegations—that Mr. Markosian "declared himself wrongful dividends"— constitute an absurdity.  Of course Mr. Markosian received dividends over the course of the past ten years in connection with his 100% ownership of his car dealership. (Notably, even assuming as factual the premise of Plaintiffs' penny stock corporate shell scheme,

Plaintiffs do not allege any basis under which their putative subsidiary was instructed to pay dividends to its putative parent.)

16.     Deny.  Mr. Markosian has always been and believed himself to be the 100% owner of his car dealership.  Ms. Small likewise at all times has believed Mr. Markosian to be the 100% owner of his car dealership.  Plaintiff Swiss entities did not pay any compensation to Mr. Markosian in exchange for the putative transfer of 100% of his ownership of the company, and yet now seek to claim ownership of the business he has been running for 25 years.  This Court will determine in this action which parties culpably participated in the alleged "scheme of unjust personal enrichment."

17.     Deny.  Mr. Markosian did not send the disavowal letter because of such concerns; he never tried to sell any of his putative shares, and would not have known how to do so.  As to putative value, Plaintiffs' penny stock scheme never had any value whatsoever.  As in all such schemes, the exchange prices associated with Plaintiff's penny stock corporate shell scheme fluctuated up and down before and after Mr. Markosian's clear and unequivocal disavowal letter in September 2020.  The  decision to not disclose Mr. Markosian's disavowal is a matter for the recipients of that disavowal to address with Swiss regulators.  Likewise as to Capana's decision to not disclose Mr. Markosian's disavowal, and instead allegedly engage in further acquisitions of scheme shares, with the presumable goal of implementing the instant lawsuit.

18.     Admit only that in 2015, Mr. Markosian executed a term sheet between Rymark, Inc. and Ananda Capital Partners, Inc.  Deny the remainder.  Mr. Markosian understood the term sheet consistent with the nature of discussions with Ananda, including possible future conveyance of 2% of Rymark, Inc. in exchange for $1,000,000 net proceeds obtained by

Rymark, Inc (Term Sheet, p. 2).  Rymark, Inc. never obtained any proceeds whatsoever from the activities of Ananda Capital Partners or Plaintiff Swiss Entities.

19.    Deny.  This Agreement: 1) expired on its own terms on April 1, 2016; 2) specified that Ananda would not act in any capacity requiring its registration with the SEC; 3) specified that Ananda would have no power to enter into an agreement on behalf of or bind Rymark, Inc,; 4) required Rymark, Inc. to convey $125,000 to Ananda in exchange for specific investment acquisition services, namely solicitation of an "Institutional Investment" in Rymark, Inc.; 5) expressly contemplated "capital invested in [Rymark, Inc.] as a result of these efforts."

20.    Deny.  The putative notarization specifies the "custodian" of the document as being David A. Hesterman.

21.    Deny.

22.    Lack of knowledge and therefore deny.  Mr. Markosian never had any communications with Markus Thier, Adrian Zehner, or any attorneys at Gysi & Partner Rechtsanwälte Ltd. in St. Gallen, Switzerland.  Furthermore, the suspect documentation does not hold weight even on its own terms.  The purported Power of Attorney references "incorporation of Amerimark Automotive AG" but according to the commercial register, the company AmeriMark Automotive AG was already founded on September 23, 1998 under the name Bernard & Nef GmbH, in Wil, Canton St. Gallen. Thus, contrary to the language of the putative power of attorney, and the allegations in the Complaint, the shares were therefore not contributed in the context of the company's incorporation, but as part of a change of name and capital increase of an already existing company. Mr. Thier was therefore not authorized to execute the contribution in kind to an already existing company. All actions by Mr. Thier on behalf of Mr.

Markosian in connection with the purported capital increase were accordingly taken without power of representation.

23.     Deny.  This document bears indications of forgery.  For instance, it references 500 shares of Rymark, Inc., with that number crossed out in handwriting to be 1300.  Neither number has any factual basis.

24.     Deny.  This document also bears indication of forgery.  For instance, it contains the following "signature" of Nicholas Markosian as a putative shareholder of "Emission & Power Solutions Inc"

**SHAREHOLDER OF EMISSION & POWER SOLUTIONS INC**

Nicholas Markosian,

It is hard to imagine Mr. Markosian signing his name to a signature line specifying a Company he never heard of: "Emission & Power Solutions, Inc."  Upon limited investigation, Emission & Power Solutions, Inc. appears to have been caught up in a similar penny stock shell entity scheme.  In 2014, Svein Erik Ulsteen, labeled an "International Con Man" by the DOJ and SEC, was sentenced to four years in federal prison.  Mr. Ulsteen is listed on various documents as the CEO of Emission & Power Solutions, Inc.  (Apparently the proprietors of the instant penny stock shell entity scheme recycled documentation as part of their ongoing operations.)

25.     Deny.  Mr. Markosian never had a single communication with his putative power of attorney "Dr. Markus Thier."

26.     Deny.  Mr. Markosian never had a single communication with his putative power of attorney "Dr. Markus Thier."

27.     Deny.  Mr. Markosian never had a single communication with his putative power of attorney "Dr. Markus Thier."

28.     Deny.  Mr. Markosian never had a single communication with his putative power of attorney "Dr. Markus Thier."

29.     Deny.  This German document bears indicia of fraud, including an unsigned signature line for Colshorn and a putatively signed signature line with the same paragraph # for Mr. Markosian.  Signature page swaps are a common tactic for those engaged in penny stock shell entity schemes.

30.     Deny.  The memorialization of this document purports to have occurred at the hand of Adrian Zehnder, another unknown attorney with whom Mr. Markosian never interacted.

31.     Deny.  This German "share certificate" bears multiple indicia of forgery.  It is not even purportedly signed by Dr. Markus Thier, and furthermore is not signed by any representatives of biw Bank fur Investments and Wertpapiere AG.  The document expressly states "it is only valid if signed by two authorized signatories of biw Bank fur Investments and Wertpapiere AG."  No such signatures exist in Plaintiffs' "verified" exhibit.   In 2015, biw Bank fur Investments and Wertpapiere AG advertised its services as follows: "In order to implement promising financial ideas, you usually need a banking license. If this is missing, the white label offer from biw AG comes into play . . . ."

32.     Lack of knowledge and therefore deny.  Gysi and Partner never had any communications with Mr. Markosian.

33.     Deny.

34.     Deny

35.     Deny.  Per the minutes alleged in this Paragraph, and presented as an exhibit in Plaintiffs' Verified Complaint, a Board meeting was purportedly held at Amerimark Automotive AG, Breitenstr. 16, 8500 Fruuenfeld, Switzerland with Mr. Markosian as the sole attendee.  Mr. Markosian has never been to Switzerland.

36.     Deny.  The exhibit presented is expressly inconsistent with the allegation.  The exhibit lists only the shares of "friends & equity GmbH."

37.     Deny.

38.     Deny.

39.     Deny.

40.     Deny.

41.     Admit solely that Ananda's fundraising efforts ran into difficulties; deny the remainder.

42.     Admit solely that Ananda's fundraising efforts apparently included Malta; deny the remainder.

43.     Deny that Markosian retained Granchester Equity; lack information and therefore deny the remainder.

44.     Deny.

45.     Admit only that an email was sent from an individual who had previously entered into a consent judgment following being accused by the SEC of shell entity penny stock fraud, namely Miron Leshem (whose full name according to SEC records is Ashley Miron Leshem). Deny the remainder.

46.     Admit only that Miron Leshem asked for additional funds to continue efforts to attract investment.  Deny the remainder.

47.     Admit only that Mr. Markosian emailed Miron Leshem, rejecting the request for additional payment for fundraising work.  Deny the remainder.

48.     Admit only that Mr. Markosian emailed Miron Leshem on September 4, 2018, requesting transparency and status updates on efforts to attract investment.  Deny the remainder.

49.     Admit only that Mr. Markosian exchanged emails with Miron Leshem, on October 12, 2018 and October 15, 2018.  Deny the remainder.

50.     Admit only that Mr. Markosian exchanged emails with Miron Leshem, on October 12, 2018 and October 15, 2018. Deny the remainder.

51.     Admit only that Mr. Markosian exchanged emails with Miron Leshem, regarding efforts to solicit investments. Deny the remainder.

52.     Lack of information and therefore deny.  Defendant had not heard of White Tree Capital, Ltd. until this lawsuit was filed.  Miron Leshem, did communicate regularly with controller Vicky Small regarding documentation needed for putatively ongoing investment solicitation.

53.     Lack information and therefore deny.  Plaintiffs' allegations do not explain the putative dilution events.  Defendants never received reasonable notification of these transactions, which contain indicia of significant fraud.

54.     Deny.  Mr. Markosian submitted no such application.

55.     Deny. Mr. Markosian received no such communication.  The letter on its face purports to have been sent to Switzerland and to: mv@i-z-m.info  Mr. Markosian has never been to Switzerland.  The email address appears to be connected with a Mr. Matthias Voigt at "I-Z-M Real Estate Service."  The letter is dated April 16, 2019 but references "shares issued by AmeriMark Group AG on 24 June 2019."

56.     Admit only that Miron Leshem, sent an email on April 26, 2019 addressed to five individuals, one of whom was Mr. Markosian.  Deny the remainder.

57.     Lack information and therefore deny.  Plaintiffs have neither alleged nor been responsive to inquiries regarding what White Tree Capital, Ltd. did in exchange for its "large stock grants" or how funds were allegedly owned to the shell entities involved in the scheme.

58.     Lack information and therefore deny.

59.     Lack information and therefore deny.

60.     Lack information and therefore deny.  Plaintiffs fail to allege the identity of the "Swiss legal counsel" who putatively solicited the "distressed project" investment from Plaintiff Capana and or its predecessor.

61.      Lack information and therefore deny.  Plaintiffs allege that Orbital commenced due diligence of the "contribution agreement," but as one example, fail to explain why Orbital 's "diligence" did not uncover that the contribution agreement was signed not by Rymark, inc. but by Emission & Power Solutions Inc.

62.     Lack information and therefore deny.

63.     Lack information and therefore deny.  Plaintiffs cite to an email sent by Miron Leshem, which email did not include a word about White Tree or Orbital.

64.     Admit only that Ms. Small continued to convey financial information to Miron Leshem, as part of an ongoing exchange intended to support Ananda's continued efforts to solicit investment.  Deny the remainder.

65.     Lack information and therefore deny.

66.     Lack information and therefore deny.

67.     Lack information and therefore deny.

68.     Lack information and therefore deny.

69.     Admit only that Ms. Small continued to convey financial information to Miron Leshem, to support Ananda's continued efforts to solicit investment.  Lack information and deny the remainder.

70.     Admit only that Mr. Markosian received an email from Miron Leshem.  Lack information and deny the remainder.

71.     Admit only that Mr. Markosian and Mr. Hesterman received an email from Miron Leshem.  Lack information and deny the remainder.

72.     Lack information and therefore deny.  Mr. Markosian continued to believe that Mr. Leshem, Mr. Hesterman, and Ananda were in the process of soliciting investments for his company.

73.     Admit only that Ms. Small responded to the inquiries from Miron Leshem, and provided accounting and company information in connection with their efforts to solicit investment.  Lack information and deny the remainder.

74.     Admit only that Mr. Markosian and Mr. Kirkland responded to the inquiries from Miron Leshem, and provided accounting and company information to be used with Ananda's continued efforts to solicit investment.  Lack information and deny the remainder.

75.     Admit only that Mr. Markosian and Mr. Kirkland responded to the inquiries from Miron Leshem, and provided accounting and company information to be used with Ananda's continued efforts to solicit investment.

76.     Admit only that Mr. Markosian, Mr. Kirkland and Ms. Small exchanged email communications with Miron Leshem.  Deny the remainder.

11

77.     Admit only that Ms. Small exchanged in email communications with Miron Leshem.  Deny the remainder.

78.     Lack information and therefore deny.

79.     Deny.  Mr. Leshem offered to give a $30,000 refund on the $125,000 consulting fee, including because no investment capital had yet been delivered.  Mr. Leshem ultimately conveyed the $30,000 refund.

80.     Lack information and therefore deny.  Mr. Markosian never made the statements attributed to him.

81.     Admit only that Mr. Kirkland exchanged email communications with Miron Leshem, relating to Ananda's continued effort to solicit funds.  In these exchanges, on July 17, 2020,  Mr. Kirkland inquired of Mr. Leshem: "Can you email me a how the company is structured I know how the board of directors are other than that I have know idea how is getting paid to maintain the business over see."  Deny the remainder.

82.     Admit only that Mr. Kirkland exchanged email communications with Miron Leshem, relating to Ananda's continued effort to solicit funds.  Lack information and therefore deny the remainder.

83.     Admit only that Mr. Kirkland exchanged email communications with Miron Leshem, and Nicolai Colshorn, relating to Ananda's continued effort to solicit funds.  Lack information and therefore deny the remainder.

84.     Lack information and therefore deny.

85.     Lack information and therefore deny.  Mr. Markosian was never aware of active trading in the alleged entity; he made no effort to sell or buy any putative shares in the corporate shell penny stock scheme entity, and would not have known how to do so.

12

86.     Admit that individuals contacted Mr. Markosian and Mr. Kirkland; lack information and therefore deny the remainder.

87.     Admit that the letter was sent on September 16, 2020 disavowing any Swiss shell entity's claim to ownership of Rymark, Inc., and the contents of the letter are accurately presented in the exhibit.  Deny the remainder.  Following receipt of communications from individuals in Europe regarding legal demands, Mr. Markosian retained counsel and became aware that Amerimark was claiming it already owned Rymark, Inc.; hence, Mr. Markosian directed delivery of the disavowal letter.

88.     Admit.

89.     Deny.  It is unclear which entity Venable represented at which times.  Venable and Capana did in fact telephone and email counsel for Rymark, Inc. after the Disavowal Letter. Venable and Capana asked that the letter be rescinded in writing; counsel for Rymark, Inc. refused.

90.     Deny.  During these conversations, Capana specifically represented that it was always interested in fundraising and other investment transactions.  In fact, Capana offered to be the broker on a future sale of Rymark for Mr. Markosian at a discounted commission.  Consistent with these communications, Capana sent a letter explaining: "As per our prior conversations regarding potential financing for, or investment in Rymark, Inc., we would appreciate the opportunity to review financial materials and reports for Rymark."  For that purpose, Rymark forwarded to Capana updated financials on multiple occasions.

91.     Lack information and therefore deny.

92.     Lack information and therefore deny.

93.     Lack information and therefore deny.

94.    Lack information and therefore deny.

95.    Lack information and therefore deny.

96.    Lack information and therefore deny.

97.    Lack information and therefore deny.

98.    Admit that financial information was conveyed; Deny the remainder.  Capana specifically represented that it was always interested in fundraising and other investment transactions.  In fact, Capana offered to be the broker on a future sale of Rymark for Mr. Markosian at a discounted commission.  Consistent with these communications, Capana sent a letter explaining: "As per our prior conversations regarding potential financing for, or investment in Rymark, Inc., we would appreciate the opportunity to review financial materials and reports for Rymark."  For that purpose, Rymark forwarded to Capana updated financials on multiple occasions.

99.    Lack information and therefore deny.

100.    Deny.

101.    Admit.

102.    Admit.

103.    Incorporate responses.

104.    Admit that a justiciable controversy exists and that Defendants deny such ownership.  Deny the remainder.

105.    Admit that declaratory relief from the Court is an appropriate potential remedy as to both Plaintiffs' and Defendants' requests in this litigation.

106.    Admit that declaratory relief from the Court is an appropriate potential remedy as to both Plaintiffs' and Defendants' requests in this litigation.  Deny that Plaintiffs are entitled to the relief they seek.

107.    Incorporate responses.

108.    Deny.

109.    Deny.

110.    Deny.

As to Plaintiffs' prayer for relief, Defendants deny that Plaintiffs are entitled to the relief requested.

As to Plaintiffs' jury demand, Defendants acknowledge that a jury is appropriate for this dispute and also assert a request for a jury as appropriate for their defenses and counterclaims.

## IV.  FURTHER DEFENSES

The following general allegations relate to each of the below-enumerated and specifically pled defenses and counterclaim.

1.    Plaintiffs, two Swiss entities, allege in the Complaint that actually they own a used car dealership in Taylorsville, Utah (Rymark, Inc.)  The Swiss entities allege that they acquired 100% of Markosian Auto from Mr. Markosian.  Yet neither the Swiss entities nor anyone else paid a single penny to either Rymark or Mr. Markosian.

2.    Plaintiff Swiss Entities present to this Court a "Share Exchange Agreement" signed only by an entity called "Emission Power & Solutions, Inc.."  It appears that Emission Power & Solutions, Inc. was involved in a previous shell entity penny stock scheme.

3.    In 2015, Mr. Markosian was approached by two individuals—David A. Hesterman and Miron Leshem—who claimed to represent an investment bank.

4.      Mr. Hesterman attended the same church as Mr. Markosian's mother, and ingratiated himself to Mr. Markosian by helping him move and socializing at the dealership.[1] For many months, this friendship blossomed and Mr. Hesterman performed various consulting jobs at the dealership, including tasks like looking at vehicles for sale at auctions and preparing reports.

5.      Mr. Hesterman and Mr. Leshem stated that they could help find outside investors in his used car business, and that they would solicit investment and then report to Mr. Markosian on whether investors were interested in either purchasing a small percentage of his dealership (and the price and commensurate percentage of the company) or, alternatively, providing business loans.

6.      The Agreement was contemplated to last one year.  Mr. Markosian understood that the Agreement meant that Mr. Markosian would potentially convey a small, undetermined percentage of his used car dealership in exchange for an investment amount also to be determined, with specific terms to be dependent on the ongoing financial performance of the auto dealership, and specifically the financial status at the time of the investment.

7.      Unfortunately, Mr. Markosian did not know at the time that Mr. Hesterman and Mr. Leshem had both previously been accused of securities fraud, and were then running ongoing business practice of corporate shell penny stock schemes in the European marketplace.

8.      Subsequent to that 2015 Meeting, Mr. Hesterman and Mr. Leshem charged Mr. Markosian $125,000 for these investor solicitation services.

---

[1] Unfortunately, Utah has a reputation of being the affinity fraud capitol of the United States. *E.g.*, https://www.securities.utah.gov/communication-and-outreach/basic-definitions/affinity-fraud/; https://www.sec.gov/files/affinityfraud.pdf

9.     It now appears that Mr. Hesterman and Mr. Leshem fraudulently prepared documents purporting to transfer the used car dealership into a new Swiss entity.  Mr. Markosian understood that Mr. Hesterman and Mr. Leshem, through the Ananda Capital Partners entity, were engaged in efforts to find investors or loans.

10.     Mr. Hesterman and Mr. Leshem then pursued efforts to "register" the new entity, with various stops and starts over a period of years.  They indeed provided Mr. Markosian with occasional updates, and requested occasional cooperation.  Mr. Markosian interpreted these interactions only as being follow-up efforts to eventually see some potential opportunities stemming from the $125,000 he had paid them in fees.  Mr. Markosian definitively did not understand that Mr. Hesterman and Mr. Leshem intended to represent to others that 100% of his Taylorsville auto dealership had been or could be transferred to a different entity.  Mr. Markosian did not and would not have transferred his ownership interests to an entity that he did not understand or control, in exchange for no compensation.

11.     It now appears that Mr. Hesterman and Mr. Leshem prepared documents purporting to effectuate a transfer.  However, it does not appear that any valid authorization existed for such a transfer, and that such a transfer would violate various laws.

12.     Furthermore, it now appears according to Plaintiffs' complaint that Mr. Leshem purported to act to dilute Mr. Markosian's alleged ownership of one of the many various Leshem-created shell Swiss entities by 70 percent.  Mr. Markosian of course was not informed of this.  Also, it does not appear that any legitimate justification would exist for any such dilution.

13.     Based upon Defendants' investigation to date, it appears that Plaintiff Capana obtained its putative ownership in one of the Leshem-created Swiss shell entities from a foreign entity named White Tree Capital, Ltd. which appears to be a Leshem-created shell entity existing

17

for the sole purpose of fraudulently diluting Mr. Markosian's ownership in a different Leshem-created shell entity.

14.     Next, Mr. Leshem obtained "registered" status on a Vienna penny stock exchange; again, Mr. Markosian interpreted this as further efforts on delivering upon the initial promise of interested investors who would then make offers of loans or investments.  Of course, the only logical reason for any company to participate in an offering of any kind is to introduce capital into the entity.  Yet this "registration" provided no compensation to either Rymark or to Mr. Markosian.  Defendants have no idea what shares were sold and who received any revenues from the sale.

15.     Ultimately, and tragically, Mr. Markosian was a perfect foil for this particular scheme.  He is earnest and well-meaning.  He will hire *anyone* from his AA meetings.  He will re-hire employees that burned the dealership previously.  He trusts others and believes in them.  Here, he trusted Mr. Hesterman's characterization of the efforts to seek potential investors.

16.     Mr. Markosian started his career in the car business at the age of 14 as a lot technician.  His business buys used cars from auction, and sells them to consumers—sometimes at a profit and sometimes at a loss.  He did not attend college and he exhibits a poor understanding of securities transactions, whether in America or elsewhere.

17.     Ms. Small and Mr. Kirkland followed similar tracks.  No college.  Their careers began early in the car business, and that's what they know.  They have little understanding of legal issues, corporate governance issues, or securities issues.

18.     In Summer 2020, upon receiving communications containing legal threats, Mr. Markosian indeed inquired with legal counsel given the existence of a threat to sue.  He had not previously inquired with counsel about his interactions with Mr. Hesterman and Mr. Leshem,

including because he viewed those interactions as an improvident $125,000 payment to investment finders that had turned up no investors.

19.     Following this inquiry, counsel investigated the transaction, including a complete review of all correspondence sent and received from Rymark's outlook email servers.  Mr. Markosian and Rymark, Inc. sent the September 2020 correspondence to one of the Swiss shell entities.

20.     The September 2020 letter disavowed that any transfer of Rymark, Inc. had ever lawfully taken place.  Within days of the conveyance of that letter, the Venable law firm called, purportedly on behalf of one of the Amerimark shell entities.  (Venable has at various points appeared to represent one of or both Capana and various of the Amerimark shell entities).  Venable's first communication contained two simple points: *Please retract the letter and send a written acknowledgment of this.  That letter has put us in a tight spot.  Also, even if there is something awry in the leadup to this transaction, why does Mr. Markosian not want to bless the transaction?  Even at his diluted percentage of 30%, he's rich given the present valuation of the Amerimark shares.*

21.     Despite Venable's entreaties, Mr. Markosian flatly refused to retract the Disavowal Letter.  Frustrated, Venable then sent some of the documents attached to the Complaint, highlighted by the Share Exchange Agreement identifying Emission & Power Solutions, Inc. as the signing transferor.   Rymark continued to refuse the repeated requests to acknowledge a transfer had occurred.

22.     In subsequent communications, Venable and a Capana representative, Shaen Bernhardt,  stated that they would be making voluntary efforts to shut down operations at Amerimark (which in fact appears to have never operated any business whatsoever).  Mr.

Markosian and Rymark reiterated that the affairs of Amerimark were of no concern to them, and that the September 2020 Letter was their final position on the matter.  It was expressly communicated that if Amerimark and Capana disagreed with the September 2020 Letter, they should promptly file suit ("If this is what you think, you need to come to Utah and sue us").

23.     During these conversations, Capana specifically represented that it was always interested in fundraising and other investment transactions.  In fact, in writing, Capana offered to be the broker on a future sale of Rymark for Mr. Markosian, at a discounted commission.  Consistent with these communications, Capana had sent correspondence explaining: "As per our prior conversations regarding potential financing for, or investment in Rymark, Inc., we would appreciate the opportunity to review financial materials and reports for Rymark."  For that purpose, as expressly stated in letters from Capana and Rymark, Rymark forwarded to Capana updated financials on multiple occasions.

24.     In the three years since the September 2020 Letter, and just as he has done for the past 25 years, Mr. Markosian has been running his business.  He has received no inquiries, directions or feedback on the business from the "owner" alleged in the Swiss entities' Complaint.[2]

### FIRST DEFENSE
### (Estoppel/Waiver/Laches/Acquiescence/Abandonment)

25.     This defense incorporates the allegations in ¶¶ 1-24.

---

[2] Of course, Mr. Markosian is flummoxed by nearly all allegations in the Complaint, including 1) why he would transfer his ownership in his car dealership in exchange for no consideration; 2) even under the framework of a transaction as outlined by the Swiss entities, how did Mr. Markosian lose 70% of his interest and how did Capana obtain its shares, without Mr. Markosian or Rymark having ever been informed; and 3) why the Swiss entities waited nearly three years after the Disavowal Letter to assert the instant contentions.

26.     Plaintiffs' claims and recovery are barred by the related equitable doctrines of estoppel, waiver, laches, acquiescence, and abandonment, as supported by the foregoing allegations.  Specifically, Amerimark and Capana received notice including through the sloppiness of the various European shell entity transactions, and the Disavowal Letter. Nonetheless, they failed to conduct proper diligence prior to 2020, and since 2020 and the receipt of the Disavowal letter, failed to act on their current contentions in a timely fashion. Rymark relied upon that inaction in running its business and dramatically growing the business growth and profitability over the past three years.  In essence, Plaintiffs sat by in the weeds and watched Rymark put in the work to build a large house, only to claim, once the house was completed: "hey we own that house."

27.     Plaintiffs and/or their predecessors-in-interest were not diligent in asserting the instant claims, and Defendants have been injured as a result of that lack of diligence.

28.     Representatives of at least one of the Plaintiffs, and at least one of the Swiss shell entities expressly or impliedly communicated their intent to relinquish the rights asserted in the Complaint.  The totality of the circumstances warrants the inference of relinquishment.

29.     Plaintiffs' delays and actions specifically prejudiced Defendants' ability to defend the instant claims.

**SECOND DEFENSE**
**(Statute of Limitations)**

30.     This defense incorporates the allegations in ¶¶ 1-24.

31.     Applicable statutes of limitations have run as to Plaintiffs' claims.

**THIRD DEFENSE**
**(Plaintiffs' Claims are Based upon Non-Existent Ownership Rights**
**or are the Fruits of a Fraudulent Scheme)**

32.     This defense incorporates the allegations in ¶¶ 1-24.

33.     Plaintiffs allege having obtained their asserted rights directly from a shell entity created by a convicted market manipulator and denizen of penny stock fraud.  That market manipulator either did not acquire any ownership rights or acquired such rights through fraud.

34.     As such, Plaintiffs have no ownership rights themselves and no ability to bring the instant claims.

### FOURTH DEFENSE
### (Unjust Enrichment/Unclean Hands: Plaintiffs Paid Nothing of Value for The Rights They Assert in this Litigation)

35.     This defense incorporates the allegations in ¶¶ 1-24.

36.     Plaintiffs paid nothing of value to Mr. Markosian and Rymark, Inc.  Indeed, no one paid anything of value to Mr. Markosian and Rymark, Inc., a fact that has always been known to Plaintiffs.

37.     As such, Plaintiffs' claims would constitute unjust enrichment, and Plaintiffs do not have clean hands in asserting such claims.

### FIFTH DEFENSE
### (Illegality)

38.     This defense incorporates the allegations in ¶¶ 1-24.

39.     Plaintiffs' conduct constitutes illegal actions, including violations of United States and other laws.  For instance, Plaintiffs purport to have acquired ownership rights in Rymark, Inc. and in real property in Utah without having complied with the Foreign Investments in Real Property Act, the Tax Equity and Fiscal Responsibility Act, the International Investment and Trade In Services Survey Act, the Foreign Investment and National Security Act, and the Foreign Agents Registration Acts.

40.     Furthermore, Plaintiffs allege activities on behalf of themselves or their predecessors-in-interest, which activities if true would constitute wholesale violation of US and

other countries' securities laws.

41.    Furthermore, Plaintiffs do not actually own what they allege that they own.

42.    Furthermore, Plaintiffs purport to be a parent entity of Rymark, Inc. without having ever complied with relevant laws and actions, based upon statutory law, common law, and entities' internal ordering documents, all of which they would have been required to comply with.

43.    As such, Plaintiffs claims are void.

**SIXTH DEFENSE**
**(Absence of Claimed Agency Relationship)**

44.    This defense incorporates the allegations in ¶¶ 1-24.

45.    Plaintiffs claim that many other individuals acted as agents for Defendants.

46.    For instance, Plaintiffs claim that an attorney was given authority to conduct certain activities on behalf of Defendants, and references a document that precludes on its face any authority to engage in the alleged activities of the putative agent.

47.    Such individuals did not have authority to act on behalf of Defendants, as would have been known to any reasonable person.

48.    As such, Plaintiffs' reliance upon agency authority was wholly unreasonable.

**SEVENTH DEFENSE**
**(Kirkland and Small against Plaintiffs)**

Plaintiffs bring a declaratory relief and accounting action against Mr. Kirkland and Ms. Small, but these two individuals have no ownership or rights as to Rymark, Inc.  As such, the actions against them are improper and without basis in fact and law.

**EIGHTH DEFENSE**
**(Insufficient Particularity/Right to Amend)**

Plaintiffs have not set out their claims with sufficient particularity to permit Defendants to raise all appropriate defenses.  Defendants have not knowingly or intentionally waived any applicable defenses, but Defendants reserve the right to assert and to rely upon additional defenses not stated here, including such other defenses as may become available or apparent. Defendants further reserve the right to file an Amended Answer as more facts or legal theories become applicable by means of subsequent disclosures, discovery, procedural issues, or modification of existing statutes and defenses.  In particular, Defendants believe that once they obtain documentation that is only in the possession of Plaintiffs and/or third parties, then they will add several additional counterclaims and cross-claims against known and unknown parties.

**COUNTERCLAIM**
**Declaratory Judgment**
**(Brought by Nicholas T. Markosian and Rymark, Inc. Against Plaintiffs)**

1.  This counterclaim relates to the same background of factual matters asserted in the above Answer and Defenses.

2.  This counterclaim is also properly before the Court pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure because it involves an actual controversy among the Parties and a request that the Court declare the rights and other legal relations of the Parties hereto.

3.  Counterclaimants repeat and incorporate by reference the factual allegations included in the Defenses set forth above.

4.  Including for the reasons set forth in the Defenses, Counterclaimants are entitled to a declaration that Mr. Markosian is the sole owner of Rymark, Inc. and Plaintiffs are estopped and

disallowed from asserting any claim to the contrary.

5.    For the reasons set forth above in the defenses, Counterclaimants is entitled to a declaration that any claim of Plaintiffs is barred by one or more of the doctrines of laches, waiver, and acquiescence.

6.    Counterclaimants have an ongoing material interest in ensuring the clear title of Rymark, Inc.

7.    There appears to be a genuine controversy with respect to the ownership of Rymark, Inc.

8.    Counterclaimants therefore request that the Court issue an order resolving that controversy.

**PRAYER FOR RELIEF**

WHEREFORE, Defendants respectfully requests that the Court:

1.    A declaration that Mr. Markosian is the sole owner of Rymark, Inc.

2.    An Order finding that Plaintiffs' claims are not legally valid.

3.    An Order granting fees and costs specially to Mr. Kirkland and Ms. Small, who are not even alleged to be owners of Rymark and should not have been included as Defendants in this declarator judgment action.

4.    An Order granting fees and costs to all Defendants.

3.    An Order granting Defendants all such relief as the Court may deem just and proper.

**Jury Demand**

Defendants demand a trial by jury on all issues triable by a jury.

Dated: September 18, 2023

Salt Lake City, Utah

                                        Respectfully submitted,
Kunzler Bean & Adamson, LLC

/s Chad S. Pehrson
R. Jeremy Adamson
Chad S. Pehrson
Taylor Smith