Outlook

---

**Capana et al. v. Rymark et al. | Draft Amended Counterclaim and Third-Party Complaint**

---

**From** Stephen Richards <srichards@kba.law>

**Date** Fri 6/28/2024 5:40 PM

**To** Diamond, Sarah E. <SEDiamond@Venable.com>; Erik A. Christiansen <EChristiansen@parsonsbehle.com>; Gallagher, Zoe <ZGallagher@Venable.com>; Benjamin Perkins <BPerkins@parsonsbehle.com>

**Cc** Jeremy Adamson <jadamson@kba.law>; Chad Pehrson <cpehrson@kba.law>; Robert Harrington <rharrington@kba.law>

📎 1 attachment (3 MB)

2024.06.28 Draft Amended Counterclaim and Third-Party Complaint.pdf;

Counsel:

Rymark and Mr. Markosian intend to amend their counterclaim to add additional causes of action against Plaintiffs, as well as certain claims against third-party defendants. I am attaching the current form of our draft amended pleading to this email for your review. Please advise whether your clients will stipulate to its filing. We would appreciate hearing from you by no later than the close of business on Monday, July 8. After that time, if we have not heard from you, we will proceed with filing.

Contemporaneous with filing, we intend to include the filed Amended Counterclaim and Third-Party Complaint with informal requests for information from each of the following parties: (i) officials at the Euronext and Wiener Borse; (ii) the Management and Supervisory Boards of Philomaxcap AG; (iii) Baker Tilly's Munich office, (iv) officials at the Frankfurt, Dusseldorf, Munich, Stuttgart exchanges; and (v) individual purported shareholders of AmeriMark Group AG, including Martin Nolle and Miguel Angel Loinaz Ramos.

Finally, pursuant to Section 9(b) of the protective order, Defendants challenge all confidentiality designations you have applied to all documents produced since our February 5, 2024 letter (at which time we challenged all confidentiality designations then to-date, such that – for clarity's sake – we have challenged all confidentiality designations you have made).

Stephen

---



**STEPHEN RICHARDS**
Of Counsel

50 W BROADWAY, SUITE 1000
SALT LAKE CITY, UTAH 84101
DIRECT: 801.939.3696 OFFICE: 801.994.4646
srichards@kba.law

R. Jeremy Adamson (12818)
Chad S. Pehrson (12622)
Robert P. Harrington (12541)
Stephen Richards (19332)
KUNZLER BEAN & ADAMSON, PC
50 West Broadway Ste 1000
Salt Lake City Utah 84101
Telephone: (801) 994-4646

*Attorneys for Defendants, Counter-Claimants, and Third-Party Plaintiffs*

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CAPANA SWISS ADVISORS AG, a Swiss corporation; AMERIMARK AUTOMOTIVE AG, a Swiss corporation,<br><br>       Plaintiffs,<br><br>vs.<br><br>RYMARK, INC., a Utah corporation; NICHOLAS THAYNE MARKOSIAN, an individual; JOHN KIRKLAND, an individual; and VICKY SMALL, an individual,<br><br>       Defendants. | **[DRAFT]**<br>**AMENDED COUNTERCLAIM AND**<br><br>**THIRD-PARTY COMPLAINT**<br><br>Case No.: 2:23-cv-00467<br><br>Judge: Robert J. Shelby<br>Magistrate Judge: Cecilia M. Romero |
| RYMARK, INC., a Utah corporation; and NICHOLAS THAYNE MARKOSIAN, an individual,<br><br>       Counter Claimants,<br><br>vs.<br><br>CAPANA SWISS ADVISORS AG, a Swiss corporation; AMERIMARK AUTOMOTIVE AG, a Swiss corporation.<br><br>       Counter Defendants | |

RYMARK, INC., a Utah corporation; and
NICHOLAS THAYNE MARKOSIAN, an
individual,

           *Third-Party Plaintiffs*,

vs.

SHAEN BERNHARDT, an individual;
ASHLEY MIRON LESHEM, an individual;
DAVID HESTERMAN, an individual;
NICOLAI COLSHORN, an individual;
STEFAN KAMMERLANDER, an individual;
ALEXANDER COENEN, an individual;
AMERIMARK GROUP AG, a Swiss
corporation; and
PHILOMAXCAP AG, a German corporation,

           *Third-Party Defendants.*

## INTRODUCTION AND SUMMARY

1.     This case involves an international "pump-and-dump" securities fraud scheme. The scheme was conceived by Third-Party Defendants David Hesterman and Ashley "Miron" Leshem. But it was operated by Leshem and a cabal of European associates led by Third-Party Defendant Shaen Bernhardt, as well as Bernhardt's and Leshem's company, Plaintiff and Counter-Defendant Capana Swiss Advisors AG ("Capana").

2.     Hesterman and Leshem are experienced "pump-and-dump" schemers who seek out small American companies and convince those companies that they can raise money through equity offerings on European stock exchanges. Hesterman and Leshem volunteer to take on responsibility for listing a company in exchange for a six-figure cash payment and a promise of an equity stake in the company. Then, once the company is listed, Hesterman and Leshem "pump" the stock by issuing false press releases and other promotional materials meant to drive

2

the companies' stock prices temporarily higher. At the peak, Hesterman and Leshem cash in by "dump"-ing their stock for a huge profit. (Hence, the term "pump-and-dump.") After Hesterman and Leshem "dump" their stock, the price falls precipitously, and Hesterman and Leshem move on to the next scheme.

3.      In this particular scheme, Hesterman and Leshem targeted Rymark, a Taylorsville, Utah-based car dealership, and Rymark's owner, Nick Markosian. Hesterman gained Mr. Markosian's trust in part through church connections, and then abused that trust to convince Mr. Markosian he could legitimately raise money from European investors by paying Leshem $125,000 to engage in efforts to obtain investments. Leshem fraudulently induced Mr. Markosian to pay this $125,000.00 to Leshem for purported assistance with obtaining investors who would be interested in loaning money to Rymark, or potentially purchasing some ownership of Rymark from Mr. Markosian. Leshem used the money to, among other things, buy a Swiss shell corporation and attempt a fraudulent and ineffective merger with Rymark. The idea, apparently, was to list the Swiss shell – Plaintiff and Counter-Defendant AmeriMark Automotive AG – on a European stock exchange and pump-and-dump its stock.

4.      But the scheme did not go as planned. European stock exchanges are catching on to Leshem's fraud, and Leshem failed in several efforts to list AmeriMark Automotive AG (or another fraudulent shell, AmeriMark Group AG) on European exchanges. Leshem demanded more money from Mr. Markosian, but Mr. Markosian declined.

5.      At the time, AmeriMark Group AG, the then-current shell entity that Leshem was trying to get listed – had 20,000,000 shares. And even according to Leshem, Mr. Markosian owned nearly 19,500,000 of these shares: more than 97% of the total. But Leshem stole 13,000,000 of these shares and purported to give them to Whitetree Capital, a Cyprus-based

company controlled by Leshem's friend, Erika Zorkadi. This transfer was ostensibly in exchange for Whitetree agreeing to provide Leshem with some capital he needed to keep the scheme alive. Leshem also fabricated documentation to make it appear as if Whitetree had come by the shares honestly.

6.      But Whitetree, too, soon lost patience with Leshem. So Leshem turned to Bernhardt and Capana, who agreed to fund the pump-and-dump in exchange for an option to acquire Whitetree's (stolen) 13,000,000 shares. Bernhardt and Leshem agreed that given the prior failures to list AmeriMark Group, a last resort would be attempting to list the company on a Vienna-based stock exchange called the Wiener Borse (the "Vienna Stock Exchange").

7.      The Vienna Stock Exchange, however, requires that listed companies have European operations. Rymark, like most car dealerships located on Redwood Road in Taylorsville, Utah, does not have European operations. So Leshem and his cronies lied, telling regulators that actually, Rymark was on the cusp of selling used cars in Europe.

8.      This was nonsense. But thanks to Leshem and Bernhardt's experience and duplicity, the Vienna Stock Exchange was fooled and agreed to list AmeriMark Group AG. The pump-and-dump was off to the races, and AmeriMark Group's stock price rose from just over €1 in October 2019 to more than €2.60 in July 2020. But then the stock price cratered as Leshem and others "dumped" AmeriMark Group stock. Concerned investors began reaching out directly to Rymark. Rymark personnel were bewildered: Rymark had received no money from stock sales and did not realize that Leshem and Bernhardt were pumping-and-dumping the stock in Europe.

9.      Rymark sought advice from counsel, and in September 2020, its attorney sent a letter to AmeriMark Group, Leshem, Hesterman, and Counter-Defendant Nicolai Colshorn, whom Leshem had arranged to be installed as a director of AmeriMark Group. The letter

demanded that AmeriMark Group AG cease and desist from representing that it had any "connection with, relationships with, agency with, or authority from" Rymark. It also demanded that AmeriMark Group take down its investor relations website, which represented that AmeriMark Group owned Rymark.

10.     The letter sparked a panic among Leshem, Bernhardt, and Colshorn, who knew that (1) they had an obligation under European law to disclose the letter to the investing public and (2) the pump-and-dump scheme would end if the letter became public. So, desperate to make the letter go away, the trio conspired to conceal the letter from stockholders and European authorities while they attempted to convince Rymark to retract the letter.

11.     Bernhardt hired U.S. counsel – John Worden at Venable, LLP – and Worden tried to strongarm Rymark into withdrawing the letter. Rymark refused. So Bernhardt hatched a new plan: con Rymark into producing its latest financial data, which Bernhardt could use in Europe, both to pump-and-dump AmeriMark Group's stock and also to persuade others that Rymark was actually cooperating with Capana.

12.     Bernhardt and Worden falsely told Rymark's counsel – including in a signed writing from Capana – that Capana wanted Rymark's financial data to explore a potential investment in Rymark. Duped, Rymark sent Capana the financial data in May 2021. Once Bernhardt had the financials he needed, he ignored Rymark and returned to the pump-and-dump scheme in Europe.

13.     By this time, trading activity on AmeriMark Group's shares had slowed markedly, and its stock price remained low. So Leshem, Bernhardt, and their confederates convinced the Vienna Stock Exchange exchange to accept 6.8 million new shares for trading and then immediately set about pumping-and-dumping these shares. At Leshem and Bernhardt's direction,

AmeriMark Group released two blatantly false press releases saying that AmeriMark Group was doing business with European used car marketplaces. And AmeriMark Group published two other misleading press releases using the financial results Bernhardt had tricked Rymark into giving Capana.

14.     AmeriMark Group's stock price soared 400% on these false statements, and Capana cashed in, repeatedly selling shares in May 2021. By the time Capana's selling frenzy was over, the stock price had collapsed again. And the Viennese authorities were onto the scam. Austrian financial authorities issued a public warning about the stock, and then on June 8, 2021, the Vienna Stock Exchange sent AmeriMark Group a letter saying its shares would be delisted. The pump-and-dump was over.

15.     Bernhardt, however, was not done with the fraud. He concocted another plan to profit from the pump-and-dump: exercise Capana's option for Whitetree's stolen 13,000,000 shares of AmeriMark Group stock and then use these stolen shares to acquire stock in another company: a German corporation, Third-Party Defendant Philomaxcap AG ("Philomaxcap").

16.     Capana exercised its option in 2022, came into possession of the 13,000,000 stolen shares, and then set about attempting to use those shares to buy a controlling share in Philomaxcap. This plan hit a snag when European shareholders skeptical of the swap filed litigation questioning whether AmeriMark Group really owned Rymark.

17.     So Bernhardt raced back to America, hoping once again that he and Worden could bully Rymark into withdrawing the September 2020 letter and pretending it was actually owned by AmeriMark. Again, Rymark would not recant the letter or say, falsely, that it was owned by AmeriMark Group. And the European litigation quickly heated up. So Bernhardt directed Capana and AmeriMark Automotive to file this lawsuit in July 2023, hoping that a lawsuit would cow

Rymark. This did not work either, so in late 2023, Bernhardt and Capana settled the European litigation by, on information and belief, paying the lead plaintiff off with stolen AmeriMark Group shares.

18.    By early 2024, Capana knew beyond any question that the AmeriMark Group shares it had acquired from Whitetree had been stolen. Rymark's attorneys sent Venable a letter on January 17, 2024 explaining that the shares appeared to have been "stolen from Mr. Markosian and transferred to your client." But Bernhardt was undeterred. In February 2024, with full knowledge that the shares had been stolen, Capana contributed them to Philomaxcap in exchange for a controlling stake in that company. Philomaxcap, which is traded on four separate European stock exchanges, has not disclosed to the public that there is a dispute over whether its shares in AmeriMark Group are stolen. Nor has Philomaxcap disclosed to investors that Rymark disputes whether it is owned by AmeriMark Group.

19.    The bottom line is that Mr. Markosian was duped by a sophisticated securities fraud scheme aimed at depriving him of his company and swindling unsuspecting investors. Counter-Defendants and Third-Party Defendants profited greatly from that scheme by transacting in AmeriMark Group stock.

20.    Mr. Markosian, by contrast, lost money in the scheme: both the $125,000 in bogus "listing fees" he paid Leshem and Hesterman, and then – Plaintiffs say – most of his company. He never sold any stock in Rymark to anyone and never received a dime in exchange for any portion of his company. He is unambiguously a victim of this scheme. Yet it is now Mr. Markosian who is defending litigation brought by the very people who defrauded him.

21.    According to Counter-Defendants' theory of this action, Mr. Markosian paid $125,000 for the privilege of losing two-thirds of his company. That theory flies in the face of

common sense.

22.     The transactions that created AmeriMark Automotive and AmeriMark Group were illegal, fraudulently induced, or otherwise ineffective. Rymark's declaratory judgment counterclaim, *see infra*, seeks a declaration that Mr. Markosian is the sole owner of Rymark.

23.     But if Rymark is wrong, the fraud worked, and Rymark is actually owned by two Swiss holding companies, then, in the alternative, Capana is liable to Mr. Markosian for the 13,000,000 shares stolen from him. And pursuant to Utah Criminal Code 76-6-408, Capana is "civilly liable for three times the amount of actual damages" sustained by Mr. Markosian. Accordingly, in addition to the other relief sought herein, Mr. Markosian seeks $126,750,000 in damages.

## **PARTIES**

24.     Defendant, Counter-Claimant, and Third-Party Plaintiff Nick Markosian is an individual who resides in Salt Lake County, Utah.

25.     Defendant, Counter-Claimant, and Third-Party Plaintiff Rymark, Inc. is a Utah corporation with its principal place of business in Taylorsville, Utah.

26.     Third-Party Defendant Shaen Bernhardt is an individual who, upon information and belief, resides in Switzerland.

27.     Third-Party Defendant Ashley Miron Leshem is an individual who, upon information and belief, resides in Florida.

28.     Third-Party Defendant David Hesterman is an individual who, upon information and belief, resides in Georgia.

29.     Third-Party Defendant Nicolai Colshorn is an individual who, upon information and belief, resides in Switzerland.

30.     Third-Party Defendant Stefan Kammerlander is an individual who, upon information and belief, resides in Switzerland.

31.     Third-Party Defendant AmeriMark Group AG ("**AmeriMark Group**") is, upon information and belief, a Swiss corporation with its principal place of business in Switzerland.

32.     Plaintiff and Counter-Defendant Capana Swiss Advisors AG ("**Capana**") is, upon information and belief, a Swiss corporation with its principal place of business in Switzerland.

33.     Plaintiff and Counter-Defendant AmeriMark Automotive AG ("**AmeriMark Automotive**") is, upon information and belief, a Swiss corporation with its principal place of business in Switzerland.

34.     Third-Party Defendant Philomaxcap AG is, upon information and belief, a German corporation with its headquarters and principal place of business in Germany.

35.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

36.     Venue is appropriate in this district under 28 U.S.C. § 1391(b)(2).

37.     The Court has personal jurisdiction over the Defendants because, as set forth herein, they purposefully availed themselves of the protections of Utah law and purposefully directed tortious conduct toward Utah.

## GENERAL ALLEGATIONS

38.     Rymark is a used-car dealership with multiple locations, all in Utah. Mr. Markosian co-founded, and now owns, Rymark.

39.     In the mid-2010s, Rymark was on the hunt for new financing. Counter-Defendant David Hesterman offered to help. Mr. Hesterman became acquainted with Mr. Markosian through Mr. Markosian's mother. (She and Mr. Hesterman attend the same church: a connection

9

that Mr. Hesterman exploited.)

40.     Mr. Hesterman is a convicted felon with a decades-long history of fraud. He was sentenced to three years in prison in the mid-1980s after he pleaded guilty in a check kiting scheme. Unreformed, he pleaded guilty in 2002 to securities fraud and failure to file a tax return. He was sentenced to 20 months in prison, fined $100,000, and ordered to make $75,000 in restitution. The SEC issued an administrative order against Hesterman in connection with the same scheme, ordering him to disgorge $852,600 and pay a civil penalty of $250,000. Hesterman was also made subject to a penny-stock bar.

41.     Mr. Markosian was unaware of Hesterman's criminal history, trusted Hesterman, and believed that Hesterman was acting in Mr. Markosian's best interest.

42.     Hesterman began helping Mr. Markosian locate vehicles for sale and explore financing opportunities in the Mountain West. But Hesterman also pitched a bigger idea: raising money by listing Rymark on a French stock exchange called the Marche Libre.

43.     Hesterman introduced Mr. Markosian to Counter-Defendant Ashley "Miron" Leshem, saying that Leshem could assist with the listing process.

44.      Leshem, like Hesterman, has a long history of securities fraud. He is subject to multiple penny-stock bars in the United States as a result of his repeated participation in securities fraud schemes. So he has largely taken his fraud abroad – where he is also getting in trouble. In January 2024, the French securities regulator, AMF, sanctioned Leshem and Leshem's company, Grantchester Equity, for market manipulation (*i.e.*, a pump-and-dump scheme). Leshem was fined €2,000,000, and Grantchester was fined €1,000,000.

45.     Leshem told Mr. Markosian that he could list Rymark on the March Libre in a matter of weeks, in exchange for $125,000.00. Then, Mr. Markosian could sell shares in Rymark

to raise capital to expand Rymark in Utah.

46.     In fact, Hesterman and Leshem never intended to help Mr. Markosian raise capital through a listing on a European stock exchange. Instead, they wanted to use Rymark in a pump-and-dump scheme and obtain fraudulent profits for themselves.

*Pump-and-Dump Schemes*

47.     Pump-and-dump schemes – Hesterman and Leshem's specialty – are not very complicated. Fraudsters acquire shares in a company, "spread false or misleading information to create a buying frenzy that will 'pump' up the price of a stock," then "'dump' shares of the stock by selling their own shares at the inflated price."[1] Then, once the frenzy is over, "the stock price typically falls and investors lose money."[2]

48.     "Most frequently, the stocks subject to pump and dump schemes are microcap stocks, many of which are colloquially referred to as 'penny stocks.'"[3] Penny stocks work well in pump-and-dump schemes because they're cheap, because the disclosure and listing requirements for small companies ("microcaps") are less stringent, because their prices can move more quickly than larger stocks, and because it's harder for investors to find correct information about small companies. The Internet has made pump-and-dump schemes easier, since it is cheap and easy to execute the "pump" by disseminating false information through blog posts, emails, and the like.

49.     American securities authorities have long attempted to crack down on pump-and-

---

[1] *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/pump-and-dump-schemes.

[2] *Id.*

[3] Austin, J., "Stock Markets Play 'Whack A Mole' With Pump And Dump Schemes," (U.C. Davis. Bus. L.J. Vol. 23), at 8, *available at* https://blj.ucdavis.edu/sites/g/files/dgvnsk15221/files/media/documents/Janet-Austin-Macroed-Article1.pdf.

dump schemes. This has driven many of the schemes abroad, where whole industries of "people who will assist in such schemes" exist, including "penny stock promotors, lawyers, brokers, and groups setting up shell companies and/or arranging transfers of funds."  Europe is particularly afflicted with the schemes, which in extreme cases have caused entire microcap exchanges to close. European securities authorities are increasingly on the lookout for pump-and-dump schemes and other forms of "market manipulation."

*Hesterman and Leshem Plan the Pump-and-Dump*

50.     From the beginning, Hesterman and Leshem were planning to get Rymark listed on a European microcap exchange and then pump-and-dump its stock, leaving Mr. Markosian, Rymark and investors in the dust. But they did not reveal this scheme to Mr. Markosian. Instead, they represented – falsely – that they would assist Rymark in a legitimate capital raise.

51.     Hesterman and Leshem – as securities fraudsters often do – used false haste to pressure Mr. Markosian to agree to the European listing plan. On December 3, 2015, Hesterman told Mr. Markosian that it was "really important" to begin the listing process because December was the "perfect month to undertake the required steps and investor funds could be flowing in by late January." Leshem, similarly, told Mr. Markosian that Rymark could be listed in "2 months or less," that the listing process was "low risk," and that Rymark would receive €70,000 in investments every week. Mr. Markosian paid Leshem $125,000 in reliance on Leshem and Hesterman's false promises.

*Leshem Unsuccessfully Attempts to List Rymark*

52.     Between early 2016 and mid-2019, Leshem and Hesterman tried unsuccessfully to list Rymark on European stock exchanges. According to Plaintiffs, Leshem began this process by using Mr. Markosian's money to purchase a dormant Swiss shell company, which was

renamed AmeriMark Automotive AG (one of the Plaintiffs here). Then, Plaintiffs say, AmeriMark Automotive acquired Rymark through a share exchange in which Rymark's sole shareholder – Mr. Markosian – swapped all of his stock for all of AmeriMark Automotive's stock.

53.     Leshem handpicked European attorneys at the firm of Gysi & Partner Rechtsanwalte AG – chiefly Daniel Gysi and Adrian Zehnder – to assist with the fraudulent transactions. On information and belief, these lawyers had assisted Leshem on prior pump-and-dump schemes. On Zehnder's recommendation,[4] Leshem installed Counter-Defendant Nicolai Colshorn as the director of AmeriMark Automotive. Leshem also solicited help from a German associate, Third-Party Defendant Alexander Coenen, who upon information and belief had worked with Leshem on prior pump-and-dump schemes.

54.     Plaintiffs say that Leshem initially tried to list AmeriMark Automotive on a French exchange, the Marche Libre. However, the Marche Libre did not accept AmeriMark Automotive for listing. Plaintiffs' Amended Complaint alleges – falsely – that this was because "a change in listing criteria for the Marche Libre segment of Euronext Paris [] made AmeriMark Automotive ineligible." (Dkt. 16 ¶ 41.) In fact, Leshem privately told others[5] (though not Mr. Markosian) that the attempted listing "failed" "through the malfeasance of Alexander Coenen."[6] In other words, the Marche Libre appears to have figured out that Leshem (and Coenen, who was helping Leshem) were trying to start a pump-and-dump scheme, and they refused to admit

---

[4] Exhibit 1 [PL_0000010848].
[5] Exhibit 2 [Hesterman0000787].
[6] Coenen was Leshem's confederate in the pump-and-dump scheme. Documents produced from Plaintiffs' files indicate that Coenen played a key role in promoting shares in the pump-and-dump; after the share price plummeted, investors contacted Colshorn to complain that they had bought shares "on the recommendation of Mr Coenen."

AmeriMark Automotive.

55.     Leshem changed tack, attempting to list AmeriMark Automotive on an exchange in Malta. This did not work either.

*Leshem Plans A "Reverse Merger" To Circumvent the Prior Denials*

56.     So in late 2017, Plaintiffs say, Leshem planned a shortcut: merge AmeriMark Automotive with a company *already traded* on the Marche Libre. Leshem selected a company called 4Service Cloud Tech AG.

57.     4Service Cloud Tech AG, on information and belief, was a prior pump-and-dump target of Leshem and Coenen. In correspondence,[7] Leshem noted the many similarities between 4Service Cloud Tech AG and AmeriMark Automotive: they had been incorporated by the same attorney, Daniel Gysi, they had the same director, Nicolai Colshorn, and Coenen had previously listed 4Service Cloud Tech.[8] (This is typical of pump-and-dump schemes: a united team of attorneys, listing agents, finders, and directors moves from one target to another.)

58.     By November 2017, the pump-and-dump scheme of 4Service Cloud Tech had petered out. Leshem noted in an email planning the next phase of the AmeriMark pump-and-dump that there was "almost no trading activity" of 4Service Cloud Tech's stock and that 4Service Cloud Tech's shares had "lost some 90% + of their value over time."

59.     Leshem's solution was to merge AmeriMark Automotive, which the Marche Libre had rejected for listing, with 4Service Cloud Tech. That way, Leshem could dodge the French authorities who had previously thwarted his attempt to pump-and-dump AmeriMark Automotive.

60.     According to Plaintiffs, Leshem carried out this "reverse merger" in May 2018.

---

[7] Exhibit 2 [Hesterman0000787].
[8] Coenen even pumped 4Service Cloud Tech on the social media site X. *See* https://x.com/MoojGuy/status/738309623124480000 (last visited June 24, 2024).

Then Leshem set about attempting to get new shares of the new entity – formerly 4Service Cloud Tech AG but by now renamed AmeriMark Group AG – listed on the Marche Libre (by this time called the "Euronext"). At this point, Leshem brought Capana personnel in to help with the scheme. In June 2018, he hired[9] Third-Party Defendant Stefan Kammerlander – subsequently a member of Capana's Board of Directors – to "certify" the reverse merger. Leshem also began emailing Bernhardt about the pump-and-dump scheme in June 2018.[10]

61. But the French authorities were not fooled. On April 16, 2019, the Euronext exchange sent a letter[11] that not only "refuse[d] the admission" of the new shares Leshem tried to list, but also "suspend[ed] trading" on the then-traded shares (*i.e.*, the old 4Service Cloud Tech shares) and "delist[ed]" those same shares. The exchange explained it had performed an "enhanced due diligence review" of Leshem's attempt to list AmeriMark Group, and that the investigation had revealed "market abuse and reputational risks." In other words, the Euronext figured out that Leshem was trying to set up a pump-and-dump scheme.

*The Creation Of AmeriMark Automotive And AmeriMark Group Was Illegal And Ineffective*

62. Defendants and Counterclaimants deny that the creation of either AmeriMark Automotive or AmeriMark Group, or any transaction those companies entered into, was effective. The companies were created for an illegal purpose – Leshem and Hesterman's pump-and-dump scheme – and transactions done for an illegal purpose are always ineffective.

63. Insofar as Mr. Markosian (or anyone else associated with Rymark) signed documentation associated with the creation of AmeriMark Automotive or AmeriMark Group, or any subsequent transaction either of those companies entered into, that documentation was

---

[9] Exhibit 3 [PL_0000007221].
[10] Exhibit 4 [PL_0000000886].
[11] Exhibit 5 [PL_0000008723].

fraudulently induced. Leshem and Hesterman represented that a listing on a European stock market was a legitimate way to raise capital. Both had a duty to disclose that they were actually operating a pump-and-dump scheme, a disclosure they never made.

64.     Regardless, forgeries drove the creation and operations of AmeriMark Automotive and AmeriMark Group. Evidence of forgery from the three-year period spanning 2016 to 2019 is (i) rampant and (ii) painfully obvious. For instance, one signature Leshem and Hesterman repeatedly forged belonged to a former Rymark employee named Eric Gardiner. Early on, however, Mr. Gardiner's first name on various forms was misspelled as "Heric." And Leshem and Hesterman, not realizing the mistake, signed "Heric":[12]





65.     Signatures were often forged in batches. Exhibit 24 to Plaintiffs' Amended

---

[12] Exhibit 6 [PL_0000004541]; Exhibit 7 [PL_0000001162].

Complaint is a stack of subscription forms. Plaintiffs present them as legitimate, but it could hardly be more obvious that the signatures are forged by a single person. Compare the following six signatures, all from Plaintiffs' Exhibit 24[13] and all clearly forged:



---

66.     And still other times, Leshem and Hesterman simply copied signatures – whether legitimate or forged – from one set of documents to another. Compare the following two "Heric Gardner" signatures.[14]  The signatures are identical – a single forgery, reproduced – but the documents have different dates, obviously because Leshem and Hesterman reused the signature (or modified the document):



---

[14] Exhibit 7 [PL_0000001162]; Exhibit 9  [PL_0000004641].

67.     Sometimes the forgery effort was so sloppy that Leshem and Hesterman didn't even bother attempting to forge the same signatures, or signatures in the same way. When Leshem and Hesterman forged a set of documents all (supposedly) signed on February 26, 2018, for instance, they signed "Eric Gardiner" once[15] and "Heric Gardiner" once[16]:



_____

[15] Exhibit 10 [Hesterman0000961].
[16] Exhibit 7 [PL_0000001162].

68.     Leshem and Hesterman were shameless about the forgeries, even joking about them in private communications. On July 9, 2018, for instance, Leshem told Hesterman to "obtain" – the quotation marks are Leshem's, and they mean *forge* – signatures of Eric Gardiner and Mathias Voigt on share transfer forms:[17]



69.     Many of the forgeries appear to be Hesterman's work. Hesterman's handwriting is distinctive; he writes in all-capital letters with a characteristic scrawl. Pursuant to a third-party subpoena, he produced many samples of his own handwriting, like the following:

---

[17] Exhibit 11 [Hesterman0000962].



70.     This handwriting matches script on many forged documents, *see, e.g.*, paragraph ##, *supra*.


71.     Plaintiffs and Hesterman also produced documents purportedly signed by Mr. Markosian that make no sense. For instance, Plaintiffs produced what they say are minutes from AmeriMark Automotive board meetings held in Frauenfeld, Switzerland, at which Mr. Markosian was the only attendee:

Present          Mr. Nicholas T. MARKOSIAN, Chairman of the Board

Chairman
It was noted that Mr. Nicholas T. MARKOSIAN was chairman of the meeting.

Notice and Quorum
The chairman reported that notice of the meeting had been given and noted that the quorum
necessary for a meeting of the board of directors was present.

Authority to Apply for Admission on Euronext (Paris) Marché Libre
It was resolved that the AmeriMark Automotive AG will apply for admission of trading of its securities
with the ▮▮▮▮▮▮▮▮▮ on the Marché Libre segment of Euronext Paris.

Close of Meeting
There being no further business the chairman declared the meeting for closed at 11:14h.

72.     Mr. Markosian, however, has never been inside Switzerland, let alone chaired any
meetings there, on his own and with no other attendees.

73.     Other forgeries, however, do not originate in Hesterman's documents, but in
Plaintiffs', meaning the forgeries were done by either Leshem, Colshorn, or both. This is true of
the most important forged documents: a set of subscription forms fabricated by Leshem in 2018
in an attempt to cover up Leshem's (and, subsequently, Capana's) theft of 13,000,000 shares of
AmeriMark Group.

*Whitetree Capital*

74.     By late 2018, Leshem had been trying to get Rymark listed on a European stock
exchange for years, with no success. He asked Mr. Markosian for more money, but Mr.
Markosian, understandably, was reluctant.

75.     So Leshem turned to theft. Sometime in late 2018 or early 2019, he took
13,000,000 shares in AmeriMark Group that belonged to Mr. Markosian and gave them to
Whitetree Capital, a company controlled by Leshem's friend, Erika Zorkadi. Mr. Markosian
never consented to this transfer and never signed any documentation related to it (including any

share certificates). Leshem just stole the shares.

76.    Leshem knew, however, that at some point the theft might be discovered. So he (sloppily) attempted to create a paper trail that might obscure the fraud. He, Colshorn, or both set about fabricating share subscription forms to make it appear as if Whitetree had come to own the 13,000,000 shares honestly.

77.    The original subscription forms in question were dated May 10, 2018, and were attached (with some exceptions)[18] as Exhibit 24 to Plaintiffs' Amended Complaint. The forms purported to effect a swap of AmeriMark *Automotive* shares for shares in AmeriMark *Group*. The original form for Mr. Markosian had him swapping 17,497,500 shares of AmeriMark Automotive for 19,441,667 shares of AmeriMark Group:



19'441'667 bearer shares with a nominal value of CHF 0.05 each
(total nominal value CHF 972'083.35)

I herewith commit myself to an unconditional contribution in kind of 17'497'500 shares of AmeriMark Automotive AG, in Frauenfeld, Switzerland, for 19'441'667 newly issued bearer shares of AmeriMark Group AG (former: 4Service Cloud Tech AG).

Place, date

For Nicholas T. Markosian:

Nicholas T. Markosian

---

[18] A forged subscription form for Eric Gardiner dated May 10, 2018 was, curiously, omitted from Exhibit 24. Presumably Plaintiffs realized that it was an obvious fake.

78.     Leshem and/or Colshorn, needing to fabricate a story for where Whitetree got its 13,000,000 shares, altered this form by keeping the same date and signature but reducing Mr. Markosian's share numbers by roughly 13 million:[19]



79.     Leshem also fabricated a subscription form for Whitetree that suggested Whitetree had actually been a shareholder in AmeriMark Automotive:[20]

---

[19] Exhibit 12 [PL_0000002053].
[20] *Id.*

80.     And Leshem fabricated subscription forms of several other purported shareholders (though usually modifying share numbers only by 1 share). Presumably, Leshem believed it would be less obvious that he had stolen 13,000,000 shares from Mr. Markosian if he reduced Mr. Markosian's holdings by not *exactly* 13,000,000 shares, but actually 13,000,012 shares. The remaining 12 shares were spread among other shareholders as Leshem and/or Colshorn fabricated several subscription forms.

81.     Mr. Markosian never consented to the transfer of any shares to Whitetree.

82.     At all times, Leshem concealed from Mr. Markosian that Whitetree supposedly owned 13 million shares of AmeriMark Group. It was not until Capana and AmeriMark Group sued Rymark and Mr. Markosian in the summer of 2023 that either Rymark or Mr. Markosian learned that Whitetree supposedly owned shares in AmeriMark Group.

*Orbital Formally Joins The Scheme*

83.     By early 2019, Whitetree had apparently tired of the pump-and-dump. So –

Plaintiffs say – Swiss attorneys approached Orbital AG, the parent company of Plaintiff and

Counter-Defendant Capana, for help. Orbital agreed to join the scheme and, in May 2019,

purchased an option to acquire Whitetree's stolen shares. The option price was CHF 12,500

(around $12,000 at that time). Both Leshem and Orbital's principal, Shaen Bernhardt, believed

that given the failure to list on the Euronext, the next listing step should be attempting to list

AmeriMark Group on a Viennese exchange called the Vienna Stock Exchange.

*Leshem Successfully Lists Rymark On The Vienna Stock Exchange*

84.     The Vienna Stock Exchange, however, only permits the listing of companies with

European operations. Rymark does not have European operations. So Leshem made some up. He

and Coenen collaborated on an "Information Document" that said, falsely, that AmeriMark

Group "intend[ed] to launch expansion into the sub-prime German and French automotive sales

markets" and that it had already "commenced plans to expand into the European markets." That

was not true. The Information Document also said that one of Leshem's cronies, Frank Hueser,

was AmeriMark Group's "European Markets Adviser." This, too, was false. AmeriMark Group

had no European operations at all.

85.     Leshem never sent the false Information Document to Rymark. Instead, Leshem

and Coenen submitted it to the Vienna Stock Exchange. Incredibly, though, they did not disclose

to the Vienna Stock Exchange that AmeriMark Group was 4Service Cloud Tech AG renamed, or

that 4Service Cloud Tech AG had been delisted on the Euronext. On information and belief,

Leshem and Coenen made these disclosures, AmeriMark Group never would have been listed on

the Vienna Stock Exchange.

26

86.     Vienna Stock Exchange officials were fooled. They admitted AmeriMark Group to trading on the Vienna Stock Exchange, and Leshem and Bernhardt's pump-and-dump was finally off to the races. Share sales commenced immediately, although Mr. Markosian never sold any shares or received any income from share sales.

*Fraudulent Telephone Number*

87.     Even once AmeriMark Group was listed, however, Leshem, Colshorn, and Bernhardt had to work furiously to keep Vienna Stock Exchange officials in the dark about the absence of *bona fide* European operations.

88.     In October 2019, the Vienna Stock Exchange Head of Listing and Indices, Martin Wenzl, learned that AmeriMark Group was formerly 4Service Cloud Tech and had been delisted on the Euronext: something Leshem and Coenen had not disclosed during the application process. Wenzl demanded that Coenen explain why the delisting had not been disclosed. So Coenen lied, saying that the delisting had "escaped" him and that he had not asked questions about AmeriMark Group's history.[21] This was false; Leshem had previously told Colshorn that Coenen was "made aware of [AmeriMark Group's] recent rejected to admission by the Euronext," and that Coenen was the one who had proposed attempting to list the company in Vienna.

89.     Leshem, though, was concerned that Wenzl was investigating and would discover the absence of European operations. In November 2019, Leshem worried[22] that AmeriMark's phone number went to "an English voice mail," and asked Colshorn if his office could "answer their number in German as AmeriMark and simply take messages," so as to give the impression

---

[21] Exhibit 13 [PL_0000003151] (translated from German).
[22] Exhibit 14 [PL_0000007310].

that AmeriMark had European operations. The key, Leshem said, was that when Wenzl "checks, everything is correct." Colshorn agreed to route AmeriMark phone calls to his personal cell phone until he could hire a telephone service. When the service was in place, Colshorn alerted Leshem, who in turn alerted Bernhardt that the telephone issue had been resolved.[23]

90.     Leshem also tasked Hueser with setting up an empty German AmeriMark affiliate to give the false impression of European activities. Bernhardt knew this, too, but it isn't clear whether the company was ever actually created; at one point in May 2021, Bernhardt promised to "check on the status" of the bogus company.[24]

*Bernhardt And Colshorn Work To Keep AmeriMark Group Listed Despite Investor Complaints*

91.     By mid-2020, AmeriMark's stock price had cratered, and investors who had purchased AmeriMark Group stock were unhappy. Some began reaching out to Martin Wenzl, the Vienna Stock Exchange's Head of Listing and Indices, to complain. Wenzl referred investors to Colshorn, who in turn went to Bernhardt for help. On July 14, 2020,[25] Colshorn forwarded an investor complaint to Bernhardt with a note: "we should act."  Bernhardt said he was putting together a "new email address" – apparently for investor complaints – and when Colshorn asked whether Bernhardt would respond to one particularly disgruntled investor, Bernhardt responded, "Yes, I will deal with it."

92.     Investors began complaining that they had been encouraged to purchase AmeriMark Group stock by an "online economics magazine," www.infoinvestor.co.uk, and suggesting that a ring of pump-and-dump schemers had been busted in July 2020.[26] Again,

---

[23] Exhibit 15 [PL_0000009120].
[24] Exhibit 16 [PL_0000002970].
[25] Exhibit 17 [PL_0000009070].
[26] Exhibit 18 [PL_0000008969].

Colshorn alerted Bernhardt.

93.     Wenzl was concerned by the investor complaints and began putting pressure on Colshorn to propose a solution. On August 19, 2020,[27] Colshorn emailed Bernhardt to ask if there was a "plan now for the future" and what the "status of Miron [Leshem] and the investor or what actions Miron is taking to make things right." According to Colshorn, he and Bernhardt needed to "present something" to Wenzl, or else he would "push the delisting" of AmeriMark Group shares. Colshorn added that Mr. Markosian would be "deleted from AmeriMark Automotive AG in the next few days" and asked Bernhardt what the "theoretical chances" were of "taking over Rymark Inc. in order to be able to build up a corresponding threatening backdrop that must be taken seriously by the Americans."

94.     On August 23, 2020, still without clarity from Bernhardt on how he should proceed, Colshorn asked point blank what he should "tell or present" to Martin Wenzl the next day. Bernhardt responded that he and AmeriMark Group's attorney, Felix Kappeler, would "have something for you first thing."[28]

95.     The next day, Leshem appeared with a plan. He told Colshorn that Capana – which Leshem described as "the Swiss vehicle through which I conduct business and [to] which Shaen [Bernhardt] is an advisor" – would (i) pay certain bills, (ii) acquire leftover "bearer shares" from the merger with 4Service Cloud Tech, and then (iii) convert these "bearer shares" to registered shares that could be traded publicly.[29] The idea was apparently to inject a large new number of shares into the market in order to continue the pump-and-dump. Leshem also said he was "working on a plan that should result in some significant liquidity in the shares of

---

[27] Exhibit 19 [PL_0000002874].
[28] *Id.*
[29] Exhibit 20 [PL_0000002861].

Amerimark" and "allow the current investors some type of exit strategy," and that he was hoping to "salvage the deal."

96.    Investors kept the pressure on, however. On August 31, 2020, one investor emailed Colshorn to accuse AmeriMark Group of "a possible market manipulation."[30] The investor also said that his attorneys had been to AmeriMark Group's supposed European headquarters and found nothing at all related to AmeriMark Group "except for a sign on a door that says 'NICOLAI.'"

*Rymark Sends Cease And Desist Letter*

97.    Investors began reaching out to Rymark personnel, including Mr. Markosian and Mr. Kirkland, with questions. Mr. Markosian and Mr. Kirkland were baffled: neither they nor Rymark had received any compensation from share sales, so complaints from individuals who had supposedly bought shares of AmeriMark Group made no sense.

98.    By mid-2020, AmeriMark's stock price had cratered, and investors who purchased AmeriMark Group stock began reaching out to Rymark personnel, including Mr. Markosian and Mr. Kirkland, with questions. Mr. Markosian and Mr. Kirkland were baffled: neither they nor Rymark had received any compensation from share sales, so complaints from individuals who had supposedly bought shares of AmeriMark Group made no sense.

99.    Rymark engaged counsel, and on September 16, 2020, counsel wrote to AmeriMark Group, Colshorn, Leshem, and Hesterman, explaining that Rymark had no connection or relationship to AmeriMark Group and demanding that AmeriMark Group stop representing that it owned Rymark.[31]

---

[30] Exhibit 21 [PL_0000004065].
[31] Exhibit 22 [PL_0000000585].

100.     The letter created a panic among Leshem, Bernhardt, and Colshorn. Bernhardt and Colshorn both realized that they were obligated to disclose the letter publicly. European Union regulations impose strict disclosure requirements on publicly traded European companies like AmeriMark Group. Companies are required to "inform the public as soon as possible of inside information which directly concerns" the company.[32] This is a continuous disclosure obligation. Information must be disclosed if it "would be likely to have a significant effect on the price[]" of the company's stock.[33] And a publicly traded company is required to "post and maintain on its website for a period of at least five years, all inside information it is required to disclose publicly."[34]

101.     But Bernhardt and Colshorn also knew that if the letter were disclosed publicly, the pump-and-dump would end. Rymark was the only asset in the (purported) AmeriMark Group structure; neither AmeriMark Automotive nor AmeriMark Group had any value aside from their (disputed) ownership of Rymark. And investors would not be willing to trade AmeriMark Group's stock if they realized that Rymark disputed whether AmeriMark Group owned it.

102.     So rather than disclose the letter, Bernhardt and Colshorn decided to try to make the letter go away. Bernhardt hired U.S. counsel – John Worden of Venable – and tasked Worden with strongarming Rymark into withdrawing the letter. Worden contacted Rymark's counsel and proposed a call with Bernhardt, whom – Worden said – "works with AmeriMark."

103.     On the ensuing call, and for months afterwards, Worden and Bernhardt attempted to cajole Rymark into withdrawing the September 2020 letter. Rymark asked basic questions

---

[32] European Union Market Abuse Regulation, Article 17(1). https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32014R0596
[33] *Id.* Art. 7(1)(a).
[34] *Id.* Art. 17(1).

about the scheme (and for a cap table of the relevant entities), but Worden and Bernhardt would not answer Rymark's questions. Instead, they demanded that Rymark withdraw the letter first. On October 15, 2020, Worden said that although Rymark might be "waiting for some information" from Bernhardt, the "Sept 16 letter [was] still out there," and that he thought they needed to "do something about [the] letter now." Worden asked Rymark whether it would "withdraw[] the statements" in the letter. Rymark refused.

104.    At this point, Bernhardt appears to have recognized that the clock was ticking on the pump-and-dump scheme. AmeriMark's stock price was low, and trading volume was almost nonexistent. Worse, Colshorn reported to Bernhardt on February 2, 2021[35] that unless AmeriMark Group could deliver a "timetable" to Martin Wenzl, AmeriMark Group would "have big problems with the Vienna Stock Exchange," and that Wenzl was even threatening "delisting" the shares. Less than a week later, Colshorn was complaining that "time is a little tight because of Wenzl" and that Capana needed to move on the fake German company.[36]

105.    So Bernhardt and Leshem concocted a new idea to keep the pump-and-dump going. Certain unlisted "bearer shares" were left over from the fraudulent transaction that had merged AmeriMark AG into AmeriMark Group. Bernhardt, Leshem, and Colshorn figured that they could apply to have these bearer shares listed on the Vienna Stock Exchange. And if the shares were admitted, the trio could release positive news about AmeriMark (whether true or false), drive the stock price up, and sell shares.

*Counter-Defendants Pump-And-Dump AmeriMark Group Stock*

106.    In early 2021, AmeriMark Group – at Leshem, Colshorn, and Bernhardt's

---

[35] Exhibit 23 [PL_0000005411].
[36] Exhibit 24 [PL_0000005459].

direction – submitted an application to the Vienna Stock Exchange to admit the 6.8 million

bearer shares. Then, Bernhardt directed Capana's U.S. attorneys to ask Rymark for updated

financials, the idea being that these financials could be released to juice AmeriMark Group's

share price.

107.    Rymark, though, was hesitant to provide any information to Bernhardt. So

Bernhardt and his U.S. attorney, Worden, lied to Rymark about the need for the information.

Rather than disclose that it would be used in the pump-and-dump scheme, they told Rymark that

the information would be used to seek new financing opportunities for Rymark.

108.    Between February and May 2021, Worden pestered Rymark relentlessly for the

financials, sometimes contacting Rymark multiple times in a single week, demanding to "speak

ASAP," and saying that there was a "certain urgency" to the situation. Neither Worden nor

Bernhardt ever disclosed that the "urgency" was that Capana believed it was close to getting the

6.8 million bearer shares listed and needed the financials to execute the pump-and-dump.

109.    Finally, Rymark agreed to "make financial info available pursuant to any third

party's interest in future potential loans, financing, etc." and asking that Capana send it a letter of

interest.

110.    Capana sent the letter of interest on April 30, 2021.[37] It requested audited

financials for 2020 for the purpose of seeking "potential financing for, or investment in Rymark,

Inc." This representation was false. Capana didn't want the financials to seek financing for

Rymark. It wanted the financials so it could publish them in Europe and pump-and-dump

Rymark's stock.

111.    Believing that they would soon have the financials and successfully list the bearer

---

[37] Exhibit 25.

shares on the Vienna Stock Exchange, Leshem, Colshorn and Bernhardt began to "pump" AmeriMark Group's stock price again through fraudulent press releases. On May 4, 2021, AmeriMark Group published a press release, in German,[38] stating that it had joined mobile.de, a German online vehicle marketplace. According to AmeriMark Group, the "admission" to mobile.de created "European market access" and would "open up immense potential for the business of AmeriMark Group AG."

112.    This was completely false. AmeriMark Group had not joined mobile.de and there was no potential for European operations of AmeriMark Group. The press release was a classic fraudulent pump-and-dump communication meant to send AmeriMark Group's share price higher so that Defendants could profit from duped investors.

113.    Rymark sent Capana the financials on May 6, 2021. AmeriMark Group then published the results in German online on May 11, 2021,[39] crowing that its "operating subsidiary," Rymark, had had a banner year and had shareholder equity of more than $5.5 million. But AmeriMark Group did not disclose to investors or market officials that Rymark disputed whether it was AmeriMark Group's "operating subsidiary." Nor did AmeriMark Group disclose that Rymark's financials – including the shareholder equity figure – were calculated independent of AmeriMark Automotive or AmeriMark Group. AmeriMark Group also falsely said that Rymark had "published"[40] its financial results. This wasn't true either. Rymark is privately held and does not publish its financials; Capana had to use false representations to dupe Rymark into giving its financials to Capana in the first place.

---

[38] Exhibit 26.
[39] Exhibit 27.
[40] The German word used was *Veröffentlichung*, meaning "publication."

114.    On May 12, 2021, the Vienna Stock Exchange announced that it would admit the 6.8 million bearer shares for trading. A renewed pump-and-dump was on.

115.    On May 17, 2021, AmeriMark Group issued *another* false press release[41] related to Rymark's financials. This press release made up some "discussion and analysis" from "management" regarding Rymark's financial results. The press release also said again that Rymark was AmeriMark Group's "operating subsidiary" – without disclosing the September 2020 letter.

116.    On May 12, 2021, Martin Wenzl – the Vienna Stock Exchange Head of Listing & Indices official  – saw AmeriMark Group's press release on Rymark's financials. Clearly skeptical, Wenzl asked to see a copy of the financials themselves, as well as for details of Rymark's business.[42] He also asked where the financials had been "published." Colschorn and Bernhardt huddled with AmeriMark Group's lawyer, Felix Kappeler, to draft a response that might appease Wenzl. Bernhardt's idea was to falsely describe the press release of the financials as being "motivated by wanting to report the core results to the market immediately," and to walk back the false representation that Rymark had "published" its financials.

117.    Meanwhile, the pump-and-dump was working: the false press releases had driven AmeriMark Group's stock price from €0.60 on May 3 to €2.50 on May 14: more than a 400% increase. Capana cashed in, selling AmeriMark Group shares on May 12, 13, 14, 19, 21, and 25, at the height of the pump-and-dump scheme. By May 27, the end of Capana's selling frenzy, the stock price had collapsed back to €0.52.

118.    Partway through the pump-and-dump, Austrian authorities leapt into action, and

---

[41] Exhibit 28.
[42] Exhibit 16 [PL_0000002970].

on May 21, 2021, the Austrian market authority – FMA – issued a warning regarding AmeriMark Group shares, noting that they appeared to be the subject of a pump-and-dump.

119.     On May 25, 2021, AmeriMark Group responded with another false press release,[43] this time insisting – falsely – that it endeavored to "remove the basis" for stock market letters or emails promoting AmeriMark Group stock "through constant publications within the legally required and permissible framework." In fact, AmeriMark Group was directly responsible for the false statements in the pump-and-dump.

120.     Things quickly came to a head with Wenzl, who emailed Colshorn on May 25[44] to note that despite AmeriMark Group's press release, the company's website did not make correct disclosures: among other things, it had no "News" updates since November 2020, no updates regarding AmeriMark's supposed (but actually nonexistent) German arm, an incorrect number of shares, and incorrect statements about Vienna Stock Exchange trading requirements. Colshorn promised Wenzl that the website would be updated. Wenzl then sent Colshorn a series of additional questions on May 28 about AmeriMark Group's corporate management.[45]

121.     Leshem, Bernhardt and Colshorn must have realized the end was near, because at this point the pump-and-dump grew even more brazen. On June 1, 2021, AmeriMark Group published another false press release[46] regarding European operations. This one said that AmeriMark was "taking a further step towards European expansions," namely, a planned inclusion in "AutoScout24," "one of Europe's largest online car markets." According to the press release, this would "offer[] AmeriMark Group AG another unique opportunity to tap into the

---

[43] Exhibit 29.
[44] Exhibit 30 [PL_0000003273] (in German).
[45] *Id.*
[46] Exhibit 31.

European automotive market," and AmeriMark Group would "officially submit offers in the used car sector via AutoScout24 in order to be able to offer mobility to flexible credit services for many more customers."

122.    Like the May 4 press release regarding mobile.de, this press release was completely false. Neither AmeriMark Group nor Rymark had any relationship with AutoScout24. Neither company had prospects for European operations. Colshorn, Leshem and Bernhardt were simply making it up as part of their pump-and-dump scheme.

123.    Mr. Wenzl, unsurprisingly, was extremely skeptical of the AutoScout24 press release. He emailed Colshorn,[47] noting that it was "not clear whether AutoScout itself" knew of the supposed deal with AmeriMark Group, and that the press release made no sense given that AmeriMark Group had "no employees." Wenzl demanded an immediate clarification.

*The Pump-and-Dump Scheme Collapses*

124.    That same day, Wenzl and Colshorn spoke on the phone regarding Wenzl's concerns. The call went disastrously for Colshorn. According to a summary sent by Wenzl afterwards,[48] Wenzl pointed out that the press release was obviously "fodder for stock market letters" and that there was "an attempt [] being made here to make money through pusher reports and selling the shares" – i.e., a pump-and-dump scheme. Colshorn did not deny that a pump-and-dump scheme was afoot but said, falsely, that he and AmeriMark Group had nothing to do with it. Colshorn was also wholly unable to provide any information about the supposed AutoScout24 deal. Wenzl, incredulous, noted that Colshorn was AmeriMark Group's director and yet appeared to have no relevant information. Wenzl also raised questions about Rymark, asking Colshorn to

---

[47] Exhibit 30.
[48] Exhibit 32 [PL_0000003261].

provide minutes from Rymark meetings. Colshorn said he "should" or "must" have the minutes. This was false; Colshorn didn't have any such minutes, and he knew it. Wenzl was again incredulous that Colshorn, as the "CEO of a listed company with a single operating investment" – Rymark – "obviously [did] not have" relevant documents. Wenzl also revealed that he called the phone number on AmeriMark's website and reached a "Ms. Jantischitz," who "said she was an Amerimark employee" – something Colshorn denied.

125.    The pump-and-dump scheme was clearly at an end. Kappeler directed Colshorn to put Wenzl off while he and Bernhardt drafted a response, "hopefully with sufficient flesh on the bone" to satisfy Wenzl.[49]

126.    At this point, even Colshorn appears to have gotten cold feet about the fraud. On June 6, 2021, he emailed Bernhardt, demanding payment of certain outstanding invoices he had sent to AmeriMark Group and complaining about "the serious mistakes AmeriMark is making."[50] He asked to discuss with Bernhardt "how we proceed." Bernhardt responded with characteristic scorn, accusing Colshorn of being "ungrateful" and saying that Capana had somehow protected Colshorn from "personal liability."[51] Colshorn, in turn, complained that he did not have a "responsible contact" at AmeriMark Group, which he needed to be compliant with Germany's money laundering statute.[52]

127.    At any rate, it was far too late for Bernhardt to save the pump-and-dump scheme. On June 8, 2021, Wenzl emailed Colshorn and Kappeler to tell them that the Vienna Stock Exchange would delist AmeriMark Group's shares.[53] The pump-and-dump was finished.

---

[49] Exhibit 33 [PL_0000002729].
[50] *Id.*
[51] *Id.*
[52] Exhibit 34 [PL_0000002716].
[53] Exhibit 35 [PL_0000003247].

*AmeriMark Becomes Mired In Shareholder Litigation*

128.    After the pump-and-dump scheme ended, Bernhardt, Leshem, and Capana set about trying to find some other way to make money from Capana's (stolen) stake in AmeriMark Group. They settled on using the shares for a capital contribution in a German company, Philomaxcorp AG. This is a common strategy in pump-and-dump schemes: pump-and-dump a stock until it is delisted or practically valueless, and then swap the stock for a stake in a new company, which can then be pumped-and-dumped. (This is, more or less, what Leshem did with 4Service Cloud Tech.)

129.    But Bernhardt, Leshem, and Capana's plan ran into a snag: shareholder litigation in Europe. A shareholder named Martin Nolle filed a complaint alleging that AmeriMark Group did not actually own Rymark. This led to a scramble in which Bernhardt pressured Colshorn to submit a sworn affidavit affirming that AmeriMark AG owned Rymark – but not disclosing, of course, the September 2020 letter in which Rymark disavowed being owned by AmeriMark AG. Colshorn eventually agreed to sign the affidavit, but only after Bernhardt promised him indemnity.

130.    In August 2022, Capana again sent a letter of interest to Rymark,[54] purporting to want to explore a "potential financing for, or investment in Rymark, Inc." Capana acknowledged that it had previously sent a letter of intent along the same lines in 2021 but said it had been "unable to follow up." This letter was signed by Kammerlander.

131.    This was, again, a fraud. Capana didn't "follow up" in 2021 because it never intended to: it wanted Rymark's financials to use in the pump-and-dump. And Capana was not genuinely interested in seeking "financing for, or an investment in," Rymark in 2022, either.

---

[54] Exhibit 36.

Instead, upon information and belief, Capana sought Rymark's financials for two other reasons: (1) it wanted to use them in the European litigation to convince Nolle and others that Rymark was, in fact, within the AmeriMark Group corporate structure; and (2) it intended to sue Rymark and argue that by producing the financials, Rymark had cooperated with AmeriMark.

*Capana Transfers The Stolen Shares To Philomaxcap*

132.    After three years' worth of efforts to persuade Rymark to retract the September 2020 letter, Bernhardt shifted tack again, this time proposing that Capana seek a "transaction" that would involve a sale of Rymark.[55] Under Bernhardt's proposal, Mr. Markosian would realize approximately $30 million in "value" from the sale, and Capana would deal with the "expense of preparing materials and securing a buyer."

133.    This was yet another lie. Bernhardt had no interest in arranging a sale of Rymark. Instead, he wanted Rymark to cooperate because the German shareholder litigation had heated up, and the shareholder plaintiffs were on the verge of discovering the September 2020 letter and Bernhardt's pump-and-dump scheme.

134.    Still, though, Rymark would not retract the September 2020 letter or agree to Bernhardt's latest scheme. So Worden threatened Rymark with a "fraud complaint," and then Capana filed this litigation in July 2023.

135.    Discovery in this litigation revealed, for the first time, that a pump-and-dump scheme was afoot, and that Leshem, Bernhardt, and Hesterman had been lying to Mr. Markosian and Rymark all along. Discovery also revealed, for the first time, that Leshem had stolen 13,000,000 shares of AmeriMark Group and given them to Whitetree, who in turn gave them to Capana. On January 17, 2024, Rymark's counsel sent Capana's counsel a letter explaining that

---

[55] Exhibit 37.

the shares appeared to have been "stolen from Mr. Markosian and transferred to your client."

136.     By this point, Bernhardt knew beyond any doubt that the 13,000,000 shares were stolen. But he was undeterred in his scheme to continue profiting from the shares. In February 2024, with full knowledge that the shares had been stolen, Capana contributed them to Philomaxcap in exchange for a controlling stake in that company. Philomaxcap, which is traded on four separate European stock exchanges, has not disclosed to the public that there is a dispute over whether its shares in AmeriMark Group are stolen. Nor has Philomaxcap disclosed to investors that Rymark disputes whether it is owned by AmeriMark Group.

## FIRST CAUSE OF ACTION

### Declaratory Relief

*Mr. Markosian and Rymark Against AmeriMark Automotive, Capana, and AmeriMark Group*

137.     Mr. Markosian and Rymark repeat and incorporate by reference the factual allegations included herein and in the Amended Answer, Dkt. 20.

138.     Mr. Markosian and Rymark are entitled to a declaration that Mr. Markosian is the sole owner of Rymark, Inc. and that Plaintiffs are estopped and disallowed from asserting any claim to the contrary.

139.     Mr. Markosian and Rymark are entitled to a declaration that any claim of Plaintiffs is barred by one or more of the doctrines of laches, unclean hands, waiver, estoppel, illegality, and acquiescence.

140.     Mr. Markosian and Rymark are entitled to a declaration that any transactions purporting to transfer ownership of Rymark to AmeriMark Automotive or AmeriMark Group are void as having been fraudulently induced or made for an illegal purpose, or as relying on forged documentation.

141.     Mr. Markosian and Rymark have an ongoing material interest in ensuring the clear title of Rymark.

142.     There appears to be a genuine controversy with respect to the ownership of Rymark.

143.     Mr. Markosian and Rymark therefore request that the Court issue an order resolving that controversy.

## SECOND CAUSE OF ACTION

### In The Alternative: Declaratory Relief

### *Mr. Markosian Against Capana, AmeriMark Group, and Philomaxcap AG*

144.     Mr. Markosian repeats and incorporates by reference the factual allegations included herein and in the Amended Answer, Dkt. 20.

145.     This cause of action is alleged in the alternative to a determination that Mr. Markosian is the sole owner of Rymark.

146.     A genuine controversy exists as to the ownership of 13,000,000 shares of AmeriMark Group which, Plaintiffs say, were transferred from Mr. Markosian to Whitetree Capital, then to Capana, and then to Philomaxcap AG. Mr. Markosian disputes that either AmeriMark Group or AmeriMark Automotive owns Rymark but, in the alternative, also disputes that the 13,000,000 shares were ever transferred from him and alleges that the shares were stolen.

147.     Mr. Markosian has an ongoing material interest in establishing title to the shares.

148.     Mr. Markosian therefore requests that the Court issue an order resolving the controversy regarding title to the 13,000,000 shares, and a declaration that Mr. Markosian is the rightful holder of title to those shares.

## THIRD CAUSE OF ACTION

**Civil Conspiracy**

*Mr. Markosian and Rymark, Inc. Against Capana, AmeriMark Automotive,*

*AmeriMark Group, Leshem, Hesterman, Bernhardt, Kammerlander, Colshorn, and Coenen*

149.    Mr. Markosian and Rymark repeat and incorporate by reference the factual

allegations included herein and in the Amended Answer, Dkt. 20.

150.    As set forth herein, Capana, AmeriMark Automotive, AmeriMark Group, Leshem,

Hesterman, Bernhardt, Kammerlander, Colshorn, and Coenen together formed a conspiracy with

the object of pumping-and-dumping AmeriMark Group stock and profiting therefrom and

depriving Mr. Markosian from as much of his ownership interests in Rymark as possible,

including through theft.

151.    Capana, AmeriMark Automotive, AmeriMark Group, Leshem, Hesterman,

Bernhardt, Kammerlander, Colshorn, and Coenen had a meeting of the minds as to the object of

their actions, namely, the pump-and-dump scheme and deprivation of Mr. Markosian's

ownership interests, money, and property.

152.    Capana, AmeriMark Automotive, AmeriMark Group, Leshem, Hesterman,

Bernhardt, Kammerlander, Colshorn, and Coenen each undertook fraudulent representations or

material omissions, or other unlawful, overt acts, towards one or more of Mr. Markosian,

Rymark, Martin Wenzl, the Vienna Stock Exchange, and others, in service of the conspiracy.

These fraudulent representations, material omissions, and other unlawful acts include, but are not

limited to the following:

      a.  Leshem and Hesterman falsely represented to Mr. Markosian and Rymark that

           Leshem and Hesterman would help Rymark raise money in Europe, without

           disclosing that actually, Leshem and Hesterman intended to pump-and-dump

Rymark's stock.

b.  Leshem, Hesterman, and/or Colshorn repeatedly forged documents in service of the conspiracy, including documents supposedly signed by Mr. Markosian, Mr. Gardiner, and other Rymark personnel.

c.  Leshem stole 13,000,000 shares of AmeriMark Group stock from Mr. Markosian and purported to transfer that stock to Whitetree and then on to Capana.

d.  Leshem, Colshorn, and Coenen submitted an "Information Document" to the Vienna Stock Exchange that falsely represented that AmeriMark Group had European operations.

e.  Leshem, Colshorn, and Coenen failed to disclose to the Vienna Stock Exchange that AmeriMark Group, as 4Service Cloud Tech, had previously been delisted on the Euronext exchange.

f.  Coenen falsely represented to Martin Wenzl that he was unaware of 4Service Cloud Tech having been delisted on the Euronext.

g.  Leshem, Bernhardt, and Colshorn schemed to keep the pump-and-dump secret by using Colshorn's cell phone, and then a telephone service, to give the false impression that AmeriMark Group had European operations.

h.  Leshem and Bernhardt collaborated on incorporating an empty German shell entity to give the false impression that AmeriMark Group had European operations.

i.  Leshem, Bernhardt, Colshorn, AmeriMark Group, and AmeriMark Automotive all failed to disclose the September 2020 letter in which Rymark disputed that it

was owned by AmeriMark Automotive.

j.  AmeriMark Group, at Bernhardt and Leshem's direction, issued multiple false press releases regarding (i) nonexistent partnerships with European used car marketplaces, (ii) Rymark financials, and (iii) a warning by Austrian officials that AmeriMark Group stock was the subject of a market manipulation scheme.

k.  Capana traded AmeriMark Group stock at inflated prices shortly after false press releases artificially inflated AmeriMark Group's stock price.

l.  Kammerlander and Bernhardt falsely represented to Rymark and Mr. Markosian that Capana wanted Rymark financial data for a good-faith effort to seek financing for Rymark, when in fact Capana wanted the data to pump-and-dump AmeriMark Group stock and deceive investors regarding Rymark's connection to AmeriMark Group.

m.  At Bernhardt's direction, Capana knowingly contributed 13,000,000 stolen shares of AmeriMark Group to Philomaxcap.

153.  At all relevant times herein, Kammerlander, Leshem, and Bernhardt acted as agents of Capana. Bernhardt also acted as an agent of AmeriMark Group and AmeriMark Automotive, as did Leshem, Hesterman, and Coenen. Colshorn was a director of AmeriMark Automotive and AmeriMark Group and acted as those companies' agent in that capacity.

154.  AmeriMark Group, AmeriMark Automotive, Capana, Leshem, Hesterman, Bernhardt, Kammerlander, Colshorn, and Coenen all took unlawful overt actions in furtherance of the conspiracy, and that conspiracy caused Rymark and Mr. Markosian damages, including punitive damages, in an amount to be proven at trial, but being no less than $126,750,000.

155.  The fraudulent statements and material omissions by the conspirators prevented

45

Rymark and Mr. Markosian from discovering the conspiracy until discovery in this action commenced.

## FOURTH CAUSE OF ACTION

**In The Alternative: Receiving/Retaining/Withholding/Disposing of Stolen Property**

**Utah Code Ann. § 76-6-408**

*Mr. Markosian Against Leshem, Capana, Bernhardt, and Philomaxcap AG*

156.    Mr. Markosian repeats and incorporates by reference the factual allegations included herein and in the Amended Answer, Dkt. 20.

157.    This cause of action is alleged in the alternative to a determination that Mr. Markosian is the sole owner of Rymark.

158.    As set forth herein, in either 2018 or 2019, Leshem stole 13,000,000 shares of AmeriMark Group stock from Mr. Markosian and purported to transfer those shares to Whitetree Capital. Thereafter, in 2022, Capana purported to exercise an option to purchase the 13,000,000 shares from Whitetree Capital.

159.    Capana knew or should have known in 2022 that the 13,000,000 shares were stolen as a result of the September 2020 letter from Rymark's counsel described herein.

160.    In January 2024, Capana came to understand beyond any doubt that the 13,000,000 shares were stolen. Nevertheless, it withheld the shares from Mr. Markosian, their true owner, and then disposed of the shares through a capital increase in Philomaxcap AG. Philomaxcap AG, similarly, is withholding the shares from Mr. Markosian unlawfully.

161.    The conduct herein violated Utah Code Ann. § 76-6-408(2).

162.    Mr. Markosian is entitled to treble damages, costs of suit, and attorney fees, pursuant to Utah Code Ann. § 76-6-408(8).

163.    At all times pertinent herein, Capana acted through its agent, Mr. Bernhardt, who is liable for Capana's actions.

164.    Mr. Markosian did not discover the theft of the 13,000,000 shares until discovery in this litigation.

## FIFTH CAUSE OF ACTION

### In The Alternative: Conversion

#### *Mr. Markosian Against Leshem, Capana, Bernhardt, and Philomaxcap AG*

165.    Mr. Markosian repeats and incorporates by reference the factual allegations included herein and in the Amended Answer, Dkt. 20.

166.    This cause of action is alleged in the alternative to a determination that Mr. Markosian is the sole owner of Rymark.

167.    As set forth herein, in either 2018 or 2019, Leshem stole 13,000,000 shares of AmeriMark Group stock from Mr. Markosian and purported to transfer those shares to Whitetree Capital. Thereafter, in 2022, Capana purported to exercise an option to purchase the 13,000,000 shares from Whitetree Capital. In doing so, Capana acted through its agent, Mr. Bernhardt, who is liable for Capana's actions. Capana therefore purports to have transferred the stolen shares to Philomaxcap AG.

168.    Mr. Markosian was deprived of the use and possession of the 13,000,000 shares.

169.    Capana, Bernhardt, Leshem, and Philomaxcap AG are liable for conversion of the 13,000,000 shares.

170.    Mr. Markosian is entitled to damages, including punitive damages, in an amount to be proven at trial.

171.    Mr. Markosian did not discover the conversion of the 13,000,000 shares until

discovery in this litigation.

## SIXTH CAUSE OF ACTION

### Fraudulent Inducement

### *Mr. Markosian and Rymark Against Leshem, Hesterman, Bernhardt, Kammerlander and Capana*

172.   Mr. Markosian and Rymark repeat and incorporate by reference the factual allegations included herein and in the Amended Answer, Dkt. 20.

173.   As set forth herein, Leshem, Hesterman, Bernhardt, Kammerlander and Capana made fraudulent representations and material omissions in service of the pump-and-dump scheme. These fraudulent representations are outlined more fully herein and include, but are not limited to:

a.   Leshem and Hesterman's representations that they could help Rymark raise money in Europe without disclosing that they actually intended to use Rymark for a pump-and-dump.

b.   Leshem and Hesterman's repeated forging of documents in service of the scheme.

c.   Capana's, Kammerlander's, and Bernhardt's false representations to Rymark and Mr. Markosian that Capana wanted Rymark financial data in a good-faith effort to seek financing for Rymark.

174.   The foregoing misrepresentations and material omissions, and the others set forth herein, were made to induce Mr. Markosian's and Rymark's reliance, and Mr. Markosian and Rymark actually and reasonably relied upon them.

175.   The foregoing misrepresentations and material omissions were made with

48

knowledge of their falsity.

176.    Mr. Markosian and Rymark did not discover the falsity of the foregoing false representations and material omissions until discovery in this action.

177.    As a result of the fraudulent representations herein, Mr. Markosian and Rymark have suffered damages, including punitive damages, in an amount to be proven at trial, but no less than $126,750,000.

## PRAYER FOR RELIEF

WHEREFORE, Defendants respectfully request that the Court enter:

1.    A declaration that Mr. Markosian is the sole owner of Rymark, Inc.

2.    In the alternative, a declaration that Mr. Markosian owned 13,000,000 shares of AmeriMark Group which were stolen from him.

3.    An Order awarding damages in an amount to be proven at trial, but which amount exceeds $126,750,000.

4.    An Order awarding punitive damages.

5.    An Order awarding reasonable attorney fees and costs.

6.    An Order granting Mr. Markosian and Rymark all such relief as the Court may deem just and proper.

## Jury Demand

Defendants demand a trial by jury on all issues triable by a jury.


DATED:

Respectfully submitted,

**KUNZLER BEAN & ADAMSON, PC**

/s/ *draft*
R. Jeremy Adamson
Chad S. Pehrson
Robert Harrington
Stephen Richards


*Attorneys for Defendants/Counter-Claimants/Third-Party Defendants*

