```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF UTAH

 3                       _ _ _

 4   CAPANA SWISS ADVISORS   )    CERTIFIED COPY
     AG, a Swiss corporation;)
 5   AMERIMARK AUTOMOTIVE AG,)
     a Swiss corporation;    )
 6                           )
         Plaintiffs,         )    Case No. 2:23-cv-0046-TS-CMR
 7                           )
     vs.                     )    Judge Ted Stewart
 8                           )
     RYMARK, INC., a Utah    )    Magistrate Judge:
 9   corporation; NICHOLAS   )    Cecilia M. Romero
     THAYNE MARKOSIAN, an    )
10   individual; JOHN        )
     KIRKLAND, an individual;)
11   and VICKKY SMALL, an    )
     individual,             )
12                           )
         Defendants.         )
13   ------------------------ )

14

15                   DEPOSITION OF

16                 MARTIN FASSER HEEG

17               KUNZLER BEAN & ADAMSON

18               SALT LAKE CITY, UTAH

19                 NOVEMBER 26, 2024

20

21

22

23

24

25
```

1      A.    Sorry?

2      **Q.    Was a vote held?**

3      A.    I would not remember at the time.

4      **Q.    And AmeriMark Automotive in this lawsuit is**

5  **represented by the two law firms listed at the top,**

6  **Parsons Behle & Latimer and Venable; is that correct?**

7      A.    That's correct.

8      **Q.    Is AmeriMark Automotive paying those two**

9  **firms bills?**

10     A.    I wouldn't know.

11     **Q.    AmeriMark Automotive doesn't have any money;**

12 **right?**

13     A.    Correct.

14     **Q.    So who's paying?  So I assume they're not,**

15 **it's not paying the bills.  Is that fair to say?**

16     A.    It's not paying the bills.  It's, I mean,

17 technically, now forgive me for being an accountant,

18 probably they expense it.  But paying is, now, again, I

19 would have to say assume, and I hate that word.

20     THE INTERPRETER:  (Converses with the witness.)

21     THE WITNESS:  I'm not sure.  My logic it must be

22 Capana, but I cannot confirm that it goes out of their

23 bank account.

24     **Q.    (BY MR. RICHARDS) Who are AmeriMark**

25 **Automotive's accountants?**

1   reflected in the public deed document; right?  Or at

2   least, I should say, the 19,000,000 number is the same?

3       A.   Yes.

4       Q.   Ends in 667; right?

5       A.   (No audible response.)

6       Q.   Let's go back to the Amended Complaint.

7       A.   (Complies.)

8       Q.   I'd like to go to paragraph 52.  Excuse me.

9   Paragraph 51.

10      A.   Yeah.

11      Q.   The transaction that created AmeriMark Group,

12  or I should say renamed the AmeriMark Group, took place

13  in June 2018?

14      A.   Sorry, again?

15      Q.   The reverse merger into AmeriMark Group took

16  place in June 2018; correct?

17      A.   (Peruses document.)

18           July '18, yes.

19      Q.   And Paragraph 51 refers to October of 2018;

20  correct?

21      A.   Correct.

22      Q.   And then paragraph 52 begins "During this

23  period, AmeriMark Group secured a new Cyprian investor,

24  WhiteTree Capital, Ltd., which demanded a significant

25  stock grant in order to fund ongoing expenses."

```
 1              Do you see that?

 2      A.   Yes.

 3      Q.   So when this says "during this period,"

 4  should I understand that this means, roughly, about

 5  October of 2018?

 6      A.   Yes.

 7      Q.   Is it true that WhiteTree demanded a

 8  significant stock grant in order to fund ongoing

 9  expenses?

10      A.   Yes.

11      Q.   What's the evidence in support of that?

12      A.   They own the share register with 13,000,000

13  shares.

14      Q.   So let's look at that share register.  I'm

15  going to mark it as Exhibit D-83.

16                 (Exhibit D-83 marked.)

17      Q.   (BY MR. RICHARDS) Is this the share register

18  you mean?

19      A.   (Peruses document.)

20           Yes.

21      Q.   It appears to be dated January 18, 2019.  Do

22  you see that?

23      A.   Yes.

24      Q.   And it looks like WhiteTree Capital is the

25  second to the last entry on the --
```

```
 1        A.   Mm-hm.

 2        Q.   -- register?

 3        A.   Correct.

 4        Q.   And it shows 13,000,000 shares?

 5        A.   Correct.

 6        Q.   And then Mr. Markosian, he's the final entry

 7   on the register; correct?

 8        A.   Correct.

 9        Q.   And his shows 6,441,655 shares?

10        A.   Correct.

11        Q.   Setting aside this document, is there any

12   other evidence that Mr. Markosian gave

13   WhiteTree Capital 13,000,000 shares?

14        MR. WORDEN:  Overbroad, calls for speculation,

15   calls for a legal conclusion.

16        MR. RICHARDS:  You can answer.

17        THE WITNESS:  Is there any other document?  That's

18   your question?

19        MR. RICHARDS:  Yeah.

20        MR. WORDEN:  He said evidence.

21        THE WITNESS:  Evidence.  I'm not aware of any

22   evidence.

23        Q.   (BY MR. RICHARDS) Any documents?

24        A.   Not aware of any documents.  I would only,

25   indirectly, WhiteTree financed the further efforts
```

 1   to -- to -- for going public for Markosian.

 2       Q.   Do you believe this document, the shareholder

 3   register, is reliable?

 4       A.   Absolutely.

 5       Q.   I'm sorry to have you do math on the fly, but

 6   if we add WhiteTree shares and Mr. Markosian's shares,

 7   the number we get to is 19,441,655.

 8       A.   Correct.

 9       Q.   And that's not the number of shares that

10   Mr. White -- that Mr. Markosian subscribed for;

11   correct?  And you can refer either to the subscription

12   form or to that document of the deed that you have in

13   front of you.

14       A.   In the deed it's also --

15       Q.   It says 19,441,667; correct?

16       A.   In the deed it says 655.

17       Q.   What does the subscription form say?

18       A.   667.

19       Q.   And the deed says 655?

20       A.   Yes.

21       Q.   So which number's correct?

22       A.   The one from the deed.

23       Q.   And why is that correct?

24       A.   Because it's notary approved.

25       Q.   But the deed relies on the subscription form;

```
 1   correct?

 2        A.   Yes.

 3        Q.   And the subscription form has a different

 4   number?

 5        A.   Yes.

 6        Q.   So why is it that the deed is correct if it

 7   relies on the subscription form with a different

 8   number?

 9        A.   I don't know.

10        Q.   You've never seen an agreement between

11   Mr. Markosian and WhiteTree; correct?

12        A.   Correct.

13        Q.   You've never seen any emails from

14   Mr. Markosian that reference WhiteTree?

15        A.   Correct.  Or I have never seen it, that's

16   correct.

17        Q.   I'm going to hand you a document that was

18   previously marked as Exhibit D-12.

19             (Exhibit D-12 previously marked.)

20        Q.   (BY MR. RICHARDS) Do you see that this is a

21   December 2, 2019 email from Nicole Kuster to

22   Miron Leshem?

23        A.   Yes.

24        Q.   And I think you previously testified you

25   think Ms. Kuster is an employee of Mr. Colshorn;
```

 1    correct?

 2         A.    Correct.

 3         Q.    So let's look at the first round bullet point

 4    in this email.  Ms. Kuster asks, "When and which share

 5    certificates did Nicholas T. sold to WhiteTree Capital

 6    before all of them exchanged their shares into

 7    registered shares of AmeriMark Group?"

 8              Does that question make any sense to you?

 9         A.    It's a valid question.

10         Q.    Did Mr. Markosian transfer shares to

11    WhiteTree Capital before the exchange into

12    AmeriMark Group or after?

13         A.    Before he exchanging -- sorry.  Again.  Can

14    you rephrase.

15         Q.    So Ms. Kuster's question asks which share

16    certificates Mr. Markosian sold to WhiteTree before all

17    of them exchanged their shares into registered shares

18    of AmeriMark Group.  So my question to you is did

19    Mr. Markosian give WhiteTree Capital 13,000,000 shares

20    before AmeriMark -- the reverse merge into

21    AmeriMark Group or after?

22         A.    I wouldn't know.

23         Q.    Well, the Complaint says it was after;

24    correct?

25         A.    Then it is correct.

1      Q.   And WhiteTree's not listed on the list of

2   shareholders in the public deed that exchanged

3   AmeriMark Automotive?

4      A.   Oh, yeah, sure.  Correct.

5      Q.   So it can't have been before; right?

6      A.   Correct.

7      Q.   Had to have been after?

8      A.   Absolutely.

9      Q.   But Ms. Kuster seems to think it's before;

10   correct?

11      A.   I don't know what she thinks, but it appears

12   so.

13      Q.   And this round bullet point continues.  "I

14   did find the file AmeriMark Subscription Agreements and

15   this agreements show very clear that WhiteTree already

16   owned shares of AmeriMark Automotive AG."

17           Do you see that?

18      A.   Correct.

19      Q.   So she attaches subscription forms in her

20   email and they're part of this exhibit.  There's 20 of

21   them.  I mean, you're welcome to count them if you'd

22   like to, but I'll represent that there are 20.

23      A.   No.  I'm not counting.

24      Q.   20's not the right number, right, 19 is the

25   right number; correct?

 1        A.    (Peruses document.)

 2              Why should 19 be correct?

 3        Q.    **There are 19 shareholders listed in the**

 4  **public deed; correct?**

 5        A.    Well, whatever the public deed says is

 6  correct.

 7        Q.    **So there are 19 listed there, so there should**

 8  **be exactly 19 subscription forms; correct?**

 9        A.    Correct.

10        Q.    **And there are 20 here?**

11        A.    Correct.

12        Q.    **And I'll represent to you that the extra is**

13  **the second to last form.**

14        A.    Second to last.  Okay.  Yes.

15        Q.    **For WhiteTree Capital.  And this subscription**

16  **form appears to indicate that WhiteTree Capital**

17  **exchanged 11,700,117 shares of Automotive in exchange**

18  **for 13,000,000 shares of Group; correct?**

19        A.    Correct.

20        Q.    **Is that what happened?**

21        A.    Well, following the deed, no.

22        Q.    **So why does this subscription form exist?  Do**

23  **you have any idea?**

24        A.    No.

25        Q.    **If you look at the last subscription form in**

```
 1    the set you were just looking at, yeah, that one, this

 2    is Exhibit D-12, that subscription form is for

 3    Mr. Markosian; correct?

 4        A.   Correct.

 5        Q.   And it says that he exchanged 5,797,547

 6    shares of Automotive in exchange for 6,641,655 shares

 7    of Group; yes?

 8        A.   Correct.

 9        Q.   And those are -- that's not the number in the

10    public deed; correct?

11        A.   Yes, it is the number in the public deed.

12        Q.   The public deed says 19,000,000.

13        A.   Oh, okay.  Yeah, sorry, sorry.

14        Q.   And this says 6,000,000; correct?

15        A.   Correct.

16        Q.   So I'm now going to mark you, excuse me, hand

17    you what is already marked Exhibit D-13.

18             (Exhibit D-13 previously marked.)

19        Q.   (BY MR. RICHARDS) I pieced together this

20    exhibit on my own.  What this exhibit is, is on the

21    first page is a subscription form that was attached to

22    the Complaint and on the second page is a subscription

23    form from Ms. Kuster's email that we looked at just

24    now.

25             So you see, for instance, on the first page
```

1   of this exhibit the first form is for Mr. Markosian and

2   it's for 19,441,667 shares; correct?

3       A.   Correct.

4       Q.   And the second form is also for

5   Mr. Markosian, but with a different number of shares;

6   correct?

7       A.   Correct.

8       Q.   But the signatures and the dates are the

9   same; right?

10      A.   Correct.

11      Q.   Do you see that on the second page, do you

12  see two faint lines that form a right angle around the

13  subscription form portion of the page above the

14  signature lines?  Do you see where I mean?

15      A.   Yeah, I believe so.

16      Q.   Do you have any idea why there would be two

17  sets of subscription forms with the same dates and same

18  signatures with different share numbers?

19      A.   No, I don't.

20      Q.   Do you think it might have been to try to

21  make up a WhiteTree transaction that didn't actually

22  exist?

23      A.   As I said, I don't know.

24      Q.   The next two pages are for Dr. Michael

25  Markosian.  These share numbers are different as well;

```
 1   correct?

 2        A.   Yeah.  By one.

 3        Q.   And Richard Markosian also different by one;

 4   correct?

 5        A.   Yes.

 6        Q.   Bruce Markosian different by one?

 7        A.   Correct.

 8        Q.   John Paul Markosian different by one?

 9        A.   Yes.

10        Q.   Lewis Markosian different by one?

11        A.   Yes.

12        Q.   Jacob Wilhite different by one?

13        A.   Yes.

14        Q.   Ethan Wilhite different by one?

15        A.   Yes.

16        Q.   Jennifer Markosian different by one?

17        A.   Yes.

18        Q.   Bill Holmes different by one?

19        A.   Yes.

20        Q.   Guz Camacho different by one?

21        A.   Yes.

22        Q.   And Paul Markosian different by one?

23        A.   Yes.

24        Q.   One more.  Nicholas Markosian different by

25   one; yes?
```

```
 1        A.   Yes.
 2        Q.   And you're aware of no explanation why two
 3   sets of subscription forms exist with different
 4   numbers?
 5        A.   I was not involved in the company at the
 6   time, correct.
 7        Q.   When you're elected to a board, do you not
 8   care about what happened until you were elected?
 9        A.   I do care, but -- yeah, I do care.
10        Q.   Have you investigated this at all --
11        A.   No.
12        Q.   -- these different forms?  No?
13        A.   No.
14        Q.   Has anyone asked you to?
15        A.   No.
16        Q.   Why haven't you investigated them?
17        A.   Why should I?
18        Q.   Because you verified a Complaint under
19   penalty of perjury; correct?
20        A.   I have a share register which confirms the
21   shareholder.
22        Q.   So why is the share register correct?
23        MR. WORDEN:  Asked and answered.
24            You can go ahead.
25        THE WITNESS:  And answer?
```

```
 1        MR. RICHARDS:  Yeah, you can answer.  You can

 2   answer.

 3        MR. WORDEN:  Unless I specifically say don't

 4   answer --

 5        THE WITNESS:  Okay.

 6        MR. WORDEN:  -- go ahead.

 7        THE WITNESS:  It's board's duty to ensure that it

 8   is correct and I have no reason to doubt the

 9   correctness.

10        Q.   (BY MR. RICHARDS) That the two sets of

11   subscription forms aren't a reason to doubt the

12   correctness?

13        A.   Correct.  Somebody must have changed their

14   mind.

15        Q.   And then signed the document with the exact

16   same signature and date?

17        A.   Yes.

18        Q.   Do you know who -- do you assume, based on

19   the signature, that Mr. Colshorn created this

20   shareholder register?

21        A.   Sorry.  Again.

22        Q.   Do you assume, based on the signature on the

23   shareholder register, that Mr. Colshorn created it?

24        A.   Whether he put the numbers and the -- the --

25   the names into an Excel, I cannot confirm, but he
```

1    signed it.

2         Q.   Does it seem like the shareholder register

3    probably relied on the second group of subscription

4    forms?

5         MR. WORDEN:  Calls for speculation.

6              You can answer.

7         THE WITNESS:  It's -- well, it relies on the

8    public deed.

9         Q.   (BY MR. RICHARDS) But the public deed doesn't

10   include WhiteTree?

11        A.   Correct.

12        Q.   So how does the shareholder register rely on

13   the public deed?

14        A.   There must have been a transaction after the

15   capital increase.

16        Q.   And an undocumented transaction; correct?

17        A.   I have no document, that's correct.

18        Q.   All right.  I'm going to now hand you what's

19   been marked as Exhibit D-15.

20              (Exhibit D-15 previously marked.)

21        Q.   (BY MR. RICHARDS) Do you see that this is an

22   email from Miron Leshem to Nicole Kuster dated

23   December 2, 2019?

24        A.   December 2, 2019.  Yes.

25        Q.   Copying Mr. Colshorn; correct?

 1      A.   Yes.

 2      Q.   And you see below that this is actually a

 3 response to the email we just looked at; correct?

 4      A.   (Peruses document.)

 5           It appears so, yes.

 6      Q.   And so the first thing Mr. Leshem says in his

 7 email is "I. WhiteTree acquired the shares prior to the

 8 subscription and, therefore, subscribed for shares of

 9 AmeriMark Group AG."

10           Is that true?

11      A.   Mm-hm.

12      Q.   Is that true?

13      A.   I don't know at the time.

14      Q.   Do you know --

15      A.   It's written here.

16      Q.   But is it true that WhiteTree acquired the

17 shares prior to the subscriptions?

18      A.   Again, I don't know at the time.  At the time

19 is today.

20      Q.   If that were true, would WhiteTree be listed

21 in the public deed?

22      A.   Yes.

23      Q.   And it's not listed in the public deed?

24      A.   Correct.

25      Q.   So this can't be true?

```
 1        A.   Correct.

 2        Q.   Setting aside the conversations you had with

 3   counsel to prepare for this deposition, which I don't

 4   want to hear about, have you ever discussed these

 5   subscription forms with Mr. Bernhardt?

 6        A.   No.

 7        Q.   I'm going to send -- I'm going to give you

 8   one more set of subscription forms and then we'll move

 9   on from this topic.  This one has been previously

10   marked as Exhibit D-14.

11              (Exhibit D-14 previously marked.)

12        Q.   (BY MR. RICHARDS) So this document is five

13   subscription forms.  If you look at the first three,

14   you'll see that the first one is for Eric Gardiner

15   beginning with an E.

16        A.   Yes.

17        Q.   And the second is for Heric Gardiner

18   beginning with an H, H-e-r-i-c.  Do you see that?

19        A.   Yes.

20        Q.   And the third one is Eric Gardiner again.

21        A.   Yes.

22        Q.   And these all have different signatures on

23   them; correct?

24        MR. WORDEN:  Calls for speculation.

25        THE WITNESS:  What was the question?
```

1      Q.    (BY MR. RICHARDS) These all have different

2  signatures on them; correct?

3      A.    Yes.

4      Q.    But they're all dated May 10, 2018; correct?

5      A.    Correct.

6      Q.    And the signature for Heric Gardiner on the

7  second page appears to begin with an H; correct?

8      A.    Yes.

9      Q.    Do you know who Heric Gardiner is?

10     A.    No, I don't know.

11     Q.    Do you know if it's a misspelling of

12  Eric Gardiner?

13     A.    I don't know.

14     Q.    If your name were misspelled on a document

15  and you were asked to sign it, would you spell your

16  name with a misspelling in it?

17     MR. WORDEN:  Objection; foundation, calls for

18  speculation.

19     THE WITNESS:  I would correct it by hand.

20     Q.    (BY MR. RICHARDS) And that -- you don't see

21  that it's corrected on this document, the second one;

22  correct?

23     A.    Correct.

24     Q.    The share numbers on these forms are all

25  identical; correct?

 1      A.   Share numbers?
 2      Q.   16,667.  See that?
 3      A.   Yes.
 4      Q.   Are you aware of any explanation why there
 5   would be three forms with the same date and the same
 6   share number, but different signatures?
 7      MR. WORDEN:  Same objections.
 8      THE WITNESS:  The same signature of whom?
 9      Q.   (BY MR. RICHARDS) I'm sorry, maybe I asked my
10   question poorly.  Can you explain why there are three
11   subscription forms for Eric or Heric Gardiner that are
12   all dated May 10th, 2018, but have different signatures
13   on them?
14      A.   And the question is whether I can explain?
15      Q.   Yeah.
16      A.   No, I cannot explain.
17      Q.   Do you know which of these documents, if any,
18   was actually signed by the real Eric Gardiner?
19      A.   No.
20      Q.   Have you ever asked anyone?
21      A.   No.
22      Q.   Does it matter to you?
23      A.   Oh, I would refer back to the public deed.
24           (Peruses document.)
25           There is an Eric Gardiner.

1      Q.   Will you now look at the last two

2   subscription forms.

3      A.   Yes.

4      Q.   These are both for a company

5   Friends and Equity GmbH; correct?

6      A.   Yes.

7      Q.   Do you know what that company is?

8      A.   What's the question?

9      Q.   Do you know what that company is?

10     A.   No, I don't know.

11     Q.   The date on both of these documents is the

12  same; correct?

13     A.   Correct.

14     Q.   But the share numbers are different; correct?

15     A.   Yes, the date is the same.

16     Q.   But the shares numbers are different;

17  correct?

18     A.   Difference of one.

19     Q.   Yeah.  And the signatures are different as

20  well; correct?

21     A.   Yes.

22     Q.   In the left-hand side on the first one, does

23  that signature appear to say something like Friends and

24  Family?  Do you have any idea?

25     A.   Yes, it appears so.

1    Q.   When you're asked to sign a document on

2    behalf of a company, do you write the company's name or

3    do you write your name?

4         MR. WORDEN:  Calls for speculation, foundation.

5         THE WITNESS:  I only know from other companies

6    that they sign in the name of the company and not in

7    the name of the audit partner in charge, but other than

8    that, I'm not aware of being normal to sign in the name

9    of the company.

10        Q.   (BY MR. RICHARDS) Okay.  Let's do some

11   exhibit cleanup.  You can set to the side the

12   subscription forms, including the two emails about the

13   subscription forms, as well as the shareholder

14   registry, but please keep the Amended Complaint out.

15        A.   (Complies.)

16        Q.   Let's turn to page 18 of the Amended

17   Complaint and look at page, excuse me, paragraph 46.

18   Do you see where I mean?

19        A.   Yes.

20        Q.   This reads "By the fall of 2018, the listing

21   process had bogged down again.  Expenses continued to

22   pile up and changes in the Euronext exchange's listing

23   rules caused more delays."

24             Do you see that?

25        A.   Yes.