# EXHIBIT 3

# ACQUISITION and REVERSE MERGER AGREEMENT

This Acquisition Agreement (the "Agreement") is effective this _____ day of February 2018,

**BETWEEN:**      **AmeriMark Automotive AG** (the "Company"), (company registration number: 100.954.940), a company organized and existing under the laws of Canton Thurgau, Swiss Federation, with its head office located at:

Breitenstrasse 16,
8500 Frauenfeld
Switzerland

**AND:**      **4 Service Cloud Tech AG** (the "Purchaser"), a publicly traded company on the Euronext Access MTF (ticker symbol: MLOVE/registration number: 356.633.696) a company organized and existing under the laws of the Canton Appenzell, Swiss Federation, with its head office located at:

Fadenrainstrasse 7
9053 Teufen
Switzerland

RECITALS

The Company, through its U.S. based subsidiary, Rymark, Inc., operates a business known as Markosian Auto that engages in the business of selling, leasing and financing automobiles and other vehicles to the sub-prime borrower.

The Company desires to exchange all of its shares with those of the purchaser pursuant to a Share Exchange Agreement by and between the Purchaser and the Company's shareholders, and Purchaser desires to purchase from the Company, all of its 18,000,000 registered shares (CHF 0.05 nominal value) issued and outstanding in exchange for the issuance of 9,000,000 shares (the "ACQUISITION SHARES"); all on the terms and conditions set forth in this Agreement.

In addition, the Company shall remit cash consideration to Purchaser pursuant to the terms and conditions of this Agreement as defined below.

The parties hereto agree and acknowledge that the issuance of 9,000,000 shares of the Purchaser's common stock shall result in the Company's shareholders remaining the majority shareholders and shall thus constitute a "reverse merger" wherein the resulting entity ("Resulting Entity") shall become listed and publicly traded on the Euronext Access Multilateral Trading Facility ("MTF").

In connection with this Agreement, the parties are concurrently entering into a Share Exchange Agreement Exhibit ["A"] (the "Share Exchange Agreement") and a Promissory Note [Exhibit "B"] in the amount of EU 250,000. These Agreements are referred to herein as the "ANCILLARY AGREEMENTS."

NOW, THEREFORE, in consideration of the above recitals and the mutual covenants hereinafter set forth, Purchaser and The Company hereby agree as follows:

## 1. CONSOLIDATION AND SHARE EXCHANGE

**1.1** The Purchaser shall first consolidate all of its 3,400,000 current shares issued and outstanding (CHF 0.10 nominal value) on a 1 for 25 basis such that the Purchaser, prior to issuing shares to the Company, shall have total share capital of 136,000 shares issued and outstanding at CHF 2.5 nominal value.

### 1.2 Capital Decrease

The Purchaser shall, after consolidation of its shares as described in Section 1.1 above, implement a capital decrease whereby the Purchaser shall cause the Nominal Value of its shares to be reduced by the maximum amount allowed by the relevant Swiss statute, which amount shall be determined by the operating loss of the Purchaser.

### 1.3 Capital Increase and Share Exchange

The Purchaser shall issue to the Shareholders of the Company 9,000,000 common shares of its capital stock as contribution "in kind" for said shares such that the Company shareholders shall now be the majority shareholders of the Company and be the beneficial owners of approximately 97.5% of the remaining entity's issued and outstanding shares.

### 1.4 Closing

Closing shall take place on or about the date of the Extraordinary Meeting of the Shareholders of the Purchaser at the offices of Gysi and Partner.

## 2. REVERSE MERGER

### 2.1 Submission of Documents

Following the closing, the Purchaser and The Company shall submit or cause to be submitted to the Listing Department of the Euronext any and all documentation necessary to obtain authorization by the Euronext for the Reverse Merger and the listing and tradability of the resulting Entity. Such documents shall include, bit not be limited to:

1. An Information Memorandum prepared by the Company's Investment banking Consultant.
2. The Minutes of the Purchaser's EGM of Shareholders authorizing the Consolidation, capital decrease and issuance of shares to the Company.
3. Any ancillary Agreements hereto
4. Any other due diligence items as might be required by the Euronext.

### 2.2 Name Change

The Purchaser, shall, in the EGM vote to alter the name of the Resulting Entity to: AmeriMark Automotive AG.

### 3.0 Additional Consideration Owed by Company

#### 3.1 Cash

In consideration of the Reverse Merger of the Company into the Purchaser's listed vehicle, the Company shall:

a) Pay to the Purchaser or his assigns the sum of EU 250,000. The Company shall pay 30% of the net proceeds of the first share sales realized from sales on the Euronext Access MTF subsequent to the Reverse Merger until such time as the full EU 250,000 is paid to Purchaser. This amount shall be guaranteed by a Promissory Note (Exhibit "B" of this Agreement) due on the one-year anniversary of the date of admission of AmeriMark to trading on the Euronext MTF.

b) Issue to the Company or it's Principal Shareholder Orie Rechtman a number of shares equal to 2.5% of the shares issued and outstanding of the resulting entity after Closing of the transaction.

c) Simultaneous with the close, the three operational subsidiaries of Purchaser (Landmark DBA 4Service Cloud Tech, Riteman Inc DBA ITatOnce and California Recycles Inc) will be spun out to Crednology Holding Corp (COHO) and/or his designee.

### 3. EVENT OF DEFAULT AND RECISSION

#### 3.1 Rescission

In the event the Company does not pay or cause to be paid to the Purchaser the sum total of EU 250,000 by the one –year anniversary of the date of admission of the Resulting Entity to the Euronext Access MTF, the Company hereby agrees to transfer any and all unsold shares of the Resulting Entity held by its shareholders to the Purchaser and or its assigns. Such transfer of shares shall effectively constitute a rescission of the transaction.

#### 3.2 Company's assets and business revert to original ownership

Should an event of default and rescission occur, it is understood that the Company shall retain any and all of its own original assets, businesses, operations and intellectual property and the Purchaser shall have no claim thereon.

### 4. ASSUMPTION OF LIABILITIES AND OBLIGATIONS

#### 4.1 No Assumed liabilities

The Resulting Entity shall not assume or become obligated in any way to pay any liabilities, debts or obligations of the including but not limited to any liabilities or obligations now or hereafter arising from or with respect to, the sale or license of any products or services of the Purchaser that occurred prior to the Closing, the termination by the Purchaser of the employment of any current or future employees of the Purchaser or any of its affiliates.

### 4.2 No obligations to third parties

The execution and delivery of this Agreement shall not be deemed to confer any rights upon any person or entity other than the parties hereto, or make any person or entity a third party beneficiary of this Agreement, or to obligate the parties to any person or entity other than the parties to this Agreement.

## 5. REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Company that all the following statements are true, accurate and correct:

### 5.1 Organization and good standing

Purchaser is a corporation duly organized, validly existing and in good standing under the laws of Canton Appenzell, Swiss Federation and has the corporate power and authority to own, operate and lease its properties and to carry on its business as now conducted and as proposed to be conducted, and is qualified as a foreign corporation in each jurisdiction in which a failure to be so qualified could reasonably be expected to have a material adverse effect on its present operations or financial condition.

### 5.2 Power, authorization and validity

    5.2.1    Purchaser has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement, and all agreements to which Purchaser is or will be a party that are required to be executed pursuant to this Agreement (the "PURCHASER ANCILLARY AGREEMENTS"). The execution, delivery and performance of this Agreement and the Purchaser Ancillary Agreements have been duly and validly approved and authorized by Purchaser's Board of Directors.

    5.2.2    No filing, authorization or approval, governmental or otherwise, is necessary to enable Purchaser to enter into, and to perform its obligations under this Agreement and the Purchaser Ancillary Agreements, except for

a) rules of laws governing specific performance, injunctive relief and other equitable remedies and

b) the enforceability of provisions requiring indemnification in connection with the offering, issuance or sale of securities;

### 5.3 No violation of existing agreements

Neither the execution and delivery of this Agreement nor any Purchaser Ancillary Agreement, nor the consummation of the transactions contemplated hereby or thereby, will conflict with, or (with or without notice or lapse of time, or both) result in a termination or material breach or violation of

a) any provision of the Articles of Incorporation of Purchaser, or the Bylaws of Purchaser, all as currently in effect,

b) in any material respect, any agreement material to Purchaser's business

c) any federal, state, local or foreign judgment, writ, decree, order, statute, rule or regulation applicable to Purchaser or its assets or properties.

### 5.4 Capitalization

The authorized capital stock of Purchaser consists of 3,400,000 shares of Common Stock. 3,400,000 shares of Purchaser Common Stock were issued and outstanding Purchaser as of January 23, 2018.

There are no options, warrants, calls, commitments, conversion privileges or preemptive or other rights or agreements outstanding to purchase any of Purchaser's authorized but unissued capital stock or any securities convertible into or exchangeable for shares of Purchaser Capital Stock or obligating Purchaser to grant, extend, or enter into any such option, warrant, call, right, commitment, conversion privilege or other right or agreement, and there is no liability for dividends accrued but unpaid. There are no voting agreements, rights of first refusal or other restrictions.

### 5.6 Litigation

There is no claim, action, suit or proceeding pending or, to Purchaser's knowledge, threatened, against Purchaser, at law, in equity, by way of arbitration or before any governmental department, commission, board or agency that might have a material adverse effect on Purchaser, nor is Purchaser aware of any reasonable basis therefore. There are no judgments, decrees, injunctions or orders of any court, governmental department, commission, agency, instrumentality or arbitrator against Purchaser.

## 6. REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to Purchaser that, Disclosure Letter delivered concurrently all of the following statements are true, accurate and correct:

### 6.1 Corporate organization

The Company is a corporation duly organized, validly existing, and in good standing under the laws of the Canton Thurgau, Swiss Federation. The Company is duly qualified to transact business as a foreign corporation, and is in good standing, in all jurisdictions where the failure to be so qualified would adversely affect the Business. The Company has all necessary corporate power enter into this Agreement and all assignments or other documents that the Company is required to execute and deliver hereunder, including without limitation the Ancillary Agreement (the " the Company ANCILLARY AGREEMENT"), and holds all permits, licenses, orders and approvals of all federal, state and local governmental or regulatory bodies necessary and required therefore. For purposes of this Section 5.1 and with respect to Section 5.2, each representation and warranty given herein and therein shall be deemed, as applicable, a separate representation and warranty of each of the Company (not including Subsidiary) and Subsidiary.

### 6.2 Power and authority; no default upon transfer

The execution, delivery and performance by the Company of this Agreement and the Company Ancillary Agreements, and the consummation of all the transactions contemplated hereby and thereby, have been duly and validly authorized by the Company by all necessary corporate action of the Company's Board of Directors and shareholders. This Agreement and the Company Ancillary Agreements, when executed and delivered by the Company, will be duly and validly executed and delivered and will be the valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms, except as to the effect, if any, of

a) applicable bankruptcy and other similar laws affecting the rights of creditors generally,

b) rules of law governing specific performance, injunctive relief and other equitable remedies and

c) the enforceability of provisions requiring indemnification in connection with the offering, issuance or sale of securities.

Neither the execution and delivery of this Agreement or the Company Ancillary Agreements by the Company, nor the performance by the Company of its obligations under this Agreement or the Company Ancillary Agreements, will

i) violate the Company's Certificate of Incorporation or By-Laws,

ii) result in a material violation or breach of, or permit any third party to rescind any term or provision of, or constitute a default under, any loan, note, indenture, mortgage, deed of trust, security agreement, lease or material contract.

iii) violate any Swiss Law, statute, rule or regulation or order, writ, judgment, injunction or decree of any court, administrative agency or government body applicable to the Company or the Business.

### 6.3 Litigation

There is no claim, action, suit or proceeding pending or, to the Company's knowledge, threatened, against the Company (including but not limited to any claim, action, suit or proceeding relating to or affecting at law, in equity, by way of arbitration or before any governmental department, commission, board or agency that might have a material adverse effect on the Business nor is the Company aware of any reasonable basis therefore. There are no judgments, decrees, injunctions or orders of any court, governmental department, commission, agency, instrumentality or arbitrator against the Company affecting the [Assets or Business.

### 6.4  Compliance with Laws

In the operation of its Business, the Company has, to the best of the Company's knowledge, duly complied with all applicable laws, rules, regulations and orders of federal, state, local and foreign governments (including but not limited to all export control laws and regulations of the USA or any governmental, authority or agency of the USA government.

### 6.5  Material misstatements or omissions

No representation or warranty by the Company in this Agreement, and no document, written statement, certificate or schedule furnished or to be furnished to Purchaser by (or on behalf of) the Company pursuant thereto, when construed together with all other such representations, warranties, documents, written statements, certificates or schedules contains, or will, when furnished, contain, any untrue statement of a material fact, or omits, or will then omit to state, a material fact necessary to make any statement of facts contained herein or therein not materially misleading.

### 7.1 Compliance

Promptly after execution of this Agreement, Purchaser shall cooperate with the Company to prepare and file such notifications as are required pursuant to the laws of the Swiss federation to complete any and all corporate actions as necessary to consummate the transaction contemplated herein.

### 7.4 Satisfaction of closing conditions

Purchaser shall use reasonable best efforts to satisfy the conditions to the Company's obligations set forth in Sections 8.1 and 8.3 prior to [DATE], provided however that Purchaser's failure to satisfy such conditions shall not be deemed a breach of this Agreement.

### 7.5 Election of the Company representative to board

Following the Admission of the Resulting Entity to the Euronext Access MTF, the Resulting Entity shall elect such members to the Board as it deems fir to serve.

## 8. COVENANTS OF THE COMPANY

The Company covenants and agrees with Purchaser as follows:

### 8.1 Consent of third parties

Prior to the Closing Date, the Company shall obtain the consent in writing of all persons necessary to permit the Company to assign and transfer all of the shares of the Company to the Purchaser.

### 8.2 Compliance

Promptly after execution of this Agreement, the Company shall cooperate with Purchaser to prepare and file such notifications as are required pursuant to the [SPECIFY] Act. Purchaser and the Company shall share the filing fees of such filings equally.

### 8.3 Consents of Subsidiary

Prior to the Closing, the Company will cause Rymark, Inc. to execute and deliver all necessary consents and approvals necessary to effectuate the transactions contemplated hereby.

## 9. TERMINATION OF AGREEMENT

### 9.1 Prior to closing

a) This Agreement may be terminated at any time prior to the Closing by the mutual written consent of each of the parties hereto.

b) Unless otherwise agreed by the parties hereto, this Agreement will be terminated if the Closing shall not have occurred on or before April 1, 2018.

c) Any termination of this Agreement under this Section 8 hereof will be effective by the delivery of notice of the terminating party to the other party hereto.

## 10. MISCELLANEOUS

### 10.1 Expenses

Each of the parties hereto shall bear its own expenses (including without limitation attorneys' fees) in connection with the negotiation and consummation of the transactions contemplated hereby.

### 10.2 Notices

Any notice required or permitted to be given under this Agreement shall be in writing and shall be personally or sent by certified or registered US mail, postage prepaid, or sent by nationally recognized overnight express courier and addressed as follows:

(a) if to Purchaser, at:
4 Service Cloud tech AG
18351 Eddy St
Northridge CA 91325 USA
Attention: Orie Rechtman, President
Facsimile: (818) 465-1290

b) If to THE COMPANY: AmeriMark Automotive AG/Rymark, Inc
Taylorsville UT 84123 USA
Attention: Nick Markosian, President
Facsimile: (801)

### 10.3 Entire agreement; Captions

This Agreement, the Schedules hereto (which are incorporated herein by reference) and the agreements to be executed and delivered in connection herewith, together constitute the entire agreement and understanding between the parties and there are no agreements or

commitments with respect to the transactions contemplated herein except as set forth in this Agreement. This Agreement supersedes any prior offer, agreement or understanding between the parties with respect to the transactions contemplated hereby. The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

### 10.4 Amendment; Waiver

Any term or provision of this Agreement may be amended only by a writing signed by the Company and Purchaser. The observance of any term or provision of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party to be bound by such waiver. No waiver by a party of any breach of this Agreement will be deemed to constitute a waiver of any other breach or any succeeding breach.

### 10.5 No third party beneficiaries

Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or to give any person, firm or corporation, other than the parties hereto, any rights or remedies under or by reason of this Agreement.

### 10.6 Execution in counterparts

For the convenience of the parties, this Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

### 10.7 Assignment

These rights and obligations of the parties to this Agreement may not be delegated or assigned by any party hereto without the prior written consent of the other party and any such attempted delegation or assignment shall be void.

### 10.8   Benefit and burden

This Agreement shall be binding upon, shall inure to the benefit of, and be enforceable by and against, the parties hereto and their respective successors and permitted assigns.

### 10.9 Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the Swiss Federation (excluding application of any choice of law doctrines that would make applicable the law of any other state or jurisdiction).

### 10.10 Severability

If any provision of this Agreement is for any reason and to any extent deemed to be invalid or unenforceable, then such provision shall not be voided but rather shall be enforced to the maximum extent then permissible under then applicable law and so as to reasonably effect the intent of the parties hereto, and the remainder of this Agreement will remain in full force and effect.

CONFIDENTIAL

Hesterman0000854_0008

### 10.11 Attorneys' fees

Should a suit or arbitration be brought to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees to be fixed in amount by the Court or the Arbitrator(s) (including without limitation costs, expenses and fees on any appeal). The prevailing party will be entitled to recover its costs of suit or arbitration, as applicable, regardless of whether such suit or arbitration proceeds to a final judgment or award.

### 10.12 Sections and exhibits

Except as otherwise indicated, all references in this Agreement to "Section(s)" and "Exhibit(s)" are intended to refer to Section(s) to this Agreement and Exhibit(s) to this Agreement, respectively.

### 10.13 Dispute resolution

All disputes arising under this Agreement shall be resolved pursuant to the dispute resolution procedures set forth in the Commercial Agreement.

### 10.14 Construction of agreement

The respective parties have negotiated this Agreement hereto and their attorneys and the language hereof will not be construed for or against either party.

### 10.15 Public announcement

Upon execution of the Agreement by both parties, and until the Closing, all press releases and other public and private communications shall be made by the parties only with the mutual written consent of the Company and Purchaser, except that each party may make such disclosures as are required by applicable law, provided, however, that a copy of such disclosure shall first be submitted to the other party within a reasonable time period prior to the dissemination thereof.

IN WITNESS WHEREOF, the Purchaser and the Company executed and delivered this Agreement by their duly authorized representatives as of the Effective Date.

| COMPANY | PURCHASER |
|---|---|
| _[signature]_ | |
| Authorized Signature | Authorized Signature |
| | |
| Nicholas Markosian, President | Orie Rechtman, President |

CONFIDENTIAL

Exhibit "B" Promissory Note

# PROMISSORY NOTE

This Promissory Note (the "Note") is made and effective the _____ day of February, 2018

**BETWEEN:**     **Orie Rechtman** (the "Lender"), a stockholder of 4 Service Cloud Tech AG having his main residence located at:

18351 Eddy St
Northridge CA 91325 USA

**AND:**     **AmeriMark Automotive AG]** (the "Borrower"), a corporation organized and existing under the laws of the Canton Thurgau, Swiss Federation with its registered office located at:

Breitenstrasse 16,
8500 Frauenfeld
Switzerland

**TERMS**

1. FOR VALUE RECEIVED, the Borrower promises to pay to the order of Lender the principal sum of EU 250,000 payable at the rate and in the manner hereinafter set forth:

2. The Maturity of the Note shall be One Year from the date the Borrower gains admission to the Euronext Access MTF

3. Borrower shall make bi-weekly payments of principal based upon the following formula:

   Payment of Thirty (30%) of net proceeds of any share sales of the Borrower's common stock, either via private placement or in the Open market, which sales shall commence upon admission of Borrower to the Euronext Access MTF through the medium of a Reverse Merger into 4Service Cloud Tech AG.

4. This Note is and will be secured by a security interest in the shares of the Borrower.

5. Borrower shall have the right to prepay any portion of the indebtedness evidenced by this Note at any time.

6. Event of default: In the event the Borrower fails to repay the principal sum of EU 250,000 on or before the Maturity date as specified in Section 2 herein, the Borrower shall transfer assign and otherwise convey any and all unsold shares of the Borrower's common stock to Lender.

8. ANY RIGHT OF TRIAL BY JURY, PRESENTMENT, NOTICE OF DISHONOR, AND PROTEST ARE HEREBY WAIVED BY ALL MAKERS, SURETIES, GUARANTORS AND ENDORSERS HEREOF. This Note shall be the joint and several obligations of all makers, sureties, guarantors, and endorsers hereof and shall be binding upon them and their respective heirs, executors, administers, successors and assigns.

9. Lender and Borrower intend that the relationship created and evidenced by this Note and the Loan Documents shall be solely that of debtor and creditor. Notwithstanding the foregoing, the Borrower acknowledges that the Note is in partial payment for completion of the Reverse Merger into the listed entity currently owned and controlled by the Lender.

11. The remedies of this Note are cumulative and concurrent and may be pursued singularly or successively together, at the sole discretion of the holder, and may be exercised as often as occasion therefore shall occur. The waiver by Lender or failure to enforce any term, covenant or condition of this Note or to declare any default hereunder, shall not operate as a waiver of any subsequent default or affect the right of the holder to exercise any right or remedy not expressly waived in writing by the holder.

12. The unenforceability or invalidity of any one or more provisions of this Note shall not render any other provision herein contained unenforceable or invalid. This note and all of the Loan Documents shall be construed under the laws of the Swiss Federation.

IN WITNESS WHEREOF, the undersigned has caused this Promissory Note to be duly executed as of the date first written below.

LENDER

_____
Authorized Signature

_____
Print Name and Title

BORROWER

*/s/ [signature]*
Authorized Signature

*Nick Markosian President*
Print Name and Title

(Corporate seal)