1            UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF UTAH

3                     -o0o-

4   CAPANA SWISS ADVISORS AG, a    )
    Swiss corporation; AMERIMARK   )
5   AUTOMOTIVE AG, a Swiss         )        **CERTIFIED COPY**
    corporation,                   )
6                                  )
              Plaintiffs,          )
7                                  ) Case No.: 2:23-cv-00467
     v.                            ) Judge Ted Stewart
8                                  )
    RYMARK, INC., a Utah           )
9   corporation; NICHOLAS THAYNE   )
    MARKOSIAN, an individual;      )
10  JOHN KIRKLAND, an              )
    individual; and VICKY SMALL,   )
11  an individual,                 )
                                   ) RULE 30(b)(6) DEPOSITION
12            Defendants.          ) AMERIMARK AUTOMOTIVE AG
    _____) BY:  SHAEN BERNHARDT
13                                 )
    RYMARK, INC., a Utah           )
14  corporation; and NICHOLAS      )
    THAYNE MARKOSIAN, an           )
15  individual,                    )
                                   )
16            Counter Claimants,   )
                                   )
17   v.                            )
                                   )
18  CAPANA SWISS ADVISORS AG, a    )
    Swiss corporation, and         )
19  Amerimark Automotive AG, a     )
    Swiss corporation,             )
20                                 )
              Counter Defendants.  )
21  _____)

22

23

24

25

```
 1    RYMARK, INC., a Utah          )
      corporation; and NICHOLAS     )
 2    THAYNE MARKOSIAN, an          )
      individual,                   )
 3                                  )
          Third-Party Plaintiffs,   )
 4                                  )
       v.                           )
 5                                  )
      SHAEN BERNHARDT, an           )
 6    individual; ASHLEY MIRON      )
      LESHEM, an individual; DAVID  )
 7    HESTERMAN, an individual;     )
      NICOLAI COLSHORN, an          )
 8    individual; STEFAN            )
      KAMMERLANDER, an individual;  )
 9    ALEXANDER COENEN, an          )
      individual; MARTIN FASSER     )
10    HEEG, an individual;          )
      AMERIMARK GROUP AG, a Swiss   )
11    corporation; and PHILOMAXCAP  )
      AG, a German corporation,     )
12                                  )
          Third-Party Defendants.   )
13    _____)
```

14

15        RULE 30(b)(6) DEPOSITION OF AMERIMARK AUTOMOTIVE AG

16                    BY:  SHAEN BERNHARDT

17

18              Taken on Friday, January 24, 2025

19                     At 9:00 a.m. MT

20

21              At Kunzler Bean & Adamson, PC

22                     50 West Broadway

23                        Suite 1000

24              Salt Lake City, Utah 84101

25    Reported by:  Brooke Simms, RPR, CCR, CSR

```
 1                    A P P E A R A N C E S

 2    For the Plaintiffs:

 3             John S. Worden, Esq.
               VENABLE LLP
 4             101 California Street
               Suite 3800
 5             San Francisco, California 94111
               (415) 653-3750
 6             jsworden@venable.com

 7
      For the Defendants:
 8
               Stephen Richards, Esq.
 9             Chad S. Pehrson, Esq.
               KUNZLER BEAN & ADAMSON, PC
10             50 West Broadway
               Suite 1000
11             Salt Lake City, Utah 84101
               (801) 994-4646
12             srichards@kba.law
               cpehrson@kba.law
13

14    For Nicholas Markosian:

15             Brennan H. Moss, Esq.
               PARKINSON BENSON POTTER
16             2750 Rasmussen Rd.
               Suite H-107
17             Park City, Utah 84098
               (415) 534-7970
18             brennan@pbp.law

19

20

21                                 *   *   *

22

23

24

25
```

```
 1                    I N D E X

 2    SHAEN BERNHARDT                                   PAGE

 3    Examination By Mr. Richards                        7

 4

 5                       *  *  *

 6

                       E X H I B I T S
 7

      EXHIBIT        DESCRIPTION                        PAGE
 8
      Exhibit D 4 - Email Chain 11/14/2017              187
 9
      Exhibit D 108 - Rymark's Amended Notice of          8
10                    Rule 30(b)(6) 1/9/2025

11    Exhibit D 109 - Email Chain 1/18/2019 [PL         39
                      0000014568-14570]
12
      Exhibit D 110 - Email Chain 1/24/2019 [PL         43
13                    0000004560-4561]

14    Exhibit D 111 - Email 2/5/2019                    49

15    Exhibit D 112 - Email Chain 2/11/2019             54

16    Exhibit D 113 - Email Chain 8/31/2020 [PL         56
                      0000014944-15045]
17
      Exhibit D 114 - Email Chain 4/26/2019 [PL         87
18                    0000000622-623]

19    Exhibit D 115 - Email Chain 6/24/2019 [PL        101
                      0000004632-4654]
20
      Exhibit D 116 - Declaration of Sarah E.          119
21                    Diamond in Support 1/02/2025

22    Exhibit D 117 - Email Chain 5/9/2023 [PL         140
                      0000019398-19400]
23
      Exhibit D 118 - Email Chain 9/26/2019 [PL        147
24                    0000002188-2189]

25
```

```
 1               E X H I B I T S (Continued)

 2    EXHIBIT          DESCRIPTION                        PAGE

 3    Exhibit D 119 - Email Chain 1/17/2019 [PL          164
                      0000014714-14716]
 4
      Exhibit D 120 - Email 11/22/2019 [PL               165
 5                    0000011399]

 6    Exhibit D 121 - Complaint                          174

 7    Exhibit D 122 - Verified Complaint 7/18/2023       174

 8    Exhibit D 123 - Email Chain 10/18/2019 [PL         206
                      0000012225-12227]
 9
      Exhibit D 124 - Email 10/31/2019 [PL               215
10                    0000012400-12404]

11    Exhibit D 125 - Euronext Letter 4/16/2019          219

12    Exhibit D 126 - Email Chain 11/4/2019 [PL          227
                      0000003151-3156]
13
      Exhibit D 127 - Email 5/16/2019 [PL                236
14                    0000000599]

15    Exhibit D 128 - Registration of Shares for         241
                      Negotiations on Vienna Stock
16                    Exchange Direct MTF 6/2019 [PL
                      0000003160-3187]
17
      Exhibit D 129 - Email Chain 11/5/2019 [PL          254
18                    0000007454-7455]

19    Exhibit D 130 - Email 11/22/2019 [PL               259
                      0000014036-14038]
20
      Exhibit D 131 - Email Chain 2/1/2021 [PL           267
21                    0000005396-5397]

22    Exhibit D 132 - Email Chain 10/31/18               269
                      [WHITETREE 000029-31]
23
      Exhibit D 133 - Email Chain 11/5/2018              279
24                    [WHITETREE 000032-34]

25
```

```
  1                    E X H I B I T S (Continued)

  2    EXHIBIT          DESCRIPTION                              PAGE

  3    Exhibit D 134 - Binding Term Sheet 11/8/2018              281
                        [WHITETREE 0000035-38]
  4
       Exhibit D 135 - Email Chain 1/9/2019                      293
  5                     [WHITETREE 000039]

  6    Exhibit D 136 - 4Service Cloud Tech AG                    297
                        Balance Sheet 12/31/2017 [PL
  7                     0000003124-3125]

  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

```
 1                P R O C E E D I N G S

 2

 3                    Shaen Bernhardt,

 4   was called as a witness, and having been first duly

 5   sworn to tell the truth, testified as follows:

 6

 7                         EXAMINATION

 8   BY MR. RICHARDS:

 9        Q.   Good morning, Mr. Bernhardt.

10        A.   Good morning.

11        Q.   You know that I'm Stephen Richards.  I

12   represent the defendants in this case, yes?

13        A.   I do know those things.

14        Q.   And you're testifying today as a corporate

15   designee of AmeriMark Automotive AG; is that right?

16        A.   That's correct.

17        Q.   And if I call that company AmeriMark

18   Automotive, you'll understand what I mean?

19        A.   I will.

20        Q.   Capana Swiss Advisors AG is also a plaintiff.

21   If I call them Capana, you'll understand what I mean?

22        A.   I will.

23        Q.   And AmeriMark Group AG is also relevant to

24   this litigation, and if I call that entity AmeriMark

25   Group, you will understand what I mean, yes?
```

1        A.    I will.

2        Q.    Thank you.  I know you know the ground rules.

3   I'll go over them briefly anyway.  You and I both have a

4   tendency --

5        A.    Mr. Richards, sorry.  If you'd like, we can

6   stipulate to skip the ground rules, if you're allowed.

7        Q.    I'll just make one, which is that you and I

8   both have a tendency to tax our court reporters.  So if

9   we could slow down and not speak over each other, Brooke

10  will be a bigger fan of us at the end of the day.

11  Otherwise, I'm happy to stipulate that you understand

12  the instructions I've given you previously.  Fair?

13       A.    I do.  And I'll try to slow down.  It's going

14  to be an effort.  I'm a fast talker -- I was saying to

15  the court reporter.  Sorry.

16                   (Exhibit D 108 was marked.)

17       Q.    (BY MR. RICHARDS)  Mr. Bernhardt, I've marked

18  as Exhibit D 108 a document titled "Rymark's Amended

19  Notice of Rule 30(b)(6) Deposition to AmeriMark

20  Automotive AG."  Do you see that?

21       A.    I do.

22       Q.    Have you seen this document before?

23       A.    I have.

24       Q.    Do you have a general recollection of the

25  first time you saw this document?

 1      A.   As I testified yesterday, because I think both

 2  of these Rule 30(b)6 deposition notices have been

 3  through a couple iterations and my recollection is that

 4  the first time I saw the earliest iteration would have

 5  been December 3rd.  I think you had a different opinion.

 6  I'd be curious to know if I was wrong about that.

 7      **Q.   I didn't check actually.**

 8      A.   That's fine.  I think it was December 3rd.  I

 9  haven't gone back and checked since my testimony

10  yesterday.  I believe that's accurate.

11      **Q.   And on pages 5 and 6 of this deposition**

12  **notice, there's a list of designated topics.  Do you see**

13  **that?**

14      A.   I do.

15      **Q.   And your attorneys objected to some of the**

16  **topics.  Setting aside the topics they objected to, are**

17  **you prepared to testify on the other topics today?**

18      A.   I am.

19           MR. WORDEN:  Let me just jump in and say, as

20  was the case yesterday, he is here to answer whatever

21  questions you have, other than specific questions I may

22  object to and instruct him not to answer.  We served the

23  objection.  Many of them are extremely overbroad -- the

24  factual basis for all allegations made in your complaint

25  and answers thereto, et cetera.  Nonetheless, as was the

1    case yesterday, we did not prohibit you from asking him

2    hardly any questions except where invading the

3    attorney-client privilege.  That is still true today.

4    You will have had him for three days, 21 hours.  He's

5    not coming back.  So I encourage you to ask whatever you

6    want to ask today.

7              MR. RICHARDS:  And I'll just state for the

8    record that there's a motion pending before the court to

9    strike the untimely objections, and we intend to see

10   that motion resolved.

11             MR. WORDEN:  Why not just ask him today?

12   What's the -- what's the prohibition --

13             MR. PEHRSON:  Mr. Worden, did you attend the

14   meet and confer session last Friday with your

15   co-counsel?  Have you read -- have you read the local

16   rules of this district?

17             MR. WORDEN:  I have read the local rules.

18   I've also been on a few depositions, including

19   yesterday, where there are lots of categories and

20   objections are made.  Nonetheless, this is the first

21   time I have ever seen someone go to the court and say

22   we're going to fly someone from Switzerland and not ask

23   them anything in this area because we want to tell the

24   court we need an extension to discovery so the court

25   will not set a trial date to drag this out.  He's here.

 1  If you have questions, ask him.  If not, that's going to

 2  be it.

 3          MR. PEHRSON:  We disagree, Mr. Worden.

 4          MR. WORDEN:  Very well.

 5          THE WITNESS:  Just for the record, I spent

 6  35 hours in continuous travel to get here.  It will be a

 7  similar trip back, and I did that twice before -- once

 8  for my mediation with the defendants and once for my

 9  prior deposition.  So I'm certainly willing to answer

10  any questions.  Looking forward to having the

11  opportunity to participate in the dispute resolution

12  process.

13          MR. WORDEN:  Thank you.

14      **Q.  (BY MR. RICHARDS)  Mr. Bernhardt, I believe**

15  **you testified yesterday you spent approximately**

16  **250 hours preparing for the combination of yesterday's**

17  **deposition and today's; is that correct?**

18      A.  I think it was 250 to maybe north of 250.

19  That is correct.

20      **Q.  And I think you testified that those hours**

21  **were split roughly equally between the two depositions.**

22  **Fair?**

23      A.  Fair to whom?

24      **Q.  Is that fair to you -- is that fair to -- is**

25  **my characterization of your testimony fair to you?**

```
 1        A.    You're asking me if it's accurate?

 2        Q.    Sure.

 3        A.    I think I also included the detail that I

 4   spent a little more time for preparing for my role as a

 5   designee -- 30(b)(6) designee for Capana Swiss Advisors

 6   than I did for my role today as a 30(b)(6) designee for

 7   AmeriMark Automotive.  I think I also added the detail

 8   that that was since approximately December 3rd.

 9        Q.    Whom did you speak with in preparation for

10   this deposition, setting aside your counsel, regarding

11   AmeriMark Automotive?

12        A.    I had discussions with -- I combined this with

13   both.  For the preparations for the depositions, I had

14   discussions, as I testified yesterday, with current and

15   former directors.  I also spoke with a number of other

16   parties.  I can refer you also to the list that I gave

17   you yesterday.  We talked to some of the outside

18   consultants for the companies.  I spent time with books

19   and records of the company.  I spoke just to designate

20   counsel, both the counsel in U.S. and counsel in

21   Switzerland.

22              I made attempts to reach Nicolai Colshorn,

23   former director of AmeriMark Automotive, and was

24   rebuffed by his attorney.  I tried to talk to Nicole

25   Kuster, and she is represented by counsel as well.  I
```

1  attempted to talk to former directors, including

2  Mr. Staeger and Mr. Spillmann.  I did not speak to

3  Mr. Spillmann, but Mr. Kammerlander, who spoke with

4  Mr. Spillmann.  I spoke with Martin Fasser Heeg, and I

5  spoke with Mr. Kammerlander.

6            At the moment that's the best of my

7  recollection.  I may have done a more complete list

8  yesterday during my deposition, but that's materially

9  the list that I spoke to.

10       **Q.   You mentioned current and former directors.**

11  **Setting aside Mr. Heeg, did you speak with any current**

12  **or former directors of AmeriMark Automotive?**

13       A.   Of Automotive, no.  The only former director

14  at AmeriMark Automotive would have been Mr. Colshorn,

15  and he was not -- his attorney refused to make him

16  available to me.

17       **Q.   Did you review any documents relating to**

18  **AmeriMark Automotive in preparation for today's**

19  **deposition?**

20       A.   It would be impossible to list the number of

21  documents that I reviewed.  Hundreds upon hundreds of

22  documents.  I went through as much of the case file as I

23  could squeeze in during that period.

24            I also, as you know from my testimony

25  yesterday, reviewed a number of physical documents which

1    we produced yesterday, including documents that had been

2    received from Daniel Gysi, the attorney of AmeriMark

3    Automotive who did the formation.  That particular set

4    of documents, as I testified yesterday, was the complete

5    corporate -- excuse me -- commercial registry file of

6    the company, cataloging it from its birth until at least

7    it was converted into AmeriMark Group.  Those documents,

8    I'll remind you, were all certified, notarized, and had

9    an apostille affixed to them by the commercial registry

10   and were delivered directly to me by attorney Daniel

11   Gysi.  I brought them with me on the flight so that I

12   could present them to you physically.  So there were

13   those documents.

14           In addition to those documents, there were

15   some original documents in the AmeriMark Automotive file

16   pertaining to the conversion of AmeriMark Automotive to

17   AmeriMark Group, specifically 39 documents, including 19

18   powers of attorney and 19 subscription agreements.

19   These were original documents on U.S. letter paper.

20   Those documents were already produced in digital form.

21   As you recall from my testimony yesterday, I established

22   the provenance of those documents by looking through the

23   case file.  They were prepared on Rymark -- in Rymark

24   offices, put on Rymark scanners, and sent from the

25   beenjerkedaround.com email domain on to Europe.  The

 1   originals were sent, I believe, by FedEx of those 2018

 2   documents.  They were received by Mr. Kammerlander in

 3   his capacity, before he was a director, in his capacity

 4   of certifying the capital increase which created

 5   AmeriMark Group.

 6            In addition to that, I also provided two

 7   physical documents -- the application for paying

 8   services -- agent services to BankM signed by

 9   Mr. Markosian.  That document was dated, I believe, back

10   on June of 2016.  On that, again, was an original.  One

11   of the application documents was on U.S. letter paper

12   signed in wet ink by Mr. Markosian.  That document was

13   FedExed to BankM and countersigned by BankM.

14            There was a second application for general

15   banking services, which is also original, also signed by

16   Mr. Markosian in wet ink, which is also dated -- I

17   believe it was June -- I think it was June 26th, but

18   certainly in June 2016.  Delivered that document.

19                 (Reporter clarification.)

20       A.   I thought it was June 26th, but I think it was

21   certainly in June 2016.

22            I'm trying to think what other documents --

23   physical documents that I reviewed.  I certainly gave a

24   fairly comprehensive list, I think, yesterday.

25            In addition to that, going through the case

 1  file, some of the specific documentation that I can

 2  recall reviewing, particularly with the intention to

 3  AmeriMark Automotive, would include anything regarding

 4  AmeriMark Automotive's various transactions that might

 5  not be in the file -- in other words, draft documents

 6  that had been in production that were not used that did

 7  not come their way in.  I spent a particular amount of

 8  time, of course, reviewing drafts of the many --

 9                (Mr. Moss enters the room.)

10          MR. RICHARDS:  This is Mr. Moss.  He's counsel

11  for Mr. Markosian.

12          THE WITNESS:  Mr. Moss.  Western California?

13          MR. MOSS:  I'm sorry.  What?

14          THE WITNESS:  Western California?

15          MR. MOSS:  No.  Utah.

16          THE WITNESS:  Utah law.  Thank you.

17      Q.   (BY MR. RICHARDS)  So I think I have the gist

18  of it.  Thank you.

19      A.   I -- okay.

20      Q.   I think your testimony yesterday was that no

21  one can identify all transactions and shares of

22  AmeriMark Group; is that correct?

23      A.   Well, I think there might be some supernatural

24  power that might be able to do that, but you have to

25  remember, AmeriMark Group for a period of time had

1    bearer shares.  AmeriMark Group for a period time had

2    registered shares.  Shares were traded on the

3    multilateral trading facility of the Vienna Stock

4    Exchange direct market.  This is the lowest segment.

5    Those transactions might be sitting somewhere in one of

6    the central security supposit- -- I said suppositories.

7    I'm so sorry.  Of course I meant depositories.

8            You know, it's just not possible to

9    reconstruct that, at least in any way that I know how to

10   do.  The bearer shares are particularly onersome -- you

11   know, onerous -- because those could have been

12   transferred back and forth between parties and were, in

13   fact, transacted back and forth between parties without

14   record.

15           In addition to that, there are several private

16   transactions between parties between AmerMark Automotive

17   and AmeriMark Group, for instance, that could have

18   happened, which we can't possibly document.  I'll give

19   you an example, because I think it's really important to

20   understand the mechanics of this for anybody who's

21   reading this transcript later.

22           Mr. Markosian acquired 18 million shares of

23   AmeriMark Automotive on June 6th, 2016, by virtue of

24   contributing his company, Rymark, Inc. into that --

25       Q.   I'm going to interrupt you, Mr. Bernhardt.

CAPANA SWISS ADVISORS AG vs RYMARK                                    30(b)(6)
SHAEN BERNHARDT - 01/24/2025                                          Page 18

 1        A.    I need to --

 2        **Q.    No.  You don't need to explain.  You need to**

 3   **answer my question.  My question was, was it your**

 4   **testimony yesterday that no one could identify all**

 5   **transactions in AmeriMark Group?  I would like to be**

 6   **efficient today.  I really would.  You've come a long**

 7   **way.  Your time is valuable.  So is Mr. Worden's.  I**

 8   **expect succinct and direct answers to my questions.**

 9             MR. WORDEN:  Okay.  All right.  That's enough

10   of that.  Are you done with your answer?

11             THE WITNESS:  I wasn't.

12        A.    What's very important to understand, because

13   there's this intonation that somehow there's an

14   obligation that some singular party, including the

15   company itself, is responsible for tracking all

16   transactions.  And what I need to explain to clarify my

17   testimony yesterday and to make sure that the record is

18   absolutely clear -- that's just not the case.  And I'd

19   like to give an example that the defense should know all

20   about.  I want to highlight that to make sure it's on

21   the record so that anyone not reading the transcript

22   from yesterday sees it today.

23             Specifically, Mr. Markosian had 18 million

24   shares from AmeriMark Automotive.  You can see that also

25   in the physical documents I delivered yesterday, the

1    official corporate file, the corporate bible, straight

2    from the commercial registry certified and apostilled.

3    You can see that.  It's very clear.  There's no doubt

4    about that.  Mr. Markosian then, in some fashion or

5    another, transferred about 500,000 of these 18 million

6    of his shares, offered his Swiss securities to several

7    U.S. persons, 18 U.S. persons to be particular.  That

8    list is completely codified also in the commercial

9    registry file because it's published in what's called a

10   public D.  This is the highest authority in Switzerland

11   of sort of legal representation.  It would be the

12   equivalent of Mr. Markosian -- when he acquired from

13   Mr. Ryan his interest in the Rymark, filing that with

14   the secretary of state.  So that's an interesting

15   transaction.

16            Mr. Markosian has offered his securities to

17   U.S. persons, and those U.S. persons then are listed

18   between June 6th, 2016, and June 17th, 2016.  Then

19   Mr. Markosian signs a share ledger.  It's the first

20   share ledger of AmeriMark Automotive AG.  That share

21   ledger lists the famous 19 initial shareholders,

22   including himself.

23            I have asked and the plaintiffs have asked for

24   documentation on these transfers on these sales.

25   Clearly they haven't.  Mr. Markosian I don't believe was

 1   lying when he took his 18 million shares and then later

 2   signed a share ledger in his capacity as the president

 3   of AmeriMark Automotive, the senior executive of that

 4   company at that time, member of the board of directors,

 5   therefore responsible for dealing with the official

 6   share ledger.  Somehow those transactions happened.

 7           The plaintiffs have asked for that

 8   documentation.  Three possibilities exist.  The

 9   documentation was created and is being withheld by the

10   defense.  The documentation was created and has been

11   destroyed, which would be unfortunate.  Or the

12   documentation was never created.

13           But as you can see, it's impossible to have

14   documentation of those transactions.  This is a perfect

15   example in a Swiss company of -- of -- and we're not

16   even dealing yet with dematerialized shares, bearer

17   shares, or anything like that.  Already, in the very

18   infancy of the company, we already have -- very

19   difficult to determine exactly what those transactions

20   were.

21           So, Counselor, my answer to you is, no, there

22   is no person who can identify all the transactions in

23   the Swiss company like that, even in the case of a Swiss

24   company that's only been alive for a few months, as in

25   the case of AmeriMark Automotive.  I hope I've clarified

 1    that.

 2              MR. RICHARDS:  I'm going to move to strike

 3    that entire answer except for the last sentence.  I'm

 4    also going to move to strike Mr. Worden's comments about

 5    halfway through.  I'm entitled to a deposition today.

 6    I'm not entitled to a filibuster.  I expect answers, and

 7    I expect Mr. Worden not to interrupt and chastise and

 8    tell the witness to just keep going until the witness

 9    thinks he's wasted enough of my time.

10              MR. WORDEN:  So, Stephen, that's unfair.  I

11    know there are new people here today.  Your tone has

12    changed today.  I don't know if it's because of the

13    audience is different today.  If I have things to say,

14    I'm going to say them.  I kept them at a great minimum

15    yesterday.  I will do so again today.  The witness has

16    his answer.  If you don't like the answer, you want to

17    move to strike, that's fine.  He gets to answer the

18    questions you ask.

19              THE WITNESS:  The company is --

20              MR. RICHARDS:  There isn't a pending question,

21    Mr. Bernhardt.

22              MR. WORDEN:  Let's go with the next question.

23        Q.   (BY MR. RICHARDS)  Who is Christian Prasch?

24        A.   Christian Prasch -- sounds to me like

25    Christian Prasch, from my memory, would have been one of

1   the greenmailing plaintiffs in Germany.  That's from my

2   memory.

3          **Q.   Did he hold bearer shares of 4Service Cloud**

4   **Tech?**

5          A.   I don't know that for sure.  Somewhere --

6   pardon me.  I'd like to clarify, if that's okay.

7          **Q.   Sure.**

8          A.   I imagine there might be a shareholder list

9   from 4Service Cloud Tech, an old shareholder list.  In

10  examining the documentation of AmeriMark Automotive, one

11  of the challenges in dealing is its predecessor

12  incarnation, 4Service Cloud -- is that in Switzerland,

13  once you do that conversion, the old company is stricken

14  from the record.  It's gone.  It's sort of a rebirth.

15  And, in fact, it's treated in the registry the same way.

16          So it's possible that Mr. Prasch would have

17  been on a share ledger for 4Service Cloud, the

18  predecessor to AmeriMark Automotive sometime earlier,

19  but I don't remember seeing him specifically in those

20  books and records.  I do remember seeing his name

21  elsewhere.  In my memory of it, I thought it was that he

22  was plaintiff in -- at the German litigation, but I'm

23  not sure of that.  I do remember the name.

24          **Q.   Will you look at the exhibit in front of you,**

25  **and look on page 5 at Topic Number 2.**

```
 1        A.    I am there.

 2        Q.    This topic reads, "The provenance and

 3   authenticity of documents produced or used by You

 4   including the subscription forms produced at

 5   PL_2081-2000 -- 2100" -- excuse me -- "and the share

 6   register attached as Exhibit 36 to the amended

 7   complaint."

 8            In the interest of not unnecessarily treading

 9   ground that we tread yesterday, we discussed the

10   subscription forms that are referenced here at length

11   yesterday; correct?

12        A.    I -- can I see the subscription forms to make

13   sure?  I'm pretty sure I know what we're talking about,

14   but I'd really like to clarify.  So we have copies of

15   those documents I can look at?

16        Q.    If you're not able to answer my question,

17   that's fine, but if you're able to answer my question,

18   I'd like you to.

19        A.    Well, I want to be sure I know what I'm

20   talking about.  I think I remember what we're talking

21   about.  I think I remember the forms.  Certainly we had

22   an exhibit yesterday, but I'd really like to clarify

23   that.  It's not that I'm not able to answer.  I want to

24   make sure my answer is truthful and accurate.

25        Q.    With respect to any subscription forms that
```

1   you and I looked at yesterday, do you have any

2   additional information regarding those forms in your

3   capacity as a corporate designee of AmeriMark Automotive

4   that you did not have in your capacity as a corporate

5   designee of Capana?

6        A.   If we're referring to in my capacity as the

7   preparation that I've done -- in other words, did I

8   segregate preparation Capana and testify about that only

9   yesterday and I'm testifying only about Automotive

10  yesterday [sic]?  Is that the gist of your question?

11       Q.   Yeah, I mean, is there anything that you felt

12  you couldn't tell me yesterday because you only knew it

13  in your capacity --

14       A.   No.  Sorry to interrupt you.

15            MR. WORDEN:  Stephen, your point is well

16  taken.  Let's please not reask every question.  Whatever

17  he asked yesterday, it's going to be the same answer

18  today, to the extent it was asked yesterday.

19            MR. RICHARDS:  That was roughly the

20  stipulation I was looking for.

21       A.   No.  I will expand on that stipulation for

22  you, Counselor.  No.  I -- yesterday, when I testified,

23  I wasn't segregating between preparation I had done for

24  one or the other, and there may be something that I

25  recollect today after thinking about it that I didn't

1   remember yesterday, but, no, I'm not segregating that

2   sort of preparation.  I understand your point entirely.

3       **Q.    AmeriMark Automotive's contention in this case**

4   **is that Mr. Markosian transferred 13 million shares of**

5   **AmeriMark Group stock to a company called Whitetree**

6   **Capital; correct?**

7       A.    Let me parse to make sure that I understand

8   what you said, but I think that that's correct.  That's

9   correct.

10      **Q.    What evidence is there of that transfer?**

11      A.    Well, there is certainly, as I discussed

12  yesterday, the share ledger, the official share ledger

13  of AmeriMark Group dated June -- excuse me --

14  January 18 -- no.  Hold on.  Let me get that right.  I

15  think that's January 18th, 2019.  It's the official

16  share ledger of AmeriMark Group showing 13 million

17  shares owned by Mr. Markosian -- excuse me -- owned by

18  Whitetree Capital on that day.

19          We also have recent production from Whitetree

20  Capital, I understand, that outlines the details of a

21  deal between Mr. Markosian and Whitetree Capital.  My --

22  I haven't had the chance to look at those as closely

23  because they're new, but my recollection of it is that

24  there was an extensive back and forth regarding two term

25  sheets.  There's a draft term sheet.  From my

 1    recollection, it's got red lining in it.

 2              The nature of the negotiations seems to have

 3    been that Mr. Markosian initially wanted a board seat on

 4    Whitetree Capital and wanted a majority, not a

 5    supermajority, a majority control of Whitetree Capital.

 6    It's reflected sort of in the first set of term sheets.

 7    It's pointed out during the correspondence and the

 8    documentation that this would trigger certain compliance

 9    problems.  In particular, that Mr. Markosian, as a U.S.

10    person, would have to be declared as the UBO --

11              (Reporter clarification.)

12    A.    Yes.  Thank you.  That stands for "ultimate

13    beneficial owner," it's an acronym, UBO.  Interrupt me

14    any time with that if you need.

15              That, of course, in correspondence from

16    September, perhaps August, of 2018 until December of

17    2018, is a problem that Mr. Markosian and his agents are

18    trying to solve.  Specifically, that as a U.S. person,

19    and this is the result of increased enforcement of FACTA

20    and FBAR -- these are the financial transactions

21    reporting and financial bank account reporting

22    regulations -- got much more intense starting 2016,

23    2017, 2018.

24              So in 2018, Mr. Markosian is trying to find a

25    transfer agent to dematerialize his shares.  This starts

```
 1   to articulate the problem that he's trying to solve,

 2   which I believe Whitetree does attempt to solve, and

 3   certainly goes a long way to evidencing why he would

 4   have done such a transaction with Whitetree, why it made

 5   sense.  The issue there was very specific.

 6             Bendura Bank -- a bank in Liechtenstein which

 7   was the transfer agent, paying agent, and also general

 8   banking provider for 4Service Cloud Tech AG, which was,

 9   of course, the predecessor company to AmeriMark Group --

10   got nervous.  Well, maybe that's an exaggeration, but

11   certainly was bringing up issues with -- with the

12   lawyers, Markus Thier among them, that Bendura Bank was

13   nervous about U.S. persons who resided in the U.S.

14   receiving shares or transferring from a Liechtenstein

15   bank to U.S. persons that had brokerage accounts in the

16   U.S.

17             The reason that this is an issue is because

18   Liechtenstein has been on and off of the OECD gray list.

19   This means for non-cooperation and tax investigations.

20   So Liechtenstein bank started to get extremely nervous

21   in this period.

22             This presented a problem for Mr. Markosian and

23   the other shareholders at that time of AmeriMark Group,

24   the 19 shareholders, all of whom except for, I believe,

25   one, Friends & Equity GmbH.
```

```
 1                  (Reporter clarification.)

 2              Friends & Equity GmbH, which was a Germany

 3    company, but everybody else was a U.S. person.  So this

 4    is the problem that had to be solved.  How do you get

 5    the shares to the brokerage accounts of their owners

 6    when all you have at the moment are registered shares?

 7    And they're going to be dematerialized and the transfer

 8    agent is going to want to send them.  So Mr. Markosian

 9    had to solve that problem.

10              Again, this is September to December 2018.

11    Bendura Bank goes back and forth, and this is important

12    because you can see a diligent and good faith effort to

13    try and solve the problem.  Also, for Mr. Markosian's

14    Swiss lawyer, Mr. Thier, going back and forth with

15    officers of Bendura Bank with the listing agent

16    Mr. Leshem, extensively trying to deal with the issue.

17              I, in my investigation of this to kind of look

18    into what the background was behind the Whitetree

19    transaction, found that this looked to me very good

20    faith effort, and also it looked to me like there was a

21    lot of different ways to solve the problem.

22              One way -- and this starts to bear directly on

23    when Whitetree comes in to solve the problem -- would be

24    to get a nominee to accept the pool of shares from the

25    U.S. persons.  Friends & Equity probably didn't have
```

 1    this problem.  They likely had brokerage accounts in

 2    Europe that were connected to Clearstream and could

 3    easily take Swiss shares which had been dematerialized

 4    into a Swiss central depository and take delivery of

 5    those, but the U.S. persons had this problem.

 6            So one solution which was proposed, both by

 7    the lawyer and the listing agent, was to come up with a

 8    nominee company.  So the nominee company would accept

 9    all of the shares of the U.S. persons, represent the

10    U.S. persons in some capacity, and then could have

11    access to the markets or at least have a brokerage

12    accounts to which the shares could be delivered in

13    common.  You can see this from the discussions.

14    There's, I think, 15 or 20 emails back and forth on this

15    point.

16            Now, there's nothing intrinsically wrong with

17    that.  Nominees are used all the time.  So first I sort

18    of looked at it and thought, well, was this -- you know,

19    is there anything funny going on?  But that's not

20    necessarily true.  Nominees are used all the time in

21    this context.  The issue is not the use of the nominee.

22    The issue is then the later disclosure of the ultimate

23    beneficial owners, the people who control that, to

24    various national authorities, particularly tax

25    authorities.  For example, in the United States, you

1    have to file, you know, your control of the 25 percent

2    more of a foreign corporation.  To the extent you have

3    signing authority, you have to declare signing authority

4    also.  You have to declare it on your 1040 tax forms to

5    the extent that you have signing authority on a foreign

6    company.

7              Then I began to discover later -- in sort of

8    looking at this transaction to determine how legitimate

9    it was, whether it had happened, whether it had been

10   properly conducted -- thanks to discovery from third

11   parties that Mr. Markosian had been lying on all of his

12   tax returns from 2016 all the way up until the last year

13   that we had records.  In the section describing his

14   interest in foreign trusts or access to foreign

15   accounts, he repeatedly says no.  He does this with tax

16   preparers, paid tax preparers, like Michael North of

17   Katz, Sapper & Miller, like his accountants, Greg White

18   of White & Associates, et cetera.

19             So this started to add some color to the

20   motivation behind the Whitetree transaction and its

21   ultimate eventual structure as the way it seems to have

22   ended up.  In particular, Mr. Markosian had a very

23   serious problem, because not only did he have to come up

24   with a nominee to take delivery of the shares, but since

25   he had been lying to the tax authority, fraud, on the

1   order of six years, he was going to have to have a

2   structure that did not disclose him as the UBO and did

3   not disclose him as a controlling entity.

4           This is where the term sheet negotiations

5   starts to ring true, because Markosian apparently asks

6   for directorship and majority control in exchange for

7   the contribution of his shares, and I think the number

8   was actually higher than 13 million shares at first --

9   or maybe he was going to get a higher stake.  I'm doing

10  that from memory.

11          So now we look at the negotiation down from

12  the initial request, and here it is.  It fits exactly

13  the fact pattern of the prior several years, and it also

14  fits exactly the issue that Mr. Markosian has in terms

15  of lying on his taxes and failing to file FBAR and FACTA

16  filings for all of those years.  He can't be shown in

17  public documents as the majority shareholder of an

18  entity, especially an entity that's going to be put on a

19  stock exchange.  There are going to be financial

20  disclosures, and his name will be front and center.

21          So what is the result?  Whitetree Capital, at

22  that time a preexisting company, then comes down to the

23  next term sheet wherein they say -- or the parties say,

24  okay, we'll take only 13 million shares of AmeriMark

25  Group in exchange for your stake -- it would eventually

 1    be a stake in Whitetree.

 2              Mr. Richards, you and I had talked about this

 3    before in a prior deposition before I had so much

 4    information of trying to figure out the significance of

 5    that number, 13 million, and I speculated, I think in an

 6    educated way and now I think it's correct, that

 7    13 million is the highest even million number that is

 8    less than 50 percent of the AmeriMark Group

 9    shareholders.  This is perfectly convenient.  It means

10    that Mr. Markosian will be just shy of a 50 percent plus

11    one, and that, in theory, would mean that banks,

12    brokerages, et cetera, would not be required to declare

13    him.  His name wouldn't be front and center.  And, in

14    fact, that appears to be the way that it came out.  It

15    was 13 million shares that ended up in Whitetree's

16    custody.

17              Then there's the issue of him not being on --

18    a member of the board of the directors.  That issue is

19    the same.  He would have to be disclosed in public

20    documentation as a signing authority.  So he doesn't

21    have signing authority in Whitetree.  In a way this is

22    unfortunate because if he had signing authority in

23    Whitetree, he probably would have had more control over

24    the 13 million shares that he granted to Whitetree.  I

25    think that's part of the problem later and one of the

 1   reasons that it makes me think that the Whitetree
 2   transaction was authentic and it just got out of control
 3   for him, because while he asked for a board seat, he
 4   didn't get one.
 5            Now, other things that make it very, very
 6   clear that there's evidence that this traction was
 7   completely real -- first of all, it's recorded in the
 8   share ledger, and it seems like the share ledger
 9   recording matches quite carefully the preparation work
10   that was being done by the lawyers and everybody else
11   and by the initial discussions, which I believe started
12   in -- this is from my memory -- between Whitetree and
13   Mr. Markosian, who directly communicated with
14   Whitetree -- I think it was in December of 2018.  Then,
15   in early January -- and I remember now for sure.  It was
16   January 18th, 2019 -- is the first share ledger of
17   AmeriMark Group that shows Whitetree with,
18   coincidentally or not, 13 million shares.  That document
19   is only one document in the other chain of evidence that
20   comes along.
21            Mr. Markosian's agent, Capital Lounge GmbH --
22   which was retained all the way back in 2016 to work on
23   the Marche Libre -- Marche Libre exchange application
24   and also the Malta application and also the creation of
25   AmeriMark Group -- now also writes the analyst report,

1    evaluation report, for the admission to trading of

2    AmeriMark Group shares on the Vienna Stock Exchange.

3    That report is dated June 17th, 2019, and that report

4    lists, front and center, Mr. Markosian with his some 6.4

5    million 441 thousand, I think, 500 shares from memory,

6    as a minority shareholder of about 24 percent of

7    capital, and Whitetree Capital, 13 million shares.

8            That report is then submitted to the exchange

9    and published, and it's been on the web ever since

10   June -- its publication date, June 17th, 2019, again

11   showing, again, the -- and now in a public form, a very

12   public form, offered as an analyst report, showing that

13   stake.

14           Then you have the disclosures to the Vienna

15   Stock Exchange in terms of the listing application,

16   which lists Mr. Markosian with 6,441,500 -- I think,

17   again, that's from memory -- and Whitetree Capital is

18   the single largest shareholder with 13 million shares

19   submitted to the exchange.  Very, very official piece of

20   documentation.

21           Then we have, later, in a presentation to the

22   Vienna Stock Exchange entire listing committee

23   consisting of five persons, which included, at least,

24   Martin Wenzl and Susanne Plank -- I'll spell those for

25   you later, to the court reporter, if you need -- Susanne

```
 1    Plank -- a meeting that went four and a half hours at

 2    minimum, which included John Kirkland, the COO of Rymark

 3    and AmeriMark Group at the time, and Mr. Frank Hueser.

 4    Frank Hueser was the manager at that time of AmeriMark

 5    Group hired to deal with European expansion, which I'm

 6    sure will be a topic on deposition later.  In that

 7    meeting, after Frank Hueser -- and this is his second

 8    time flying to Vienna on behalf of the company to

 9    present to the Vienna Stock Exchange.  At that meeting,

10    Frank Hueser outlines all sorts of activities happening

11    in Europe with relation to the exchange, and

12    Mr. Kirkland, in a FaceTime presentation, gives a full

13    tour of, I believe, the Taylorsville facility of Rymark

14    Inc. in the capacity of the COO of both Rymark Inc. and

15    AmeriMark Group.

16              In that conversation, with Mr. Kirkland

17    present, according to Mr. Hueser, the topic of Whitetree

18    Capital as the single largest shareholder of AmeriMark

19    Group is repeatedly raised.  The exchange is naturally

20    interested in who is the single largest shareholder, et

21    cetera.  My understanding is also that that question was

22    imposed at least once to Mr. Kirkland, who had answered

23    that he wasn't prepared to talk about anything on the

24    European side, which I understand since he was the COO.

25    But at no time did anyone say, no, Whitetree is not a
```

1    shareholder.  And, in fact, the public documentation has

2    supported Whitetree as a shareholder for all this time.

3           And now we have Mr. Markosian apparently on a

4    share ledger of Whitetree as a stakeholder in Whitetree

5    and we have -- despite the fact that Mr. Markosian and

6    the defendants have been for years pretending that they

7    have no idea who Whitetree was, it turns out that

8    Whitetree was well known, not only to the defendants all

9    the way in March 2020 -- because, number one it's listed

10   in 15 or 20 emails between Rymark's controller, Vicky

11   Small, and Katz, Sapper & Miller, the auditors,

12   including emails to JP Bryan and Bryan Burns of Katz,

13   Sapper & Miller.

14          In addition to that, more evidence that there

15   was actually a Whitetree transaction and that Whitetree

16   is actually known to the defendants, despite their

17   vehement and repeated denials, there's a long discussion

18   in Katz, Sapper & Miller about the Swiss tax audit in

19   which Vicky Small, controller of Rymark, forwards the

20   KYC information of the signatory to Whitetree, Erika

21   Ziconnie [ph], whose name is on the signature of every

22   share ledger that I've seen anyway and much of the

23   documentation involving Whitetree.  Ms. Small obviously

24   knew exactly who she was and forwards that information

25   to Katz, Sapper & Miller again in March 2020 in the

 1    context of a Swiss audit.

 2            So I understand that, very much like the first

 3    transaction that Mr. Markosian sort of engaged in where

 4    he somehow got shares -- 500,000 shares of AmeriMark

 5    Automotive to his friends, family, and employee members

 6    and that there's no documentation there because this is

 7    a private sale between private parties, and

 8    Mr. Markosian either retained, is withholding, or

 9    destroyed that documentation -- I suspect, because

10    Mr. Markosian doesn't have a particular interest in

11    acknowledging that Whitetree exists or that he was

12    involved in it, that that documentation has been

13    disposed of.  It's only my suspicion, but when you ask

14    me if there's any evidence that that transaction was

15    real, frankly, I could go on for probably another

16    ten minutes, but you look tired.

17        Q.  Well, let's begin with the January 18, 2019,

18    share ledger that you referenced a couple of times in

19    that answer.  Who added Whitetree to that share ledger?

20        A.  Could we take a look at that share ledger?  Do

21    we have a copy of that document here?

22        Q.  Do you have -- do you have an answer to my

23    question?  Who added Whitetree to that?

24        A.  Who added Whitetree to that.  Well, what I

25    know about the origin of that share ledger, which I've

1    testified to already just now, is that that original
2    template of the share ledger actually came for the
3    lawyer.  I think it was Markus Thier.  And you can see
4    this.  This is -- again, December 15, 16, 17; right?
5    And -- or maybe -- maybe it might even be early January.
6    And there's the interaction between Nicolai Colshorn and
7    the lawyer.  And the certain -- there's certain --
8    several drafts of the share ledger.
9            One of the drafts of the share ledger earlier
10   than that was developed directly from the documentation
11   the original shareholder list that Mr. Markosian
12   provided.  You can see, and I've taken a look at it,
13   from that original list in 2017 that the addresses are
14   roughly copied and roughly the same, that the dates --
15   that the actual shareholders are in the same order.
16           The actual Excel document you can see drafts
17   in production -- the template of the Excel document that
18   shows up in many, many other versions of the share
19   ledger, again, came from Markus Thier, and then that
20   went to Nicolai Colshorn.  There was some back and forth
21   and discussion between Nicolai Colshorn, Markus Thier,
22   and the listing agent Mr. Leshem, and the share
23   holder -- the new share ledgers then produced.  As to
24   who exactly in that combination put Whitetree on, I
25   couldn't tell you.

1    Q.    I'm going to mark Exhibit D 109.

2          (Exhibit D 109 was marked.)

3    A.    So we do have a copy -- well, no this is not

4    the copy, but very well.  I'm sorry.  Please continue.

5    Q.    (BY MR. RICHARDS)  So do you see in front of

6    you, Mr. Bernhardt, that Exhibit D 109 is an email from

7    Adrian Zehnder to Mr. Leshem dated January 18, 2019?

8    A.    I do.  And I have to correct myself.  I have

9    been saying Markus Thier when I meant Adrian Zehnder.

10   They're both at Gysi Partner.  I apologize for the

11   mistake.

12   Q.    In the second paragraph of Mr. Zehnder's

13   email, it says, "To your query:  I have provided

14   Mr. Colshorn with a shareholders' list to be signed and

15   returned to you.  The draft is attached to this email."

16         Do you see that?

17   A.    I do.

18   Q.    And we see the draft attached.  It's the next

19   page of this exhibit, the next physical page, I should

20   say.  This looks like a draft of a share register;

21   correct?

22   A.    It is.  And this is exactly the Excel sheet I

23   was referring to.

24   Q.    But Whitetree's not on it; right?

25   A.    Not on this example, no.

1        Q.   So why wasn't Whitetree on it as of

2   January 18, 2019?

3             MR. WORDEN:  Calls for speculation.

4             You can answer.

5        A.   Well, one of the reasons is because until the

6   transaction was reported to the company it's not

7   possible to put it in the share ledger.  I've testified

8   on this in numerous ways.  I'll repeat myself again.

9   The company is not able to register a transaction,

10  especially when they're only registered shares, until

11  the parties to a transaction actually report that.

12            I've given the example before, and I'll give

13  it again, as so to why it would be that there would be a

14  transaction that would not be recorded in the share

15  ledger.  I also want to point out this is not the signed

16  share ledger.  This is a draft share ledger, and there

17  are many other draft share ledgers too.  So it's not

18  necessarily surprising that it might not be accurate

19  yet.

20            If Bob and Sally are shareholders --

21            (Reporter clarification.)

22       A.   If Bob and Sally are shareholders in a Swiss

23  company and that company has registered shares, and the

24  registered shares -- that means they're listed in a

25  share ledger, very much like the one in this exhibit;

1  right?  These are the shareholders.  Bob sells his

2  shares -- let's say he has 500 shares -- to Phil.  The

3  company has no way of knowing that that transaction has

4  happened.  And in Switzerland, the company, in fact,

5  isn't really allowed --

6                    (Reporter clarification.)

7       A.   To poke that hard away at it.  It was a bit of

8  a flub.

9            The company's interest is in -- and the board

10  of directors has a responsibility to the best of their

11  efforts to maintain an accurate share ledger, but best

12  efforts is the key there.  Bob has sold shares to some

13  third party.  If Bob doesn't report that the shares are

14  sold to the third party and the third party doesn't

15  report his new shareholding to the company, well, the

16  company has no way of knowing that transaction has taken

17  place.

18            In the -- you can get even more visanteen [ph]

19  with this, and this bears directly on why Whitetree

20  might not have been in this particular example.  Adrian

21  Zehnder doesn't appear to have been involved in the

22  Whitetree transaction.  So his draft of the share ledger

23  necessarily wouldn't -- necessarily have Whitetree in

24  it.

25            Now, again, we have a private transaction

1   between Mr. Markosian and Whitetree, and neither has

2   yet, as of this moment, apparently reported that

3   transaction.  I believe that transaction was consummated

4   something like January 15, 16, 17, 18, something like

5   that, and this, of course, you can see this email is

6   January 18.  So, again, who has reported the

7   transaction?

8              Also note that it's in Mr. Markosian's

9   interest not really to report the transaction until he

10  has to because there are compliance issues here.  So

11  it's possible that things were going on in the

12  background that made it that there was some delay or

13  there was motivation to delay reporting that

14  transaction.

15             Now back to the Bob and Sally example.  The

16  other way you can get even more difficult is the filing.

17  What if the third party -- and this is -- this will come

18  right into play when we start talking share counts.

19             (Reporter clarification.)

20  A.   What if the third party now presents itself to

21  the company and says, "I'm a shareholder," and has a

22  brokerage account statement?  Well, now you have

23  overcounted shares because the seller has not reported

24  their share.  The buyer has shown that they own shares,

25  but the company now has a quandary because they don't

1    know where those shares exactly came from.

2           So this is another example in which you can

3    see it's not always true that these are totally accurate

4    all the time.  A share ledger is a snapshot, like a

5    balance sheet, and the moment actually it's printed and

6    signed, it's liable to be out of date and obsolete

7    within minutes if somebody, without reporting themself

8    to the company, sells their shares and somebody else

9    buys the shares.  So it's not -- it's not unusual at all

10   that the lawyer of the company, who's acting on all the

11   information, would provide a draft that doesn't include

12   the most recent transactions.

13        **Q.   (BY MR. RICHARDS)  When was Whitetree**

14   **transaction reported to AmeriMark?**

15        A.   At least by January 18th, 2019.

16        **Q.   At least by -- I'm sorry -- January 18th?**

17        A.   Let's -- the dates of the share ledger that is

18   first signed by Nicole.  It might be the 19th.  I'm

19   sorry.

20        **Q.   Whatever the date is on that ledger?**

21        A.   On the signed one, it had to be at least by

22   then.

23        **Q.   I'm going to mark Exhibit D 110.**

24             (Exhibit D 110 was marked.)

25        **Q.   (BY MR. RICHARDS)  Mr. Bernhardt, you have in**

CAPANA SWISS ADVISORS AG vs RYMARK                               30(b)(6)
SHAEN BERNHARDT - 01/24/2025                                     Page 44

1    front of you what's been marked as Exhibit D 110.  This

2    is a January 24th, 2019, email from Mr. Leshem to

3    Mr. Colshorn.  Do you see that?

4         A.   I do.

5         Q.   And Mr. Leshem says to Mr. Colshorn, "Please

6    sign and forward attached shareholder list to

7    Computershare."  Do you see that?

8         A.   I do.

9         Q.   And on the reverse side of the page is the

10   attachment, and you see that this is another draft

11   shareholder list?

12        A.   I do.

13        Q.   Correct?  Unsigned, yes?

14        A.   This one is unsigned.

15        Q.   But this one includes Whitetree Capital, yes?

16        A.   It does.

17        Q.   So did Mr. Leshem add Whitetree Capital to

18   this shareholder register?

19        A.   I don't know.

20             MR. WORDEN:  Objection.  Calls for

21   speculation.

22        Q.   (BY MR. RICHARDS)  Who would know?

23        A.   Honestly, I don't know.  Could -- it could

24   have been Adrian Zehnder.  It could have been Leshem.

25   It could have been Colshorn.  It could have been

1    somebody from Whitetree reporting the transaction.  It

2    could have been somebody representing Mr. Markosian

3    reporting the transaction.

4         **Q.   Why didn't you ask Mr. Leshem in preparation**

5    **for this deposition?**

6         A.   Why didn't I ask Mr. Leshem what?

7         **Q.   Who added Whitetree to the share register?**

8         A.   Well, frankly, it seemed pretty clear to me

9    that the share ledger followed exactly the path of the

10   transaction in terms of, in December, the discussions

11   and from what I saw of the Whitetree production in

12   January 14, 15, 16, the closing of something -- the

13   closing of the transaction, the dates on the share

14   ledgers for Whitetree matching the date 19 June or 18

15   June, whatever the signed version is.

16        It didn't occur to me that it would be

17   important to know precisely who had corrected the share

18   ledger, because it looked to me to be quite authentic.

19   It also looked to me to really follow the entire

20   chronology.  So there's a lot of looking into that I

21   spent as you can tell from my testimony.  I spent a

22   great deal of time looking, not just into the share

23   ledger, but the three months of activity that preceded

24   it in four different countries.

25        **Q.   Who -- when did Mr. Colshorn sign the share**

 1    register?

 2         A.   Well, as far as I know, he signed it on the

 3    proper date.

 4         Q.   **The email we're looking at now, though, is**

 5    **six days later; correct?**

 6         A.   This isn't a signed version.  This is a

 7    version that's going to be sent, in theory, to

 8    Computershare.  Computershare doesn't actually care

 9    whether it's a signed version or not.

10         Q.   **If Computershare doesn't care whether it's a**

11    **signed version, then why didn't Mr. Leshem just send an**

12    **unsigned version to Computershare?**

13         A.   I don't have the answer to that question.

14         Q.   **If Mr --**

15         A.   Wait just a sec.  What did you -- could you

16    read the question back for me?  I apologize.

17              (Record read: 46:10-12.)

18         A.   Well, so why did Mr. Leshem send an unsigned

19    version?  Well, Computershare is going to take the

20    electronic version -- and, by the way, we talked

21    yesterday about when the Heric Gardiner/Eric Gardiner

22    typo error came in.  In this particular one, I don't

23    know if it's a mistake.  I'm kind of curious.  This one

24    has Heric Gardiner in it.  So what's happening here with

25    these electronic ledgers, it's just an Excel sheet, and

1    the Excel sheet is used by the company, AmeriMark

2    Automotive in this case, in a couple of different ways.

3            One, you take a mail merge function in Word

4    when you're sending out correspondence to the

5    shareholders, and you can kind of see the evidence of

6    that because here the Heric Gardiner error that has

7    caused so much jumping up and down by the defendants was

8    introduced, according to Mr. Colshorn, basically because

9    an autocorrect changed Eric to the German name Heric.

10   Obviously he is German -- Mr. Colshorn.  So this is the

11   electronic version.

12           Computershare is going to do very much the

13   same thing.  You're sending them an electronic version

14   so they can import it.  If you send them a signed PDF,

15   they're just going to have to go and have somebody type

16   it in anyway.  So Computershare -- all those electronic

17   shareholders -- they want, from the director, which is

18   what Mr. Leshem is saying here, who is the authority on

19   the share list, to send an electronic copy.  So the fact

20   that this was sent to Computershare days after the

21   transaction was consummated doesn't strike me as unusual

22   at all.  I don't know how long it would take to kind of

23   put it together or how it was exactly reported, but this

24   doesn't seem unusual to me.

25           Q.  If Mr. Colshorn had signed the share register

1    on January 18th, why was Mr. Leshem asking him to sign

2    it again on January 24th?

3         MR. WORDEN:  Calls for speculation.

4    A.   I don't know the answer to that.  Perhaps

5    Mr. Leshem hadn't seen the signed version by that time.

6    Perhaps Mr. Colshorn hadn't forwarded it to him.

7    Mr. Colshorn wouldn't necessarily have a reason to

8    forward to Mr. Leshem the share ledger until it was

9    needed for something because that's a corporate record.

10   I can certainly see a circumstance in which the share

11   ledger is signed, it sits in the books and records in

12   the company, Mr. Leshem takes the draft version that he

13   has, not knowing that it's been signed, and then goes to

14   Mr. Colshorn and says, "Well, we're going to have to

15   send this to Computershare.  Here you go."

16   Q.   (BY MR. RICHARDS)  What's the earliest date

17   that the signed share register appears in plaintiff's

18   production?

19   A.   I don't know the answer to that question off

20   the top of my head.  And when you say appears in

21   plaintiff's production, do you mean when did we produce

22   it?

23   Q.   No.  When's -- if -- when's the earliest date

24   it was attached to an email?

25   A.   I don't know the answer to that question, but

1    it's in a file in the books and records that's from

2    January or February.  I think those were quarterly

3    files.  I think there's a file that's January, February,

4    March, first quarter, and I remember it being in the

5    first quarter file -- the physical document that we used

6    to produce.

7         **Q.   I'm going to ask that the court reporter mark**

8    **Exhibit D 111.**

9                   (Exhibit D 111 was marked.)

10        **Q.   (BY MR. RICHARDS)  Mr. Bernhardt, I've marked**

11   **as Exhibit D 111 an email chain.  There are two emails**

12   **on the page, and the lower one on the page is from**

13   **Mr. Leshem to Jeremy Blimbaum.  Do you see that?**

14        A.   I do.

15        **Q.   Who is Mr. Blimbaum?**

16        A.   I think Mr. Blimbaum was either a lawyer or

17   consultant in -- let me look at the date on this.  I

18   think he was in France, and I think he was retained by

19   the company, by which now I think we're -- by this time

20   we're talking about, I believe, AmeriMark Group.  He was

21   retained by the company to work with Euronext on behalf

22   of the company.  I think that's the case.

23        **Q.   And Mr. Leshem's email included some**

24   **information about Mr. Markosian.  Do you see that?**

25        A.   I do.

1       Q.    His date of birth and his address, yes?

2       A.    I do.

3       Q.    And then it has a number of shares, and the

4    number of shares listed here is 19,441,667; correct?

5       A.    That's correct.

6       Q.    Is that the number of shares that Mr.

7    Markosian owned as of the date of this email?

8       A.    Not according to my understanding, no.

9       Q.    Then why did Mr. Leshem get the date -- get

10   the number wrong?

11            MR. WORDEN:  Calls for speculation.

12       A.    You'll notice I'm not on this email, and I

13   wasn't involved with Mr. Blimbaum.  Not only that, but

14   in this -- you'll also notice that the company is not on

15   the copy of this email.  I don't know what Mr. Leshem is

16   doing.  I don't know if he made a simple error.  I don't

17   know if he took something from earlier and copy-pasted

18   it.  I don't know.

19            (Reporter clarification.)

20       Q.    (BY MR. RICHARDS)  Will you grab out of your

21   stack over there Exhibit D 109?

22       A.    Yes.

23       Q.    And this is the email from Mr. Zehnder;

24   correct?

25       A.    Yes.

1        Q.    And it attached the draft unsigned share

2    register.  Do you recall that?

3        A.    I do.

4        Q.    And do you see on that share register that

5    Mr. Markosian's shareholdings are identified as

6    19,441,665 --

7        A.    655.

8        Q.    -- 655.  Thank you.

9        A.    Yes, I do.

10       Q.    That's a different number even from

11   Exhibit D 111, the email.

12       A.    It is.

13       Q.    Correct?  What's -- what's the explanation for

14   that discrepancy?

15       A.    Mr. Leshem is clearly in error, passing the

16   wrong information for one reason or another.  I don't

17   know why.

18       Q.    Was Mr. Leshem aware of the Whitetree

19   transaction?

20       A.    That's not clear when he was or wasn't aware

21   of it.  But at least from the correspondence I've seen,

22   it looks like he did some introductions, and then I

23   don't see him involved in the transaction after that.

24   Did he know that there was a Whitetree and there was a

25   connection?  It looks from the production that I've seen

 1  that, yes, he did, and he started the introductory

 2  process.  But after that, I don't see him anymore in

 3  production, from my recollection.

 4       Q.   Well, he also sent an unsigned share register

 5  to Mr. Colshorn on January 24th that included Whitetree

 6  and asked Mr. Colshorn to sign it; correct?

 7       A.   Well, but when you talk about aware of the

 8  Whitetree transaction, do we mean the transaction or the

 9  end result of the transaction?  I know I'm splitting

10  hairs there, but was he involved in the process?  I

11  don't know.  Certainly he knew who Whitetree was, and he

12  knew who Whitetree was far before this transaction -- is

13  my understanding.

14       Q.   As of January 24th, Mr. Leshem was aware of

15  the result of the transaction, which is that Whitetree

16  owned 13 million shares; correct?

17       A.   I think that's clear.

18       Q.   And we have no idea why he would have told

19  Jeremy Blimbaum otherwise a few weeks later?

20       A.   Well, he's wrong on two counts; right?  He's

21  wrong on what the actual count would be absent to

22  Whitetree transaction, and he's wrong that the Whitetree

23  transaction is not reflected to what was sent to

24  Blimbaum.

25       Q.   I think you testified yesterday that you've

1   had hundreds of conversations with Mr. Leshem in the

2   course of this dispute, before and after the complaint

3   was filed; is that correct?

4       A.   So by the course of this dispute, are we

5   talking about since September 16th, 2020, when

6   Mr. Pehrson sent the disavowal letter?

7       Q.   Sure.

8       A.   Yes.  For sure, I've had hundreds of

9   conversations with him.

10      Q.   And not one of those hundreds of conversations

11  has touched on this email; correct?

12      A.   On that particular email, I don't remember.

13  The Blimbaum email?

14      Q.   Yes, the Blimbaum email.

15      A.   No.  I mean, that's -- I wasn't copied on it.

16  The company's not copied on it.

17      Q.   Plaintiffs produced it; correct?

18      A.   Yes, it was in the files from somewhere.  I

19  think it was -- probably came from Mr. Leshem's files.

20      Q.   Yeah, actually.  I want to correct myself.

21  Plaintiffs didn't produce this.  It came from

22  Mr. Hesterman's production.

23      A.   I'm sorry.  So thank you.

24           I mean so, no, I haven't had occasion to talk

25  to him about it.

1      Q.    Are you going to after this deposition?

2      A.    I'm not sure that's a good idea for me to be

3   having conversations with Mr. Leshem based on this kind

4   of stuff given that you attempted to name him as a

5   party, no.

6      Q.    I'm going to mark Exhibit D 112.

7            (Exhibit D 112 was marked.)

8      Q.    (BY MR. RICHARDS)  Mr. Bernhardt, I've marked

9   as Exhibit D 112 an email chain between -- there's

10  Damian Pelletier and Jeremy Blimbaum.  Do you see that?

11     A.    I do.  How was this produced?

12     Q.    This is also from Mr. Hesterman's production.

13     A.    I don't see a Bates stamp.

14     Q.    Yeah, he didn't --

15     A.    That's why I'm asking.

16     Q.    He didn't apply Bates stamps, but yeah.

17  That's --

18     A.    You're representing it was from him?  I

19  believe you.  I just want to know.

20     Q.    Yeah.  I'm happy to make that representation.

21     A.    Good.  Thank you.  That's fine.  Please

22  continue.

23     Q.    So the first four physical sheets of this

24  document are the original, and then I had a translation

25  made, and those are the subsequent four sheets, sheets 5

CAPANA SWISS ADVISORS AG vs RYMARK
SHAEN BERNHARDT - 01/24/2025

30(b)(6)
Page 55

1     through 8.  Do you understand what I mean there?

2          A.   I do.

3          Q.   So if you'll turn the page to the second page.

4     I'm looking in the French portion.  Do you see an email

5     from Jeremy Blimbaum to two Euronext email addresses on

6     February 5th, 2019?

7          A.   I'm having trouble even with the headings for

8     French.  So bear with me but let me --

9          Q.   And I'm sorry.  I steered you wrong.

10         A.   No, no.  Not your fault.

11         Q.   The following page.

12         A.   Does anyone in here speak French?  Not your

13    fault.  Let me try to make sure I'm in the right spot.

14    We're in page 2.

15         Q.   So the page -- the next page.  Yes.

16         A.   This page.

17         Q.   The second physical sheet.

18         A.   The second -- thank you.  The second physical

19    sheet, and you're talking about the first full email.

20         Q.   Correct.

21         A.   I have that now, and this one is the

22    English -- it has English headers.  Please continue.

23         Q.   And you see, halfway through that email or so,

24    that Mr. Blimbaum gives the Euronext exchange the same

25    information about Mr. Markosian, that he received -- he,

1   Mr. Blimbaum, received from Mr. Leshem, namely,

2   Mr. Markosian's name, date, address, and shareholdings;

3   correct?

4        A.   I do see that -- was the -- I believe you.

5   I'm just wondering.  Was the share number 19,441,667?

6   Is that also what was -- yes, it was.  So, yes, I do see

7   that, and, yes, that does match.

8        Q.   And that's wrong; correct?

9        A.   To my understanding, that's wrong.  Let me

10  look at the date again.  February 15th, 2019.  That does

11  not look correct to me.

12       Q.   And you don't have any explanation for why

13  this error occurred?

14       A.   No.  It's clearly wrong.  I mean -- and I'll

15  expand on that too.  It's not just wrong by omitting

16  Whitetree.  It's wrong, I think, without the Whitetree

17  transaction.  I think the number would be different.

18       Q.   Meaning that's the wrong number preceding the

19  Whitetree transaction?  Is that what you mean?

20       A.   I think -- I think that's right.  It wouldn't

21  even be right before the Whitetree transaction, I

22  believe.  We can go back and check, but I don't think

23  that's the point of your question.

24       Q.   I'm going to mark Exhibit D 113.

25            (Exhibit D 113 was marked.)

1      Q.   (BY MR. RICHARDS)  Mr. Bernhardt I've marked

2  as Exhibit D 113 an email from to Miron Leshem to

3  Florian Stahl and Alexander Tietze?

4      A.   Alexander Tietze, yes.

5      Q.   Tietze.  And --

6      A.   I must admit it's an unfortunate name.

7      Q.   And you're CC'd and DS Chang is also CC'd;

8  correct?

9      A.   That's also correct.

10      Q.   And this email is dated August 31st, 2020,

11  yes?

12      A.   It is.

13      Q.   Was Capana in negotiations with Philomaxcap

14  about this time?

15      A.   Yes.  We started having -- I won't say

16  directly with Philomaxcap, but we started having

17  conversations with the German entity that's been called

18  "ficon" Philomaxcap, et cetera, and also its majority

19  shareholder Philocity Global GmbH, which is a German

20  company, again a majority.  So, yes, by this time we've

21  been in those discussions since March of 2020.

22      Q.   So Mr. Leshem attached a number of documents

23  to this email.  I've included excerpts from the second

24  document that he attached described here as IM, and you

25  understand IM to mean information memorandum?

 1       A.   I do.

 2       Q.   So if you turn the page, you see a document

 3   entitled "Information Document May 2019"; correct?

 4       A.   I do.  I'm familiar with many drafts of this

 5   document.

 6       Q.   Do you know who drafted this one?

 7       A.   This document was almost certainly a

 8   combination of -- I don't know -- but I'm pretty

 9   confident that it was a combination of Mr. Leshem and

10   Capital Lounge, which was the listing services

11   consultant to Rymark at the time, and this is the

12   document that predated and was revised, eventually ended

13   up at the Vienna direct.

14                 (Reporter clarification.)

15       Q.   I'd like you to turn to Bates page 15023.

16       A.   I appreciate the Bates stamp.  It makes it

17   much easier.  150 --

18       Q.   23.

19       A.   I have it.

20       Q.   Do you see paragraph 8.5 here?

21       A.   I do.

22       Q.   As of the date of the information document,

23   and according to the shareholder's register, the

24   principal shareholder is indicated below, Nicholas T.

25   Markosian, 19,441,655 shares, 97.2 percentage of

1    ownership.  Do you see that?

2         A.    I do.

3         Q.    That's not right?

4         A.    On this date -- well, let's pick a date here.

5    So this particular document says it's a draft from

6    May 2019; right?

7         Q.    Yep.

8         A.    I don't know when it was actually printed, and

9    this email is submitting this in August of 2020; right?

10   And so no.  On neither of those dates would this be the

11   correct number of shares for Mr. Markosian, according to

12   any documentation that I have, but, on the other hand,

13   this is a draft document, and I've actually seen

14   several -- in reviewing the versions of this, I've seen

15   several erroneous copies of this draft document

16   circulated but not as official applications -- as draft

17   documents.  You can see clearly here under 8.3 that the

18   publication of figures for the financial year ending

19   December 31st, 2018 --

20               (Reporter clarification.)

21        A.    I'm sorry.  I was warned earlier.  I get

22   carried away.

23               You can see there are several gaps in here.

24   And this is fairly typical when you're composing this

25   documentation.  The other thing to note here.  What is

1    the capacity in which this is being passed along, and

2    it's clearly a draft document.  And I note also that --

3    just give me another second because I think I remember

4    certain places that there are other gaps where pieces

5    aren't filled in.  This is a preliminary kind of opening

6    discussion document.  It's not signed.  It's not

7    finalized.

8            So, yes, it's wrong.  But this -- and at this

9    stage -- let's think about this again.  End of August?

10   These are early discussions to try and get things moving

11   along.  I'm not even sure we had the final financials at

12   this point or not, whether these Keddington &

13   Christensen financials that were attached -- by the way,

14   I don't think Keddington & Christensen knew that their

15   financials were being used by Rymark in this way, and

16   they were forwarded by Vicky Small to -- for this

17   purpose.

18           But this is draft documentation.  So it's

19   surprising to me that that error has continued to be

20   propagated, but, in a way, it's draft documentation.  It

21   can be corrected later, and the deal wasn't consummated

22   until far after this.

23           Also just to be completely clear, this was not

24   the version that was submitted in any form either to the

25   pre-listing process or to the -- any listing committee

1    for Euronext.

2        Q.   What information memorandum was submitted to

3    Euronext?

4        A.   Well, I don't think there ever got around all

5    the way to being a full information memorandum submitted

6    because at some point, when the application was sent,

7    then the rejection followed pretty quickly after that.

8    And I don't know that the full application and full

9    final information memorandum, which would have to be

10   reviewed a little bit by the exchange and then corrected

11   before the final listing -- I don't think that was ever

12   finalized.  I could be wrong about that, but I don't

13   think it was ever finalized.

14       Q.   Will you grab Exhibit D 112 again.

15       A.   I have it.

16       Q.   So you recall that these are emails involving

17   Jeremy Blimbaum; correct?

18       A.   I do.

19       Q.   And if you'll turn to -- and I'm sorry these

20   aren't Bates stamped.

21       A.   It's okay.

22       Q.   The third to last physical page of the

23   document.

24       A.   Last physical page.  Second to last?

25       Q.   The third to last.

1       A.    The third to last.  I'm there.

2       Q.    **And you see on the front side of that page**

3   **there's an email from Jeremy Blimbaum dated**

4   **February 5th, 2019.  Do you see that?**

5       A.    The first full email on the page?

6       Q.    **Yes.**

7       A.    I do.

8       Q.    **And that email begins, "Dear, madam" -- and**

9   **I'm reading here from the English transaction.  "I am**

10  **following up with you regarding the reverse listing**

11  **operation through a capital increase of 20 million**

12  shares at .05 CHF of 4Service Cloud (a Swiss law

13  company) in favor of AmeriMark.  I have been able to

14  gather all the requested documents (the delay was mainly

15  due to the finalization of the information memorandum),

16  which you will find attached."

17          So I have not seen the information memorandum

18  that was apparently attached to this email.  Have you?

19      A.    No.  Well, I don't see -- interesting that

20  it's not attached to this email.  Apparently it wasn't

21  attached to this email.  This is from Hesterman's

22  production?

23      Q.    **Correct.**

24      A.    Well, I know that his production generally

25  includes attachments.  Perhaps Mr. Blimbaum did not

```
 1   include it.
 2        Q.   Well, I mean, this is a down chain email, if
 3   that makes sense.
 4        A.   It does makes sense.
 5        Q.   So this is not an email that would include the
 6   attachment, but just to be clear, you've never seen an
 7   information memorandum submitted to Euronext; correct?
 8        A.   Well, I'm not going to swear to that.  I might
 9   have seen a finalized information memorandum that was in
10   the files that was submitted to Euronext, but not in a
11   context that I knew what it was.  I've certainly seen
12   many of the information memorandums or draft information
13   memorandums related to Euronext.
14             And the other thing I'll note about this is
15   that, again, now Mr. Blimbaum was forwarding to Euronext
16   apparently erroneous information about Mr. Markosian.
17                  (Reporter clarification.)
18        Q.   And your expectation is that the information
19   memorandum would also contain that erroneous
20   information, yes?
21        A.   I mean, I'd have to speculate.  I can't say
22   that.  No.  I mean, I haven't seen what was actually
23   submitted, the actual submission document.
24        Q.   Would that document -- that information
25   memorandum that was actually submitted be in AmeriMark
```

 1   Automotive's files?

 2        A.   Well, I know I've seen several information

 3   memorandums, but, again, which one was specifically

 4   sent, I don't know.  I haven't -- again, with this

 5   email, the company is not copied on this email.  So

 6   that's unfortunate, because if Mr. Colshorn, for

 7   instance, had been copied on this email, then we would

 8   have a copy of exactly what had been submitted.  It

 9   looks to me like Mr. Blimbaum was the one who submitted

10   it, and the company was not copied.

11        Q.   Okay.  I'm sorry to go back and forth.

12        A.   That's fine.

13        Q.   Now I want to return to D 113.

14        A.   Yes.

15        Q.   And I'd like you to turn to the Bates page

16   ending in 29 -- 15029.

17        A.   15029.  I have it.

18        Q.   And you see that these are financial

19   statements of Rymark Inc. for the years ended

20   December 31st, 2016, and 2017; yes?

21        A.   I do.

22        Q.   And it looks like these were essentially

23   incorporated wholesale into this draft of an information

24   memorandum; is that right?

25        A.   Can I take a quick look?  I think you're

 1  right.  I'd like to just take a peek at a couple of

 2  things.  What I'm really looking for is to see if these

 3  are the signed statements.  My memory of this is that

 4  they are.  Where is the representation letter?

 5           They are.  Although, that does look weird that

 6  it gets spaced out, but these would be the April 10,

 7  2018, signatures, and, yes, it does look like they've

 8  been wholesale incorporated.  And I believe that I've

 9  also seen copies of this information document in which

10  they were.  The provenance of this KNC stuff actually is

11  that it came directly from Ms. Small to support the

12  listing application.  I understand from later testimony

13  that maybe she didn't have permission to do that.

14       **Q.   I'd like you now to turn to Bates page ending**

15  **in 32.**

16       A.   Ending in 32.  Yep.  I'm there.

17       **Q.   And this is, essentially, the -- I mean, it's**

18  **titled on the previous page "Independent Accountant's**

19  **Review Report."  This is essentially a cover letter to**

20  **the financials themselves, yes?**

21       A.   Yes.

22       **Q.   And you see a heading there "Known Departure**

23  **from Accounting Principles Generally Accepted in the**

24  **United States of America"?**

25       A.   I do, and I'm familiar with those passages in

 1   so many financial statements.

 2        Q.   And the first sentence here is "Accounting

 3   principles generally accepted in the United Statements

 4   of America -- require the financial statements of an

 5   entity that is wholly owned by another entity to be

 6   consolidated in the owning entity's financial

 7   statements."

 8             Do you see that?

 9        A.   I do.

10        Q.   Is that an accurate description of accounting

11   principles, to your understanding?

12        A.   I mean, I'd have to go back and look -- you

13   know, ask me back in 2018 and see exactly what those

14   were.  I'm not an accountant.  I'm not a CPA.  I don't

15   have a reason to doubt that that's accurate.

16        Q.   Rymark did its own financials rather than

17   having its financials consolidated into AmeriMark

18   Automotive; correct?

19        A.   No, that's not correct.

20        Q.   Okay.  Can you explain to me how it isn't

21   correct?

22        A.   Well, yes, in quite some detail actually.  So

23   on April 1st, 2016, Rymark signed the listing agreement

24   and the term sheet with a none to capital to start the

25   process of creating AmeriMark Automotive by contributing

 1   Rymark, as we all know, 100 percent into the new

 2   structure.

 3           When that was done, Ms. Small, on April 21st,

 4   2016, sent, with Mr. Markosian in copy, a series of

 5   financial statements.  That was only one email of

 6   several.  Ms. Small was tasked, as far as I can tell, by

 7   Mr. Markosian, with assembling a great deal of financial

 8   statements by Rymark, including four years of prior

 9   financial statements, I think at least.  It was three or

10   at least four years.  These were prepared by White &

11   Associates mostly, from my recollection.

12           Since this was 2016, I think that would have

13   2013, 2014, 2015 reviewed, because there were no audits

14   yet, that I understand, at Rymark -- reviewed financial

15   statements.  It might have gone even further back.

16           I believe this is also the time that Ms. Small

17   went so far as to send very, very large numbers and

18   other pieces of information along to the listing agent

19   and to the attorneys Daniel Gysi in Switzerland -- that

20   the defendants never had any communications with

21   according to their pleadings -- including things like

22   general ledger, including a series of tax files.

23           Ms. Small went so far as to provide the

24   passwords to the zip files so that the people at the

25   other end could undo the encrypted tax files.  A huge

1    amount of information.  And the purpose of this was

2    extremely clear and direct.  It was to create first

3    initial financial statements, including consolidated

4    financial statements, which consolidated Rymark up into

5    the structure.

6              Just a reminder, this is not three weeks into

7    the initial project after April 1st, 2016.  Those

8    financial statements were sent to, among others, Bayat

9    Vible [ph].  Bayat Vible [ph], now deceased, is a

10   certified stamped auditor, was a regulated auditor, and

11   his firm Charles Trust -- also stamped and regulated in

12   Switzerland as a full auditor, and he prepared the

13   initial balance sheet for AmeriMark Automotive.  That

14   balance sheet was dated June 6th, 2016.

15             In support of that balance sheet -- and this

16   is where, frankly, the fraud began, and it's changed in

17   complexion of this entire case in this last three weeks

18   that I've started to understand this.  I always assumed

19   that Mr. Markosian had sort of been caught in a bit of a

20   spiral and that he had made up a few shareholders and

21   had to start forging signatures and got away from him.

22   But, in fact, the fraud started immediately, because

23   Ms. Small, again, at Mr. Markosian's direction, falsely

24   represented that Rymark Properties LLC was a wholly

25   owned subsidiary of Rymark.  That was false.  It's

1   always been false.  Nick Markosian in his testimony has

2   told us so.  He's the 100 percent owner.

3           That information was taken by the Vible [ph]

4   auditor and turned into a set of consolidated financial

5   statements for AmeriMark Automotive, the initial

6   financial statements.  They also included standalone

7   financial statements, again, dated June 6th, 2016,

8   standalone financial statements.  Unfortunately, that

9   means there was a very serious fraud committed because

10  that overvalued AmeriMark Automotive with 900,000 --

11  900,000 francs instead of a substantially lower amount

12  if AmeriMark Properties had not been included.

13          What's important to know about that in the

14  context of the consolidation is those consolidated

15  financials that pass up Rymark's revenue, Rymark's

16  balance sheet, Rymark's expenses straight into the

17  accounting, and Mr. -- frankly, Mr. Vible [ph] did a

18  good job.  They're pretty strong financial statements.

19  Those financial statements serve as the basis for every

20  corporate transaction that followed, and they were

21  totally fraudulent.

22          And there were more consolidations.  In fact,

23  those financial statements were updated frequently and

24  showed total consolidation of Rymark into the structure,

25  culminating even further.  At the eve of the AmeriMark

1    Group transaction, Ms. Small and Mr. Markosian, on

2    Markosian scanners, Rymark's scanners, from Rymark email

3    addresses, signing two key documents -- the first a

4    valuation of Rymark Group, which shows Rymark and Rymark

5    Properties erroneously, fraudulently, as a hundred

6    percent subsidiary, consolidating the equity of those

7    entities into AmeriMark Automotive.

8           Both Ms. Small, in her capacity as controller

9    of Rymark, and Mr. Markosian, in his capacity as

10   president of Rymark, signed those documents and

11   forwarded them on, this time to the new auditor,

12   Mr. Kammerlander -- Mr. Kammerlander, who is a member of

13   the board of directors of Capana, the plaintiff here,

14   and also a counter defendant since defendants decided to

15   sue him for doing his audit work.

16          That document then -- those set of documents,

17   those consolidated financials consolidating Rymark up

18   into AmeriMark Automotive, were used for Mr. Markosian

19   and the other 18 shareholders to offer their Swiss

20   securities for sale to 4Service Cloud Tech, another

21   Swiss company, fraudulently because 4Service Cloud Tech,

22   ignorant of these misrepresentations, had no clue that

23   it was buying tainted shares.

24          So, yes, those were consolidated.  The other

25   document that's very key there was the confirmation

 1   document, again, sent April 24th, 2018.  That

 2   confirmation document which Mr. Markosian signed

 3   asserted that Rymark was the 100 percent subsidiary of

 4   AmeriMark Automotive on that day, and those were sent to

 5   the others.  So, yes, there are plenty of times when

 6   Rymark has produced consolidated financials

 7   consolidating all of Rymark into the Swiss entities.

 8        Q.   Will you turn to page -- Bates page 15036.

 9        A.   5036, yes.  Yes.

10        Q.   Do you see that there -- there's data on this

11   page that records dividends?

12        A.   I do not see dividends on this page, no.

13        Q.   So do you see that on the left side, balance,

14   December 31st, 2015?

15        A.   I see dividends here.  I don't see dividends

16   declared, unless they're listed as retained earnings

17   deficits.  That's possible.

18        Q.   So there are dividends listed here.

19        A.   If retained earnings deficits, which could be

20   dividends, are dividends, then, yes, I think there would

21   be dividends here.

22        Q.   They're identified as dividends; correct?

23        A.   If they're under the retained earnings

24   deficits column, I think that's correct.

25        Q.   Did Rymark ever pay dividends to AmeriMark

1    Automotive?

2        A.    Not to my knowledge, no, and this became a

3    rather serious issue when there was a Swiss tax on it.

4    Swiss tax on it began -- and I'm doing this from memory.

5    The Swiss audit began of AmeriMark Automotive, and by

6    extension Group, or perhaps the other way around --

7                    (Reporter clarification.)

8        A.    Let me restate that for the poor court

9    reporter who has to tolerate me.

10               The Swiss tax audit -- and I'm doing this all

11   from memory.  But the Swiss tax audit began somewhere, I

12   think, in 2018 or 2019, and it was in reference to

13   AmeriMark Group and AmeriMark Automotive.  And the

14   reason this dividend issue came up -- and I think it's

15   important to discuss how we came along the information

16   that the dividends hadn't been paid up -- is because, in

17   Switzerland, a tax on dividends or on hidden

18   dividends -- that is, something that the Swiss tax

19   authority deems to be a dividend -- is an onerous tax.

20               The directors -- members of the board of

21   directors are joint and severally liable for those

22   dividends with the company.  So you get a lot of

23   attention very quickly.  The Swiss tax authority loves

24   enforcing these because they get compliance right

25   away -- the directors have a pinch.

1           So there was sort of some consternation in

2    2019 and 2020 when the Swiss tax authority began a

3    routine audit.  They do them almost by -- by rule, every

4    four years or whatever rotating basis, and they started

5    questioning at first the valuation of Rymark.  Ms. Small

6    and Keddington & Christensen, including Greg Jenkins

7    [ph], participated in a number of conference calls in

8    order to address some of the issues brought up by the

9    Swiss tax authority.  So there was immediate response by

10   Rymark to deal with these things.

11          In the course of that -- and by the way,

12   Rymark also provided substantial documentation on Rymark

13   Properties in order to validate what the Swiss tax

14   authority was asking about, the value of the

15   contribution of Rymark back in -- and I think, again,

16   this is -- included both transactions, 2016 Automotive

17   and Group in 2018.  So both of those were being looked

18   at.

19          So Rymark provided a great deal of

20   information, including about Rymark Properties, as if

21   Rymark Properties was a wholly-owned subsidiary of

22   Rymark in order to satisfy the Swiss tax authority that

23   the contribution had not been undervalued.  Undervalued

24   is important.  When you undervalue a contribution like

25   that, the Swiss tax authority says, well, you were

1    supposed to pay a stamp duty on a larger amount.  So

2    they're always looking for that.

3            So Ms. Small provided a great deal of

4    information, and the Swiss tax authority was mostly

5    satisfied on that issue.  They assessed a small -- you

6    know, something like 20,000 on that.  But then yes.  And

7    here we come to the dividends.

8            They -- and I believe somewhere in the

9    documentation, the Swiss tax authority saw something

10   that was actually called distributions, not dividends,

11   and that's what keyed their attention.  And I think

12   Mr. Colshorn and Mr. Small, not being familiar with the

13   sort of English use of distributions, didn't understand

14   that those had been dividends.  And, yes, Swiss tax

15   authority said, "If you've been paid dividends, if your

16   subsidiary has paid dividends and you're the 100 percent

17   owner, they must have gone to AmeriMark Automotive.  So

18   where are the taxes that you should have paid on those

19   dividends?"  There were no good answers for this

20   question.

21           By this time it's now March to perhaps April

22   or May of 2020, and that question started to filter up

23   into Rymark -- down to Rymark, I should say -- from

24   AmeriMark Automotive.  Mr. Colshorn was, of course, very

25   upset about it because he was potentially personally

 1    liable for any assessments here, and eventually the tax

 2    authority got very aggressive about it because their

 3    view was there had been dividends and there had been no

 4    payments, and not only that, but they hadn't been

 5    declared.

 6            And this went on for quite some time, and,

 7    frankly, it's very unusual to me that within a few

 8    months of -- of that discussion, which included,

 9    tangentially at least, Bryan Burns and JP Bryan at Katz,

10    Sapper & Miller at the time and Vicky Small discussing

11    the Swiss tax on it and what it meant and how to resolve

12    it.  Then it was awfully unusual, from my perspective,

13    that three -- two and a half to three months later,

14    September 16, 2023, the disavowal letter gets written.

15    I thought that timing was convenient.  So, yes, this was

16    a huge issue and continued to be an issue.

17            Eventually, the Swiss tax authority attempted

18    to assess a 250,000 franc tax, which Mr. Colshorn was

19    unbelievably upset about.  That's one of the reasons

20    that we got involved in May 2019 -- is because that tax

21    issue came along, and we agreed to pay it off

22    unconditionally, knowing that actually the owner of

23    Orbital at the time, the entity that was doing the

24    transaction, was very skilled in dealing with the tax

25    authorities and actually made a bit of his cottage

 1   business dealing with these dividend issues and helping

 2   directors through it.

 3          Eventually, I think they came down from 250

 4   to -- from my memory, 57,700 Swiss francs, which we then

 5   paid off, laboriously, in a payment plan over, I think,

 6   six months.

 7          MR. RICHARDS:  Thank you.  So I'm going to

 8   move to strike everything except for the sentence and

 9   note for the record that I asked a yes-or-no question,

10   and the witness spoke for more than five minutes.

11       Q.   (BY MR. RICHARDS)  Will you please turn to

12   Bates page 15040.

13       A.   I will.  150 --

14       Q.   40.

15       A.   40.

16       Q.   These are the notes to Rymark's financial

17   statements; correct?

18       A.   Correct.

19       Q.   And do you see the heading Income Taxes about

20   halfway down the page?

21       A.   I do.

22       Q.   And this paragraph says, "The company elected

23   to be taxed as an S corporation, and as such, the

24   company's taxable income and losses are passed through

25   to its stockholder.  Accordingly, no provision for

 1    income taxes has been made."

 2              As of the date of this document, May 2019, who

 3    was Rymark's stockholder?

 4        A.    May -- give me the date again -- I'm sorry --

 5    that you referred to.

 6        Q.    May 2019.

 7        A.    May 2019 the stockholder was 100 percent

 8    AmeriMark Automotive.

 9        Q.    Were Rymark's taxable income and losses passed

10    through to AmeriMark Automotive?

11        A.    They were not.

12        Q.    And in your view, that was a violation of tax

13    law; correct?

14        A.    We didn't understand it at the time, but yes.

15    Now -- can I expound on that a little bit without you

16    striking or --

17        Q.    Briefly.

18        A.    Briefly.

19              MR. WORDEN:  If you have to answer a question,

20    answer the question.

21        A.    The first person who sort of began to notice

22    this was Nicole Kuster, who was the accountant at the

23    time for both the AmeriMark Group and AmeriMark

24    Automotive.  And it's -- the S corp issue is an obscure

25    issue.  It's so --

```
 1                  I'm sorry.  I kicked John Worden, my attorney,

 2      under the table.  That was not me signaling anything.

 3                  The S corp issue is a bit of an obscure

 4      issue -- so obscure that we had to retain Helm Advisors

 5      in Switzerland to actually explain to us how bad a

 6      situation actually was after quite some time, but yes.

 7      The gist of it was, until 2018, you could not be an S

 8      corp, and that's true, I think, of Utah both and

 9      federally.  You cannot have a S corp and do pass-through

10      taxation if you have, one, a non-national person

11      shareholder, even one, or, two, a foreign shareholder.

12      So to be 100 percent owned by a foreign shareholder is a

13      complete -- you can't make S corp elections.  You can't.

14                  This issue was brought up by Mr. Markosian's

15      own employees also two or three times.  So we didn't

16      catch it until Ms. Kuster started asking about it in the

17      context of the Swiss tax audit.

18          Q.   (BY MR. RICHARDS)  Will you turn to page --

19      Bates page 15042.

20          A.   I'm there.

21          Q.   Do you see Note 7 that's titled "Related Party

22      Transactions"?

23          A.   I do.

24          Q.   And this says, "Due from Related Parties."

25      And then the first item is a "Receivable from an entity
```

1   that is owned by stockholder that is in the process of

2   being formed.  The receivable is considered long term."

3        A.   Yes.

4        Q.   **Stockholder here does not mean AmeriMark**

5   **Automotive; correct?**

6        A.   Well, I can't answer that with any certainty.

7   There's some context here.  I believe that it should

8   have at this day.  Keddington & Christensen was never

9   told the details of the AmeriMark Automotive

10  transaction.  And so since they prepared these reports,

11  I believe they did so with erroneous information.  Also,

12  it was always curious to us, from the very beginning,

13  why the stockholder was not named.  It seemed very

14  unusual construction that you would just say stockholder

15  without any discussion.

16       Q.   **The next paragraph reads, "Receivable from an**

17  **entity that is owned by stockholder that leases the**

18  **premises to the Company."**

19            **AmeriMark Automotive does not own any entities**

20  **that lease anything to Rymark; correct?**

21       A.   I can't think of any.  I don't -- I can't

22  imagine that that this is true.  I can't imagine that

23  AmeriMark Automotive was leasing anything to its

24  subsidiary at the time or now.

25       Q.   **Third paragraph.  "Receivable from an entity**

1    that is owned by stockholder's wife."

2           AmeriMark Automotive -- fair to say it does

3    not have a wife, yes?

4        A.   This was our first clue that there was a big

5    problem here.  I noticed it at some point.  I think I

6    even brought it up in some deposition.  Yes.  I don't

7    think that even in Switzerland that companies can marry.

8               (Reporter clarification.)

9        Q.   (BY MR. RICHARDS)  Turn to Bates page 15043.

10       A.   I am there.

11       Q.   This is still Note 7.  Do you see the heading

12   Related Party Notes Payable?

13       A.   I do.

14       Q.   And the first paragraph references a note

15   payable based on an agreement that the stockholder has

16   with a family investment firm.  You're not aware of any

17   such agreement between AmeriMark Automotive and a family

18   investment firm, are you?

19       A.   No.  This would be, I believe, AAR

20   investments.

21       Q.   And so the stockholder in this -- you

22   understand stockholder here to mean Mr. Markosian?

23       A.   At the time I did not.  Now I do.

24       Q.   So when you say "at the time," what time do

25   you mean?

 1      A.   Well, when I first started looking at this

 2  material in any detail, it wasn't clear to me that

 3  stockholder should mean anything other than AmeriMark

 4  Automotive, but as you go through it now and look at

 5  this, obviously it has family investment and a wife.

 6      **Q.   Yeah.  I mean, that was going to be my next**

 7  **question.**

 8      A.   Yeah.

 9      **Q.   When you saw stockholder's wife, it wasn't --**

10  **it wasn't clear to you that that couldn't be AmeriMark**

11  **Automotive?**

12      A.   It was once we started paying attention in

13  detail, especially after the Swiss tax audit.

14      **Q.   These financials were submitted to the Vienna**

15  **Stock Exchange; correct?**

16      A.   Just a moment.  I'm not sure that that's

17  correct in this case.  I can't say that for sure, no.

18  Some version of them, yes.

19      **Q.   Did anyone at the Vienna Stock Exchange ever**

20  **raise questions about the meaning of stockholder in**

21  **Rymark's financial statements?**

22      A.   No.  No.  And I think one of the reasons for

23  it and one of the reasons most the Europeans didn't

24  catch that either is because these financial

25  presentations are sort of alien to the way you would do

1    them in Europe.  You would do IFRS, and there you simply

2    list a table, and you have to show related parties and

3    these kinds of disclosures in a completely different

4    way.  So I think it's one of the reasons that nobody

5    caught the S corp issue either.  You know, these --

6    these are different presentations than are expected.

7        Q.    What about Philomaxcap?  Did they catch the S

8    corp issue as you just said?

9        A.    Well, this transaction with Philomaxcap didn't

10   happen until much later, and by that time they were

11   completely aware of the litigation.  We didn't

12   consummate the transaction until over a year after --

13   well, let me think.  It was July 2023 when we filed this

14   litigation.  It was over a year later.  No.  Even more

15   than that.  We finally closed the transaction in

16   February of this year -- no.  Sorry.  Let me go back.

17   February of '24.  I'm sorry.

18        So we've been in litigation for, you know,

19   several months beforehand.  So by that time, the

20   presentation of what AmeriMark Group was and the hair on

21   it and the issues in it was known to everybody.  So --

22       Q.    So prior to the filing of the litigation and

23   Philomaxcap receiving notice of that, did Philomaxcap

24   ever raise the S corp issue?

25       A.    No.  It wasn't brought up because we never got

1    to the stage where the raw financials were really

2    cranked away at.  We did commission a German auditor,

3    and it was a court mandated German auditor who prepared

4    preliminary reports on the valuation, but those were

5    based on the stock itself and not consolidated

6    financials.

7            We would have had to do a full-blown

8    consolidated financials once we got the transaction

9    going, but, unfortunately, because of the September

10   letter and all of the other interference from the

11   defendants, they gummed up the works on that transaction

12   for years.  By the time we finally got around to doing a

13   full-blown audit and going through all of this material

14   and also doing a discussion about the litigation and the

15   risks and et cetera, it was well clear that the

16   financials were tainted.

17       **Q.    You mentioned a German auditor.  Do you mean**

18   **Mr. Wesling [ph]?**

19       A.    Wesling [ph].  He was one.  He was the court

20   appointed auditor who had a very limited role.  He

21   didn't conduct a complete audit.  He did very much what

22   Mr. Kammerlander would do -- looked at the very basic

23   documentation, looked at the share counts, looked at the

24   asset being contributed.

25                  (Reporter clarification.)

1    A.    Not a fairness opinion.  Just a certification

2    of the capital increase, and he was court appointed.  In

3    fact, his audit wasn't finally used in the final

4    transaction, and it wasn't -- to even call it an audit

5    is overdoing it a little bit.  But, yes, Mr. Wesling

6    [ph] was involved from 2020 to 2022.

7    **Q.    And when you say he was court appointed, did**

8    **the court select him?  Who paid for him?  How did that**

9    **work?**

10    A.    Paid for by the company, and I think we loaned

11    the company money to do that at the time.  I don't

12    remember that 100 percent.  By court appointed, I mean

13    there were a series of auditors who were sort of in a

14    rotation that are credentialed to do this exact work.

15    When I say court appointed, I also mean not like a

16    court -- like, for example, a U.S. district court.  I

17    mean a registered court.  In Germany, the registries are

18    provided over by registry court and judges.  They call

19    it a court.  In Switzerland, it's a little more benign.

20    So when I say court appointed, appointed by the

21    commercial registry as a certified auditor to certify a

22    capital contribution.

23    **Q.    Got it.  So he was credentialed in some**

24    **important way?**

25    A.    He was a full-blown auditor also but didn't

 1  act in that capacity for this work.

 2      **Q.  Set aside Mr. Wesling [ph].  Who was the other**

 3  **German auditor you mentioned?**

 4      A.   It was a firm -- and I'm going to struggle to

 5  remember this, and it's very difficult to pronounce.

 6  MHL is their initials.  They're the -- one of the

 7  largest law firms and accounting firms in Germany, and

 8  we commissioned them to do the fairness opinion,

 9  including discussing the litigation, when we finally

10  were able to close the transaction in February of last

11  year.  I'm saying February of last year.  That's from

12  memory.

13          There was another set of auditors, of course,

14  Baker Tilly, which is a substantial audit firm where the

15  general statutory auditors were Philomaxcap at the time.

16  I had extensive conversations which had to be

17  confidential with Baker Tilly because litigation was

18  still going, but they were constantly informed about the

19  fact that there was litigation and about the dispute.

20  It wasn't something that we were able to publicly

21  disclose until we filed suit because it had been deemed

22  that that would be illegal in Switzerland or Germany.

23      **Q.   When did MHL issue its fairness opinion?**

24      A.   It would have been attached to the minutes of

25  the report of the annual meeting of the shareholders

1  which approved the transaction.  I'm going to say -- I'm

2  working this totally from memory -- that that must have

3  been end of '23, maybe beginning of '24.

4      **Q.   After the litigation was filed?**

5      A.   Yes, for sure.  I had extensive discussions

6  with MHL in the litigation.  I mean, tens of hours.

7      **Q.   And did MHL identify I think what you and I**

8  **both described as the S corp issue, quote/unquote?**

9      A.   I identified for them.  I told them both about

10  the S corp issue and about the issue of the litigation,

11  about the dispute over titles.  So yeah.  I pointed that

12  issue out.  I pointed the dividend issue out.

13          I also pointed out that there might be --

14  related to the S corp issue and the dividend issue, that

15  there might be significant tax liability after the fact

16  that would have to be cleaned up in Rymark and that any

17  fairness opinion that they were going to do was going to

18  have to account for that.  Specifically, to the extent

19  that Rymark was not permitted pass-throughs and took

20  them, it should have been paying corporate level tax for

21  all those years -- '16, '17, '18, '19, '20.

22          This is something else we had Helm Advisors,

23  when they prepared their report for us, estimate, and we

24  also were very curious to have an understanding of how

25  to work that out.  What do you have to do to restate?

 1   How difficult is that to do?  How aggressive is the IRS?

 2   These were all things I talked about with Helm and

 3   incorporated that into my discussions with MHL to make

 4   sure they had an understanding of what the issues were

 5   before they issued their fairness report.

 6          One more note on the fairness report.  The

 7   fairness report is conducted to a fairly stringent

 8   standard.  It's called IDWS-8, I think.  IDWS-8 is the

 9   fairness opinion standard.  That will be important

10   because anybody who looks at that standard can see what

11   MHL was supposed to do for that fairness opinion.

12          MR. RICHARDS:  Brooke, we've gone about 90

13   minutes.  Could you use a break?

14          COURT REPORTER:  I would love one.

15          (Recess taken from 10:32 to 10:44.)

16       Q.  (BY MR. RICHARDS)  Mr. Bernhardt, I'm going to

17   mark Exhibit D 114.

18          (Exhibit D 114 was marked.)

19       Q.  (BY MR. RICHARDS)  Mr. Bernhardt, do you see

20   that you've been handed an April 26th, 2019, email from

21   Mr. Leshem to Mr. Markosian, Mr. Rechtman, Mr. Hesterman

22   with Mr. Blimbaum and Mr. Colshorn in CC?

23       A.  I do.  I'm familiar with this email.

24       Q.  At this period of time, AmeriMark Group was

25   applying to have 20 million new shares listed on the

1   Euronext exchange; is that correct?

2        A.   I'll take a tiny little quip with that with

3   the word "listed."  I think listed often implies a

4   public offering.  I want to be careful about that.  It's

5   different in the U.S. and Europe.  It was applying to

6   have those shares admitted to trade.  The distinction --

7   which I'll be very brief on -- is important.  What this

8   means is that existing shareholders are having their

9   shares admitted to trading so that they can trade and

10  sell their existing shares on the exchange, not a new

11  listing, so to speak.

12            Also, one other thing -- no.  I'm sorry.

13  That's it.

14       Q.   Okay.  And the Euronext denied the admission

15  to listing or the admission to trading of those

16  20 million shares; correct?

17       A.   It did.

18       Q.   Let's look at Mr. Leshem's email.  The first

19  paragraph says, "Attached hereto is the letter from

20  Euronext Compliance regarding AmeriMark's application

21  for admission to trading.  The Euronext has taken a very

22  hard and indeed harsh position.  Their letter simply

23  hides behind boilerplate legal language, such as

24  references to their 'reputational risk'" -- in quotation

25  marks --

 1       A.    Yep.

 2       Q.    -- "and falls back on their right to deny

 3   admission to any company."

 4             Next paragraph.

 5       A.    Yes.

 6       Q.    "Without specific information, I can only

 7   speculate that the listing department may have felt the

 8   company's business was good, but compliance objected to

 9   other matters.  The fact that the largest shareholder is

10   a U.S. person probably counted against us."

11             Do you see that?

12       A.    I do.

13       Q.    Was the largest shareholder of AmeriMark

14   Automotive a U.S. person as of the date of this email?

15       A.    Not strictly in that sense.

16       Q.    What do you mean by not strictly?

17       A.    The UBO would have been a U.S. person, but,

18   technically, he is incorrect here, because on

19   April 26th, 2019, the largest shareholder -- single

20   shareholder, not majority shareholder, would have been

21   Whitetree Capital.  So if Mr. Markosian was properly

22   declaring himself as a UBO, he would have been the

23   largest natural person shareholder, which is a

24   distinction that may or may not have occurred to

25   Mr. Leshem in this email.

1      Q.   But your belief is that Mr. Markosian knew, as

2   of this email, that Whitetree had 13 million shares that

3   used to belong to him, yes?

4      A.   Most certainly.

5      Q.   And you have no explanation for why Mr. Leshem

6   would have said that the largest shareholder was a U.S.

7   person?

8      A.   Well, look at who's on -- he's on here in

9   copy.  Maybe some of these people he didn't feel the

10  need to disclose that Mr. Markosian was behind

11  Whitetree.  I mean, you're asking me to speculate.  I

12  can think of reasons why he would do that, why he

13  wouldn't to Orie Rechtman or -- or to -- particularly

14  Orie Rechtman want to disclose that.

15          But, you know, part of the problem there is,

16  of course, at least as far as I can tell,

17  Mr. Markosian's participation in the Whitetree structure

18  wasn't particularly above board, and it certainly wasn't

19  being declared in the United States, and it was also not

20  properly declared when the Vienna application came

21  around.  So I don't know if that's what's going on here.

22          The fact that the largest shareholder is a

23  U.S. person is technically incorrect.  Certainly, the

24  largest natural person shareholder was still

25  Mr. Markosian through his participation in Whitetree.  I

 1   don't know that that's what Mr. Leshem is saying here,

 2   though.  So without more context, like, for example, how

 3   Mr. Markosian wanted to or didn't to want to disclose

 4   his role at Whitetree, I can't really answer that

 5   question.

 6        Q.   I gather you have not discussed this email

 7   with Mr. Leshem before?

 8        A.   I have discussed this email with Mr. Leshem.

 9        Q.   Tell me about that discussion.

10        A.   I discussed it in the context that he saw the

11   accusation apparently that he had misled Mr. Markosian

12   about this email.  I think that was a particular

13   reference to this phrase about boilerplate and

14   explaining the rationale.  And he complained to me, as

15   Mr. Leshem sometimes is apt to do, that how can that

16   accusation be made against him when he attached the

17   actual letter?  That was the context of my discussion

18   with him about this email.

19        Q.   You didn't discuss with him the statement --

20   his statement that AmeriMark Group's largest shareholder

21   was a U.S. person; correct?

22        A.   I didn't catch it at the time that I had a

23   discussion with him, no.  Actually, the first time I've

24   really recognized the context of that statement is when

25   you brought it up to me.

1        Q.   If you had caught it, would you have discussed

2    it with him?

3        A.   I would have asked exactly this question I

4    just asked you.  Were you trying to refer to the fact

5    that he was the largest natural person shareholder?

6    Because that's a tortured construction, if so.

7        Q.   The next physical sheet in this exhibit Bates

8    numbered 623 is the letter from Euronext itself, and I'm

9    sorry.  It's fuzzy.  This is how it was produced.

10       A.   Can I stop you there for a second?  I'm really

11   familiar with this letter.  In our production, we

12   produced a fuzzy one and a clearer one.  So I know this

13   letter, and I'm happy to talk about the fuzzy version.

14       Q.   Okay.  And I actually think the clearer one

15   may make an appearance later on, but we'll see.

16            Just so I have a clear understanding of what

17   the Euronext did, the Euronext refused admission to

18   trading of the 20 million new shares?

19       A.   That's correct.

20       Q.   And when I say new shares, I mean the shares

21   that resulted from the reverse merger with AmeriMark

22   Automotive; correct?

23       A.   That's exactly correct.

24       Q.   And it also suspended trading on the then

25   traded shares of AmeriMark Group; correct?

1        A.     That's also correct.   That was worth 3.4

2    million bearer shares.   To my memory, they had a par

3    value of ten rappen, which is Swiss cents, and, yes,

4    they suspended those and then eventually delisted them.

5        **Q.     And when you say eventually delisted,**

6    **Romanette three, little Roman three.**

7        A.     Yes.

8        **Q.     Says that this letter is delisting them;**

9    **correct?   Or on a particular date?   Is that what you**

10   **mean?**

11       A.     Well, yes.   There's a process to delisting.

12   In -- generally, in these exchanges, you suspend first

13   and then you delist because there are technical things

14   that have to be done, for instance, with the securities

15   depository.   Sometimes you want to suspend rather than

16   delist immediately because there's also the possibility

17   that something might change and you don't want to do

18   something irreversible.   So usually it's suspend and

19   delist.   It's not 100 percent clear to me what the

20   mechanics were here at the Euronext at this time, but I

21   do think that it was a two-step process -- suspend and

22   then delist.

23       **Q.     The -- the paragraph that immediately precedes**

24   **those four Romanettes begins with "Taking into**

25   **account" -- do you see where I mean?**

1      A.    I do.

2      Q.    "Taking into account the large amount of

3  financial instruments to be listed along with the new

4  shareholder structure" -- let's stop there.  Do you have

5  an understanding of why it mattered to the Euronext that

6  there was a large amount of financial instruments to be

7  listed?

8      A.    I'm speculating a little bit, but I think I'm

9  on good ground with this, and that is they were seeking

10 to -- excuse me.  AmeriMark Group was seeking to have

11 admitted to trading 20 million shares at five rappen,

12 Swiss cents, per share; right?  Which is a sizable share

13 capital to be increasing by.  It more than -- I have to

14 do the math again.  It more than doubles the share

15 capital existing in the company.  This is a big

16 transaction.

17          And so I think when they're talking about the

18 large amount of financial instruments to be listed,

19 they're talking about the relative ratio between the

20 20 million new shares and the existing 3.4 million

21 bearer shares, and it was -- it was going to go from --

22 I do have the math in my head actually.  It was going to

23 go from 6.8 million in share capital, francs, to

24 26.8 million.  And I think that's what they're referring

25 to here.  I'm quite confident that's what they mean.

CAPANA SWISS ADVISORS AG vs RYMARK
SHAEN BERNHARDT - 01/24/2025

30(b)(6)
Page 95

1        Q.    Why would that have concerned them?

2        A.    Well, for a company -- and 4Service Cloud

3   was -- that had been moribund on the exchange for a

4   while, had been listed on the Marche Libre before in

5   2015, and then suddenly you have a massive transaction,

6   you know, it attracts attention for sure.  It's a big

7   transaction.  Increasing the share capital by that much

8   is unusual.  Normally in a company -- that's a lot of

9   dilution for existing shareholders.

10            Normally when a company does something like

11   that, it is a fraction, perhaps a sizable fraction, not

12   a multiple of existing share capital.  That's not always

13   true, but it's definitely something that I would imagine

14   would catch an exchange's attention.

15        Q.    What about the new shareholder structure?

16   First of all, can you describe the shareholder structure

17   in AmeriMark Group as of this time period?

18        A.    Well, so at this time period, AmeriMark Group

19   would have had the shareholder structure reflected in a

20   January -- 18th or 19th.  I'm forgetting now -- 2019

21   share ledger; right?  So it would have been the original

22   19 -- I'll call them the Markosian shareholders,

23   Whitetree Capital.  I can't remember if there was

24   anybody else in the share ledger, but that would have

25   been the new share structure.

1            But I think what they're talking about here

2    with the new shareholder structure is actually that --

3    you've got -- well, I have to speculate now.  When they

4    say new shareholder structure, they're certainly talking

5    about the fact that the old shareholder, the old bearer

6    shareholders, is now completely obviated by the new

7    shareholder structure.  In addition to that, they don't

8    say it here, but the fact that there were two classes of

9    shares with two different share capitals is an issue.

10   And, frankly, all exchanges, as in stock exchanges, hate

11   that.  They hate it because it creates investor

12   confusion, especially when you have two different

13   share -- cap size and you have two different types of

14   shares here.  Registered shares and the existing bearer

15   shares.  So when they say that, I don't know that

16   they're talking about the actual shareholders.  They

17   might be, but I think it's more likely that they're

18   talking about the structure of the shares.

19           Q.   This sentence continues, "Euronext Paris

20   deemed it appropriate for this request to be subjected

21   to an enhanced due diligence review."  What's your

22   understanding of how that enhanced due diligence review

23   proceeded?

24           A.   Well, normally for an admission like this, I

25   guess there's a basic review, and I've never been

1    through any of these before, and so I rely on the books

2    and records here because this is before I got involved

3    with the project by about a month and a half.

4              But my understanding is that the admission

5    process usually can be quite streamlined, but there are

6    several concerns or, you know, unusual aspects of a

7    transaction that might trigger an enhanced scenario, and

8    what exchange is saying here, to my mind, is that

9    between the -- they say it literally.  It's a large

10   amount of financial instruments.  It's a big

11   transaction.  There's a lot of dilution.  You're

12   expanding the share capital a lot.  Certainly they don't

13   say it, but certainly it comes into play that this is a

14   company that's been --

15              (Reporter clarification.)

16        A.    -- moribund, docile, for a long time, and then

17   suddenly there's a big transaction.  Now that's not

18   totally unusual, but definitely it's something that

19   says, well, what's happened here?  Obviously you have a

20   new group of investors coming in taking a major

21   position.

22              And shell companies or shelf companies --

23   companies that are kind of, you know, sitting there,

24   still just kind of hanging on but don't have any

25   operations yet are really waiting for an investor to

1    come in and do that because it's expensive to list.

2              So here it's not that that's unusual in

3    itself, but this is a big transaction.  There's two

4    classes of shares.  The shares have different nominal

5    values.  Certainly, it makes it more complicated for the

6    exchange, and the exchange's number one concern is

7    actually exchange profits, but its second concern is for

8    investor well-being and confusion potentially.  And this

9    could be -- I think the intention was always to merge

10   the shares anyway, but that's a lot of work.  I think

11   that's what's being responded to here.

12             You asked about enhanced diligence review.

13   These things -- the way I read the sentence -- and I've

14   done some diligence on it in the past.  I talked to a

15   lawyer who did some work with Euronext to kind of

16   understand this letter, but I think that's what's going

17   on.  So they trigger an enhanced due diligence review

18   because it's an usual transaction, more scrutiny.

19   That's my -- that's my understanding.

20        Q.   And it sounds like, in the abstract, at least,

21   you don't take issue with the Euronext view that these

22   two particular features maybe warrant a closer look than

23   another deal?

24        A.   Not at all.  I think they're exactly correct.

25        Q.   Next sentence begins, "Considering" -- do you

 1    see where I mean?

 2         A.   I do.

 3         Q.   "Considering the market abuse and reputational

 4    risks resulting from this investigation" -- What do you

 5    understand market abuse and reputational risks to mean

 6    here?

 7         A.   Well, this sentence, I think, sort of shows

 8    that the authors of this letter didn't have English as

 9    their first language, and let me parse it out.  I've

10    spent a lot of time thinking about this because it's

11    been back and forth in pleadings quite a bit.

12              "Considering the market abuse and reputational

13    risks resulting from this investigation" -- how are --

14    it's not that market -- did market abuse result from

15    this investigation?  Did reputational risk result from

16    this investigation?  I don't know.  You know, I have to

17    kind of stick words into the exchange's mouth here, into

18    Euronext's mouth, but I think what they meant to say is

19    "Considering the market abuse and reputational risks

20    potentially shown from this investigation" -- I hope the

21    investigation did not create market abuse, for instance.

22              So I think it's a sloppy sentence, but what

23    it's certainly saying is that they looked deeper into

24    the transaction and found things they didn't like.  I

25    also asked very carefully, again, to the lawyer I talked

1    to -- I don't think it was a privileged conversation --

2    I asked very carefully, you know, what does this

3    language mean?  And here I think Mr. Leshem is actually

4    pretty close when he says it's boilerplate.

5            Also, I looked at the press releases that the

6    Euronext made related to this announcement, and there

7    were two at least -- one announcing the suspension and

8    one announcing the delisting, which is another reason

9    that I segregate those.  And my understanding of that --

10   they're very, to be honest, schizophrenic.  The

11   suspension cites a totally different set of rules that

12   are cited to do the suspension than does the delisting

13   than does this letter.

14           So I don't know.  You know, I can only

15   speculate on what was going on with the exchange here,

16   but it does feel like they really had a bunch of

17   different parts all not talking to one another on this

18   paragraph.

19       **Q.   Do you believe that the Euronext was worried**

20   **about market manipulation?**

21       A.   It's hard for me to, you know, delve windows

22   into -- windows of the Euronext's soul here.  Everything

23   that I've been told -- you know, I haven't talked to the

24   Euronext about it, but everything I've been told says

25   that this is fairly boilerplaty stuff and that the risks

```
 1   and market abuse stuff is like the catchall trump card.

 2   They can do whatever they want.  They don't have to

 3   justify themselves.  They can kick you out "because we

 4   think there's a risk of 'X', market abuse.  We think

 5   there's a reputational risk."  The reputational risk to

 6   the exchange is the catchall because the final

 7   determiner of that is the exchange.

 8        Q.    I'm going to mark Exhibit D 115.

 9              (Exhibit D 115 was marked.)

10        Q.    (BY MR. RICHARDS)  After the Euronext denied

11   the admission to trading of the new shares of AmeriMark

12   Group and suspended and subsequently delisted the then

13   traded shares of AmeriMark Group, a decision was made to

14   seek listing of AmeriMark Group on the Vienna Stock

15   Exchange; is that correct?

16        A.    Excuse me.  I'm so sorry.

17              That is correct.

18        Q.    Who made that decision?

19        A.    Well, I think the initial idea came from

20   Mr. Leshem, and I think it might have even come to

21   Mr. Leshem -- and I'm speculating now, but I think it

22   came to Mr. Leshem from Mr. Coenen of Capital Lounge,

23   the --

24              (Reporter clarification.)

25        A.    I'm sorry -- the listing service -- I flubbed
```

```
 1   my words there.  The listing services provider for

 2   Rymark was Capital Lounge GmbH, a German company, and

 3   its principal was Alexander Coenen, C-o-e-n-e-n.

 4            The reason I'm kind of persuaded by that is

 5   because at the time Mr. Coenen and his company, Capital

 6   Lounge, were certified capital market coaches for the

 7   Vienna Stock Exchange.  You can go on the websites, and

 8   they had a list, and there were only, I think, at the

 9   time, like, eight or nine.  And because he was C in the

10   list, he was, like, third on the list there for

11   certified market coaches.

12            Not only that, but he had a very good

13   relationship, which I came to understand personally,

14   with Martin Wenzl, who was the head of listing in the

15   Vienna Stock Exchange.  So -- and I'm fairly sure -- I'm

16   speculating a little, but I'm fairly sure that a

17   conversation between Mr. Leshem and Mr. Coenen probably

18   happened because Mr. Coenen was at least partially

19   involved in the Euronext transaction.

20            And, again, I'm guessing here a little bit,

21   but I think it's highly likely that he had to kind of

22   figure out another solution very quickly.  And you'll

23   notice that this is quite quick.

24            If I can go back to the letter really quick

25   just to look at the date.
```

CAPANA SWISS ADVISORS AG vs RYMARK                                              30(b)(6)
SHAEN BERNHARDT - 01/24/2025                                                   Page 103

```
 1        Q.   Yes.  I'm interested in this.  So yes.  Go
 2   ahead.
 3        A.   Sorry.  Your deposition.
 4             So, you know, this is April 26th, 2019, and
 5   the letter from the Euronext, I think, is the same
 6   day -- no, it's not.  It's the 16th the letter is dated.
 7             By the way, just on this exhibit again, the
 8   hard copy of this letter and the envelope is in
 9   AmeriMark's files.  We have the hard copy.  I think I
10   even scanned -- had the envelope scanned just to be
11   careful.
12             So it took a while for this to get, and it
13   came -- those also addressed to Mr. Markosian, but
14   Mr. Colshorn got it, and I don't know how quickly he
15   forwarded it.  This is before my time.
16             So now here we are two months, right,
17   June 24th from -- almost exactly, from April 24th, two
18   months later.  So obviously some discussions had
19   happened in the past.  By this time, I had been
20   involved.  So starting in May of 2019.  But my
21   understanding is, going back to your original question,
22   that it was Alexander Coenen probably, since he was able
23   to do it, helping Mr. Leshem solve the problem of the
24   failed admission to trading on Euronext.
25        Q.   And during this time period, you, meaning
```

1    Mr. Bernhardt, you were a consultant who was assisting

2    with the effort to list on Vienna; correct?

3        A.    That's correct.

4        Q.    And I think you described that in a previous

5    deposition is it happened quite quickly.  Is that a fair

6    characterization?

7        A.    When you say happened quite quickly, what

8    happened?  The listing?

9        Q.    The listing.  I think you said it happened in

10   a hundred days or something.

11       A.    Yeah.  I was saying it.  I think it was

12   something like, you know, 101 or 102 days, but, you

13   know, at first, early on, we were quite proud of that,

14   and a lot of that was Alexander Coenen's work, I think.

15   I didn't work a lot directly with him.  I'm definitely

16   in contact with him.  Because, yes, from the time of the

17   first sort of getting involved to listing was, yes,

18   100 days, and I do attribute that to the fact that

19   Alexander Coenen had a great relationship with Martin

20   Wenzl, and he was the capital market's coach, and I do

21   remember him, you know, being basically totally hands on

22   in the development of all the materials.

23       Q.    At the time that Euronext denied admission to

24   the 20 million new shares, were those shares

25   dematerialized?

1      A.   I think they had -- and this is a good

2   question.  I feel like they had to be because to apply

3   for listing, they should have been dematerialized, but

4   I'm not sure.  There's an email somewhere, and I

5   remember it from production right now, and I can't

6   remember the date, from BankM announcing the

7   dematerialization.  And I feel like that should have

8   been -- that should have been the case because you

9   can't -- unless there's something I don't understand

10   about the Euronext, which might be the case, I think you

11   should have your shares dematerialized by then.

12      Q.   All right.  Well, let's look at the email in

13   front of us.  Mr. Leshem says to Mr. Colshorn, "Dear,

14   Nicolai, as we approach the admission of AmeriMark Group

15   AG to listing, please forward following documents

16   attached below to BankM in order to facilitate future

17   instructions on share transfers," and then he lists,

18   "Number I, the complete shareholder list, and, Number

19   II, the subscription agreements of shareholders."

20      A.   Yes.

21      Q.   And then I'm hoping you can help me with some

22   of the next thing.  So Mr. Leshem continues.  He says,

23   "According to Ralf Helfritsch" --

24      A.   Correct.  Good job.

25      Q.   -- "at BankM, you as the director can

 1    designate that shares be sent to any account we direct."

 2            Can you explain what this means?

 3        A.   I think what he's talking about is whether or

 4    not this goes to a custody account in Switzerland,

 5    whether or not it goes to the Austrian custody account,

 6    which is the -- I don't remember the initials.  I'm

 7    going to say it in German -- OeKB, which is the

 8    equivalent of SIX SIS --

 9                 (Reporter clarification.)

10        A.    -- which is the national securities depository

11    in Switzerland or -- or Clearstream.  I think that's

12    what he's talking about.  You can direct who it is, but

13    honestly I'm not sure exactly what he means here.

14        Q.   And then Mr. Leshem continues, "Lucie

15    Sauerbrei of BankM wrote to you the following

16    previously," and I gather that this is a quotation from

17    an email from Sauerbrei.  "In order to be able to submit

18    the application to SIX SIS, we first need you to have

19    the shareholders' list and the investors' custody

20    account data (as already discussed, ideally as an Excel

21    list)."

22        A.   Yes.

23        Q.   What application to SIX SIS is meant here?

24        A.   So this is why it's weird and I think you

25    bring up and why I was unsure.  It either -- either it's

1    possible to make that application to the Euronext

2    without having your shares first dematerialized.  And I

3    wasn't involved in that process; so I don't have

4    personal knowledge of whether that was a requirement or

5    not.  I sort of assumed it should have been, but maybe

6    not.

7            I do know that it was definitely a

8    prerequisite to have your shares admitted to trading on

9    the Vienna.  That was definitely -- and I actually had

10   conversations with SIX SIS about this.  So what's

11   happening here apparently is you say -- or maybe they --

12   maybe because -- now I'm speculating.  Maybe they get --

13   I don't know how you would rematerialize shares.  So I

14   don't know.

15           But saying in order to submit the application

16   to SIX SIS, first, we need you to have the shareholders'

17   list.  The application to SIX SIS really sounds to me

18   like the application to have the shares dematerialized,

19   put into custody at SIX SIS, and then delivered to

20   whichever account they tell BankM to deliver it to for

21   the master custody account, be that in Austria or

22   whatever.

23           These are pretty technical details I think I'm

24   getting right, but I just want to be clear that some of

25   these things are a little out of my purview.

1       Q.    I understand the uncertainty.

2       A.    Okay.

3       Q.    If you look at the third to last paragraph on

4   this page.  It begins with "As soon as we" -- do you see

5   where I mean?

6       A.    I do.

7       Q.    "As soon as we, a paying agent, have submitted

8   the application for the shares to the collective

9   custody, SIX SIS will contact you in the next step

10  regarding your consent to custody of the shares without

11  a physical global certificate."

12      A.    Right.

13      Q.    That sounds consistent with what you just

14  described that this is an application to dematerialize

15  the shares, yes?

16      A.    I would agree with that.  Yeah.  And the next

17  sentence makes it clear.

18      Q.    Yeah.  "Subsequently, we will receive the

19  shares credited by SIX SIS and begin to transfer them to

20  your shareholders."

21      A.    Correct.

22      Q.    And if we look above in the same email, it

23  looks like BankM needs some information.  Bank, account

24  holder, account number, bank code, number of shares,

25  contact of the bank for transfers outside of Germany.

 1    Do you see that?

 2         A.   I do.

 3         Q.   Do you know when that information was

 4    provided?

 5         A.   I don't exactly.  I don't exactly know when it

 6    was provided.

 7         Q.   There were two attachments to this email.

 8    You'll see that the first attachment is a set of

 9    subscription forms.  Do you see where I mean?

10         A.   I do.

11         Q.   And the last subscription form in this set,

12    Bates 4653, it's the second to last physical sheet of

13    the exhibit --

14         A.   Yes.

15         Q.   -- is from Mr. Markosian, and you see that it

16    has the 644-1655 share count.  Do you see that?

17         A.   I do.

18         Q.   And that's -- that's the wrong number;

19    correct?

20         A.   Yes.

21         Q.   That we've established?

22         A.   Wait a minute.  What do you mean the wrong

23    number?  In terms of the subscription, yes, this is the

24    wrong number.

25         Q.   Okay.  And do you know why Mr. Leshem would

1  have been forwarding these subscription forms to Nicolai

2  to tell him to give them to the bank?

3       A.   I don't, other than it was in a file

4  somewhere, and he took them all and sent them on.  I

5  don't.  I wasn't involved in this email one way or the

6  other.

7       Q.   I mean, you seem like a naturally curious

8  person.  I'm not trying to flatter you, but you like to

9  get to the bottom of things.  You seem not to have any

10 interest to get to the bottom of this.  Why is that?

11      A.   Well, I don't think that's true at all.  Just

12 in this particular case, I hadn't caught what

13 subscription of grievance had been sent.  And also, I

14 wasn't copied on this email.  Certainly it's in the

15 company files.  I see it was produced by us, but I

16 didn't catch the nuance on this at all.

17      Q.   The last physical sheet of the document Bates

18 4654 is the January 18, 2019, share I've just read that

19 we've now discussed a number of times; is that right?

20      A.   It is.  And I'm glad I remember now it's the

21 18th, not the 19th of January.  Thank you.

22      Q.   And the -- the share number on this share

23 register for Mr. Markosian matches the share number on

24 the subscription form attached to this email; correct?

25      A.   It does.

1      Q.   This is the first time I see this assigned

2   version of the share register in plaintiff's production.

3   Although I may be overlooking something.  Are you aware

4   today of an earlier one, meaning it was attached to an

5   earlier communication than this?

6      A.   Well, as I said, it was in the first quarter

7   2019 binder, the physical version.  So I don't have any

8   reason to believe that it wasn't in there in January.

9      Q.   Got it.  When was AmeriMark Automotive

10  created?

11     A.   AmeriMark Automotive was created on June 6th,

12  2016.

13     Q.   And I'm sorry.  Was it renamed as of that

14  date, or did it exist previously?

15     A.   Well, there was a show company that was bought

16  called Bernard & Nef.  It was renamed, but in the Swiss

17  structure, it is a new existing company.  It's --

18  literally the German word for it is rebirth.

19     Q.   Got it.

20     A.   But, yes, it was -- in the common law

21  jurisdiction sense, yes.  It was converted from a shell

22  company or a shelf company depending.

23     Q.   And as of the moment of its creation or

24  rebirth, did it have any assets?

25     A.   In theory, it had Rymark Inc.

1       Q.    So that all happened contemporaneously, and

2  when I say "that all," I mean the contribution of Rymark

3  shares into AmeriMark Automotive happened commensurate

4  with its rebirth?

5       A.    Well, no.  To be more accurate about it, there

6  was a series of steps.  I can describe them for you.

7       Q.    Sure.

8       A.    So I'm just -- Bernard & Nef -- I'm just going

9  to call it the original company because I hate that

10  name.  The original company was a limited liability

11  company with a share capital of 20,000 francs, which is

12  the minimum share capital for a minimum liability

13  company in Switzerland.  I don't recall off the top of

14  my head what established that share capital, but

15  certainly there would have been some nominal assets in

16  there, perhaps a bank account with some hundred francs

17  or something.  There would have been something on the

18  books because if it was zero, you'd have to kind of

19  strike the company off.  So the directors probably

20  maintained something.

21            The papers of Bernard & Nef are actually in

22  the AmeriMark file.  I didn't look at them all that

23  closely for here.  There's actually a reference to it in

24  the -- I'm pointing to your thing, but a reference in

25  the corporate bible, the registry bible that I bought.

1    There's a reference to it and shows it stricken off the

2    record.  So there would have been some assets there

3    lingering.

4            Those assets were marked at 20,000 francs, and

5    then the Rymark contribution valued at 880,000 francs

6    combined with the 20,000 francs to make 900,000 francs

7    of share capital.  That would be the share capital.  As

8    to the exact value of the assets that varies, of course,

9    the book value of the assets.

10           So, yes, there would have been some lingering

11   assets there first.  The first step was Bernard & Nef

12   had injected into it Rymark, and Mr. Markosian in

13   Switzerland then took possession of one unit.  Of

14   course, the same as here, limited liability companies

15   don't have shares.  They have units.  It was one single

16   unit.

17           Then -- and I'm doing this from memory, but

18   you have the original file, which I could walk you

19   through probably with more detail, but that might be

20   beyond the purview of your question.

21           Then the one unit Mr. Markosian has he then

22   converts in a straight conversion when they change

23   AmeriMark Bernard & Nef into AmeriMark Automotive into

24   18 million registered shares.  So it's that kind of a

25   steppingstone.

1          Did it -- was that responsive to your

2    question.

3          Q.    Yes.

4          A.    Okay.

5          Q.    Who were the directors on Bernard & Nef on

6    June 5th of 2016?

7          A.    It's a good question.  That will be in the

8    commercial registry entry.  I don't have it memorized.

9    I think there were one or two.  And that entry, also, I

10   have the history of the directors.  I think that company

11   had been around for quite some time.

12         Q.    And did those directors remain directors of

13   the new company?

14         A.    I don't believe so.  I think initially

15   Mr. Markosian's lawyers, either Thier or Zadner [ph],

16   joined as the first director.  And then when he came in,

17   he became the sole director, and then Mr. Colshorn

18   joined at a later time.  That's from memory.  You can

19   see the exact progression and the dates of that in the

20   corporate file.

21         Q.    So we start with just Mr. Markosian.  We add

22   Mr. Colshorn at some time, and for a while they are

23   codirectors; correct?

24         A.    They're certainly codirectors for a time.  I

25   don't want to commit myself on who was first and what

1    order it was, but they were definitely codirectors for

2    quite some period of time.

3        **Q.    And then at some point Mr. Markosian is**

4    **removed as a director from AmeriMark Automotive;**

5    **correct?**

6        A.    Removed is the wrong word, I think.  He didn't

7    stand for reelection, and he wasn't put on the ballet;

8    and, therefore, he wasn't reelected.

9        **Q.    And when did that happen?**

10       A.    From my memory, August of 2020.

11       **Q.    All right.  And between June 6th, 2016, and**

12   **what I'll call the reverse merger in 2018, who were the**

13   **shareholders over at Amerimark Automotive?**

14       A.    Well, initially, it was 18 million shares to

15   Mr. Markosian, and then Mr. Markosian, on June 17th,

16   2016, signs the initial shareholder list which creates a

17   total of 19 shareholders -- Markosian plus friends,

18   family members, and Friends & Equity, the German

19   company.  That carries on until the next transaction.

20           I should point out this is -- I think this is

21   important.  All these transactions are actually not done

22   by the shareholders themselves but are done by the

23   shareholders' lawyers in Switzerland signing documents

24   on behalf of the shareholders from power of attorney.  I

25   think from the securities law perspective, it's

 1   important to understand that all these transactions

 2   happened in Switzerland.

 3            But anyway -- so the 19 shareholders exist

 4   until -- and I believe -- I'm going from memory here --

 5   I believe the next transaction is Mr. Markosian's

 6   transaction with Whitetree, which brings Whitetree in,

 7   and then that's before the merger.  That's January 2019,

 8   and the reverse merger, of course, is May -- no.  I'm

 9   sorry.  Wait just a second.  I'm not sure I have the

10   dates right.

11       **Q.   You said January 2019.  I don't think that's**

12   **right.**

13       A.   No.  I have that wrong.  I'd really like to

14   look at the ledger but --

15       **Q.   It's all right.  I'm not going to hold you to**

16   **the dates.  You're speaking from memory.**

17       A.   So do you want to -- ask me the question

18   again.  Let me see if I can redo --

19       **Q.   Yeah.  I think the question was who were the**

20   **shareholders of AmeriMark Automotive between its**

21   **creation in 2016 and the reverse merger in 2018?  And I**

22   **think you've answered that question.**

23       A.   Yeah, I think I got that right.

24       **Q.   And then as of 2018, when the reverse merger**

25   **happened --**

 1          A.    May 2018, right.  That helps me.

 2          Q.    **The list of shareholders expanded to include**

 3    **all of whom we'll call the legacy shareholders of**

 4    **4Service Cloud Tech.**

 5          A.    Thank you.  You're referring to the bearer

 6    shareholders?

 7          Q.    **Right.**

 8          A.    Right.  So point taken.  The issue with the

 9    bearer shareholders is that --

10                (Reporter clarification.)

11          A.    Up until the reverse merger, that's right.

12    It's the 19 shareholders.  Then we have the reverse

13    merger in the middle of 2018.  And now I was thinking

14    only of the registered shares, but, now, yes, you

15    inherit the bearer shareholders of the company of

16    4Service Cloud, right.

17          Q.    **(BY MR. RICHARDS)  But -- and not to be**

18    **pedantic, but as of the reverse merger, my understanding**

19    **is that your testimony is that AmeriMark Automotive's**

20    **shareholder became AmeriMark Group?**

21          A.    Automotive.  Yes, correct.  It became the

22    100 percent subsidiary of the Amerimark Group, as of the

23    reverse merger.  I was mixing Group and Automotive up.

24    I'm sorry, Counselor.  It's been a long day.

25          Q.    **I want to make sure we were straight on that.**

 1          A.    I think we are.

 2          Q.    **And then Group had the shareholders you just**

 3    **described.**

 4          A.    Yes.

 5          Q.    **The bearer shareholders and then the**

 6    **registered shareholders?**

 7          A.    Correct.

 8          Q.    **And at the time of the reverse merger,**

 9    **Mr. Colshorn was made the director of Group; correct?**

10          A.    I'd have to look at it, but I think that's

11    correct.

12          Q.    **And subsequently Mr. Heeg was made a director**

13    **of both Automotive and Group, yes?**

14          A.    In different steps, yes.

15          Q.    **And he remains a director of both Automotive**

16    **and Group, yes?**

17          A.    As of today, yes, that is correct.  There's a

18    nuance in there.  There was a period when AmeriMark

19    Group's board was actually disabled legally.  So when we

20    say he was a director, there was a period in time when

21    nobody actually had directorial powers in Group -- at

22    least very limited directorial powers because the

23    company hadn't held annual meetings often enough.  So

24    there were issues there.

25          Q.    **I'm going to mark Exhibit D 116.**

```
 1                    (Exhibit D 116 was marked.)

 2         Q.   (BY MR. RICHARDS)  Mr. Markosian [sic], I've

 3    marked as Exhibit --

 4         A.   I'm not Mr. Markosian.  I'm sorry.  It's been

 5    a long day for you too, Counselor.  Mr. Bernhardt, yes.

 6    Hello.

 7         Q.   Mr. Bernhardt, I have marked for you as

 8    Exhibit D 116 a pleading in this case which is titled

 9    "Declaration of Sara E. Diamond in Support of AmeriMark

10    Group AG's Motion to Dismiss for Insufficient Service

11    Pursuant to Rule 12(b)(5) of the Federal Rules of Civil

12    Procedure."

13              Do you see that?

14         A.   I do, and I'm familiar with this document.

15         Q.   Okay.  So let's look at page 3 of the

16    document.  I'm looking at paragraph 7 of Ms. Diamond's

17    declaration.

18         A.   Yes.

19         Q.   She says, "Mr. Heeg is chairman of the board

20    for plaintiff AmeriMark Automotive AG.  He has no role

21    of AmeriMark Group, and, therefore, is not authorized to

22    accept service on its behalf."

23              I was surprised when I read this.  Is it true

24    that Mr. Heeg has no role in AmeriMark Group?

25         A.   Well, I think what was meant here-- that's not
```

1    correct.  What was meant here is that, unfortunately,

2    this was the period when the board had -- I don't know

3    how to explain it in English -- a disability.  So, in

4    fact, the board was not able to act on behalf of the

5    company for a long period of time, and this was within

6    that period.

7        Q.   When you say --

8        A.   It's not true -- I'm sorry to have to say that

9    it is not true that he had no role in AmeriMark Group at

10   the time.  He was sort of a board member in suspension.

11   I don't know how to describe it.  There's a German word

12   that I can't remember but --

13       Q.   When was that period?

14       A.   I'd have to remember this also.  I'd have to

15   go back and look at the books, but the problem was that

16   the board, under a ruling in Switzerland, after a period

17   of time of not being able to finish the financials --

18   unfortunately, the reason for that is because of your

19   client, Mr. Markosian -- the board's powers are

20   suspended until the issue is cured.

21            So at this period of time, I don't remember

22   exactly the span on that, but I do remember at this

23   period of time that that was the case, that the board

24   was, in effect, powerless.

25       Q.   And I still don't quite understand what you

1  mean when you say "this period of time."  What period of
2  time do you believe is relevant here?
3       A.   Well, I remember talking about this pleading,
4  and I remember talking to Mr. Heeg, and there was some
5  conversations with counsel that I can't discuss that led
6  into this pleading.
7       Q.   Got it.  Okay.  The disability you
8  described -- was that in 2024?
9       A.   I remember it being in this period because
10 when we discussed this issue and I discussed with
11 Mr. Heeg, we thought that that's what the period was.
12 That's my memory of it.  But I'm going completely from
13 memory here, and I don't have -- I mean this is an
14 AmeriMark Group issue.  I didn't study the AmeriMark
15 Group papers on this issue for this deposition.
16      Q.   Is AmeriMark Automotive --
17      A.   One -- I'm sorry.
18      Q.   No.  Keep going.
19      A.   One other thing that went into this memo in
20 Switzerland, and in general, directors are simply not
21 empowered to accept service on behalf of the Swiss
22 company.  It's illegal.  That definitely was part of the
23 discussion I had with Mr. Heeg on this point.  It's
24 literally not possible under Swiss law.  Directors are
25 not authorized to do that.

1      Q.    AmeriMark Automotive is a Swiss corporation;

2    correct?

3      A.    It is.

4      Q.    And it's subject to Swiss corporate governance

5    laws?

6      A.    When you say governance laws, I want to have

7    some distinction there, but it certainly is subject to

8    Swiss law.  I assume that encompasses the governance

9    laws that you're talking about.

10     Q.    Are there Swiss governance regulations that

11   you think of as distinct from laws?

12     A.    Well, I'm not a practitioner in Switzerland,

13   but certainly there is body of regulation.  The Code of

14   Obligations is sort of a commercial law.  There are

15   definitely regulations that are involved, sure.

16     Q.    So AmeriMark Automotive is subject to the

17   Swiss Code of Obligations; correct?

18     A.    Absolutely.

19     Q.    What does it do to ensure compliance with the

20   Swiss Code of Obligations?

21     A.    Well, it has counsel, and I assume that the

22   board of directors has discussions with counsel on

23   regulatory issues that come up, and it takes advice and

24   acts accordingly.

25     Q.    Are there particular corporate governance

1  **guidelines, like sort of best practices, that are**

2  **written down somewhere that AmeriMark Automotive**

3  **follows?**

4       A.    Not particularly.  Smaller Swiss companies

5  don't really have that kind of infrastructure, and in

6  Switzerland, the small and medium enterprise, SME,

7  infrastructure is very light.  There's a very strong

8  entrepreneurial culture in Switzerland.  So I think

9  there's probably, you know, a set of guidelines that are

10  nonbinding.  But, again, I'm not a practitioner.  So --

11  definitely the case that some companies that get large

12  enough or, you know, are listed or otherwise regulated

13  or unregulated industries would have a long set of

14  regulations.

15       I can -- you know, I can add to my testimony.

16  Certainly the basic, like, anti-money regulations,

17  anti-money laundering regulations -- I think most of

18  those are statutory, but certainly those exist.

19  Certainly compliance laws exist.  Directors also -- I

20  don't think this is what you meant, but it definitely

21  plays into the regulations.  Directors also will be

22  members of self-regulatory agencies or self-regulatory

23  organizations, SROs.

24       PolyReg is a large SRO, and I know for a fact

25  that directors are members of those.  I know Mr. Staeger

 1    was a member of an SRO.  I know Mr. Spillmann was a

 2    member of SRO.  It's not always mandatory, but it's

 3    definitely something that most directors do, and that

 4    has certainly a set of codes, what to expect, and the

 5    Polyreg SRO, for example, will do periodic anti-money

 6    laundering compliance audits. We'll do -- you know,

 7    check to see that all the KYC for various customers are

 8    filed, et cetera.  I know that Mr. Colshorn has gone

 9    through that because he was at PolyReg, and I know that

10    Mr. Staeger has gone through that.

11            So I think that might be responsive to your

12    regulation question in trying to define the sphere of

13    regulations that the directors in the company are

14    subject to; is that right?

15        Q.   Yeah.

16        A.   Okay.

17        Q.   I'm not familiar with SROs.  Is that, like, a

18    state bar organization sort of in that it sets rules for

19    practitioners that you're expected to follow?

20        A.   It's not a bad analogy.  Is the state bar a

21    governmental agency?

22        Q.   Yeah, yeah.  At the state level, yes.

23        A.   Then I would say instead it would be more like

24    the ABA or a chapter of the ABA.  They're

25    nongovernmental.  They're private organizations.  That's

1    why its called self-regulatory organization rather than

2    a regulatory umbrella over from the government -- SRO.

3    The concept exists also here in -- I'm sorry -- here in

4    the United States.

5        Q.   Okay.  Let's talk anti-money laundering, AML,

6    regulations.  What does AmeriMark Automotive do to make

7    sure it complies with those?

8        A.   Well, the directors, especially under the

9    auspices of the SROs that they're members of, go through

10   periodic audits.  Mr. Colshorn, for example, has

11   periodically gone through and asked for updates of KYC.

12   He's required to go through his files to make sure they

13   are current.  To the extent they're not current, he's to

14   seek to correct that.

15            He's required to update any question about,

16   for example, source of funds for any funds that are

17   coming in.  If there's over a substantial amount -- I

18   think that number is 50,000 francs, 400,000 francs in

19   Switzerland.  That's just from my memory.  All of these

20   things have to be done.  A lot of it is about KYC

21   recordkeeping.  For small companies in particular, this

22   is really the only thing that goes on that's really

23   onerous -- onerous is the wrong word -- that requires

24   work.

25        Q.   And KYC stands for "know your customer"

1    base --

2        A.    It does.  I'm sorry.

3        Q.    -- in this context?

4        A.    Know your customer, KYC.

5        Q.    And KYC obligations for AmeriMark Automotive

6    in particular would involve AmeriMark tracing its

7    ownership down to the final UBOs at the AmeriMark Group

8    level; is that correct?

9        A.    For certain -- certain thresholds, yes.  At

10    the top of my head, I don't know what those are.

11    There's common thresholds in compliance.  I'm not sure

12    when it comes to the anti-money laundering

13    self-regulatory guidelines, what those would be.  But

14    the common ones tend to be something like 10 percent, 25

15    percent, 50 percent plus 1, 75 percent, 90.  I don't

16    know how tiered that is, but definitely there is the

17    idea that you should be able to identify, for particular

18    classes of shareholders, who the ultimate beneficial

19    owner is.

20            There's lots of exceptions.  For example, if

21    you have an entity over a certain threshold number of

22    shareholders -- I don't know what number that is -- 5,

23    6, 7, 8 -- or no shareholder owns more than "X,"

24    20 percent, then you sort of don't have to do the look

25    down.

 1              The same thing is true of companies that have

 2      their shares admitted to trading.  For instance, for

 3      shares that are held -- and here I'm going to have to

 4      translate the Swiss word by intermediaries or -- I have

 5      it -- intermediated shares.  For example, if the shares

 6      are dematerialized, you have a far lower burden on those

 7      because those are intermediated.  There's a custody.

 8      They're held somewhere, and that means that a lot of

 9      that KYC or a lot of the regulatory piece goes there,

10      right, is on that side.

11              So it's -- it's complicated, but for a small

12      company, not difficult.

13          Q.   Is the UBO of -- well, Philomaxcap holds

14      13 million shares of AmeriMark Group; correct?

15          A.   It does.

16          Q.   And Capana holds more than 90 percent of

17      Philomaxcap?

18          A.   About 92 percent.

19          Q.   And your Capana's UBO; correct?

20          A.   Am I Capana's UBO?  Yes, I am.

21          Q.   So by extension, does AmeriMark Automotive --

22      is it required to keep KYC information for you on it

23      files?

24          A.   It does.

25          Q.   You're over that threshold?  What about

1    Mr. Markosian?

2         A.   Yes.  And, unfortunately, that's lapsed.

3         Q.   **What about Mr. Nolay [ph]?**

4         A.   Mr. Nolay [ph], I don't know.  I don't know

5    that Mr. Nolay [ph] -- in fact, I think he is not in the

6    current shareholder list, the last one that I looked at.

7         Q.   **The one that you just worked on with Mr. Heeg?**

8         A.   It's not finalized yet, but yeah.

9              Also -- let me stop you for a second.  It's

10   important to understand the KYC requirements and also

11   the consequences of not doing requirements.  So if the

12   board of directors or the director or whoever is the

13   compliance officer for the company is required to do

14   that, but he's not required to have complete KYC files.

15   He's required to attempt to obtain them.

16             If he can't obtain them, the consequences for

17   shareholders are simple.  They have no voting rights.

18   They cannot vote.  They cannot receive dividends; right?

19   And they're not allowed to even attend the meetings.

20   They're not allowed to register themselves until they

21   cure the defect.

22             So -- and that's less an anti-money laundering

23   thing than it is -- than it is sort of ensuring that the

24   right people are appearing at shareholder meetings.  So

25   I don't want to leave the impression that there's a KYC

 1   regulation that will smack a director if they don't have

 2   current KYC files.  They're required to diligently keep

 3   them to the extent that they are able and to be able to

 4   show that they do that.

 5        Q.   And I think you just testified that

 6   Mr. Markosian's KYC information on file with AmeriMark

 7   Automotive has lapsed; is that correct?

 8        A.   It has.

 9        Q.   And what that means, I think, from what you

10   just told me, is that Mr. Markosian can't receive

11   dividends from AmeriMark Group?

12        A.   Correct.

13        Q.   Although I don't believe AmeriMark Group has

14   ever paid any dividends; is that correct?

15        A.   I don't know that it -- I don't think that it

16   has.  I'm totally unaware of any dividends.  I would be

17   shocked to learn that it had.

18        Q.   But Mr. Markosian also couldn't register to

19   appear at a shareholder meeting or vote at such meeting;

20   is that right?

21        A.   He's not supposed to participate.  I might

22   have misspoke there.  He's not supposed to participate

23   in the meeting.  There actually are some other people

24   that can attend the shareholder meeting.  He's not

25   allowed to participate, to vote at the meeting.

1        Q.    Got it.

2        A.    What I meant to really say, to totally

3    clarify, he's not allowed to register as a shareholder

4    at the meeting.  He's allowed to appear at the meeting.

5        **Q.    Swiss law or regulations -- and you can tell**

6    **me which it is -- require Swiss corporations to have**

7    **annual general meetings; correct?**

8        A.    Swiss law does not.  Swiss regulations do not.

9    There is a court case -- and this is very recent.  It is

10   a court case -- there's a guideline -- let me start

11   over.

12        Swiss law include a code of obligations, and

13   I'm not a practitioner.  I'm doing this from memory, but

14   I'm pretty close, I think.  There's a guideline that

15   says annual meetings must be completed by June 30 of

16   the -- including the financials by June 30 of the prior

17   year.  This is a guideline.

18        For a long time in many Swiss companies,

19   they're still in a situation -- and it's not enforced,

20   there's no penalty, even though it's delineated -- and

21   this is, again, from my memory, in the code of

22   obligations, which is essentially the commercial law of

23   Switzerland.  Its statute.  It was, for a long period of

24   time, not enforced -- or there was no enforcement clause

25   for it.  It wasn't a self-enforcing clause.  So many

1    companies, to this day, even large companies, lapse all

2    the time.

3           There was a court case -- I was about to say

4    something about the judge, but I'm not going to.  There

5    was a court case which found, recently, that the moment

6    that that -- that point lapsed, the board became

7    ineffectual.  It no longer has power.  It's supposed to

8    be to incentivize directors to, you know, be more

9    prompt, and it caused a lot of problems in Switzerland

10   because nobody was doing it, really, on time.  And the

11   problem is that under Swiss law -- this is Swiss law --

12   it is the board of directors that calls the annual

13   meeting.  So if the board of directors is powerless and

14   you need an annual meeting to become compliant -- I know

15   I'm getting into the weeds, but this is exactly the

16   situation that AmeriMark Group found itself in that I

17   was referring to earlier.  So that's what we're talking

18   about.

19   **Q.   So I want to differentiate between a**

20   **requirement the company have an annual general meeting**

21   **and the requirement that they have it by a particular**

22   **date.  Are those separate requirements in Swiss law?**

23        A.   I don't know the answer to that one exactly.

24   I know the -- I know the -- the guideline that you're

25   supposed to have by a particular date and I -- you know,

1    everyone knows that you're supposed to have annual

2    meetings.  I don't know that I can articulate the exact

3    statutory structure that defines it, but I can tell you

4    it's not a strict obligation because for years

5    and years, many, many companies were not compliant.

6         **Q.   What has to happen at an annual general**

7    **meeting for it to count as an annual general meeting?**

8         A.   Well, I don't know that I'm perfectly able to

9    do that.  I'd want to talk to counsel to really tell me,

10   but I can give you my best estimation.  In theory,

11   you're supposed to have the financials report by the

12   board and potentially any other agenda items pass the

13   meeting, and sometimes they're incredibly simple.

14   Sometimes it's enough to say, "These are the financials.

15   We passed.  There are no other items," and that's it.  I

16   might be understating the case a little bit.  I'm not a

17   practitioner, but I've certainly been in meetings.

18          And, for example, many meetings of AmeriMark

19   Automotive have been incredibly simple and don't even

20   require a physical meeting.  This is because, as we

21   talked about in another context in some of this

22   testimony, in Switzerland, if you have you 100 percent

23   shareholding, you can do a circular meeting.  100

24   percent shareholder says, "Here's the meeting.  Here are

25   the minutes.  Finished.  Done."  No physical meeting.

 1   Nothing else.  It's over.  In fact, Mr. Markosian held

 2   one such meeting for AmeriMark Automotive in the very,

 3   very beginning, a universal circular meeting.

 4          So the requirements are actually quite light.

 5   I will add because it's -- it's important to the context

 6   here.  Because AmeriMark Group couldn't hold annual

 7   meetings for a long period of time and you're supposed

 8   to send the shareholder approved financials to the tax

 9   authority, AmeriMark Group spoke at the tax authority --

10   I think this is Nicole Kuster's conversation -- I don't

11   remember exactly who it was -- and they pointed out

12   that, in fact, what you can do is you can submit the

13   financials with a note that say, "Not approved by

14   shareholders," which you have to do if you can't hold

15   the meeting.  And sometimes there are companies that

16   just have an administrative issue and they can't.

17          So AmeriMark Group has done that for some

18   years, two or three years, in order to get over the fact

19   that they're unable to have annual meetings.

20   **   Q.   So you described a universal circular**

21   **meeting -- I think was the term that you used -- that**

22   **Mr. Markosian held in 2016 for AmeriMark Automotive;**

23   **correct?**

24          A.   I think it was 2016.  It might have been -- I

25   might have to correct myself.  It might have been

1   related to the reverse merger and the authorization for

2   a reverse merger.  And then I think -- I'm not sure.

3   I'm pretty sure that that's what that was.  And when I

4   said "universal circular," I think in the United states

5   it's called a "circular meeting," possibly, or a meeting

6   by circulation.  We just circulate the document.  We're

7   done.  And I think in Switzerland it's called a

8   "universal meeting."  In other words, the whole universe

9   of shareholders makes a decision.

10         **Q.   And the predicate is that all shareholders**

11   **need to be united or there needs to be a single**

12   **shareholder or something else.**

13         A.   If there's -- if 100 percent of shareholders

14   are not represented, you can't just write a paper.  You

15   have to have some kind of a process to protect the

16   shareholder that is not represented -- right -- to give

17   them an opportunity to be heard.  This is why, often,

18   you really want to have 100 percent shareholdings.  It

19   makes corporate governance pretty easy.  You don't have

20   to hold meetings all the time or you don't have to send

21   out invitations.  No invitations have to go out when you

22   already have 100 percent of shareholders, for instance.

23         **Q.   So prior to the reverse merger in May 2018,**

24   **AmeriMark Automotive could not have held a universal**

25   **meeting without all 19 shareholders consenting; right?**

```
 1        A.    That's right.  It would have to be 100
 2   percent.  So I think I must be referring to one of the
 3   earlier meetings.  I do feel like I saw a 2016 universal
 4   meeting form Mr Markosian, but I don't remember a
 5   hundred percent for sure.  I take it back.  Thanks for
 6   clarifying.  What I'm thinking of is the board
 7   resolution signed by Mr. Markosian for the reverse
 8   merger to authorize the company to seek to admit its
 9   shares.  That's my mistake.  Thank you for helping me.
10        Q.    And he would have signed that resolution, not
11   in his capacity as shareholder, but in his capacity as a
12   director?
13        A.    As a director.  As a board of resolution.  My
14   mistake.
15              (Reporter clarification.)
16        Q.    (BY MR. RICHARDS)  Do you know whether
17   AmeriMark Automotive had an annual general meeting in
18   2017?
19        A.    I believe it had annual general meetings
20   across the board.  Let me think about the context of
21   2017.  By 2017, we now have 18 shareholders -- I'm
22   sorry.  19 shareholders should be in 2017.  I don't know
23   what that record is like.  I do know that that would
24   have been handled by Nicole Kuster and Nicolai Colshorn,
25   and I feel like they have always been on top of things.
```

1  On that one, I don't know 100 percent for sure.  I don't

2  know why it wouldn't have been.

3      Q.   What about 2018, same answer?

4      A.   I would give you the same answer.

5      Q.   And then beginning in 2019, AmeriMark --

6      A.   Let me stop you for just a second.  2018,

7  2019 -- we're talking Automotive now?

8      Q.   Yes.

9      A.   I feel like I've definitely -- well, I'm not

10  going to say definitely.  I feel like I've seen 2018,

11  2019, 2020, 2021 on for Automotive.  I feel like I have.

12      Q.   Well, beginning in 2019, Automotive had a

13  single shareholder; right?

14      A.   Yes, but we would have done -- definitely done

15  universal meetings every year, because you have to pass

16  the financials anyway eventually.  So --

17      Q.   So you're not aware of AmeriMark Automotive

18  missing a year in its meetings?

19      A.   I'm not aware of it, no.  I think we were

20  current.  I think, also, in order to do the latest

21  AmeriMark Group meeting, we needed to make sure all the

22  Automotive's were current.  I know for -- I know also,

23  just to -- to close the loop on this point, one of the

24  things -- yes.  Anyway --

25      Q.   What about Group?  Did Group miss any

 1    meetings?

 2         A.   Well, by missed, some were severely delayed

 3    until recently when we were able to cure the

 4    administrative default, and then we held -- I don't

 5    remember -- two or three sort of simultaneously or in

 6    short sequence.  So as to my knowledge, AmeriMark Group

 7    is current on its annual meetings.

 8         **Q.   And that administrative default, the**

 9    **suspension or whatever it was -- that was a result of a**

10    **problem with the directors?**

11         A.   It was a result of the fact that we couldn't

12    get consolidated financials because after

13    September 16th, 2020, Mr. Markosian refused to provide

14    them in any real way and wouldn't cooperate.  So it

15    wasn't enough to have the Rymark financials, the audited

16    financials.  We needed a management statement.  We

17    needed all sorts of participation, and we knew that was

18    not forthcoming.  So we couldn't hold meetings.

19         **Q.   And you haven't -- you being AmeriMark**

20    **Group -- hasn't got any of those things since September**

21    **2020; correct?**

22         A.   No.  It required court intervention actually.

23              (Reporter clarification.)

24         **Q.   And the court said basically, "Okay, you can**

25    **keep holding meetings without financials"?**

CAPANA SWISS ADVISORS AG vs RYMARK
SHAEN BERNHARDT - 01/24/2025

30(b)(6)
Page 138

1      A.    "You can do this one meeting now, and then you
2    have to cure, in that meeting, the default."  That was
3    the authorization.
4           This was -- you know, it was done in an oral
5    hearing.  It was actually -- yeah.  I was going to say
6    something, but I'll tell you later if you're interested,
7    just from an academic legal point of view about how it
8    got solved.  It's not relevant to the company, but I
9    think you'd be interested in the academic part of it.
10          But, yes, we had to literally find a very
11   unique way to solve this problem.  It was a novel
12   problem caused by this one judge in Switzerland.  It was
13   just bizarre.
14      **Q.    2023, I think your testimony is that you**
15   **believe AmeriMark Automotive had an annual general**
16   **meeting, and you believe it would have been a circular**
17   **meeting; is that correct?**
18      A.    Let me think about this again.  Did AmeriMark
19   Automotive have an annual meeting in '23, and was it a
20   circulation meeting?  I'm basically positive it did
21   because the close of '23 is for Group, and you can't do
22   that until you close the subsidiary and consolidate up.
23   So I believe that that's correct.
24      **Q.    So let's set aside annual general meetings.**
25   **There's also such thing as a special meeting; correct?**

1        A.    Correct.

2        Q.    **How many special meetings has AmeriMark**

3   **Automotive had?**

4        A.    Few to none.  You know, special meetings with

5   the shareholders, to do special shareholder actions, I

6   don't -- we're talking about Automotive now?

7        Q.    **Mm-hmm.**

8        A.    I think few to none.  In Switzerland, there

9   are certain special shareholder actions, but I don't

10   know that the company ever undertook anything that

11   required it.

12        Q.    **What about in Utah in 2023?  We discussed at**

13   **some length yesterday Barbara McFarland at Parsons Behle**

14   **acting as a nominee for a special meeting.**

15        A.    We did.

16        Q.    **Was that a special meeting of AmeriMark**

17   **Automotive?**

18        A.    I thought that it was a board resolution, not

19   a special meeting.

20        Q.    **And the difference between those two things is**

21   **what?**

22        A.    Board resolution is called by the board, and

23   the board votes in its own sole capacity to make a

24   resolution.  No shareholder involvement is required.

25              Well, eventually the shareholders can see that

 1  the board resolution was done when they inspect the next

 2  year's papers.

 3      **Q.   And has an annual meeting been held since the**

 4  **board resolution we were just discussing?**

 5      A.   Remind me the date of that board resolution.

 6      **Q.   I'm not sure.**

 7      A.   Remind me the year.

 8      **Q.   2023.**

 9      A.   I'm not positive on that.  I don't know.  So

10  we're talking Automotive again?

11      **Q.   Yeah.**

12      A.   I don't know if the 2024's have been closed.

13  It's only January '25.  Probably not.

14      **Q.   I'm going to mark D 117.**

15              (Exhibit D 117 was marked.)

16      A.   Got it.  Yes.  Did we look at this yesterday?

17      **Q.   (BY MR. RICHARDS)  We may have, and I may have**

18  **remarked it.  I'm actually -- I really don't think I'm**

19  **remarking very much stuff today, but we may have looked**

20  **at this yesterday.**

21      A.   It's fine.  Just for my recollection.

22      **Q.   This is a March -- excuse me -- this is a**

23  **May 9th, 2023, email from you to Nick Greenwood and**

24  **Sarah Diamond with several others in CC; correct?**

25      A.   Correct.

1        Q.   And correct me if this is wrong.  I'm looking

2    at the main email on this first page.

3        A.   Mm-hmm.

4        Q.   And some of the lines have little sort of

5    sideways carrots before them.  I think that's

6    Mr. Greenwood's email, and then the lines without

7    carrots, I think, are your interlineations.  Is that

8    your understanding?

9        A.   That is my understanding.

10        Q.   Mr. Greenwood begins, "Shaen, thank you for

11    the revisions.  This will work from my perspective,

12    assuming you will have the separate certificate and

13    indemnity as well.  Could you please confirm and send me

14    the proposed final version of that certificate and

15    indemnity?"

16            What certificate and indemnity is meant here?

17        A.   Certificate I don't -- I think -- let me read

18    the bottom on here for a second.  Just a second.  What

19    am I saying?  I don't know what he means 100 percent by

20    certificate.  I'm going to speculate, and I'm going to

21    say that he maybe wants a certificate of the board

22    resolution.

23            Indemnity was that -- because Parsons Behle

24    was sending their paralegal, Barbara McFarland, just in

25    her capacity as, essentially, a notary, that she should

 1   be indemnified from -- from be acting as a notary in

 2   that way.  That was -- that was what the indemnification

 3   conversation was all about, and we did provide them

 4   indemnification.

 5        Q.   And when you say "we," is that indemnification

 6   between Capana and Miss McFarland or Capana and Parsons

 7   Behle or someone else?

 8        A.   I -- let's think about that.  I think -- I

 9   don't remember who it was from exactly.  It could have

10   been from Automotive indemnifying her, which makes

11   sense, but honestly I don't remember exactly where the

12   indemnification came from.

13        Q.   And do you believe that the board resolution

14   that came out of this process was made in or about May

15   of 2023 based on this email?

16        A.   I can't remember when all of this finally came

17   to pass, but I don't -- I don't know.  I mean,

18   obviously, it was generally in this -- this time.  I

19   can't tell if it was May.  Did it go in June?  I just

20   don't know.  Certainly in this time frame.

21        Q.   And it resulted in a signed resolution of a

22   physical piece of paper.  Yes?

23        A.   I don't know if it would have been physical or

24   digital.  Again, it was a board resolution.  So let's

25   see.  At this time in 2023, was it a single director?

 1   You know, you can hold a single -- you can hold the

 2   equivalent of a universal board meeting and just make a

 3   notation.  I don't know the exact documentation, and

 4   even in my review, I didn't actually come across this

 5   particular document, which would be -- let me specify, a

 6   board resolution from Automotive authorizing --

 7   authorizing the -- committing the shares of Automotive

 8   of Rymark shares-- let me start for the court reporter

 9   again -- a board resolution from AmeriMark Automotive

10   directing the voting of shares in its subsidiary Rymark.

11        Q.   You respond, "I think we have approved the

12   certificate without material edits (Sarah?).  If you

13   agree the latest draft, I'll have the directors execute

14   that this evening."

15             That's consistent with, I think, your guess

16   earlier that the certificate means something that

17   enabled Ms. McFarland to hold the meeting in the first

18   place.  Does that sound right?

19        A.   Or perhaps what is going to be presented to be

20   apostille, to have an apostille sign to it.  Honestly, I

21   don't remember what that refers to.  Clearly part of the

22   process.

23        Q.   All right.  Let's skip down a couple of

24   paragraphs.  Do you see the one that begins, "If you

25   would please"?

```
 1        A.   If you would --

 2        Q.   It's after a little carrot, three lines.

 3        A.   Got it.

 4        Q.   "If you would please send final versions of

 5   the two Word documents and let me know when you would

 6   expect to like Ms. McFarland to sign, I would appreciate

 7   it."

 8             Do you know which Word documents are meant

 9   here?

10        A.   I don't remember that.

11        Q.   You can set that exhibit aside.

12             Was AmeriMark Automotive registered to do

13   business in Utah at the time of this email?

14        A.   Not to my knowledge.

15        Q.   Do you know whether it subsequently registered

16   to do business in Utah?

17        A.   I don't believe it was.

18        Q.   When did AmeriMark Automotive first become

19   aware that Rymark had paid dividends to Mr. Markosian as

20   you allege in the amended complaint?

21        A.   I'm not sure I can put an exact date on it.

22   Automotive -- I mean, so the mechanism for Automotive to

23   discover it, I suppose -- you know, if I wanted to be

24   pedantic, I would say Automotive never discovered it,

25   but I think, naturally, Mr. Colshorn would have learned
```

 1    of it, and at Mr. Colshorn's directorship, that

 2    certainly would have put AmeriMark Automotive in --

 3    aware of it.

 4            But there was a long period when we were

 5    trying to sus out exactly what happened.  You know, when

 6    were we clear that dividends should have been passed up

 7    that weren't, and this was a complicated enough issue on

 8    it, and there was enough uncertainty on it.  And,

 9    frankly, Rymark's financials were so obscure on the

10    topic that we went so far, again, as to hire Helm

11    Advisors to advise us on that point.  That's the part I

12    remember that I have to be careful talking about because

13    that really was sort of the attorney-client part, but we

14    definitely spent a great deal of time trying to figure

15    out exactly what happened.

16            The other thing was, could it have been the

17    financials were just misstated or in error?  Certainly I

18    knew, very quickly, that there were lots of problems

19    with the financials back and forth once the September

20    letter came in, but did that rise to the level that we

21    knew that they had been stolen?  I think it took us

22    quite some time to figure that out.  When did AmeriMark

23    Automotive learn of this?  Well, certainly by the time

24    we filed the litigation, we had a strong suspicion that

25    that was going to turn out to be an issue.

1          But, for example, you know, the dividends or
2     the distributions or however -- however they were
3     accounted for in the Rymark financials were a bit
4     obscure, and what you really want to do is you really
5     want to ask the controller, "Hey, were these
6     distributions made?  When were they made?  How were they
7     made?"  And, of course, we couldn't do that.
8          So when did they discover that?  I mean, I
9     don't think we really super discovered it until into
10    this litigation.  When did we know?  I mean, had an
11    inkling, yes, but no opportunity to interview the
12    management of Rymark to say, "Hey, did you pay these
13    dividends?"
14         I'll also note that going -- you know, looking
15    over this issue after the fact in discovery, there are a
16    bunch of cleanup activities about dividends that go back
17    and forth with Vicky Small and Katz, Sapper & Miller.
18    And I think what happened is that something about
19    distributions or dividends was not properly done.  They
20    were apparently haphazard, and when Katz, Sapper &
21    Miller came in, they pointed this out, and those were --
22    so far as I know -- and I think this is one reason that
23    Keddington & Christensen statements are -- have been
24    restated in past in their many versions -- is because I
25    think that issue had to -- they had to go back and

1    reclassify them.

2            I also remember seeing correspondence where it

3    was perhaps -- instead of taking distributions,

4    Mr. Markosian would do something like loan forgiveness

5    or convert loans into equity.  Like so I'm not sure even

6    Rymark quite knew what it was doing with dividends or

7    distributions.  So I'm not -- to answer the question

8    about AmeriMark Automotive, I really don't think it was

9    until we had started seeing the discovery.  Because it's

10   one thing we see some financial statements that say "X"

11   but you know that they are maybe unreliable, but when

12   you go back and you see discovery talking about issue

13   "X," then you start to realize that there were problems

14   there.  So I know that's an obtuse answer, but I don't

15   have a better one for you.

16        Q.   I'm going to mark Exhibit D 118.

17             (Exhibit D 118 was marked.)

18        Q.   (BY MR. RICHARDS)  Mr. Bernhardt, I've marked

19   as Exhibit D 118 what you can see as a September 26th,

20   2019, email from Ms. Kuster to Mr. Leshem; correct?

21        A.   Correct.

22        Q.   And just to make sure we're on the same,

23   Ms. Kuster is an employee of Mr. Colshorn's firm; is

24   that right?

25        A.   Correct.

1        Q.   So she addresses her email to Mr. Leshem, and

2   Mr. Colshorn's in CC.  Yes?

3        A.   He is.

4        Q.   And I have some questions about some of the

5   things she says.  So let's read her email.

6             "Dear, Miron.  Thanks a lot for your answers!

7   Please find attached the adopted organization chart.

8   May we ask you for the following information:  It looks

9   like that 21 percent of bearer shares of 4Service Cloud

10  AG are upheld by public shareholders.  This cannot be...

11  could you please check on this?  Maybe also Mr. A.

12  Coenen can help on this question?!"

13            What do you understand Ms. Kuster to be saying

14  here?

15       A.   Well, because the bearer share issue was --

16  this is now September 2019; right?  So it's after the

17  reversed merger and the failed admissions to trade

18  intershares, and the bearer shares, 4Service Cloud,

19  which became AmeriMark Group, again, had been hanging

20  around for a long time, like since 2015.  So -- and I

21  think it might have been even earlier than that.  I

22  don't actually know when they were dematerialized.

23            And then, again, we have the same issue here.

24  When you have a share ledger -- particularly, when

25  you're dealing with bearer shares and you have a company

 1    that's been listed and delisted and had an electronic

 2    share lecture and then doesn't have an electronic share

 3    ledger, it becomes impossible to get close, and you have

 4    overcounts.  And this is one of those instances where

 5    you have a shareholder list that shows a bunch of

 6    shareholders.  It's not current.  Somebody else buys

 7    from -- from one of the original shareholders, presents

 8    themselves to the company, and now you have an

 9    overcount.

10           I think that's what's going on here.  When she

11    says, "This cannot be," I don't know if it's because she

12    means there are no bearer shares because the 21 is too

13    high or 21 is too low.  I don't know what she means, but

14    certainly it's some issue, something on that issue.

15         Q.   Are you aware of overcounts in AmeriMark

16    Group's shared register?

17         A.   Absolutely.

18         Q.   Can you describe that?

19         A.   Well, we talked about it earlier Mr. Nolay

20    [ph] claiming that he has "X" and that not fitting the

21    share ledger.  That's a real clear overcount.  And then

22    we also pointed out that I haven't seen perfect evidence

23    from Mr. Nolay [ph].  Maybe it exists.  I haven't seen

24    perfect evidence from Mr. Nolay [ph] on his

25    shareholding.  And this happens all the time to

 1   companies.

 2            "Hey, I'm a shareholder."

 3            "Well, let me see your evidence."

 4            "Well, I have this and this."

 5            And this happened with great length in June

 6   and August of 2020 to AmeriMark Group.  So, yes, you can

 7   have overcounts.  Maybe that's the case here.

 8       **Q.   How did the directors of a company go about**

 9   **resolving those overcounts?**

10       A.   We're doing it right now with the group;

11   right?  So what you do is you look at all the evidence

12   that you possibly have, and you have to take the most

13   reliable piece of evidence that you have -- the last

14   time you knew or at least thought that this was correct

15   and compare it against -- if there's something that's

16   old, that gets sort of -- not discounted, but gets sort

17   of demoted, and you have to work through all the way.

18            And, also, you can call shareholders,

19   especially the larger shareholders that are listed,

20   because if you got a bunch of large shareholdings that

21   are listed and some of these people might have sold

22   their shares, that's where the big overcounts come;

23   right?  Because then a big bunch of shares that you

24   think belong to Bill actually belong to Ted.

25            So you can call them, but you see, the

1    shareholders have no obligation to talk to you.  They

2    have no obligation to tell the Swiss company whether

3    they have sold or not. The buyer may or may not declare

4    themselves.  So you go through a process.  It's a --

5    what's the word I'm looking for -- reconciliation

6    process, but in a company like this that got messy all

7    the way back in 2018, this is part of the process,

8    frankly, of distressed debt.  Who's really a

9    shareholder?

10        **Q.    Do you call brokerages to ask how many shares**

11   **they have?**

12        A.    They would absolutely never tell you in

13   Switzerland.

14        **Q.    They're forbidden from telling you?**

15        A.    Absolutely no chance.

16        **Q.    It's plaintiff's position in this lawsuit that**

17   **Mr. Markosian still owns on the order of 6 million and**

18   **change AmeriMark Group shares; correct?**

19        A.    6,441,855, maybe something like that.

20        **Q.    Where are those shares?**

21        A.    Well, at the moment they're listed in the

22   share registry, and I assume that they're still either

23   sitting with the transfer agent, or they're in an

24   account that Mr. Markosian has that we don't know about.

25        **Q.    Is transfer agent BankM?**

 1        A.   It could be BankM, or it could Volens Bank.
 2   I'd rather think it's Volens Bank.
 3        **Q.   Why do you rather think it's Volens Bank?**
 4        A.   Because BankM didn't really distribute any
 5   more shares after they were delivered to Volens Bank.
 6   Volens Bank essentially -- not essentially.  Volens Bank
 7   took over the transfer agent role.
 8        **Q.   So is it your understanding that at some point**
 9   **all 20 million new registered shares were put into**
10   **custody at Valens Bank?**
11        A.   I'm not sure that that's true, because some
12   shareholders may have taken their delivery and put it
13   into their depo when BankM was the transfer agent and
14   before Volens Bank took over.  I don't know.  I don't
15   actually know.
16        **Q.   All right.  Let's stay in the document we're**
17   **on.**
18        A.   Mm-hmm.
19        **Q.   I'd like to look at the largest paragraph**
20   **here.  It's about two-thirds of the way down the page.**
21   **There's a little tick, and then it says, "In the**
22   **financial statement."  Do you see where I mean?**
23        A.   I do.
24        **Q.   "In the financial statement December 31, 2016,**
25   **of Rymark Inc. it is written 'Dividends to owner'**

1    $233,992....  At the end of 2016, the owner of Rymark

2    Inc was AmeriMark Automotive AG:  I can't find an

3    incoming dividend in its accounting?!"

4         Do you see that?

5    A.   I do.

6    Q.   So this is Ms. Kuster identifying the dividend

7    issue in the financials, yes?

8    A.   Finding an inconsistency, yes.

9    Q.   All right.  Next paragraph, "Please also have

10   a look at page 12 of the report, related party

11   transactions:  There it is written e.g. '...owned by

12   stockholder's wife.'"

13   A.   Yes.

14   Q.   "... how can this be if Rymark was owned by AA

15   Automotive by the end of the year 2016??!  Same for 2017

16   and in 2018 it is written 'Distribution to

17   stockholder"... is this similar to a dividend and if

18   so -- to whom was it paid as in the books of AM

19   Automotive there is no income."

20   A.   I see.

21   Q.   Same thing.  She's identifying the issues

22   we've already discussed today; correct?

23   A.   She is.  September 26, 2019.

24   Q.   Do you know what was done to investigate these

25   issues during this time period fall of 2019?

1      A.   Well, it was also -- this is also in the

2    context of the Swiss tax audit.  So I definitely see in

3    production -- I'm not sure that the dividend and the --

4    and the stockholder wife thing was -- was brought up,

5    but it was definitely in -- in production that -- this

6    is the period of the Swiss tax audit too.  In this

7    period, there was still conversations going on between

8    Vicky Small and at least Miron Leshem and also, you

9    know, I think now -- let's think about this too.  Yeah,

10   I think this is also the period when Keddington &

11   Christensen got involved.  I think Rick White even was

12   on calls.  I have is to go back and look at production,

13   but all of this was in connection also with the Swiss

14   tax collections.

15            So I do remember having the impression when

16   all of that was going on that there was active dialogue

17   with the company to the point where they were offering

18   up, you know, their accountants to talk.  I'm really

19   sure I saw a call where Mr. Markosian addresses, you

20   know, what AmeriMark is; right?  Because, from my

21   memory, Greg Jenkins and Gary Kennington are asking, and

22   they ask White to come on.  I think that's in this

23   period to.  This is when this all started.  It's the end

24   of 2019, beginning of 2020.

25            And so at the very least, it was discussed.  I

1    thought it was a little later, this actual issue.  I'm

2    not copied on this email.  I hadn't remembered it, but

3    it definitely came up later, and eventually -- not

4    until, again, 2020 did Mr. Colshorn start getting very

5    upset about it and sort of talking about what the hell

6    are the Americans, meaning Rymark, doing.  But until

7    then -- and even up until that point, you see, you know,

8    talking about the Swiss tax audit.  Nicole Kuster, I

9    know, was getting information from --

10                    (Reporter clarification.)

11        A.   So there's this active dialogue going on.  I

12   don't remember this issue being this early.  It clearly

13   was at least raised, but all the way through March 2020,

14   even April 2020, discussions are going on, talking to

15   accountants, KSM is involved.  I never talked directly

16   to KSM, but certainly Vicky was relaying the Swiss tax

17   audit thing, and that was coming -- that was Nicole

18   Kuster's concerns coming along.

19                And I do remember when Colshorn got upset and

20   a little bit upset with me even.  You know, what are

21   they doing?  That's now -- these issues still not

22   resolved, but at least dialogue happening until March,

23   April, May of 2020.

24        Q.   I asked you earlier whether Group ever paid

25   dividends, and you said no.  Automotive also never paid

CAPANA SWISS ADVISORS AG vs RYMARK
SHAEN BERNHARDT - 01/24/2025

30(b)(6)
Page 156

1    any dividends; correct?

2        A.    I'm not aware of any, and I would be surprised

3    to find that they had.

4        **Q.    What taxes does AmeriMark Automotive have to**

5    **pay?**

6        A.    Well, every time you do a capital increase, or

7    something along those lines, there's a stamp duty, stamp

8    tax.  In addition to that, there can be -- and I'm not a

9    tax expert, but there can be a ongoing tax on the

10    capital of the company; right?  And AmeriMark

11    Automotive's capital is quite high, you know, in

12    Switzerland, and this was also part of the tax audit.

13    Okay?  You've got 900,000, but you got AmeriMark

14    Properties -- of course, except, we don't because

15    AmeriMark Properties was never in part of AmeriMark.

16    Show us that you haven't substantially overstated or

17    understated, and that will become a tax too.

18            And I think, actually, Automotive still has

19    some taxes that we deferred that are going to come due.

20    I haven't looked most carefully at that, not for this

21    deposition anyway.

22            But definitely there's those taxes, and then

23    there's a tax on salary paid to directors.  There's

24    withholding salary paid to directors very much in the

25    social security sense of things.  I don't know if it's

 1    directly a tax.  I consider it a tax.  But there's

 2    definitely those ongoing obligations.  Even in a small

 3    company like that you have to pay those.

 4          Was that responsive to your question?

 5    **Q.   It was.  Thank you.**

 6    A.    You're welcome.

 7    **Q.   What requirements do Swiss law or regulations**

 8    **or guidelines impose on companies with respect to**

 9    **document retention?**

10    A.    Well, I'm not a practitioner here, but it's

11    pretty light, unless we're talking about regulatory

12    documents -- is my understanding.  So, for example, tax

13    files, et cetera, I think, have -- I don't want to

14    guess -- some number year of retention, but for general

15    business records, unless they're pertaining to something

16    dramatic, I'm not aware of anything specific.

17          That's totally different, of course, if you're

18    a licensed entity.  Licensed by, you know, FINMA, which

19    is basically the fed of Switzerland, and then they're

20    extremely onerous.

21          Also, I think there are some requirements with

22    respect to how long you keep KYC documentation.  That's

23    more requirement on the board and on the directors

24    individually, I think.  And in addition to that -- I

25    mean, it depends.  If you're in a particular medical

 1    industry or something like that, there's probably more

 2    accelerated document retention, but for the most part,

 3    especially for small or medium enterprises, I think it's

 4    fairly benign.

 5           Again, I'm not a practitioner, but that's my

 6    understanding.

 7           MR. WORDEN:  Stephen, I need to take five.

 8           (Recess taken from 12:04 to 12:12.)

 9    Q.   (BY MR. RICHARDS)  Mr. Bernhardt, does

10    AmeriMark Automotive have a phone number?

11    A.   I don't believe it does anymore.

12    Q.   Did it once?

13    A.   Automotive -- I don't know that for sure.

14    Q.   Does it have an office?

15    A.   Yes.

16    Q.   Where?

17    A.   I'd have to look at the personal register

18    because the domicile was recently changed, but that's

19    listed in the commercial registry, commercial registered

20    document.  You can find it in the web.  It's in Canton

21    Zug for sure.  I can't remember what the exact address

22    was.

23    Q.   And I'm not going to describe this well, but

24    is it one of those places where a bunch of corporations

25    are headquartered in a single location?

 1        A.   I think it is in a dome -- what we call a

 2   domicile office with multiple corporations.  It's not

 3   the sole offices of Automotive.  Remembering that

 4   Automotive, you know, has really, essentially, just been

 5   a holding company since 2018.  So yes.  I believe the

 6   offices are the same as Group at the moment.

 7        **Q.   When Mr. Colshorn was a director of**

 8   **Automotive, was Automotive located at his offices?**

 9        A.   Well, it was in -- I think that was a

10   Steinhausen 74 in Zug.  Do you need me to spell that?

11             (Reporter clarification.)

12        A.   That is Mr. Colshorn's offices or was the

13   offices of Econ commercial company, and, you know,

14   that's a more substantial office.  I wouldn't call that

15   a purely domicile office.  Conference rooms, there's

16   separate suites.  I would call that more, like, shared

17   offices.

18        **Q.   Meaning Econ shares it with other companies?**

19        A.   No.  Meaning Econ owns it or holds it -- is

20   the sole tenant, and then sublets to its companies that

21   are domiciled there.

22        **Q.   For which Econ performs some sort of services?**

23        A.   At the time, yes.

24        **Q.   Does Automotive have a bank account?**

25        A.   It does anymore.  The last bank account I'm

1    aware of would have been Bendura Bank.  Well, let me

2    stop you -- I'm going to stop myself.

3            AmeriMark Automotive shares are still

4    dematerialized.  So -- and those are held, I believe,

5    still at BankM, and I think there is, actually, a

6    current account attached to that, but it hasn't been

7    used for some period of time.

8        Q.    When were Automotive's shares dematerialized?

9        A.    Pretty much immediately, and as I mentioned, I

10   think, yesterday, in my last deposition back in

11   September, I had that wrong.  I hadn't realized that

12   Automotive's shares had been dematerialized, but, in

13   fact, pretty much right after creation, the BankM

14   relationship was started.

15           One of the things that triggered me

16   understanding that is the physical document I brought

17   Mr. Markosian signing the payment -- the payment agent

18   application, which was all the back in June of 2016.  So

19   relatively soon after the creation of the company.

20           So technically speaking, to answer your

21   original question, Automotive does have bank account.

22       Q.    How often does Automotive's board meet?

23       A.    I'm not sure that they have regular board

24   meetings.  Automotive, again, doesn't have that many

25   activities.  Certainly annual meetings.

1      Q.    You described earlier today a Swiss tax audit.

2   My understanding of your testimony is that that tax

3   audit was into Group as opposed to Automotive; is that

4   correct?

5      A.    I don't think it's technically correct because

6   the issues were, for example, what was the size -- I

7   think it was both companies eventually.  How that

8   progressed, when which, I don't remember.  But I'll tell

9   you what the issues were which suggest to me that it was

10  both Automotive and Group.

11          Number one, the value of the contribution of

12  Rymark into Automotive which necessarily entails an

13  exploration into Automotive.  And, two, the reverse

14  merger of Automotive into Group, which necessarily

15  entails Automotive and Group.

16          You know, in Switzerland -- here in the U.S.

17  you know, calling a tax audit is a -- is a particular

18  thing.  One is a target of a tax audit.  Switzerland,

19  the tax authorities are much different.  It's an

20  examination.  It's cordial.  A lot of it is done by

21  phone and in person.  It's just a much more

22  collaborative process.  So there might be -- my point --

23  describing that being, there might be a blurring of the

24  lines into exactly what's going on.  But, certainly,

25  both of companies were referred to in the tax

 1    examination that was done.

 2         Q.   Setting aside that tax examination, are you

 3    aware of any other regulatory investigations into

 4    Automotive?

 5         A.   I want to be careful about defining regulatory

 6    investigation.  So let me give you an example.  Did you

 7    fail to pay your -- this is Switzerland; right?  So

 8    there's some, you know, sort of all these quasi

 9    government-regulating things.  Did you fail to pay your

10    local fire bureau?  Then the fire people might come over

11    and do an inspection because you've lapsed.

12                   (Reporter clarification.)

13         A.   Is that -- I don't think you mean a regulatory

14    investigation in that context.  I think you're talking

15    about from a regulatory agency that would have some

16    relevance to this litigation.

17         Q.   Yeah.  I don't know about relevance to the

18    litigation.  I am contemplating something slightly more

19    formal.  Are you aware of anything besides, like, you

20    didn't pay your required levy?

21         A.   No, not for Automotive.  You know, nothing

22    like that.

23         Q.   What about for Group?

24         A.   Also not for Group.  Yeah, nothing from --

25    nothing from, you know, the Swiss securities regulator,

1    nothing from, you know, occupational safety and hazard,

2    whatever that position is.  I'm really not aware of

3    anything like that.

4        Q.   What authority did Mr. Leshem have at

5    Automotive?

6        A.   Well, in his capacity as the listing agent of

7    its subsidiary Rymark is my understanding of pretty much

8    what -- the way that he interacts.  To the extent that

9    he also interacted with Nicolai Colshorn when Colshorn

10   was a director at either Automotive or Group level, he

11   would have been working with either the implicit or

12   potentially the explicit authorization of the board.

13            So, formally, as the listing agent of a

14   subsidiary, Rymark.  Informally, in a capacity as a

15   consultant to the board, et cetera.  Along those lines.

16       Q.   Same answer for Group?

17       A.   I think that's correct.

18            Very quickly, are we done with this?

19       Q.   Yes.

20       A.   Same answer for Group, yes.  I think that --

21   well, certainly, he collaborated with the board of

22   directors, but also with Mr. Markosian at the Automotive

23   level.  One could be saying that he was an agent of the

24   president of AmeriMark Automotive insofar as he was

25   working for Mr. Markosian until August of 2020.

1        Q.    I'm going to mark Exhibit D 119.

2              (Exhibit D 119 was marked.)

3        Q.    (BY MR. RICHARDS)  So, Mr. Bernhardt, you have

4    in front of you an email chain dating January 2019;

5    correct?

6        A.    I do.

7        Q.    And you see that the first -- well, let's look

8    first at the second email on this first page, which is

9    from Nicolai Colshorn to Miron Leshem, correct?

10       A.    Mm-hmm.

11       Q.    And Mr. Colshorn says, "I forwarded you the

12   offer from Computershare for the Swiss share registry."

13       A.    I see that.

14       Q.    I imagine from this that Colshorn has gotten a

15   quote from Computershare that puts the electric share

16   registers.  Is that about right?

17       A.    I suspect that's correct.

18       Q.    And Mr. Leshem responds, "Dear, Colshorn, this

19   is acceptable.  Please engage in Computershare."

20       A.    I see that.

21       Q.    Why would Mr. Leshem have been making

22   decisions about whom to engage for an electronic

23   register?

24       A.    Well, I think that's a slight

25   mischaracterization.  I don't think this is a decision.

1   I think Mr. Colshorn probably had no idea what a

2   reasonable offer from a share registry would look like.

3           Sorry.  I kicked my lawyer again.

4           Mr. Leshem's entire role here was to -- was to

5   serve that purpose -- was to guide the companies through

6   the listing process, and I would interpret that being he

7   took a look at it.  Mr. Colshorn is going to have to

8   sign it.  Mr. Colshorn made -- I can see down here

9   below -- made the initial contact to Computershare, and

10  it seems like the work flows.

11      Q.   You can set that one aside, and I'm going to

12  mark Exhibit D 120.

13              (Exhibit D 120 was marked.)

14      Q.   (BY MR. RICHARDS)  Mr. Bernhardt, you're now

15  looking at an email dated November 22nd, 2019; correct?

16      A.   I am.

17      Q.   And this is from Mr. Leshem to Mr. Kappeler?

18      A.   It is.

19      Q.   And at the time Mr. Kappeler would have been

20  corporate counsel to Automotive or Group or both?

21      A.   Potentially both.  I don't know what his exact

22  would have been on this exact date, but certainly here

23  he would have been acting in Automotive's capacity.

24      Q.   And you say that because the subject of this

25  email is "AmeriMark Automotive AG EGM"?

1      A.   Yes.

2      **Q.   And what does EGM mean in this context?**

3      A.   Extraordinary general meeting, but I'm not

4   sure if that -- yes.  I know exactly what this context

5   is.  That's an extraordinary general meeting.

6      **Q.   Can you give me sort of the 30 second primmer**

7   **on what an extraordinary general meeting is?**

8      A.   This is a meeting that's not an annual

9   meeting.  Any meeting called by the shareholders or by

10  the directors outside of the annual meeting process.

11     **Q.   So the meetings I described earlier as special**

12  **meetings could also be characterized as extraordinary**

13  **meetings?**

14     A.   In fact, I think they're almost the exact

15  equivalence in Switzerland, yes.

16     **Q.   And you're in CC and so is Mr. Colshorn.**

17     A.   That's correct.

18     **Q.   And Mr. Leshem says, "Dear Felix:  Please**

19  **accept this email as formal authorization to commence**

20  **activities to call an EGM and take any and all other**

21  **steps necessary to secure the cancellation of part or**

22  **all of the Amerimark Group AG CHF0.10 Bearer Shares and**

23  **the concomitant capital reduction."**

24         **Do you see that?**

25     A.   I do.

1        Q.    So why did Mr. Leshem -- why was he empowered

2    to give Mr. Kappeler formal authorization to call an

3    EGM?

4        A.    Well, again, here he's copied on Mr. Colshorn.

5    The background on this EGM is important to understand

6    exactly why Mr. Colshorn would have relied on Mr. Leshem

7    to help guide through this process.

8              So this EGM, which I don't think actually ever

9    took place, was to deal with the problem that the Vienna

10   Stock Exchange was irritated and no longer wanted

11   AmeriMark Group to have two classes of shares, and they

12   also -- there was also a problem in Swiss law that

13   bearer shares were being faced out and forbidden, and

14   the bearer share prohibition was actually fairly

15   stringent.  If you still had bearer shares, they were

16   not allowed to vote or have any dividends at a company

17   after a particular date.  From my memory, that date was

18   going to be somewhere in 2021.  The law was enacted in

19   2017 to 2016.  I'm doing that from memory, but I think

20   I'm close.

21             So, obviously, the company had to take

22   measures to deal with this, not only because of the

23   Vienna Stock Exchange issue here but also because the --

24   sorry.  Not only because of the bearer share issue, but

25   also because the stock exchange doesn't want to two

1    classes of shares.  We discussed that a little bit

2    earlier today.  Exchanges hate that.

3            The problem here was that the bearer shares

4    had a par value of ten rappen, which is Swiss cents, and

5    the registered shares were half of that.  Our first idea

6    in conjunction with corporate counsel to deal with this

7    issue is to cancel the shares as you see referenced

8    here.  That idea came from Mr. Leshem.  Mr. Leshem was

9    far more experienced in that kind of corporate

10   governance than anybody else on this email, for sure.

11           Later it came out that we couldn't actually do

12   that.  That's not material to your question, but what's

13   really going on here, in my estimation, is that

14   Mr. Leshem copied Mr. Colshorn, just sort of cutting a

15   corner and saying, "Look, let's do this, and this is

16   what we need to do."  And, also, I don't think

17   Mr. Colshorn would have been able to describe exactly

18   what the corporate activity, the corporate action here

19   should be.  Mr. Leshem could have done that in his

20   sleep.  I think that's the upshot of this email.

21       **Q.   So Mr. Leshem is just telling Mr. Kappeler**

22   **letter what needs to happen, and he's putting**

23   **Mr. Colshorn in CC so that Mr. Colshorn can object, but,**

24   **of course, Mr. Colshorn is not going to; is that right?**

25       A.   Well, I don't know that he's not going to.

 1    I've certainly see Mr. Colshorn often object to him, and

 2    ask him, he did it to me more than once.  That's in

 3    production too, where he would say, "Just a second.

 4    Where do you have the authorization for that?" you know,

 5    every time he checked me up, and he was right.  It's not

 6    my experience with him that he was a puppet.  Not at

 7    all.

 8            But, again, in this case, Mr. Leshem is the

 9    expert on this issue.  It turned out that Mr. Kappeler,

10    after we went into this for a while, figured out why

11    this was going to be totally impossible to deal with,

12    but I think that's beyond the purview of your question.

13        **Q.   Why would it be totally impossible to deal**

14    **with?**

15        A.   Well, the cancelation of shares -- and here

16    the EGM is referred to -- cancellation of shares

17    requires more than an EGM.  In the United States, I

18    think it's easier to do.  I'm not corporate lawyer of

19    the United States on a state level anywhere, but I think

20    it's easier to do.

21            But in Switzerland, this is a capital

22    reduction.  When you think about it, if you've got a

23    shareholder and you're canceling their shares -- you are

24    not buying them back, you are canceling them, you are

25    destroying value -- at least the value of the share, ten

 1    rappen in the case.  You can't do that without obtaining
 2    consent and eventually we determined, although Felix has
 3    never seen this issue before that not only do you have
 4    to obtain consent, you have to obtain consent from every
 5    single shareholder.
 6            As we discussed many times, the bearer shares
 7    in the AmeriMark Group were an absolute mess.  Nobody
 8    knew who were the shareholders were.  Some of the
 9    shareholders might not have known who they were.  So
10    there was no way to do this.  It was an effort, and then
11    we had to abandon it.  And then here you see him
12    referencing work with Mr. Wenzl.  I think also Miron
13    here is copying Felix so that Felix has some information
14    to go back to Mr. Wenzl and talk about the actions we
15    were taking to get out of the mess that the bearer
16    shares had put us in.
17        Q.   **Was Mr. Rechtman on the board with the plan to**
18    **cancel the bearer shares.**
19        A.   I don't think we ever got around to talking to
20    him.  We would have had to have asked him because he
21    certainly had bearer shares.  I mean, actually, I've
22    heard differing statements on how many he had, but he
23    might have still been a supermajority shareholder at
24    this point.  I'm pretty sure Mr. Rechtman would have,
25    "Forget it."  I'm guessing and speculating, but my

1    understanding of Orie Rechtman is he probably would have

2    told us to pound sand.

3        **Q.   Yea.  Why would you agree to a cancellation of**

4    **the shares?**

5        A.   And I think that's what Miron didn't

6    understand and I didn't understand at the time.  It was

7    a first idea of how to deal with this problem.  Well,

8    we've got the bearer shares.  It's a huge pain in the

9    ass.  Why don't we just get rid of them?  How would you

10   do that?  And Mr. Leshem's out here, "Well, let's just

11   cancel them," which you can do, I think a lot easier in

12   the United States.  I've never done it, but I think it's

13   probably easier.

14       **Q.   Was there ever a deal described --**

15   **contemplated with Mr. Rechtman where someone would pay**

16   **him, and in exchange, he would agree to have his shares**

17   **canceled?**

18       A.   You have skipped ahead in school.  That was

19   exactly the next idea.  What if we buy everybody back?

20   What if we do an offer and buy everybody back?  And if

21   you do that, you make kind of a, "Okay.  We'll buy your

22   shares," and then there is -- I'm doing this from

23   memory, and I'm not a practitioner in Switzerland, but I

24   remember Felix discussing the fact that there would be a

25   provision in Swiss law so that if you got a certain

 1   number of shareholders to agree, you could kind of

 2   force -- you know, it's a squeeze out, essentially;

 3   right?  And you could do that, and I can't remember what

 4   the number was, but it was certainly, like, 90 percent

 5   or higher.  Once we realized that, we said, "Well,

 6   that's never going to happen either."

 7        Q.   So then the plan changed to convert these

 8   things to registered shares; correct?

 9        A.   Correct.

10        Q.   And that was easier?

11        A.   Much easier.  I can't remember the exact

12   mechanics, but it's much easier because you're not

13   eliminating any kind of value.  You're not destroying

14   shares, and you don't have to, (a), come up with the

15   capital, and, (b), contact all the shareholders to buy

16   them out.

17        Q.   Was the conversion of the bearer shares to

18   registered shares a dilutive event for the other

19   shareholders?

20        A.   It wouldn't have been a diluted event for the

21   conversion.  The admission to trading of the new shares

22   into the existing pool of tradable shares would have

23   been a dilution for sure.

24        Q.   Why would have been the dilution rather than

25   just the creation of the new shares to begin with?

1       A.   Well, let's talk about exactly what dilution

2    means.  So in way converting the shares is not a

3    dilution because the share capital across the board

4    doesn't change.

5       Q.   Right.

6       A.   And each shareholder is in the same basic

7    economic position, but from the perspective of somebody

8    who has tradeable shares, having 6.8 million tradeable

9    shares come on market is the worse thing in the world.

10   That's hugely dilutive to your trading ability, to your

11   liquidity.  It's not diluted from a capital perspective,

12   but it's certainly not what you want to see.

13      Q.   Capana had tradable shares during this time;

14   correct?

15      A.   It did.

16      Q.   Did it object to the plan to convert the

17   bearer shares to registered shares?

18      A.   No, because Capana was intimately aware that

19   the consequence might be delisting if the Vienna Stock

20   Exchange wasn't -- wasn't happy.  And, also, Capana,

21   unlike some maybe some smaller shareholders who don't

22   know a lot about corporate governance knew that

23   eventually the bearer shares were going to cause other

24   problems because they were becoming illegal under Swiss

25   law.

CAPANA SWISS ADVISORS AG vs RYMARK                                    30(b)(6)
SHAEN BERNHARDT - 01/24/2025                                          Page 174

1              So some shareholder who doesn't know these

2    things might go -- might care or not care, but once you

3    sort of know what the issues are -- and Capana wasn't

4    interested in really selling large amounts of shares on

5    the market.  We wanted to use -- this is now 2019.  We

6    were committed to using those shares in the Philomaxcap

7    transaction.

8              (Reporter clarification.)

9         Q.   Okay.  You can put that one to the side for

10   now.  I'm going to mark two exhibits at once.  The first

11   one will be Exhibit D 121, and the second will be

12   Exhibit D 122.

13             (Exhibits D 121 and D 122 were marked.)

14        Q.   (BY MR. RICHARDS)  All right.  So we're

15   looking now at Exhibit D 121, which does not have a page

16   or stamp on it and Exhibit D 122 which does have one;

17   correct?

18        A.   I see that.

19        Q.   And D 121 is a draft version of the complaint

20   that was filed in this action.  We got it from

21   Mr. Christiansen, your local counsel, about a week

22   before the complaint was filed.

23             If you'll turn to paragraph 13 of this draft

24   complaint on page 4.  Do you see where I mean?

25        A.   I do.

1        Q.    "Seeking to have Rymark, a Utah-based

2    automotive dealership, publicly listed an a European

3    exchange through a foreign holding structure, on May

4    9th, 2016, Markosian, who then owned Rymark outright,

5    injected 100 percent of Rymark shares into Automotive.

6    Markosian later assumed control of the Swiss entity

7    AmeriMark Group into which he injected 100 percent of

8    the shares of Automotive to form AmeriMark Group as a

9    master holding company.  In exchange, Markosian

10   eventually retained 35 percent of the outstanding shares

11   of AmeriMark Group, and a number of his friends, family,

12   and Rymark's senior management also came to own shares

13   of AmeriMark Group."

14        Do you see that?

15        A.    I do.

16        Q.    Is 35 percent the correct number?

17        A.    Of the outstanding register shares of

18   AmeriMark Group, yes.  I believe that's correct.  That

19   would be -- what -- his 6.4 million over 20 million.  I

20   haven't done that math right this second in my head, but

21   I think that's correct.

22        Q.    If you'll now look at Exhibit 122, turn to

23   page 5, you'll see this -- sort of the second half of

24   paragraph 13 at the top.

25        A.    Yes.

1       Q.   And at the end of that first line, there's the

2    word "in."  Do you see where I mean?

3       A.   No.  I'm sorry.  Got lost for a second.  We're

4    on page 5.

5       Q.   "In exchange, Markosian eventually retained

6    approximately 32 percent of the outstanding shares of

7    AmeriMark Group."

8            So why did the number change from 35 to 32?

9       A.   Is there a calculator I can look at because I

10   can probably figure out where that number came from, if

11   there is one.  I'm guessing that this is 6.441855 over

12   20 million, which would be the outstanding registered

13   shares of AmeriMark.  I'm not positive.

14      Q.   So someone just did the math wrong the first

15   time is your --

16      A.   Well, I'm not going to claim -- I would like

17   to -- let's do the math and figure out where the number

18   came from, if you want to.  I don't know whether it's

19   wrong or right.

20      Q.   And I'm mainly just concerned with the change.

21   If you don't have any recollection of why the change was

22   made, then that's fine for today's purposes.

23      A.   I don't.

24      Q.   Okay.  Regardless, 32 or 35 percent is not the

25   proportion of shares that Mr. Markosian had if we count

 1   the converted bearer shares; correct?

 2       A.   Well, but outstanding shares, outstanding

 3   registered shares, I think it might be correct.  There

 4   also is a portion of share capital -- so you have to ask

 5   that question.  Outstanding shares is sort of an

 6   encompassing term; right?

 7       Q.   How many outstanding shares of AmeriMark Group

 8   are there?

 9       A.   Well, in which class?

10       Q.   Well, is it not one single class now?

11       A.   Clearly on the usage here I don't think that

12   it is.

13       Q.   I'm sorry.  Say that again.

14       A.   I said in the usage here, I don't think it is

15   a single class.

16       Q.   This is a document -- both of these documents

17   are dated 2023; correct?

18       A.   I don't see -- I don't actually have any idea

19   what the date on this document is.  This one is

20   stamped -- excuse me -- July 18th, '23.  I have no idea

21   what the date on this document is.

22       Q.   I'll represent that we received it July 10th,

23   but, regardless, the complaint was not drafted before

24   2023; correct?

25       A.   I don't know exactly the timing of the

1   drafting of the complaint.  I can't testify to that.  I

2   don't know.  I can't do that with any specificity.

3       Q.   Well, if I asked you today, you know,

4   January 24th, 2025, what percentage of the outstanding

5   shares of AmeriMark Group Mr. Markosian owned -- I won't

6   ask you to do the math on the spot, but could you

7   ballpark it for me?

8       A.   Well, but today there's a single class of

9   shares.

10      Q.   And there's also --

11      A.   And in the time that they were talking about

12  there, I don't think there was a single class of shares.

13      Q.   I see what you mean.  In the time described in

14  this portion of the complaint.  Is that the idea?

15      A.   Well, that certainly was being referred to.

16  So so far as I understand.  I mean, there's not a

17  specific time for me to talk about.  Eventually retained

18  approximately 32 percent -- eventually, from when,

19  obtained approximately 32 percent.  Is that a final

20  number either?  Look, I know and We can nitpick about

21  this all day, but my impression of it is it's materially

22  accurate statement.

23              (Reporter clarification.)

24      Q.   There was an initial effort to --

25      A.   I'm finished.  I'm sorry.

CAPANA SWISS ADVISORS AG vs RYMARK
SHAEN BERNHARDT - 01/24/2025

30(b)(6)
Page 179

1    Q.   Yes.  Thank you.

2    A.   Initial effort, please.

3    Q.   There was an initial effort to list AmeriMark

4   Automotive on the -- excuse me -- on the Marche Libre,

5   M-a-r-c-h-e L-i-b-r-e, exchange in France; correct?

6    A.   That is correct.  Just to -- not to split

7   hairs, but I think the Marche Libre is a Euronext

8   exchange.

9         (Reporter clarification.)

10    A.   So sometimes we use this interchangeably.

11   This would be the Marche Libre, the free market in

12   Paris, which I believe at the time was Euronext

13   exchange, yes.

14    Q.   And you've -- you've sort of been deliberate

15   over the last day and a half about differentiating

16   between the admission of new shares and an IPO.

17    A.   Yes.

18    Q.   This would have been an IPO?

19    A.   No.

20    Q.   No, it would have been a listing of shares?

21    A.   Not a listing.  This is the admission of

22   trading of existing shareholders into trading.  Right?

23   So no shares -- new shares are being offered.  This is

24   often, you know, sloppy language.  I've been guilty of

25   it myself in the past.  No new shares are being offered.

 1    There's no shares being offered to the public, for
 2    instance.  This is an opportunity for existing
 3    shareholders to have listed shares that they may then
 4    sell through their accounts to third parties.
 5            Other important part about that is the entire
 6    transaction, which created AmeriMark Group, with the
 7    exception of Mr. Markosian offering his Swiss shares to
 8    his U.S. person shareholders in the United States.  No
 9    other part of the transaction all the way up until the
10    listing actually touched any place other than
11    Switzerland and France.
12            So, again, the 19 shareholders Mr. Markosian
13    identified on his share ledger June 17th, 2016, are
14    going to have their shares which were being held as
15    registered shares in Switzerland dematerialized at SIX
16    SIS in Switzerland, then deposited in his BankM transfer
17    account in Switzerland, custody in Switzerland.  Then
18    the shares will be admitted to trading, and at that
19    point they can, at the shareholder's option, be
20    delivered to the brokerage account of the shareholder.
21            There's no public offer of shares.  There's no
22    new issuance of shares by the company.  It's a common
23    misnomer.  Like I said before, I've been as guilty of it
24    as anybody.  These aren't really listings.  They're
25    admissions to trade.

 1          Q.    Who participated in that initial effort?

 2          A.    That is an incredibly long list.  There's an

 3   interrogatory on this too, and I think I'm on my second

 4   page filling that out.  I mean, how much time do you

 5   want me to spend?  How deep do you want me to go?  Do

 6   you want me to talk about the principles that I know

 7   about?  Do you want me to go all the way down to the

 8   lawyers, many of whom I don't know that well.  I'm not

 9   trying to evade your question.  It's just a really

10   burdensome question.

11          Q.    No.  I appreciate the effort to clarify.

12   That's perfectly fine with me.

13                Who was the listing agent?

14          A.    The listing agent -- so Mr. Leshem would have

15   been Rymark's -- at least his contract calls him the

16   listing agent.  Now, there's also -- and I don't know

17   what it would be called in the Marche Libre, right, but

18   what we would call a capital market's coach at the --

19   when at the Vienna level.  I believe that would have

20   been Alex -- I know that was Alexander Coenen.  I don't

21   know what the title is, but he was approved by the

22   exchange, had a relationship with the exchange -- this

23   is only my understanding, but I think I'm right -- and

24   had, you know, connections with the exchange.  He was

25   the sort of liaison to the exchange for AmeriMark.

1          So listing agent of Rymark, according to his

2     agreement, Mr. Leshem.  I don't know what we're calling

3     listing -- I think his agreement, from my memory signed

4     in June of 2016, Mr. Coenen's agreement with Capital

5     Lounge called it a listing services agreement.  So maybe

6     he was a listing servant.  I don't know, but I think

7     that's what you're talking about -- is those two roles.

8          Q.   And in the ordinary course when one is trying

9     to get shares admitted to an exchange like the Marche

10    Libre, there's an application process --

11         A.   Right.

12         Q.   -- and an information memorandum is presented;

13    is that right?

14         A.   I'm not positive there's always an information

15    memorandum.  For example, on the multi -- the effort to

16    admit to the multi stock exchange -- I think it was much

17    more abbreviated.  The prospects listing -- I think that

18    was, like, a four-page application.  That was never

19    completed; so I don't know if there was one.  I don't

20    know that there always is.

21         I believe for the Marche Libre there was --

22    any information documented in the information

23    memorandum.  The reason it's called that -- and another

24    important distinction -- it's not a prospectus.  It's

25    not reviewed by the regulatory authority or the -- it's

1    reviewed by the exchange, potentially.  I'm not totally

2    familiar with the Marche Libre process as much as I am

3    with the process in Vienna.

4         **Q.   How far did that process go before it was**

5    **determined that it wasn't going to be successful?**

6         A.   I think the final sort of we better shift to

7    Malta -- and, again, I'm doing this from memory, had to

8    have been late 2016 to early 2017.  That's when in the

9    production I see old conversations switch between

10   Ms. Small, Mr. Markosian, Mr. Leshem, Mr. Hesterman

11   still at this time, maybe even John Kirkland, and also

12   Eric Gardiner, the employee, got very involved in the

13   Malta at the end of 2016 but certainly in 2017.

14        **Q.   And why was -- what went wrong with the Marche**

15   **Libre?**

16        A.   Well, there was some disputes -- and I'm doing

17   all this from email production and from memory, but

18   there was some dispute between Mr. Leshem and Mr. Coenen

19   that Mr. Coenen had missed a detail.  It was

20   understandable in retrospect, and I spent a great deal

21   of time on this issue because I knew this was going to

22   be important to talk about today.

23        There was a great deal of back and forth

24   because apparently Mr. Coenen had missed an obscure

25   detail, and that was the Marche Libre stopped accepting

1    Swiss entities for applications for listings.  And, in

2    fact, I went in order to kind of validate this and look

3    back and forth about it.  I went up and looked up every

4    press release involving a listing that the Marche Libre

5    issued going back to 2014.  I said either earlier today

6    or perhaps in testimony yesterday -- they've blended

7    together a bit for me by this point -- that the last

8    Swiss-listed company on the Marche Libre starting from

9    2015 was 4Service Cloud Tech.  It was listed in 2015 on

10    the Marche Libre.

11          The next Swiss company to be listed on the

12    Marche Libre was not until 2021.  I'm almost positive

13    that's true.  I look very carefully at all that stuff.

14    It's all in French.  So I had to struggle through it.

15          Why?  Well, there's a fundamental difference

16    in Swiss and European union law.  Swiss is not --

17    Switzerland, the confederation, is not part of the

18    European Union.  European Union Law, when it comes to

19    shareholders, is very transparency oriented.  In fact,

20    they started a new transparency register now.  So that,

21    you know, almost all shareholders are going to be at

22    least disclosed to a governmental list in EU.

23          Switzerland does not share that sentiment.  In

24    Switzerland, as long as it's been, and this is a legacy

25    of World War II, and, of course, you know, the Gestapo

```
 1   hunting down people in their bank accounts.  Switzerland

 2   has not been transparent.  It's just a different policy.

 3   The board of directors of the Swiss company is not

 4   permitted, without good cause and potentially without

 5   consulting the shareholders, to release shareholder

 6   information, including the identity of shareholders.

 7   France, and the EU in particular, hate that policy.

 8              In addition to that, starting in particular in

 9   2019 but already brewing at this point in time, 2016,

10   there was a severe rift between the European Union

11   Switzerland.  So I investigated that also to see if that

12   played into a role what motivated the Marche Libre not

13   to accept Swiss companies.  Sure enough, there was a lot

14   of lunging back and forth.  EU has been trying to

15   conclude a set of agreements -- international

16   cooperative agreements with Switzerland that would

17   essentially, you know, make it more harmonized with the

18   market.  But it was so contentious that by 2019, the

19   European Union unilaterally removed all Swiss companies

20   from all European exchanges, all of them, including

21   Euronext.  It's a fight over market access, and it was

22   already starting in 2016, and this is one of the issues.

23              Switzerland said, "I'm sorry.  We're not going

24   to allow shareholder list to be released."  So the

25   Marche Libre just wasn't going to accept the
```

1    application.

2            And my understanding -- although I don't have

3    any personal knowledge of it.  This predated me by

4    years -- but that Mr. Coenen and Mr. Leshem had a tiff

5    over this.  They recovered and came up with the next

6    plan, which was the prospects listing in multi.

7            It's a long answer, but I think the color is

8    important to understand because I know this has been a

9    point of contention.  Did the Marche Libre think

10   something was changing about the deal and reject it?  My

11   understanding is that there was never even a formal

12   objection, and I'm not totally sure that the application

13   was even fully submitted.  I think it came to light that

14   it was just not going to be approved.  This is a very

15   European thing.  Sometimes they don't say no.  They just

16   keep not saying yes.

17       **Q.   You mentioned European markets expelling, for**

18   **lack of a better words, Swiss companies from trading.**

19   **Did that happen to 4Service Cloud Tech?**

20       A.   No.  This was in 2019 from my memory.  It was

21   a big deal.  It was all over the news.

22       **Q.   So after 4Service Cloud Tech had been**

23   **delisted?**

24       A.   Correct.  I think it was late 2019.  I'm doing

25   that completely from memory, but it's very easy to look

```
 1   up.  It was a huge -- at least for Switzerland and

 2   Europeans.

 3        Q.   I think you answered this.  I was going to ask

 4   you whether Automotive got a rejection letter from

 5   Marche Libre, and I think you said you're not aware of

 6   one; is that correct?

 7        A.   I've never seen one in the papers.  I don't

 8   believe one exists.

 9        Q.   All right.  Let's look briefly at an email I

10   think you have sort of alluded to right now.  We're

11   going to mark this -- oh, it's been premarked, D 4.

12                (Previously marked Exhibit D 4 was

13                introduced.)

14        Q.   (BY MR. RICHARDS)  So this is an email chain

15   between Miron Leshem and others dated 2 November 2017;

16   correct?

17        A.   I see that.

18        Q.   Let's turn to the second page, the back of the

19   first sheet of the document.

20        A.   Just to note really quickly, I don't know that

21   it's relevant, but I don't see -- for some reason I

22   don't see the company on here anyway, but I don't care.

23   Let's keep going.

24        Q.   All right.  So on the second page here, do you

25   see the first email on the page from Mr. Leshem to
```

 1      Daniel Gysi and Beat Weibel?

 2                 (Reporter clarification.)

 3      Q.    I'm sorry.  Turn the page.  Yep.  That one.

 4            First email on the page from Mr. Leshem?

 5      A.    I'm sorry.  I'm still lost.  This one here.  I

 6   have it.  Also, this is from Hesterman, I guess.  I

 7   don't see a Bates number.

 8      Q.    Yeah, that's right.

 9      A.    That's fine.  Thank you.

10      Q.    Mr. Leshem here says the following,

11   "Gentlemen, 4Cloud Services remains listed on the

12   Euronext Access (formally the Marche Libre) under ticker

13   symbol MLOVE.  The recent price was EU 0.13 per share.

14   There are approximately 400,000 shares in the public

15   float.  There is almost no trading activity."

16            This is what you were describing earlier with

17   4Service Cloud Tech being moribund or dormant on the

18   exchange, yes?

19      A.    Well, there are a couple of things.  I don't

20   want to quibble, but I know there were a few different

21   4Service Cloud or 4Service companies, and here he

22   doesn't write 4Service Cloud Tech.  He writes 4Cloud

23   Services.  I do believe that we're probably talking

24   about the same company, but I just want to call it out

25   just in case.  I don't remember what the ticker was.

1    This was probably 4Service Cloud Tech, probably.

2        **Q.    Okay.**

3        A.    And I apologize.  Your question was does it

4    match what I described?  Yes.  The company was moribund.

5    It was -- I wouldn't say dormant, but the trading

6    activity was slack.

7        **Q.    Two paragraphs down, "At the same time."  Do**

8    **you see where I am?**

9        A.    One, two.  Yes.

10       **Q.    "At the same time, AmeriMark Automotive AG**

11   **remains a private Swiss company in good standing.  The**

12   **company has a thriving business, and it's growing.  As**

13   **you recall, we originally attempted to list AmeriMark**

14   **with Capital" -- it says "fro" -- I assume it means "for**

15   **Markets on the Euronext but failed to do so through the**

16   **malfeasance of Alexander Coenen."**

17       A.    I can clarify the "Capital fro Markets."

18   Capital for Markets is sort of a DBA of Capital --

19   Capital Lounge.  So this would be either a related

20   entity that Alexander Coenen was the principal of or

21   maybe his brand.  And so, you know, it's describing

22   getting Capital for Markets.  Capital for Markets.

23   That's what I think Mr. Leshem was referring to.

24       **Q.    And I actually understand your prior testimony**

25   **to mean that when Mr. Leshem says the malfeasance**

1    allowed under Coenen, you think he means that Mr. Coenen

2    didn't realize that Euronext wasn't accepting Swiss

3    companies?

4          A.   I think that's right.  That's my

5    understanding.  By the way, they did makeup eventually,

6    and he worked on the prospects, et cetera.

7               This is -- let me stop you for just a second.

8    Let's talk about the malfeasance piece and the

9    relationship between Leshem and Coenen here again.

10              So this is now November 2017; right?  This

11   means that I think by this time the Malta listing effort

12   has fizzled.  Alexander Coenen was intimately involved

13   in the Malta listing effort.  So I think -- Miron has

14   a -- Mr. Leshem has a tendency to do this to be

15   bombastic, but he worked very closely with Mr. Coenen,

16   and Mr. Coenen worked with the defendants also on Malta

17   listing.  So if he was so upset by the malfeasance in

18   the Marche Libre, I don't know why he would have worked

19   with them.  I think he's just being his cranky self in

20   this email, but your point is taken.

21        Q.   So I've changed my mind.  Let's stay here for

22   one more minute.

23        A.   Sure.

24        Q.   Will you go to the last page of text?  This is

25   still Mr. Leshem writing, and he says, "I note the

```
 1   following."  Do you see where I mean?

 2        A.   I do.

 3        Q.   "Number I, Herr Gysi incorporated both

 4   companies and is familiar with them.

 5             "Number II, Herr Colshorn is the Swiss

 6   director for both companies."

 7             Do you know how many companies besides

 8   4Service/AmeriMark Group that Mr. Leshem and

 9   Mr. Colshorn worked on together?

10        A.   I don't.

11        Q.   Are you aware of any other companies besides

12   the ones I've just identified?

13        A.   Not specifically, no.  I don't know of any.

14        Q.   What about Cog International [ph]?

15        A.   What about Cog International?

16        Q.   Was Mr. Colshorn a director of Cog?

17        A.   I don't believe that he was.  I could be wrong

18   on that.  I haven't looked at Cogs in a long time.

19        Q.   Are you aware of Mr. Gysi and Mr. Leshem

20   working on any other companies together besides the ones

21   we've just identified?

22        A.   I'm not.

23        Q.   Okay.  All right.  You can put this one to the

24   side.

25             So why did the effort shift to Malta from the
```

1    Marche Libre?

2        A.    Well, the Marche Libre effort fizzled, and so

3    my interpretation, having read the discovery --

4    reminder.  This is way before my time -- but reading the

5    discovery is that Mr. Leshem had an obligation to get

6    the company listed.  And, in fact, you know, he agreed

7    to do that, and so I think he pivoted to Malta.

8            It seems like -- and I'm speculating -- that

9    Alexander Coenen probably suggested that.  Alexander

10   Coenen -- I don't know that Malta had a capital markets

11   coach kind of status.  I see less, you know, production

12   on that, but Mr. Coenen clearly participated in how to

13   put together the application, which he sent to

14   Mr. Markosian to sign, which I understand Mr. Markosian

15   signed, did it, and forwarded on.  That was forwarded on

16   by direct post.  So we see the application in its

17   preparatory stage describing the company, describing

18   Mr. Markosian shareholding and et cetera.

19           This is now -- I can't remember exactly when

20   it's -- if it started in late -- I think it started in

21   early -- early 2017 because for sure by that time Marche

22   Libre was a done -- done project.  And so my

23   interpretation is that they needed to do somewhere else.

24   The idea was to list on a European exchange.  It's a

25   small company.  It's not going on the NYSC, and so the

 1  next step was to go to Malta.

 2       Q.   And Mr. Coenen assisted with that.  Mr. Leshem

 3  assisted with that.  There were lawyers involved as

 4  well, I assume?

 5       A.   Correct.

 6       Q.   Why did the Malta effort failed?

 7       A.   The Malta effort appears to have failed

 8  because of the auditor, James Ellul in Malta.  Let me go

 9  back just a little bit.

10            We talked before about different levels of

11  scrutiny that an exchange will give an application;

12  right?  And the context of the Euronext rejection of the

13  admission to trading of the AmeriMark Group shares --

14  that they hadn't done enhanced due diligence because

15  somethings were concerning.  A similar thing, I think,

16  happened in Malta but for different reasons.

17            So the first part of the process in Malta

18  involved retaining Main Street, Limited, a

19  multi-consulting and maybe accountancy firm.  And the

20  two principals there were Nic Bianco and -- Nicolas with

21  a "C" -- N-i-c-o-l-a-s Bianco, which made actually

22  reviewing this discovery quite a pain because of a bunch

23  of emails with Mr. Markosian in it where it's Nic.

24  "Hey, what about you, Nic?  Hey, what about you, Nic?"

25  Which made it really difficult to review.

 1                But, anyway, Nicholas Bianco.  There was

 2     someone else at Main Street Capitol.  I think it was a

 3     man.  His name escapes me.  The process started there

 4     without the auditor; right?

 5                And the reason I say Mr. Coenen was involved

 6     is because I see the application from him, and I see his

 7     name, and it was actually -- we talked about different

 8     levels of applications for different -- different

 9     exchanges.  The application was, like, three pages and

10     handwritten, and it looks like Mr. Coenen was the one

11     preparing it.  It says, you know, preparer, something

12     along that lines, Alexander Coenen, at the bottom.  That

13     was, again, sent to Mr. Markosian for signature and then

14     forwarded on.

15                So the process goes Ms. Small is putting the

16     materials together, sends the financials along.  You

17     know, this is always the point where I have to point out

18     by this time already material frauds were being

19     representing -- misrepresentations were being made

20     because Rymark Properties LLC was being included as a

21     consolidated part of Rymark.  It wasn't.  We can go past

22     that again because I talked about it a million times.

23                "Ms. small is participating actively and also

24     enters now Eric Gardiner who is an employee and also a

25     shareholder of Mr. Markosian.  And you know, going back

 1   and reading through the materials -- and I have this

 2   reaction to almost everyone of these application

 3   processes.  There's a really solid, diligent effort at

 4   collecting these materials and putting it together.

 5   Absent the financial issues and absent, you know, what

 6   was -- misrepresentations and all that, the process is

 7   as messy as these processes are, but it's an interesting

 8   team dynamic that's working.

 9           Ms. Small is incredibly responsive.

10   Mr. Gardiner is responsive.  Nic -- sorry --

11   Mr. Markosian is directing the process.  And the

12   consultants -- Nic Bianco and his colleague who's name I

13   can't remember going back and forth and developing a

14   memorandum that's going to be used, and there's several

15   drafts in production, which, of course, incorporates

16   Rymark's financials in it, describes everything else.

17           And this goes on, and then something that I

18   don't quite see -- because it's not in production.

19               (Reporter clarification.)

20       A.    Something that I don't quite see in looking at

21   all the documents when all production happens, maybe it

22   was a phonecall, but I just don't see it in production.

23           And then Main Street brings in or Leshem

24   brings in or the exchange brings in -- and there's at

25   least one email from an exchange officer that's got the

 1   exchange multi seal on it.  It's clearly official.  So

 2   the exchange is clearly at least a little bit involved

 3   in this process, and I think that is when the auditor

 4   comes in James Ellul.

 5                    (Reporter clarification.)

 6        A.    And he's with an accounting and certified

 7   audit firm.  He's a certified auditor and CPA in Malta,

 8   and his role is to validate financials and the business

 9   and do risk analysis.  We talked again about enhanced

10   due diligence.  I don't know that there was enhanced due

11   diligence.  It's possible that it's normally the process

12   in Malta, but in this case it happened, and it was like

13   two step for us.  Main Street preparation exchange.

14   Auditor appears.

15              So then there's a lot of back and forth, and

16   Keddington & Christensen now is directly involved.

17   They're having conference calls with James Ellul.

18   Not -- I don't think Eric Keddington, but certainly Ted

19   Jenkins directly involved in this process.

20              And what emerges is that Keddington &

21   Christensen makes several modifications to the financial

22   statements of Rymark because Keddington & Christensen

23   are Rymark's accountants, not Automotive's accountants,

24   and those have the effect of moving shareholder equity,

25   the balance sheet item, up, and there are more than one.

1  And this apparently attracts the concerns and attention

2  of James Ellul because -- in an email he writes back and

3  responds.  He says -- I'm going to quote this almost

4  from memory.  You can see it in production.  The

5  constant changes while within U.S. GAAP are

6  concerning -- paraphrasing -- and raise questions about

7  the integrity of Rymark's financials.

8            Now, if you know anything about accounting,

9  that is a huge alarm bell.  That is a huge alarm bell.

10  What Mr. Ellul is basically saying is I'm not sure we

11  believe these.  And then he continues.

12            "In the constant changes, again, while within,

13  potentially, the guidelines of U.S. GAAP create concerns

14  about the independence of Keddington & Christensen,"

15  which is James Ellul saying "I don't know that these

16  guys are actually making independent judgments, and I

17  think the management of Rymark might be -- have undue

18  influence over them".  And that is, again, if you know

19  anything about accounting, a massive alarm bell.

20            To put those two things together is basically

21  saying, "I don't believe your accounting, and I don't

22  trust your accountants."  There's nothing worse an

23  auditor can say.  It's just unbelievable, and there is

24  some effort after that to restore things.

25            Also, the Subchapter S corporation thing is

1    brought up again.  Eric Gardiner catches it -- actually,

2    I think James Ellul caught it, and he said, "Currently,

3    you're Subchapter S.  Are you allowed to be?"  And Eric

4    Gardiner says no.  The company's going to have a foreign

5    shareholder.  We're going to have to change to a C Corp.

6    And then in a later email he says no.  Help us

7    understand when we have to change to a C corp or if it

8    happens.  So that was also caught, and I'm not sure if

9    that factored into James Ellul's thinking or not.

10            But after that, although there was some

11   attempt to fix it, things fizzled, and I don't think the

12   application was even ever made finally.  And why would

13   you?  Because you can't get the auditor to sign off, and

14   this is the auditor that was supposed to endorse the

15   financials to the exchange and wouldn't do so.

16            So that, to answer your question, is why Malta

17   fizzled.

18        **Q.   It was your understanding that the auditor's**

19   **approval, if you will, or sign off on the numbers --**

20   **that was all going to happen pre-application; is that**

21   **correct?**

22        A.   I think he -- I think that he was brought in

23   to endorse the application so that the exchange had

24   confidence.  I'm not sure, like I said before, if that

25   was a mandatory step in the Malta process or not.  I

```
 1    just don't know enough about it, and I couldn't tell
 2    from the production whether he was brought in because
 3    there was an enhanced due diligence concern by the
 4    exchange or for some other reason.
 5         Q.   So Marche Libre fizzles.  Malta fizzles.
 6         A.   Yes.
 7         Q.   Why not just go to Vienna?
 8         A.   I can't tell you.  There was going to be --
 9    that would have been a decision that Mr. Leshem would
10    have been making in 2018, before my time, and I don't
11    have anything in the records that would help me opine on
12    why he would or wouldn't do it.  Maybe he hadn't done
13    anything else on Vienna.  I think it was Coenen who had
14    the connection to Vienna.  Maybe he was pissed at Coenen
15    because this is -- again, I'm speculating, but now
16    there's been two fizzles with Coenen, and I don't know
17    how involved Coenen was in the beginning in the reverse
18    merger.  Notice, it doesn't require a listing process
19    reverse merger.  Maybe that's why.  Later he appears
20    again.  So I don't know.  I mean, I'll speculate, but
21    I'm only speculating.
22         Q.   In any event Mr. Leshem decides that the best
23    option is reverse merger with a firm that's already
24    listed on the Euronext; correct?
25         A.   Correct.  And actually clever.
```

1        Q.    How do you mean?

2        A.    Well, it's a way to get into the listing

3    process without, you know, having to spend the money,

4    time, and effort of the full listing process, and there

5    is a ton of correspondence with Mr. Leshem.  I think

6    it's Mr. -- what's his name -- Birmbaum? -- the

7    French -- it might have been a different French

8    attorney.

9        Q.    Blimbaum?

10       A.    It might have been Blimbaum.  I don't

11   remember, but another French attorney.  In which he asks

12   about this concept and asked the attorney to go to the

13   Euronext and ask.  And the Euronext comes back and

14   says -- this is all in production -- and says, "Yeah,

15   we -- we would definitely consider that.  It's a weird

16   structure, but we would consider it," which is one

17   reason I think Mr. Leshem was so pissed off that this

18   didn't happen.  He had all these conversations, and then

19   the exchange is like "non."

20              (Reporter clarification.)

21       A.    The French no, "non."

22       Q.    So your understanding is that Mr. Coenen was

23   not involved in the reverse merger; is that correct?

24       A.    I can't say that with great authority.  I

25   don't see a lot of them in there.  I feel like I see him

1    later, but, again, I'm going through 75,000 documents of

2    production from memory.

3        Q.   So there was no listing agent for the reverse

4    merger because -- at least in that -- in the way there

5    was one with the efforts to list on Marche Libre and

6    Malta?

7        A.   That's a good question that I haven't thought

8    about before.  If there was a listing agent, maybe there

9    would have to be for the admission of shares to trading

10   after the merger.  And, of course, that's when it all

11   sort of collapsed; right?  So was there a listing agent

12   who ushered through that application?  I sort of feel

13   like there must have been because there was an

14   application that was rejected, but I don't know the

15   details, though.

16       Q.   And would that have been Mr. Leshem?  Would it

17   have been a coach?  Do you have any sense?

18       A.   I don't.  I don't know what the Euronext -- I

19   think there was Euronext Access.  I don't know what the

20   requirements were there, and I don't see a lot in

21   production on it.

22       Q.   In any event, Euronext says, "No, we're not

23   going to let you do this"?

24       A.   In effect, yes.

25       Q.   And then Group, by this point, goes to Vienna,

1    and I think you just testified that you thought that

2    that was Mr. Coenen's idea, yes?

3         A.   I do, because, again, he was the capital

4    market's coach, and he was literally on the top three

5    listed on the page for the capital market coaches you

6    could select.  I don't know if it was Mr. Coenen's idea.

7    The idea definitely came in our direction from

8    Mr. Leshem.  I hadn't really talked to or met Mr. Coenen

9    personally at this time.

10        Q.   When is the first time you met Mr. Coenen?

11        A.   It would have been in 2019, briefly in Zurich

12   I think we had lunch once when the application process

13   maybe was finished.

14        Q.   And then did you periodically correspond

15   during the listing process?

16        A.   Not that much.  Certainly there was some

17   discussion, but I don't remember a lot of it.  Really,

18   you know, a lot of that -- of the AmeriMark stuff that

19   was done -- all that listing stuff was done outside of

20   my view.  I was working more on trying to get the

21   company stabilized, personally.

22        Q.   To make sure there was something to list by

23   the time the listing was approved?

24        A.   Well, we did notice, that, first of all, you

25   know, the company had a bunch of bills that we had to

1    deal with, and, you know, it was approaching its

2    solvency, and then it turned out that there were a lot

3    of things in there that were much worse than we thought.

4    So that was -- I won't call a full-time job, but it

5    definitely occupied a lot time.  I also wasn't a

6    principal at this point or these efforts would have been

7    Mr. Staeger, Mr. Leshem, and I -- I assume Mr. Coenen --

8    I know Mr. Coenen because I know that he -- well, he was

9    writing the valuation report, and that was already

10   published in June.  So by May he must have already been

11   working on it.

12        **Q.   What application documents were submitted to**

13   **the Vienna Stock Exchange in connection with AmeriMark**

14   **Group's listing?**

15             MR. WORDEN:  Calls for speculation.

16             You can answer.

17        A.   The ones that I know for sure -- there's a --

18   the one that I know for sure is the raw application

19   document, and there's drafts of that in the production.

20   I think that draft document was done in hard copy and

21   sent hard copy to the exchange.  I think there had to be

22   a wet signature on that probably from Colshorn.

23             And there was an information memorandum, and

24   that was sent in original form, and I think that also

25   had to be signed by the serving person.  There had to be

1    a wet signature on that.  The testing person or the --

2    that's the wrong term.  The author of the report or the

3    director asking for the listing -- that was Mr. Coenen.

4    That was also sent directly to the exchange.

5            So we have copies of the drafts of those, both

6    of those documents in production.  Let me think.  What

7    else was sent to the exchange?  No.  Other submissions,

8    I think, would have been after listing.

9        Q.   Okay.  And the Vienna exchange admits

10   AmeriMark Group -- although they only admit the

11   20 million shares; correct?

12       A.   Correct.  And this became a point of

13   contention later.

14       Q.   Was Vienna Stock Exchange aware of the bearer

15   shares at the time the application was made?

16       A.   Well, this is in dispute, but what we do see

17   is that Mr. Wenzl was directed to the -- to the

18   commercial register to look up the company, and for sure

19   a copy of the registry extra was attached to the

20   application, was part of the application.  That's just

21   required.  Nobody does anything with that, though.  All

22   he had to do was glance at that to see that there were

23   3.4 million bearer shares on the share ledger.  And I

24   think the reason that this became, you know, a point of

25   contention, is that he got called out when somebody

 1   asked him and he hadn't looked.  That's me speculating,

 2   but I have pretty good grounds to speculate on that from

 3   what happened afterwards.

 4       **Q.   So he should have figured it out, but he**

 5   **didn't, and it wasn't explicit in the application?**

 6       A.   I think it was explicit in the application.  A

 7   copy of the commercial register extract was part of the

 8   application.  It had to be.

 9       **Q.   Was it elsewhere described in the application,**

10   **to your knowledge?**

11       A.   The only other document would have been maybe

12   the information memorandum, and I don't know if it was

13   or wasn't in the information memorandum.

14           A word about commercial register extracts.

15   When I talk about those, we're really talking about, you

16   know, sort of the -- I'm not sure what it would be here

17   in Utah -- certificate of good standing.  It's the

18   basic -- it's got to go with everything, and the

19   Europeans are very big on it.  They want to know the

20   company number because then they know tax jurisdiction

21   it's in.  CHE is the beginning of company numbers for

22   Swiss companies.  They know it's a Swiss company.  You

23   can look it up in the register, and you get all the

24   directors.  This is, like, the starting document for

25   all.  So I think that Mr. Wenzl had quite a lot of egg

 1  on his face when somebody perhaps in the exchange asked

 2  him, "Why does this have two classes of shares?"  Again,

 3  as we've discussed, exchanges hate that.  So someone

 4  noticed it, and I think Wenzl probably dropped the ball,

 5  and he got very upset about it after that.

 6      **Q.   And you think that explains some of his**

 7  **defensiveness about this?**

 8      A.   I wouldn't call it defensiveness.  I would

 9  call it aggressiveness, actually.

10          MR. RICHARDS:  I'm going to mark Exhibit 123.

11          (Exhibit D 123 was marked.)

12      **Q.   (BY MR. RICHARDS)  So you have in front of you**

13  **Exhibit D 123, which is an email chain from**

14  **October 2019; correct?**

15      A.   I do, and I'm familiar with this email.

16      **Q.   And just to orient ourselves, this is -- this**

17  **is after the listing.  AmeriMark Group is now listed on**

18  **the Vienna Stock Exchange; correct?**

19      A.   Yes.  I think it was listed in August.

20      **Q.   And on the back side of that first page, we**

21  **see an email in German from Mr. Coenen to Mr. Wenzl;**

22  **correct?**

23      A.   Yes.

24      **Q.   And Mr. Wenzl is a market official at the**

25  **Vienna Stock Exchange?**

CAPANA SWISS ADVISORS AG vs RYMARK                                    30(b)(6)
SHAEN BERNHARDT - 01/24/2025                                          Page 207

 1      A.    Mr. Wenzl is the head of listing at the Vienna
 2   Stock Exchange.
 3      Q.    And then on the first page of t he exhibit,
 4   Mr. Colshorn writes to Mr. Leshem and helpfully provides
 5   an English translation of Mr. Coenen's email.
 6      A.    Thank you, Mr. Colshorn.
 7      Q.    So let me go first about halfway down
 8   Mr. Colshorn's translation.  Do you see the paragraph
 9   that begins, "According to the company"?
10      A.    I do.
11      Q.    "According to the company (AmeriMark), there
12   was a general meeting at which the complete withdrawal
13   of the bearer shares was resolved.  According to
14   AmeriMark, these will be canceled."
15            Is that true?
16      A.    Well, let's look at this timing because this
17   pertains exactly to the email with Mr. Kappeler where it
18   was discussed that perhaps these will be canceled;
19   right?  So according to AmeriMark, these will be
20   cancelled, forward looking.
21            What was the -- can we check the date of that
22   email?  Sorry to go back exhibits, but my memory is that
23   email is, like, from September or something; is that
24   right?
25      Q.    So it's D 120.  You're welcome to grab it.

```
 1        A.    Thank you for that.  D 117, D 119, D 120.

 2              Okay.  So this is later.  Same time frame;

 3   right?  So we're all -- this is November 2019.

 4   Already -- still, the idea is, yes, we're going to try

 5   and cancel -- withdraw and cancel the shares.  So, yes,

 6   at this point in time -- and let's see what Mr. Colshorn

 7   had to say.  "According to the company" -- he's

 8   representing on behalf of the company -- "there will be

 9   [sic] a general meeting."  He's wrong there.  It's an

10   EGM.

11        Q.    Yeah.  I'm sorry.

12        A.    I apologize.

13        Q.    I think you said, "There will be a general

14   meeting."  This reads, "There was a general meeting";

15   correct?

16        A.    Let me see.  "According to the company, there

17   was a general meeting"; that's right.  "... complete

18   withdrawal of the shares was resolved.  According to

19   AmeriMark, this will be canceled."  My mistake.  You're

20   right.

21              That's not right so far as I know.  I don't

22   think that that happened.

23        Q.    No meeting had been called; correct, sir?

24        A.    I don't think so.  I don't think so.  Also, it

25   wouldn't have been a general meeting.
```

```
 1        Q.    It would have been an extraordinary meeting?

 2        A.    It would have been an EGM -- well, at least

 3   according to Mr. Kappeler's emails.

 4        Q.    Let's keep going in --

 5        A.    Now, once again, this is a translation,

 6   though, and one thing you have to understand about

 7   German to English translation is that the tense of verbs

 8   is very tough to do.  I assume that this is correct, but

 9   that there was a general meeting -- "es war, es wird."

10   I'm not sure.

11        Q.    Let's keep going in Mr. Coenen's email

12   translated.  He says, "The AmeriMark Group" --

13        A.    Wait.  I apologize.  When you say Mr. Coenen's

14   email, you mean Mr. Colshorn's email where he is

15   forwarding the Coenen email.  Thank you.  Go ahead.

16        Q.    With the translation.

17        A.    Go ahead.

18        Q.    "The AmeriMark Group AG itself has nothing to

19   do with 4Service Cloud Tech AG.  It is an economic

20   startup as the management of AmeriMark Gropu AG has

21   taken over the shell of the former 4Service Cloud Tech

22   AG."

23              Let's pause there.  Are those two sentences

24   consistent with your understanding?

25        A.    I think they are.  Nothing to do -- this is,
```

1  again, we talked about this earlier, and I testified to

2  it, you know.  When you take over the company, there's a

3  rebirth in Swiss law.  In this case -- also, you can

4  take over a company in a way that you take over the

5  operations and everything else.  So if what Mr. Coenen

6  through this translation is saying, is that the old

7  operations are done.  We have nothing to do with the

8  business plan.  The purpose of the company has changed.

9         In fact, I think the statutes did change the

10  purpose of the company eventually in Group.  The

11  statutes from 4Service Cloud were annihilated, and

12  Group's, I think, were totally different, and I think

13  that probably included a purpose change in the company.

14  That's easy to see.  We have it in production somewhere.

15         So in that respect, I would say it is true.

16  The language is inartful.  I wouldn't have said

17  AmeriMark Group has nothing to do with 4Service Cloud.

18  I said, you know, has nothing to do with the 4Service

19  Cloud business.  But in his later sentence, he manages

20  to heal that a little bit.  It says it's taken over the

21  shell of the former 4Service Cloud Tech AG, and I think

22  that's correct.

23    **Q.   He continues, "4Service Cloud Tech AG also had**

24  **a completely different business purpose."**

25    A.   I anticipated that sentence apparently.

1        Q.    "The assets of the former 4Service Cloud Tech

2    AG are now located in Crednology Holding Corp. which are

3    traded under the ticker COHO" --

4        A.    Mm-hmm.

5        Q.    -- on the trading platform OTCMarkets."

6        A.    Yep.

7        Q.    Is that true?

8        A.    It is -- or -- those are Orie Rechtman's

9    companies, and what happened is -- it became a point of

10   contention later, but what happened is, after the

11   reverse merger, where he did, he pulled out those two

12   COHO and whatever the other one was called --

13   Crednology.  COHO and Crednology.

14            Now, later, Nicole Kuster took some issue with

15   the way that Mr. Rechtman had done that transaction and

16   felt that he hadn't properly compensated the company.

17   Mr. Rechtman said, "Well, I have this option agreement,

18   et cetera," and it never really got resolved except I

19   think AmeriMark Group simply had to write off those

20   positions.  But Orie took the position that those were

21   his, and Ms. Kuster had some technical arguments for why

22   they shouldn't have been or it should have been done

23   differently, but at the end of the day, nobody was

24   interested in those assets anyway.  The idea, of course,

25   was Rymark was the crown jewel of the estate.

1        Q.    Second to last line on this page says, "Why

2    the empty shell was taken over is beyond my knowledge."

3        A.    So Coenen saying, "Why the empty shell was

4    taken over is beyond my knowledge."  Well, we speculated

5    on how involved Coenen was before, like with the merger,

6    as opposed to now, and there's perhaps, the answer.  He

7    wasn't.

8        Q.    Well, I mean, it's obvious why the empty shell

9    was taken over.  It was to get AmeriMark Automotive

10    shares traded; correct?

11        A.    Yeah, I would agree with you but -- and,

12    again, I don't know how good this translation is, but I

13    can certainly say -- and there's a phrase in German, aus

14    meine meinung.  It means -- a-u-s m-e-i-n-e

15    m-e-i-n-u-n-g.  It means "it's out of my mind," and

16    maybe that's the translation here.  Beyond my knowledge,

17    out of my mind.  It sort of just means "wasn't my

18    affair."  I don't know that that's the case but --

19        Q.    Let's now look at Mr. Leshem's email at the

20    top of this same page.  He says, "Hi, Nicolai.  I'm

21    aware of this from yesterday.  As I said, Wenzyl seems

22    to think that there is something 'fraudulent' about the

23    fact that we did not disclose that 4Service Cloud was

24    listed on the Euronext.  Of course he had the

25    handelsregister auszug from day one, which clearly

1  showed the name change, and he never even asked about

2  it.

3          "We are waiting to talk to our attorney, Felix

4  Kappeler, who will answer all questions on behalf of

5  AmeriMark for us and also write additional explanation.

6          "Wenzl seems really angry and upset about

7  this."

8          Do you see that?

9      A.   Yeah, and that absolutely comports with my

10  memory of those periods.

11      Q.   And in an earlier deposition you described

12  Coenen as the golden boy of the Vienna Stock Exchange.

13  Do you recall that testimony?

14      A.   Yeah.  It was probably a little bit excessive,

15  but he definitely had a very close relationship with

16  Wenzl, and Wenzl told me that himself on one occasion.

17      Q.   Is this the beginning of the end of that?

18      A.   I don't know.  You're asking me to speculate.

19  I will tell you that within months of this they were

20  definitely on the outs, and Wenzl was generally angry at

21  all the companies that Coenen had anything to do with.

22      Q.   With cause, would you say, Wenzl was angry

23  or --

24      A.   I don't know.  I don't know what passed

25  between them, you know, and, again, this company got

 1    listed in 100 days from application, which I don't -- I

 2    don't know how many, you know, Vienna applications go

 3    that fast, but Wenzl was very keen to have the company

 4    listed, and it went very quickly.  The approval was

 5    sailed through, and I think one of the things you see

 6    here is that Wenzl might have been a little less than

 7    careful, maybe because of Coenen, maybe that's what it

 8    was, but -- and I'm totally speculating now.

 9         Q.   But you don't think there was, in Mr. Leshem's

10    term, where it's something fraudulent about the failure

11    to disclose that 4Service Cloud was listed on the

12    Euronext?

13         A.   I'll go further.  I'm not sure that there was

14    a failure to disclose.  I mean, you have -- you have the

15    ledger.  You can see also the two classes of shares.

16    Did somebody send the, you know, the Euronext rejection

17    letter to Wenzl?  Probably not.  But I -- I don't know

18    exactly what happened there, and it's a little bit

19    outside of the ken of AmeriMark automotive also.  This

20    is interactions that were involved in between these

21    people personally.

22         Q.   Regardless, Mr. Kappeler is deputized, if you

23    will, to answer Mr. Wenzl's questions and try to calm

24    him down; is that about right?

25         A.   I think we should us a word other than

CAPANA SWISS ADVISORS AG vs RYMARK                                              30(b)(6)
SHAEN BERNHARDT - 01/24/2025                                                   Page 215

 1   deputized.

 2        Q.   What word would you -- do you think is more

 3   accurate to describe Mr. Kappeler's role here?

 4        A.   Retained.

 5        Q.   He was retained, and his assignment was to

 6   communicate with Mr. Wenzl about this?

 7        A.   Well, not just that.  I mean, he was general

 8   corporate counsel, I think -- outside counsel very

 9   quickly.  Remember, it was Mr. Kappeler who actually

10   recommended the project to Orbital and the reason that I

11   got involved.

12        Q.   You can put that to the side for now.  I'm

13   going to mark D 124.

14                  (Exhibit D 124 was marked.)

15        Q.   (BY MR. RICHARDS)  You see here that this is a

16   letter, excuse me, from Mr. Kappeler to Mr. Wenzl.  Is

17   that your understanding?

18        A.   I do see that.

19        Q.   And the first -- and we'll do this with a few

20   exhibits.  The first three sheets of this exhibit are in

21   German, and then I have an English translation on the

22   back.  So let's start with the English.

23        A.   May I briefly make a comment?  I'm sorry.

24   It's going to pertain to the translations.

25        Q.   Go ahead.

1        A.   As you know, because you did the deposition.

2    I was deposed here in September.  In that deposition a,

3    number of translations were presented, particularly

4    related to press releases and so forth.  In my process

5    of preparing for this deposition, I reviewed those

6    translations and found that many of them were materially

7    really off, and so I really want to just make sure that

8    that's on the record.  And, frankly, that was extremely

9    concerning.  So I do want to be very, very careful about

10   original documents in this deposition.

11       Q.   I understand.

12       A.   Okay.

13       Q.   So let's look at Bates -- well, the Bates

14   aren't going to be helpful because the Bates are all the

15   same, but the first page of the English translation,

16   Bates 12400 in English.  Do you see where I mean?  I

17   think one more turn.

18       A.   I have it.

19       Q.   Okay.  Perfect.  So let's look here at what's

20   titled "Question Complex One, Bearer Shares," and the

21   question Mr. Kappeler records here is "Why was trading

22   on Euronext suspended on June 25th, 2019."  Do you see

23   that?

24       A.   I do.

25       Q.   And Mr. Kappeler says, "In July 2018, the

1    company created an additional 20 million registered

2    shares, class B, alongside the existing 3.4 million

3    bearer shares which were listed on Euronext class A."

4    Let's pause there.  Good so far?  That's correct?

5        A.   I'm not sure about the classes.

6        Q.   The numbers are correct and the time is

7    correct?

8        A.   I'm not 100 percent sure on the time when the

9    shares were issued.  It would be in the commercial

10   register.  The number of shares looks correct to me.

11       Q.   Next sentence.  "It then became apparent that

12   Euronext was not happy with the complexity of a dual

13   share structure."  Pause there.

14            Is that true?

15       A.   Yeah, I believe so.  We discussed that in my

16   prior testimony.  Exchanges hate dual share structures.

17       Q.   Next, "Furthermore, the listed bearer shares

18   had hardly been traded for over a year with only very

19   small sold lots and months of inactivity in between."

20            That's also consistent with your

21   understanding?

22       A.   Well, now here comes the problem with

23   translation and I want to bring to your attention.  If

24   you read this sentence carefully.  "Furthermore, the

25   listed bearer shares had hardly been traded for over a

 1  year."  Had hardly been traded for a year -- that's not

 2  true.  The company had been listed since 2015.

 3          And this is why it's dangerous -- I'm sorry to

 4  be a nitpicker about this.  It's dangerous to use these

 5  English translations if they're machine translations,

 6  because I'm positive that Felix didn't get that detail

 7  wrong, and that reads poorly.

 8          MR. WORDEN:  You're welcome to read the German

 9  if you want.

10      **Q.   (BY MR. RICHARDS)  And I understand this to**

11  **mean that for over a year, there had been little trading**

12  **activity in the stock, and I think that's consistent**

13  **with your prior testimony?**

14      A.   I don't want to comment on the text.  I will

15  say that that is consistent with my understanding of the

16  facts.

17      **Q.   Okay.  Next sentence, "For this reason,**

18  **Euronext did indeed remove the listed bearer shares from**

19  **trading, but at the same time invited the company to**

20  **have the new registered shares listed."**

21          **Is that true?**

22      A.   It is.  You can see it in the Euronext letter.

23  I know there's been a lot of discussion about this to

24  try and suggest that the place where it says you're

25  welcome to reapply to another exchange seems to suggest

1   that there -- that that's not an invitation, but this is

2   a problem, again, I think with language.  There is no

3   other exchange at the Euronext it's entitled to invite

4   you to apply to.  They're inviting you to apply to

5   another Euronext exchange within -- I think it says

6   90 days.  That's from my memory, but I think that letter

7   is exactly consistent.  I don't think Mr. Kappeler is

8   wrong about this at all.

9          Q.   So let's mark Exhibit 125, which is the

10  clearer version of that Euronext letter so that we can

11  refer to it together.

12                   (Exhibit D 125 was marked.)

13         Q.   (BY MR. RICHARDS)  Okay.  Romanette i here in

14  the Euronext letter Exhibit D 125 says that the Euronext

15  was going to "refuse the admission to trading of the

16  Class-B shares of AmeriMark Group AG on Euronext Access

17  Paris, pursuant provision 2.7 of the Euronext Access

18  Market Rules."

19             Do you see that?

20         A.   I do, and this is a very important detail.

21  This is Euronext.  You see down here this is signed by

22  the chairman of Euronext Paris and the head of

23  compliance for all of France.  What they're saying is

24  that it's been denied for trading on the Euronext Access

25  Paris, and there are multiple Euronext access exchanges

```
 1   in this period -- is my understanding.

 2        Q.   So you -- and then we continue, "This

 3   provision allows Euronext to decline an application on

 4   any appropriate ground, including (without limitation),

 5   in case trading might be detrimental to the fair,

 6   orderly, and efficient operation of the Market or to the

 7   reputation of market and/or Euronext as a whole";

 8   correct?

 9        A.   Yes, that's what it reads.

10        Q.   Okay.  Mr. Kappeler here says that the

11   Euronext invited the company to have the new registered

12   shares listed; correct?

13        A.   This decision is irreversible but allows you

14   to ask admission and be admitted on another stock

15   exchange within 60 days."

16             Euronext is not telling you to go list in

17   Vienna.  It's telling you to list on another Euronext

18   exchange.  If that's not an invitation, I don't know

19   what is.

20        Q.   Well, but that's Romanette iii, which pertains

21   to the class "A" shares; correct?

22        A.   I think you're splitting hairs beyond --

23   beyond recognition.  I'm sorry, Counsel.

24        Q.   You think I should read Romanette iii when

25   Romanette i says we're not going to admit the shares, I
```

1   **should read Romanette iii to say we're inviting you to**

2   **admit the shares?**

3       A.   Allows you to ask admission to be admitted on

4   another stock exchange within 60 days.  Is that not an

5   invitation?

6            And let's remember, also, you're dealing with

7   the translation here, and you're dealing with Euronext

8   writing in English when their natural language is

9   French.

10           Look, I know the intimation you're trying to

11  make.  I just can't agree with it.

12      **Q.   So Mr. Kappeler continues here in his letter,**

13  **three lines up from the bottom, "At that time, however,**

14  **the company had already decided to focus on a listing on**

15  **the Vienna Stock Exchange, not least because the**

16  **delisting by Euronext was carried out unilaterally and**

17  **without prior notice, which did not create good**

18  **conditions for further cooperation."**

19      A.   See, now, the translation comes in again.  The

20  German reads. (Speaking in German).  "Up to this point"

21  as opposed to --

22               (Reporter clarification.)

23      A.   This is "at that time."  This says "up to this

24  point," and I just -- I can't agree with you that this

25  is inconsistent with the Euronext language.

 1                Also, let's remember, this is a lawyer

 2      interpreting a letter that he's seen once and passing it

 3      off.  He's not making a formal representation.  Also

 4      he's had to work through talking to whoever he needs to

 5      talk to about this in order to research.

 6                I just don't agree with you that it's

 7      inconsistent what Mr. Kappeler wrote, and I've looked at

 8      this issue extremely carefully, and I've talked to

 9      Mr. Kappeler about it.  And, in fact, Wenzl came back

10      and had some issues about the some of the disclosures --

11      for example, the exact definition of "publish."

12                And throughout this entire process,

13      Mr. Kappeler -- don't think that this letter was in

14      isolations or that it was sort of a monolith.

15      Throughout this entire process, Mr. Kappeler had dozens

16      of phone calls with Mr. Wenzl, and we worked diligently

17      with Mr. Wenzl for weeks to resolve his issues, and

18      eventually he let it go.  To the extent -- this is

19      October 31st, 2019 -- that in March of 2020, they're

20      considering an up-listing, and for the second time,

21      including Rymark employee John Kirkland, they're

22      presenting to the full panel of the Vienna Stock

23      Exchange.

24                So, I'm sorry, Counsel, but I simply can't

25      agree with the thrust of what you're doing.

1        Q.   (BY MR. RICHARDS)  Let's turn the page, Bates

2    page 12401.  The first question on this page is "Why was

3    the listing/delisting at Euronext not mentioned to us?"

4            And Mr. Kappeler writes, "The company has

5    prepared an information memorandum as thoroughly as

6    possible with the assistance of a Capital Market Coach.

7    Since the company did not seek the admission of the

8    'old' bearer shares and intended to destroy them as

9    quickly as possible and because the share information in

10   the extract from the Commercial Register was publicly

11   accessible, the company likely did not understand how

12   important it would have been to disclose this fact.  In

13   retrospect, one must say that it was a mistake."

14           Do you see that?

15        A.   I do.  And it's a bit different than the

16   German, but I'll tell you I helped draft this paragraph,

17   and the discussion that we had about this was that we

18   thought Wenzl, again, had egg on his face and that if we

19   push the issue and suggested that he had made the

20   mistake, rather than taking the small bullet and moving

21   on, at least giving him a little bit of his due, then he

22   was just going to get more defensive, more aggressive,

23   so to speak.

24           I mean -- and this is a misrepresentation.

25   The company hasn't prepared it as thoroughly as

 1  possible.  I actually don't think it's true, and we

 2  thought it was maybe not true that, quote -- let me find

 3  the section that gets me -- "to disclose this fact."  I

 4  actually think that it was disclosed to Wenzl, and he

 5  just didn't mention it up the chain.

 6         And, you know, the kind of relationship

 7  that -- my understanding -- that Wenzl and Coenen had at

 8  this period of time was that they were having lunch

 9  together once a week, and I don't know exactly how that

10  happened, but I do remember discussing this, and I do

11  remember talking about the fact that, look, they're the

12  exchange officials, and they can use boilerplate all the

13  time to just refuse you.  Let's just kind of try to call

14  bygones bygones, split it down the middle, and move on,

15  which we did.

16     Q.   So you don't think Group made a mistake in its

17  application.  You're just trying to take a fall and get

18  Wenzl off your back?

19     A.   I'm not sure it's accurate to say that there

20  wasn't a mistake in the application.  You know, I wasn't

21  involved in the preparation of the application.  I think

22  almost all of that was Coenen, because if you look at

23  the application and you look at it side-by-side with the

24  later valuation report from June 17th, 2019, I mean,

25  it's a lot of overlap.

1          So I don't feel like it was just a

2    seriously -- a serious mistake, but, you know, I might

3    have been loquacious about the history of the company,

4    but by the same token, you could also have seen it in

5    Kappeler's right here.  You could also have seen it in

6    the public information, and he should have.  Wenzl

7    should have seen it in the public information.

8          I just think he -- and this is only my

9    opinion, and I'm basing it on speculation.  I think he

10   was probably a little closer to Coenen than he should

11   have been, and then when somebody above him -- and he

12   reports directly to more senior exchange officials --

13   including -- by the way, the president of the exchange

14   signs off on every listing -- CEO.  Excuse me.  I think

15   it's the CEO of the Vienna Stock Exchange.  I suspect

16   that -- that he got called out and he said -- what they

17   said, "Wait a minute.  Isn't this the same?"  And he

18   didn't have an answer.  Now, this is me speculating

19   but -- and this is the speculation we had at the time.

20   **Q.   So if -- if -- and I understand you're**

21   **speculating, but if upper exchange officials were**

22   **alarmed by the fact that it was the same company that**

23   **had just been delisted, doesn't that sound like the sort**

24   **of material thing that should have been disclosed in the**

25   **application?**

1    A.    Clearly the exchange officials didn't think

2    so.  They took this letter and moved on.  Well, again,

3    the company was applying for an uplisting and was, in a

4    way, the darling of the exchange.  It had, I think, the

5    highest revenue of any company in the segment.  Martin

6    Wenzl said he didn't think it should still be in the

7    direct.  It should go up to the direct plus, which is

8    what occasioned the meeting in March 2021.  Does that

9    sound to you like a bunch of super concerned exchange

10   officials who maybe there was something that should have

11   been disclosed that irritated them, but then they got

12   past it?

13   **Q.    So you think that if a group had submitted the**

14   **letter from Euronext that says Group was being delisted**

15   **for market abuse and reputational risks, that Group**

16   **still would have been listed with Vienna?  It wouldn't**

17   **have mattered?**

18   A.    How can I go into the minds of the officials

19   and say what they would or wouldn't have done if they

20   had or hadn't had a documentation -- a piece of

21   documentation that that they didn't have.  I mean, how

22   do you me to speculate that?

23         They obviously didn't think that much of it

24   later.  They were fully in their power to delist the

25   company in that particular moment for -- for not doing a

```
 1   proper application.  They chose not to.  The reverse --
 2   they wanted to push the company up the next change.
 3   Again, I'd reiterate it.  I'll say it again.  Does that
 4   sound to you like a bunch of concerned exchange
 5   officials?
 6              All these -- all these are messy.  These are
 7   small companies.  This company had been through the
 8   ringer twice.  There's a lot of deal fatigue to this,
 9   and it happens.  You'll always have that sort of thing.
10   The exchange obviously got over it -- more than got over
11   it.
12        Q.   I'm going to mark Exhibit D 126.
13              (Exhibit D 126 was marked.)
14        Q.   (BY MR. RICHARDS)  I've marked as Exhibit D
15   126 an email from Alexander Coenen to Martin Wenzl dated
16   November 4th, 2019.
17              Do you see that?
18        A.   I do.
19        Q.   Email is in German.  There is a translation
20   attached to the back.  If you'll go to the English page
21   with the Bates stamped 3151.
22        A.   I'm there.
23        Q.   You've made your concerns with translations
24   clear on the record.
25        A.   Thank you for acknowledging that.
```

CAPANA SWISS ADVISORS AG vs RYMARK                                                    30(b)(6)
SHAEN BERNHARDT - 01/24/2025                                                       Page 228

```
 1        Q.   Let's actually turn one more page, 3152.

 2        A.   Thanks for the Bate numbers -- Bates Numbers.

 3   It makes it easier.

 4        Q.   Do you see at the bottom of this page that

 5   there's an email from Mr. Wenzl and Mr. Coenen?

 6        A.   I do.

 7        Q.   And Mr. Wenzl says, "Dear, Mr. Coenen.  The

 8   company is now legally represented, and we are already

 9   in communication regarding the questions below."

10             I gather this is a reference to the fact that

11   Mr. Kappeler had been communicating with Mr. Wenzl.  Is

12   that your understanding?

13        A.   You're making me speculate on what Mr. Coenen

14   means here, but certainly by this date I think

15   Mr. Kappeler was corporate counsel for the company.

16        Q.   Yeah.  And I'm sorry.  I may have misspoken.

17   This email that we're looking at now is from Mr. Wenzl;

18   correct?  Not from Mr. Coenen?

19        A.   I'm at the bottom, but it says -- I don't know

20   what Mr. Coenen said -- oh, I see.  Wenzl is

21   representing to Coenen the company has represented.

22             Well, again, I don't know what Wenzl means

23   here.  I will tell you that my understanding is the

24   company was represented at this point.

25        Q.   Okay.  Next paragraph.  This is Mr. Wenzl's
```

CAPANA SWISS ADVISORS AG vs RYMARK                                      30(b)(6)
SHAEN BERNHARDT - 01/24/2025                                            Page 229

```
 1   writing to Mr. Coenen.

 2        A.   Next paragraph.  I have it.

 3        Q.   "For our further corporation, we must clarify

 4   why you did not mention the history of the company,

 5   including the delisting at Euronext, to us.  I kindly

 6   request a statement regarding this."

 7             Do you see that?

 8        A.   I do.

 9        Q.   And then I believe that Mr. Coenen's response

10   is actually at the top of this same page.  Do you see

11   the line that begins "The publicly accessible history"?

12        A.   Yes.

13        Q.   Do you see that?  "The publicly accessible

14   history has in this case escaped both Capital Lounge

15   GmbH and the Vienna stock exchange"?

16        A.   Yes.

17        Q.   So he's saying, "Look, I didn't know either.

18   You and I both missed it"?  Is that the idea?

19        A.   Read that part one more time.  I'm sorry.

20        Q.   "The publicly accessible history has" --

21        A.   Sorry.  Where are we?

22        Q.   Same, 3152.

23        A.   Thank you.  I'm there.

24        Q.   Go to the top of the page.  There are two

25   lines.
```

```
 1        A.   I see.  You jumped up.  That's where I missed

 2   you.

 3        Q.   Yeah.  Sorry.

 4        A.   Go ahead.  "The publicly accessible history

 5   has" --

 6        Q.   -- "in this case escaped both Capital Lounge

 7   GmbH and the Vienna Stock Exchange."

 8        A.   And this is him to Wenzl.

 9        Q.   Coenen to Wenzl, correct.

10        A.   Okay.

11        Q.   So do you understand Mr. Coenen to be saying

12   here, "I missed it too"?

13        A.   I think it's important to realize who's carbon

14   copied on this.  Do you see that?  Susanne Plank.

15        Q.   Who is she?

16        A.   Susanne Plank is also a member of the

17   executive committee -- I think it's the executive

18   committee -- of the exchange, and Susanne Plank

19   reports -- my understanding, she reports directly or

20   reported directly to the CEO.  It's instrumental here, I

21   think, to understanding this, and I've looked at this

22   correspondence before, that Plank is in here, because I

23   take every piece of this to look like Wenzl trying to

24   clear his name with his upper officials.  He's writing

25   to a Coenen, who is a friend of his -- they're
```

1    colleagues.  They have lunch all the time.  They are

2    more than friends -- in very formal language and

3    copying, effectively, his boss Susanne Plank.

4            This is another reason I came to the idea that

5    something had happened above and Mr. Coenen, for lack of

6    a better term, had gotten spanked or slapped on the

7    wrist.  And this -- now, the elaborate dance between

8    these two friends is a way of trying to both of them

9    take the bullet in front of Susanne Plank.

10           And then notice that Wenzl complains about the

11   way that the -- the -- that the CC list is being

12   distributed; right?  If you see that on -- I'm sorry --

13   Bates number ending 3153.  Mr. Wenzl to Mr. Coenen

14   copied Plank and the director.  "Thank you for the

15   response.  Since you have accompanied the company in the

16   listing process... concern you, please keep the email

17   distribution as it is [sic]."

18           This is a sensitive spot for these people.

19   There's a mistake that's been made.  The exchange

20   certainly got upset with Wenzl.  This is the process of

21   walking it all back internal politics at the Vienna

22   Stock Exchange.  That's my assessment, especially having

23   been a little bit around this with talking to

24   Mr. Kappeler and especially after reviewing this

25   material in the course of this litigation.

1    Q.    All right.  So I want to --

2    A.    Excuse me.  Just a second.  I'm sorry.

3    Q.    Bless you.

4          I want to return to some -- some of that in a

5    moment.  I want to clear up the CC issue first.

6    A.    Of course.

7    Q.    So let's turn to 3154.

8    A.    3154.

9    Q.    The first email in this chain is from

10   Mr. Coenen to Mr. Wenzl copying Mr. Colshorn; correct?

11   A.    3154?

12   Q.    Yeah.

13   A.    From -- I see at the top here.  From Wenzl.

14   Q.    Sorry.  Go to the bottom of this page, which

15   will be the original -- the earliest email.

16   A.    From Coenen.  I have that.  To Wenzl.  Copied

17   Colshorn.  Agreed.

18   Q.    So Coenen to Wenzl, copied Colshorn.  And then

19   Mr. Wenzl's response four days later on the 21st of

20   October is above; correct?  We just move up that same

21   page.

22   A.    Yes, I have it.

23   Q.    And it's Mr. Wenzl who adds Ms. Plank?

24   A.    Correct.

25   Q.    So I'm not quite sure I follow the idea that

1    Mr. Wenzl is concerned that Ms. Plank is copied here if

2    he put her in there.

3        A.    No.  It's the reverse.

4        Q.    Okay.

5        A.    He wants his boss to see that this is -- that

6    this is being resolved.

7        Q.    Okay.

8        A.    He's clearing his name with his boss.  I'm

9    sorry if I -- I didn't make that more clear, and -- and

10   I think you noticed it.  Coenen is trying to take her

11   off because he's being accused of something.  He

12   wants -- you know, he wants it to be Wenzl and himself

13   and the director, and Wenzl's like, "No, no, no.  You're

14   putting my boss on here too because I want to hear you

15   say you made a mistake," or whatever the politics is

16   there.

17          I mean, to me it's as clear as day.  It's an

18   internal tiff, and I did call him the golden boy of the

19   exchange.  I mean, he was very close.  This formal kind

20   of stilted language with all these details and now the

21   company is represented by counsel to his old friend with

22   his boss in carbon copy that his boss refuses to let out

23   of carbon copy.  I think it's clear as day what's going

24   on.

25       Q.    Okay.  So let's now return to Bates 3152.

```
 1        A.    I'm there.

 2        Q.    And go to this line near the top -- the

 3   publicly accessible history.  Do you see where I mean?

 4        A.    3152.  I'm on the German.  You're probably on

 5   the English.

 6        Q.    I'm on the English.

 7        A.    I'm sorry.  Let's go.

 8              3152.  The publicly accessible history.  I

 9   have it.

10        Q.    So I read this to -- as being Mr. Coenen

11   saying, "You missed this, and so did I," and I gather

12   you to suggest that he's basically trying to help

13   Mr. Wenzl save face in front of his boss.  Is that the

14   idea?

15        A.    I mean, again, I'm speculating, but I think

16   I'm very close on that, and it matches exactly what's

17   happening here, and notice how he -- notice how he talks

18   about the mistake.  "The publicly addressable

19   history" -- like, "boy, we both should have known

20   better"; right?  Is my interpretation of that.  He's

21   talking, I'm certain, about the extract from the

22   commercial register, not -- not -- in a way, pointing

23   out, "You should have looked at that first," and Wenzl

24   should have but --

25        Q.    But Mr. Coenen --
```

1      A.    All of this, by the way, is happening outside

2   of the view of the company except when Coenen --

3            (Reporter clarification.)

4      A.    All of this is happening outside the view of

5   the company except when Coenen is in copy -- but then I

6   was going to correct myself.  Look, he's in copy

7   actually in most of this.  So I'm wrong about that.

8      Q.    Colshorn is in copy, you mean?

9      A.    That's what I meant.  Again, it's been a long

10  couple days.

11     Q.    So is Mr. Coenen telling the truth here,

12  though, in that the publically accessible history did,

13  in fact, escape him, Capital Lounge GmbH?

14     A.    I don't know.  I don't actually know what

15  Capital Lounge knew.  I don't know what the Vienna Stock

16  exchange knew.  Again, I think -- I think probably --

17  and look at the language here.  "Has escaped."  Let me

18  see what the German is on this because -- 315.

19     Q.    3152.

20     A.    Yeah.  My German is not perfect but [starts

21  speaking in German] -- I'm not going to read it out

22  loud.  How about that?

23     Q.    Sure.

24     A.    It's even beyond my German a little bit.  It's

25  very nuanced.  So I don't know.  But, again, it's

1    entirely consistent with trying to, with Susanne Plank
2    in copy, eventually trying to just say it was out there.
3    Yeah, you should have seen it, and maybe he's saying
4    that -- is he going to say, "Hey, Martin, you screwed
5    this up.  I had it.  I gave it to you"?  You know,
6    again, all of this is speculation.  I'm happy to
7    speculate on it to try and add the color to the general
8    transaction, but I don't know what they were thinking at
9    the time.  I have no idea.
10        Q.   I'm going to mark Exhibit D 127.
11             (Exhibit D 127 was marked.)
12        Q.   (BY MR. RICHARDS)  See here, Mr. Bernhardt,
13   that this is a May 16th, 2019, email from Mr. Leshem to
14   a number of individuals.  Yes?
15        A.   I do.
16        Q.   And the email begins, "To the director,
17   officers, shareholders, service providers, and creditors
18   of AmeriMark Group SA."
19        A.   Yes.
20        Q.   "Pursuant to the efforts of Mr. Orie Rechtman,
21   shareholder and founder of AmeriMark Group AG, I have
22   had a preliminary discussion with Mr. Alexander Coenen,
23   the listing sponsor who was originally listed 4Service
24   Cloud Tech on the Euronext and who was engaged to list
25   AmeriMark Automotive on the Euronext."

 1          Next paragraph.  "Mr. Coenen was made aware of

 2   our recent rejection to admission by the Euronext and

 3   discussed our situation and explained our current

 4   structure.  Mr. Coenen had already completed several

 5   listings on the Vienna Direct and the Vienna Direct

 6   Plus.  He has expressed confidence that he can assist us

 7   in gaining admission to that market and is willing to

 8   work on a success basis and be compensated after funds

 9   are raised."

10          So it appears from this email to me that

11   Mr. Coenen did know that Group had been rejected, that

12   the admission of 20 million shares of Group had been

13   rejected by the Euronext.  Yes?

14                (Cross-talk.  Reporter interrupts.)

15          MR. WORDEN:  Objection.  Calls for

16   speculation.

17      A.   Yeah.  You're assuming what Mr. Leshem is

18   saying here is accurate, and I don't know it is, and I

19   don't know what the source of his information on this

20   is.  He could just be wrong.  How do I know?

21      Q.   (BY MR. RICHARDS)  Do you find Mr. Leshem

22   trustworthy?

23      A.   In this case I don't have any reason not to

24   think he's trustworthy at this period in time, no, but

25   how would I know whether he just simply made a mistake

1  here?  He's describing a complicated sequence of events.

2  I have no idea.  I'm not going to speculate on that.

3       **Q.   At this period of time, Capana was funding the**

4  **listing effort; correct?**

5       A.   That is -- I don't know that that's totally

6  accurate.  I have to think about the time frame.  This

7  is May 2019.  No.  Capana didn't even exist at this

8  moment.  I'm sorry.

9       **Q.   Okay.  Orbital --**

10      A.   Made it very -- made it very difficult for

11  Capana to fund the company in that instance.

12      **Q.   Was Orbital funding the company at this stage?**

13      A.   I can't remember exactly what the funding all

14  was here, and the Orbital material wasn't something I

15  paid all that much attention to for this deposition.

16      **Q.   Do you know whether -- you know, Mr. Leshem**

17  **says here that Mr. Coenen would be -- was willing to**

18  **work on a success basis and be compensated after funds**

19  **are raised.  I gather the idea is he's not going to take**

20  **a fee now.  He'll take a fee out of share sales on the**

21  **back end; is that right?**

22      A.   Again, you're asking me to speculate exactly

23  what Mr. Leshem meant by this, and I don't know.  I

24  mean, I can take the plain meaning of it.  I'm not

25  actually aware that Mr. Coenen had a backend on this.  I

 1  haven't seen anything like that in the production.  I

 2  don't know what Mr. Leshem is referring to here.

 3      **Q.   Have you seen any fees to him on the front**

 4  **end?**

 5      A.   I have not.  I'll take that back.

 6           Mr. Coenen?

 7      **Q.   Yeah.**

 8      A.   Well, certainly, he was paid early on -- maybe

 9  not on this transaction -- but certainly he was paid and

10  retained in his capacity of Capital Lounge, because he's

11  been retained by Capital Lounge basically with the same

12  company since 2016 when he was retained by

13  Mr. Markosian.

14           So how the payment went, I don't know.  It's

15  also possible that Mr. Leshem, as the -- as the listing

16  agent, was paying him directly.  I think that's the more

17  likely case because Mr. Leshem's fee structure -- my

18  understanding was that he accepted fees from Rymark in

19  order to do the listing, and he was responsible for

20  these expenses.  I do think that he probably pay -- I'm

21  almost positive he paid Capital Lounge out of his own

22  money in the AmeriMark Automotive transaction because

23  Automotive didn't have any bank account until it was

24  formed; right?  And certainly didn't have really any

25  cash injected into it until -- until later.

 1          So I expect that probably that's where the
 2    payment went.  I haven't seen any direct payments to
 3    Capital Lounge or Mr. Coenen in the company's records
 4    that I can remember at the moment.
 5          **Q.   When did the money for Mr. Markosian run out?**
 6          A.   I don't know the answer to that question
 7    because that's a question you would have to ask Ananda
 8    Capital and then its successor.  Mr. Markosian's
 9    arrangement and the 125,000 was with them and
10    Mr. Hesterman.  I mean, I've seen production about
11    Mr. Markosian's complaints on the matter, But that's
12    secondhand.
13          **Q.   All right.  You can put that one to the side.**
14          A.   What I will tell you is by this time, we're
15    looking at May 2019, the solvency issues of the company
16    by which I mean AmeriMark Group, were getting severe.
17    That's why Mr. Leshem wrote this email.  Mr. Markosian
18    had starved the company of money, and by the way, just
19    as a reminder, stolen dividends.  So if that money had
20    been put in the company, it would be in much better
21    shape at that point.
22          MR. WORDEN:  Stephen, let's take five, please.
23          MR. RICHARDS:  That's fine.
24          (Recess taken from 1:49 to 2:04.)
25          **Q.   (BY MR. RICHARDS)  I'd like to mark as**

 1   Exhibit 128.

 2                    (Exhibit D 128 was marked.)

 3       Q.   (BY MR. RICHARDS)  Mr. Bernhardt, you have in

 4   front of you what I have marked as Exhibit D 128.

 5       A.   I see that.

 6       Q.   This is an information memorandum from

 7   AmeriMark Group; correct?

 8       A.   An information document, yes.

 9       Q.   Dated June 2019.  Is that what you see?

10       A.   I do see that.

11       Q.   And I'll make it clear.  This is excerpts from

12   the document, the document is --

13       A.   I was going to note just now that doesn't seem

14   to be complete.

15       Q.   It's very large, the whole thing.  I only want

16   to ask about a few sections.

17            This was attached to Mr. Coenen's email to

18   Mr. Wenzl that we just reviewed.

19       A.   I'll take your representation on that.

20       Q.   I'd like to start on Bates 3161.

21       A.   Thanks for the Bates number.  I have it.

22       Q.   Paragraph 1.1, "Person in charge of the

23   information document."  Nicolai Colshorn is listed here

24   as the person who assumes responsibility for the

25   completeness and truthfulness of the data and

 1    information contained in the information docket."

 2             Do you see that?

 3       A.    I do.

 4       Q.    I don't see a signature on this one.  Is it

 5    your understanding that Mr. Colshorn did sign the -- the

 6    document that was submitted?

 7       A.    The original -- sorry to interrupt you.  Do

 8    your question again.  That was my fault.

 9       Q.    Is it your understanding that Mr. Colshorn did

10    sign the information document that was officially

11    submitted to the Vienna Stock Exchange?

12       A.    The officially submitted stock exchange

13    document would have had to have been the hard copy with

14    wet signature.  It is my understanding that it should

15    have been Mr. Colshorn, but we don't have that document

16    in production.  The exchange would have.

17             Also, I'm going to represent to you -- point

18    out to you, this is a draft document, even the extras

19    you have here.  This is a draft version.  You can see

20    right there under the one two statement, the

21    responsibility, the date and the highlight.  This is a

22    draft document.

23       Q.    Let's go to 3162.

24       A.    3162 -- oh, Bates number.  I asked for them,

25    and then I don't comply.  3162.  I'm there.

1       Q.    Do you see paragraph 1.6?

2       A.    I do.

3       Q.    European markets advisor?

4       A.    I do.

5       Q.    And Mr. Hueser's name is put there, yes?

6       A.    I see that also.

7       Q.    Did you speak with Mr. Hueser in preparation

8    for today's deposition?

9       A.    I tried to reach Mr. Hueser and was unable.

10   So, no, I did not.

11      Q.    Was he, in fact, the European markets advisor

12   for AmeriMark Group during the time period of June 2019?

13      A.    Mr. Hueser was added as a formal officer of

14   the company AmeriMark Group as manager, and I don't know

15   exactly what the date of that was, but it will certainly

16   be on the Commercial Register file.  He was an officer

17   and the director of AmeriMark Group.  Whether or not he

18   was -- and, again, though this document says it's dated

19   June 2019, I'm not sure exactly when it was printed, and

20   I'm not sure which draft this is.  This is a draft

21   document.  It's possible that Mr. Hueser's name was

22   removed later.

23      Q.    What were Mr. Hueser's responsibilities as

24   European markets advisor?

25             MR. WORDEN:  Calls for speculation.  You can

1   answer.

2        A.   It does call for speculation, but also, as I

3   pointed out, it says European markets advisor here.  It

4   doesn't mean he was.  This is a draft document.  I don't

5   know what the original said.  I'm happy to talk about

6   his responsibilities, but let's be careful about this

7   European markets advisor term, shall we.

8        **Q.   Sure.  So was he or was he not the European**

9   **markets advisor for AmeriMark Group?**

10       A.   I don't know that title.

11       **Q.   Okay.  What were his responsibilities with**

12   **respect to AmeriMark Group?**

13       A.   Mr. Hueser was a consumer finance specialist,

14   and I believe that he came through Mr. Leshem when

15   Mr. Leshem was looking for somebody who would be able

16   to --

17            Just -- excuse me for just a second.  I'm

18   sorry.

19            -- looking for somebody who would be able to

20   take the Markosian formula and translate it into

21   something that worked in Europe.  Mr. Hueser, initially,

22   I think approached this as an entrepreneurial project.

23   It wasn't really clear what we were going to do.  I wish

24   I had, actually, in front of me the commercial registry

25   entry so I could tell when he officially became an agent

1   because then I could use that as an anchor to tell you

2   kind of how his responsibilities evolved.

3            But in any event, the first kind of issues

4   that I think we were thinking about when it came to what

5   would be -- European operations were, (a), you love to

6   borrow money in Switzerland.  I mean Swiss finance is

7   borrowing money in Switzerland and borrowing it

8   extremely and expensively.  It's fantastic.  So our

9   first idea before encountering Mr. Hueser was that we

10  would use Swiss financing to basically replicate what

11  Rymark was doing with APG Financial or something like

12  that.  I'm not sure exactly how it would have worked.

13  I'm not sure we would have had a captive finance

14  company.

15           And at the very beginning, of course, right

16  after the listing here, the listing being in August,

17  finally completed in August.  At the very beginning,

18  these were sort of nascent concepts.  The kind of

19  preference that was expressed by the exchange to have

20  some kind of European connection was expressed by

21  Mr. Wenzl either towards the end of the listing process

22  or maybe afterwards.  I don't actually remember.

23           But in any event, we took it seriously, and

24  Mr. Hueser's first kind of task was to figure out how

25  could we use Swiss financing to do this, and what

 1   structure would you use?  For instance, would you simply

 2   lend money from a Swiss bank, Credit Suisse still in

 3   existence at the time, into AmeriMark Group and then use

 4   that as directly to a subsidiary?  Would the subsidiary,

 5   if you need one operating in Europe, borrow money

 6   directly?  So this is a question that we didn't really

 7   have any way to know about, and one of the reasons

 8   Mr. Hueser was brought on board, my understanding, was

 9   to plug in to consumer credit expertise.  Excuse me

10   again.  I'm sorry.

11          What emerged -- and we didn't know it at the

12   time -- is that the consumer finance infrastructure,

13   regulatory infrastructure in Europe and in particularly

14   Germany is incredibly stringent.  We didn't know that

15   until Mr. Hueser described it.  It was supposed to be

16   his area of expertise, and I think, you know, he proved

17   that it was.

18          And one of the things that he pointed out very

19   early on was there would have to be a German entity.  My

20   understanding is that he went around and had a number of

21   talks with a number of organizations.  He started

22   writing reports.  I think the first one is from the end

23   of 2019.  And in the reports, he describes talking with

24   people, potential partners both in the finance side and

25   on the buying cars side, the infrastructure side -- I

 1    guess I should call that the inventory side -- that

 2    these partners in Germany would want to deal with other

 3    German entities.  The reason being that as soon as you

 4    start cross-border financing, it gets incredibly

 5    complicated from a regulatory perspective.

 6              And so, also, you'd have non, you know, sort

 7    of matching regulatory regimes, a Swiss regulatory

 8    regime in the Ukraine Union and Germany.  So one of the

 9    first tasks that he had was to form a company in Germany

10    that could address this, and this was not our idea

11    particularly.  It was Mr. Hueser's idea.

12              Mr. Hueser also did, early on, quite a lot of

13    research on exactly what the Markosian formula --

14    translated Markosian formula would look like.  So he

15    came up with some really interesting ideas.  The one is

16    immobilization.  He came up with the idea -- I don't

17    know if he came up with the idea, but he proposed the

18    idea that a way to deal with impoundment, repossession

19    risk, was to be able to remotely immobilize a vehicle.

20    I don't think that's all that sophisticated in 2019,

21    2020, but, you know, we hadn't really thought about it,

22    and I think Rymark at least does it now, you know, or at

23    least uses GPS tracking to minimize repossession risk.

24    So that was really kind of a mirror, you know, of the

25    concept.  I don't know if they actually strictly do

 1    immobilization.

 2              In his reports he describes talking to

 3    Santander Bank about doing financing, and the problem

 4    with Santander Bank, according to Hueser, is that their

 5    kind of credit scale -- I don't know that the court

 6    reporter can see what I'm doing -- the credit scale was

 7    higher; so the floor of credit was higher.  They don't

 8    really have FICO scores in Germany.  They do have some

 9    kind of credit ratings.  And so I don't know the exact

10    specifics of how credit is rated, but there was

11    definitely a perception that Santander was sort of not

12    going to do the kind of business that Rymark was going

13    to do, but Hueser came up with an idea to solve that

14    problem.

15              And when I say this, every time, you know, I

16    go along and I talk about the entrepreneurial kind of

17    bent to Mr. Hueser, I'm talking about this, you know,

18    this idea that -- and by the way, he was paid very

19    little money at the beginning -- I think almost nothing

20    in the beginning and eventually later, you know, quit

21    because he wasn't being paid at all.  We'll get to that

22    later maybe.

23              But so continuing to his responsibilities, he

24    came up with the idea or at least transplanted the idea

25    from somewhere of the credit improvement, which I think

 1   is also a Rymark concept.  I remember seeing, you know,

 2   an executive business summary in production in a Word

 3   document came from Mr. Markosian, Mr. Hesterman, that

 4   was specifically to sort of fill in the business plan

 5   pieces of -- of the applications, and that included this

 6   kind of long description.  And I found a lot of that

 7   stuff translated sort of into a European Union German

 8   sense.  So that was part of his responsibility.

 9           And he didn't -- I didn't report to him.  He

10   didn't report to me, but that was definitely kind of the

11   pattern that he was going to translate the Markosian

12   ideas into Markosian formula, which had been, you know,

13   prominent on the AmeriMark website for instance into the

14   European sphere.

15           So when Santander gave his floor concept,

16   Hueser came up with the credit enhancement idea.  Okay.

17   well, then, we need -- we, AmeriMark, whichever entity

18   it would be because there was three eventually when he

19   formed AmeriMark Deutschland GmbH -- these entities

20   would then sort of service this market, and Santander

21   was apparently very interested in allowing the upside of

22   that -- like the trade up into Santander's --

23   Santander's financing portfolio.  So it was almost like

24   an entry level outside provider AmeriMark would be to

25   fill in Santander's profile by improving the credit of

 1    AmeriMark customers in Europe.

 2             The other thing that he was responsible for

 3    doing -- and, you know, by the way, you read his

 4    reports, and he reports in great and exact detail.  Even

 5    talking about renting offices, he had the address for

 6    the offices he was potentially going to rent, and I

 7    don't remember what they were, but they were in Germany.

 8    I think he was near Hamburg.

 9             He was then also obviously going to have to

10    deal with how to acquire inventory and so, apparently,

11    had conversations with two or three Mercedes-Benz

12    dealers.  Over here, of course, we think

13    Mercedes-Benz -- oh, it's a luxury car.  Germany,

14    Mercedes-Benz is a Ford; right?

15             So that actually was pretty interesting, and

16    he had gotten some good traction on that.  He also was

17    going to be responsible for some kind of integration

18    between all these pieces, and to this extent he talked

19    both to Santander -- and I thought there was another

20    bank too, a German bank, but it's in his reports, but I

21    don't remember it offhand.  But Santander was extremely

22    interested in connecting them with the portal.

23             So now you've got kind of the concept.  Down

24    here.  Let's feed Santander -- Santander's conversations

25    feature all over his reports, which span, I think, 2019

```
 1   to 2021.  I think there were three or four detailed

 2   reports.

 3              So then that would fill from here up into

 4   Santander, and then Santander had a financing portal

 5   also.  It wasn't clear to me always what the connection

 6   there was going to be, and then the other side, of

 7   course, is inventory.  He describes meeting with ALD

 8   Leasing.

 9              ALD Leasing is one of the largest leasing

10   operations in -- on the continent of Europe for sure.

11   Today, they have something like 200 to 220,000

12   automobiles in inventory, and the last I looked, their

13   revenue from 2023 is 1 billion euro.  Also -- and this

14   has been a bone of contention between the parties for

15   some period of time.  ALD Leasing has some very

16   interesting pair of partners.

17              (Reporter clarification.)

18   A.    ALD has a very interesting pair of partners --

19   Mobile.de and AutoScout24.  So the responsibilities that

20   he had were essentially to craft all of that, and those

21   responsibilities evolved from come up with the concept,

22   make reports, to eventually implementation, which, of

23   course, never happened.

24              Now, in addition to that -- and it does say

25   here that he was connected to the listing process;
```

 1  right?  He's in this information document.  He met twice

 2  in person with the entire listing committee at the

 3  Vienna Stock Exchange.  His first meeting he describes

 4  as being three to four hours, and his second meeting --

 5  which took place when John Kirkland, as I mentioned

 6  earlier in this deposition, was presenting to the same

 7  people in face time and realtime -- took something like

 8  four hours.  He'd fly on his own dime out there to have

 9  those meetings.

10          By the way in those meetings -- sorry to say

11  it again -- but in the second meeting, Whitetree Capital

12  is the largest single shareholder.  AmeriMark Group was

13  repeatedly mentioned in John Kirkland's presence because

14  the exchange was in interested in WhiteTree capital, it

15  being the largest shareholder.  That was Frank Hueser's

16  role.

17          And, honestly, if you read his reports and

18  look at the details, he talks about places, names,

19  companies he's talked to, what the discussion was, what

20  they were interested in, what they weren't interested

21  in.  That was his role, and those were his

22  responsibilities.

23      **Q.  And, eventually, he quits because he's not**

24  **getting paid; correct?**

25      A.  Around 2021 or 2022.  And then I can't

 1  remember when he came immediately off the commercial

 2  register, but eventually he was off the commercial

 3  register as well.

 4      Q.   Why wouldn't Capana just pay him?

 5      A.   Well, at that point you have to remember,

 6  Mr. Markosian had written the false letter of

 7  September 16, 2020.  Mr. Hueser continued to work on,

 8  but certainly an expansion at that point when you're

 9  trying to sort of save your company and get

10  Mr. Markosian and the other defendants to come to their

11  senses is a tough thing to do.

12           And I have to point something else out.  I

13  don't believe anymore that Mr. Markosian ever intended

14  to help fund the European expansion.  I think if he --

15  if he had -- and he certainly knows what that means, and

16  he has an able chief operating officer in John Kirkland.

17  He knew what it was going to take to do that expansion.

18           You asked why didn't Capana fund it?  Why

19  didn't Mr. Markosian?  And at the same time, you know,

20  we're putting fires out in the company at this point.

21  Mr. Markosian has left a trail of debt, you know, quite

22  wide in tax liabilities and everything else.  I'm amazed

23  Mr. Hueser held on as long as he did.  I'm glad that he

24  did, but I'm amazed.

25      Q.   The Mobil.de and AutoScott24 press releases

1    that you and I have looked at before came many months

2    after Mr. Pehrson's September 20th letter; right?

3         A.   They did, evidencing Mr. Hueser continuing to

4    work.

5         Q.   You can put that one to the side.

6                   (Exhibit D 129 was marked.)

7         Q.   (BY MR. RICHARDS)  Mr. Bernhardt, you have in

8    front of you an email chain dated November 2019;

9    correct?

10        A.   Yes.  And I recognize this chain.

11        Q.   So let's start on Bates page 7455.  Do you see

12   where I mean?

13        A.   I do.

14        Q.   The bottom email on this page is from

15   Mr. Leshem to Mr. Colshorn dated November 4th.  Do you

16   see that?

17        A.   I do.

18        Q.   And the subject is AmeriMark open issues; yes?

19        A.   It is.

20        Q.   And Mr. Leshem says, "Dear Nicolai.  AmeriMark

21   is still getting some questions from Vienna Borse.

22   Would it be possible simply to have your office answer

23   their number in German as AmeriMark and simply take

24   messages?  This is important to the exchange.  Right now

25   it goes to an English voicemail."

1              Do you see that?

2        A.    I do.

3        Q.    **Why was it important to the exchange to have a**

4   **number be answered in German as AmeriMark?**

5              MR. WORDEN:  Calls for speculation.

6        A.    It does call for speculation.  I don't know

7   exactly what the exchange -- why that was particularly

8   important.  I could guess, but I'd rather not.

9        Q.    (BY MR. RICHARDS)  And I think you just

10  described the exchange at least having a preference that

11  listed companies have a European presence; is that

12  right?

13       A.    That's not what I testified.  I had said that

14  they had a preference specifically for AmeriMark and

15  that the preference was expressed, I think, by Martin

16  Wenzl anecdotally.  I don't think it was for listed

17  companies.  In fact, there's several listed companies I

18  believe even today that don't have European operations.

19       Q.    **Well, and the Vienna Stock Exchange was under**

20  **the impression that AmeriMark was at least pursuing**

21  **business opportunities in Europe; correct?**

22       A.    Well, in what time period are we talking about

23  now that Vienna had this impression?

24       Q.    **November 2019.**

25       A.    Well, I can't see that from this email.  This

1   email is talking about a phone being answered in German,

2   not an impression of European anything.

3        **Q.   Why would it have been a problem to just have**

4   **the phone answer in English?**

5        A.   Well, why would it be English when it's a

6   Swiss company?  English is not an official language in

7   Switzerland.

8        **Q.   Mr. Colshorn replies, "Dear Miron, yes, please**

9   **let me know what we shall do."**

10        **And then Mr. Leshem proposes, moving up the**

11   **page, "Just have the number answer during regular**

12   **business hours by someone in your office in German**

13   **saying, 'Good day.  AmeriMark Group AG.  How may I be of**

14   **assistance?'  Then they can take a message.  If asked**

15   **about management, they can say that Herr Frank Hueser is**

16   **in charge of European operations and will return the**

17   **call."**

18        **Did you discuss this plan with Mr. Leshem at**

19   **the time?**

20        A.   I don't know if I discussed him -- with him

21   this in November of 2019.  I might have.  Certainly the

22   issue of infrastructure came up.  Part of this emerged

23   from the fact that the Vienna Stock Exchange, when they

24   started getting more interested in the company, they

25   came closer to the company, and when there were problems

1    with the company -- wanted to have infrastructure that

2    didn't cause anybody calling us to then call them and

3    say, "I'm not sure who I was able to talk to."

4            Mr. Wenzl was starting to -- I think maybe

5    it's not until later that Mr. Wenzl starts getting

6    purported investor emails and such and such, but he made

7    a good point.  And the information document makes it

8    very clear that AmeriMark Group is a -- is a holding

9    company for -- for operating subsidiaries.  So it wasn't

10   expected at the very beginning.  I don't recall.  The

11   idea that eventually there would be an expansion of the

12   Markosian formula into Europe was an aspirational and

13   forward looking.

14           But, yes, certainly you do want someone that's

15   trying to reach the company or there's somebody who's

16   interested in the posted information memorandum or the

17   valuation report, you definitely want somebody to

18   answer.  And I remember at the time that Mr. Colshorn --

19   mostly all his business -- the numbers would forward

20   sort of direct to his cell phone.  So what's being asked

21   here that AmeriMark should have really its own presence

22   seems quite reasonable to me.

23       Q.   Now, let's turn to Bates 7454.

24       A.   I'm there.

25       Q.   And the first complete email on this page is

CAPANA SWISS ADVISORS AG vs RYMARK                                          30(b)(6)
SHAEN BERNHARDT - 01/24/2025                                               Page 258

 1    from Mr. Leshem to Mr. Colshorn.  Do you see that?

 2        A.   I do.

 3        Q.   And Mr. Leshem says, "Yes, correct, but I

 4    expect very few calls.  We just need to make sure that

 5    when Wenzl checks, everything is correct."

 6             What does that mean?

 7        A.   Well, exactly what it says.  Mr. Wenzl is

 8    checking boxes.  Like, look, you know, the company needs

 9    to have its own phone number, no matter what it does, no

10    matter how much it's doing.  We should have its phone

11    number so when he checks, he can check his box.

12        Q.   But the company didn't have its own company

13    phone number; correct?

14        A.   No.  I just think I testified that at this

15    point Mr. Colshorn was getting these on his cell

16    phone -- that they were forwarding -- there may have

17    been, like, a general Econ commercial company phone

18    number, and I think -- this is -- this is just my vague

19    memory on this.  This isn't something that I studied for

20    this deposition, but my memory of it is that, generally

21    speaking, if you call the main office, you get

22    Mr. Colshorn's phone -- cell phone -- or perhaps

23    Ms. Kuster would answer.  There were a couple of other

24    employees in there too.  But Mr. Wenzl made a good

25    point.  This is now -- what -- November?  So the

 1   company's been listed for a few months.  It should have

 2   its own phone number.

 3        Q.   And the phone number needs to be in German?

 4        A.   Well, the answer should be in German.  It's a

 5   Swiss company.  English, as I already testified, not an

 6   official language in Switzerland.

 7        Q.   And everything is correct.  Why would it be

 8   incorrect to have a phone number answered in English?

 9        A.   I don't think that's what this is saying.  I

10   think -- is correct -- I mean, the word "okay" is -- you

11   know, originally stands for "all correct."  Everything

12   is correct.

13        Q.   You can put that to the side.

14                  (Exhibit D 130 was marked.)

15        Q.   (BY MR. RICHARDS)  Mr. Bernhardt, you're

16   looking at Exhibit D 130, which is a November 22nd,

17   2019, email from Mr. Kappeler to Mr. Wenzl; correct?

18        A.   That is correct.  What date did you say?

19        Q.   November 22nd, 2019.

20        A.   That's correct.  Yeah, I got it.

21        Q.   The letter I had -- one page exhibit -- so

22   what you'll see here is the letter which is in German

23   and the exhibit in German, and then you'll see the

24   letter translated to English --

25        A.   I see that.

 1       Q.   And the exhibit translated to English.  Do you

 2   see where I mean?

 3       A.   I do.

 4       Q.   So let's go to Bates page ending in 036 in

 5   English.

 6       A.   Yes.

 7       Q.   And Mr. Kappeler begins this letter by saying,

 8   "Dear, Mr. Wenzl, I refer to our previous correspondence

 9   and would like to present the following additional

10   information regarding AmeriMark Group AG (the 'Company')

11   divided into two topics.

12            "Commencement and expansion of business

13   activities in Europe.

14            "I have received from the Company an interim

15   report on the establishment of business activities in

16   Europe, written by Mr. Frank Hueser, which I am pleased

17   to attach to this letter.  At the moment these

18   activities are not yet public; therefore, I request your

19   confidential treatment."

20            Do you see that?

21       A.   I do.

22       Q.   Had business activities commenced for

23   AmeriMark Group in Europe?

24       A.   Well, I think you refer to Frank Hueser's

25   report.  I've read the report fairly carefully, and I

 1   don't have any reason to believe that anything in that

 2   report was inaccurate.  Notice that he talks business

 3   activities in Europe but prefers Mr. Wenzl specifically

 4   to that report.  So any definition business activities

 5   in Europe that the defendants would like to try and

 6   drive a truck through should be limited by that report.

 7        **Q.   Let's look at the report, which is attached as**

 8   **an exhibit.  This is Bates 38.  Do you see where I mean?**

 9        A.   I do.

10        **Q.   And the title of this is "Attachment:**

11   **Statement on the sales activities of AmeriMark AG."**

12             **Do you see that?**

13        A.   I do.

14        **Q.   What sales activities have there been?**

15        A.   You're going to have to ask Mr. Hueser

16   specifically, but when you read through the report and

17   he describes what he's done here, I have no reason to

18   believe that any of this is wrong.  It's a great detail,

19   as I identified before we even looked at this exhibit

20   because I've read these reports before in preparation

21   for this deposition.

22             Mr. Hueser obviously is doing very detailed

23   reports.  He's talking about specific companies that

24   he's meeting with.  He's talking about specific

25   discussions with those companies.  He's talking about

1   specific people at those meetings and what he discussed

2   with.  This is exactly what I was talking about from

3   memory.  I actually forgot that he had BMW involved

4   here.

5            I have no reason whatsoever to doubt that all

6   of these activities were done.  Mr. Hueser was a very

7   detailed-oriented guy.  He made regular reports.  This

8   is only one.  You know, I'm not sure what it is -- that

9   more one could could expect from somebody, especially

10  given the process that this is a startup.  He has very

11  little resources -- no resources given to him.  He

12  traveled around at his own dime, my understanding is.

13  He actually capitalized AmeriMark Deutschland on his

14  own.  Never got repaid for that.  The company was

15  eventually stricken from the record for lack of

16  capitalization because nobody would support it, because,

17  I'm afraid to tell you, your clients lied, stole, and

18  cheated.

19           You know, honestly, every time I think about

20  Hueser, it just -- it's sad.  What does the guy get in

21  exchange for all of this, having not been paid?  He gets

22  sued by you guys.  I bet he doesn't even know he's been

23  served -- that you're trying to serve him.  What did

24  Frank Hueser ever do to you people?  And on what

25  basis -- I'm sorry, but I have to defer it when we're

1    talking about whether these sales activities happened --

2    on what basis was he added to the complaint?  On what

3    basis?  The absence of evidence is evidence of absence?

4    Is that what we're reduced to?

5              I'm sorry.  I have a temper about the Hueser

6    issue.  I will return to the point.

7              I have no reason whatsoever to believe that

8    there's anything in here that's not accurate, and

9    Mr. Hueser was a very competent, in my view, executive.

10   He served faithfully with the very little resources and

11   almost no compensation, and he deserved better.

12       Q.   Did Group ever sell any cars in Europe?

13              (Reporter clarification.)

14       A.   I'm not aware that it did.  If Mr. Markosian

15   perhaps hasn't stolen dividends and sucked the money out

16   of the company, he might be a centi-millionaire today on

17   this deal instead of having cheated on his taxes and

18   lied to the IRS for eight years.

19       Q.   Did Automotive ever sell any cars in Europe?

20       A.   Not that I'm aware of.

21       Q.   Did either of those companies ever buy any

22   cars in Europe?

23       A.   Well, no, but let's talk about what Mr. Hueser

24   did to sort of prompt them to buy companies in Europe.

25   You and I have talked about in the past in a very

CAPANA SWISS ADVISORS AG vs RYMARK
SHAEN BERNHARDT - 01/24/2025

 1    frustrating way for me about Mobile.de and AutoScout24.

 2    I remind you those are partners of ALD Leasing.

 3    Mr. Hueser was very, very intent on finding a way to

 4    source automobiles, to source automobiles and bring them

 5    into the structure.  I've already testified to that.

 6    I'm not sure what the relevance is whether they sold the

 7    car or not.

 8            Mr. Markosian knew what it took.  Mr. Kirkland

 9    knew what it took when he was sitting here while Frank

10    Hueser was presenting these plans to the Vienna Stock

11    Exchange and said nothing.  Where were [sic]

12    Mr. Kirkland helping out with the organization?  Where

13    was Mr. Markosian helping out with the organization?

14    Nowhere.

15        **Q.   What did Mr. Markosian get in exchange for his**

16    **$125,000 except this lawsuit?**

17        A.   He got his company listed, and he got foreign

18    investors lent to the company and kept the company

19    sustained when he abandoned it.  The listing agreement

20    said list the company -- it said Marche Libre

21    originally.  Eventually, it did get listed.  That part

22    of the contract was fulfilled except for the detail of

23    Marche Libre.

24            What else did he get?  Well, he was promised

25    to have foreign investment.  He borrowed 250,000 euro

CAPANA SWISS ADVISORS AG vs RYMARK
SHAEN BERNHARDT - 01/24/2025

30(b)(6)
Page 265

```
 1   from Orie Rechtman for the process.  Poor Miron Leshem,
 2   whatever we may think of him, went out-of-pocket
 3   substantially more than $125,000 in order to push this
 4   deal through.  I see -- all I see, when it comes to the
 5   listing agreement, is Mr. Leshem, and to some extent
 6   Mr. Hesterman until the defendants decided to throw him
 7   under the bus, working diligently trying to meet their
 8   requirements.  I think he got a lot.  The fact is, he
 9   probably would have gotten a lot more if on September
10   16th, 2020, he didn't lie.
11        Q.   So he ends up net negative $95,000, yes?
12        A.   Who?
13        Q.   Mr. Markosian.
14        A.   How is that true?  His listing fee was 125,000
15   to have his company listed, which it was, and to have --
16   to secure European financing, which it did.
17        Q.   And now --
18        A.   How is he out that money?
19        Q.   Well, and now --
20        A.   He paid for services; the services were
21   provided.
22        Q.   And now he owns 24 percent of a company that
23   has nothing -- no assets except the company he started
24   with; correct?
25        A.   Well, Mr. Markosian made that deal, didn't he?
```

1      Mr. Markosian chose to pursue the 4Service Cloud listing

2      which diluted him to some extent.  Mr. Markosian chose

3      to make a deal with WhiteTree.  Don't forget he owns

4      Whitetree shares as well at this point.  It's not my

5      choice.  Nobody in this -- I don't think -- made these

6      decisions for Mr. Markosian.

7              Not only that, but if you go all the way back

8      to the original listing proposal, it always contemplated

9      a major piece of dilution from Mr. Markosian.  Back

10     then, it was because he was going to merge with Homes

11     Motors.  I think I remember that he was going to end up

12     with less than 50 percent of the larger company because

13     it was a larger company.

14             He went through a process.  He got diluted.

15     He obtained investors.  That's how it works.  That's

16     exactly how it works, and I'm sorry, but this idea that

17     somehow Mr. Markosian and Ms. Small and Mr. Kirkland,

18     who committed fraud within three weeks of starting this

19     project, are somehow poor, humble people who innocently

20     got trapped.  I used to believe that.  I really did.  I

21     had my theory, and I talked about it before, that he

22     just got wound up in the downward spiral because of the

23     shareholder signature issue because he got tired of

24     sending David Hesterman to Park City to collect

25     signatures from Eric Gardiner, but I don't see that

1    anymore, and it was preparing for this deposition that

2    finally put it together for me -- all together.

3            They cheated from day one.  They created a

4    company that was fraud from day one.  It was birthed in

5    fraud because Rymark Properties -- among other issues,

6    Rymark Properties was never in it, and then they doubled

7    down on that fraud when they signed those documents

8    again on April 26th, 2018.  So I'm sorry.  To suggest

9    that Mr. Markosian is out money is absurd.

10       Q.   You can put D 130 aside for now.

11            (Exhibit D 131 was marked.)

12       Q.   (BY MR. RICHARDS)  Mr. Bernhardt, you have in

13   front of you an email dated February -- Mr. Bernhardt

14   you have in front of you an email dated February 1st,

15   2021, from Mr. Colshorn to you; correct?

16       A.   That is correct.

17       Q.   And Mr. Colshorn says, "Hi, Shaen, are the

18   attached invoices paid??  BankM will not work for

19   Amerimark again until these bills are also paid.

20   However" -- let's pause there.

21            Why did -- why did AmeriMark need BankM to

22   work with it again?  Was it to list the bearer shares?

23       A.   No.  The moment that your transfer agent

24   quits, the exchange kicks you off the exchange.  The

25   transfer agent is a mandatory component to being on the

1    exchange, and this was a crisis, and it wasn't the first

2    one.  The company had so many problems, and, again, how

3    are you going to attract investment, you know, when the

4    defendants are sticking their fingers in their ears and

5    saying, "La, la, la, we've never heard of you before."

6    So, yes, the problem here was severe.  If BankM

7    terminates the agreement, which Mr. Markosian signed,

8    the stock exchange would eject the company.

9        Q.    Next sentence.  "However, if I do not provide

10   Mr. Wenzl with a timetable today, AmeriMark will have

11   big problems with the Vienna Stock Exchange."

12            What time table was Mr. Wenzl demanding?

13       A.    When are these bills going to be paid, I

14   think.  I don't remember this specifically.  When

15   will -- and, you know, in fact, I also remember at this

16   time that, actually, the Vienna Stock Exchange, or the

17   FMA -- I think bills came from the FMA, which is the

18   financial regulatory agency in Austria and the stock

19   exchange bill too -- they have a annual bill.  This is

20   February.  I imagine their annual bill was in, and I

21   think that was 1,000 francs or 2,000 francs.  Maybe that

22   was in Europe because it was from Austria.

23            The company was in distress.  I don't know

24   exactly what time table he's talking about, but I'm sure

25   Wenzl was on about something else because it was very

1    hard to maintain the infrastructure of the company in

2    this condition.

3        **Q.   I mean, Wenzl had complaints with the company**

4    **almost until it was delisted; correct?**

5        A.   When you say since the beginning, I think his

6    first complaints were with Coenen that extended into

7    complaints with the company; but, yes, on again, off

8    again, there were lots of problems.  It's a small

9    company with a lot of growing pains.

10       **Q.   You can put this one aside.**

11           **Let's mark Exhibit D 132.**

12               (Exhibit D 132 was marked.)

13       **Q.   (BY MR. RICHARDS)  So, Mr. Bernhardt, I've**

14   **handed you a document that has a Bates stamp Whitetree**

15   **29 on it.  Do you see where I mean?**

16       A.   I do.

17       **Q.   And this is an email chain.  I trust you've**

18   **seen this before?**

19       A.   I have.

20       **Q.   When's the first time you saw this email**

21   **chain?**

22       A.   A few weeks ago.  I'm guessing.

23       **Q.   The email chain begins with an email from**

24   **Mr. Leshem.  This is on Bates 30.**

25           **Do you see where I mean?**

```
 1        A.   I do.

 2        Q.   And its sent to someone that Mr. Leshem

 3   addresses as Herr Reedstein.  I gather that's Martin

 4   Reedstein from other emails in this chain.  Do you

 5   agree?

 6        A.   I do see that.

 7        Q.   What do you know about Mr. Reedstein or

 8   Reedstein?

 9        A.   Well, it appears that he was the one who

10   introduced Whitetree, and I think he was connected to

11   Whitetree in some sense before this.  It's certainly

12   what I gather from this.  His name rings a bell.  I

13   think it's in perhaps a piece of production or at least

14   there's a Reedstein in production with reference to

15   Ms. Kuster at AmeriMark saying someone who has paid a

16   bill.  I'm doing this pure from memory, and I think it

17   was only the last name.  You know who paid the bill?

18   And it was an AmeriMark bill, and the answer was

19   Reedstein.  I searched for the name in production after

20   I first looked at this material.

21        Q.   And only found that one other document to your

22   recollection?

23        A.   This is the only one that I remember at the

24   moment that caught my eye.

25        Q.   Mr. Leshem's email addresses a number of
```

```
 1   issues that he was dealing with at the time; correct?

 2        A.   We're talking now still about the --

 3        Q.   Yeah, same one.

 4        A.   Yeah.  We have several issues to address.

 5        Q.   I want to look at Item 3, which is on Bates

 6   31.

 7        A.   Yes.

 8        Q.   Do you see where I mean?

 9        A.   I do.

10        Q.   "We will need to deal with the proceeds of

11   future share sales by the U.S. persons shareholders.

12   Any introductions to your banking relationships will

13   prevent problems going forward for the shareholders."

14             Do you understand what Mr. Leshem is

15   describing here?

16        A.   I don't exactly.  I mean, I've looked at this

17   material, and I've taken from this context what it might

18   describe.  I don't want to speculate.  I mean, it does

19   fit in parse and -- part and parcel -- excuse me -- with

20   the problems with U.S. persons that Bendura Bank was

21   expressing.  Bendura Bank was expressing those, in other

22   words, how to get U.S. persons proceeds, how to deliver

23   them their shares.  I'm not sure Bendura said proceeds;

24   right?  But how to deliver them their shares.  And this

25   is October 2018, this email.  Maybe the next one -- is
```

1    30th, but it's earlier -- 30th of October.  It's just

2    after those --

3              I'm sorry.  I keep kicking John.

4              -- it's just after those discussions.  So I'll

5    speculate by saying it seems to me that those issues are

6    connected.

7        Q.   Got it.  It appears from this email chain that

8    this first email that we're looking at now, 30

9    October 2018 at 14:14, is just from Mr. Leshem to

10   Mr. Reedstein.  Is that what you see?

11       A.   It looks that way from the headers, yes.

12       Q.   And then there's a response from Mr. Reedstein

13   where he says, "Miron, thank you for your note.  It

14   could be interested if the listing is quick.  Can we

15   please arrange to receive diligence materials?"

16             Do you see where I mean?

17       A.   I do.

18       Q.   And that also is an email just between

19   Mr. Reedstein and Mr. Leshem, yes?

20       A.   I mean, in the list is a BCC somewhere in here

21   that's not quoted.  These are quotations; right?  So the

22   BCC might not show up.  That's my only comment on that.

23       Q.   Let's turn now to Bates 29.

24       A.   Yes.

25       Q.   Bottom of the page.  So we're moving forward

1    in time.  Miron says, "I think we can help," and

2    WhiteTree Capital -- excuse me -- Mr. Reedstein says,

3    "Miron, I think we can help, and Whitetree Capital might

4    be interested.  Can you please arrange a call with the

5    principals?"  Yes?

6         A.   Yes.

7         Q.   And then Mr. Leshem, in the email above that,

8    arranges a call, lists the participants, Mr. Markosian,

9    Mr. Reedstein, Mr. Keller, and Mr. Leshem.

10             Do you see that?

11        A.   I do.

12        Q.   Have you talked with Mr. Leshem about the call

13   that was supposedly held?

14        A.   I didn't really.  I think he talked about it

15   in his deposition.  I think we -- I can't remember if we

16   knew he was going to be deposed or not -- but this

17   material -- I can't remember when this was produced.

18             MR. WORDEN:  This was -- well, this is the one

19   Chad had for a month until I emailed him and asked him

20   why he hadn't turned it over.  It was never produced by

21   Mr. Markosian, never produced by the defendants, and I

22   only got it because I made some calls in Europe, found

23   out they had sent documents to Chad a month earlier, and

24   he had sat on them, including this one, until I pushed

25   him about it.

```
 1                  (Reporter clarification.)

 2              MR. RICHARDS:  I'm going to move to strike all

 3    of that.

 4              MR. WORDEN:  That's exactly what happened.

 5        Q.   (BY MR. RICHARDS)  I think my question was did

 6    you talk to Miron about this?  And I think your answer

 7    was not really.  Can you explain what you mean?

 8        A.   I didn't talk to him about this email.

 9        Q.   Okay.

10        A.   I'm trying to remember whether or not we saw

11    this before we knew that he was scheduled for a

12    deposition or not.  I can't remember the schedule, but I

13    do remember at one point or another that I thought, as

14    much as I might like to, if he's about to be deposed,

15    probably not a good idea to bring this up.  I do believe

16    that he discussed this in his deposition.  I don't

17    remember it exactly.

18        Q.   What do you recall him saying about it?

19        A.   In the deposition?

20        Q.   Yeah.

21        A.   I don't remember.  Frankly, the whole --

22    this -- this whole production makes me angry.  So I -- I

23    don't remember exactly the deposition.  So --

24        Q.   The next email in the chain appears to be from

25    Mr. Markosian; yes?
```

```
 1        A.    It does.
 2        Q.    Sent to Mr. Leshem with copies to Mr. Keller,
 3   Andrea Voss, mr@vossreedstein.  I assume these are --
 4        A.    I see some initials, and I see what you're
 5   saying.
 6        Q.    And the email says, "This is fine with me,
 7   Nick."  Do you see that?
 8        A.    I do.
 9        Q.    And then Mr. Keller appears to forward this
10   whole thread to Ms. Zorkadi, yes?
11        A.    I see that.
12        Q.    Have you spoken with Ms. Zorkadi about this
13   email?
14        A.    Not about this email.
15        Q.    Have you spoken with her about something else?
16        A.    Yes.  I've had, I think, a couple of
17   discussions with Ms. Zorkadi going back to the annual
18   meetings of AmeriMark Group, which was, after all, the
19   signatory for the largest shareholder of the company.  I
20   talked to her, I think, in relation to either the
21   scheduling of the annual meeting -- I've testified about
22   this before -- either the schedule of the annual meeting
23   or the proxy materials that had to go to WhiteTree or
24   something about the organization, of her participation,
25   the company's participation in the annual meeting.
```

```
 1              Also -- yeah.  That's -- and maybe I talked to
 2    her twice, once or twice, and that would have been,
 3    like -- I can't remember if this was the 2019 meeting,
 4    annual meeting, which would mean it was sometime in
 5    early 2020.  I think that must have been it.  I think it
 6    must have been around that time frame.
 7         Q.   You haven't spoken to her since the
 8    commencement of this litigation; correct?
 9         A.   I have not.
10         Q.   Have you tried?
11         A.   I have, repeatedly, actually.
12         Q.   You just never got anywhere?
13         A.   We also did -- when you say the commencement
14    of this litigation -- and I testified about this before.
15    You know, we had limited what we could do to investigate
16    Whitetree after this, but certainly we looked around,
17    and I got ahold of somebody, and I testified about this
18    before in Switzerland that was connected with the --
19    what it appeared to be -- what now definitely appears to
20    be one of the affiliated companies, a Whitetree Capital
21    in Zug.
22              And I had a discussion back and forth about
23    the structure because at that time I was trying to get
24    the transfer of shares from WhiteTree to then -- I think
25    it was Capana by then.  I was wondering if that couldn't
```

 1    be a Swiss-to-Swiss transfer then rather than a Cyprus

 2    because it would have pressed a lot of risk out of the

 3    transfers.  You and I talked about that at great length,

 4    I believe, in September.

 5              I mean, those are the discussions I had with

 6    WhiteTree.  I definitely tried to poke around but

 7    haven't had very much luck.

 8              Did I mention that I thought I talked to -- I

 9    think it was the lead person, and I think he was --

10    that's -- those are the connections that I remember

11    having.

12         **Q.   You don't have any other information or**

13    **knowledge about this email chain; correct?**

14         A.   I mean, what do you mean by information or

15    knowledge?

16         **Q.   I mean have you spoken to anyone who was**

17    **involved in this supposed call or is on this email**

18    **chain?**

19         A.   I had some conversations with counsel that I

20    can't discuss.

21         **Q.   Sure.  Yeah.  I'm not asking about that.**

22    **Other factual information about this email chain you**

23    **don't have; is that right?**

24         A.   What do you -- I don't know what you mean by

25    factual information.

1         Q.    That's fine.

2         A.    This was a surprise.

3         Q.    The bottom of the page in the footer in the

4    bottom right, do you see -- there appears to be a date

5    and time stamp.  Do you see where I mean?

6         A.    I do.

7         Q.    I assume you don't know anything about that?

8         A.    Oh, the date and time stamp?

9         Q.    Yeah, why it's there, when these documents

10   were created.  Do you know anything about that?

11        A.    I assume that this was -- I don't know.  Date

12   and time stamp -- does it come from the email software?

13   Does it come from the --

14        Q.    Oh, yeah.  I'm sorry.  I should have

15   clarified.  It was on the documents when we received

16   them.

17        A.    I don't know anything about that.

18        Q.    All right.  That's what I figured.  All right.

19   Let's mark --

20            MR. WORDEN:  Stephen, while we're here, did we

21   get every document that was in that DHL packets to Jeff?

22            MR. RICHARDS:  There may have been a cover

23   letter that you may have not gotten, but any production,

24   yeah, and if you want to circulate a letter, I can see

25   if I can dig it up.

```
 1              MR. WORDEN:  I don't have to see it now, but
 2     at some point please.
 3              Has Chad received anything else from --
 4              MR. RICHARDS:  Not to my knowledge.
 5              MR. WORDEN:  -- anyone at WhiteTree?
 6              MR. RICHARDS:  Not to my knowledge.
 7                  (Exhibit D 133 was marked.)
 8         Q.   (BY MR. RICHARDS)  This is another email chain
 9     from the WhiteTree production.  Do you see that,
10     Mr. Bernhardt?
11         A.   I do.
12         Q.   And this email chain begins on page 2 with an
13     email from Mr. Leshem about a quarter of the way down
14     the page.  Do you see where I mean?
15         A.   I think I do, yes.
16         Q.   And he says, "Gentlemen, thank you for a
17     productive call.  As discussed, I proposed some
18     following next steps.  One, WhiteTree to provide a draft
19     term sheet for review by Voss Reedstein.  The goal is to
20     develop a final binding AmeriMark term sheet within the
21     next five days.  Two, I will provide KYC materials for
22     Mr. Markosian.  Three, Voss Reedstein to provide
23     introductions to potential paying/transfer agents.
24     Four, Voss Reedstein to provide introductions to banking
25     relationships for AmeriMark Group's U.S. shareholders."
```

```
 1              So let's start with number one.  A final
 2    binding term sheet -- do you know whether one was
 3    executed within five days of this email?
 4         A.   Let me read this again.  Why one was -- what's
 5    your question again?  I'm sorry.
 6         Q.   Let's look at Roman I --
 7         A.   Yeah, I got it.
 8         Q.   Do you see what I mean?
 9         A.   Yeah.
10         Q.   Do you know whether a final binding AmeriMark
11    term sheet was, in fact, executed within five days of
12    this email?
13         A.   I have no more information about this than the
14    WhiteTree production.  I don't know.
15         Q.   Okay.
16         A.   Also -- let me comment.
17         Q.   Go ahead.
18         A.   A final binding term -- AmeriMark term sheet
19    is, frankly, a weird construction.  It was my reaction
20    when I read this first.  Final binding AmeriMark term
21    sheet.  I mean, they are binding term sheets, but it
22    just -- it seems a weird construction.
23         Q.   I don't disagree with you.
24              Okay.  It's not clear to me from the texts of
25    this email who this email was sent to.  I assume that's
```

1   also not clear to you?  I mean, I gather it was sent to

2   at least Andrew Keller who responds to it, but I don't

3   have any more information than that.  Do you?

4        A.   I mean, there's, like, three levels of

5   quotation here.  If that's your issue, I'd take the

6   point.  I don't know.

7        Q.   And then we see an email from Mr. Keller at

8   the bottom of Bates 32 that continues into Bates 33;

9   yes?

10       A.   32 to 30 -- so we're back -- yes.  Mr. Kelly--

11  Mr. -- yes.

12       Q.   And then on 32, we see additional emails from

13  Mr. Reedstein and then two from Mr. Keller; correct?

14       A.   You're back on 32 again?

15       Q.   32, yeah.

16       A.   Yes.

17       Q.   And Mr. Markosian doesn't appear to be copied

18  on any of these communications; correct?

19       A.   No.  And it's the same assessment I made when

20  I first looked at these.  Finished with that one?

21       Q.   Yep.  We can put that one to the side.

22                 (Exhibit D 134 was marked.)

23       Q.   (BY MR. RICHARDS)  So I've marked D 134.  This

24  is a bit of an odd document in that it appears to be two

25  versions of a term sheet, but the -- the pages of the

 1   first version appear to be one and four, and the pages

 2   of the second version appear to be two and three in the

 3   middle.  This is the order the documents came in in the

 4   mail.

 5        A.   Oh, I see.

 6        Q.   Do you see what I mean, though?  What appears

 7   to be happening, maybe?

 8        A.   I mean, I can't tell.  I guess, to your point,

 9   when I looked at that, I didn't notice this in

10   particular -- that these would be out of order or

11   whether they were out of order.

12        Q.   Let's start on Bates 35.  This document is

13   entitled "Binding Term Sheet, Share Exchange, and Line

14   of Credit."  And it defines a company and an investor.

15   Do you see that?

16        A.   I do.

17        Q.   And -- and I don't see Mr. Markosian

18   referenced in this --

19        A.   I do.

20        Q.   -- term sheet.  Do you?

21        A.   I do.  Under transaction structure,

22   irrevocable grant from AmeriMark Group Nicholas

23   Markosian.

24        Q.   I'm sorry.  I must be looking at the wrong

25   spot.  Oh, I see.  I'm sorry.  Yes, of course.

1       A.   I do see him referenced there, yes.

2       **Q.   Transaction structure -- irrevocable grant**

3   **from AmeriMark Group/Nicholas Markosian, 13 million**

4   **registered shares of AmeriMark Group, 49 percent of**

5   **capital.  Do you see that?**

6       A.   I do.

7       **Q.   And that's 49 percent, you understand, of the**

8   **26.8 million number --**

9       A.   Well, the construction here is unusual but not

10  unheard of.  Like -- so what they're talking about is

11  share capital, by which often times that's done if you

12  have class -- multiple classes of shares or used to have

13  multiple classes of shares because, as was the case with

14  Group, when you have that, you have to be careful that

15  one set of shares doesn't have a higher par of value

16  than the other.  So it's not a totally alien

17  construction.  In this case, by this time -- this is,

18  what, 2019?  -- 2018?  I don't see a date on here.  Is

19  there one?

20      **Q.   No.  But --**

21      A.   We're thinking that this is -- what --

22  December 2018?

23      **Q.   I think it's actually November 2018, but I'm**

24  **happy to leave that concern --**

25      A.   Okay.  Fine.  But the point is -- let's see --

1  the reason I bring this up, why this expression of

2  capital rather than shares -- about to ask the question

3  I don't know in my head at the moment.  Did AmeriMark

4  Group have two classes of shares at this point?  And I

5  think that the answer is it still did.  I think the

6  shares -- the shares were at least dematerialized in

7  2021.  So maybe that's the reference, because AmeriMark

8  Group has two classes of shares, they're expressing it

9  as capital rather than shares.

10      Q.    And -- okay.  And the proposed transaction

11  that seems to be contemplated here is a swap of shares.

12  Who is the grant from on the AmeriMark side?  What's

13  your understanding?

14      A.    Well, it says, "Irrevocable Grant from

15  AmeriMark Gropu/Nicholas Markosian."  That also is a

16  tortured construction, because the company itself

17  shouldn't be granting shares.  The company shouldn't

18  have its own shares.  It's not issuing shares.  Nicholas

19  Markosian, I guess, in the slash is referred to as one

20  of the grantors.  It's a strange construction.

21      Q.    And in exchange someone -- and I think it

22  doesn't say -- is going to receive a grant from

23  WhiteTree Capital limited/Erika Zorkadi.  Same sort of

24  tortured construction; right?  Only one of those two

25  would be granting shares.  You would agree?

 1       A.   Or we're saying that she's the shareholder of
 2   WhiteTree and that Nick Markosian is the shareholder of
 3   AmeriMark that's granting shares.  And you said we're
 4   not sure who it's going to, but since it says in
 5   exchange, I assume that that's cross -- those are
 6   crosses.  And to me, it looks like Erika Zorkadi on the
 7   right, the shareholder, the company on the left, and
 8   Nick Markosian on the right, the shareholder and the
 9   company on the left, and that way it's consistent.
10       Q.   And then a 250,000 euro line of credit from
11   WhiteTree, I guess?  I mean, I think you would agree
12   this is not particularly precise?
13       A.   I would absolutely agree with that.  What I
14   did note the first time I looked at this though is this
15   250 is interesting because it's exactly the amount that
16   was borrowed from Orie Rechtman in the last transaction.
17   I don't know that that's a coincidence, but it did
18   attract my attention.
19       Q.   Do you know whether -- well, let me ask,
20   when -- when did WhiteTree stop paying AmeriMark's bills
21   and Orbital/Capana started paying them?
22       A.   There was some overlap in my recollection.  I
23   think WhiteTree was still paying some invoices, like, in
24   2019, even after May and June when the option agreement
25   was, but they definitely stopped -- I don't know -- some

 1   months after, and I think there was some lingering

 2   things too.  Like, maybe there was an invoice that had

 3   their name on it and they did pay.  I don't remember

 4   that off the top of my head.

 5           I will tell you it wasn't a smooth cutoff, but

 6   there was a point that it seemed obvious that WhiteTree

 7   was just done, because the bills started not being paid.

 8   I thought -- and that, I think, was with Kuster -- was

 9   talking about maybe in relation to the one reach dime

10   reference that I remember is that maybe -- and I'm

11   totally speculating here -- but maybe that was in

12   connection with the bill payment and he was connected to

13   WhiteTree and maybe there was organizing payments from

14   WhiteTree.

15           What I can tell you also is that in the

16   production, the Rymark production, there's that

17   payment -- famous $30,000 from WhiteTree, and that's

18   March 2020 still.  So I don't know.  But in our case, I

19   don't think it was much past that period.  I think it

20   must have been -- beginning of 2020, I don't think there

21   were any more WhiteTree dependents.  I'm doing from

22   memory.

**23       Q.   How much total did WhiteTree outlay to**

**24   AmeriMark?**

25       A.   You know, there was a couple of things in

```
 1  production that actually had a list, and I think it's

 2  because either Colshorn or Kuster asked for it.  You

 3  know, the invoices were paid for by WhiteTree, and there

 4  was a list.  I don't remember how big that was.  The

 5  other thing is we do know that they paid -- so a couple

 6  of things in production.  They paid invoices directly,

 7  not through Rymark or through the company.  And, of

 8  course, that was a problem for -- well, we had Group at

 9  this time, and it had bank accounts, I think.  So I

10  don't know exactly.

11       Q.   Do you know whether it approached 250,000?

12       A.   I don't.  Again, I'm going to speculate.  I

13  really want to go back and look, but I feel like it was

14  at least 100,000 francs, right, but, again, this is from

15  a list.  It's in production.  There's a list there

16  somewhere that seemed to be pretty clear, and there was

17  a bunch of invoices too I remember also.

18       Q.   The next line -- the next term, I guess, is

19  500,000 registered shares of AmeriMark Group reserved

20  for WhiteTree sales?

21       A.   That also attracted my attention when I saw

22  this.

23       Q.   What does this mean?  It doesn't make any

24  sense to me.

25       A.   Well, it's -- again, it's hard to speculate.
```

1    The best guess I can give you is that this is the amount

2    of the 13 million because where else would WhiteTree get

3    shares?  This is the amount -- some subset of the 13

4    million shares, which are reserved for WhiteTree to sell

5    if he wants to.  That was my reaction when I saw this

6    too -- that maybe this is -- we talked about the backend

7    for Mr. Coenen.  Maybe this is the backend compensation

8    for WhiteTree, that they get to take some of these

9    shares and sell them as part of the expense but --

10        **Q.   Wouldn't they have a right to sell any or all**

11   **of their shares?  I don't understand.**

12        A.   And here's where I don't like to speculate,

13   but this is one of the reasons that this makes me angry,

14   right, because if what this is saying -- and it's

15   obviously not clear, but if what this is saying is that

16   WhiteTree was only authorized to sell 500,000 of these

17   shares, then were the rest Mr. Markosian's and this was

18   a front for him to do that?  I don't know, but I don't

19   like implication, but I don't know.

20        **Q.   The next line, I guess, of this says that the**

21   **term sheet is going to be effective upon mutual transfer**

22   **of shares.**

23             **Do you know when shares were transferred to**

24   **WhiteTree?**

25        A.   I only know what I've seen in this production.

1    Shares to WhiteTree from Markosian?

2         **Q.    Mm-hmm.**

3         A.    I only know what I know in this production,

4    and now I'm just going from memory, but I thought there

5    was something regarding January 13, 14, 15, 16,

6    something like that, that involved close -- whatever

7    that meant.  I assume, and I'm not sure it was explicit,

8    that that was mutual transfer of shares -- was the

9    trigger of that, but I'm just -- I don't know.

10        **Q.    Then there's use of proceeds, then fees, and**

11   **then there's conditions, and the first condition says**

12   **investor, and investor, you see at the top, is**

13   **WhiteTree; correct?**

14        A.    Looks like it, yes.

15        **Q.    "Investor may it its option terminate credit**

16   **facility if a material adverse effect or material change**

17   **in ownership has occurred.  Facility fully transferable**

18   **at investor's option."**

19             **WhiteTree did not transfer this facility to**

20   **Capana; correct?  That was not the structure of that**

21   **transaction at all?**

22        A.    No.  This was a surprise.  It was different.

23   We -- as we felt that we were assuming, you know, sort

24   of working capital liabilities, and as you and I have

25   discussed before, that was more an implicit kind of

 1    thing.  I don't remember.  I'd have to go back and look

 2    at the option agreement; right?  But I think we had that

 3    discussion back in September.  But it was definitely our

 4    understanding that we were taking over the working

 5    capital requirements of the company because WhiteTree

 6    wasn't going to pay anymore.

 7           But facility transfer -- I mean, these

 8    conditions look pretty boilerplate-like.  Like this --

 9    this material adverse effect, you know, change -- well,

10    change in ownership has occurred.  I mean, this looks

11    like kind of boilerplate stuff.  We didn't get any

12    information about a facility that I know of.

13    **Q.   So if you'll turn to the very last page of**

14    **this exhibit, Bates 38, I think -- and, again, it's just**

15    **not clear.  This is sometimes the challenge of**

16    **third-party productions.  I think this is supposed to be**

17    **the second page of the term sheet we just looked at.  I**

18    **realize you don't know.**

19           **Notices -- does that address look right for**

20    **AmeriMark Group?**

21    A.   At that time I don't know.  I've seen it

22    before in the past.  I don't know.  This is what?

23    December 2018?  I mean, you can look at the commercial

24    register.  We should have all of the old addresses that

25    were official for the company.

1      Q.   And then there's a signature block for

2   WhiteTree from Ms. Zorkadi, and there's not a signature

3   block for either AmeriMark Group or Mr. Markosian;

4   correct?

5      A.   There are not.

6      Q.   Construction is odd, yes?

7      A.   It does.

8      Q.   I mean, almost everything about this term

9   sheet is just odd.

10     A.   It's not the first time that I've seen a

11  one-way term sheet where we're saying, look, this is our

12  binding term sheet proposal.  We're bound to it, and

13  that's a spark for discussion.  That's not the first

14  time I've seen it, but it's definitely unusual, and I

15  noted it the first time I saw it.

16     Q.   Well, and if we look at the -- what I'll call

17  the inside pages of this exhibit, it appears to be the

18  same term sheet with changes in track; correct?

19     A.   I'm sorry.  You said with change -- track

20  changes?

21     Q.   Track changes.  I'm sorry.  Yeah.

22     A.   I would agree with that.

23     Q.   And I look at the track changes, and it looks

24  like, to my eye at least, they were accepted in the

25  version that we just looked at.

 1        A.    That is when I looked at this the first time

 2   too, and I had some testimony -- maybe it was

 3   yesterday -- about what the structure of the deal was.

 4   Markosian wanting a board seat, et cetera, and this is

 5   part of, you know, what I looked at in that analysis.

 6        **Q.    I expect you have not discussed this term**

 7   **sheet with Mr. Leshem; is that right?**

 8        A.    This is a toxic document for the moment in my

 9   opinion.

10        **Q.    A toxic document for?**

11        A.    Discussing with anybody.

12        **Q.    What do you mean by that?**

13        A.    Honestly, counsel, I don't want to go into

14   that because it's going to involve discussion of conduct

15   of counsel and so forth, and I think that's better

16   maybe -- I don't feel like we should go into that.  Is

17   that acceptable?

18        **Q.    I'm entitled to an answer but --**

19        A.    I'll give you one if you really want it.

20        **Q.    Yes, I do want it.**

21        A.    The production of this document appears like

22   it's been the product of arguable malfeasance by

23   counsel, and I don't like saying that, and honestly that

24   makes -- I just -- it makes me not want to discuss it.

25              MR. WORDEN:  We're not talking about you,

 1   Stephen.

 2         MR. RICHARDS:  We're talking about

 3   Mr. Pehrson?

 4         THE WITNESS:  I don't want to go into

 5   specifics.  I will say -- I'm sorry.

 6         MR. WORDEN:  Go ahead.  I'm sorry.

 7     A.   I don't want to go into specifics, but not

 8   you, Mr. Richards, but definitely serious concerns, and

 9   honestly it makes me -- anyway, I hope you're okay with

10   that answer.

11         MR. WORDEN:  And we understand there are more

12   WhiteTree documents that were not included here.  I'll

13   just leave it at that.

14         MR. RICHARDS:  I'm going to mark 135.

15         (Exhibit D 135 was marked.)

16     **Q.   (BY MR. RICHARDS)  All right.  This is an**

17   **email from January 9th, 2019; correct, Mr. Bernhardt?**

18     A.   If it's a European date, which I expect it is,

19   it's 9th of January 2019, yes.

20     **Q.   And we see that, actually, on the other two**

21   **emails where in January --**

22     A.   Yeah, in there you have --

23     **Q.   -- and it's spelled out?**

24     A.   Yeah, you have the spell out format.  Yes.

25     **Q.   So let's look at the original message, the**

1    last email on the page.  This appears to be from

2    Mr. Keller to Mr. Reedstein; correct?

3         A.   It does appear that way.

4         Q.   And Mr. Keller says, "Martin, Valens is asking

5    where proceeds -- where should proceeds of personal

6    sales go?  I have --

7              "AmeriMark Group AG Further Credit to Nicholas

8    Markosian," and then there's an IBAN number, an account

9    number, a SWIFT number, Bendura Bank, and then an

10   address.  Do you see that?

11        A.   I do.

12        Q.   Do you understand what Mr. Keller is asking

13   here?

14        A.   I think so.  Nicholas Markosian was listed on

15   this Bendura bank account, or at least a bank account in

16   Liechtenstein with Bendura Bank.  I don't remember if

17   it's exactly this account number, this IBAN.  IBAN,

18   I-B-A-N, is an international bank account number format.

19             So Mr. Markosian is listed as UBO or signatory

20   in at least one Bendura bank account in Liechtenstein.

21   I think what's happening here, having looked at this a

22   little bit, is that -- again, I don't know what proceeds

23   of personal sales means.  I don't know what that means.

24   I've talked about it a lot.  I don't know what it means,

25   but it seems to me here that somebody is asking where to

1   send money to Markosian, and the first suggestion is

2   that it's this Bendura Bank account.

3           And, again, Bendura Bank was the former bank,

4   was 4Service Cloud Bank, and so AmeriMark Group sort of

5   inherited it.  Excuse me.  I apologize.  So I interpret

6   this as saying where should those sales go?  And the

7   first answer is this -- this Bendura bank account.

8           The "Further Credit to," when I looked at

9   this, I thought maybe that is an error.  The reason I

10  think it's in error because I don't -- I think this

11  account was the corporate account, I think.  I don't

12  have all the Bendura -- we don't even have a production,

13  I don't think, of all the Bendura account numbers.  Some

14  of them are quite old and documents from -- from, you

15  know, 2016, 2017, back -- back, you know, in the early

16  4Service Cloud days.

17          So my interpretation is this is -- this is an

18  effort to ask where to send money to Group and/or

19  Markosian.

20      Q.   The company's not listed at this point;

21  correct?

22      A.   This is January 2019.  No, it would be listed.

23  August 2019 was the listing of AmeriMark Group.

24      Q.   And this is January 2019; right?

25      A.   Oh, I'm sorry.  Correct.  Yep.  Not listed

1    yet.

2         Q.    So -- in any event, Mr. --

3         A.    If you -- I'm not going to ask your question

4    for you.  Go ahead.

5         Q.    Mr. Reedstein responds and says, "To Valens."

6    What do you understand that to mean there?

7         A.    Well, that's got to be Valens Bank as in the

8    bank that was, I believe, successor transfer agent to

9    BankM, the commerce island institution that we talked

10   about yesterday.  That's my interpretation.  That's what

11   Valens must -- it could with something else, but it

12   would be a coincidence for it to be anything other than

13   Valens Bank.

14        Q.    Yeah, I follow.  My question is Mr. Keller's

15   question is Valens is asking where proceeds of personal

16   sales go, and the answer is "to Valens," and that

17   doesn't make a ton of sense to me.

18        A.    No.  I'm sorry.  Valens is asking where it

19   says personal shares go, and then the suggestion is

20   AmeriMark Group.  I take your point.  What personal

21   sales given that the company is not listed yet?  So this

22   is aspirational, I assume.  This is planning.  And then

23   I guess -- what did you say?  And then you see the

24   answer "to Valens."

25        Q.    So Valens is asking where to send them?  Send

 1  them to itself?  I mean --

 2      A.  Well, I couldn't -- look, I'm going to

 3  speculate.  In this -- with these documents, and I

 4  haven't -- this is recent production.  With these

 5  documents, I'm extremely nervous to speculate, but what

 6  this could mean -- and I think this occurred to me the

 7  first time I looked at it -- Valens has proceeds for

 8  some kind of personal sales, and they're asking where

 9  they go maybe to -- you know, where should they go for

10  Mr. Markosian, and the suggestion is do they go to

11  Bendura Bank.  The answer, Valens.  Is this Valens a

12  personal account, a separate account of Valens of

13  Markosian?  Again, this is a dangerous piece of

14  speculation.  I don't know.  It could be that way, but I

15  don't know.

16      Q.  I'm going to mark 136.  Keep that with you.

17              (Exhibit D 136 was marked.)

18      Q.  (BY MR. RICHARDS)  What's an IBAN number?

19      A.  International bank account number.  They're

20  generally the standard bank account number format that

21  was put together in Europe, and now we're testing my

22  memory here.  It's been around for quite a while.  It

23  was a way to harmonize international bank -- bank

24  account numbers between different countries that used to

25  have many, many different formats.

CAPANA SWISS ADVISORS AG vs RYMARK
SHAEN BERNHARDT - 01/24/2025

30(b)(6)
Page 298

1      Q.    And IBANs are specific to individual accounts;

2    correct?

3      A.    They should be, yes.

4      Q.    They're not, like, routing numbers, I mean.

5      A.    Let me take that back.  Could there be an

6    omnibus account that had several subaccounts, yes, but I

7    think the omnibus account would have a single of that, I

8    think.  By the way, you could also have IBAN -- excuse

9    me.  I'm starting to lose my voice after a long day.

10   You can also have IBANs for custody and securities

11   accounts.

12     Q.    All right.  So I've marked as Exhibit D 136 a

13   balance sheet.  You can see from the Bates stamp that

14   this is from plaintiff's production; correct?

15     A.    I do, yeah.

16     Q.    So let's look on Bates 24.  Do you see where I

17   am?

18     A.    I am right there.

19     Q.    Under assets at the top.  We have cash and

20   cash equivalence.

21     A.    Yep.

22     Q.    10-20.  Do you know what that entry means?

23     A.    Well, it will be a cash account because it's

24   number one, and in these financial presentations, the

25   asset accounts are all 1,000 accounts, and the current

```
 1   asset accounts, you know, like cash, usually are at the

 2   very top.  So this is a cash account.  This will be a

 3   current bank account.

 4        Q.   And I'm just sorry to sort of make you go

 5   through the motions of doing this, but will you compare

 6   the IBAN number --

 7        A.   They're exactly the same.

 8        Q.   All right.

 9        A.   So this is clearly -- this reference in the

10   WhiteTree production is clearly referring to the

11   Liechtenstein Bendura -- which I thought.  I couldn't

12   remember.  It's clearly referring to the Liechtenstein

13   Bendura bank account in the balance sheet.  This is an

14   earlier balance sheet.  So it's clear, and this is from

15   4Service Cloud Tech that this is the account that was

16   inherited by AmeriMark Group from 4Service Cloud Tech

17   with Bendura.

18             MR. RICHARDS:  So I've reached the end of my

19   questions for today.  Mr. Worden and I have both said

20   our piece on the record.  We're at odds about whether

21   I'll get you again, but I am grateful for your time.

22   You've come a long way.  I always enjoy speaking with

23   you.

24             John, anything else to add?

25             MR. WORDEN:  Just that Mr. Bernhardt is here
```

1   to continue answering questions.  We've made that offer.

2   You've declined.  So I guess that's all I have.

3              MR. RICHARDS:  Thank you.

4              (Reporter asks if witness would like to

5              read and sign the transcript.)

6          MR. WORDEN:  Just send us the electronic

7   version.  Okay?  I'm not sure how you do it here.  He

8   doesn't need to come down to your office, if that's what

9   you're asking.

10             (Reporter clarification.)

11         MR. WORDEN:  We would like him to read it, but

12  I'm sure he would even if I told him not to.

13         THE WITNESS:  I will review the electronic

14  version and give him any comments -- only punctuation,

15  et cetera -- is the instruction I'm given on these

16  usually, and I'm happy to do that.  I would like to do

17  that.

18             (Reporter asks for transcript orders.)

19         MR. RICHARDS:  Yes, please.

20             (This deposition was concluded at

21             3:11 p.m. MT.)

22                  * * * * *

23

24

25

```
 1    Case:  CAPANA SWISS ADVISORS AG, a Swiss corporation;
      AMERIMARK AUTOMOTIVE AG, a Swiss corporation vs. RYMARK,
 2    INC., a Utah corporation; NICHOLAS THAYNE MARKOSIAN, an
      individual; JOHN KIRKLAND, an individual; and VICKY
 3    SMALL, an individual
      Case No.: 2:23-cv-00467
 4    Reported By:  Brooke Simms, RPR, CCR, CSR
      Date Taken:  Friday, January 24, 2025

 5

 6                        WITNESS CERTIFICATE

 7            I, Shaen Bernhardt, HEREBY DECLARE:

 8            That I am the witness in the foregoing
      transcript; that I have read the transcript and know the
 9    contents thereof; that with these corrections, I have
      noted this transcript truly and accurately reflects my
10    testimony.

11    PAGE-LINE CHANGE-CORRECTION                  REASON
      _____  _____  _____
12    _____  _____  _____
      _____  _____  _____
13    _____  _____  _____
      _____  _____  _____
14    _____  _____  _____
      _____  _____  _____
15    _____  _____  _____
      _____  _____  _____
16    _____  _____  _____
      _____  _____  _____
17    _____  No corrections were made.

18            I, Shaen Bernhardt, deponent herein, do hereby
      certify and declare under penalty of perjury the within
19    and foregoing transcription to be true and correct.

20            _____
                     Shaen Bernhardt, Deponent
21
              SUBSCRIBED and SWORN to at _____
22    _____, this _____ day of _____, _____.

23            _____
                     Notary Public
24

25
```

```
 1                      REPORTER'S CERTIFICATE

 2     STATE OF UTAH          )
                              ) SS
 3     SALT LAKE COUNTY       )

 4              I, BROOKE SIMMS, an Idaho Certified Shorthand

 5     Reporter, Utah State Certified Court Reporter, and

 6     Registered Professional Reporter, hereby certify:

 7              THAT the foregoing proceedings were taken

 8     before me at the time and place set forth in the caption

 9     hereof; that the witness was placed under oath to tell

10     the truth; that a verbatim record of the proceedings was

11     made by me using machine shorthand which was thereafter

12     transcribed under my direction; further, that the

13     foregoing is an accurate transcription thereof taken to

14     the best of my ability.

15              I further certify that I am not a relative or

16     employee of an attorney or party, nor am I financially

17     interested in the action.

18                      [XX] Signature was requested.

19                      [] Signature was waived.

20                      [] Signature was not requested.

21              I have subscribed my name on this 3rd

22     day of January, 2025.

23

24     _____
                      Brooke Simms, RPR, CCR, CSR
25                    Idaho CSR No. 1174
                      Utah CCR No. 12335391-780
```

*Brooke J. Simms*