Chad S. Pehrson (12622) (cpehrson@kba.law)
Robert P. Harrington (12541) (rharrington@kba.law)
Stephen Richards *(19332)* (srichards@kba.law)
**KB & A**
50 West Broadway Ste 1000
Salt Lake City Utah 84101
Telephone: (801) 994-4646

*Attorneys for Defendants, Counter Claimants
and Third-Party Plaintiffs*

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CAPANA SWISS ADVISORS AG, a Swiss corporation; AMERIMARK AUTOMOTIVE AG, a Swiss corporation,<br><br>     Plaintiffs,<br><br>vs.<br><br>RYMARK, INC., a Utah corporation; NICHOLAS THAYNE MARKOSIAN, an individual; JOHN KIRKLAND, an individual; and VICKY SMALL, an individual,<br><br>     Defendants. | **DEFENDANTS' AND THIRD-PARTY PLAINTIFFS' OPPOSITION TO THIRD-PARTY DEFENDANT MIRON LESHEM'S MOTION TO DISMISS**<br><br><br>Case No.: 2:23-cv-00467<br><br>Judge Ted Stewart<br>Magistrate Judge Cecilia M. Romero |
| RYMARK, INC., a Utah corporation; and NICHOLAS THAYNE MARKOSIAN, an individual,<br><br>     Counter Claimants,<br><br>vs.<br><br>CAPANA SWISS ADVISORS AG, a Swiss corporation, and Amerimark Automotive AG, a Swiss Corporation,<br><br>     Counter Defendants. | |

RYMARK, INC., a Utah corporation; and
NICHOLAS THAYNE MARKOSIAN, an
individual,

        Third-Party Plaintiffs,

vs.

SHAEN BERNHARDT, an individual;
ASHLEY MIRON LESHEM, an individual;
DAVID HESTERMAN, an individual;
NICOLAI COLSHORN, an individual;
STEFAN KAMMERLANDER, an individual;
ALEXANDER COENEN, an individual;
MARTIN FASSER HEEG, an individual;
AMERIMARK GROUP AG, a Swiss
corporation; and PHILOMAXCAP AG, a
German corporation,

        Third-Party Defendants.

## I.    INTRODUCTION

Third-Party Defendant Miron Leshem is a career securities fraudster who runs pump-and-dump penny stock schemes, both in the United States and abroad. In 2015, Leshem selected as his then-latest pump-and-dump target a Utah car dealership, Third-Party Plaintiff Rymark, Inc. ("**Rymark**"). Leshem's co-conspirator, Third-Party Defendant David Hesterman, introduced Leshem to Rymark and its Utahn owner, Third-Party Plaintiff Nicholas Markosian. Leshem successfully duped Mr. Markosian into paying $125,000 for Leshem to supposedly raise money for Rymark in Europe. After years of false starts, Leshem successfully listed Rymark (in the form of a Swiss shell company, "**AmeriMark Group**") on an Austrian stock exchange in 2019, where he and others then pumped-and-dumped the stock for a profit. Along the way, Leshem stole 13,000,000 shares of AmeriMark Group from Mr. Markosian, leaving Mr. Markosian with a

minority of the company. Eventually, Austrian officials caught on and delisted AmeriMark Group. Leshem and his confederates then attempted to use AmeriMark Group in another corporate transaction, but this required Mr. Markosian's cooperation, and when Mr. Markosian would not go along, Plaintiffs filed this lawsuit, with Leshem's assistance.

The upshot is that thanks to Leshem, Mr. Markosian paid tens of thousands of dollars for the privilege of going from owning 100% of Rymark to owning a minority – sometimes Plaintiffs say it is 32%, and sometimes 24% – of a Swiss shell company that owns **nothing valuable except for Rymark**. The only other thing Mr. Markosian received in this unenviable trade is this lawsuit, filed by Europeans he does not know, who say they own his Taylorsville-based used car dealership.

Mr. Markosian used the discovery process to investigate the pump-and-dump scheme, and in July 2024, Mr. Markosian and Rymark moved for leave to file a Third-Party Complaint naming Mr. Leshem and others as Third-Party Defendants. The Court granted the motion over Plaintiffs' opposition, rejecting Plaintiffs' argument that amendment should not be allowed because Mr. Markosian and Rymark's claims were futile. (Dkt. 137.)

Leshem then spent months evading service, requiring Mr. Markosian to incur thousands of dollars in process server, private investigator, and surveillance fees. Leshem retained a lawyer to represent him with respect to the dispute, but this lawyer refused to accept service of the Third-Party Complaint. Leshem was finally served in mid-January. And now he has filed a motion to dismiss (the "Motion" or "Mot.," Dkt. 252). The Motion is meritless and should be denied.

*First*, the Court has personal jurisdiction over Leshem. Virtually everything about the pump-and-dump scheme was directly connected to Utah. Leshem solicited a Utah company (Rymark) and its Utah owner (Mr. Markosian), arranged (disputed) acquisitions of Rymark by

multiple European shell companies, then promoted those European shell companies by relying on Rymark's financial results, all of which are derived from selling or leasing used cars in Utah. Documents drafted by Leshem for submission to market officials in Europe mention Utah – not just Rymark, but *Utah* – dozens of times. And even Leshem's co-conspirators say that it was Leshem who drafted key press releases describing Rymark's Utah-based financial results. Leshem also repeatedly sent documents and other information to Utah for signature, and then forged or otherwise doctored documents signed by Utahns. He also stole 13,000,000 shares of AmeriMark Group stock from Mr. Markosian, a Utahn. Even a fraction of these contacts would satisfy the personal jurisdiction test. This is not a close personal jurisdiction case.

*Second*, Mr. Markosian and Rymark's claims against Leshem are well-stated. Here, Leshem recycles arguments that the Court already rejected when it granted leave to file the Third-Party Complaint, like that the Third-Party Complaint fails to satisfy Rule 9(b). The Court reminded Plaintiffs that the Third-Party Complaint "should be read as a whole," and that when it is, it "satisf[ies] Rule 9(b)" by articulating the "'who, what, when, where, and how' of the allegedly fraudulent acts and representations." (Dkt. 137 at 8–9.) Leshem also argues that the economic loss rule bars Mr. Markosian and Rymark's claims but does not contend with the (many) independent duties Mr. Markosian and Rymark have alleged Leshem violated.

*Third*, Leshem complains that when – after months of evasion – he was finally served with the Third-Party Complaint, he was not served with the exhibits to the Complaint. This is a distraction; Leshem has now appeared and can download exhibits from PACER anytime he likes. Leshem identifies no prejudice, and his arguments about exhibits appear to just be more service gamesmanship.

*Finally*, Rymark and Mr. Markosian respectfully submit that although the Motion clearly fails, the prudent course may be for the Court to simply grant Rymark and Mr. Markosian's pending motion to amend their Third-Party Complaint, Dkt. 180, and thereby moot the Motion. The proposed amendment alters some issues raised in the Motion (particularly personal jurisdiction, since the amendment asserts claims under the federal securities laws, which provide for nationwide service of process and therefore limit certain jurisdictional arguments).

The Motion should be denied.

## II.    BACKGROUND

### A.    Factual Background

Miron Leshem operates pump-and-dump schemes. Pump-and-dump schemes are not complicated. Fraudsters acquire shares in a company, "spread false or misleading information to create a buying frenzy that will 'pump' up the price of a stock," then "'dump' shares of the stock by selling their own shares at the inflated price." (Dkt. 139 ¶ 48.) Then, once the frenzy is over, "the stock price typically falls and investors lose money." (*Id.*) Leshem first entered into a cease-and-desist consent order with the Securities & Exchange Commission ("**SEC**") in 1999 after he was caught "willfully violat[ing]" Section 17(a) of the Securities Action, Section 10(b) of the Exchange Act, and Rule 10b-5. (Declaration of Stephen Richards ("**Richards Decl.**") ¶ 2 & Ex. A at 2.) The consent order in question barred Leshem from "participation in penny stock offerings." (*Id.*)

Alas: Leshem did not abide by the terms of the consent order. In 2006, the SEC filed a civil complaint against Leshem and his company, Ananda Capital Partners, Inc. ("**Ananda**"), alleging that Leshem had run a pump-and-dump; Leshem hired personnel to "promote" a penny stock "in

5

a manner that would increase the price and volume" of the stock. (Richards Decl. ¶ 3 & Ex. B ¶ 3.) Leshem kept 300,000 shares of the stock in question as "compensation" for his role in the scheme and sold some of those shares for a profit. (Richards Decl. Ex. B ¶ 108.) This violated Leshem's penny stock bar, and in 2007, Leshem entered into *another* consent order with the SEC. Leshem was ordered to pay $99,200 in disgorgement and penalties and return 110,000 shares of the penny stock he had retained. (Richards Decl. ¶ 3 & Ex. C at 2–3.) Leshem also agreed, again, to a penny stock bar. (*Id.*) Having twice attracted the attention of the SEC, Leshem took his scams abroad – where he is also getting in trouble. Only last year, the French securities regulator, AMF, sanctioned Leshem and another of Leshem's companies, Granchester Equity, for a "pump and dump" scheme. (Dkt. 139 ¶ 45; *see also* Richards Decl. ¶ 4 & Ex. D.) Leshem was fined €2,000,000, and Granchester Equity was fined €1,000,000. (*Id.*)

This case involves a pump-and-dump scheme designed and directed by Leshem. In 2015, Third-Party Defendant David Hesterman[1] gained the trust of Mr. Markosian through church connections and introduced Mr. Markosian to Leshem, who – Hesterman said – could help Rymark raise money in Europe. (Dkt. 139 ¶ 3.) On December 3, 2015, Hesterman emailed Mr. Markosian, copying Mr. Leshem, to say that December was "the perfect month to undertake the required steps and investor funds could be flowing in by late January." (Richards Decl. ¶ 5 & Ex. E.) Then, on December 15, 2015, Leshem emailed Mr. Markosian and laid out what Leshem said were the various advantages of European equity raises, including a "short time to listing-2 months or less" and a "low cost of listing (US$ 115,000) compared with double or more for equivalent US listings." (Richards Decl. ¶ 6 & Ex. F.) Leshem did not, of course, disclose that he was not permitted to

---

[1] Hesterman also has a long history of securities fraud and has served prison time. ([Dkt. 139](Dkt. 139) ¶ 41.)

participate in domestic penny stock equity listings.

Duped, Mr. Markosian eventually agreed to pay Leshem $125,000. (Dkt. 139 ¶ 52.) Plaintiffs say that Leshem then used Mr. Markosian's money to purchase a dormant Swiss shell company, rename that company AmeriMark Automotive AG, and engineer an acquisition of Rymark by AmeriMark Automotive. (*Id.* ¶ 54.) (Rymark and Mr. Markosian dispute the effectiveness and legality of this and other transactions at issue in the case.) Leshem then tried – and failed – to list AmeriMark Automotive on multiple European exchanges. (*Id.* ¶¶ 56–57.) So he planned a shortcut: merge AmeriMark Automotive with a company that was already listed on a French exchange. Leshem renamed this company AmeriMark Group. But the French exchange figured out the ruse and refused to allow Leshem to list additional shares. (*Id.* ¶¶ 62–63.) And Mr. Markosian refused to give Leshem more money. So Leshem stole 13,000,000 shares of AmeriMark Group stock from Mr. Markosian and gave the shares to associates of his at a company called Whitetree Capital. (*Id.* ¶¶ 76–84.) Leshem also doctored subscription forms allegedly signed by Mr. Markosian in an attempt to cover up the theft. (*Id.*)

In 2019, after recruiting Plaintiff Capana Swiss Advisors AG and its principal, Third-Party Defendant Shaen Bernhardt, into the scheme, Leshem finally managed to get AmeriMark Group listed on a stock exchange in Vienna. (Dkt. 139 ¶ 88.) He did so through the use of multiple documents that expressly described (and relied on) Rymark's operations *in Utah*, especially an "Information Document" that premised the attempted listing on the strength of Rymark's financials, the promise of the Utah used car market, and the effectiveness of the "Markosian formula":

AmeriMark Automotive AG (the "Company" or "AmeriMark") is a Swiss based holding company that, through its U.S. based subsidiary, owns and operates 3 used car dealerships that predominantly, but not exclusively, sell cars on the "lease-here-pay-here" (LHPH) model to subprime purchasers. The dealerships are located Salt Lake City and Ogden, Utah in the United States. The company was founded in 2000 and currently has commenced plans to expand into the European markets.

The Company intends to launch expansion into the sub-prime German and French automotive sales markets using the Markosian formula. After research and due diligence, Management has determined that the formula can clearly be implemented by AmeriMark in retail operations in Europe for both greater efficiency and customer satisfaction. The competitive outlook in Germany and the U.K. is more favorable than that in the Company's home market and Management feels confident that a gradual and incremental entry into these markets can be successfully accomplished.



### 3.1.4. Utah market

Utah repayment rates are better than the national average.

Percentage of loan balances 30 dpd

Utah has lower default and delinquency rates than elsewhere in the US

Percentage of loan balances 60 dpd

### 3.2.2. Used car dealerships in Utah (Salt Lake City)

In Utah, total sales from all dealership in 2017 totalled USD $8.6bn, according to the National Automobile Dealers Association. The industry is highly fragmented with large national players mostly absent from servicing the subprime market. The association Used Car Dealers of Utah has 500 members, although this does not represent the majority of used car dealers in the state. Finally, in recent years more independent BHPH dealerships have opened up.

(Richards Decl. ¶ 7 & Ex. G at **8617, 8624, 8627, 8634.) The Information Document contains the word "Utah" dozens of times and includes such minutiae about our good state as (1) how far Ogden is from Salt Lake City and (2) the relative sizes of the Larry H. Miller and Ken Garff dealerships, respectively. (*Id.* Ex. G at *8631.) German-language submission documents for AmeriMark Group, too, discuss Utah in depth. (Richards Decl. ¶ 8 & Ex. H.)

Leshem also drafted press releases regarding AmeriMark Group in order to gin up interest in share sales, and these press releases, among other things, describe Rymark's finances in detail, call Rymark a "U.S. based regional automotive lease here – pay here company," invent a fake quotation from Mr. Markosian, and say (falsely) that AmeriMark Group was in the process of "expanding its unique products offerings and client service model" – *i.e.*, a model that existed only in Utah – "into the European Union." (Richards Decl. ¶¶ 9–10 & Exs. I, K.)

In September 2020, Rymark wrote to Leshem and others, demanding that AmeriMark Group stop representing that it owned Rymark. (Dkt. 139 ¶ 101.) But the scheme only heated up, and in 2021, Leshem and Bernhardt collaborated on multiple openly false press releases regarding AmeriMark Group. The price of AmeriMark Group's stock spiked, and Austrian regulators issued a warning that AmeriMark Group shares appeared to be the subject of market manipulation. (Dkt. 139 ¶ 120.) Austrian market officials, whom Leshem had worked to deceive for more than a year, figured out what was going on and delisted AmeriMark Group stock. (*Id.* ¶¶ 126–29.)

With AmeriMark Group delisted, Leshem and his confederates could no longer make money pumping-and-dumping the stock. So Third-Party Defendant Shaen Bernhardt developed a new idea: swap Capana's shares of AmeriMark Group stock, which Leshem had stolen from Markosian, for a controlling stake in another company called Philomaxcap AG. (Dkt. 139 ¶¶ 130–

31.) Bernhardt needed Rymark and Mr. Markosian to cooperate with this plan by conceding that Rymark was owned by AmeriMark Group. Mr. Markosian refused, and after months of threats, Capana and AmeriMark Automotive filed this lawsuit. (*Id.* ¶ 136.)

Leshem was instrumental in planning and developing the lawsuit. Bernhardt testified that he has consulted with Leshem "hundreds" of times about this dispute since 2020. (Richards Decl. ¶ 11 & Ex. O.) Leshem was also copied on correspondence with Plaintiffs' counsel in the months leading up to the lawsuit. (Dkt. 201 at 6; *see also* Dkt. 201-2 (under seal).)

### B. Procedural Background

In July 2024, Rymark and Mr. Markosian moved for leave to file an Amended Counterclaim and Third-Party Complaint. (Dkt. 107.) Plaintiffs opposed, arguing that the amendments were futile. (Dkt. 125.) The Court granted Rymark and Mr. Markosian's motion on September 3, 2024. (Dkt. 137.) Rymark and Mr. Markosian moved to amend again in November 2024, Dkt. 180, and that motion is currently before the Court. In the meantime, Rymark and Mr. Markosian attempted to serve Leshem with the Third-Party Complaint, but Leshem spent months evading service. (*See, e.g.*, Dkts. 183, 190, 201, 219, 228, 243.) Leshem retained counsel – the Florida counsel who represents him here – but his counsel would not accept service of the Third-Party Complaint. (Dkt. 219-1 ¶ 4.) Eventually, after paying for round-the-clock surveillance, Rymark and Mr. Markosian served Leshem. (Dkt. 243-1 ¶ 9.) Leshem then filed the Motion.

### III.    LEGAL STANDARD

When a defendant challenges personal jurisdiction under Rule 12(b)(2), the plaintiff has the burden of establishing that jurisdiction over the defendant is proper. *See Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 456 (10th Cir. 1996). At this preliminary stage, however,

the plaintiff "need only make a prima facie showing of personal jurisdiction." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). "All factual disputes are resolved in favor of the plaintiffs when determining the sufficiency of this showing." *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1100 (10th Cir. 2009).

The exercise of jurisdiction over a nonresident defendant comports with due process "so long as there exist minimum contacts between the defendant and the forum State." *Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000) (citation omitted). There are two types of personal jurisdiction – general and specific – but only specific is at issue here. Specific personal jurisdiction is established when a party has "purposefully directed" its activities at resident of the forum and the plaintiff's claims "arise out of or relate to those activities." *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998) (quotation marks and citation omitted). If the defendant's activities create sufficient minimum contacts, courts then consider "whether the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice.'" *Id.* (citation omitted).

Rule 8(a)(2) requires only that a plaintiff set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Accordingly, to survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim is facially plausible when the allegations give rise to a reasonable inference that the defendant is liable." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). In addition to accepting all well-pleaded facts as true, courts "must liberally construe the pleadings and make all reasonable inferences in favor of the non-moving party." *Brokers' Choice of Am., Inc. v. NBC*

*Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017).

## IV.    ARGUMENT

### A.  The Court Should Grant Rymark And Mr. Markosian's Motion For Leave To Amend And Deny Leshem's Motion To Dismiss As Moot

Currently pending before the Court is Rymark and Mr. Markosian's motion for leave to amend, Dkt. 180. The Court should grant that motion for the reasons set forth therein. Doing so will moot Leshem's current motion to dismiss. And although it is possible that Leshem will file a subsequent motion to dismiss, the proposed amendment will narrow the disputed issues. Among other things, Rymark and Mr. Markosian's proposed amended pleading asserts a federal securities claim against Leshem, and the federal securities laws create nationwide service of process. *See, e.g.*, *Castle v. Jones*, 2024 WL 4267326, at *3 (D. Utah Sept. 23, 2024) (Stewart, D.J.) (because the Exchange Act "authorizes nationwide service of process," minimum contacts is "not the applicable test[]," and only the outer due-process limitations on personal jurisdiction apply). Accordingly, the prudent approach as a matter of judicial economy is to grant the motion for leave to amend and deny the Motion as moot.

### B.  The Court Has Personal Jurisdiction Over Leshem Because He Was A Co-Conspirator

The Court has personal jurisdiction over Leshem because he was a co-conspirator with several others who are subject to personal jurisdiction in Utah. The Utah Supreme Court has expressly "adopt[ed] a conspiracy theory of jurisdiction." *Raser Techs., Inc., v. Morgan Stanley & Co.*, 2019 UT 44, ¶ 85. This theory focuses on minimum contacts, "but recognizes that these contacts may be through a third party." *Id.* ¶ 76. The Tenth Circuit, too, has recognized personal jurisdiction based on conspiracy. *See, e.g.*, *Newsome v. Gallacher*, 722 F.3d 1257, 1265–66 (10th

12

Cir. 2013). The basic idea is straightforward: the "existence of a conspiracy and overt acts of a co-conspirator within the forum may, in some cases, subject another co-conspirator to the forum's jurisdiction." *Id.* at 1265 (cleaned up); *see also Frickey v. Thompson*, 136 F. Supp. 3d 1300, 1310 (D. Kan. 2015) (minimum contacts exist for co-conspirators "if the conspiracy is directed at the forum or substantial steps in furtherance of the conspiracy were taken in the forum"). Here, David Hesterman resided in Utah during much of the relevant time period, and Leshem specifically directed Hesterman to take steps in furtherance of the conspiracy – like forging signatures – *in Utah. E.g.*, Dkt. 139 ¶¶ 40–44, 70.) Moreover, Plaintiffs, who were themselves members of the conspiracy, consented to personal jurisdiction in this Court by filing this lawsuit, and other third-party defendants with whom Leshem conspired – like Shaen Bernhardt – have conceded that they are subject to personal jurisdiction in this Court. (*See* Dkt. 162 ¶ 38.) And in any case, *Newsome* specifically explained that even when *all* co-conspirators reside outside the forum, personal jurisdiction over an entire conspiracy may still exist if – as here – the conspiracy is targeted at the forum state: "If three Kansans conspired to fire a cannonball into Oklahoma, we do not believe the Constitution would foreclose Oklahoma courts from exercising jurisdiction over the conspirators simply because they confined themselves to Kansas." *Newsome*, 722 F.3d at 1266.

The Motion does not address conspiracy personal jurisdiction at all, although the issue has appeared in prior briefing in this case. (Dkt. 199 at 7–8.) And although Leshem challenges the conspiracy cause of action, his arguments are meritless for the reasons set forth below.

### C. The Court Has Personal Jurisdiction Over Leshem Under The Traditional Purposeful Direction Test

Even if personal jurisdiction based in conspiracy were absent here, Rymark and Mr.

13

Markosian have made the traditional minimum contacts showing.[2] "In tort-based lawsuits," " 'purposeful direction' has three elements: '(a) an intentional action . . . that was (b) expressly aimed at a forum state . . . with (c) knowledge that the brunt of the injury would be felt in the forum state . . . ." *Newsome*, 722 F.3d at 1264–65 (quoting *Dudnikov*, 514 F.3d at 1072 (2008)). This test was derived from *Calder v. Jones*, 465 U.S. 783 (2006), and is often shorthanded as the "*Calder* effects test." *See, e.g.*, *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 966 (10th Cir. 2022). Although the Motion acknowledges the *Calder* effects test, *see* Motion at 20, its analysis does not actually track the three *Calder* prongs in any clear way. Regardless, Rymark and Mr. Markosian easily satisfy all three prongs.

### i. Leshem Performed Intentional Actions

The Complaint alleges at considerable length the intentional actions Leshem took in connection with the scheme at issue here. (*See, e.g.*, Dkt. 139. ¶¶ 52, 54, 55, 57–63, 66–69, 77, 78–82, 84, 86–88, 89–92, 97, 107, 113–21, 123–24.) Leshem does not address the "intentional act" prong of the *Calder* test or argue that it is not met here.

### ii. Leshem Expressly Aimed His Tortious Conduct At Utah

Leshem also expressly aimed his tortious conduct at Utah under *Calder*'s second prong. The express aiming prong requires the forum state "to have been the 'focal point' of the tort." *Newsome*, 722 F.3d at 1268. The Tenth Circuit has said that *Calder* and the Supreme Court's

---

[2] Utah's long-arm statute authorizes jurisdiction "to the fullest extent permitted by the due process clause of the Fourteenth Amendment." Utah Code Ann. § 78B-3-201(3). And although the traditional test for personal jurisdiction with respect to tort claims is clearly met here, *see infra*, Leshem's focus on the (disputed) "Listing Agreement" between his company and Rymark provides an independent basis for personal jurisdiction. *See* Utah Code Ann. § 78B-3-205 ("contracting to supply services or goods" in Utah creates specific jurisdiction).

subsequent decision in *Walden v. Fiore*, 517 U.S. 277 (2014) "mark the guideposts" for whether this prong is met. *Calder* involved an allegedly libelous article in the National Enquirer that had been written and edited in Florida. The subject of the article sued in California, and the Supreme Court held that personal jurisdiction was proper there because the writer and editor worked on "an article that they knew would have a potentially devastating impact upon respondent," and that the "brunt of that injury would be felt" in California. *Calder*, 465 U.S. at 789. It did not matter that the writer and editor were "acting entirely from Florida," because they acted "to cause injuries in California," and knew they were doing so. *Newsome*, 722 F.3d at 1265.

*Walden*, by contrast, involved DEA agents who seized cash from Nevada residents while they were transiting through Atlanta. The plaintiff sued in Nevada, but the Supreme Court held that Nevada courts lacked personal jurisdiction because it was "undisputed" that "no part" of the "course of conduct" leading to the lawsuit "occurred in Nevada." *Walden*, 571 U.S. at 289. The law enforcement agent never "contacted anyone in" or "sent anything or anyone to Nevada." *Id.* Instead, all contacts with Nevada were merely fortuitous; *Walden* is about a seizure in Georgia that only happened to involve Nevada residents.

This case is like *Calder*, not *Walden*. Although acting from Florida – just like the writer and editor in *Calder* – Leshem acted to cause injuries in Utah. He defrauded a *Utah* corporation, Rymark, and its *Utahn* owner, Mr. Markosian. He repeatedly sent materials for the scheme to Utah for signature and contacted Utahns while they were in Utah. He drafted press releases that described Rymark's financials, which are based solely on Utah business activities, namely, sales and leases of cars *in Utah, to Utahns*. Indeed, Rymark was the lone valuable asset of either of the Swiss shells Leshem created or renamed, and as a result, the entire pump-and-dump scheme

15

depended on the value of a Utah-based car dealership and its Utah-based business activities. *See Calder*, 465 U.S. at 788–89 (article "concerned the California activities of a California resident," "impugned the professionalism of an entertainer whose television career was centered in California," and "was drawn from California sources"). And the Tenth Circuit has repeatedly held, in cases involving substantially fewer contacts with a forum state, that personal jurisdiction exists. *See, e.g.*, *Newsome*, 722 F.3d at 1269 (where defendants "knew [the plaintiff] operated exclusively in Oklahoma," this made "Oklahoma the focal point of any tort against [the plaintiff] they may have committed"); *Dudnikov*, 514 F.3d 1063, at 1076 (express aiming requirement met where defendants acted outside Colorado to cancel auction occurring in Colorado).

Leshem's arguments are not persuasively to the contrary. Leshem says that he acted from Florida, that others acted from Europe, and that he "never travelled to Utah." (Mot. at 21–22.) This is all beside the point; "*Calder* makes clear that a defendant need not be physically present in a state to have 'expressly aimed' his conduct there." *Eighteen Seventy*, 32 F.4th at 970. Leshem also argues that under *Walden*, it does not matter that Rymark and Mr. Markosian "are Utah residents." (Mot. at 22.) But the Tenth Circuit has explained that this reading of *Walden* "misunderstands the law." *XMission, L.C. v. PureHealth Research*, 105 F.4th 1300, 1311 n.12 (10th Cir. 2024). Tortfeasors do not defraud forums; they defraud people. And tortious conduct directed toward Utah residents *can* establish personal jurisdiction when the defendant acts "knowing [the plaintiffs] live in Utah," in which case the conduct becomes "conduct in Utah." *Id.* at 1311 (defendant's sending "newsletter emails" to Utahns created personal jurisdiction). Put differently, *Walden* teaches that "random," "fortuitous," "attenuated," or "unilateral" contacts between a plaintiff and a forum may not create personal jurisdiction over a defendant. *Walden*, 571 U.S. at 286. But

Rymark and Mr. Markosian's residence in Utah is none of these things. Leshem knew from the jump that he was defrauding Utahns, and Rymark's Utah business (and the Utah used-car market more generally) formed key elements of the scheme.[3]

Leshem does not argue that any controlling case law is analogous on its facts. Instead, he cites a series of district court cases that have little in common with this case. *See REI Holdings, LLC v. LienClear – 0001, LLC*, 2019 WL 498356 (D. Utah Feb. 8, 2019) (no jurisdiction where defendant worked only on Connecticut tax liens outside of Utah); *Shipp v. Int'l Auto Grp. of S. Fla., Inc.*, 2016 WL 3951079, at *4 (D. Utah July 20, 2016) (business dealings "arose from the initial action of Plaintiff contacting the Defendants about the vehicle"); *Far W. Capital v. Towne*, 828 F. Supp. 909, 915 (D. Utah 1993) (contract dispute involving land and geothermal plants in Nevada), *aff'd*, 46 F.3d 1071 (10th Cir. 1995); *All Am. Security Corp. v. Borealis Mining Co., LLC*, 2015 WL 9581761, at *4 (D. Utah Dec. 30, 2015) (contracts "utilized Nevada resources" and "were performed exclusively in Nevada").

Finally, Leshem also says – falsely – that he has "never solicited" "business in Utah." (Dkt. 253 ¶ 21.) This is wrong as to Mr. Markosian, whom Leshem (and Hesterman) solicited, not the other way around. (Richards Decl. Exs. E, F.) But it is also wrong more generally. Documents produced by Leshem's co-conspirator, David Hesterman, show Hesterman and Leshem scheming to entangle at least two other Utah companies in a nearly identical European listing scheme. (Richards Decl. ¶ 11 & Exs. L (Leshem letter regarding listing proposal to "Strawberry Highlands"

---

[3] Leshem also says that a "Listing Agreement" between Ananda elected Florida law and a Florida venue. But (1) the agreement in question, by its terms, expired in 2017; (2) the provision in question only applies to disputes over the "interpretation, construction, performance or breach" of the agreement (of which this lawsuit is not one); and (3) Leshem was not personally a party to the agreement anyway. (*See* Dkt. 253-1 at 5 Art. VII.A; *id.* at 6 Art. VIII.C; *id.* at 7.)

in Heber City, UT); M (listing proposal); N (Hesterman directing Leshem to review and modify listing proposal for a "multistate land development company with proposed holdings in Utah, Montana, Idaho and Colorado"). These activities, too, support personal jurisdiction in Utah (and call in question Leshem's credibility in his declaration). *See Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1226 (10th Cir. 2021) (even contacts not causally related to the plaintiff's injury can support purposeful direction).

### iii. Leshem Acted With Knowledge That The Brunt Of Rymark And Mr. Markosian's Injuries Would Be Felt In Utah

The third *Calder* prong is also met, since Leshem acted with "knowledge that the brunt of the injury would be felt" in Utah. *See Newsome*, 722 F.3d at 1265. No one disputes that Leshem knew Rymark was a Utah corporation and Mr. Markosian was a Utah resident. Nor does Leshem explain how, when he engaged in the fraud and theft alleged in the Third-Party Complaint, he could have possibly been confused on where Rymark and Mr. Markosian might feel the "brunt" of the injuries he was inflicting.

Leshem complains that Mr. Markosian and Rymark have "failed to make any allegation" that the brunt of Mr. Markosian and Rymark's injuries would be felt in Utah. (Mot. at 20.) But the Tenth Circuit has explained that when a defendant knows that a plaintiff business "operated in" a particular state, then "[a]t the pleading phase," "it is a fair inference" that the defendants "knew that the brunt of any injury" would be felt in that state." *Newsome*, 722 F.3d at 1269. And elsewhere, in any case, Leshem appears to concede that Rymark and Mr. Markosian "suffered harm in Utah." (Mot. at 24.)

### iv. The "Arising Out Of" Requirement Is Met

The personal jurisdiction test also requires that the plaintiff's injuries "arise out of [the]

defendant's forum-related activities." *Newsome, 722 F.3d at 1269*. Here, Leshem mentions the arising-out-of requirement only in passing, Mot. at 19, 20, and does not dispute that it is met here. Rymark and Mr. Markosian's injuries were caused by Leshem's Utah-focused activities.

### v.  Personal Jurisdiction Does Not Offend Traditional Notions Of Fair Play And Substantial Justice

Leshem also argues that even if the *Calder* test is met, exercising jurisdiction over him would be inconvenient because he lives in Florida. (Mot. at 25–26.) But only "highly unusual cases" will present such inconvenience as to trigger due process concerns. *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1212 (10th Cir. 2000) (citation omitted). And in any case, Leshem (1) identifies no unusual burden in traveling to Utah to participate in litigation *he helped to engineer*, (2) misstates Utah's interest (which is to protect its residents from fraud), (3) entirely disregards Mr. Markosian's and Rymark's interests, (4) fails to explain how *separate* litigation in another state would somehow be "efficient," and (5) misstates virtually everything about the choice-of-law provision at issue (which is expired, did not apply to Leshem in the first place, and would not apply to Rymark and Mr. Markosian's claims anyway). *See OMI, 149 F.3d at 1095* (identifying due process factors).

### vi.  If The Court Believes Personal Jurisdiction Is In Question, It Should Order Jurisdictional Discovery

Rymark and Mr. Markosian respectfully submit that this is not a hard personal jurisdiction case. Leshem specifically chose to target a Utah company and its Utah owner, sent materials and communications to Utah over a period of many years, engineered supposed acquisitions of the Utah company by European companies, attempted to list those European companies on stock exchanges purely on the Utah-based financial results and economic performance of Rymark, stole

13,000,000 shares of stock from a Utahn, doctored forms supposedly signed by Utahns to cover up the theft, described Rymark's financial performance in misleading press releases, falsely misrepresented that Utahns were expanding their business operations into Europe, profited from trading stock based on his various representations about Utah, and consulted "hundreds" of times with the plaintiffs who filed this litigation against Rymark and Mr. Markosian. He should not now be heard to complain that he must defend himself in Utah.

Nevertheless, if the Court believes that the personal jurisdiction question here is a difficult one, it should order jurisdictional discovery. "When a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion." *Budde v. Ling-Temco-Vought, Inc.*, 511 F.2d 1033, 1035 (10th Cir. 1975). Here, jurisdictional discovery is likely to be particularly fruitful in light of the fact that Hesterman's document production shows that – contrary to Leshem's declaration submitted in support of the motion – Hesterman and Leshem targeted *other* Utah companies besides just Rymark.

### D. The Economic Loss Rule Does Not Bar Rymark And Mr. Markosian's Claims

Leshem argues that Third-Party Plaintiffs' claims against Leshem are barred under the economic loss rule. (Mot. at 26-29.) Under Utah law, "[t]he economic loss rule is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care." *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 32, 28 P.3d 669. The economic loss rule does not apply, however, "when a tortfeasor incurs a duty outside of any contract." *Donner v. Nicklaus*, 778 F.3d 857, 872 (10th Cir. 2015). If "the basis" for the plaintiff's

tort claims "is distinct and separable from the basis for the contract claims," the economic loss rule does not govern. *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 2018 UT 61, ¶ 15. "When an independent duty exists, the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule." *Hermansen v. Tasulis*, 2002 UT 52 ¶ 17 (2002).

Leshem's economic loss argument fails for several reasons. *First*, the argument relies on the Listing Agreement, which was not attached to the Third-Party Complaint. Leshem neither argues that the Listing Agreement was incorporated by reference nor that the Court may take judicial notice of it, so the Court should decline to consider it. *See, e.g.*, *Gray v. Oracle Corp.*, 2005 WL 3132344, at *1 (D. Utah Nov. 22, 2005)* (Stewart, D.J.). ("In resolving a 12(b)(6) motion, a court may not consider matters outside the pleadings, unless those documents are attached to the complaint or are referenced in the complaint.").

*Second*, even if the Court could consider the Listing Agreement, Rymark and Mr. Markosian do not assert contract claims that are supposedly in conflict with tort claims, and their tort claims neither claim that Leshem violated some contractual term nor seek expectancy damages. Put another way, Rymark and Mr. Markosian do not allege that Leshem tortiously failed to perform contractual duties, the classic situation in which the economic loss doctrine applies. *See Donner v. Nicklaus*, 778 F.3d 857, 872–875 (10th Cir. 2015) (party alleged negligent misrepresentation, seeking "the benefit of their bargain" under a contract). Instead, Rymark and Mr. Markosian allege that Leshem orchestrated a years-long fraudulent scheme that included fraudulent inducement.

*Third*, the Listing Agreement expired – according to its own terms – no later than April of

2017, nearly eight years ago. (Dkt. 253-1 at 5 Art. VII.A ("This Agreement . . . shall remain in effect for One (1) year . . . .").) And all of Rymark and Mr. Markosian's claims are premised on a fraudulent scheme that includes *years* of post-expiration conduct. As of April 2017, Leshem was still more than two years away from successfully listing AmeriMark Group on the Viennese market. He had not yet (1) executed the (bogus) reverse merger with AmeriMark Group, (2) stolen the 13,000,000 shares, (3) attempted to cover up that theft through doctored documents, (4) recruited Capana and Bernhardt into the scheme, (4) issued press releases about AmeriMark Group, (5) deceived Austrian market officials, or (6) sold a single share of stock. And Leshem has no explanation for how tort claims based on this conduct, all of which postdated the Listing Agreement, are supposedly barred by the economic loss rule. *See, e.g.*, *BC Tech., Inc. v. Ensil Int'l Corp.*, 464 Fed. App'x 689, 699 (10th Cir. 2012) (economic loss rule did not bar cause of action for conversion post-contract termination); *Big Squid, Inc. v. Domo, Inc.*, 2019 WL 3555509, at *15 (Aug. 5, 2019) (similar).

And *fourth*, Rymark and Mr. Markosian's claims are premised on duties independent of any duty set forth in the Listing Agreement. Leshem appears to concede that the economic loss rule does not apply in the presence of an independent legal duty. (Mot. at 27, 29.) And Rymark and Mr. Markosian allege independent legal duties in spades. Among other things, Leshem violated his statutory duty not to receive, retain, or dispose of stolen property under Utah Criminal Code section 76-6-408. (*See* Dkt. 139 ¶¶ 165–73.) *See, e.g.*, *Big Squid, Inc. v. Domo*, 2019 WL 3555509, at *14 (D. Utah Aug. 5, 2019) (declining "to interpret Utah's economic loss rule as barring a *statutory* claim" for misappropriation of trade secrets) (emphasis original). He similarly violated his not to defraud another Rymark and Mr. Markosian, the duty not to convert another's

property, and the duty not to conspire to inflict economic or financial injury upon a party. *Knight Bro., LLC v. Barer Engineering Co. of Am.*, 2011 WL 237153, at *6 (D. Utah Jan. 24, 2011) (Stewart, D.J.) (declining to dismiss fraud claim under economic loss rule because "Utah courts have found fraud claims may fall outside the doctrine"); *CounselNow, LLC v. Deluxe Small Business Sales Inc.*, 430 F. Supp. 3d 1247, 1259 (D. Utah Dec. 20, 2019) (economic loss rule did not bar misrepresentations that fraudulently induced party to enter into contract, since those representations were "an independent basis to support its fraud claim").

### E.  The Third-Party Complaint States A Claim For Civil Conspiracy

Leshem argues that Defendants have not stated a civil conspiracy claim against him because they have not identified specific fraudulent statements with sufficient particularity. (Mot. at 29–30.) The Court already rejected this exact argument when Plaintiffs made it in response to Rymark and Mr. Markosian's motion for leave to amend, explaining that "the Proposed Amended Counterclaim and the attached materials satisfy Rule 9(b) by providing . . . the 'who[,] what, when, where and how' of the allegedly fraudulent acts and representations." (Dkt. 137 at 9.)[4] Plaintiffs, the Court previously explained, erroneously "focus[ed] only on the paragraphs under each count heading," even though the pleading needed to be "read as a whole." (*Id.*)

Here, Leshem does not even focus on the paragraphs under the causes of action, let alone address the entire pleading. For instance, although Leshem also argues that the Third-Party Complaint does not identify any overt acts in furtherance of the conspiracy, he completely ignores paragraph 161 of the Third-Party Complaint, which sets forth a page-and-a-half worth of overt

---

[4] The Proposed Amended Counterclaim and the Third Party Complaint are the same pleading. (*Compare* Dkt. 138 *with* Dkt. 139.)

acts. In any case, the Third-Party Complaint exhaustively catalogs years' worth of overt fraudulent acts by Leshem. (*See, e.g.*, Dkt. 139 ¶¶ 46, 51, 54–62, 65–70, 75–84, 86–87, 89–92, 97, 107–08, 113, 123, 130–31, 160–63.)

### F.  The Third-Party Complaint States A Claim For Fraudulent Inducement

Leshem similarly argues – in cursory form – that Rymark and Mr. Markosian's fraudulent inducement claim fails to satisfy Rule 9(b). (Mot. at 30.) The Court has already rejected this argument, Dkt. 137 at 9, and it should do so again; the Third-Party Complaint alleges in detail ample fraudulent statements, actions, and omissions by Leshem. *See supra* (collecting paragraphs).

### G.  The Third-Party Complaint States A Claim Under Section 76-6-408

Utah Criminal Code section 76-6-408 makes it a crime to "receive[]," "retain[]," or "dispose[] of the property of another knowing that the property is stolen, or believing that the property is probably stolen." Utah Code Ann. 76-6-408(2). It is also a crime to "conceal[], sell[], withhold[], or aid[] in concealing, selling, or withholding" stolen property. *Id.* Section 76-6-408(8) creates a civil cause of action for "three times the amount of damages," plus "costs of suit and reasonable attorney fees."

Mr. Markosian's Section 408 claim against Leshem is based on Leshem's theft and subsequent disposal of 13,000,000 shares of AmeriMark Group stock. (Dkt. 139 ¶ 167.) Leshem argues that he cannot have violated Section 408 even if he "affirmatively stole" the 13,000,000 shares from Mr. Markosian, since Section 408 only applies to those who *receive* stolen property, rather than steal it themselves. (Mot. at 31.) But Leshem ignores the express language of the statute, which criminalizes not just "receiving" stolen property, but also "retaining" it, "disposing" of it, "concealing" it, "selling" it, or "withholding" it. Utah Code Ann. 76-6-408(2). And here, Mr.

Markosian alleges that Leshem not just "stole" 13,000,000 shares of AmeriMark Group stock, but that he "purported to transfer those shares to Whitetree Capital." (Dkt. 139 ¶ 167.) Leshem also concealed the stolen shares from Mr. Markosian. (Dkt. 139 ¶ 84.) Hence, Leshem not only stole the shares, but also retained them, concealed them, withheld them, and then disposed of them to Whitetree Capital. Any of these violates Section 408.

Leshem's case law is not to the contrary. In *Labertew v. WinRed, Inc.*, 2022 WL 1568924, at *8 (D. Utah May 18, 2022), the district court dismissed a Section 408 claim where the plaintiff had alleged only that the defendant "affirmatively stole" money. Here, by contrast, Mr. Markosian alleges that Leshem stole particularized property, concealed the theft, then transferred the stolen property to Whitetree. And to the extent that Leshem argues Section 408 is meant only to address "pawnbrokers, secondhand businesses, and coin dealers," this Court has specifically held that "there is no indication that the statute is limited to only these groups." *Sorensen v. Polukoff*, 2020 WL 1692815, at *8 (D. Utah Apr. 7, 2022) (Stewart, D.J.); *see also id.* (plaintiff properly stated Section 408 claim with respect to stolen hard drive containing patient information).

### H.  The Third-Party Complaint States A Claim For Conversion

Leshem argues in conclusory form that Mr. Markosian's claim for conversion fails because Mr. Markosian has not pleaded an absence of "lawful justification." (Mot. at 31.) This is bewildering. Mr. Markosian pleads that Leshem "stole 13,000,000 shares of AmeriMark Group stock from Mr. Markosian." (Dkt. 139 ¶ 176.) And he pleads the circumstances of that theft – including Mr. Leshem's apparent doctoring of documents to conceal the theft – in detail. (*Id.* ¶¶ 76–84.) It ought to go without saying that theft is not lawfully justified, and Leshem cites no case law suggesting that when a plaintiff alleges open theft (and violation of a criminal theft statute,

25

to boot), it must use the magic words "without lawful justification" to state a claim for conversion.

## I.   Service of Process Was Adequate

Mr. Leshem argues that when he was served with the Third-Party Complaint, the process server did not attach the [] of exhibits.  [Mot. At 32.]  Mr. Leshem characterizes this as a "critical defect" and requests dismissal of the Complaint or alternatively quashing the summons.

The law dictates that courts have broad discretion under to deem service defects excused. *E.g.*, *United States v. Ayer*, 857 F.2d 881, 885 (1st Cir. 1988) ("It is well-established that a technical failure in service may be excused where it does not result in prejudice to the defendant."). *Hendry v. Schneider*, 116 F.3d 446, 449 (10th Cir. 1997) ("A defect in service that does not result in prejudice to the defendant does not require dismissal of the action.)

No evidence exists supporting Mr. Leshem's attorney's argument that this defect was "critical."  First, Mr. Leshem's 9-page affidavit does not articulate any prejudice whatsoever in connection with the putative non-service of the exhibits. Second, substantial evidence would rebut that notion, if it had been argued. Specifically, Mr. Leshem is indisputably informed of this case and the nature of the claims against him. Mr. Leshem has responded with a substantive motion, demonstrating no prejudice from the absence of physical attachments. Furthermore, while at times Plaintiffs have denied this, Mr. Leshem is indisputably the co-architect of his litigation. Plaintiffs' corporate representative, Third-Party Defendant Shaen Bernhardt, testified that he has conferred with Leshem literally "hundreds" of times about this dispute. (Richards Decl. Ex. O.) And Leshem was involved in numerous communications with Plaintiffs' counsel pre-filing. (Dkt. 201 at 6; *see also* Dkt. 201-2 (under seal).)

Given Mr. Leshem's intimate connections with this litigation – since its onset – even assuming that the finally effectuated service of Mr. Leshem did not include the exhibits and should have done so,[5] the requested dismissal of the entire action is neither required nor justified.

Mr. Leshem cites a District of Utah opinion from *Clifford v. Dewbury Homes,* No. 2:18-cv-00522, 2018 WL 11584099, at *1 (D. Utah Oct. 1, 2018). Indeed, in *Clifford*, the *pro se* plaintiff served the registered agent of an entity defendant, Dewbury Homes, with a copy of the summons and complaint while failing to include 33 exhibits. Dewbury Homes moved to quash service, and the plaintiff did not oppose the Motion. *Id.* Magistrate Judge Furse, while noting that Rule 4 "does not specifically state that a plaintiff must serve exhibits with a Complaint," nonetheless ordered Plaintiff to re-serve Dewbury Homes within fourteen days. *Id.*

One obvious point of distinction: in *Dewbury Homes*, the re-service on an entity's registered agent was an easy correction. Yet here, a similar direction would be far less easy. As the Court knows, Mr. Leshem is not an entity defendant with a registered agent. Rather, he appears to reside part-time at his mother's house in Boca Raton. Last fall, he spent months actively evading multiple process servers. (*See generally* Dkt. 243-1.) Furthermore, Mr. Leshem's counsel in this action accepted service of a deposition subpoena from Plaintiffs, while simultaneously refusing to accept service of the third-party complaint. While the expenditure of thousands of dollars in pursuing Mr. Leshem was great "fun," Rymark and

---

[5] This point itself is not without controversy. First, exhibits are only incorporated by reference to a Complaint if the Complaint specifically refers to the document and if its authenticity is not questioned. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir.2005); *Cooper v. Pickett*, 137 F.3d 616, 622-23 (9th Cir.1997). In this case, the authenticity of many documents is in question.

Mr. Markosian respectfully would like to avoid a second chase.

In sum, Mr. Leshem is already fully apprised of the claims, has appeared, and has not articulated any prejudice. As such, any Rule 4(c) violation has effectively been cured or waived. In his 9-page declaration, Mr. Leshem does not assert that he does not have access to the exhibits, or that any delay in access interfered with his defense. So, the requested dismissal would be an extreme and unnecessary sanction for what amounts to, *at most*, a ministerial issue.

## V.    CONCLUSION

For the reasons set forth herein, the Motion should be denied. If the Court is inclined to grant any part of the Motion, Rymark and Mr. Markosian respectfully request leave to amend in order to add even more factual detail regarding Leshem's fraudulent and criminal activities.

DATED: March 27, 2025

**KB&A**

/s/*Chad S. Pehrson*
Chad S. Pehrson
Robert P. Harrington
Stephen Richards

*Attorney for Defendants and Third-Party Plaintiffs*

**WORD COUNT CERTIFICATATION**

I, Chad S. Pehrson, certify that according to Microsoft Word's "Word Count" function, and excluding the caption page, signature blocks, and the like, this brief contains 7,479 words and complies with DUCivR 7–1(a)(4).

/s/*Chad S. Pehrson*
Chad S. Pehrson

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 27th day of March 2025, I filed the foregoing

**DEFENDANTS' AND THIRD-PARTY PLAINTIFFS' OPPOSITION TO MOTION TO**

**DISMISS** via the Court's CM/ECF system, which provided notice of such filing to all counsel

of records.


*/s/Chad S. Pehrson*