# EXHIBIT D
## to
## Declaration of Stephen Richards

R É P U B L I Q U E    F R A N Ç A I S E



**The Sanction
Commission**

| |
|---|
| **SANCTIONS COMMISSION** <br><br> **Decision no. 2 of January 24, 2024** |

Procedure no. 22-12
Decision no. 2

**People involved :**

- Mr Miron Leshem
   Resident at [...].

- Grantchester Equity Limited U.S.
   corporation
   whose registered office is at 28 Old Rudnicck Lane, Dover, Delaware 19901 (United States), for which mail
   has been sent to and received at the address of its Chairman, Mr. Miron Leshem.
   Taken in the person of its legal representative

- Mr. Dirck Van Wylick
   Born on [...] in [...]
   Resident in [...]

- Mrs. Aude Planche
   Born [...] in [...]
   Resident in [...]
   With domicile at the law firm of Julien Visconti, Visconti, Grundler & Artuphel, 63 avenue Franklin D.
   Roosevelt, 75008 Paris.

- Mr Christian Person
   Born on [...] at [...]
   Domiciliated [...]
   Having elected domicile with Me Emilie Vasseur at the Mayer B r o w n  law firm, 10, avenue Hoche, 75008
   Paris.

- Mr  Léon  Lucide
   Born  on  [...]  at
   [...]    Domiciled
   at [...]
   Having elected domicile with Me Emmanuel Molina, at the firm Molina Avocats, 80, rue Saint-Jacques,
   13006 Marseille

- 2 -



- Mr Serge Goldner
  Born on [...] at [...]
  Domicile [...]
  Having elected domicile with Mr Johann Bioche, practising at 78 avenue Kléber, 75116 Paris

The 1ère section of the Enforcement Committee of the Autorité des marchés financiers (hereinafter: "**AMF**"):

The European Convention on Human Rights and Fundamental Freedoms, in particular article 6;

Having regard     to Regulation (EU) No. 596/2014 of the European Parliament and of the Council of April 16, 2014 on market abuse, and in particular Articles 3, 12, 15, 19 ;

The French Monetary and Financial Code, in particular articles L. 621-15, L. 621-18-2, R. 621-38 to R. 621-40 and

R. 621-43-1 ;

Vu le règlement général de l'AMF et notamment ses articles 223-23 et

221-1; Après avoir entendu au cours de la séance publique du 15 décembre

2023 :

- Sophie Schiller, in her report;
- Géraldine Marteau, AMF representative;
- Mr. Christian Person, accompanied by Mr. Mustapha Lahdir, Chief Financial Officer of Umalis Group, and assisted by his counsel, Ms. Emilie Vasseur of Mayer Brown, accompanied by Mr. Florent Testud;
- Mr Léon Lucide, assisted by his counsel, Mr Aurélien Olivier, of the firm Molina Avocats;
- Julien Visconti, attorney with the law firm Visconti, Grundler & Artuphel, accompanied by Quentin Bertrand, representing Mrs. Planche, absent;
- Mr. Johann Bioche, representing Mr. Serge Goldner absent ;

Grantchester Equity Limited, Mr. Miron Leshem and Mr. Dirck Van Wylick, who were duly summoned but did not attend.

The respondents were given the floor last.

## FACTS

Grantchester Equity Limited (hereinafter "**Grantchester Equity**"), chaired by Mr. Miron Leshem, is a US company which, at the time of the events, presented itself as a *consulting* firm.

Aude Planche, a French citizen, was, at the time of the events, managing director of GEM Capital Investments, a French société à responsabilité limitée à associé unique, which is the Paris office of Global Emerging Markets (hereinafter "**GEM**"). GEM is an American alternative investment fund with $3.4 billion in assets under management through several investment funds with diversified strategies and exposure to emerging markets. In particular, it invests in capital increase programs through the exercise of options. Ms. Planche is also Chairman and sole partner of Fauve Capital SAS (hereinafter referred to as "**Fauve Capital**"), an investment advisory company incorporated under French law.

Mr. Dirck Van Wylick, a Dutch national, manages Unimatrix Limited, registered in Mauritius (hereinafter "**Unimatrix**"), as well as Global Capital Research Gmbh, registered in Germany at the time of the events ( hereinafter "**Global Capital Research**"), which offers the following services *"Marketing & Promotion*" with issuers.

Mr. Serge Goldner, a dual French-Israeli national, is the founder and CEO of Gour Medical (hereinafter, "**Gour Medical**"), a company specializing in the development of veterinary care products for senior pets. Created on July 17, 2014, Gour Medical is a company



a French public limited company headquartered in Paris, now known as Coretech 5. It has been listed since December 1er 2016 on Euronext Access Paris.

Gour Medical recorded sales of 5,782.51 euros and net accounting income of - 214,407.09 euros for fiscal 2019. Its market capitalization stood at around 10,000,000 euros on June 5, 2018 (share price of 3.50 euros) with virtually no free float (0.09% of share capital, with Mr. Goldner holding virtually all of the share capital), rising to 335,000 euros on September 1er 2020 (share price of 0.12 euros). To date, Mr. Goldner holds almost 63% of Gour Medical's capital. The company's market capitalization stood at 335,635 euros on December 8, 2023.

Mr. Christian Person, a French citizen, is the founder and Chief Executive Officer of Umalis Group (hereinafter "**Umalis"**), a société par actions simplifiée (simplified joint stock company) incorporated under French law with its registered office in Paris, which offers freelance administration services for consultants specializing in the IT and engineering sectors. Created on November 1er , 2008 and listed on the open market on April 15, 2014, Umalis has remained listed on Euronext Access Paris at double *fixing*. Following capital increases approved on July 17, 2016, Umalis was 96.74%-owned by Edern SAS (hereafter, "**Edern**"), a *holding company* wholly-owned by Mr. Person. Edern currently holds 75.7% of Umalis' capital.

Umalis recorded sales of around 3,570,000 euros in fiscal 2019, an increase of almost 6% on fiscal 2018, when a loss of around 1,800,000 euros was recorded, and net income of virtually zero.

Its market capitalization stood at around €7,300,000 on September 5, 2018 (share price €7.35). Since on January 1er , 2020, it varied between 1,500,000 and 2,000,000 euros (share price of 1.25 euro on September 4, 2020). The
2,979,000 at December 8, 2023.

Mr Léon Lucide, a French national, is the founder and Chairman of Groupe CIOA (hereinafter "*CIOA*"), a limited company set up in 1994 by Mr Léon Lucide and his wife Mrs A. Lucide. CIOA operates a business-to-business network specializing in opportunities with French-speaking countries on the African continent, and describes itself as "*a collaborative, multidisciplinary business consultancy that provides companies and organizations of all sizes with the strategies, connections and resources to succeed in a world transformed by the globalization brought about by the WTO, and by the widespread use of digital technology*".

Listed on the open market in December 2014, CIOA has been majority-owned since its creation by the Lucide family, notably *via* its *holding* company, Festival of Spirit Limited (hereafter, "*Festival of Spirit Ltd*").
Mr. Léon Lucide wholly owns the *holding company* Festival of Spirit Ltd, which itself held 95.1% of CIOA at the end of 2017 (free float of 4.9%), with this percentage rising to 91.9% at the end of 2018 (free float of 8.1%). Festival of Spirit Ltd currently holds 36% of CIOA's share capital. Festival of Spirit Ltd owns a French company, Festival of Spirit EURL, managed by Mr. Léon Lucide.

Sales generated by CIOA, for the 2019 financial year, amounted to around 11,720,000 euros (up 21% on the previous year), with net income of around 1,400,000 euros (also up 8.68% on 2018).

On September 19, 2018, CIOA's market capitalization stood at 14,500,000 euros (share price of 2.84 euros), and on September 1er , 2020 at 4,000,000 euros (share price of 0.76 euros). CIOA's market capitalization stood at 2,500,000 euros on December 8, 2023.

In 2018, Mr Léon Lucide was Managing Director of CIOA, a position that is currently held by his son, Mr Lionel Lucide.

## **PROCEDURE**

Suspicious variations were observed in the share prices of Gour Medical, Umalis and CIOA in 2018 and 2019. On October 17, 2018, January 11, 2019 and June 11, 2019, the Secretary General of the AMF decided to open three investigations concerning, on the one hand, "*the market for GOUR MEDICAL (CH0342399851) shares, and any financial instrument whose price or value depends on the price or value of GOUR MEDICAL shares* [...] *or whose price or value has an effect on the price or value of GOUR MEDICAL shares* [...], respectively, *as from*

- 4 -



*1ᵉʳ janvier 2018"*, on the other hand, "*financial information and the market for UMALIS GROUP shares, and on any financial instrument whose price or value depends on the price or value of UMALIS GROUP shares or whose price or value has an effect on the price or value of UMALIS GROUP shares, from 1ᵉʳ January 2018"*, and finally on "*financial information and the market for CIOA shares (FR0012384907), and on any financial instrument whose price or value depends on the price or value of CIOA shares [...] or whose price or value has an effect on the price or value of the CIOA share [...], as of January 1ᵉʳ 2018"*.

On November 19, 2019, the Secretary General of the AMF decided to combine these three investigations into a new investigation into the market for the three securities as well as the financial information of Umalis and CIOA as of January 1ᵉʳ 2018.

On April 8, 2021, the AMF's Investigations and Control Department sent letters to Mrs. Planche, Mr. Lucide, Mr. Goldner, Mr. Van Wylick, Mr. Leshem and Mr. Person, as well as to Grantchester Equity, informing them in detail of the possible charges against them in light of the investigators' findings, and of their right to submit comments within one month.

On April 28, April 30, May 7, May 21 and May 25, 2021, Mr. Van Wylick, Ms. Planche, Mr. Person, Mr. Goldner and Mr. Lucide respectively submitted comments in response.

On January 6, 2022, the AMF's Investigations and Control Department sent new letters to Messrs Lucide, Goldner and Person, informing them in detail of the possible charges against them in the light of the investigators' findings, and informing them of their right to submit comments within one month.

On January 26, February 4 and February 14, 2022, comments in response were sent by respectively Mr Lucide, Mr Person and Mr Goldner.

The survey resulted in a report dated March 15, 2022.

On March 29, 2022, the Specialized Commission no. 1 of the AMF Board decided to notify grievances to Mr. Leshem, Grantchester Equity, Ms. Planche, Mr. Van Wylick, Mr. Goldner, Mr. Person and Mr. Lucide.

Notifications of grievances were sent to the respondents on July 26, 2022 by registered letter with acknowledgement of receipt or by international courier. They were received on July 27, 2022 by Mr. Goldner and Ms. Planche, on July 28, 2022 by Mr. Van Wylick, and on August 1ᵉʳ 2022 by Mr. Leshem. Notifications of grievances addressed to Messrs Person and Lucide and to Grantchester Equity were again sent to them respectively, by registered letter with acknowledgement of receipt or by international courier, on August 4, September 1ᵉʳ and September 6 2022. They were received on September 6, 2022 in the case of Mr. Lucide, and on September 9, 2022 in the case of Grantchester Equity. The acknowledgement of receipt of the second dispatch of the notification of grievances sent to Mr. Person does not indicate the date of receipt.

The complaint is that Mr. Leshem and Grantchester Equity have failed to comply with the obligation to refrain from price manipulation on the securities under investigation listed on Euronext Access, in breach of the provisions of Articles 12 and 15 of Regulation (EU) No. 596/2014 of April 16, 2014 on market abuse (hereinafter, the "***MAR Regulation***").

More specifically, Mr. Leshem and Grantchester Equity are accused of having devised and implemented a manipulative scheme concerning these securities that constitutes conduct :

- giving or being likely to give false or misleading indications as to the offer, demand or price of the securities, within the meaning of Article 12.1 a) i) of the MAR Regulation;

- fixing or being likely to fix the price of the securities at an abnormal or artificial level, within the meaning of Article 12.1 a ii) of the MAR Regulation;



- influencing or being likely to influence the price of the securities by using fictitious procedures or any other form of deception or artifice, within the meaning of Article 12.1 b) of the MAR Regulation;

- which enabled Unimatrix, Edern and Festival of Spirit Ltd to secure a dominant position in the supply of securities during the periods analyzed, within the meaning of article 12.2 a) of the MAR Regulation.

Mrs Planche and Mr Van Wylick are accused of having, by participating in the implementation of this manipulative scheme, adopted a behaviour that contributed to each of the aforementioned cases of price manipulation, in breach of the provisions of articles 12 and 15 of the MAR Regulation, as clarified by recital 39 of the MAR Regulation.

In addition, it complains:

- to Mr. Goldner, for having erroneously and belatedly declared the transactions carried out between May 16 and July 16, 2018 on the Gour Medical share, the amount of which exceeds the threshold of 20,000 euros;

- Mr Person for failing to declare the transactions in Umalis shares carried out via his personal holding company Edern between September 5 and November 27, 2018 and between February 11 and June 3, 2019, the amounts of which exceed the threshold of 20,000 euros;

- to Mr Lucide, for failing to declare the transactions carried out via his holding company Festival of Spirit Ltd on the CIOA share between September 21 and December 7, 2018, the amount of which exceeds the threshold of 20,000 euros,

in breach of Articles 19 of the MAR Regulation, L. 621-18-2 of the French Monetary and Financial Code, 223-23 and 221-1 of the AMF General Regulation (hereinafter referred to as the "***RGAMF***").

A copy of the grievance notifications was sent to the Chairman of the Enforcement Committee on July 26, 2022, in accordance with the provisions of article R. 621-38 of the French Monetary and Financial Code.

By decision dated September 8, 2022, the Chairman of the Enforcement Committee appointed Sophie Schiller as rapporteur.

By letter dated October 4, 2022, the respondents were informed that they had a period of one month, pursuant to article R. 621-39-2 of the French Monetary and Financial Code, to request the recusal of the rapporteur under the conditions set out in articles R. 621-39-3 and R. 621-39-4 of the Monetary and Financial Code.

After requesting and obtaining additional time, Mr. Goldner and Ms. Planche filed observations in response to the statements of objections on October 5, 2022 and October 21, 2022 respectively. Comments in response to the notifications of grievance were received from Mr. Person on October 12, 2022, and from Ms. Planche on October 17, 2022.
Mr Lucide. No response to the notification of grievances has been received from Mr. Van Wylick, Mr. Leshem or Grantchester Equity.

The rapporteur heard Messrs Goldner and Person on June 28, 2023, and Mr Lucide and Ms Planche on June 29, 2023. Following their hearings, Messrs Lucide and Person provided additional information on July 4 and 10, 2023 respectively. Mrs. Planche submitted additional information on July 10, 2023, and further comments on September 14, 2023.

Mr Leshem, Grantchester Equity and Mr Van Wylick were duly summoned but did not appear before the rapporteur.

The rapporteur submitted his report on October 27, 2023.

By letters dated October 30, 2023, enclosing the rapporteur's report, the respondents were invited to attend the meeting of the Enforcement Committee on December 15, 2023, and informed that they had fifteen days to submit their observations in response to the rapporteur's report, in accordance with the provisions of III of article R. 621-39 of the French Monetary and Financial Code.



By letters dated November 9, 2023, the respondents were informed of the composition of the Enforcement Committee panel due to deliberate at the meeting of December 15, 2023, and of the fifteen-day period within which they had the right, pursuant to article R. 621-39-2 of the Monetary and Financial Code, to request the disqualification of one or more of its members, in accordance with articles R. 621-39-2 to R. 621-39-4 of the same code.

Comments in response to the rapporteur's report were submitted by Mr Goldner on November 12, 2023, by Mr Person and Mrs Planche on November 14, 2023, and Mr Lucide on November 28, 2023.

**REASONS FOR DECISION**

    **I.**    **Procedural grounds**

        ***1.  On Mrs. Planche's plea that the rights of the defense have been seriously and irreparably impaired***

        ***1.1    Medium presentation***

1.    Ms. Planche argues that the proceedings against her have been conducted in conditions that irremediably infringe her rights of defence, so that they are unlawful and must be discontinued.

2.    She first argues that the central element of the prosecution's case against her lies in the assertion that GEM's investment in the capital of the issuers Gour Medical, CIOA and Umalis was conditional on the prior implementation of a liquidity program, the terms of which were manipulative. To contest this argument, Mrs. Planche argued that the e-mails exchanged by the directors of these issuers during the periods surrounding the implementation of the liquidity programs, which were seized by the investigators but not placed in the file, constituted exculpatory evidence essential to the exercise of her rights of defense. According to her, these e-mails would have enabled her to demonstrate that the liquidity programs set up by these executives were unrelated to any investment by GEM, that these programs were set up at the express request of the same executives, and that she herself had not intervened in the setting up and execution of the said programs. She added that she had no access to these e-mails, including those exchanged between her and the directors, since she had deleted them from her inbox.

3.    Secondly, Ms. Planche points out that she requested the production of these e-mails as soon as the investigation began, by writing to the directors of the issuers, who did not reply, and then as soon as the adversarial phase began, by letter dated September 8, 2022, sent to the Chairman of the Enforcement Committee. She also points out that the request made in this letter was rejected by the rapporteur in his letter of September 21, 2022, on the grounds that the electronic messaging media seized by the investigators from the issuers had already been destroyed, and that the rapporteur did not have the power to request a new delivery from the issuers, which Ms. Planche denounces. She also deduced from the rapporteur's unfavorable response to her request that it was impossible for her to obtain a copy of the e-mails she had requested, as they had been destroyed after use before the end of the deadline for replying to the notification of grievances, and that any new request to the rapporteur would be doomed to failure.

4.    It argues that the extremely restrictive selection of the e-mails exchanged by the directors and attached to the investigation report was unfair in that it led to the exclusion of exculpatory evidence useful to its defense. It also maintains that the hasty destruction of all the other e-mails seized by the investigators hindered the full exercise of the adversarial process. She points out that it was impossible for her to specify the list and content of the requested e-mails, as she was unable to consult them. It further maintains that the existence of these e-mails is indisputable, since they were seized by the investigators from the issuers, and that it is clear that the directors exchanged numerous e-mails relating to the liquidity programs, since they were required to participate actively in them.

5.    Furthermore, she asserts that the infringement of the executives' right to privacy caused by the production of the e-mails in question for the exercise of her rights of defence would not be disproportionate, given the seriousness of the facts of which she is accused and the numerous accusations made against her by the executives.



6.    Finally, Ms. Planche refers to the letters sent by the Director of Investigations on October 19, 2021, transmitting the statements of findings. She points out that while the destruction of e-mails not included in the proceedings was indicated, it was also specified that "*only these documents will be included in the file attached to the investigation report, unless the parties make an additional request*". She points out that, since each statement of facts is addressed solely to the person who handed over the electronic mailboxes to the investigators, she was only able to formulate a supplementary request concerning the managers' electronic mailboxes after the adversarial phase of the proceedings. She concludes that it was the investigators' eagerness to destroy the seized e-mail boxes just after the notification of grievances had been sent that prevented her from making a supplementary request and irremediably compromised her rights of defence.

### 1.2    Examination of the means

7.    Article 6 of the European Convention for the Protection of Human Rights and Fundamental Freedoms (hereinafter "***ECHR***") states that: "*1. Everyone is entitled to a fair hearing* [...] *by an independent and impartial tribunal* [...] *3. Every accused person has the right in particular to: a) to be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him; b) to have adequate time and facilities for the preparation of his defence; c) to defend himself in person or through legal assistance of his own choosing and, if he has not sufficient means to pay for legal assistance, to be given it free when the interests of justice so require ; d) to examine, or have examined, the witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him; e) to have the free assistance of an interpreter if he cannot understand or speak the language used at the hearing*".

8.    While the Enforcement Committee must be considered as deciding on the merits of criminal charges, within the meaning of article 6 of the CSDH, when dealing with acts that may give rise to the sanctions provided for in the Monetary and Financial Code, it is settled case law that the requirements of a fair trial arising therefrom, such as the principle of contradiction, apply only from the notification of grievances opening the sanction proceedings, and not during the preliminary investigation phase, which must nevertheless be fair in order not to compromise the interests of the company, such as the principle of contradiction, apply only from the notification of grievances opening the sanction procedure, and not to the preliminary investigation phase, which must nevertheless be fair so as not to irremediably compromise the rights of defence of the persons concerned. Subject to this proviso, the investigators are free to determine the nature and scope of the investigations they decide to carry out as part of the inquiry entrusted to them, as well as the choice of actions carried out, documents examined and persons interviewed.

9.    Furthermore, the fact that AMF investigators select the documents to be included in the file is not in itself such as to vitiate the procedure, unless it can be shown that, in breach of their duty of loyalty, they have withheld information likely to influence the Enforcement Committee's assessment of the merits of the complaints lodged.

10.   In the present case, it should first be noted that the investigators were given the professional mailboxes of Mr. Lucide, Ms. A, Mr. Person and Mr. Goldner between January 10, 2019 and February 4, 2020. After an initial visit to the GEM premises on March 18, 2019, during which Ms. Planche decided not to attend, the investigators again visited the GEM premises on March 25, 2019, where they were received by Ms. Planche and given her professional mailbox.

11.   Following the analysis of these mailboxes, and in accordance with the terms of the investigation charter, on October 18, 2021, the investigators drew up statements of findings in which they indicated that they had "*noted that among those sent from these electronic mailboxes or received (as addressee or as copy) in these electronic mailboxes, there are electronic mailboxes that usefully fall within the scope of the investigation*" and "*extracted and recorded the said electronic mailboxes*", listed in each statement of observation. These statements were sent respectively to the directors of the issuers and to Mrs. Planche on October 19, 2021, in letters which stated: "*Of the electronic messages contained in the mailboxes handed over to the investigators, only these documents will be included in the file attached to the investigation report, unless the parties make an additional request*" and "*since the updating of the Investigation Charter on September 27, 2021, the electronic mail media collected by the investigators in the exercise of their own powers are now destroyed by the AMF departments, in the interests of greater efficiency. They will no longer be returned to the person concerned*".



12. Secondly, the investigators' examination of Ms. Planche's e-mail inbox revealed that she had probably deleted a significant number of e-mails exchanged by her in connection with the facts complained of, given the very limited number of e-mails remaining, in particular concerning her exchanges with Mr. Leshem and with the directors of the issuers (mainly telephone appointments), even though her e-mail inbox also contained older exchanges or exchanges with business introducers.

13. Thirdly, it should be noted that in its letter of September 8, 2022 addressed to the chairman of the commission, Ms. Planche's counsel requested: "*the production of the following emails, seized by the investigators but not attached to the investigation report: / (i) emails exchanged by Mr. Goldner over the period 1ᵉʳ  March - September 15, 2018; / (ii) emails exchanged by Mr. Person over the period 1ᵉʳ  March 2018 - June 15, 2019; / (iii) emails exchanged by Mr Lucide and Mrs A over the period August 23, 2018 - June 15, 2019*", on the grounds that these electronic mailboxes were likely to contain exculpatory evidence demonstrating that improving the liquidity of the companies in question had not been a condition imposed by Mrs Planche but had been requested by their managers themselves, who wished to sell their shares.

14. This request was forwarded to the rapporteur, appointed by decision dated September 8, 2022, who, in his letter of reply dated September 21, 2022, did not respond favorably. Under the terms of this letter, it was recalled, firstly, that only the e-mails selected by the investigators from the electronic mailboxes of Messrs. Goldner, Person and Lucide and Mrs. A in particular, as falling usefully within the scope of the investigation, had been extracted and recorded by them, then added to the file before the destruction of the electronic mail media, as indicated by the Director of Investigations in the letters transmitting the statements of findings on October 19, 2021. Secondly, the provisions of article L. 621-10 of the French Monetary and Financial Code allow investigators to obtain all documents, regardless of their medium, but do not apply to the rapporteur, as no other legislative or regulatory provision confers on the latter the power to obtain the e-mails in question from the companies. Ms. Planche's counsel was reminded of the terms of the letters dated October 19, 2021, which specified that only the documents in question "*will be included in the file attached to the investigation report, unless the parties make an additional request*", and added that since the updating of the investigation charter on September 27, 2021, "*electronic messaging media, collected by investigators in the exercise of their own powers, are now destroyed by the AMF departments, in the interests of greater efficiency*". At the date of the above-mentioned letter from Ms. Planche's counsel, this was the case for the e-mail boxes whose disclosure was requested.

15. It should be pointed out that the letters transmitting the statements of findings are sent to each of the persons who handed over an e-mail box to the investigators before the opening of the adversarial phase of the proceedings, so that the possibility of making an additional request to the investigators concerning the electronic messages in the file is only open to the person whose e-mail box was seized. Thus, the circumstance invoked by Mrs. Planche that it was the destruction by the investigators of the electronic mailboxes seized just after the notification of grievances was sent that prevented her from making a supplementary request is inoperative, since her request, which concerned not her own electronic mailbox but those of the directors of the issuers, was not admissible in view of its purpose.

16. In addition, Mrs. Planche contests the investigators' selection of the documents in the file, without however providing any detailed evidence to justify that obtaining the requested e-mail boxes would be likely to be of interest to her defense. In fact, the company is content to request all the e-mail inboxes of the issuers' senior executives over periods of 7 to 18 months, which is longer than the period used for the alleged price manipulation offenses, from March 2018 to June 3, 2019. According to GEM, the mailboxes in question are likely to contain exculpatory evidence, showing that improving the companies' liquidity was not a prerequisite for GEM's investment. The company has not provided any additional information concerning the e-mails sought or their subject matter, to establish that they contain exculpatory material, given that it has itself deleted almost all of its electronic exchanges relating to the alleged facts.



17.  Ms. Planche's allegations in this respect are based on mere suppositions which appear all the more unfounded as they are contradicted by the investigators' investigations. The investigators found emails exchanged between Ms. Planche and Mr. Person on June 6, 2018 and between Ms. Planche and Mr. Goldner on September 3, 2018, the terms of which unambiguously confirm that GEM's investment was presented as conditional on the stock's liquidity first improving. Moreover, these emails demonstrate that the investigators have added to the file the elements that are usefully within the scope of the investigation.

18.  It follows from the above that Mrs. Planche's request for access to the electronic mailboxes of the issuers' directors could not be granted, regardless of the destruction of the electronic mailboxes by the investigators.

19.  In addition, Ms. Planche's request concerns access to e-mails, the communication of which is strictly controlled in view of the need to protect privacy. Contrary to Mrs. Planche's assertion, even if her request is based on the exercise of her rights of defense, the infringement of the right to privacy of senior executives resulting from the production of the e-mail boxes requested by her would have been manifestly disproportionate given that her request concerned, as indicated above, all the e-mail boxes in question over periods of 7 to 18 months.

20.  In any event, Mrs. Planche has not pointed to any circumstances that could legitimately suggest that the investigators withheld information likely to influence the Enforcement Committee's assessment of the merits of the complaints against her, or that for any other reason they failed in their duty of loyalty.

21.  It follows from the foregoing that neither the disloyalty of the investigators nor the irremediable infringement of the adversarial principle and Mrs. Planche's rights of defense have been established, so that the plea put forward by her is rejected.

### *2.  Mr. Person's plea that the rights of the defense have been seriously and irreparably impaired*

#### *2.1    Medium presentation*

22.  Mr. Person also maintains that the procedure seriously and irremediably infringes his rights of defense, and puts forward three reasons. Firstly, Mr. Person maintains that the notification of grievances is imprecise and obscure, contrary to the principle of adversarial proceedings and the rights of the defense, insofar as it refers in its conclusions to a possible breach of Edern's reporting obligations, but also mentions in the body of the document market manipulation within the meaning of articles 12 and 15 of the MAR Regulation, so that there was uncertainty as to whether this was another grievance.

23.  Secondly, Mr. Person maintains that the notification of grievances is based on complaints from German individuals which were not communicated to him, in violation of the adversarial principle and the rights of the defense, even though they are, in his view, a very important element in the prosecution, since they appear to have revealed possible market manipulation.

24.  Thirdly, Mr. Person contests the absence of prosecution of the main perpetrator of the alleged breach of reporting obligations, i.e. Edern. He argues that he cannot be prosecuted alone, in place and stead of his principal, who is principally liable for the obligation to declare the crossing of thresholds. Mr. Person also points out that there was no profit made from the transactions in question, since all the sums received by Edern were advanced to Umalis in the form of a shareholder's current account, so that Umalis could meet the repayment schedule of its debt to the Commission des Chefs de Services Financiers (CCSF).



*2.2    Examination of the means*

25.  Respect for the principle of adversarial proceedings and the rights of the defence, guaranteed by article 6 of the CSDH reproduced in point 7, requires that grievances be formulated in a sufficiently clear and precise manner so that the person concerned is aware not only of the facts on the basis of which he or she is reproached, but also of the qualification envisaged.

26.  In addition, pursuant to article L. 621-15 of the Monetary and Financial Code, the AMF Board has sole discretion as to whether or not to institute proceedings, deciding on the nature and scope of the complaints to be notified and the persons to be charged. It is not bound by the legal qualifications proposed by the investigating authorities, and may take a different view of the facts uncovered by the latter, either less severely or more severely.

27.  In this case, the first detailed letter sent to Mr. Person on April 8, 2021 accused him of failing to comply with articles 12 and 15 of the MAR Regulation, as clarified by recital 39 of the Regulation, in respect of his participation in the implementation of the potentially manipulative scheme set up by Mr. Leshem, and pointed out that he had not reported his transactions to the AMF as required by article 19 of the Regulation. The second detailed letter sent to Mr. Person on January 6, 2022, accused him, in addition to the aforementioned breach of price manipulation by reference to the first detailed letter of April 8, 2021, of failing to comply with the reporting obligation arising from articles 19 of the MAR Regulation, L. 621-18-2 of the French Monetary and Financial Code and 223-23 of the RGAMF. As for the notification of grievances addressed to Mr. Person, it reads as follows: *"It appears from the report of the AMF's Investigations and Controls Division, to which this notification of grievances refers, that you may have committed a breach of the reporting obligation resulting from Articles 19 of Regulation (EU) No. 596/2014 of the European Parliament and of the Council of April 16, 2014 on market abuse (hereinafter "MAR Regulation"), L. 621-18-2 of the French Monetary and Financial Code and 223-23 of the AMF General Regulation, in the absence of a declaration of the transactions you carried out in UMALIS GROUP shares, via your personal holding company Edern, between September 5, 2018 and November 27, 2018 and then between February 3, 2019 and June 11, 2019."*. It then concludes: *"Edern may thus have failed to comply with its reporting obligations arising from the provisions of Article 19.1 of the MAR Regulation and L. 621-18-2 of the French Monetary and Financial Code, a failure which could be imputed to you pursuant to Article 221-1 of the AMF General Regulation. / For all the above-mentioned facts and reasons, you may have failed to comply with the obligation arising from Articles 19 of the MAR Regulation, L. 621-18-2 of the French Monetary and Financial Code and 223-23 of the AMF General Regulation, by failing to declare the transactions you carried out, via your personal holding company Edern, in UMALIS GROUP shares, between December 5, 2018 and November 7, 2018 and between February 11, 2019 and June 3, 2019, the amounts of which exceed the threshold of 20,000 euros"*.

28.  It is clear from a simple reading of this document that the facts complained of and their legal classification, based on the provisions of article 19 of the MAR Regulation, L. 621-18-2 of the Monetary and Financial Code and 223-23 of the RGAMF, are clearly set out in the notification of grievances.

29.  Moreover, if the notification of grievances addressed to Mr. Person refers to market manipulation, it is only under circumstances that aggravate the declaratory breach, as can be seen from the following passage: *"Finally, certain transactions on the UMALIS GROUP share market highlight several elements which could characterize market manipulation within the meaning of articles 12 and 15 of the MAR regulation. [...] However, the implementation of this potentially manipulative scheme on the UMALIS GROUP share was facilitated by your behavior* [...]. *These circumstances aggravate the failure to declare the transactions that were thus carried out"*, and *"This failure is all the more serious in that by failing to notify the AMF of the transactions that you carried out, via your personal holding company Edern on the UMALIS GROUP share, you facilitated the implementation and execution of a potentially manipulative scheme on the share"*.

30.  Consequently, the facts complained of and their legal characterization, i.e. failure to comply with reporting obligations in respect of transactions carried out on Umalis shares, are clearly distinguishable from the circumstance presented as aggravating this failure, relating to the facilitation of a potentially manipulative scheme. The grievances notified to Mr. Person are therefore neither obscure nor imprecise, so that
Mr. Person had sufficient evidence to enable him to present his defense.



31. With regard to the complaints from German individuals referred to in the notification of grievances, which were allegedly not communicated, it should be noted that the file to which Mr. Person had access contains anonymous testimonials recorded by the German regulatory authority (BAFIN) concerning investors canvassed to acquire Umalis shares, as well as reports concerning Gour Medical and CIOA. In any event, Mr. Person's argument that these complaints constituted an important element of the prosecution in that they revealed possible market manipulation is inoperative, given that
Mr Person is being prosecuted solely for declaratory breaches unrelated to the complaints in question.

32. It follows that Mr. Person's criticisms of the notification of grievances and the complaints from German individuals are unfounded. There has been no breach of the adversarial principle or of Mr. Person's rights of defense.

33. With regard to Edern's lack of involvement, it should be noted that article 221-1 of the RGAMF, referred to in the notification of grievances as indicated in point 27, makes all the provisions of title II of book II applicable, including those of article 223-23, also referred to in the notification of grievances, to the following companies
As a result, *the obligations arising from these provisions*, *as* well as any breaches of these obligations, are *attributable not only to the issuers, entities or other legal entities that are debtors of the obligations in question, but also to the "directors of the issuer, entity or legal person concerned"*. Consequently, the obligations resulting from these provisions, as well as any breaches of these obligations, are attributable not only to the issuers, entities or other legal persons who are debtors of the obligations in question, but also generally to their directors. It is undisputed that Mr. Person is the director of Edern.

34. The fact that the grievance was not notified to Edern, the company primarily responsible for reporting obligations, is irrelevant, since the provisions of article 221-1 of the RGAMF do not make the liability of the manager conditional on that of the entity managed, or on the impossibility of engaging the liability of the latter, and since the AMF Board has the power to assess the appropriateness of prosecution.

35. The lack of profit alleged by Mr. Person as a result of these transactions is also irrelevant.

36. As a result, Mr. Person can be held responsible for breaches of declarations even though Edern has not been implicated.

37. Mr Person's plea that his rights of defence had been seriously and irreparably impaired is thus rejected.

    II.    **On the notified grievances**

      *1.  On the allegations of price manipulation*

        *1.1  On price manipulation by setting the price at an abnormal or artificial level on Gour Medical, Umalis and CIOA shares*

      **1.1.1.**    **Notification of grievances**

38. The statements of objections addressed to Grantchester Equity, Mr Leshem, Mr Van Wylick and Ms Planche allege that they engaged in conduct constituting or contributing to price manipulation by having devised and implemented, or having participated in the implementation of, a manipulative scheme based on a three-stage operating procedure, namely targeting and canvassing entities seeking investors, then contacting and presenting a *market making* program, and finally implementing this program.

39. With regard to the first phase, known as targeting the easiest-to-manipulate securities, the grievance notifications state that the aim was to identify companies in need of financing for their development, listed on Euronext Access Paris and characterized by a low liquidity of their securities. The grievance notifications indicate that the "origination" of the dossiers was carried out by Mrs. Planche on behalf of GEM, by means of e-mails mentioning the latter's interest in the company concerned, followed by telephone conferences in which Mrs. Planche presented the proposed packages. As far as the companies were concerned, the statements of grievance noted that GEM's investment was presented by Mrs. Planche as being conditional on an improvement in the liquidity of the shares of the companies in question, and that to this end, Mrs. Planche had immediately made them



presented by Mr. Leshem and his company Grantchester Equity. According to the statement of objections, this liquidity was intended to increase the attractiveness of the companies' shares, so as to attract the interest of players with the resources to finance their development, such as GEM.

40.　With regard to the second phase of Mr. Leshem's presentation of the *market making program*, the statement of objections notes that, on his own initiative, Mr. Leshem contacted the companies' managers directly by telephone or e-mail to present his program and propose his standard two-page contract specifying the following elements Leshem contacted the companies' managers directly by telephone or e-mail to present his program and propose his standard two-page contract specifying the following elements: the identity of the initial seller, i.e. the legal entities holding the shares and controlled by the managers of the companies listed on Euronext Access or the manager directly or the intermediary (*trustee*) between the selling manager and the market, the duration, the possible sales volumes, the price targets, the distribution of the sales proceeds, the *lock-up* request from the other shareholders in order not to
"Pollute" sales and access to the company's website.

41.　With regard to the third phase, the execution of the *market making program*, the statement of objections explains that it consisted, on the one hand, in having the managers themselves sell a significant number of their company's shares on the market over a period of several weeks and, on the other, in encouraging purchases of shares by private individuals, mainly in Germany and Austria, *via* a telephone canvassing campaign carried out by bogus *brokers* disseminating false information about the companies. The notifications of grievance add that the execution of the *market making program* may have begun even before any contract was signed, particularly in the case of CIOA.

42.　The statement of objections also points out that the remuneration paid to Grantchester Equity and its partners for carrying out the *market making program* corresponded to 70% of the proceeds from the sale of securities on the market, with the remaining 30% going to the seller.

43.　They set out the facts concerning Gour Medical, Umalis and CIOA shares, in particular the interactions between the companies' directors, Mr Leshem and Grantchester Equity, Unimatrix, Global Capital Research and/or Ms Planche from March 2018 in the case of Gour Medical, from June 2018 in the case of Umalis, and from September 2018 in the case of CIOA. They also show transactions in Gour Medical shares between June 5 and August 8, 2018, in Umalis shares between September 5 and November 27, 2018, and between February 11 and June 3, 2019, and in CIOA shares between September 19 and October 2, 2018, and between October 23 and December 7, 2018.

44.　The statements of objections also point out that certain transactions in these shares reveal elements that could be construed as price manipulation. In this respect, they state that the above-mentioned manipulative scheme, developed and executed by Mr. Leshem and Grantchester Equity - of which the latter is Chairman - and in which Mr. Van Wylick, through the companies Unimatrix and Global Capital Research, of which he was Chairman at the time of the events, and Ms. Planche, as an individual and through the company Fauve Capital, took part, could be qualified as market manipulation within t h e  meaning of article 12.1 of the MAR Regulation.

45.　The statements of objections mention the sharp variation in the prices of the securities concerned during the periods identified, before referring to the indicator relating to *"the extent to which orders placed or transactions carried out represent a significant proportion of the daily volume of transactions carried out on the financial instrument concerned,* [...]*, in particular when these activities result in a significant variation in their price"* provided for in a) of Annex I A of the MAR Regulation.

46.　They point out that the *market making program* set ex-ante very high price targets or promises of price trends, without any underlying economic justification, in return for 70% commission on sales generated. They conclude that these elements could reflect the adoption of behaviour aimed at fixing or likely to fix at an abnormal or artificial level the price of one or more financial instruments within the meaning of article 12.1 (a) (ii) of the MAR Regulation.



**1.1.2.    Respondents' comments**

47.    Mr. Leshem, Grantchester Equity and Mr. Van Wylick did not submit any comments in response to the statement of objections or the rapporteur's report. Mr. Van Wylick replied to the detailed letter sent to him during the investigation, but did not put forward any evidence relating to the alleged cases of price manipulation.

48.    Ms. Planche denies having participated in the execution and implementation of the liquidity programs. Without putting forward any element specific to the breach of price manipulation by fixing the share price at an abnormal or artificial level, she maintains that she merely put the issuers in contact with Mr. Leshem, which cannot, in her opinion, be qualified as price manipulation.

**1.1.3.    Applicable texts**

49.    The facts complained of, which took place between March 2018 and June 3, 2019, must be examined in the light of the texts then applicable.

50.    Article 12 of the MAR Regulation, which came into force on July 3, 2016 and has not since been amended, states that: "*1. For the purposes of this Regulation, the notion of 'market manipulation' covers the following activities: / a) effecting a transaction, placing an order or engaging in any other conduct which : [...] / ii) fixes or is likely to fix at an abnormal or artificial level the price of one or more financial instruments [...]*".

51.    Article 15 of the MAR Regulation, which came into force on July 3, 2016 and has not been amended since, states that: "*A person must not engage in or attempt to engage in market manipulation*".

52.    Section A of Annex I of the MAR Regulation on "*Indicators of manipulation consisting in giving* false *or misleading indications or fixing prices at an abnormal or artificial level*", which came into force on July 3, 2016, unamended since, provides that: "*For the purposes of applying Article 12(1)(a) of this Regulation, and without prejudice to the forms of manipulation described in paragraph 2 of that Article, market participants and competent authorities shall take into consideration, when examining transactions or orders, the following indicators, which list is not exhaustive and which should not, however, be considered in themselves as constituting market manipulation : / a) the extent to which orders placed or transactions carried out represent a significant proportion of the daily volume of transactions carried out on the financial instrument concerned, a related spot commodity contract or a product auctioned on the basis of emission allowances, in particular where these activities result in a significant variation in their price; [...] *".

**1.1.4.    Examination of the grievance**

✓    *On the price manipulation indicator*

53.    The file shows, for the shares of each of the companies in question and for each of the periods identified by the investigators to characterize the implementation of the manipulative scheme, by comparing the average volume of shares traded during and after the periods in question, a very sharp increase in volumes traded followed by a sharp decrease in liquidity thereafter. For Gour Medical, average trading volumes were 8,062 shares during the period between June 5 and August 8, 2018, compared with 748 shares after this period, between August 9, 2018 and February 8, 2019. For Umalis the corresponding values are on the one hand 1,148 between September 5 and November 27, 2018 and 909 between February 11 and June 3, 2019, to be compared with 165 after the observation periods, between June 4 and December 4, 2019. For CIOA average volumes of 7,947 between September 19 and October 2, 2018 and 4,835 shares between October 23 and December 7, 2018, observed during sensitive periods, to be compared with 417 shares traded post-periods between December 8, 2018 and June 8, 2019.



54.   The file also reveals a high degree of concentration, over the above-mentioned periods selected by the investigators, in the volumes sold by the operators suspected of having taken part in the manipulative scheme: in the case of Gour Medical shares, 81% sold by Unimatrix; in the case of Umalis shares, between 73% and 82% sold by Edern; and in the case of CIOA shares, between 58% and 69% sold by Festival of Spirit Ltd.

55.   These unusual trading volumes coincided with a significant upward movement in the price of the shares in question. The value of Gour Medical shares rose by 157% during the period in which Unimatrix sold them on the market. The value of CIOA shares rose by 84% and then 72% during the periods in which Festival of Spirit Ltd sold the shares. The value of Umalis shares rose by 18% and then 23% during the two periods in which Edern intervened to sell this stock. These latter variations are apparently less significant, but they are still significant in view of the fact, highlighted by the investigation report, that this stock, which was traded very little, could remain unchanged for long periods.

56.   It follows from the above that the criteria for assessing the price manipulation indicator mentioned in Section A of Annex 1 of the MAR Regulation must be considered satisfied.

57.   The fact that, in this case, the demonstration is based on a comparison of averages rather than directly observed daily trading volumes for each of the securities in question does not render the demonstration invalid, given the specific nature of the securities in question, which are particularly illiquid and "normally" the subject of very few transactions. In such a case, comparison by reference to period averages, rather than by reference to daily volumes, can be accepted.

58.   In any event, since an indicator does not in itself constitute price manipulation, it is necessary to determine whether the conduct complained of is likely to be classified as such within the meaning of Article L. 225-129 of the French Commercial Code.
      12.1 (a) (ii) of the MAR Regulation.

      ✓   *On the assessment of price manipulation by setting the share price at an abnormal or artificial level with regard to Gour Medical, Umalis and CIOA shares*

59.   The statements of complaint accuse the defendants of engaging in "*behavior*" characterized by the "*manipulative pattern*" described in points 39 to 45 above.

60.   The case file shows that each of the directors of the issuing companies was initially approached by Mrs. Planche on behalf of GEM, on the grounds that the fund might be interested in investing in each of the companies in question. As part of these exchanges, Ms. Planche then introduced the companies' directors to Mr. Leshem, with the aim of improving the liquidity of the companies' shares.

61.   More specifically, with regard to Gour Medical, emails in the file attest to the existence of initial exchanges in February 2018, followed by a telephone meeting on March 15, 2018, at the end of which Ms. Planche introduced Mr. Goldner to Mr. Leshem with the aim of improving the liquidity of the Gour Medical share. The terms of an email dated September 3, 2018 sent by Ms. Planche to Mr. Goldner establish that improving the liquidity of this stock was a condition put to GEM as a prerequisite to studying an investment opportunity in Gour Medical.

62.   With regard to Umalis, Ms. Planche contacted Mr. Person in March 2018. After a telephone exchange on June 4, 2018, she introduced Mr. Leshem to Mr. Person by email on June 6, 2018, under the terms of which:
      "*GEM will be happy to consider an investment opportunity in Umalis Group as soon as your shares are more liquid and your market capitalization reaches 20-25 million euros*", which confirms that, in this case too, improving the liquidity of the stock concerned was a prerequisite set by GEM or Ms. Planche.

63.   With regard to CIOA, from August 23, 2018, Ms. Planche took the same approach to the company's management as she had done with Gour Medical and Umalis. On August 30, 2018, she introduced Mr. Leshem to Mr. Lucide, who, according to Mr. Lucide's statements, presented himself as offering *marketing* services "*in the GEM ecosystem*" that would give CIOA visibility among its portfolio of qualified investors by improving the share's liquidity.



64. Once contact had been established between the managers and Mr. Leshem, the latter presented the *market making program* to them, and sent them a brochure outlining the main principles of the program. It states that liquidity is improved through "*lead generation*", with a team of sales representatives/investment advisors making their best efforts to stimulate interest and purchase of shares by qualified individual investors. The presentation brochure also outlined the main legal mechanisms in place, with some specificities depending on the companies involved.

65. With regard to Gour Medical, the presentation document dated March 15, 2018 sent by Mr. Leshem to Mr. Goldner outlined the main terms of the *market making program*. Firstly, an agreed number of Gour Medical shares were to be transferred free of charge to the account of a third-party custodian acting as receiver/trustee (*Trustee*), who would then arrange for investment advisors to canvass customers or prospects with a view to obtaining purchase orders, with the *Trustee* responsible for ensuring that limited sale orders were kept on the market, so as to capture virtually all trading volume. Secondly, a formal written agreement between the company and the *Trustee* was to determine Gour Medical's share of the proceeds from the sale of shares. Thirdly, the *Trustee* was to *report* weekly on share sales, and pay Gour Medical's share into the designated account. Fourthly, with regard to the seller's obligations, the seller was required to obtain a commitment from the other shareholders to retain their shares for the duration of the program (*"lock-up")* in order to ensure its effectiveness. Finally, the documentation mentioned that, based on past performance, Grantchester Equity *felt comfortable* that Gour Medical could generate net proceeds of €4 to €5 million over a 12-month period.

66. The terms of the *market making program* presentation documents sent by Mr. Leshem to Mr. Person for Umalis and to Mr. Lucide for CIOA, dated June 7, 2018 and September 4, 2018, were substantially identical to the one sent to Gour Medical, subject to certain reservations. In particular, Umalis or, as the case may be, CIOA or one of their shareholders, could sell the shares directly on the market without recourse to the *Trustee*, subject to retroceding 70% of the proceeds of share sales to Grantchester Equity (or another company of its choice), in accordance with the allocation provided for in the *term sheet*. Grantchester Equity was given access to Umalis' or CIOA's websites, with a view to making them more attractive. Lastly, the presentation brochures were supplemented by draft *term sheets* setting out the terms of remuneration for the *market making program*, i.e. 70% of the proceeds from the sale of shares on the market to Grantchester Equity (plus *bonus shares* of 50,000 Umalis shares) and 30% to Umalis, or CIOA as the case may be. The *term sheet* provided for a maximum volume of 200,000 Umalis shares to be sold at a minimum price of 7.40 euros within six months of signature of the agreement, in addition to the translation of the website into German, so that the transaction would generate indicative net proceeds of 600,000 euros for Edern and a maximum volume of 1 million CIOA shares to be sold, generating a net profit for CIOA of 2 million euros.

67. Thirdly, the formalization and execution of the *market making program* differed from one security to another.

68. As far as Gour Medical is concerned, there has been no regularization of the documentation relating to the *market making program*. However, it has been established that a promise to purchase dated May 4, 2018 relating to 500,000 Gour Medical shares was granted by Mr. Goldner to Unimatrix, at a price of €1.14 per share. This promise was amended by an amendment dated May 5, 2018 to include a price adjustment clause, so that Mr. Goldner will receive a total amount corresponding to 30% of the proceeds from the sale of the shares on the market by Unimatrix as and when the sales are completed. It should be noted that this share is identical to that provided for in the *market making program term sheet*.

69. Based on the information in the file, it has been established that between May 16 and July 16, 2018, Mr. Goldner sold 306,000 Gour Medical shares over the counter for a total of 443,900 euros to Unimatrix under separate disposal contracts. Unimatrix then sold on the market all the shares acquired within this framework between June 5 and July 31, 2018 for a gross amount of 1,743,353 euros, with the result that Unimatrix no longer held any Gour Medical shares as of July 31, 2018, as it had prior to May 2018.



70. It is also established on the basis of the documents in the file that between June 19 and August 1$^{er}$ 2018, Mr. Goldner received from Unimatrix 515,686 euros corresponding to 30% of the net amount of sales made by Unimatrix in accordance with the promise to purchase shares dated May 4, 2018, as amended on May 5, 2018. In addition, it should be noted that Mr. Goldner has asked the other Gour Medical shareholders for undertakings to retain their shares, as provided for under the *lock-up* mechanism in the *market making program* documentation.

71. In the case of Umalis, the *market marking program* presentation document and the *term sheet* were signed on July 5, 2018 by Mr Person and Mr Leshem. As of September 5, 2018, Umalis shares were sold on the Euronext Access market by Edern. By an amendment to the *term sheet* dated October 18, 2018 (signed only by Grantchester Equity), the duration of the program was extended from 6 to 9 months and it was confirmed that Grantchester Equity could, at its discretion, designate the bank account of any affiliate or other company to receive the transfer of the 70% share.

72. In addition, Edern sold 50,133 Umalis shares between September 5 and November 27, 2018 for 434,714 euros gross, representing 73% of sales on Euronext Access, and 58,334 Umalis shares between February 11 and June 3, 2019 for 420,525 euros gross, representing 82% of sales on Euronext Access.

73. With regard to CIOA, according to Mr Lucide's statements, the *market making program* was implemented by Mr. Leshem even before the documentation was regularized, the first unusual animations around the CIOA order book having been noted around September 20, 2018 by Mr. Lucide. From the emails exchanged during this period, it appears that Mr. Leshem had confirmed on September 20, 2018 to Mr. Lucide that Grantchester Equity was ready to start the *market making program* without having obtained the commitments to hold the securities, going so far as to specify the terms and conditions for placing orders to be respected by CIOA's managers, with the placing o f orders in hidden quantities wherever possible. In addition, on September 25, 2018, Mr. Leshem asked Mr. Lionel Lucide, son of Mr. Léon Lucide, for the free transfer of 100,000 CIOA shares to Valens Bank *via* its British *broker*, Daniel Stewart & Company Plc, to facilitate transaction management by directly disposing of the shares. This request was reiterated in an email dated September 26, 2018, which also requested payment of Grantchester Equity's first invoice in order to compensate its sellers.

74. In an email reply dated September 30, 2018, Mr. Lionel Lucide requested that a new invoice be issued in the name of the *holding company* Festival of Spirit Ltd and the regularization of a contract in order to proceed with its settlement. He also requested renegotiation of the 70% share retroceded to Grantchester Equity, deemed excessive. This last request was rejected by Mr. Leshem in an email dated October 1$^{er}$ 2018, indicating that if the initial agreement was not respected, their collaboration should cease immediately.

75. In parallel, between September 19 and October 2, 2018, Festival of Spirit Ltd sold 54,620 CIOA shares, corresponding to 69% of the volume traded on Euronext Access, it being specified that 90.6% of purchases over this period were made by individuals. Then, between October 23 and December 7, 2018, Festival of Spirit Ltd sold 95,132 shares, corresponding to 58% of the volume traded on Euronext Access, and 79% were made by individuals over this period.

76. Furthermore, the file shows that, for all the companies' securities, the execution of the *market making program* had an impact on the share price.

77. With regard to Gour Medical, between June 5, 2018 and August 8, 2018, i.e. in parallel with the share sales carried out by Unimatrix, significant variations in the share price were observed, with the price rising by 157.14%, from 3.5 euros to 9 euros in a daily volume of 8,062 shares traded, representing 378,901 shares traded over the period on Euronext Access. An analysis of TREM and Euronext data for this period in the file reveals that 80% of transactions were carried out by private individuals, mainly of German, Austrian and English nationality, with Unimatrix accounting for almost 81% of all shares sold over the period on Euronext Access. It should be noted that between January 1$^{er}$ and June 4 2018, i.e. prior to the significant uptrend, Gour Medical's share price fluctuated between 3.8 euros and 4.06 euros, with the stock being listed for only 7 days with an average volume per session of 45 shares traded. By



On the other hand, between August 9, 2018 and February 8, 2019, in the six months following the active phase of price and volume increases, Gour Medical's average share price fell to 2.05 euros and average daily volume to 748 shares traded.

78.    In the case of Umalis and CIOA, there have been two periods of price increases for each of these companies.

79.    For Umalis, firstly, it is noted that from September 5, 2018, the date from which shares were sold by Edern on the Euronext Access market, until October 10, 2018, the share price rose from 7.35 euros to 9.10 euros, an increase of 23.81% for a total volume over the period of 44,370 shares traded. Then, on October 12, 2018, the Umalis share price fell by 10.99% from 9.10 euros to 8.10 euros for a volume of 5,404 shares traded. This was followed between October 15, 2018 and November 27, 2018 by an increase in the share price between 8.10 euros and 8.72 euros for a total volume of 19,093 Umalis shares traded on Euronext Access over the period under review, with a daily trading volume of 597 shares. The period between September 5 and November 27, 2018 is hereinafter referred to as "**Umalis period 1**".

80.    Secondly, between February 11 and June 3, 2019 (hereinafter, "**Umalis Period 2**"), the Umalis share price underwent a second phase of growth in above-average volumes, with the price rising by 23.33% from 5.90 euros to 7.40 euros for a total volume of 70,916 Umalis shares traded on Euronext Access over the period, with an average daily volume of 909 shares.

81.    The share price and trading volumes fell drastically between period 1 Umalis and period 2 Umalis insofar as, on the one hand, between November 28 and December 19, 2018 inclusive, the share was no longer traded and, on the other hand, it was quoted for only 10 days between December 20, 2018 and February 8, 2019 inclusive. Emails dated December 12, 2018 received by Mr. Person from Ms. Planche and Mr. Leshem attest during this period of reminders regarding the transfer of shares that had not been able to be carried out for technical reasons. On January 17, 2019, Mr. Person was given formal notice by Mr. Leshem's counsel to pay the balance of certain invoices relating to the *market making program*. As a result, this downward phase in the share price corresponds to a period of tension between Mr. Person and Mr. Leshem over unpaid commissions in cash and *bonus shares*, during which Mr. Leshem had suspended execution of the program. Leshem had suspended the execution of the *market making program*, which is corroborated by Mr. Person's statements at the hearing confirming that the new period of rising share price resulted from the resumption of the program.

82.    With regard to CIOA, it should be noted that the share price fluctuated more significantly from September 19, 2018 to October 2, 2018 (hereinafter, "**CIOA Period 1**"), rising 83.93% from 2.80 euros to 5.15 euros for a total volume of 79,473 CIOA shares traded, corresponding to an average daily volume of 7,947 shares traded. Then, between October 3 and October 22, 2018, the share price fell by 44.85% from 5.15 euros to 2.84 euros for a volume of 45,811 shares traded, corresponding to an average daily volume of 3,272 shares traded. Between October 23 and December 7, 2018 (hereinafter,
*During* the first six months of the "**CIOA 2 period**", the share price was more volatile, rising by 72.54% from 2.84 euros to 4.90 euros for a volume of 164,390 shares, corresponding to an average daily volume of 4,835 shares traded. Between December 8, 2018 and June 8, 2019, in the six months following the second phase of price and volume increases, the average price fell back to 3.23 euros and the average daily volume to 417 shares traded. As in the case of Umalis shares, the low period can be explained by the tensions between Messrs Leshem and Lucide between period 1 CIOA and period 2 CIOA. These tensions appear in particular in the terms of an e-mail dated October 24, 2018 addressed to Mr. Lionel Lucide, of which Ms. Planche was a copy, in which Mr. Leshem states that he had contacted the sales force to redouble their efforts, assuring them that he was capable of generating a significant volume of sales in a very short space of time once the settlements had taken place.

83.    Monetary and financial flows have also been identified in the file, between the various protagonists involved in the procedure and to the benefit of third-party companies that are similar to Grantchester Equity's partners.

- 18 -





84. With regard to Gour Medical, it has been established in the file that Unimatrix, whose role is similar to that of *Trustee* (as provided for in the brochure presenting the *market making program*, which was not signed but executed), in addition to transferring the sum of 515,685 euros to Mr. Goldner, equivalent to 30% of the amount of the sales of shares, made the following transfers:

- a total of 39,258 euros to Fauve Capital, whose sole shareholder and manager is Ms. Planche, between June 28 and August 1$^{er}$ 2018, Ms. Planche having admitted during her hearings that this amount corresponded to her remuneration of 2.5% of the amount of the disposals as business contributor to Mr. Leshem in accordance with a contract dated May 1$^{er}$ 2018 signed by Fauve Capital for Unimatrix. In this regard, Ms. Planche stated at the hearing that "*for me, Unimatrix was Miron* [Leshem]";

- a total of 859,326 euros in respect of 16 transfers between June 7 and August 1, 2018 to Moelis Tech FZE, based in the United Arab Emirates;

- for a total of 335,619 euros on August 10, 2018 to Mr. Van Wylick, manager of Unimatrix ;

- 12,830 on October 26, 2018 to the Cypriot company WhiteTree Capital, although the investigators did not identify any contractual relationship with this company.

85. In addition, on July 25, 2018, Mr. Van Wylick transferred 20,006 euros to Grantchester Equity as remuneration for investment advice according to the related invoice.

86. For Umalis, analysis of the file reveals the following flows:

- Edern has received an invoice "*Invoice GCR-MLUMG 001 - MIRON*" dated September 24, 2018 in the amount of 93,745 euros from the German company Global Capital Research for services of "*marketing & promotion*" from August 20 to September 24, 2018, settled by 4 transfers between September 25 and October 3, 2018. On October 10 and November 22, 2018, Global Capital Research made 2 transfers to Grantchester Equity for a total amount of approximately 19,000 euros ;

- on september 26, 2018, Mr. Person informed Mr. Leshem by email that he was ready to "*deliver 50% of the first bonus in asap shares*". Following this email, Ms. Planche communicated to Mr. Person the bank account details of Fauve Capital for the transfer of 5,000 Umalis shares by email dated September 28, 2018, it being specified that almost a month later, on October 22, 2018, Edern received a *consulting contract* signed by Fauve Capital under the terms of which a maximum of 30,000 Umalis shares were to be transferred to Fauve Capital in a consulting capacity. On October 31, 2018, Mr. Leshem wrote to Mr. Person regarding the transfer of Umalis shares to his UK *broker*, Daniel Stewart & Company Plc, before subsequent requests to his bank dated November 4 and 5, 2018 were made regarding the transfer of 15,000 Umalis shares to Daniel Stewart & Company Plc for the benefit of Grantchester Equity. On December 12, 2018, Ms. Planche contacted Mr. Person again by email (copied to Mr. Leshem) with a view to obtaining the transfer of the shares. On the same day, at 5:06 p.m., Mr. Leshem also sent a reminder message to Mr. Person. According to Mr. Person, the transfer of the shares could not be carried out for technical reasons;

- Umalis received 3 invoices dated October 16, November 12 and November 26, 2018 for a total amount of 215,784.33 euros from the Turkish company Kaya Kuyumculuk Turizm İnsaat Ltd (hereinafter "Kaya") for "*marketing & promotion*" services, it being specified that it follows from statements made at the hearing by Mr. Person that their payment, in addition to those drawn up by Global Capital Research, corresponds to payment of the 70% share provided for in the *term sheet*. On January 17, 2019, Edern received a formal notice from Solvaction on behalf of Grantchester Equity to pay the sum of 50,002 euros due in respect of the balance of invoices issued by the Turkish company Kaya. The formal notice also proposed a payment schedule and the resumption of the *market making program* between Grantchester Equity and Edern;



- on November 12, 2018, Grantchester Equity entered into a *consulting* agreement with WhiteTree Capital (a company already identified with regard to flows on Gour Medical), which then transferred a net amount of 51,856.15 euros to Grantchester Equity;

- Mr. Leshem sent an email on February 6, 2019 to Mr. Person concerning a transfer to the bank account (Cyprus Bank) of WhiteTree Capital "*for transfer*", which Mr. Person forwarded to the Umalis management control manager indicating "*RIB for CACEIS EDERN Miron account*".
  Mr. Person confirmed that he had given his custodian CACEIS access so that Mr. Leshem could sell Umalis shares directly. Between February 13 and September 9, 2019, CACEIS transferred 448,768 euros for Edern to WhiteTree Capital's account at Cyprus Bank.

87. With regard to CIOA, the investigations revealed that, in parallel with these sales on the market, Festival of Spirit EURL made several transfers totalling 472,556 euros to Moelis Tech FZE and WhiteTree Capital between October 3, 2018 and January 9, 2019, corresponding to 70% of Festival of Spirit Ltd's total net sales (675,109 euros) over the period under review.

88. Lastly, the AMF's German and, where applicable, Austrian counterparts (FMA), as well as Mr. Goldner, have taken evidence from private individuals who have been approached to invest in the companies during periods of price fluctuations, as shown in the file in point 31.

89. It follows from the above that the implementation of the *market making program* on the initiative of
Mr. Leshem's dealings in the shares of Gour Medical, Umalis and CIOA reveal substantially similar practices in the shares of these companies, which resulted in the aforementioned transactions and, over and above the transactions themselves, in behaviour that led to :

- capture all or almost all sell orders by making it harder for other sellers to position their shares, by obtaining or attempting to obtain *lock-up* commitments from the companies' other shareholders. For example, Mr. Goldner solicited lock-up commitments from other Gour M e d i c a l shareholders. Similarly, the contractual documentation and *term sheet* signed on July 5, 2018 by Mr. Person, Chairman of Edern, mention as a prerequisite obtaining *lock-up* undertakings from Umalis shareholders. In the case of CIOA, the lock-up commitment was not entered into, or at least not complied with, by a shareholder who had been allocated free shares representing 4% of the share capital at the time of CIOA's IPO as remuneration, and who refused to enter into and execute the agreement proposed by Mr. Leshem.

- canvass investors following instructions given by Grantchester Equity to its investment advisors ("the sales force") with the aim of generating purchase orders for the companies' securities.

- sell the shares of the companies concerned on the market, following Grantchester Equity's instructions to capture all purchase orders. In the case of Gour Medical, Mr. Goldner's sales to Unimatrix were part of the market making program, with Unimatrix then acting as trustee and selling the shares on the market. As regards Umalis, Edern followed Mr. Leshem's instructions before granting him access to Umalis Group's securities account at CACEIS to enable him to sell Umalis shares directly. With regard to CIOA, the Lucide family also received instructions from Mr. Leshem on how to proceed with the sale of shares, in particular by placing so-called "iceberg" orders, the Lucide family having refused to give him direct access to CIOA's securities account, which also contributed to the tensions with Mr. Leshem.

- Allocate 70% of the proceeds from the sale of shares to Grantchester Equity (and its partners) and 30% to the sellers, namely Mr Goldner, Edern and Festival of Spirit Ltd in the case of Gour Medical, Umalis and CIOA respectively.

90. It is necessary to analyze the consequences of the behavior described above, which, according to the statements of complaint, was characterized by the implementation of what they consider to be a manipulative scheme, in order to establish whether it fixed or was likely to fix the price of the shares of the companies concerned at an abnormal or artificial level.



- 20 -



91.    It is clear from the file that the transactions, and more generally the coordinated interactions referred to above, were aimed at having a direct effect on the share price, and not simply on the stock's liquidity. This is illustrated in particular by the price targets expressly stipulated, or not, in the *market making program* documentation.

92.    In the case of Gour Medical, for example, the documentation does not specify a price target, unlike the programs implemented f o r Umalis and CIOA shares, but states that Grantchester Equity is "*feels comfortable*" with the fact that the company will be able to achieve "*net proceeds of 4 to 5 million euros over a 12-month period*". However, such a provision amounts to anticipating, independently of any economic justification, a sharp rise in Gour Medical's share price (minimum of 4.75 euros, subject to the sale of all its shares, but more likely well over 13.3 euros) in order to generate net proceeds of around 4 to 5 million euros over 12 months, on the basis of a remuneration for Mr. Goldner corresponding to 30% of the amount of the shares sold, a share formalized in the rider of May 5, 2018.

93.    As regards the *market making programs* implemented on Umalis and CIOA shares, these expressly provided for price targets. In the case of Umalis, the *market making program* presentation document and its *term sheet*, signed by Mr. Leshem on May 7, 2018, countersigned by Mr. Person on July 5, 2018 and modified by an amendment dated October 18, 2018, stipulated an *ex ante* price target of "*€12-€14 over a 12-month horizon*", even though the company's last share price was €7.4. It is also worth noting the details in the *market making program's term sheet* concerning the quantity of shares, which could reach "*up to 200,000 ordinary shares of the company for total net proceeds expected for the company of 600,000* euros", implying a minimum selling price of 10 euros. With regard to CIOA, the *market making program* presentation documentation signed by Mr. Leshem alone, in his capacity as Chairman of Grantchester Equity, set a 12-month price target of 5-6 euros for CIOA, whereas the share price on September 18, 2018 was 2.80 euros. In addition, as for Umalis, the *market making program term sheet* signed by both parties, without expressly repeating the price target defined in the documentation, provided for the sale of up to "*1,000,000 ordinary shares of the company for total net proceeds to the company of 2,000,000 euros*", i.e. a price of around 6.60 euros corresponding to the 30% remuneration of the sale proceeds provided for the benefit of the seller.

94.    It has been established that the implementation of these liquidity programs has led to a sharp rise in trading volumes, as well as an increase in share prices, as investors have been reassured in their investment decisions.

95.    Moreover, the effectiveness of the *market making program* in boosting share prices and trading volumes is particularly clear in the case of Umalis and CIOA, given the drastic fall in share prices and trading volumes that occurred precisely during the periods of tension between Mr Leshem and Mr CIOA.
Mr. Person concerning unpaid commissions in cash and *bonus* shares, and between Mr. Leshem and Mr. Lucide concerning attempts to renegotiate commissions requested by Grantchester Equity.

96.    Furthermore, in view of the way the *market making program* operates, it is clear that the sales of Gour Medical shares by Mr Goldner and then by Unimatrix, of Umalis shares by Edern, and of CIOA shares by Festival of Spirit Ltd, are not the result of a genuine selling interest on the part of their authors, but are aimed at improving liquidity and increasing the price of Gour Medical, Umalis and CIOA shares respectively.

97.    It follows from all the foregoing that a pattern of behavior existed in this case, characterized by the design and implementation of a manipulative scheme applied in the same way to the shares of the three companies in question, that this behavior resulted from the coordinated actions of a number of players in application of a predefined program, and that this behavior led to an artificial increase in the liquidity of the companies' shares, causing an artificial rise in their share price, with the proceeds of their sale being allocated, for the most part, to the designers of the manipulative scheme. The facts of this case therefore meet the definition of market manipulation set out in article 12.1(a)(ii) of the MAR Regulation.



### 1.2  On price manipulation through false or misleading information on supply, demand or the price of Gour Medical, Umalis and CIOA shares

#### 1.2.1  Notification of grievances

98.   According to the statement of objections, Unimatrix, Edern and Festival of Spirit Ltd, which accounted for the majority of sales during the periods analyzed, together with Mr. Leshem, Grantchester Equity and the sales force deployed, behaved in such a way as to give the market the impression of abundant available liquidity, which soon turned out to be non-existent once the manipulation was over. They argue that this behavior could constitute market manipulation within the meaning of article 12.1 (a) (i) of the MAR Regulation, insofar as the behavior described gave or was likely to give false or misleading indications as to the supply, demand or price of a financial instrument.

#### 1.2.2  Respondents' comments

99.   It has already been indicated that Mr. Leshem, Grantchester Equity and Mr. Van Wylick did not submit any comments in response to either the statement of objections or the rapporteur's report. Mr. Van Wylick replied to the detailed letter sent to him in the course of the investigation, but did not put forward any elements relating to the alleged cases of price manipulation.

100.   Ms. Planche did not submit any observations specifically concerning the breach of price manipulation by means of false or misleading information. She denies having participated in the execution and implementation of the liquidity programs.

#### 1.2.3  Applicable texts

101.   The acts of which the defendants are accused took place between March 2018 and June 3, 2019, and will therefore be examined in the light of the texts in force at the time.

102.   Article 12 of the MAR Regulation, which came into force on July 3, 2016 and has not since been amended, states: *"1. For the purposes of this Regulation, the concept of 'market manipulation' covers the following activities: / a) effecting a transaction, placing an order or engaging in any other conduct which: / i) gives or is likely to give false or misleading indications as to the supply, demand or price of a financial instrument [...].*
*[...]; / unless the person effecting a transaction, placing an order or engaging in any other conduct establishes that such transaction, order or conduct was effected for legitimate reasons and is in accordance with accepted market practices as established in accordance with article 13".*

103.   Article 15 of the MAR Regulation, which came into force on July 3, 2016, has already been reproduced in point 511.1.3 *above.*

104.   The indicator referred to in a) of Annex I A of the MAR Regulation has already been reproduced in point 52 *above.*

#### 1.2.4  Examination of the grievance

105.   As a preliminary point, it should be noted that when the prosecution alleges that the same facts constitute market manipulation within the meaning of article 12.1 of the MAR Regulation and under several provisions of this article, the facts of the case are again analyzed in the light of the other applicable provisions, without the conclusion of this analysis having to lead to the finding, with regard to the respondents, of the existence of a separate breach.

106.   It has been established above that the indicator provided for in a) of Annex I A of the MAR Regulation is characterized.

107.   With regard to the assessment of the facts of the case under article 12.1(a)(i), please refer to the points *above* concerning the analysis of manipulative behavior, which is identical for the four cases presented by the prosecution.

108.   It will only be recalled here that at the heart of the manipulative scheme, the designer of the *market making program* has set up, in all three cases, a specific sales force, proactively deployed to individuals



investors to generate (relatively) large numbers of buy orders, irrespective of any economic justification, by arranging for these buy orders to be matched, immediately and in highly comparable quantities, with sell orders placed by the companies concerned, i.e. the *holding companies* of the companies' directors and Unimatrix.

109. It is these large numbers of buy and sell orders, occurring during specific periods, for securities which until then had been characterized by very low liquidity, which must be regarded as "*likely to give misleading indications [...] as to the supply, demand or price of a financial instrument*" within the meaning of article 12(a)(i).1 They were in fact likely to encourage other investors, whether or not they had been specifically canvassed and motivated by the sudden buoyancy of the market, to acquire the securities in question.

### 1.3  On price manipulation using fictitious procedures or any other form o f  deception or artifice on Gour Medical, Umalis and CIOA shares

#### 1.3.1.    Notification of grievances

110. According to the statement of objections, the scheme organized by Mr. Leshem and deployed with his partners around the *market making program* falls within the scope of the suspension of programs on "*pump and dump*" practice, and also appears to characterize market manipulation through the use of fictitious procedures or any other form of deception or artifice within the meaning of b) of article 12.1 of the MAR Regulation on Gour Medical, Umalis and CIOA shares.

111. Generally speaking, they are based on two indicators, namely the indicator relating to the dissemination of false information before or after transactions have been carried out, and the indicator relating to the dissemination or production of investment recommendations that are false, biased or influenced by a significant interest before or after transactions have been carried out, provided for respectively in a) and b) of Section B of Annex I of the MAR Regulation.

112. In this respect, the statement of grievances reiterates the principles and method of the *market making program* described in the brochure, pointing out that this program was aimed at companies listed on a market with low liquidity. They explain the proposed solution, which consists o f  market making by Grantchester Equity (*lead* generation) *via* large-scale prospecting (by *emailing*, telephone campaign or social networks) with the aim of attracting a significant number of investors. They also recall the remuneration terms set out in the *term sheet* and the 70% share of proceeds from the sale of shares on the market to be paid to Grantchester and its sales force.

113. With regard to the examination of indicators, the notifications of grievances first note the effectiveness of this method in view of the effects on the share price (immediate fall) in the event of the suspension of programs on CIOA and Umalis shares at the time of the tensions between Mr Leshem and Messrs Person and Lucide respectively. They also point to the desire to target certain investor profiles, as evidenced by the requests for access to the CIOA and Umalis websites and their translation into German. Finally, they note the dissemination of false information by the sales force deployed, i.e. the network of *brokers* headed by Mr. Leshem, in order to encourage private individuals, mainly German and Austrian, to buy securities.

114. The statement of objections concludes that the sales transactions carried out by Unimatrix, Edern and Festival of Spirit Ltd on each of the three securities analyzed for the periods under consideration were carried out by people linked to Mr. Leshem, Grantchester Equity and the sales force in place, who were behind the dissemination of false information and investment recommendations that were false or clearly influenced by a significant interest, insofar as they received more than 70% of the profit from the sale of the securities.

115. The notifications of grievances add that the manipulative scheme in question corresponds to the practice of "*pump and dump*" within the meaning of Annex II section 2, 2 b) of Commission Delegated Regulation (EU) n°2016/522 of December 17, 2015 (hereinafter, "*Delegated Regulation*"), which specifies the indicator provided for in b) of section B of Annex I of the MAR Regulation.



### 1.3.2.  Respondents' comments

116.  It has already been indicated that Mr. Leshem, Grantchester Equity and Mr. Van Wylick made no comments in response to the grievance notifications or the rapporteur's report. In his reply to the detailed letter sent to him in the course of the investigation, Mr. Van Wylick denies having been involved personally or through one of his companies in the production or dissemination of investment recommendations that were false, biased or manifestly influenced by a significant interest.

117.  Ms. Planche has not submitted any observations specifically concerning the breach of price manipulation through the use of fictitious procedures or any other form of deception or artifice. She denies having participated in the execution and implementation of the liquidity programs.

### 1.3.3.  Applicable texts

118.  The acts of which the defendants are accused took place between March 2018 and June 3, 2019, and will therefore be examined in the light of the texts in force at the time.

119.  Article 12 of the MAR Regulation, which came into force on July 3, 2016 and has not since been amended, states: "*1. For the purposes of this Regulation, the notion of 'market manipulation' covers the following activities: / b) effecting a transaction, placing an order or carrying out any other activity or engaging in any other conduct influencing or likely to influence the price of one or more financial instruments* [...] *by using fictitious schemes or any other form of deception or artifice;* [...]".

120.  Article 15 of the MAR Regulation, which came into force on July 3, 2016, has already been reproduced in point 511.1.3 *above*.

121.  Section B of Annex I to the MAR Regulation on "*Indicators of manipulation involving the use of fictitious processes or any other form of deception or artifice*", in the same version, states: "*For the purposes of applying Article 12(1)(b) of this Regulation, and without prejudice to the forms of manipulation described in paragraph 2 of that Article, market participants and competent authorities shall take into consideration, when examining transactions or orders, the following indicators, which are not exhaustive and which should not, however, be considered as constituting market manipulation per se: / a) whether orders placed or transactions carried out by persons are preceded or followed by the dissemination of false or misleading information by the same persons or persons linked to them; and / b) whether orders are placed or transactions carried out by persons before or after they, or persons linked to them, produce or disseminate investment recommendations which are false, biased or manifestly influenced by a significant interest.* "

122.  Point 2 b) of Section 2 of Annex II of the Delegated Regulation supplementing the MAR Regulation concerns the practice of "*pump and dump*" among the "*Practices specifying the indicator described in Annex I, Section B, point b), of Regulation (EU) n°596/2014*", defined in point 4 c) of Section 1 of the same Annex as follows: "*(c) taking a long position in a financial instrument* [...] *and then undertaking further buying activities and/or disseminating misleading positive information about the instrument or product concerned with the aim of raising the price of the financial instrument* [...] *by attracting further buyers. When the price is at an artificially high level, the long position held is liquidated - a practice generally known as "shorting".*
"pump and dump.

### 1.3.4.  Examination of the grievance

✓ *On indicators*

123.  The indicators set out in points a) and b) of Annex I B of the MAR Regulation relate to false or misleading information or, as the case may be, to investment recommendations that are false, biased or manifestly influenced by a significant interest, emanating directly from the persons having carried out the transactions or from persons linked to them.



124. In order to characterize the indicator provided for in a) of Annex I B of the MAR Regulation, it must first be demonstrated that the sale transactions carried out in this case by Unimatrix, Edern and Festival of Spirit Ltd were carried out after or before the dissemination of false or misleading information. It must then be established that this information was disseminated by the companies behind the disputed transactions, or by persons linked to them.

125. E-mails received by Mr. Goldner, as well as replies from BAFIN and the FMA communicated to the investigators, show that brokers were canvassing private investors by telephone, inviting them to buy Gour Medical shares, in particular because of the forthcoming acquisition of a shareholding by an investor, with the possibility of an increase in the share price to around 12 euros, and the acquisition of a stake in the company by a major American pharmaceutical company, either in the future or already completed. The existence of false or misleading information about Gour Medical shares has therefore been established.

126. In the case of Umalis and CIOA shares, the testimonials from individual investors are anonymous and less detailed, since they only mention recommendations to invest, but they confirm the same modus operandi: aggressive canvassing by a "sales force" specially deployed to place the shares in question.

127. Secondly, the dissemination of the information in question is not in doubt in the light of the documents in the file. In addition to the testimonies mentioned above attesting to the fact that they were received, Mr. Leshem describes the strategy implemented by his sales force in an email dated October 24, 2018 addressed to Mr. Lucide and Ms. Planche: for them, it is a matter of *"selling the story again and again"* to canvassed customers, which *"generates quick sales"*, and this without him at any time giving any verifiable element that could fit into this story.

128. Lastly, with regard to the condition concerning dissemination by persons linked to the authors of the disputed transactions, there is a body of evidence showing that the dissemination of information on the Gour Medical share is indeed linked to Unimatrix, the author of the sales of this share. As the stock in question is illiquid and is not followed by any analyst in France or abroad (Germany in particular), the massive and targeted dissemination of information on this stock over time can only be explained by the existence of a manipulative strategy. The same applies to Umalis and CIOA. Furthermore, the existence of a link between Unimatrix, the company operating the Gour Medical share and headed by Mr. Van Wylick, and the manipulation of the Umalis share is established by the fact that
Mr. Person, the latter's manager, paid, as Edern's representative, an invoice issued by Global Capital Research, headed by Mr. Van Wylick. Similarly, as mentioned in the investigation report, the existence of a relationship between the companies Moelis Tech FZE and Unimatrix is established by the conclusion between them of a contract for canvassing services and the existence of transfers from German individuals canvassed to buy Gour Medical shares, between April and December 2018.

129. It follows from the above that the indicator provided for in a) of Annex I B of the MAR Regulation can be considered to have been verified for the securities of the companies in question.

130. The indicator provided for in b) of Annex I B of the MAR Regulation relates to the existence of recommendations that are false, biased or influenced by a significant interest. It requires it to be established that the sale transactions carried out in this case by Unimatrix, Edern and Festival of Spirit Ltd took place after these companies, or persons linked to them, had produced or disseminated investment recommendations that were false, biased or influenced by a significant interest. This indicator is illustrated by the practice of "pump *and dump*" referred to in annex II section 2, 2 b) of the Delegated Regulation, to which the grievance notifications refer.

131. The existence of false recommendations results from the testimonies mentioned above, collected by the German and Austrian authorities, counterparts of the AMF, and reporting recommendations formulated by false *brokers* to encourage the purchase of Gour Medical, Umalis or CIOA shares. In the same way, the existence of a significant interest is characterized for each of the securities. In each case, it has been demonstrated that 30% of the sales proceeds were paid to the companies. The remaining 70% of the amount of the disputed transactions corresponds to the remuneration provided for in the *market making program* carried out on Gour Medical shares,

- 25 -



Umalis and CIOA. It is clear from the file that all the above-mentioned players who distributed information - such as Moelis Tech and Kaya, which received transfers from private individuals canvassed to buy Gour Medical and Umalis shares - did indeed have a significant interest within the meaning of the provisions relating to the indicator.

132. Finally, with regard to the links between the *brokers* and the perpetrators of the disputed transactions, the file reveals the existence of flows from Umalis and Edern to Global Capital Research and the Turkish company Kaya, which, according to statements made by Mr. Person at the hearing, corresponded to "*payment of the 70%. It was Miron who sent us these invoices*". In this respect, Mr. Person specified that the invoices issued for "*marketing and promotion*" services came from two different entities, as the call centers were not the same. In this case, it can only be the call platforms used for canvassing. With regard to transactions involving CIOA shares, the evidence in the file shows that the Emirati company Moelis Tech FZE was involved in telephone canvassing and *marketing*, and that Festival of Spirit EURL made several transfers to it, entitled "*Miron fact 1* [to 6]", to settle the corresponding invoices sent to Festival of Spirit Ltd.

133. Regarding transactions in Gour Medical shares, the file shows that Moelis Tech FZE was linked to Unimatrix, itself linked to Mr. Van Wylick and Grantchester Equity, that Moelis Tech FZE was in charge of the canvassing and that there are transfers from individuals canvassed to buy Gour Medical shares, to Moelis Tech FZE.

134.  It follows from the above that the indicator provided for in b) of Appendix B to the MAR Regulation has been verified.

135. With regard to the practice known as "*pump and dump*", which under the terms of point 2 b) of section 2 of Annex II of the Delegated Regulation illustrates this indicator in b) of Annex B of MAR, it involves taking a long position in a financial instrument, then undertaking other buying activities and/or disseminating misleading positive information about the financial instrument concerned with the aim of driving up its price by attracting other buyers, and finally liquidating the long position held when the price is at an artificially high level.

136. In this case, Unimatrix acquired 306,000 Gour Medical shares between May 16 and July 16, 2018. Edern and Festival of Spirit Ltd were the historical shareholders of Umalis and CIOA respectively. However, this factual situation does not rule out the characterization of a "long position" within the meaning of the "*pump and dump*" regulations.

137. Moreover, even though neither the MAR Regulation nor the Delegated Regulation provide any clarification on the notion of
For the purposes of the definition of "taking a long position", a useful element can be drawn from Regulation (EU) No. 236/2012 of the European Parliament and of the Council of March 14, 2012 on short selling and certain aspects of credit risk swaps, which defines the notion of a long position as follows: "*any position that results from either of the following: a) the holding of a share issued by a company or a debt security issued by a sovereign issuer; b) the conclusion of a transaction which creates a financial instrument or establishes a link with a financial instrument other than an instrument referred to in point a), where the effect or one of the effects of this transaction is to confer a financial advantage on the natural or legal person concluding the said transaction in the event of an increase in the price or value of the share or debt security*".

138. Thus, even though the aforementioned provisions relate to a purpose other than the practice of "*pump and dump*", it is interesting to note that the long position thus defined covers the conclusion of transactions involving financial instruments, one of the effects of which is to confer a financial advantage on the person concluding the transaction in the event of an increase in the price or value of the share or debt security. In the present case, this is indeed the purpose of the transactions envisaged within the framework of the manipulative scheme, as these transactions are intended to benefit both the entities concerned through the allocation of part of the proceeds of sales and the participants in the scheme as remuneration for their intervention. In addition, as explained above, there is evidence of the dissemination of misleading positive information on the various securities in question.



139.    Finally, in each case, the long position was liquidated at an artificially high level, in line with both the definition of
"*pump and dump*" and the manipulative scheme. It follows from the above that a "*pump and dump*" practice
existed in this case, which supports the analysis concerning the meeting of the criteria of the index mentioned in
b) of appendix B of the MAR Regulation.

140.    However, since an indicator does not in itself constitute price manipulation, it is necessary to determine whether
the conduct complained of in the present case is likely to be classified as such within the meaning of Article L.
225-129 of the French Commercial Code.
12.1 (b) of the MAR Regulation.

   ✓   *On the assessment of price manipulation using fictitious procedures or any other form of deception or
       artifice on Gour Medical, Umalis and CIOA shares*

141.    The demonstration of the validity of this assessment in the present case is largely based on the evidence provided
in the two previous cases of price manipulation. It should simply be recalled that the *market making program*
consists of aggressive canvassing by telephone, with the dissemination of misleading information and
recommendations that make investors want to buy the shares of the companies in question, without any objective
economic justification concerning these companies. In addition, the purpose of the program is to create an illusion
of abundant liquidity resulting from the meeting between the demand artificially created by the canvassing and the
supply created by the sell orders of the managers via their asset *holding companies* and Unimatrix, where
applicable. This situation should itself reinforce the motivation of investors to buy the securities.

142.    It follows from the foregoing that the manipulation of the price of the securities of the companies concerned by
recourse to a fictitious process or any other form of deception or artifice within the meaning of article 12.1 (b) of
the MAR Regulation is characterized.

   **1.4    On price manipulation by creating a dominant position likely to fix the purchase or sale prices
   of Gour Medical, Umalis and CIOA shares or to create unfair trading conditions for these shares**

   **1.4.1    Notification of grievances**

143.    The notifications of grievances state that the scheme set up and executed by Grantchester Equity and Mr.
Leshem with their partners appears to characterize price manipulation by the construction of a dominant position
on the markets for the companies' securities within the meaning of article 12.2 (a) of the MAR Regulation. They
note that by following the sales protocol described by Mr. Leshem, which enabled securities to be sold as and
when required while facilitating price rises, Unimatrix Ltd, Edern and Festival of Spirit Ltd secured a dominant
position in the supply of the securities of the companies concerned during the periods analyzed.

144.    According to the statements of objections sent to Grantchester Equity and Mr Leshem, they were acting "*in
concert*" with Unimatrix, Edern and Festival of Spirit Ltd.

   **1.4.2    Respondents' comments**

145.    It should be noted that Mr Leshem, Grantchester Equity and Mr Van Wylick did not submit any comments in
response to the statement of objections or the rapporteur's report, and that Mr Van Wylick replied to the detailed
letter sent to him during the investigation, without however putting forward any evidence relating to the alleged
cases of price manipulation.

146.    Ms. Planche argues that she has not secured a dominant position in the supply or demand of a financial
instrument.



### 1.4.3    Applicable texts

147.    The acts of which the defendants are accused took place between March 2018 and June 3, 2019, and will therefore be examined in the light of the texts in force at the time.

148.    Article 12 of the MAR Regulation, which came into force on July 3, 2016 and has not since been amended, states: "*2. The following conduct shall, inter alia, be considered market manipulation: / a) the fact that a person or several persons acting in concert secure for themselves a dominant position on the supply or demand for a financial instrument* [.*with the effect, real or potential, of directly or indirectly fixing purchase or selling prices or creating, real or potential, other unfair trading conditions;* [...]*".

149.    Article 15 of the MAR Regulation, which came into force on July 3, 2016, has already been reproduced in point 511.1.3 *above*.

### 1.4.4    Examination of the grievance

150.    The illiquid nature of the market, as in the present case, makes it easier to demonstrate price manipulation through the creation of a dominant position in the absence of an order book, since the shares are quoted at double *fixing*, giving sellers a dominant position. What's more, as majority shareholders in the companies concerned, Mr. Goldner, Edern and Festival of Spirit Ltd were *de facto* in a dominant position in the event of the sale of their shares. This situation was reinforced by the execution of the *market making program*, based on Mr. Goldner, Edern and Festival of Spirit Ltd seeking and obtaining *lock-up* commitments from the other shareholders of Gour Medical, Umalis and CIOA, so as to make it harder for other potential sellers to position themselves, and to be able to control the issue of the largest proportion of sell orders, so that the sell orders issued were captured by almost all the buy orders placed.

151.    Moreover, the massive nature of the transactions carried out under the *market making program* has already been noted *above*, with sales by the majority shareholders or the *Trustee* representing 81% of trading volumes over the periods identified for Unimatrix, 73% over period 1 Umalis and 82% over period 2 Umalis for Edern, and 69% over period 1 CIOA and 58% over period 2 CIOA for Festival of Spirit Ltd.

152.    It follows from the above that the persons who carried out the *market making program* by selling their securities on the markets for the three securities concerned, on the instructions of Grantchester Equity and Mr Leshem, have, in concert with the latter, secured a dominant position in the supply of the securities of the companies concerned. More specifically, Mr. Goldner, Unimatrix and Grantchester Equity in the case of Gour Medical, Edern and Grantchester Equity in the case of Umalis, and Festival of Spirit Ltd and the Lucide family, in addition to Grantchester Equity, in the case of CIOA.

153.    It has already been established *above* that the *market making program* had the effect of increasing the price of the companies' shares over the duration of the program, in addition to improving liquidity, and this without prejudice to the knowledge of the companies' management of the objective of the *market making program*.

154.    Moreover, as already indicated *above*, the *market marking program* involved selling the companies' shares according to Mr. Leshem's instructions, depending on the arrival of buy orders on the market, so that its execution led to a gradual rise in the price of the said shares.

155.    It should be noted that the market price of the companies' shares has risen significantly over the periods identified as a result of the *market making program*.

156.    Consequently, the dominant position resulting from the execution of the *market making program* by Mr. Goldner, Unimatrix, Edern and Festival of Spirit Ltd, sellers, following the instructions of Mr. Leshem, had the effect, actual or potential, of directly or indirectly fixing the purchase prices or selling prices of the shares of Gour Medical, Umalis and CIOA.



157.    The infringement of price manipulation by construction of a dominant position likely to fix the purchase or sale
        prices of the companies' securities within the meaning of article 12.2 (a) of the MAR Regulation is therefore
        characterized.

### 1.5   Characterization of price manipulation offences against respondents

#### 1.5.1.   Notification of grievances

158.    The notifications of grievance set out the assessment of the situation for each of the respondents in a section
        devoted to the "*imputability*" *of* the price manipulation breaches, which sets out the demonstration of the
        characterization of the said breaches with regard to Grantchester Equity, Mr. Leshem, Mr. Van Wylick and Ms.
        Planche.

159.    In assessing the situation of Mr. Leshem and the company Grantchester Equity, which he chairs, the statements
        of objections note that Mr. Leshem, together with Grantchester Equity, may have been the instigator of the
        manipulative scheme identified by the investigators. They note that Mr. Leshem, in his capacity as Chairman of
        Grantchester Equity, was in regular contact with the directors of the companies concerned for the implementation
        and execution of the *market making program*. They add that Grantchester Equity's documentation sets out the
        principles of the program, detailing its mechanism and the conditions required (volume, price, duration, distribution
        of sales proceeds) to generate purchase orders from investors for the companies' securities through a dedicated
        sales force. They also state that the actual terms and conditions of the sales of the shares of the directors of these
        companies were developed and organized by Grantchester Equity and its chairman Mr. Leshem, who managed
        the sales forces and controlled the pace of sales, in particular, in the case of Umalis and CIOA, by suspending
        execution in the presence of unpaid shares and then relaunching the telephone canvassing campaigns. The
        Statement of Objections also states that all the parties involved were managed by Grantchester Equity, which also
        organized the entire payment circuit for invoices sent to Gour Medical, Umalis and CIOA via intermediary
        companies located in Turkey, Cyprus and Dubai.

160.    They also found that the potentially manipulative strategy was devised by Grantchester Equity and
        M. Leshem, in a personal capacity and as representative of Grantchester Equity, who were also in charge of its
        implementation, notably by (i) personally contacting the directors to propose a manipulative strategy, (ii)
        intervening directly on the market by selling Umalis shares, or indirectly by introducing the Gour Medical executive
        to the company Unimatrix, which was responsible for selling Gour Medical shares on the market, and advising him
        on the disposal strategy, in particular by placing *iceberg* orders, and (iii) managing the transfer of profits from
        sales of shares during the manipulative periods by invoicing related companies. The statements of objections add
        that they benefited economically from the manipulation of Gour Medical and Umalis shares. Finally, they point out
        that in view of their involvement and their indictment for similar acts in the United States and Great Britain, they
        could not have been unaware of the illicit nature of these activities. The statements of objections conclude that
        Grantchester Equity and Mr. Leshem engaged in conduct constituting price manipulation, in breach of articles
        12.1 a) and b) and 15 of the MAR Regulation.

161.    In assessing the situation of Mrs Planche and Mr Van Wylick, the statements of objections note that they
        participated in the implementation of the manipulative scheme identified by the investigators, set up by Mr
        Leshem on the shares of the companies concerned. They deduce that their behavior contributed to price
        manipulation, in breach of articles 12.1 a) and b) and 15 of the MAR regulation, as clarified by recital 39 of the
        same regulation. They apply similar criteria to Mrs. Planche and Mr. Van Wylick, namely, on the one hand, their
        knowledge of the objective pursued by the scheme in question on securities which, given the market segment, are
        by nature illiquid, and, on the other hand, their active participation in the implementation of this scheme, adding
        that they may have derived a financial benefit from these operations.

162.    With regard to Mr. Van Wylick's knowledge of the objective pursued by the manipulative scheme identified by the
        investigators, the notification of grievances notes, firstly, that Mr. Leshem, with whom he was in contact,
        introduced him to Mr. Goldner. Next, it adds that Mr. Van Wylick could not have been unaware of the potentially
        fictitious or abnormal nature of the market price of Gour Medical shares, given that the shares acquired by
        Unimatrix from Mr. Goldner off-market had been purchased at a substantial discount to the market price at the
        time, with a price adjustment clause of 30% of the value of the shares. In addition, after noting his



representing Unimatrix, the notification of grievances points out that several share purchase contracts with Mr. Goldner were concluded even before Gour Medical shares began to be sold on the market when the buyer flow appeared. Similarly, a contract was signed with Fauve Capital for investment advice on small listed stocks, the purpose of which was, according to the statement of grievances, artificial, since Mrs. Planche did not provide Unimatrix with any investment selection or financial analysis, and Fauve Capital's remuneration depended not on the investment advice but on the proceeds of sales made by Unimatrix. The statement of grievances also points out that, having invoiced Mr. Person's *holding company*, Edern, *via* its company Global Capital Research, for "*marketing and promotion*" services, he was clearly aware of the promotional telephone canvassing campaigns aimed at generating a flow of buyers. The notification of grievances also points out that Unimatrix entered into an investor relations contract with Moelis Tech FZE, the remuneration for which corresponded to 50% of the amount of shares sold through Moelis Tech FZE.

163. With regard to Mr. Van Wylick's active participation in the implementation of the scheme, the statement of objections explains that he played an essential role through his companies Unimatrix and Global Capital Research. More specifically, it states that, firstly, Unimatrix became the sole intermediary, acquiring the shares from the selling manager at a discounted price over-the-counter (306,000 shares for 443,900 euros) and then selling them on the market as they came along (between June 5 and July 31, 2018 for 1,743,353 euros), its role being similar to that of the *Trustee* described in the presentation document of the *market making progam* concerning Gour Medical; secondly, through the seller's flow generated by the sale of Gour Medical shares, he contributed to the subsequent increase in prices and volumes traded as a result of the encounter with the buyer's flow created by the telephone canvassing campaign; thirdly, Mr. Van Wylick's involvement was major in the market making progam for Gour Medical. Thirdly, Mr. Van Wylick played a major role in the financing of the telephone canvassing campaign and the flow of funds between Unimatrix, Edern, Grantchester Equity, Global Capital Research, Ms. Planche, Moelis Tech FZE and WhiteTree Capital, the latter two companies being linked to Mr. Leshem.

164. With regard to Mrs. Planche's knowledge of the objective pursued by the manipulative scheme identified by the investigators, the statement of grievances emphasizes, firstly, her status as a seasoned professional in financial operations and the financial markets, particularly with regard to her functions within GEM, on whose behalf Mrs. Planche had to find and canvass by e-mail target companies for PACEO (or *equity line*) financing throughout the world. Secondly, it adds that the operations initiated were followed up by Ms. Planche, as confirmed by the analysis of her e-mail messages, in particular her exchanges with a Tunisian prospect and a Romanian company. Thirdly, the notification of grievances notes that, as a "*key player*" in the *market making programs* of various intermediaries other than Grantchester Equity, including the German company SGCI Gmbh, she had full knowledge of the *market making programs*, as well as of the e-mails exchanged between Mr. Leshem and the managers of the companies concerned on his mechanism and invoicing, and of the track record of Mr. Leshem, who had been sanctioned by the *Securities and Exchange Commission* (SEC) in the past.

165. With regard to Mrs. Planche's active involvement in the implementation of the scheme in question, the statement of grievances notes that she first of all used GEM's reputation to canvass and lure the companies with a possible investment from GEM conditional on a strong prior increase in their liquidity and market capitalization. Secondly, Mrs. Planche introduced Mr. Leshem to the companies' managers, presenting him as capable of bringing them liquidity, in full knowledge of the potentially manipulative strategy he was going to employ. Finally, and simultaneously, the notification of grievances considers that she continued to be involved in certain operational aspects. It concludes that Mrs. Planche played a major role in the start-up phase of the scheme.

### 1.5.2.    Respondents' comments

166. Mr. Leshem, Grantchester Equity and Mr. Van Wylick did not submit any comments in response to the statements of objections. In his reply to the detailed letter sent to him during the investigation, Mr. Van Wylick points out that he has never been in direct or indirect contact with an investor. He adds that he was not informed of the nature of the *market making program* and that he would never have agreed to receive shares or make payments if he had known. He maintains that he was naive and did not act in bad faith.



167.  Mrs Planche alleges that no material act punishable under the applicable regulations was committed by her. She maintains that the justifications provided to demonstrate this involvement are factually inaccurate and illogical, legally unsubstantiated and contradicted by the evidence she provides concerning the reality of the directors' operations, with the result that her involvement in the implementation of the scheme has not been demonstrated and that the infringement has not been established in her case.

168.  Ms. Planche points out that the prosecution maintains that the executives acted solely because they wished to enter into an "*Equity Line*" contract with GEM, itself conditional on their participation in a price manipulation program. However, it asserts that none of them subsequently asked GEM to invest in the companies' capital. She adds that it is in any case illogical to accuse a defendant of having served as bait between two co-perpetrators of a stock market breach. She also points out the direct personal interest of the directors, who are ultra-majority shareholders in the companies concerned, in implementing the *market making program* that enabled them to dispose of a significant proportion of their illiquid holdings, before explaining why liquidity is not a prerequisite for GEM's *equity lines*. She explains that her personal interest lies in setting up *equity* lines rather than in establishing relationships with issuers.

169.  In addition, Ms. Planche contests the evidence of her alleged knowledge of Mr. Leshem's manipulative strategy, arguing that the investigators' findings are not established since their analysis of her role as a key player in *market making programs* is contradicted by the evidence they produce. Mr. Leshem argues that his exchanges, notably with a Romanian company, on which the investigators rely, do not relate to the alleged facts, since GEM's commercial proposal concerns *equity lines*, not the *market making* program, and are therefore irrelevant.

170.  Ms. Planche gives a factual account of the background to the transactions carried out under the *market making program*, demonstrating that the liquidity programs had not been set up to meet her requirements, but at the request of the issuers' management. She maintains that Mr. Goldner did not intend to implement the *equity line* proposed by GEM, but wanted to carry out a capital increase, specifying that the improvement in liquidity was intended to facilitate his negotiations with the potential investors contacted with a view to the capital increase. Moreover, according to Ms. Planche, Mr. Person only wanted to improve liquidity, without setting up an *equity line* contract, which he considered too unfavorable. With regard to
M. Lucide, Ms. Planche asserts that the liquidity program was set up exclusively as a result of the executive's desire to sell his illiquid stake, and not because of any alleged liquidity requirement on the part of GEM.

171.  She also contests her status as a seasoned market professional, arguing that she was more of a saleswoman dedicated exclusively to intensive canvassing of issuers, without ever being involved in the technical and financial implementation of GEM's *equity lines*.

172.  She points out that, in application of the principle of individualized sentencing, only the commission or attempted commission of market manipulation is punishable, so that she cannot be prosecuted for acts that she did not actually commit. In this respect, it relies on the terms of the investigation report to refute any collaboration in price manipulation by participating in its execution. It adds that the notification of grievances is based on acts that fall under the criminal concept of complicity, and argues that recital 39 of the MAR Regulation, which is written in the conditional tense, has no binding force under French law. It also argues that it cannot be accused of price manipulation even though the three directors of the companies concerned, who were directly involved in the execution of the *market-making program,* have now been exonerated on this count.

### 1.5.3.    Applicable texts

173.  The facts complained of, which took place between March 2018 and June 3, 2019, must be examined in the light of the texts then applicable.

174.  Articles 12 and 15 of the MAR Regulation, which came into force on July 3, 2016 and has not been amended since, have already been reproduced *above*.

AUTORITÉ DES MARCHÉS FINANCIERS
AMF

175. Recital 39 of the MAR Regulation states that: "*Prohibitions on market abuse should also cover persons who collaborate in market abuse. Such persons could include, by way of non-exhaustive examples, brokers devising and advising on a* trading *strategy aimed at committing market abuse, persons encouraging another person in possession of inside information to disclose it unlawfully, or persons developing software in collaboration with a* trader *in order to facilitate market abuse*".

**1.5.4. Examination of the grievance**

176. The applicable texts concern any natural or legal person who carries out or attempts to carry out price manipulation, which includes not only the initiator of the manipulation, but also, in the light of Recital 39 of the MAR Regulation cited above, the persons who collaborate in it.

177. In the present case, the notifications of grievances accuse Mr. Leshem, Mr. Van Wylick and Ms. Planche for their personal liability, independently of the entities they preside over that are responsible for the acts complained of, namely Grantchester Equity, on the one hand, and Unimatrix and Global Capital Research, on the other, as well as Fauve Capital.

178. These breaches must be assessed in the light of the respondents' personal conduct.

✓ *Review of Mr Leshem's and Grantchester Equity's situation*

179. With regard to the implementation of the *market making program* for Gour Medical shares, it is clear from the information in the file that Mr. Leshem, as Chairman of Grantchester Equity, first transmitted the program documentation to Mr. Goldner, as explained *above*. Secondly, through Unimatrix, he coordinated and determined the procedures for selling the shares on the market, which it has been established were implemented in application of the *market making program,* notwithstanding the absence of any regularization of the documentation. In this respect, it should be noted that both Mrs Planche and Mr Goldner stated that they were unable to distinguish Unimatrix from Mr Leshem in his capacity as Chairman of Grantchester Equity. Thirdly, it has been established that Mr. Leshem in his capacity as Chairman of Grantchester Equity received on July 25, 2018 the sum of 20,006.88 euros by transfer from Mr. Van Wylick, manager of Unimatrix, which corresponds to an economic profit.

180. With regard to the implementation of the *market making program* on Umalis securities, the file shows that Firstly, Mr. Leshem, in his capacity as Chairman of Grantchester Equity, sent Mr. Person the program presentation documentation and a draft *term sheet* for the *market making program*, which he signed on June 7, 2018 and which was countersigned by Mr. Person on July 5, 2018. Secondly, he coordinated and determined the terms and conditions for the sale of Umalis shares by Edern on the market, as evidenced by the signature of the amendment to the *term sheet* on October 18, 2019 confirming Grantchester Equity's right to designate the bank account of any company of its choice as the beneficiary of the 70% of the proceeds from the sale of the shares. Furthermore, it was also established that he gave instructions to Mr. Person on how to place the sale orders, even requesting that Umalis transfer the securities to be sold to a company linked to him, WhiteTree Capital, so that he could place the orders himself, which was the case between February 11 and June 3, 2019, after Mr. Person had given him his access codes to Edern's securities account opened with CACEIS. Thirdly, Mr. Leshem, in his capacity as President of Grantchester Equity, personally coordinated the investment advisors and more generally the sales force, as illustrated by the immediate effect of the suspension of the program on the share price during the tensions encountered between him and Mr. Person. Fourthly, it has been established that all the parties involved, as well as the payment circuit for invoices sent to Umalis or Edern, were managed in accordance with his instructions, as evidenced in particular by Edern's payment of an invoice dated September 24, 2018 issued by Global Capital Research entitled Grantchester Equity received two transfers from Global Capital Research for a total of 19,000 euros, while Umalis received an invoice for "Invoice GCR-MLUMG 001 - MIRON" for 93,745 euros. Similarly, the invoices received by Umalis from the Turkish company Kaya, as well as those from Global Capital Research, were paid, according to Mr. Person, under the 70% share of sales proceeds. The investigation file shows that a *consulting* contract was signed between Grantchester Equity and WhiteTree Capital on November 12, 2018, before Grantchester Equity received the sum of 51,856.15 euros from WhiteTree Capital between December 11, 2018 and June 5, 2019.

Finally, as explained *above*, Grantchester Equity did not hesitate to put Edern on notice, through its counsel, to pay the sum of 50,002 euros in respect of the balance of Kaya's invoices.

181. With regard to the implementation of the *market making* program for CIOA securities, it has been established, firstly, that

Mr. Leshem, in his capacity as President of Grantchester Equity, sent Mr. Lucide the documentation presenting the *market making program*, together with a draft *term sheet* dated September 4, 2018. Secondly, the sales forces and the pace of sales were coordinated by him, as confirmed by the powerful and immediate effect of the suspension of the program on the CIOA share price. Thirdly, the arrangements for the sale of CIOA shares by Festival of Spirit Ltd on the market were steered by Mr. Leshem in his capacity as Chairman of Grantchester Equity, who, on the one hand, worked to reach an agreement with a minority shareholder refusing to sign a commitment to retain the shares, and on the other hand, requested the transfer by Festival of Spirit Ltd of CIOA shares to its *broker*, without success however. Mr. Leshem also provided Mr. Lucide with information on how to place orders, notably in hidden quantities, *using* the *iceberg* order technique, after the Lucide family refused to transfer the shares. Fourthly, all the parties involved, as well as the invoice payment circuit, were coordinated and steered by Mr. Leshem in his capacity as President of Grant. Leshem in his capacity as Chairman of Grantchester Equity, as evidenced in particular by the transfers received by Moelis Tech FZE and WhiteTree Capital between October 3, 2018 and January 9, 2019 for a total amount of 472,556 euros from Festival of Spirit EURL, an amount corresponding in part to the 70% of net sales of CIOA shares by Festival of Spirit Ltd (675,109 euros) over the period, in accordance with the remuneration provided for under the terms of the *market making program*.

182. Consequently, for all the companies' securities, it has been established not only that the *market making program* strategy was devised by Mr. Leshem, in his capacity as President of Grantchester Equity, but also that he participated in its actual execution and control, while deriving a substantial economic benefit from all these operations.

183. Moreover, as Mr. Leshem materially carried out all the acts performed by Grantchester Equity, both have the same degree of involvement in the acts complained of.

184. In view of the foregoing, Grantchester Equity and Mr. Leshem are guilty of price manipulation by fixing the price of Gour Medical, Umalis and CIOA shares at an abnormal or artificial level, by making false or misleading statements concerning the supply, demand or price of these shares, by using fictitious procedures or any other form of deception or artifice and by creating a dominant position such as to fix the purchase and sale prices of these shares.

    ✓ *Review of Mr. Van Wylick's situation*

185. With regard to the implementation of the manipulative scheme described above concerning Gour Medical shares, it has been established *above* that Unimatrix, chaired by Mr. Van Wylick, acted as *trustee* within the meaning of the *market making program* presentation document when acquiring 306,000 Gour Medical shares off-market from Mr. Goldner for a total discounted price of 443,900 euros, before selling them on the market in accordance with Grantchester Equity's instructions for a gross amount of 1,743,353 euros. Consequently, Mr. Van Wylick, on behalf of Unimatrix, intervened directly on the market to generate the flow of buyers for these shares. Secondly, as explained above, Mr. Van Wylick, on behalf of Unimatrix, intervened in the financing of the *market making program*, in particular by paying sums to (i) WhiteTree Capital (a Cypriot company linked to Mr. Leshem, also involved in the Umicore files), (ii) the French subsidiary of Unimatrix, and (iii) the French subsidiary of Unimatrix. Leshem, which is also involved in the Umalis and CIOA files, in the amount of 12,830 euros on October 26, 2018, (ii) Moelis Tech FZE between June 7 and August 1$^{er}$  2018 in the amount of 859,326.42 euros under an investment advisory agreement (remuneration of 50% of the amount of shares sold thanks to its intervention), and (iii) Ms. Planche in the amount of 39,258.64 euros. On a personal basis, Mr. Van Wylick also paid Grantchester Equity 20,006.88 euros in compensation for investment advice. As a result, Mr. Van Wylick, a director of Unimatrix, actively contributed to the price manipulation of Gour Medical shares.



186.    The explanation put forward by Mr. Van Wylick, relating to the alleged "naivety" to which he refers in his reply to the detailed letter, is inoperative since he was aware of the conditions of the transactions, in particular the exchange prices of the securities, so that he could not have been unaware that the operating scheme in which his intervention formed part was based on a mechanism intended to impact the formation of the price of Gour Medical securities on the market and to mislead potential investors as to their liquidity.

187.    As a result, Mr. Van Wylick, a director of Unimatrix, must be considered to have actively and knowingly contributed to the manipulation of the Gour Medical share price.

188.    With regard to the implementation of the *market making program* on Umalis shares, the file shows that
Mr. Van Wylick played a major role in the financing of the canvassing campaign and the circulation of financial flows between the protagonists. His company, Global Capital Research, invoiced Edern for "*marketing & promotion*" services in the amount of 93,745 euros for the period from August 20 to September 24, 2018. According to Mr. Person, this payment actually corresponded to the payment of the 70% share of the proceeds from the sale of the shares provided for in the program. In addition, he had Global Capital Research transfer the sum of 19,000 euros to Grantchester Equity on October 10 and November 22, 2018 and personally transferred 20,006.88 euros to Grantchester Equity.

189.    In view of the foregoing, Mr. Van Wylick must be deemed to have collaborated in price manipulation by fixing the price of Gour Medical and Umalis shares at an abnormal or artificial level, by providing false or misleading information on the supply, demand or price of these shares, by using fictitious procedures or any other form of deception or artifice and by constructing a dominant position such as to fix the purchase and sale prices of these shares. The infringement is well-founded.

    ✓    *Examination of Mrs Planche's situation*

190.    It is clear from the evidence in the file that Ms. Planche had over 8 years' experience with the GEM investment fund, for which she was managing the French office at the time of the events. It can be deduced from this that she had a good knowledge of the workings of the financial markets, so that she can be qualified as a seasoned professional in this field.

191.    With regard to the facts of the case, it has been explained above that Mrs. Planche was responsible for introducing Mr. Leshem, the instigator of the scheme constituting price manipulation, to the three directors of the companies concerned.

192.    It is also clear from the file that, contrary to its allegations, its involvement in the three cases where this scheme was implemented was not limited to its activity as a business contributor, but represented an active contribution, with full knowledge of the facts, to the smooth running of the operations. In each case, this analysis is based on the chronology of the facts.

193.    With regard to trading in Gour Medical shares, Mr Leshem's contact in March 2018 with
Mr. Goldner's presentation of the *"market making program"* to Mr. Goldner was followed, on May 1$^{er}$ of the same year, by the signature by his company Fauve Capital of an agreement with Unimatrix, Mr. Van Wylick's company, for the provision of investment advice in return for a fee corresponding to 2.5% of the amount of net sales actually achieved. As explained above, and as provided for in the program, Unimatrix acquired Mr. Goldner's shares in Gour Medical from him and then sold them on the market at an artificially high price. Concurrently with these sales, between June 28 and August 1$^{er}$ 2018, Fauve Capital received 39,258 euros, or 2.3% of the amount of the sales made by Unimatrix, in accordance with the above-mentioned contract.

194.    Finally, on September 3, 2018, Ms. Planche contacted Mr. Goldner, explaining that she had observed a return to liquidity in Gour Medical shares, and that as a result GEM (the company she represented in France, as explained above) could now consider the opportunity of an investment. This demonstrates that she was closely monitoring the results of the manipulation.

- 34 -



195.    With regard to the transactions in Umalis shares, after Mr Leshem and Mr Person had been put in contact with each other and had signed the documentation describing the course of the transactions, sales of shares on the market at an artificially high price began on September 5, 2018. On September 26, Ms. Planche received, together with

Mr. Leshem, an email from Mr. Person indicating that the latter was prepared to "*deliver 50% of the first bonus in asap shares*". On September 28, 2018, by return of this email, Ms. Planche sent Mr. Person the bank details of the Fauve Capital account for the transfer of 5,000 Umalis shares. On the following October 22, Edern received a *consulting* contract signed by Ms. Planche, providing for the delivery of Umalis shares in payment for consulting services. The contract stipulated that Fauve Capital would assist Edern in "*developing investor awareness and the liquidity of Umalis shares*": the pursuit of such an objective was at the heart of the manipulative scheme described above. Clearly, Mrs. Planche played an active role in the implementation of the *market making program*. She subsequently contacted Mr. Person to activate the transfer of shares by the latter, for her benefit and that of Mr. Leshem, in remuneration for services rendered.

196.    With regard to trading in CIOA shares, in September 2018 Ms Planche put Mr Leshem in touch with

Mr. Lucide by introducing the former as "*a player in the GEM ecosystem*", i.e. the American company whose representative she was in France and about which she dangled the possibility of financing their activities to the managers of the three companies concerned, provided the liquidity of their securities improved, which was precisely the purpose of the "*market making program*". Moreover, in his email of October 24, 2018 to Mr. Lucide, Mr. Leshem directly calls Ms. Planche as a witness to confirm the effectiveness of his investment advisors in generating rapid sales of securities.

197.    It has also been established that Mrs Planche was warned by Mr Person that Mr Leshem had been implicated in a US SEC proceeding concerning price manipulation on *penny stocks*.

198.    Ms. Planche's argument that her remuneration from *equity lines*, i.e. a commission of 40% representing 80/90% of Fauve Capital's sales, was more advantageous than her remuneration as a business contributor in *market making programs,* i.e. a commission of 2.5

% of the proceeds from sales on the market, is irrelevant, since it could have wished to combine the two remunerations. Moreover, the remuneration received for the *market making* program for Gour Medical alone, amounting to 39,258.64 euros, represented 3% of Fauve Capital's annual sales, which is significant for only one of the dossiers submitted. Ms. Planche sought significantly higher remuneration by asking Edern to sign a draft *consulting* contract for her involvement in manipulating the Umalis Group share price. Moreover, unlike her remuneration for *equity lines*, which is independent of GEM's profits on drawdowns, her remuneration for the *market making program* is linked to the execution of the *market making* program insofar as this remuneration is correlated to the amount of securities sold on the market.

199.    As indicated *above*, the manipulative behavior resulting from the execution of the *market making program* resided in the coordinated interactions of the various participants, notably concerning *lock-up* commitments on the part of the other historical shareholders of the companies concerned, canvassing by investment advisors ("the sales force" of Grantchester Equity and Mr. Leshem) with the aim of eliciting buy orders for the companies' shares, and the sale of the companies' shares following Mr. Leshem's instructions so that all sales would be captured by the buy orders elicited.

200.    It follows from the above that Mrs. Planche's role in the execution of this scenario was not simply that of a business contributor who made it possible to start up operations, but that she continued to provide active support thereafter. In fact, as Mr. Person said at the hearing: "*The boss is Aude Planche. At one point, she asked for a specific number of shares, and it was she who initiated everything*".

201.    As a result, Mrs. Planche must be deemed to have collaborated in the manipulation of share prices by fixing the price of Gour Medical, Umalis and CIOA shares at an abnormal or artificial level, by providing false or misleading information on the supply, demand or price of these shares, by using fictitious procedures or any other form of deception or artifice, and by creating a dominant position such as to fix the purchase and sale prices of these shares. The infringement is also characterized with regard to him.



### 2.  <u>On the grievances relating to non-compliance with the obligation to report transactions</u>

### 2.1    On the grievance against Mr Goldner

#### 2.1.1    Notification of grievances

202.    The complaint is that Mr. Goldner made a late and erroneous declaration of the over-the-counter sales of 306,000 Gour Medical shares to Unimatrix carried out between May 16, 2018 and July 16, 2018, the amount of which exceeded the threshold of 20,000 euros, in breach of the provisions of Articles 19 of the MAR Regulation, L. 621-18-2 of the French Monetary and Financial Code and 223-23 of the RGAMF.

203.    After recalling the course and context of the sales transactions in question with regard to the manipulative scheme, the notification of grievances states that the reporting obligations requiring persons exercising managerial responsibilities and persons closely linked to them to notify the issuer and the AMF of any transaction carried out on their own behalf within three working days of the transaction date, were applicable to Mr. Goldner in his capacity as Chairman and CEO of Gour Medical at the time of the events. The notification of grievances notes that the transaction dates indicated in the notifications sent to the AMF differ by several days or even weeks from the dates on which the shares were delivered to Unimatrix, as shown in the statements for Unimatrix's account with VP Bank. It also notes that the dates of notification to the AMF do not comply with the regulatory requirement of three working days.

204.    It also states that the breach of this reporting obligation is all the more serious in that, by failing to notify the AMF of transactions in Gour Medical shares, Mr. Goldner facilitated the implementation and execution of the potentially manipulative scheme devised by Mr. Leshem in relation to these shares. It adds that the implementation and execution of the manipulative scheme was facilitated and enabled by Mr. Goldner's decision to sell to Unimatrix a large number of Gour Medical shares that he knew were destined to be resold on the market, by agreeing to sell 70% of their market value and to receive only 30%. According to the notification of grievances, Mr. Goldner was aware of the artificial nature of the price of the transactions carried out with Unimatrix and was in a position to suspect that such a transaction would be reprehensible to the AMF. It states that Mr. Goldner received a financial benefit of 515,686 euros from Unimatrix, specifying that he himself transferred a net amount of 160,700 euros to a Gour Medical current account.

#### 2.1.2    Respondent's comments

205.    Mr. Goldner does not dispute the late nature of the Gour Medical share transaction reports, but points out that they were made during the disputed period. He maintains that he deferred notification of the transactions because of the risk of non-payment by Unimatrix, pointing out that the transactions in question were subject to a 30-day payment period in Unimatrix's favor. He added that these were technical breaches which he had never committed in the past, nor repeated, and from which he had not derived any benefit. According to him, these breaches had no direct or indirect effect on the fraud perpetrated against other people.

206.    He contests the aggravating circumstances mentioned in the notification of grievances concerning his participation in the potentially manipulative scheme, which in his view are unfounded in both law and fact. Invoking the principle of legality and foreseeability of the sanction, it argues that the regulations applicable in this case do not provide for the possibility of aggravating circumstances. He also maintains that the over-the-counter sales made to Unimatrix did not imply his knowledge of the manipulative scheme undertaken by Mr. Leshem and his associates, arguing that he did not sign the *market making program* contract, but only the sales contracts, the nature of which is distinct from the liquidity contract. He also maintains that his statements on the artificial nature of the price must be put into context. He also claims that he was the victim of a staged operation designed to deceive him and surprise his consent, and that he cannot be accused of complicity in an offence of which he was unaware, nor can he be charged with investigation and compliance obligations for which there is no legal provision.



### 2.1.3 Applicable texts

207. The disputed operations took place between May 16, 2018 and July 16, 2018, so the facts complained of will be examined in the light of the texts then applicable.

208. Article 19 of the MAR Regulation, which came into force on July 3, 2016 and has not since been amended on these points, states:
   *" 1. Persons discharging managerial responsibilities and persons having a close link with them shall notify the issuer [...] and the competent authority referred to in the second subparagraph of paragraph 2: / a) as regards issuers, of any transaction carried out for their own account and relating to the shares or debt securities of that issuer, or to derivatives or other related financial instruments; [...] / These notifications shall be made promptly and no later than three working days after the date of the transaction. [...] /*
   *8. Paragraph 1 applies to all subsequent transactions once the total amount of EUR 5,000 has been reached in the course of a calendar year. The EUR 5,000 threshold is calculated by adding, without netting, all the transactions referred to in paragraph 1. / 9. A competent authority may decide to raise the threshold set out in paragraph 8 to EUR 20,000 and shall inform ESMA of its decision to adopt a higher threshold and the reasons for its decision, with specific reference to market conditions, prior to its application. ESMA shall publish on its website the list of thresholds that apply in accordance with this Article and the justifications provided by competent authorities for these thresholds."*

209. Article 3 (1) paragraph 25 of the MAR Regulation, which came into force on July 3, 2016, provides: "*1. For the purposes of this Regulation, the following definitions shall apply: [...] / 25) "person discharging managerial responsibilities": a person within an issuer [...] who is: / a) a member of the administrative, management or supervisory body of that entity; [...]*".

210. Article L. 621-18-2 of the French Monetary and Financial Code, in the version in force since July 3, 2016, states:
   *" I. - Are communicated by the persons mentioned in a to c to the Autorité des marchés financiers and made public by the latter, under the conditions mentioned in Regulation (EU) No 596/2014 of the European Parliament and of the Council of 16 April 2014 on market abuse (Market Abuse Regulation) and repealing Directive 2003/6/EC of the European Parliament and of the Council and Commission Directives 2003/124/EC, 2003/125/EC and 2004/72/EC, the transactions mentioned in Article 19 of the same Regulation, when these transactions are carried out by: / a) The members of the Board of Directors, the Management Board, the Supervisory Board, the Managing Director, the Sole Managing Director, the Delegate Managing Director or the Manager of this person; / b) Any other person who, under the conditions defined by the general regulations of the Autorité des marchés financiers, has the power to make management decisions concerning the issuer's development and strategy, and who has regular access to inside information concerning the issuer directly or indirectly; / c) Persons who, under conditions defined by decree of the Conseil d'Etat, have close personal ties with the persons mentioned in a and b. [...] / The General Regulation of the Autorité des Marchés Financiers sets the threshold above which transactions must be disclosed, and the procedures for applying this threshold.*

211. Article 223-23 of the RGAMF, in the version in force since November 20, 2017, states: "*In accordance with the last paragraph of Article L.621-18-2 of the Monetary and Financial Code, transactions carried out by a person mentioned in the aforementioned article do not give rise to reporting when the cumulative amount of said transactions does not exceed 20,000 euros for the current calendar year.*"

### 2.1.4 Examination of the grievance

212. On a combined reading of the aforementioned texts, an issuer's Chairman and Chief Executive Officer must declare any transaction carried out for his own account and relating to the issuer's shares or debt securities within three working days of the transaction date, the transactions concerned being those whose cumulative amount exceeds 20,000 euros for the current calendar year.



213.   Failure to comply with these provisions does not require proof of intent or the existence of a profit.

214.   In this case, Mr. Goldner has been Chairman and CEO of Gour Medical since 2017. In his capacity as a member of Gour Medical's administrative and management body, he was therefore required, at the time of the events complained of, to declare his transactions in Gour Medical shares exceeding the threshold of €20,000 for the current calendar year within three working days of the date of the transactions.

215.   It is established by the evidence in the file and not disputed by Mr. Goldner that he sold 306,000 Gour Medical shares over-the-counter to Unimatrix between May 16 and July 16, 2018, and that these transactions, which together exceeded the regulatory threshold of 20,000 euros, were notified out of time.

216.   In this respect, the fact, invoked by the respondent, that the notifications took place during the disputed period is irrelevant to the characterization of the breach, as is his argument that his late declarations did not contribute to the manipulative scheme. Mr Goldner's argument relating to the risk of non-payment of the price by Unimatrix to justify the delay in notifying the transactions is also inoperative, since the transfer of ownership of financial securities results from their registration in the purchaser's securities account in accordance with article L. 211-17 of the French Monetary and Financial Code, so that the sale of securities, which generates the reporting obligations, is completed independently of the payment of the price.

217.   Thus, by belatedly reporting transactions carried out between May 16, 2018 and July 16, 2018 on 306,000 Gour Medical shares in amounts exceeding €20,000, Mr. Goldner failed to meet the reporting obligations imposed by the regulations.

218.   Consequently, the breach relating to Mr. Goldner's failure to comply with the obligation to report transactions, as provided for in articles 19 of the MAR Regulation, L. 621-18-2 of the French Monetary and Financial Code and 223-23 of the RGAMF, is characterized.

### *2.2     On the grievance against Mr Person*

### 2.2.1     Notification of grievances

219.   The complaint is that Mr Person failed to declare the sale of 108,467 Umalis shares, carried out between September 5, 2018 and November 27, 2018, and then between February 3, 2019 and June 3, 2019 *via* his personal *holding company* Edern, in an amount exceeding 20,000 euros, in breach of the provisions of Article 19 of the MAR Regulation, Article L. 621-18-2 of the French Monetary and Financial Code and Article 223-23 of the RGAMF.

220.   The notification of grievances first recalls the course and context of these sales transactions in terms of the manipulative scheme in question. It then notes that Mr Person was Chairman and Chief Executive Officer of Umalis at the time of the events, and that he is Chairman of Edern, his personal *holding company*, for which he acted as principal in the sales of shares concerned. It concludes that Edern is subject to the reporting obligations incumbent on persons exercising managerial responsibilities and persons closely linked to them to notify the issuer and the AMF of any transaction carried out on their own behalf, within three working days of the transaction date. The notification of grievances specifies that
Mr Person, in his capacity as manager of the legal entity concerned, is also subject to this obligation.

221.   It further notes that the investigation report shows that Mr. Person, *via* his personal *holding company* Edern, sold 50,133 Umalis shares for around 434,700 euros between September 5, 2018 and November 27, 2018. It states that the 20,000 euro threshold triggering the reporting obligation was crossed on September 10, 2018. It also notes that Edern sold 58,334 Umalis shares for around 420,400 euros between February 11, 2019 and June 3, 2019. According to the notification of grievances, these transactions should have been notified to the AMF from September 10, 2018, then between February 11 and June 3, 2019, which was not done.





222. Finally, the notification of grievances states that the breach of this reporting obligation is all the more serious in that, by committing it, Mr. Person facilitated the implementation and execution of the potentially manipulative scheme devised by Mr. Leshem on the Umalis share. She points out that by deciding to sell a large volume of Umalis shares, either directly on the market, or indirectly by giving the codes for his CACEIS account to Mr. Leshem so that he could make the sales directly, and by agreeing to sell 70% of their market value even though he was aware of Mr. Leshem's past dealings with the SEC relating to price manipulation on *penny stocks*,
Mr. Person enabled the implementation and execution of this manipulative scheme, from which he was able to derive a financial benefit. It adds that Edern received a net amount of 239,000 euros at the end of the two sales periods analyzed, all of which Mr. Person is likely to have reinvested in the Umalis current account opened in Edern's books.

### 2.2.2    Respondent's comments

223. Mr Person does not contest the alleged breach of declarations. He argues that this failure does not justify the imposition of a sanction against him since he is acting in good faith. He points out that he was wrongly unaware of his obligations in this area. He also states that he has always cooperated with the AMF in its investigations.

224. On the other hand, he disputes the prosecution's allegations of price manipulation, which by their very nature do not relate to the reported breaches. In his view, no price manipulation can be held against him, nor can it constitute an aggravating circumstance in the case of a breach of declarations.

225. In this respect, he points out, firstly, with regard to the setting of an *ex ante* upward target without any underlying economic justification, that this target, which did not seem excessive to him, was only mentioned by Mr. Leshem in the *term sheet* he sent to Mr. Person. He added that Grantchester Equity was
"This assumption was not binding on him, as his obligations were disconnected from the share price. Secondly, Mr. Person maintains that Edern merely sold the Umalis shares it held in order to meet market demand, adding that he had given Mr. Leshem access, at his request, to his account at CACEIS to enable him to sell Umalis shares directly and receive direct payment of the sums due to him. Thirdly, Mr. Person asserts that the indications of market manipulation are not likely to characterize a fault against him since the very sharp price variation is not characterized over the period of execution of the program understood as the period from September 2018 to the end of May 2019 (0.06%), and that the Umalis share price of 7.40 euros at the end of May 2019 is nothing abnormal compared with its estimate of 10.40 euros at the time of its IPO in 2014 and its valuation between 8 euros and 6.50 euros between the end of 2014 and mid-2018. With regard to the indicator relating to t h e high proportion of daily trading volume in Umalis shares, Mr. Person argues that the sharp drop in liquidity observed by the investigators after the sharp increase in trading volumes is the result of a biased reading on their part, taking into consideration, for example, the volume of shares traded between January 5, 2021 and March 31, 2021 (1,081), comparable to the volumes traded during the manipulative periods selected. He also maintains that he wished to limit the percentage of capital made available to Grantchester Equity to 20%, whereas Mr. Leshem had requested 100% in the *term sheet* of June 6, 2018. Mr. Person also points out that the translation of the Umalis website into German is in line with the company's development strategy, as are the translations into English and Arabic, which were not commented on by the investigators. He also states that n o details are given on the nature of the false or misleading information, and it has not been demonstrated that he was behind the dissemination of such information. Mr. Person also points out the lawfulness of the remuneration for the *market making program* brought to the attention of CIC and CACEIS Corporate Trust's Operations Department, as well as the payment of invoices issued by third-party companies in connection with the execution of the *market making program*.

226. In addition, he argues that any sanction against him would be disproportionate in the absence of any benefit derived from the transactions in question, which concerned a small share of Umalis' share capital. He added that the absence of a declaration and the amending declaration of January 17, 2022 had had no effect on the Umalis share price or its order book. In his opinion, the failures to declare notified to him are not particularly serious, since the failure to declare the sales made by Edern did not really create any doubt as to the identity of the seller, and did not distort investors' perception of the issuer's true situation. He also points out that he did not derive any personal advantage or profit from the breaches.



that it has not committed any previous breaches sanctioned by the Enforcement Committee and has cooperated fully during the proceedings.

### 2.2.3    Applicable texts

227.   The disputed operations took place from September 5, 2018 to November 27, 2018 and then from February 11, 2019 to June 3, 2019, so that the facts complained of will be examined in the light of the texts then applicable, subject to the retroactive application of less severe provisions that came into force subsequently.

228.   Articles 19 and 3 (1) paragraph 25 of the MAR Regulation, L. 621-18-2 of the French Monetary and Financial Code and 223-23 of the RGAMF, in the versions applicable in this case, have already been reproduced *above*.

229.   Article 3 (1) paragraph 26 of the MAR Regulation, which came into force on July 3, 2016 and has not since been amended on these points, states: "*1. For the purposes of this Regulation, the following definitions shall apply: [...] / 26) "closely related person": :[...] /
d) a legal person, trust or partnership, the managerial responsibilities of which are exercised by a person exercising managerial responsibilities or by a person referred to in a), b) and c), which is directly or indirectly controlled by that person, which has been constituted for the benefit of that person, or the economic interests of which are substantially equivalent to those of that person; [...]*".

230.   Article R. 621-43-1 of the French Monetary and Financial Code, in the version in force from March 5, 2006 to July 5, 2018, states: "*The persons mentioned in c of article L. 621-18-2, who have close personal ties with one of the persons mentioned in a or b of the same article, are: [...] / 4° Toute personne morale ou entité, autre que la personne mentionnée au premier alinéa de l'article L. 621-18-2, constituée sur le fondement du droit français ou d'un droit étranger, et : / a) Dont la direction, l'administration ou la gestion est assurée par l'une des personnes mentionnées aux a et b de l'article L. 621-18-2 ou par l'une des personnes mentionnés en 1°, 2° ou 3° et agissant dans l'intérêt de l'une de ces personnes ; / b) Or which is controlled, directly or indirectly, within the meaning of Article L. 233-3 of the French Commercial Code, by one of the persons mentioned in a and b of article L. 621-18-2 or by one of the persons mentioned in 1°, 2° or 3° [...]*".

231.   Since July 6, 2018, the words "*and acting in the interest of one of these persons*" have been deleted from a) of 4° of the aforementioned Article R. 621-43-1 of the Monetary and Financial Code. The more recent provisions of article
R. 621-43-1 of the French Monetary and Financial Code are no less stringent than the previous ones, so there is no need to apply them retroactively.

232.   Article 221-1 of the RGAMF, in the version in force since December 24, 2017, which has not since been amended on this point, states in its last paragraph: "[...] *The provisions of this title [title II of Book II] are also applicable to the directors of the issuer, entity or legal person concerned.*".

### 2.2.4    Examination of the grievance

233.   As a result of the combined reading of the above-mentioned texts, persons exercising managerial responsibilities and persons having a close link with them are required to report to the AMF any transaction carried out for their own account and relating to the issuer's shares within three working days of the transaction date, the transactions concerned being those whose cumulative amount exceeds 20,000 euros for the current calendar year. The notion of a person closely linked to persons exercising managerial responsibilities refers to any legal person or entity whose direction, administration or management is ensured by such persons.

234.   In addition, pursuant to Article 19.7 (b) of the MAR Regulation, which came into force on July 3, 2016, the transactions to be notified by persons discharging managerial responsibilities or persons closely linked to them include "*transactions carried out by persons arranging or executing transactions in a professional capacity or by another person on behalf of a person discharging managerial responsibilities or a person closely linked to them, as referred to in paragraph 1, including where discretion is exercised*".



235. In this case, at the time of the disputed sales transactions, Mr. Person was Chairman and Chief Executive Officer of Umalis and Chairman of Edern, his personal *holding company*, which he wholly owns. It follows that Edern, as a person closely linked to Mr. Person exercising management responsibilities within Umalis, was subject to the reporting obligations set out in articles 19 of the MAR Regulation, L. 621-18-2 of the Monetary and Financial Code, and 223-23 of the RGAMF.

236. The circumstance invoked by Mr. Person that he had given the codes for his CACEIS account to Mr. Leshem to sell Umalis shares directly from February 11, 2019 does not a f f e c t  Edern's obligation to report the transactions in question, i n  accordance with Article 19 (7) of the MAR Regulation.

237. With regard to the transactions in q u e s t i o n , the file shows that Edern sold 50,133 Umalis shares b e t w e e n September 5 and November 27, 2018 for a gross amount of 434,714 euros, the regulatory threshold of 20,000 euros having been exceeded on September 10, 2018. Edern then sold 58,334 Umalis shares between February 11 and June 3, 2019 for a net amount of 417,848.89 euros, the regulatory threshold of 20,000 euros having been exceeded on March 4, 2019.

238. However, it has been established and not contested by Mr. Person that neither the sales of Umalis shares carried out by Edern from September 10, 2018 to November 27, 2018, nor those carried out by it from March 4, 2019 to June 3, 2019 were notified to the AMF.

239. The arguments put forward by Mr Person relating to his good faith, the absence of consequences of the failure to notify and the absence of personal advantage or profit have no bearing on the assessment of the characterization of this grievance.

240. By failing to declare its transactions in 108,467 Umalis shares between September 5 and November 27, 2018 and between February 11 and June 3, 2019 in amounts exceeding €20,000, Edern has failed to meet the reporting obligations imposed by the applicable texts.

241. The imputability mechanism provided for in article 221-1 of the RGAMF, and whose application has already been retained *above* insofar as it covers the provisions of Title II of Book II, applies to section 5 "*Transactions by directors and persons mentioned in article L. 621-18-2 du code monétaire et financier sur les titres de la société*" of the said Title II of Book II, which includes an article 223-22-A under the terms of which: "*The provisions of the present section apply to the transactions mentioned i n  article L. 621-18-2 of the code monétaire et financier*". Article L. 621-18-2 of the French Monetary and Financial Code, to which article 223-22-A of the RGAMF refers, provides for the obligation to report to the AMF the transactions mentioned in article 19 of the MAR Regulation. It follows that the imputability mechanism of article 221-1 of the RGAMF applies, by reference to article 223-22-A of the RGAMF, to the reporting obligation, set out in article L. 621-18-2 of the Monetary and Financial Code, relating to the transactions mentioned in article 19 of the MAR Regulation.

242. Consequently, while the reporting obligations set out in article 19.1 of the MAR Regulation and article L. 621-18-2 of the French Monetary and Financial Code are primarily incumbent on Edern, which carried out the transactions, they also apply to Mr. Person in his capacity as a director of Edern, independently of Edern's liability.

243. The complaint that Mr Person failed to comply with the obligation to report transactions, as set out in articles 19 of the MAR Regulation, L. 621-18-2 of the French Monetary and Financial Code and 223-23 of the RGAMF, is therefore well-founded.

### *2.3    On the grievance against Mr Lucide*

#### 2.3.1    Notification of grievances

244. The complaint is that Mr Lucide did not declare the sale of CIOA shares carried out between September 21, 2018 and December 7, 2018 *via* his *holding company* Festival of Spirit Ltd, the amount of which exceeded 20,000 euros, in breach of the provisions of Article 19 of the MAR Regulation, Article L. 621-18-2 of the Monetary and Financial Code and Article 223-23 of the RGAMF.





245.    The notification of grievances recalls the course and context of the transactions in question with regard to the manipulative scheme in the context of the examination of the price manipulation grievances, before noting that Mr. Lucide was Chairman and Chief Executive Officer of CIOA at the time of the events and *Director* of his *holding company* Festival of Spirit Ltd, for which he acted as principal in the transactions in question. The notification of grievances deduces that the reporting obligations requiring persons exercising managerial responsibilities and persons closely linked to them to notify the issuer and the AMF of any transaction carried out on their own behalf, within three working days of the transaction date, are applicable to Festival of Spirit Ltd as well as to Mr. Lucide in his capacity as manager of the legal entity concerned.

246.    It states that the investigation report shows that Mr. Lucide sold, *via* his *holding company* Festival of Spirit Ltd, 160,705 CIOA shares between September 21 and December 7, 2018 for a total of 675,100 euros, the 20,000 euro threshold triggering the reporting obligation having been crossed on September 24, 2018. According to the notification of grievances, the transactions in question should have been regularly notified to the AMF from this date, which was not done.

247.    It adds that this breach is all the more serious in that, by committing it, Mr. Lucide facilitated the implementation and execution of the potentially manipulative scheme devised by Mr. Leshem on the CIOA share. In this respect, the notification of grievances states that by deciding to sell a large volume of CIOA shares, either directly on the market or indirectly, and by agreeing to sell 70% of their market value, Mr. Lucide enabled the implementation and execution of this manipulative scheme, from which he was able to derive a financial benefit. It specifies that Mr. Lucide's French company, Festival of Spirit EURL, made 5 transfers to CIOA's current account in the amount of 286,000 euros between October 15 and December 24, 2018.

### 2.3.2    Respondent's comments

248.    Mr. Lucide argues that the principle of the individual nature of penalties prevents him from being prosecuted and possibly punished for the acts in question, since it has not been proven that he directly carried out the transactions in question. He claims to have given a mandate to a broker within the framework of the contract concluded with the Chairman of Grantchester Equity, Mr. Leshem (market maker program) for the sale of CIOA shares during the period in question, which in his view transfers responsibility to Mr. Leshem.

249.    In this respect, he points out that he actively participated in the investigation procedure, responding to all requests from the AMF, which was given access to all transactions concerning CIOA's share price. He maintains that he did not initiate the financial transactions in question, as he only responded favorably to requests from qualified professionals in the stock market sector, such as Mrs. Planche and Mr. Baudouin.
Mr. Leshem, and to have trusted him to carry out the necessary due diligence to ensure the regularity of transactions. In his view, the relationship between the standards applicable to regulated markets and the rules stemming from the MAR Regulation is particularly complex, giving rise to contradictory obligations on this type of market, so that the commission must apply a temperament to the rule stemming from Article 19 of the MAR Regulation, particularly when the transactions in question were not directly carried out by the executive. He also maintains that issuers whose securities are admitted to trading on Euronext Access cannot be bound by the obligations arising from admission to trading on a regulated market. He also asserts that he did not seek any financial gain, since the conclusion of the mandate with Mr. Leshem was motivated in particular by the search for liquidity in order to meet the condition of the GEM investment fund and the investment criteria set, as evidenced by the size of the commissions due to Mr. Leshem, amounting to 70%.

### 2.3.3    Applicable texts

250.    The disputed operations took place between September 21, 2018 and December 7, 2018, so the facts complained of will be examined in the light of the texts then applicable, subject to the retroactive application of less severe provisions that came into force subsequently.

251.    Articles 19 and 3 (1) paragraphs 25 and 26 of the MAR Regulation, L. 621-18-2 and R. 621-43-1 of the French Monetary and Financial Code, and 221-1 and 223-23 of the RGAMF, in the versions applicable in this case, have already been reproduced *above*.



#### 2.3.4    Examination of the grievance

252.   At the time of the disputed sales, Mr Lucide was Chairman and Chief Executive Officer of CIOA and *Director* of Festival of Spirit Ltd, in which he held the entire share capital. It follows that Festival of Spirit Ltd, as a person closely linked to Mr Lucide exercising managerial responsibilities within CIOA, was subject to the reporting obligations set out in articles 19 of the MAR Regulation, L. 621-18-2 of the French Monetary and Financial Code, and 223-23 of the RGAMF.

253.   Pursuant to the aforementioned provisions of article 19 (7) of the MAR Regulation, the circumstance invoked by Mr. Lucide's mandate to Mr. Leshem, even if proven, has no bearing on Festival of Spirit Ltd's obligation to report the transactions in question.

254.   With regard to the transactions in q u e s t i o n , the information in the file reveals that Festival of Spirit Ltd sold 160,705 CIOA shares between September 21 and December 7, 2018 for 675,109.18 euros, the threshold 20,000 having been exceeded on September 24, 2018.

255.   However, it has been established and not disputed by Mr Lucide that the sales of CIOA shares by Festival of Spirit Ltd from September 24, 2018 were not notified to the AMF.

256.   The arguments put forward by Mr Lucide concerning his good faith and the absence of financial gain have no bearing on the assessment of the nature of this grievance. Similarly, the trading platform rules invoked by Mr. Lucide, both Euronext and Euronext Access have no legal value and are therefore irrelevant.

257.   Thus, by failing to declare the transactions carried out on 160,705 CIOA shares between September 21 and December 7, 2018, the amounts of which exceed 20,000 euros, Festival of Spirit Ltd has failed to meet the reporting obligations imposed by the applicable texts.

258.   For the reasons set out in paragraph 242, while the reporting obligations set out in article 19.1 of the MAR Regulation and article L. 621-18-2 of the French Monetary and Financial Code are primarily the responsibility of Festival of Spirit Ltd, which carried out the transactions, they also apply to Mr Lucide in his capacity as director of Festival of Spirit Ltd.

259.   Consequently, the complaint that Mr Lucide failed to comply with the obligation to report transactions, as set out in articles 19 of the MAR Regulation, L. 621-18-2 of the French Monetary and Financial Code and 223-23 of the RGAMF, is well-founded.

#### PENALTIES AND PUBLICATION

##### I.    On penalties

260.   The breaches found against the respondents took place between March 2018 and June 3, 2019.

261.   Article L. 621-15, II of the Monetary and Financial Code, in the version in force from January 3, 2018 to October 23, 2019, which has not since been amended on these points, states: "*II.- The Enforcement Committee may, after an adversarial procedure, impose a sanction on the following persons:* [...] / *c) Any person who, on French territory or abroad :/ 1° Has engaged in or attempted to engage in* [...] *market manipulation, within the meaning of Articles 8 or 12 of Regulation (EU) No 596/2014 of the European Parliament and of the Council of 16 April 2014 on market abuse (Market Abuse Regulation) and repealing Directive 2003/6/EC of the European Parliament and of the Council and Commission Directives 2003/124/EC, 2003/125/EC and 2004/72/EC;* [...] / *4° Or has engaged in any other breach mentioned in the first paragraph of II of article L. 621-14, / insofar as these acts concern: / - a financial instrument* [...] *traded on a trading platform located on French territory or for which an application for admission to trading on such a trading platform has been submitted;* [...]".



262. The first paragraph of II of Article L. 621-14 of the French Monetary and Financial Code, in the version in force from December 11, 2016 to January 1er 2020, which has not since been amended on this point, to which 4° of c) of II of Article
L. 621-15 of the same code, stipulates: "*The College may, after having given the person concerned the opportunity to present his or her explanations, order that an end be put to, in France and abroad, [...] any other breach likely to undermine the protection of investors or the proper functioning of the markets* [...]".

263. Breaches of the obligation to declare transactions in an issuer's securities by directors and related parties are liable to undermine investor protection and the smooth operation of the markets, and are therefore punishable under II c) of article L. 621-15 of the French Monetary and Financial Code, as are breaches of price manipulation.

264. Under the terms of III of Article L. 621-15 of the Monetary and Financial Code, in the version in force from January 3, 2018 to October 23, 2019, which has not since been amended on these points: "*III.- The penalties applicable are :* [...] */ c) For persons other than one of the persons mentioned in II of article L. 621-9, perpetrators of the acts mentioned in c to h of II of the present article, a pecuniary penalty, the amount of which may not exceed 100 million euros or ten times the amount of the benefit derived from the breach if this can be determined; the sums are paid to the Treasury* [...] */ The pecuniary penalties imposed in application of this III may be subject to a surcharge, up to a limit of 10% of their amount, payable by the person sanctioned and intended to finance victim assistance.*".

265. As a result, each of the defendants is liable to a maximum penalty of 100 million euros, or ten times the amount of the benefit derived from the breaches.

266. Article L. 621-15 of the Monetary and Financial Code, in the version in force since December 11, 2016, defines the criteria to be taken into account in determining the sanction as follows: "*In implementing the sanctions mentioned in III and III bis, particular account is taken of: / - the seriousness and duration of the breach; / - the quality and degree of involvement of the person in question; / - the financial situation and capacity of the person in question, having regard in particular to their assets and, in the case of a natural person, their annual income, and in the case of a legal entity, their total sales; / the importance of either the gains or advantages obtained, or the losses or costs avoided by the person in question, insofar as they can be determined; / - the losses suffered by third parties as a result of the breach, insofar as they can be determined; / the degree of cooperation shown by the person in question with the Autorité des marchés financiers, without prejudice to the need to ensure the restitution of the benefit obtained by this person; / - previous breaches committed by the person in question; / - any circumstances specific to the person in question, in particular the measures taken by him or her to remedy the malfunctions observed, caused by the breach for which he or she is responsible and, where applicable, to repair any damage caused to third parties, as well as to avoid any repetition of the breach.*

267. The price manipulation breaches found against Grantchester Equity, Mr Leshem and
Mr. Van Wylick have distorted the regular functioning of the market and undermined investor confidence, so that they are all particularly serious. These breaches were repeated in the shares of the companies concerned over respective periods of 6 months for Gour Medical, 1 year for Umalis and 4 months for CIOA.

268. The investigation report also shows that the mainly German private investors purchased around 3,270,000 euros worth of shares (net of fees) during the trading periods for Gour Médical, Umalis and CIOA shares, in execution of the *market making program.* The total loss suffered by investors in the markets for these securities during these periods is estimated at between 2,200,000 euros (unrealized loss by valuing the securities at market price without taking illiquidity into account) and 3,300,000 euros (unrealized loss by taking illiquidity into account and valuing the securities at 0).

269. The disclosures made by Mr. Goldner, Mr. Person and Mr. Lucide occurred between May 16 and July 16, 2018 in the case of Mr. Goldner, between September 5, 2018 and November 27, 2017 in the case of Mr. Person, between February 11, 2019 and June 3, 2019 and between September 21, 2018 and December 7, 2018 in the case of Mr. Lucide. Even though the College has not notified these executives of any price manipulation, by failing to declare their transactions, or by declaring them late, these individuals have contributed to concealing the manipulation and have thereby deprived the College of the opportunity to make its decision.

- 44 -



market for useful information, given that the behavior of company directors in selling or arranging for the sale of their company's shares is by its very nature likely to be of interest to a reasonable investor. It is reasonable to think that private German or Austrian buyers, in possession of this information, might not have placed the same trust in the "sales force" canvassers whose insistence on recommending the purchase of the disputed shares was based on the provision of misleading information, such as the imminence of a takeover bid.

270.   It should also be noted that, while the regulations applicable in this case do not formally include the notion of aggravating circumstances, unlike other branches of criminal law, the very terms of III ter of article L. 621-15 of the French Monetary and Financial Code call for the seriousness of the conduct of the accused to be assessed in the light of any circumstances peculiar to them and relevant to the case, the examples mentioned in this respect by these provisions being non-exhaustive.

271.   In any case, failures to declare are intrinsically serious, since they are likely to affect the smooth running of the market, as is clear from recitals 58 and 59 of the MAR Regulation.

### 1.   On the Grantchester Equity situation

#### 1.1      On the gains or advantages obtained :

272.   Based on the information in the file, Grantchester Equity made a minimum profit of 90,936 euros from the execution of the *market making program* on the shares of the three companies concerned, corresponding to the transfer of 20,006.88 euros made on July 25, 2018 by Mr. Van Wylick in the Gour Medical file, plus the transfers of 51,856.15 euros made between December 11, 2018 and June 5, 2019 by WhiteTree Capital in the Umalis file, as well as those of a total amount of 19,073.05 euros made by Global Capital Research.

#### 1.2      On the degree of cooperation with the AMF :

273.   Grantchester Equity did not provide any information in response to the notification of grievances, did not respond to the invitation to attend a hearing and did not attend the meeting of the Enforcement Committee.

#### 1.3      On the respondent's financial situation and capacity :

274.   No evidence of Grantchester Equity's results is on file.

### 2.   Mr. Leshem's situation

#### 2.1      On the gains or advantages obtained :

275.   No distinction is made between the situations of Mr. Leshem and Grantchester Equity, and we therefore refer to the discussion *above* concerning the gains or advantages obtained by Grantchester Equity.

#### 2.2      On the degree of cooperation with the AMF :

276.   Mr Leshem did not provide any information in response to the notification of grievances, did not respond to the rapporteur's invitation to attend a hearing during the investigation and did not attend the meeting of the Sanctions Committee.

#### 2.3      Previous breaches committed by the respondent :

277.   In 1999 and 2007, Mr. Leshem was involved in price manipulation proceedings in the United States before the SEC, which banned him from trading in *penny stocks* and imposed financial penalties. Mr. Leshem was also named in a 2011 *England and Wales High Court* ruling in a *Financial Services* Authority case of share sales fraud.



### 2.4    On the respondent's financial situation and capacity :

278.   There is no evidence of Mr Leshem's resources in the file.

### 3.   _Mr. Van Wylick's situation_

### 3.1    On the gains or advantages obtained :

279.   Mr. Van Wylick received a transfer of 335,619 euros from Unimatrix in execution of the _market making program_ on Gour Medical, it being specified that Unimatrix, of which Mr. Van Wylick is a representative and manager, has, according to the investigation report, received approximately 1,717,000 euros net from sales of Gour Médical shares (repaid up to (i) 30% to
Mr. Goldner, (ii) 50% to Moelis Tech FZE and (iii) the balance to Mr. Leshem's partners).

### 3.2    On the degree of cooperation with the AMF :

280.   Mr. Van Wylick replied to the detailed letter by e-mail dated April 28, 2021, but did not respond to the notification of grievances or to your rapporteur's invitation to attend a hearing, and did not attend the meeting of the Enforcement Committee.

### 3.3    On the respondent's financial situation and capacity :

281.   The file contains no information on Mr. Van Wylick's resources.

### 4.   _Mrs Planche's situation_

### 4.1    On the gains or advantages obtained :

282.   Ms Planche received €39,258.64 under the Gour Medical _market making program_.

### 4.2    On the degree of cooperation with the AMF :

283.   Mrs. Planche's cooperation was difficult at the investigation stage, as underlined by the investigation report, which mentions in particular her refusal to come to her office during the investigators' first visit and the deletion of a large number of her e-mails. In the course of the investigation, Mrs. Planche replied to the notification of grievances, attended the hearing with the rapporteur that she herself had requested, and provided information on her financial situation and assets following the hearing.

### 4.3    On the respondent's financial situation and capacity :

284.   At the end of her interview with the rapporteur, Mrs. Planche submitted her tax assessment for 2022, showing a reference tax income of [...] euros (1 part), a net salary of [...] euros in 2021 and a plot of land in the Dordogne with an estimated value of between [...] and [...] euros, the only property she owns according to her declarations.

285.   During her interview with the rapporteur, Mrs. Planche also indicated that she had non-liquid holdings in X, a _start-up_ specializing in cellular agriculture in which she is Managing Director (around 32%), Y, a biotech company in Lille in which she has made a personal investment, and Fauve Capital, in which she is the sole partner, which holds around 200,000 euros in cash and pays dividends to Mrs. Planche, who is not an employee, as and when required. She had declared that she owned around 50% of her home with her spouse, her stake being valued at [...] euros. Ms. Planche reported that she received remuneration from GEM ranging from [...] to [...] euros, depending on the case. However, she provided no evidence to support these statements.



### 5. _Mr. Goldner's situation_

#### 5.    1On gains or benefits obtained :

286.    No gain or advantage resulting from the failure to file declarations has been established for Mr. Goldner.

#### 5.    2On the degree of cooperation with the AMF :

287.    On his own initiative, Mr. Goldner contacted the AMF on August 6, 2018 to report the significant variations observed in Gour Medical's share price in recent weeks, which "_in view of the Company's projects and current situation, do not seem justified_". It also communicated the testimonies collected from individuals in connection with suspicions of price manipulation on the companies' shares.

288.    He was also interviewed by the investigators and the rapporteur, and provided information on his financial situation and assets, in Hebrew.

#### 5.    3On the respondent's financial situation and capacity:

289.    With regard to his income, Mr. Goldner stated during his interview with the rapporteur that he received a salary of between [...] and [...] euros per month. The respondent produced salary slips for 2022 and 2023 written in Hebrew, which cannot be used without translation. According to his statements to the rapporteur, his income comes from his work at Gour Medical, as well as from consulting and teaching activities.

290.    With regard to his assets, Mr. Goldner declared that he and his wife owned their main residence in Israel, acquired in 2009, valued at [...] euros and accompanied by a loan of [...] euros to be repaid over 15 years. He also declared that he held a Swiss bank account containing [...] euros and shares in Gour Medical.

### 6. Mr. Person's situation

#### 6.1    On the gains or advantages obtained :

291.    No gain or benefit resulting from the failure to file declarations has been established for Mr. Person.

#### 6.2    On the degree of cooperation with the AMF :

292.    Mr. Person maintains that he has always cooperated with AMF investigators, responding promptly to all questions and giving his full support to the ongoing investigation.

#### 6.3    On the respondent's financial situation and capacity :

293.    With regard to his income, Mr. Person, who is single and has no dependent children, filed his tax return for 2022, which shows a net salary of [...] euros. With regard to his assets, Mr. Person indicated that he held shares in several companies and a securities account valued at around [...] euros. He also indicated that he did not own any real estate.

### 7. Mr Lucide's situation

#### 7.1    On the gains or advantages obtained :

294.    No gain or benefit resulting from the failure to file declarations has been established for Mr Lucide.



**7.2    On the degree of cooperation with the AMF :**

295.    Mr. Lucide points out that he took an active part in the investigation procedure, responding to all the AMF's requests.

**7.3    On the respondent's financial situation and capacity :**

296.    With regard to his income, Mr Lucide produced his tax return for 2022, which shows a reference tax income in 2021 of [...] euros (for himself and his wife) and more precisely [...] euros of salaries in 2021 concerning him (his 2022 tax return mentions [...] euros of salaries), and income from transferable securities in the amount of [...] euros received in 2021. His 2023 tax return for his 2022 income shows a reference tax income of [...] euros. Mr Lucide also produced a letter dated November 13, 2023, stating that he had retired. According to his declarations, this is now his only source of income.

297.    With regard to his assets, Mr. Lucide has produced a statement to the effect that he does not own any real estate, but does own 44% of the shares in a family SCI. The latter owns a property acquired in 2022 for [...] euros thanks to a bank loan of [...] euros. Mr Lucide confirms that he is a tenant of this SCI.

298.    By a decision dated September 13, 2023 of the Toulon Commercial Court, CIOA was placed, at the request of Mr. Lucide, in judicial liquidation with cessation of activity. The date of cessation of payments was provisionally set at July 19, 2023. As a result, Mr Lucide declared that he could no longer claim any income from movable property.

299.    In view of these factors, financial penalties o f  one million euros are imposed on Grantchester Equity, two million euros on Mr. Leshem, one million euros on
Mr. Van Wylick, 400,000 euros against Ms. Planche, 25,000 euros against Mr. Goldner, 100,000 euros against Mr. Person and 100,000 euros against Mr. Lucide.

## II.    About the publication

300.    Mrs Planche and Mr Person request that the decision of the Sanction Commission be made anonymous.

301.    Mr. Person claims that publication in non-anonymous form would seriously damage his credibility and that of Umalis, of which he is Chairman and CEO, even though there is no evidence that investors have been harmed by the failure to disclose the disposals in question. He points out that publication by name would make it more difficult to pursue the development of the Umalis group, insofar as the latter is publicly associated with Mr. Person, in his capacity as the group's managing director and majority shareholder.

302.    V of Article L. 621-15 of the Monetary and Financial Code, in the version applicable since December 11, 2016, states: "*The decision of the Enforcement Committee is made public in the publications, newspapers or media it designates, in a format proportionate to the misconduct committed and the sanction imposed. Costs are borne by the sanctioned parties. / The Enforcement Committee may decide to postpone publication of a decision, to publish it anonymously or not to publish it in any of the following circumstances: / a) When publication of the decision is likely to cause serious and disproportionate harm to the person concerned, in particular, in the case of a sanction imposed on a natural person, when publication includes personal data; b) When publication would be likely to seriously disrupt the stability of the financial system, as well as the progress of an ongoing investigation or control.* [...] ".

303.    The claims made by Mrs Planche and Mr Person are not substantiated. In any event, it appears that publication of the present decision is neither likely to cause the persons having committed the breaches

- 48 -



The information contained in this document is not likely to cause serious and disproportionate harm, nor to seriously disrupt the stability of the financial system or the course of an ongoing investigation or audit.

304.   Consequently, this decision will be published on the Autorité des marchés financiers website without anonymization for a period of five years from the date of this decision.

**BY THESE REASONS,**

**And as deliberated by Mr. Jean Gaeremynck, Chairman of the Enforcement Committee, and by Ms. Valérie Michel-Amsellem, Mr. Alain David, Ms. Sandrine Elbaz-Rousso, and Mr. Lucien Millou, members of the 1ère section of the Enforcement Committee, in the presence of the session secretary, the Enforcement Committee finds that :**

- the plea raised by Mrs Aude Planche alleging infringement of her rights of defence is rejected;

- the plea raised by Mr. Christian Person alleging serious and irremediable infringement of his rights of defence is rejected;

- the infringement of price manipulation by fixing the price of Gour Medical, Umalis and CIOA shares at an abnormal or artificial level, by making false or misleading indications concerning the supply, demand or price of these shares, by using fictitious procedures or any other form of deception or artifice and by constructing a dominant position such as to fix the purchase and sale prices of these shares, is characterized with regard to Grantchester Equity and Mr. Leshem;

- the infringement of price manipulation by fixing the price of securities at an abnormal or artificial level, by false or misleading information on supply, demand or the price of securities, by recourse to fictitious procedures or any other form of deception or artifice and by construction of a dominant position likely to fix the purchase and sale prices of securities, is characterized with regard to Mr Van Wylick on the Gour Medical and Umalis shares;

- the infringement of price manipulation by fixing the price of Gour Medical, Umalis and CIOA shares at an abnormal or artificial level, by false or misleading information on supply, demand or the price of these shares, by recourse to fictitious procedures or any other form of deception or artifice and by the construction of a dominant position likely to fix the purchase and sale prices of these shares, is characterized with regard to Mrs. Planche;

- Mr Goldner's failure to comply with the obligation to report transactions, as set out in Articles 19 of the MAR Regulation, L. 621-18-2 of the French Monetary and Financial Code and 223-23 of the RGAMF, is a breach of the law;

- Mr Person's failure to comply with the obligation to report transactions, as set out in articles 19 of the MAR Regulation, L. 621-18-2 of the French Monetary and Financial Code and 223-23 of the RGAMF, is a breach of the law;

- Mr Lucide's failure to comply with the obligation to report transactions, as set out in articles 19 of the MAR Regulation, L. 621-18-2 of the French Monetary and Financial Code and 223-23 of the RGAMF, is a material breach of the law.

**Consequently, the Sanction Commission :**

- imposes a fine of €2,000,000 (two million euros) on Miron Leshem;

- imposes a fine of €1,000,000 (one million euros) on Grantchester Equity Limited;

- imposes a fine of €1,000,000 (one million euros) on Dirck Van Wylick;

**AMF**

- imposes a fine of €400,000 (four hundred thousand euros) on Aude Planche;

- imposes a fine of €25,000 (twenty-five thousand euros) on Serge Goldner;

- imposes a fine of €100,000 (one hundred thousand euros) on Christian Person;

- imposes a fine of €100,000 (one hundred thousand euros) on Mr Léon Lucide;

- orders the publication of this decision on the website of the Autorité des marchés financiers and sets the duration of its non-anonymous online publication at five years from the date of this decision.


Paris, January 24, 2024


The Secretary of the                                                meetingThe Chairman,




Martine                                                GresserJean Gaeremynck


| This decision may be appealed under the conditions set out in article R. 621-44 of the French Monetary and Financial Code. |
| --- |

R É P U B L I Q U E    F R A N Ç A I S E



**La Commission
des sanctions**

---

**COMMISSION DES SANCTIONS**

**Décision n° 2 du 24 janvier 2024**

---

Procédure n° 22-12
Décision n° 2

**Personnes mises en cause :**

–  M. Miron Leshem
   Domicilié à […]

–  Grantchester Equity Limited
   Société de droit américain
   dont le siège social est situé 28 Old Rudnicck Lane, Dover, Delaware 19901 (États-Unis), pour laquelle les
   courriers ont été envoyés et reçus à l'adresse de son Président, M. Miron Leshem
   Prise en la personne de son représentant légal

–  M. Dirck Van Wylick
   Né le […] à […]
   Domicilié à […]

–  Mme Aude Planche
   Née […] à […]
   Domiciliée à […]
   Ayant élu domicile chez Me Julien Visconti au sein du cabinet Visconti, Grundler & Artuphel, sis 63 avenue
   Franklin D. Roosevelt, 75008 Paris

–  M. Christian Person
   Né le […] à […]
   Domicilié […]
   Ayant élu domicile chez Me Emilie Vasseur au sein du cabinet Mayer Brown, sis 10, avenue Hoche,
   75008 Paris

–  M. Léon Lucide
   Né le […] à […]
   Domicilié […]
   Ayant élu domicile chez Me Emmanuel Molina, au sein du cabinet Molina Avocats, sis 80, rue Saint-Jacques,
   13006 Marseille



– M. Serge Goldner
Né le […] à […]
Domicilié […]
Ayant élu domicile chez Me Johann Bioche, exerçant au 78 avenue Kléber, 75116 Paris

La 1ère section de la commission des sanctions de l'Autorité des marchés financiers (ci-après : « **AMF** ») :

Vu     la convention européenne des droits de l'Homme et des libertés fondamentales, notamment son article 6 ;

Vu     le règlement (UE) n°596/2014 du Parlement européen et du Conseil du 16 avril 2014 sur les abus de marché et notamment ses articles 3, 12, 15, 19 ;

Vu     le code monétaire et financier et notamment ses articles L. 621-15, L. 621-18-2, R. 621-38 à R. 621-40 et R. 621-43-1 ;

Vu     le règlement général de l'AMF et notamment ses articles 223-23 et 221-1 ;

Après avoir entendu au cours de la séance publique du 15 décembre 2023 :

- Mme Sophie Schiller, en son rapport ;
- Mme Géraldine Marteau, représentant le collège de l'AMF ;
- M. Christian Person, accompagné de M. Mustapha Lahdir, directeur financier de la société Umalis Group et assisté par son conseil Me Emilie Vasseur, avocat du cabinet Mayer Brown, accompagnée de Me Florent Testud ;
- M. Léon Lucide, assisté par son conseil Me Aurélien Olivier, avocat du cabinet Molina Avocats ;
- Me Julien Visconti, avocat du cabinet Visconti, Grundler & Artuphel, accompagné de Me Quentin Bertrand, représentant Mme Planche absente ;
- Me Johann Bioche, représentant M. Serge Goldner absent ;

la société Grantchester Equity Limited, M. Miron Leshem et M. Dirck Van Wylick, régulièrement convoqués, ne s'étant pas présentés.

Les mis en cause ayant eu la parole en dernier.

**FAITS**

La société Grantchester Equity Limited (ci-après, « **Grantchester Equity** »), présidée par M. Miron Leshem, est une société de droit américain qui se présentait, à l'époque des faits, comme exerçant une activité de « *consulting* ».

Mme Aude Planche, de nationalité française, était gérante, à l'époque des faits, de la société GEM Capital Investments, société à responsabilité limitée à associé unique de droit français, qui est le bureau parisien de la société Global Emerging Markets (ci-après, « **GEM** »). GEM est un fonds d'investissement alternatif américain gérant 3,4 milliards de dollars d'encours par le biais de plusieurs fonds d'investissement aux stratégies diversifiées, avec une exposition sur les marchés émergents. Il procède notamment à des investissements sous forme de programmes d'augmentation de capital par exercice d'options. Mme Planche est également présidente et unique associée de la société de droit français Fauve Capital SAS (ci-après, « **Fauve Capital** ») qui exerce une activité de conseil en investissements.

M. Dirck Van Wylick, de nationalité néerlandaise, dirige la société Unimatrix Limited, immatriculée à l'île Maurice (ci-après, « **Unimatrix** »), ainsi que la société Global Capital Research Gmbh, immatriculée en Allemagne à l'époque des faits (ci-après, « **Global Capital Research** »), proposant des prestations de « *Marketing & Promotion* » auprès d'émetteurs.

M. Serge Goldner, de double nationalité franco-israélienne, est le fondateur et président directeur général de la société Gour Medical (ci-après, « **Gour Medical** »), spécialisée dans le développement de produits de soins vétérinaires pour les animaux de compagnie seniors. Créée le 17 juillet 2014, Gour Medical est une société



anonyme de droit français dont le siège social est situé à Paris, désormais désignée Coretech 5. Elle est cotée depuis le 1er décembre 2016 sur Euronext Access Paris.

Gour Medical a enregistré, au titre de l'exercice 2019, un chiffre d'affaires de 5 782,51 euros et un résultat net comptable de - 214 407,09 euros. Sa capitalisation boursière s'élevait à environ 10 000 000 euros le 5 juin 2018 (cours de 3,50 euros) avec un flottant quasi nul (0,09 % du capital, M. Goldner détenant la quasi-totalité du capital), puis à 335 000 euros le 1er septembre 2020 (cours de 0,12 euro). À ce jour, M. Goldner détient près de 63 % du capital de Gour Medical. La capitalisation boursière de cette société s'élevait à 335 635 euros au 8 décembre 2023.

M. Christian Person, de nationalité française, est le fondateur et président directeur général de la société Umalis Group (ci-après, « **Umalis** »), société par actions simplifiée de droit français dont le siège social est situé à Paris, qui propose des prestations de portage salarial pour consultants spécialisés notamment dans les secteurs de l'informatique et de l'ingénierie. Créée le 1er novembre 2008 et inscrite sur le marché libre le 15 avril 2014, Umalis est restée cotée au double *fixing* sur Euronext Access Paris. À la suite d'opérations d'augmentations de capital votées le 17 juillet 2016, Umalis était détenue à hauteur de 96,74 % par la société Edern SAS (ci-après, « **Edern** »), *holding* détenue intégralement par M. Person. À ce jour, Edern détient 75,7 % du capital d'Umalis.

Umalis a enregistré, au titre de l'exercice 2019, un chiffre d'affaires de l'ordre de 3 570 000 euros, soit une augmentation de près de 6 % par rapport à l'exercice 2018 au cours duquel une perte de l'ordre de 1 800 000 euros avait été réalisée, et un résultat net quasiment nul.

Sa capitalisation boursière s'élevait environ à 7 300 000 euros le 5 septembre 2018 (cours de 7,35 euros). Depuis le 1er janvier 2020, elle a varié entre 1 500 000 et 2 000 000 euros (cours de 1,25 euro le 4 septembre 2020). La capitalisation boursière d'Umalis s'élève à 2 979 000 euros au 8 décembre 2023.

M. Léon Lucide, de nationalité française, est le fondateur et président du conseil d'administration de Groupe CIOA (ci-après, « **CIOA** »), société anonyme créée en 1994 par M. Léon Lucide et son épouse Mme A. Elle exploite un réseau de mise en relation d'entreprises, spécialisé dans la recherche d'opportunités avec les pays francophones du continent africain, et se présente comme « *un cabinet d'affaires collaboratif et pluridisciplinaire qui apporte aux entreprises et aux organisations de toutes tailles, les stratégies, les connexions et les ressources pour réussir dans un monde transformé par la globalisation qu'induit l'OMC, et par la généralisation du digital* ».

Inscrite en décembre 2014 sur le marché libre, CIOA est détenue majoritairement depuis sa création par la famille Lucide, notamment *via* la société *holding*, Festival of Spirit Limited (ci-après, « ***Festival of Spirit Ltd*** »). M. Léon Lucide détient intégralement la *holding* Festival of Spirit Ltd, qui elle-même détenait 95,1 % de CIOA fin 2017 (flottant de 4,9 %), ce pourcentage de détention passant à 91,9 % fin 2018 (flottant de 8,1 %). À ce jour, Festival of Spirit Ltd détient 36 % du capital de CIOA. Festival of Spirit Ltd détient une société française désignée Festival of Spirit EURL, dirigée par M. Léon Lucide.

Le chiffre d'affaires généré par CIOA, au titre de l'exercice 2019, s'élevait environ à 11 720 000 euros (en progression de 21 % par rapport à l'année précédente), son résultat net s'élevant à environ 1 400 000 euros (également en progression de 8,68 % par rapport à 2018).

Le 19 septembre 2018, la capitalisation boursière de CIOA s'élevait à 14 500 000 euros (cours de 2,84 euros), et le 1er septembre 2020 à 4 000 000 euros (cours de 0,76 euro). La capitalisation boursière de CIOA s'élève à 2 500 000 euros au 8 décembre 2023.

En 2018, M. Léon Lucide était directeur général de CIOA, fonction qui est, à ce jour, occupée par son fils, M Lionel Lucide.

## PROCÉDURE

Des variations suspectes ont été observées sur le cours des titres Gour Medical, Umalis et CIOA en 2018 et 2019. Les 17 octobre 2018, 11 janvier 2019 et 11 juin 2019, le secrétaire général de l'AMF a décidé l'ouverture de trois enquêtes portant respectivement sur, d'une part, « *le marché du titre GOUR MEDICAL (CH0342399851), et sur tout instrument financier dont le cours ou la valeur dépend du cours ou de la valeur du titre GOUR MEDICAL […] ou dont le cours ou la valeur a un effet sur le cours ou la valeur du titre GOUR MEDICAL […], à compter du*



*1er janvier 2018 »*, d'autre part, « *l'information financière et le marché du titre UMALIS GROUP, et sur tout instrument financier dont le cours ou la valeur dépend du cours ou de la valeur du titre UMALIS GROUP ou dont le cours ou la valeur a un effet sur le cours ou la valeur du titre UMALIS GROUP, à compter du 1er janvier 2018 »*, et enfin sur « *l'information financière et le marché du titre CIOA (FR0012384907), et sur tout instrument financier dont le cours ou la valeur dépend du cours ou de la valeur du titre CIOA […] ou dont le cours ou la valeur a un effet sur le cours ou la valeur du titre CIOA […], à compter du 1er janvier 2018 »*.

Le 19 novembre 2019, le secrétaire général de l'AMF a décidé de joindre ces trois enquêtes en une nouvelle enquête portant sur le marché des trois titres ainsi que sur l'information financière des sociétés Umalis et CIOA à compter du 1er janvier 2018.

Le 8 avril 2021, la direction des enquêtes et des contrôles de l'AMF a adressé à Mme Planche et MM. Lucide, Goldner, Van Wylick, Leshem et Person ainsi qu'à la société Grantchester Equity des lettres les informant de manière circonstanciée des faits éventuellement susceptibles de leur être reprochés au regard des constats des enquêteurs et de la faculté de présenter des observations dans le délai d'un mois.

Les 28 avril, 30 avril, 7 mai, 21 mai et 25 mai 2021, des observations en réponse ont été adressées par respectivement M. Van Wylick, Mme Planche, M. Person, M. Goldner et M. Lucide.

Le 6 janvier 2022, la direction des enquêtes et des contrôles de l'AMF a adressé à MM. Lucide, Goldner et Person de nouvelles lettres les informant de manière circonstanciée des faits éventuellement susceptibles de leur être reprochés au regard des constats des enquêteurs et de la faculté de présenter des observations dans le délai d'un mois.

Les 26 janvier, 4 février et 14 février 2022, des observations en réponse ont été adressées par respectivement M. Lucide, M. Person et M. Goldner.

L'enquête a donné lieu à un rapport daté du 15 mars 2022.

La commission spécialisée n° 1 du collège de l'AMF a décidé, le 29 mars 2022, de notifier des griefs à M. Leshem, Grantchester Equity, Mme Planche, M. Van Wylick, M. Goldner, M. Person, et M. Lucide.

Les notifications de griefs ont été adressées le 26 juillet 2022 aux mis en cause par lettres recommandées avec demande d'avis de réception ou par transporteur international. Elles ont été reçues le 27 juillet 2022 par M. Goldner et Mme Planche, le 28 juillet 2022 par M. Van Wylick, et le 1er août 2022 par M. Leshem. Les notifications de griefs adressées à MM. Person et Lucide et à la société Grantchester Equity leur ont été envoyées à nouveau respectivement, par lettres recommandées avec demande d'avis de réception ou par transporteur international, les 4 août, 1er septembre et 6 septembre 2022. Elles ont été reçues le 6 septembre 2022 s'agissant de M. Lucide, et le 9 septembre 2022 s'agissant de la société Grantchester Equity. L'avis de réception du second envoi de la notification de griefs adressée à M. Person ne comporte pas d'indication de date de réception.

Il est fait grief à M. Leshem et à Grantchester Equity d'avoir manqué à l'obligation d'abstention de manipulation de cours sur les titres objet de l'enquête cotés sur Euronext Access, en méconnaissance des dispositions des articles 12 et 15 du règlement (UE) n° 596/2014 du 16 avril 2014 sur les abus de marché (ci-après, le « **Règlement MAR** »).

Plus précisément, il est fait grief à M. Leshem et Grantchester Equity d'avoir conçu et mis en œuvre concernant ces titres un schéma manipulatoire constitutif d'un comportement :

-   donnant ou étant susceptible de donner des indications fausses ou trompeuses sur l'offre, la demande ou le cours des titres, au sens des dispositions de l'article 12.1 a) i) du Règlement MAR ;

-   fixant ou étant susceptible de fixer le cours des titres à un niveau anormal ou artificiel, au sens des dispositions de l'article 12.1 a ii) du Règlement MAR ;

- 5 -



- influençant ou étant susceptible d'influencer le cours des titres par recours à des procédés fictifs ou toute autre forme de tromperie ou d'artifice, au sens des dispositions de l'article 12.1 b) du Règlement MAR ;

- ayant permis aux sociétés Unimatrix, Edern et Festival of Spirit Ltd de s'assurer une position dominante sur l'offre des titres pendant les périodes analysées, au sens de l'article 12.2 a) du Règlement MAR.

Il est fait grief à Mme Planche et M. Van Wylick d'avoir, en participant à la mise en œuvre de ce schéma manipulatoire, adopté un comportement ayant contribué à chacun des cas de manipulation de cours précités, en méconnaissance des dispositions des articles 12 et 15 du Règlement MAR, tels qu'éclairés par le considérant 39 du Règlement MAR.

Par ailleurs, il est fait grief :

- à M. Goldner, d'avoir déclaré de façon erronée et tardivement les opérations réalisées entre le 16 mai et le 16 juillet 2018 sur le titre Gour Medical dont le montant excède le seuil de 20 000 euros ;

- à M. Person de ne pas avoir déclaré les opérations réalisées via sa holding personnelle Edern sur le titre Umalis entre le 5 septembre et le 27 novembre 2018 puis entre le 11 février et le 3 juin 2019 dont les montants excèdent le seuil de 20 000 euros ;

- à M. Lucide, de ne pas avoir déclaré les opérations réalisées via sa holding Festival of Spirit Ltd sur le titre CIOA entre le 21 septembre et le 7 décembre 2018 dont le montant excède le seuil de 20 000 euros,

en méconnaissance des articles 19 du Règlement MAR, L. 621-18-2 du code monétaire et financier, 223-23 et 221-1 du règlement général de l'AMF (ci-après, « **RGAMF** »).

Une copie des notifications de griefs a été transmise le 26 juillet 2022 au président de la commission des sanctions, conformément aux dispositions de l'article R. 621-38 du code monétaire et financier.

Par décision du 8 septembre 2022, le président de la commission des sanctions a désigné Mme Sophie Schiller en qualité de rapporteur.

Par lettre du 4 octobre 2022, les mis en cause ont été informés qu'ils disposaient d'un délai d'un mois, en application de l'article R. 621-39-2 du code monétaire et financier, pour demander la récusation du rapporteur dans les conditions prévues par les articles R. 621-39-3 et R. 621-39-4 du code monétaire et financier.

Après avoir sollicité et obtenu un délai supplémentaire, M. Goldner et Mme Planche ont déposé des observations en réponse aux notifications de griefs respectivement les 5 octobre 2022 et 21 octobre 2022. Des observations en réponse aux notifications de griefs ont été reçues le 12 octobre 2022 de M. Person, et le 17 octobre 2022 de M. Lucide. Aucune réponse aux notifications de griefs n'a été reçue de la part de MM. Van Wylick et Leshem ni de Grantchester Equity.

Le rapporteur a entendu MM. Goldner et Person le 28 juin 2023, et M. Lucide et Mme Planche le 29 juin 2023. À la suite de leurs auditions, MM. Lucide et Person ont communiqué des éléments complémentaires respectivement les 4 et 10 juillet 2023. Mme Planche a communiqué des éléments complémentaires le 10 juillet 2023 ainsi que de nouvelles observations le 14 septembre 2023.

Dûment convoqués afin d'être entendus, M. Leshem, Grantchester Equity et M. Van Wylick ne se sont pas présentés devant le rapporteur.

Le rapporteur a déposé son rapport le 27 octobre 2023.

Par lettres du 30 octobre 2023 auxquelles était joint le rapport du rapporteur, les mis en cause ont été convoqués à la séance de la commission des sanctions du 15 décembre 2023 et informés qu'ils disposaient d'un délai de quinze jours pour présenter des observations en réponse au rapport du rapporteur, conformément aux dispositions du III de l'article R. 621-39 du code monétaire et financier.

- 6 -



Par lettres du 9 novembre 2023, les mis en cause ont été informés de la composition de la formation de la commission des sanctions appelée à délibérer lors de la séance du 15 décembre 2023 ainsi que du délai de quinze jours dont ils disposaient, en application de l'article R. 621-39-2 du code monétaire et financier, pour demander, conformément aux articles R. 621-39-2 à R. 621-39-4 du même code, la récusation d'un ou de plusieurs de ses membres.

Des observations en réponse au rapport du rapporteur ont été déposées par M. Goldner le 12 novembre 2023, par M. Person et par Mme Planche le 14 novembre 2023, par M. Lucide le 28 novembre 2023.

## MOTIFS DE LA DÉCISION

### I.     Sur les moyens de procédure

#### 1.    *Sur le moyen invoqué par Mme Planche tiré de l'atteinte grave et irrémédiable aux droits de la défense*

##### 1.1     *Présentation du moyen*

1.      Mme Planche fait valoir que la procédure engagée à son encontre a été conduite dans des conditions qui portent une atteinte irrémédiable à ses droits de la défense, de sorte qu'elle est illégale et doit être abandonnée.

2.      Elle soutient d'abord que l'élément central de la thèse de la poursuite à son égard réside dans l'affirmation selon laquelle l'investissement de GEM dans le capital des émetteurs Gour Medical, CIOA et Umalis était subordonné à la mise en œuvre préalable d'un programme de liquidité dont les modalités étaient manipulatoires. Pour contester cette thèse, Mme Planche fait valoir que les courriels échangés par les dirigeants de ces émetteurs sur les périodes entourant la mise en place des programmes de liquidité, qui ont été saisis par les enquêteurs mais non versés au dossier, constitueraient des éléments à décharge indispensables à l'exercice de ses droits de la défense. Selon elle, ces courriels lui auraient notamment permis de démontrer que les programmes de liquidité mis en place par ces dirigeants étaient sans lien avec un éventuel investissement de GEM, que ces programmes ont été mis en place à la demande expresse des mêmes dirigeants, et qu'elle-même n'est pas intervenue dans la mise en place et l'exécution desdits programmes. Elle ajoute qu'elle n'avait pas accès à ces courriels, y compris ceux échangés entre elle et les dirigeants puisqu'elle les avait supprimés de sa boîte de messagerie.

3.      Ensuite, Mme Planche relève qu'elle a sollicité la production de ces courriels dès l'ouverture de l'enquête en s'adressant aux dirigeants des émetteurs qui ne lui ont pas répondu, puis dès l'ouverture de la phase contradictoire par courrier du 8 septembre 2022 envoyé au président de la commission des sanctions. Elle relève aussi que la demande formulée dans ce courrier a été rejetée par le rapporteur dans son courrier du 21 septembre 2022 au motif que les supports de messageries électroniques saisis par les enquêteurs auprès des émetteurs avaient déjà été détruits et que le rapporteur ne disposait pas du pouvoir de solliciter une nouvelle remise auprès des émetteurs, ce que Mme Planche dénonce. Elle déduit en outre de la réponse défavorable du rapporteur à sa demande qu'il lui est impossible d'obtenir une copie des courriels sollicités, ceux-ci ayant été détruits après exploitation avant la fin du délai de réponse à la notification de griefs, et que toute nouvelle demande formulée auprès du rapporteur serait vouée à l'échec.

4.      Elle fait valoir que la sélection extrêmement restrictive des courriels échangés par les dirigeants et joints au rapport d'enquête a été déloyale en ce qu'elle a conduit à écarter des éléments à décharge utiles à sa défense. Elle soutient également que la destruction hâtive de l'intégralité des autres courriels saisis par les enquêteurs a entravé en l'espèce le plein exercice du contradictoire. Elle précise qu'il lui était impossible de préciser la liste et le contenu des courriels sollicités puisqu'elle n'a pas pu les consulter. Elle soutient de plus que l'existence de ces courriels est incontestable dès lors qu'ils ont été saisis par les enquêteurs auprès des émetteurs et qu'il est manifeste que les dirigeants ont échangé de nombreux courriels relatifs aux programmes de liquidité puisqu'ils devaient y participer activement.

5.      Par ailleurs, elle affirme que l'atteinte portée au droit à la protection de la vie privée des dirigeants par la production des courriels en cause pour l'exercice de ses droits de la défense ne serait pas disproportionnée, compte tenu de la gravité des faits qui lui sont reprochés et des nombreuses accusations formulées à son encontre par les dirigeants.

- 7 -



6.   Enfin, Mme Planche mentionne les courriers de transmission des relevés de constatation adressés par le directeur des enquêtes le 19 octobre 2021. Elle relève que si la destruction des courriels non versés en procédure y était indiquée, il était également précisé que « *seules ces pièces figureront au dossier joint au rapport d'enquête, sauf requête complémentaire des parties* ». Elle précise que, dès lors que chaque relevé de constatation est adressé uniquement à la personne qui a remis des boîtes de messageries électroniques aux enquêteurs, elle n'a pu formuler une requête complémentaire concernant les boîtes de messageries électroniques des dirigeants qu'à compter de la phase contradictoire de la procédure. Elle conclut que c'est l'empressement des enquêteurs à détruire les messageries électroniques saisies juste après l'envoi des notifications de griefs qui l'a empêchée de présenter une requête complémentaire et a irrémédiablement compromis ses droits de la défense.

### 1.2    Examen du moyen

7.   L'article 6 de la convention européenne de sauvegarde des droits de l'Homme et des libertés fondamentales (ci-après, « **CSDH** ») dispose que : « *1. Toute personne a droit à ce que sa cause soit entendue équitablement* […] *par un tribunal indépendant et impartial* […] *3. Tout accusé a droit notamment à : a) être informé, dans le plus court délai, dans une langue qu'il comprend et d'une manière détaillée, de la nature et de la cause de l'accusation portée contre lui ; b) disposer du temps et des facilités nécessaires à la préparation de sa défense ; c) se défendre lui-même ou avoir l'assistance d'un défenseur de son choix et, s'il n'a pas les moyens de rémunérer un défenseur, pouvoir être assisté gratuitement par un avocat d'office, lorsque les intérêts de la justice l'exigent ; d) interroger ou faire interroger les témoins à charge et obtenir la convocation et l'interrogation des témoins à décharge dans les mêmes conditions que les témoins à charge ; e) se faire assister gratuitement d'un interprète, s'il ne comprend pas ou ne parle pas la langue employée à l'audience* ».

8.   Si, lorsqu'elle est saisie d'agissements pouvant donner lieu aux sanctions prévues par le code monétaire et financier, la commission des sanctions doit être regardée comme décidant du bien-fondé d'accusations en matière pénale, au sens de l'article 6 de la CSDH, il est de jurisprudence constante que les exigences du procès équitable en découlant, telles que le principe de la contradiction, ne s'appliquent qu'à compter de la notification des griefs ouvrant la procédure de sanction, et non à la phase préalable d'enquête, laquelle doit néanmoins être loyale afin de ne pas compromettre irrémédiablement les droits de la défense des personnes en cause. Sous cette réserve, les enquêteurs déterminent librement la nature et l'étendue des investigations auxquelles ils décident de procéder dans le cadre de l'enquête qui leur est confiée ainsi que le choix des actes effectués, des documents examinés et des personnes interrogées.

9.   En outre, la circonstance que les enquêteurs de l'AMF procèdent à une sélection des pièces à verser au dossier n'est pas, en soi, de nature à vicier la procédure, sauf à ce qu'il soit démontré que, manquant à leur devoir de loyauté, ils auraient distrait des éléments de nature à influer sur l'appréciation par la commission des sanctions du bien-fondé des griefs retenus.

10.  En l'espèce, en premier lieu, il y a lieu de relever que les enquêteurs se sont fait remettre les boîtes de messageries professionnelles de M. Lucide, Mme A, M. Person et M. Goldner entre le 10 janvier 2019 et le 4 février 2020. Après une première visite dans les locaux de GEM le 18 mars 2019 lors de laquelle Mme Planche a décidé de ne pas se présenter, les enquêteurs se sont à nouveau présentés dans les locaux de GEM le 25 mars 2019, où reçus par Mme Planche, ils se sont fait remettre sa boîte de messagerie professionnelle.

11.  À la suite de l'analyse de ces boîtes de messageries et conformément aux termes de la charte de l'enquête, le 18 octobre 2021, les enquêteurs ont dressé des relevés de constatation aux termes desquels ils indiquaient avoir « *constaté que figurent parmi ceux ayant été envoyés depuis ces messageries électroniques ou reçus (en qualité de destinataire ou en copie) dans ces messageries électroniques, des courriers électroniques entrant utilement dans le champ de l'enquête* » et avoir « *extrait et consigné lesdits courriers électroniques* », listés dans chaque relevé de constatation. Ces relevés ont été envoyés respectivement aux dirigeants des émetteurs et à Mme Planche le 19 octobre 2021 par courriers aux termes desquels : « *Parmi les messages électroniques figurant dans les boîtes de messageries qui ont été remises aux enquêteurs, seules ces pièces figureront au dossier joint au rapport d'enquête, sauf requête complémentaire des parties* » et « *depuis la mise à jour de la Charte des enquêtes le 27 septembre 2021, les supports de messageries électroniques, collectés par les enquêteurs dans le cadre de l'exercice de leurs pouvoirs propres, sont désormais détruits par les services de l'AMF, dans un objectif de plus grande efficacité. Ils ne sont plus restitués à la personne concernée* ».



12.  En deuxième lieu, l'examen de la boîte de messagerie de Mme Planche par les enquêteurs a révélé que cette dernière avait vraisemblablement supprimé une quantité importante de courriels échangés par elle s'agissant des faits reprochés compte tenu du nombre très limité des courriels subsistants, s'agissant en particulier de ses échanges avec M. Leshem et avec les dirigeants des émetteurs (essentiellement les rendez-vous téléphoniques), alors même que sa boîte de messagerie contenait par ailleurs des échanges plus anciens ou des échanges avec des apporteurs d'affaires.

13.  En troisième lieu, il y a lieu de relever que dans son courrier du 8 septembre 2022 adressé au président de la commission, le conseil de Mme Planche a sollicité : « *la production des courriels ci-après, saisis par les enquêteurs mais non joints au rapport d'enquête : / (i) les courriels échangés par Monsieur Goldner sur la période 1ᵉʳ mars – 15 septembre 2018 ; / (ii) les courriels échangés par Monsieur Person sur la période 1ᵉʳ mars 2018 – 15 juin 2019 ; / (iii) les courriels échangés par Monsieur Lucide et Madame A sur la période 23 août 2018 – 15 juin 2019* », au motif que ces boîtes de messageries électroniques étaient susceptibles de comporter des éléments à décharge de nature à démontrer que l'amélioration de la liquidité des sociétés en cause n'avait pas été une condition imposée par Mme Planche mais avait été demandée par leurs dirigeants eux-mêmes, qui souhaitaient céder leurs titres.

14.  Cette demande a été transmise au rapporteur, désigné par décision du 8 septembre 2022, qui, par sa lettre en réponse du 21 septembre 2022, n'y a pas donné une suite favorable. Aux termes de cette lettre il était rappelé, premièrement, que seuls les courriels sélectionnés par les enquêteurs dans les boîtes de messageries électroniques notamment de MM. Goldner, Person et Lucide et Mme A comme entrant utilement dans le champ de l'enquête avaient été extraits et consignés par eux, puis versés au dossier avant la destruction des supports de messagerie électronique, comme indiqué par le directeur des enquêtes dans les courriers de transmission des relevés de constatation du 19 octobre 2021. Deuxièmement, que les dispositions de l'article L. 621-10 du code monétaire et financier permettent aux enquêteurs de se faire communiquer tous documents quel qu'en soit le support mais ne sont pas applicables au rapporteur, aucune autre disposition législative ou réglementaire ne conférant par ailleurs à ce dernier le pouvoir de se faire communiquer les courriels en cause par les sociétés. Les termes des courriers du 19 octobre 2021 étaient ainsi rappelés au conseil de Mme Planche, lesquels précisaient que seules les pièces visées « *figureront au dossier joint au rapport d'enquête, sauf requête complémentaire des parties* », et ajoutaient que depuis la mise à jour de la charte de l'enquête le 27 septembre 2021, « *les supports de messageries électroniques, collectés par les enquêteurs dans le cadre de l'exercice de leurs pouvoirs propres, sont désormais détruits par les services de l'AMF, dans un objectif de plus grande efficacité.* » A la date de la demande du courrier précité du conseil de Mme Planche, tel était le cas des boîtes de messageries électroniques dont la communication était demandée.

15.  Il y a lieu de préciser que les courriers de transmission des relevés de constatations sont adressés à chacune des personnes ayant remis une boîte de messagerie électronique aux enquêteurs avant l'ouverture de la phase contradictoire de la procédure, de sorte que la possibilité de formuler une requête complémentaire auprès des enquêteurs concernant les messages électroniques versés au dossier n'est ouverte qu'à la personne dont la boîte de messagerie a été saisie. Ainsi, la circonstance invoquée par Mme Planche selon laquelle c'est la destruction par les enquêteurs des messageries électroniques saisies juste après l'envoi des notifications de griefs qui l'a empêchée d'adresser une requête complémentaire est inopérante dès lors que sa requête, qui portait non sur sa propre boîte de messagerie électronique mais sur celles des dirigeants des émetteurs, n'était pas recevable au regard de son objet.

16.  Au surplus, Mme Planche conteste la sélection des pièces du dossier par les enquêteurs, sans pour autant donner d'éléments circonstanciés permettant de justifier que l'obtention des boîtes de messageries électroniques sollicitées serait susceptible de présenter un intérêt pour sa défense. Elle se contente en effet de demander la communication de l'intégralité des boîtes de messageries électroniques des dirigeants des émetteurs sur des périodes de 7 à 18 mois, plus étendues que la période retenue pour les griefs de manipulation de cours reprochés courant de mars 2018 au 3 juin 2019. Selon elle, les boîtes de messagerie en question seraient susceptibles de comporter des éléments à décharge, montrant que l'amélioration de la liquidité des sociétés n'a pas été posée comme condition préalable à l'investissement de GEM. Elle n'apporte aucun élément complémentaire, s'agissant des courriels recherchés et de leur objet, de nature à établir qu'ils contiendraient des éléments à décharge, étant rappelé qu'elle a elle-même supprimé la quasi-totalité de ses échanges électroniques relatifs aux faits reprochés.

- 9 -



17.    Les allégations de Mme Planche à cet égard reposent sur de simples suppositions qui apparaissent d'autant moins fondées qu'elles sont contredites par les investigations des enquêteurs. Ces derniers ont en effet recensé des courriels échangés entre Mme Planche et M. Person le 6 juin 2018 et entre Mme Planche et M. Goldner le 3 septembre 2018, dont les termes sont de nature à confirmer sans ambiguïté que l'investissement de GEM était présenté comme subordonné à l'amélioration préalable de la liquidité du titre. Du reste, ces courriels établissent que les enquêteurs ont versé au dossier les éléments entrant utilement dans le champ de l'enquête.

18.    Il résulte de ce qui précède que la demande de communication des boîtes de messageries électroniques des dirigeants des émetteurs formulée par Mme Planche ne pouvait être accueillie favorablement, indépendamment de la destruction des boîtes de messageries électroniques par les enquêteurs.

19.    En outre, la demande de Mme Planche porte sur l'accès à des courriels dont la communication est strictement encadrée compte tenu des impératifs de protection de la vie privée. Contrairement à ce que soutient Mme Planche, quand bien même sa demande se fonde sur l'exercice de ses droits de la défense, l'atteinte au droit à la protection de la vie privée des dirigeants résultant de la production des boîtes de messagerie réclamées par elle aurait été manifestement disproportionnée dès lors que sa demande portait, comme indiqué ci-avant, sur l'intégralité des boîtes de messageries électroniques en cause sur des périodes de 7 à 18 mois.

20.    En tout état de cause, Mme Planche ne fait état d'aucune circonstance pouvant légitimement laisser penser que les enquêteurs auraient distrait des éléments de nature à influer sur l'appréciation par la commission des sanctions du bien-fondé des griefs retenus à son encontre ou qu'ils auraient pour un autre motif manqué à leur devoir de loyauté.

21.    Il ressort de ce qui précède que ni la déloyauté des enquêteurs, ni l'atteinte irrémédiable au principe du contradictoire et aux droits de la défense de Mme Planche ne sont établis, de sorte que le moyen invoqué par elle est écarté.

### *2.    Sur le moyen invoqué par M. Person tiré de l'atteinte grave et irrémédiable aux droits de la défense*

#### *2.1    Présentation du moyen*

22.    M. Person soutient également que la procédure porte une atteinte grave et irrémédiable à ses droits de la défense, et avance trois raisons. Premièrement, M. Person soutient que la notification de griefs revêt un caractère imprécis et obscur contraire au principe du contradictoire et aux droits de la défense dans la mesure où elle fait état dans ses conclusions d'un possible manquement aux obligations déclaratives incombant à Edern mais mentionne également dans le corps du document une manipulation de marché au sens des articles 12 et 15 du Règlement MAR, de telle sorte qu'il y avait incertitude sur le point de savoir s'il s'agissait d'un autre grief.

23.    Deuxièmement, M. Person soutient que la notification de griefs s'appuie sur des plaintes de particuliers allemands qui ne lui ont pas été communiquées en violation du principe du contradictoire et des droits de la défense, et ce alors qu'il s'agit selon lui d'un élément très important de la poursuite puisqu'elles semblent avoir été le révélateur d'une possible manipulation de marché.

24.    Troisièmement, M. Person conteste l'absence de poursuite de l'auteur principal du manquement déclaratif reproché, à savoir la société Edern. Il fait valoir qu'il ne saurait être poursuivi seul, en lieu et place de sa mandante, tenue à titre principal de l'obligation de déclaration de franchissement de seuils. M. Person relève également l'absence de profit réalisé au titre des transactions en cause, l'intégralité des sommes perçues par Edern ayant fait l'objet d'une avance en compte courant d'associé au profit d'Umalis de manière à lui permettre d'honorer les échéances de remboursement de sa dette à l'égard de la Commission des Chefs de Services Financiers (CCSF).



- 10 -



### 2.2 Examen du moyen

25. Le respect du principe du contradictoire et des droits de la défense, garanti par l'article 6 de la CSDH reproduit au point 7, exige que les griefs soient formulés de façon suffisamment claire et précise pour que l'intéressé connaisse non seulement les faits sur la base desquels des reproches lui sont adressés, mais également la qualification envisagée.

26. En outre, en application de l'article L. 621-15 du code monétaire et financier, le collège de l'AMF apprécie seul l'opportunité des poursuites, en décidant de la nature et de l'étendue des griefs qu'il notifie ainsi que des personnes mises en cause. Il n'est pas lié par les qualifications juridiques proposées par les services d'enquête et peut avoir une appréciation différente des faits relevés par ces derniers, soit dans un sens moins sévère, soit dans un sens plus sévère.

27. En l'espèce, la première lettre circonstanciée adressée à M. Person le 8 avril 2021 lui reprochait un manquement aux articles 12 et 15 du Règlement MAR, éclairés par le considérant 39 de ce règlement, au titre de sa participation à la mise en exécution du schéma potentiellement manipulatoire mis au point par M. Leshem, et relevait l'absence de déclaration de ses transactions à l'AMF comme prévu par l'article 19 dudit règlement. La seconde lettre circonstanciée adressée à M. Person le 6 janvier 2022, lui reprochait, outre le manquement de manipulation de cours précité par renvoi à la première lettre circonstanciée du 8 avril 2021, un manquement à l'obligation déclarative résultant des articles 19 du Règlement MAR, L. 621-18-2 du code monétaire et financier et 223-23 du RGAMF. Quant à la notification de griefs adressée à M. Person, elle est rédigée en ces termes : *« Il ressort du rapport de la Direction des enquêtes et des contrôles de l'AMF, auquel renvoie la présente notification de griefs que vous pourriez avoir commis un manquement à l'obligation déclarative résultant des articles 19 du Règlement (UE) n°596/2014 du Parlement européen et du Conseil du 16 avril 2014 sur les abus de marché (ci-après « règlement MAR»), L. 621-18-2 du code monétaire et financier et 223-23 du règlement général de l'AMF, en l'absence de déclaration des opérations que vous avez réalisées sur le titre UMALIS GROUP, via votre holding personnelle Edern, entre le 5 septembre 2018 et le 27 novembre 2018 puis entre le 3 février 2019 et le 11 juin 2019. ».* Elle relève ensuite, en conclusion : *« La société Edern pourrait ainsi avoir manqué à ses obligations déclaratives découlant des dispositions de l'article 19.1 du règlement MAR et L. 621-18-2 du code monétaire et financier, manquement qui pourrait vous être imputé en application de l'article 221-1 du règlement général de l'AMF. / Pour l'ensemble des faits et raisons susvisés, vous pourriez avoir manqué à l'obligation résultant des articles 19 du règlement MAR, L. 621-18-2 du code monétaire et financier et 223-23 du règlement général de l'AMF, en l'absence de déclaration des opérations que vous avez réalisées, via votre holding personnelle Edern sur le titre UMALIS GROUP, entre le 5 décembre 2018 et le 7 novembre 2018 puis entre le 11 février 2019 et le 3 juin 2019, dont les montants excèdent le seuil de 20 000 euros ».*

28. Il résulte de la simple lecture de ce document que les faits reprochés ainsi que leur qualification juridique, fondée sur les dispositions des articles 19 du Règlement MAR, L. 621-18-2 du code monétaire et financier et 223-23 du RGAMF, sont clairement exposés dans la notification de griefs.

29. Au demeurant si la notification de griefs adressée à M. Person fait référence à la manipulation de marché, c'est uniquement au titre de circonstances venant aggraver le manquement déclaratif tel que cela ressort du passage ci-après : *« Enfin, certaines transactions sur le marché du titre UMALIS GROUP font ressortir plusieurs éléments qui pourraient permettre de caractériser une manipulation de marché au sens des dispositions des articles 12 et 15 du règlement MAR. [...] Or, la mise en œuvre de ce schéma potentiellement manipulatoire sur le titre UMALIS GROUP a été facilitée par votre comportement [...]. Ces circonstances viennent aggraver le défaut de déclaration des transactions qui ont ainsi été effectuées »,* et *« Ce manquement est d'autant plus grave qu'en vous abstenant de notifier à l'AMF les transactions que vous avez réalisées, via votre holding personnelle Edern sur le titre UMALIS GROUP, vous avez facilité la mise en place et l'exécution d'un schéma potentiellement manipulatoire sur le titre ».*

30. Par conséquent, les faits reprochés et leur qualification juridique, à savoir, le manquement aux obligations déclaratives s'agissant des transactions effectuées sur le titre Umalis, se distinguent nettement de la circonstance présentée comme venant aggraver ce manquement, relative à la facilitation du schéma potentiellement manipulatoire. Les griefs notifiés à M. Person ne sont donc exposés de façon ni obscure ni imprécise, de sorte que M. Person a disposé d'éléments suffisants pour lui permettre de faire valoir sa défense.



31.    S'agissant ensuite des plaintes de particuliers allemands auxquelles se réfère la notification de griefs et qui n'auraient pas été communiquées, force est de constater que le dossier, auquel M. Person avait accès, contient des témoignages anonymes enregistrés par l'autorité de régulation allemande (BAFIN) concernant des investisseurs démarchés pour acquérir des titres Umalis ainsi que des signalements concernant Gour Medical et CIOA. En tout état de cause, l'argument de M. Person selon lequel ces plaintes constitueraient un élément important de la poursuite en ce qu'elles auraient révélé une possible manipulation de marché est inopérant dès lors que M. Person est uniquement poursuivi pour manquements déclaratifs sans lien avec les plaintes en question.

32.    Il s'ensuit que les critiques de M. Person sur la notification de griefs et les plaintes de particuliers allemands sont infondées. Aucune atteinte au principe du contradictoire et aux droits de la défense de M. Person n'est caractérisée.

33.    S'agissant de l'absence de mise en cause de la société Edern, il convient de relever que l'article 221-1 du RGAMF, visé par la notification de griefs comme indiqué au point 27, rend applicables l'ensemble des dispositions du titre II du livre II, parmi lesquelles figurent celles de l'article 223-23 également visé par la notification de griefs, aux « *dirigeants de l'émetteur, de l'entité ou de la personne morale concernés* ». Par suite, les obligations résultant de ces dispositions, de même que les manquements à ces obligations, sont imputables non seulement aux émetteurs, entités ou autres personnes morales qui sont débiteurs des obligations en cause, mais encore d'une manière générale à leurs dirigeants. Or il n'est pas contesté que M. Person est bien le dirigeant de la société Edern.

34.    La circonstance que le grief n'a pas été notifié à la société Edern, tenue à titre principal des obligations déclaratives, est sans incidence dès lors, d'une part, que les dispositions de l'article 221-1 du RGAMF ne subordonnent pas la responsabilité du dirigeant à celle de l'entité dirigée ou à l'impossibilité d'engager la responsabilité de cette dernière, et d'autre part que le collège de l'AMF dispose du pouvoir d'apprécier l'opportunité des poursuites.

35.    L'absence de profit allégué par M. Person du fait de ces opérations est également indifférente.

36.    Il en résulte que les manquements déclaratifs imputés à M. Person peuvent lui être reprochés alors même que la société Edern n'a pas été mise en cause.

37.    Le moyen tiré par M. Person de l'atteinte grave et irrémédiable à ses droits de la défense est ainsi écarté.

**II.    Sur les griefs notifiés**

**1.    *Sur les griefs de manipulation de cours***

**1.1    *Sur la manipulation de cours par fixation du cours à un niveau anormal ou artificiel sur les titres Gour Medical, Umalis et CIOA***

**1.1.1.    Notifications de griefs**

38.    Les notifications de griefs adressées à Grantchester Equity, M. Leshem, M. Van Wylick et Mme Planche leur reprochent d'avoir adopté un comportement constitutif ou ayant contribué à des manipulations de cours en ayant mis au point et exécuté ou en ayant participé à la mise en œuvre d'un schéma manipulatoire reposant sur un mode opératoire en trois étapes, à savoir le ciblage et le démarchage d'entités à la recherche d'investisseurs, puis le contact et la présentation d'un programme de liquidité (*market making program*), et enfin l'exécution de ce programme.

39.    Concernant la première phase dite de ciblage des titres les plus faciles à manipuler, les notifications de griefs exposent qu'il s'agissait d'identifier des sociétés ayant un besoin de financement pour leur développement, cotées sur Euronext Access Paris et se distinguant par une faible liquidité de leurs titres. Les notifications de griefs indiquent que « l'origination » des dossiers était effectuée par Mme Planche pour le compte de GEM par courriels mentionnant l'intérêt de cette dernière pour la société concernée, suivis de conférences téléphoniques de présentation par Mme Planche des montages envisagés. En ce qui concerne les sociétés, les notifications de griefs relèvent que l'investissement de GEM a été présenté par Mme Planche comme étant subordonné à une amélioration de la liquidité des titres des sociétés en question et qu'à cet effet, Mme Planche leur a immédiatement



présenté M. Leshem et sa société Grantchester Equity. Selon les notifications de griefs, cette liquidité devait permettre d'accroître l'attractivité des titres des sociétés de manière à susciter l'intérêt d'acteurs dotés de ressources pour financer leur développement, tels que GEM.

40. Concernant la deuxième phase de présentation du *market making program* par M. Leshem, les notifications de griefs relèvent que, de sa propre initiative, M. Leshem contactait directement les dirigeants des sociétés par téléphone ou par courriel pour présenter son programme et proposer son contrat standard de deux pages précisant les éléments suivants : l'identité du vendeur initial, c'est-à-dire des personnes morales détenant les titres et contrôlées par les dirigeants des sociétés cotées sur Euronext Access ou du dirigeant directement ou de l'intermédiaire (*Trustee*) entre le dirigeant vendeur et le marché, la durée, les volumes de vente possibles, les objectifs de cours, la répartition du produit des ventes, la demande de *lock-up* des autres actionnaires pour ne pas « polluer » les ventes et l'accès au site web de la société.

41. Concernant la troisième phase tenant à l'exécution du *market making program*, les notifications de griefs exposent qu'elle consistait d'une part, à faire vendre sur le marché pendant plusieurs semaines par les dirigeants eux-mêmes un nombre significatif de titres de leur société et, d'autre part, à susciter des achats de titres par des particuliers essentiellement allemands et autrichiens *via* une campagne de démarchage téléphonique par des faux *brokers* diffusant de fausses informations sur les sociétés. Les notifications de griefs ajoutent que l'exécution du *market making program* a pu débuter avant même la signature de tout contrat, notamment s'agissant de CIOA.

42. Les notifications de griefs relèvent également que la rémunération prévue au bénéfice de Grantchester Equity et ses partenaires dans le cadre de l'exécution du *market making program* correspondait à 70 % du produit des ventes de titres sur le marché, le solde de 30 % revenant au vendeur.

43. Elles exposent les faits constatés sur les titres Gour Medical, Umalis et CIOA, en particulier les interactions entre les dirigeants des sociétés, M. Leshem et Grantchester Equity, Unimatrix, Global Capital Research et/ou Mme Planche à compter de mars 2018 s'agissant de Gour Medical, à compter de juin 2018 s'agissant de Umalis, et à compter de septembre 2018 s'agissant de CIOA. Elles présentent également les transactions réalisées sur le titre Gour Medical entre le 5 juin et le 8 août 2018, sur le titre Umalis entre le 5 septembre et le 27 novembre 2018, puis entre le 11 février et le 3 juin 2019, et sur le titre CIOA entre le 19 septembre et le 2 octobre 2018 puis entre le 23 octobre et le 7 décembre 2018.

44. Les notifications de griefs relèvent encore que certaines transactions sur ces titres font ressortir des éléments permettant de caractériser une manipulation de cours. Elles exposent à cet égard que le schéma manipulatoire précité, mis au point et exécuté par M. Leshem et Grantchester Equity - dont ce dernier est le président -, et auquel ont participé notamment M. Van Wylick, par l'intermédiaire des sociétés Unimatrix et Global Capital Research dont il était le président au moment des faits, et Mme Planche, en tant que personne physique et par l'intermédiaire de la société Fauve Capital, pourrait être qualifié de manipulation de marché au sens de l'article 12.1 du Règlement MAR.

45. Les notifications de griefs mentionnent la forte variation des cours des titres concernés lors des périodes identifiées, avant de se référer à l'indicateur relatif à « *la mesure dans laquelle les ordres passés ou les transactions effectuées représentent une proportion importante du volume quotidien de transactions réalisé sur l'instrument financier concerné,* […]*, en particulier lorsque ces activités entraînent une variation sensible de leur cours* » prévu au a) de l'annexe I A du Règlement MAR.

46. Elles relèvent que des objectifs de cours très à la hausse ou des promesses d'évolution du cours ont été fixés ex-ante par le *market making program*, sans aucune justification économique sous-jacente, en contrepartie de 70 % de commissions sur les ventes générées. Elles concluent que ces éléments pourraient refléter l'adoption d'un comportement visant à fixer ou susceptible de fixer à un niveau anormal ou artificiel le cours d'un ou de plusieurs instruments financiers au sens de l'article 12.1 (a) (ii) du Règlement MAR.



### 1.1.2.    Observations des mis en cause

47.    M. Leshem, Grantchester Equity et M. Van Wylick n'ont pas formulé d'observations en réponse aux notifications de griefs ni au rapport du rapporteur. M. Van Wylick a répondu à la lettre circonstanciée qui lui a été adressée au cours de l'enquête, sans toutefois faire valoir d'élément relatif aux cas de manipulation de cours reprochés.

48.    Mme Planche conteste avoir participé à l'exécution et à la mise en place des programmes de liquidité. Sans faire valoir d'élément propre au manquement de manipulation de cours par fixation du cours à un niveau anormal ou artificiel, elle soutient qu'elle s'est limitée à une simple mise en relation des émetteurs avec M. Leshem, laquelle ne peut, selon elle, être qualifiée de manipulation de cours.

### 1.1.3.    Textes applicables

49.    Les faits reprochés, qui se sont déroulés entre mars 2018 et le 3 juin 2019, doivent être examinés au regard des textes alors applicables.

50.    L'article 12 du Règlement MAR, entré en application le 3 juillet 2016, non modifié depuis, dispose qu': « *1. Aux fins du présent règlement, la notion de « manipulation de marché » couvre les activités suivantes : / a) effectuer une transaction, passer un ordre ou adopter tout autre comportement qui* : […] / *ii) fixe ou est susceptible de fixer à un niveau anormal ou artificiel le cours d'un ou de plusieurs instruments financiers* [...] ».

51.    L'article 15 du Règlement MAR, entré en application le 3 juillet 2016, non modifié, depuis dispose qu': « *Une personne ne doit pas effectuer des manipulations de marché ni tenter d'effectuer des manipulations de marché* ».

52.    La section A de l'annexe I du Règlement MAR relative aux « *Indicateurs de manipulations consistant à donner des indications* fausses *ou trompeuses ou à fixer les cours à un niveau anormal ou artificiel* », entré en application le 3 juillet 2016, non modifié depuis, prévoit qu': « *Aux fins de l'application de l'article 12, paragraphe 1, point a), du présent règlement, et sans préjudice des formes de manipulations décrites au paragraphe 2 dudit article, les participants au marché et les autorités compétentes prennent en considération, lors de l'examen de transactions ou d'ordres, les indicateurs suivants, dont la liste n'est pas exhaustive et qui ne doivent pas pour autant être considérés en soi comme constituant une manipulation de marché : / a) la mesure dans laquelle les ordres passés ou les transactions effectuées représentent une proportion importante du volume quotidien de transactions réalisé sur l'instrument financier concerné, un contrat au comptant sur matières premières qui lui est lié ou un produit mis aux enchères sur la base des quotas d'émission, en particulier lorsque ces activités entraînent une variation sensible de leur cours ;* [...] ».

### 1.1.4.    Examen du grief

✓ *Sur l'indicateur de manipulation de cours*

53.    Le dossier met en évidence, pour les titres de chacune des sociétés en cause et pour chacune des périodes identifiées par les enquêteurs pour caractériser la mise en œuvre du schéma manipulatoire, par comparaison du volume moyen des titres échangés pendant et après les périodes en cause, une très forte augmentation des volumes échangés suivie d'une forte diminution de la liquidité par la suite. S'agissant de Gour Medical les volumes moyens échangés ont été de 8 062 titres lors de la période retenue entre le 5 juin et le 8 août 2018, à comparer avec des volumes de 748 après cette période, entre le 9 août 2018 et le 8 février 2019. Pour Umalis les valeurs correspondantes sont d'un côté 1 148 entre le 5 septembre et le 27 novembre 2018 et 909 entre le 11 février et le 3 juin 2019, à comparer avec 165 postérieurement aux périodes d'observation, entre le 4 juin et le 4 décembre 2019. Pour CIOA des volumes moyens de 7 947 entre le 19 septembre et le 2 octobre 2018 et 4 835 titres entre le 23 octobre et le 7 décembre 2018, observés pendant les périodes sensibles, à comparer avec 417 titres échangés post périodes entre le 8 décembre 2018 et le 8 juin 2019.



54.   Il ressort également du dossier une forte concentration, sur les périodes mentionnées ci-dessus retenues par les enquêteurs, des volumes vendus par les opérateurs soupçonnés d'avoir participé au schéma manipulatoire : s'agissant des titres Gour Medical, 81 % vendus par Unimatrix, s'agissant des titres Umalis, de 73 à 82 % vendus par Edern, et s'agissant des titres CIOA, de 58 à 69 % vendus par Festival of Spirit Ltd.

55.   Ces volumes d'échanges tout à fait inhabituels ont coïncidé avec une variation sensible à la hausse du cours des titres en question. La valeur du titre Gour Medical a augmenté de 157 % pendant la période au cours de laquelle la société Unimatrix a cédé les titres en question sur le marché. La valeur du titre CIOA a progressé de 84 % puis de 72 % au cours des périodes pendant lesquelles la société Festival of Spirit Ltd est intervenue à la vente sur ce titre. La valeur du titre Umalis a enregistré une hausse de 18 % puis de 23 % au cours des deux périodes pendant lesquelles la société Edern est intervenue à la vente sur ce titre. Ces dernières variations sont apparemment moins importantes mais elles restent significatives, eu égard au fait, mis en évidence par le rapport d'enquête, que ce titre, qui faisait l'objet de très peu d'échanges, pouvait ne connaître aucune variation sur de longues périodes.

56.   Il résulte de ce qui précède que les critères d'appréciation de l'indicateur de manipulation de cours mentionnés à la section A de l'annexe 1 du Règlement MAR doivent être considérés comme satisfaits.

57.   La circonstance qu'en l'espèce la démonstration repose sur la comparaison de moyennes plutôt que sur des volumes quotidiens de transactions directement observés pour chacun des titres en question ne rend pas cette démonstration pour autant invalide, eu égard à la spécificité des titres en question, particulièrement illiquides et ne faisant l'objet « en temps normal » que de très peu de transactions. Dans un tel cas de figure, la comparaison par référence à des moyennes par périodes, plutôt que par référence à des volumes quotidiens peut être admise.

58.   En tout état de cause, un indicateur ne constituant pas en lui-même une manipulation de cours, il convient de déterminer si les comportements reprochés sont susceptibles de recevoir une telle qualification au sens de l'article 12.1 (a) (ii) du Règlement MAR.

   ✓   *Sur l'appréciation de la manipulation de cours par fixation du cours à un niveau anormal ou artificiel s'agissant des titres Gour Medical, Umalis et CIOA*

59.   Les notifications de griefs reprochent aux personnes mises en cause la mise en œuvre d'un « *comportement* », caractérisé par le « *schéma manipulatoire* » présenté ci-dessus aux points 39 à 45.

60.   Il résulte des éléments du dossier que chacun des dirigeants des sociétés émettrices a, dans un premier temps, été démarché par Mme Planche pour le compte de GEM au motif que ce fonds pouvait être intéressé par un investissement dans chacune des sociétés en question. Dans le cadre de ces échanges, Mme Planche a ensuite introduit les dirigeants des sociétés auprès de M. Leshem dans le but d'améliorer la liquidité des titres des sociétés.

61.   Plus précisément, s'agissant de Gour Medical, les courriels versés au dossier attestent l'existence de premiers échanges en février 2018, puis d'une réunion téléphonique du 15 mars 2018 à l'issue de laquelle Mme Planche a introduit M. Goldner auprès de M. Leshem dans le but d'améliorer la liquidité du titre Gour Medical. Les termes du courriel du 3 septembre 2018 adressé par Mme Planche à M. Goldner établissent que l'amélioration de liquidité de ce titre était une condition posée à GEM, préalable à l'étude d'une opportunité d'investissement dans Gour Medical.

62.   S'agissant d'Umalis, Mme Planche a pris contact en mars 2018 avec M. Person. Après un échange téléphonique du 4 juin 2018, elle a introduit M. Leshem auprès de M. Person par un courriel du 6 juin 2018 aux termes duquel : « *GEM sera heureuse d'étudier une opportunité d'investissement dans Umalis Group dès que vos actions seront plus liquides et que votre capitalisation boursière atteindra 20-25 millions d'euros.* », ce qui confirme que, dans ce cas également, l'amélioration de la liquidité du titre concerné était un prérequis fixé par GEM ou par Mme Planche.

63.   S'agissant de CIOA, à partir du 23 août 2018 Mme Planche a mis en œuvre auprès des dirigeants une démarche identique à celle effectuée auprès de Gour Medical et Umalis. Le 30 août 2018, elle a introduit M. Leshem auprès de M. Lucide, présenté, selon les déclarations de ce dernier, comme proposant « *dans l'écosystème GEM* » des services de *marketing* de nature à donner une visibilité à CIOA auprès de son portefeuille d'investisseurs qualifiés par le moyen d'une amélioration de la liquidité du titre.



64. Dans un deuxième temps, une fois le contact établi entre les dirigeants et M. Leshem, ce dernier leur a présenté le *market making program*, et leur a adressé une plaquette de présentation décrivant les grands principes de ce programme. Il y est indiqué que l'amélioration de la liquidité s'effectue au moyen de la génération de prospects (« *lead generation* ») grâce à l'animation du marché par une équipe de commerciaux/conseillers en investissements qui font leurs meilleurs efforts pour susciter l'intérêt et l'achat de titres par des investisseurs individuels qualifiés. La plaquette de présentation reprenait également les grands mécanismes juridiques mis en place, avec certaines spécificités selon les sociétés concernées.

65. S'agissant de Gour Medical, le document de présentation daté du 15 mars 2018 adressé par M. Leshem à M. Goldner prévoyait les principales modalités du *market making program*. Il consistait, en premier lieu, à transférer gratuitement un nombre convenu d'actions de Gour Medical sur le compte d'un tiers dépositaire agissant en qualité de séquestre/fiduciaire (*Trustee*), puis à faire démarcher des clients ou prospects par des conseillers en investissements en vue de susciter des ordres d'achat, à charge pour le *Trustee* de veiller à conserver des ordres de vente limités sur le marché afin de capter la quasi-totalité du volume des transactions. En deuxième lieu, un accord écrit formalisé entre la société et le *Trustee* devait déterminer la quote-part du produit des ventes d'actions revenant à Gour Medical. En troisième lieu, le *Trustee* devait réaliser un *reporting* hebdomadaire des ventes d'actions ainsi que le paiement de la quote-part revenant à Gour Medical sur le compte désigné. En quatrième lieu, s'agissant des obligations du cédant, celui-ci devait obtenir, à titre de prérequis l'engagement des autres actionnaires de conserver leurs titres pendant la durée du programme (« *lock up* ») afin d'en assurer l'efficacité. Enfin, la documentation mentionnait le fait qu'au regard des performances antérieures, Grantchester Equity estimait (« *feels comfortable* ») que Gour Medical pouvait réaliser un produit net de 4 à 5 millions d'euros sur une période de 12 mois.

66. Les termes des documents de présentation du *market making program* transmis par M. Leshem à M. Person pour Umalis et à M. Lucide pour CIOA, datés des 7 juin 2018 et 4 septembre 2018, étaient sensiblement identiques à celui adressé à Gour Medical, sous certaines réserves. En particulier Umalis ou, le cas échéant, CIOA ou l'un de leurs actionnaires, pouvaient céder directement les titres sur le marché sans recours au *Trustee* sous réserve de rétrocéder 70 % du produit des ventes d'actions à Grantchester Equity (ou une autre société de son choix), conformément à la répartition prévue par le *term sheet*. Grantchester Equity pouvait accéder aux sites internet d'Umalis ou CIOA en vue de les améliorer pour les rendre plus attrayants, et enfin, les plaquettes de présentation étaient complétées de projets de *term sheet* qui mentionnaient notamment les modalités de rémunération du *market making program*, à savoir 70 % du produit de cession des titres sur le marché au profit de Grantchester Equity (et un *bonus shares* de 50 000 titres Umalis) et 30 % au profit d'Umalis, ou le cas échéant, CIOA. Ces *term sheet* prévoyaient s'agissant d'Umalis un volume maximum de 200 000 titres à céder à un prix minimum de 7,40 euros dans les six mois suivant la signature de l'accord, outre la traduction du site internet en allemand ; de sorte que cette opération devait générer au profit d'Edern un produit net indicatif de 600 000 euros et s'agissant de CIOA, un volume maximum de 1 million de titres à céder de manière à générer un profit net pour CIOA de 2 millions d'euros.

67. Dans un troisième temps, la formalisation et l'exécution du *market making program* ne se sont pas réalisées de la même manière selon les titres en cause.

68. S'agissant de Gour Medical, il n'y a pas eu de régularisation de la documentation relative au *market making program*. Toutefois, Il est établi qu'une promesse d'achat datée du 4 mai 2018 portant sur 500 000 actions de Gour Medical a été consentie par M. Goldner au profit d'Unimatrix, au prix de 1,14 euro par action. Cette promesse a été modifiée par avenant du 5 mai 2018 de manière à prévoir une clause d'ajustement de prix, de sorte que M. Goldner reçoive un montant total correspondant à 30 % du produit de cession des titres sur le marché par Unimatrix au fur et à mesure de la réalisation des ventes. Il y a lieu de relever qu'il s'agit d'une quote-part identique à celle prévue par les *term sheet* de *market making program*.

69. Au regard des éléments du dossier, il est établi qu'entre le 16 mai et le 16 juillet 2018, M. Goldner a procédé à la vente de gré à gré de 306 000 actions de Gour Medical pour un montant total de 443 900 euros au profit d'Unimatrix par contrats de cession séparés. Unimatrix a ensuite cédé sur le marché l'ensemble des titres acquis dans ce cadre entre le 5 juin et 31 juillet 2018 pour un montant brut de 1 743 353 euros, de sorte qu'Unimatrix ne détenait plus aucun titre Gour Medical à compter du 31 juillet 2018, à l'instar de sa situation avant le mois de mai 2018.



70. Il est également établi sur la base des pièces du dossier qu'entre le 19 juin et le 1er août 2018, M. Goldner a reçu d'Unimatrix 515 686 euros correspondant à 30 % du montant net des ventes réalisées par Unimatrix conformément à la promesse d'achat de titres du 4 mai 2018, tel qu'amendée le 5 mai 2018. Par ailleurs, il y a lieu de constater que M. Goldner a sollicité auprès des autres actionnaires de Gour Medical des engagements de conservation des titres, ainsi que cela était prévu au titre du mécanisme de *lock up* selon la documentation de *market making program*.

71. S'agissant d'Umalis, le document de présentation du *market marking program* ainsi que le *term sheet* ont été signés le 5 juillet 2018 par MM. Person et Leshem. À compter du 5 septembre 2018, des titres Umalis ont été cédés sur le marché Euronext Access par Edern. Par avenant au *term sheet* du 18 octobre 2018 (signé uniquement par Grantchester Equity), la durée du programme a été portée de 6 à 9 mois et il a été confirmé que Grantchester Equity pouvait, à sa discrétion, désigner le compte bancaire de toute affiliée ou autre société afin de recevoir le virement de la quote-part de 70 %.

72. En outre, Edern a vendu 50 133 titres Umalis entre le 5 septembre et le 27 novembre 2018 pour un montant de 434 714 euros bruts représentant 73 % des ventes réalisées sur Euronext Access, et 58 334 titres Umalis entre le 11 février et le 3 juin 2019 pour un montant de 420 525 euros bruts représentant 82 % des ventes réalisées sur Euronext Access.

73. S'agissant de CIOA, selon les déclarations de M. Lucide, le *market making program* aurait été mis en œuvre par M. Leshem avant même la régularisation de la documentation, les premières animations inhabituelles autour du carnet d'ordres de CIOA ayant été constatées vers le 20 septembre 2018 par M. Lucide. Aux termes des courriels échangés à cette période, il apparaît que M. Leshem avait confirmé le 20 septembre 2018 à M. Lucide que Grantchester Equity était prête à démarrer le *market making program* sans avoir obtenu les engagements de conservation des titres, allant jusqu'à préciser les modalités de passation des ordres à respecter par les dirigeants de CIOA, avec le passage d'ordres en quantités cachées dans la mesure du possible. En outre, le 25 septembre 2018, M. Leshem a demandé à M. Lionel Lucide, fils de M. Léon Lucide, le transfert gratuit de 100 000 actions de CIOA à la société Valens Bank *via* son *broker* britannique, la société Daniel Stewart & Company Plc, pour faciliter la gestion des transactions en disposant directement des titres. Cette demande a été réitérée par courriel du 26 septembre 2018 qui sollicitait également le règlement de la première facture de Grantchester Equity afin de rétribuer ses vendeurs.

74. Par courriel en réponse du 30 septembre 2018, M. Lionel Lucide a demandé à ce qu'une nouvelle facture soit émise au nom de la *holding* Festival of Spirit Ltd et la régularisation d'un contrat afin de procéder à son règlement. Il a également demandé une renégociation de la quote-part de 70 % rétrocédée à Grantchester Equity, jugée excessive. Cette dernière demande a été rejetée par courriel du 1er octobre 2018 de M. Leshem qui indiquait qu'à défaut de respect de l'accord initial, leur collaboration devait cesser immédiatement.

75. En parallèle, entre le 19 septembre et le 2 octobre 2018, Festival of Spirit Ltd a vendu 54 620 titres CIOA, correspondant à 69 % du volume échangé sur Euronext Access, étant précisé que 90,6 % des achats sur cette période ont été effectués par des particuliers. Puis, entre le 23 octobre et le 7 décembre 2018, Festival of Spirit Ltd a vendu 95 132 titres, correspondant à 58 % du volume échangé sur Euronext Access et 79 % ont été réalisés par des particuliers sur cette période.

76. Par ailleurs, il ressort du dossier que, pour l'ensemble des titres des sociétés, l'exécution du *market making program* s'est traduite par un effet sur le cours.

77. S'agissant de Gour Medical, entre le 5 juin 2018 et le 8 août 2018, soit parallèlement aux cessions de titres réalisées par Unimatrix, des variations importantes du cours du titre ont été observées, le cours ayant notamment augmenté de 157,14 %, passant de 3,5 euros à 9 euros dans un volume quotidien de 8 062 titres échangés, soit 378 901 titres échangés sur la période sur Euronext Access. L'analyse des données TREM et Euronext sur cette période figurant au dossier révèle que les opérations ont été effectuées à hauteur de 80 % par des particuliers, essentiellement de nationalités allemande, autrichienne et anglaise étant observé qu'Unimatrix a été à l'origine de près de 81 % du total des titres vendus sur la période sur Euronext Access. Il est précisé qu'entre le 1er janvier et le 4 juin 2018, soit antérieurement à la phase de hausse significative, le cours du titre Gour Medical a varié entre 3,8 euros et 4,06 euros, le titre n'ayant été coté que 7 jours avec un volume moyen par séance de 45 titres échangés. Par

- 17 -



ailleurs, entre le 9 août 2018 et le 8 février 2019, au cours des six mois suivant la phase active de hausse du cours et des volumes, le cours moyen du titre Gour Medical a chuté à 2,05 euros et le volume quotidien moyen à 748 titres échangés.

78.    S'agissant d'Umalis et CIOA, il y a lieu d'observer deux périodes de hausse sur le cours pour chacune de ces sociétés.

79.    Pour Umalis, en premier lieu, il est relevé qu'à compter du 5 septembre 2018, date à partir de laquelle des titres ont été cédés par Edern sur le marché Euronext Access et jusqu'au 10 octobre 2018, le cours a augmenté de 7,35 euros à 9,10 euros, soit une progression de 23,81 % pour un volume global sur la période de 44 370 titres échangés. Puis, le 12 octobre 2018, le cours du titre Umalis a baissé de 10,99 % de 9,10 euros à 8,10 euros pour un volume de 5 404 titres échangés. Il s'en est suivi entre le 15 octobre 2018 et le 27 novembre 2018 une augmentation du cours entre 8,10 euros et 8,72 euros pour un volume total de 19 093 titres Umalis échangés sur Euronext Access sur la période considérée, avec un volume quotidien d'échanges de 597 titres. La période entre le 5 septembre et le 27 novembre 2018 est ci-après désignée « *période 1 Umalis* ».

80.    En deuxième lieu, entre le 11 février et 3 juin 2019 (ci-après, « *période 2 Umalis* »), le cours du titre Umalis a fait l'objet d'une seconde phase de progression dans des volumes plus importants que la moyenne, le cours ayant augmenté de 23,33 % de 5,90 euros à 7,40 euros pour un volume total de 70 916 titres Umalis échangés sur Euronext Access sur la période, avec un volume moyen quotidien de 909 titres.

81.    Le cours et les volumes de transactions ont baissé drastiquement entre la période 1 Umalis et la période 2 Umalis dans la mesure où, d'une part, entre le 28 novembre et le 19 décembre 2018 inclus, le titre n'a plus été négocié et, d'autre part, il a été coté seulement 10 jours entre le 20 décembre 2018 et le 8 février 2019 inclus. Les courriels du 12 décembre 2018 reçus par M. Person de la part de Mme Planche et M. Leshem attestent durant cette période de relances s'agissant du transfert de titres qui n'avait pas pu être effectué pour des raisons techniques. Le 17 janvier 2019, M. Person a été mis en demeure par le conseil de M. Leshem de régler le solde de certaines factures au titre du *market making program*. Il en résulte que cette phase de baisse du cours correspond à une période de tensions entre M. Person et M. Leshem au sujet de commissions impayées en espèces et en titres désignés « *bonus shares* » au cours de laquelle M. Leshem avait suspendu l'exécution du *market making program*, ce qui est corroboré par les déclarations de M. Person en audition confirmant que la nouvelle période de hausse du cours résulte de la reprise du programme.

82.    S'agissant de CIOA, il y a lieu de constater que le cours a connu des variations plus significatives à compter du 19 septembre 2018 et jusqu'au 2 octobre 2018 (ci-après, « *période 1 CIOA* ») puisqu'il a progressé de 83,93 % passant de 2,80 euros à 5,15 euros pour un volume de 79 473 titres CIOA échangés au total, ce qui correspond à un volume quotidien moyen de 7 947 titres échangés. Puis, entre le 3 octobre et le 22 octobre 2018, le cours a baissé de 44,85 % de 5,15 euros à 2,84 euros pour un volume de 45 811 titres échangés, ce qui correspond à un volume quotidien moyen de 3 272 titres échangés. Entre le 23 octobre et le 7 décembre 2018 (ci-après, « *période 2 CIOA* »), le cours du titre s'est montré plus volatil avec une progression de 72,54 % passant de 2,84 euros à 4,90 euros pour un volume de 164 390 titres, ce qui correspond à un volume quotidien moyen de 4 835 titres échangés. Entre le 8 décembre 2018 et le 8 juin 2019, au cours des six mois suivant la seconde phase de hausse du cours et des volumes, le cours moyen est retombé à 3,23 euros et le volume moyen quotidien à 417 titres échangés. De la même manière que s'agissant du titre Umalis, la période de creux peut s'expliquer par les tensions opposant MM. Leshem et Lucide entre la période 1 CIOA et la période 2 CIOA. Ces tensions apparaissent notamment dans les termes d'un courriel du 24 octobre 2018 adressé à M. Lionel Lucide, duquel Mme Planche était en copie, dans lequel M. Leshem indique avoir contacté la force de vente afin qu'elle redouble d'efforts, assurant être capable de générer un volume de vente important dans un laps de temps très court une fois les règlements intervenus.

83.    Des flux monétaires et financiers ont également été identifiés dans le dossier, entre les différents protagonistes impliqués dans la procédure et au profit de sociétés tierces qui s'apparentent à des partenaires de Grantchester Equity.



84. S'agissant de Gour Medical, il est établi par les éléments du dossier qu'Unimatrix, dont le rôle se rapproche de celui de *Trustee* (tel que prévu par la plaquette de présentation du *market making program*, non signé mais exécuté) a, outre le transfert de la somme de 515 685 euros au profit de M. Goldner équivalant à 30 % du montant des ventes de titres, effectué les virements ci-après :

- d'un montant total de 39 258 euros au profit de Fauve Capital, dont l'unique actionnaire et dirigeante est Mme Planche, entre le 28 juin et le 1er août 2018, cette dernière ayant admis lors de ses auditions que ce montant correspondait à sa rémunération de 2,5 % du montant des cessions en qualité d'apporteur d'affaires auprès de M. Leshem conformément à un contrat du 1er mai 2018 signé par Fauve Capital à destination de Unimatrix. À cet égard, Mme Planche a déclaré en audition : « *pour moi Unimatrix, c'était Miron* [Leshem] » ;

- d'un montant total de 859 326 euros au titre de 16 virements entre le 7 juin et le 1er août 2018 au profit de la société Moelis Tech FZE, établie aux Émirats Arabes Unis ;

- d'un montant total de 335 619 euros le 10 août 2018 au profit de M. Van Wylick, dirigeant d'Unimatrix ;

- d'un montant de 12 830 euros le 26 octobre 2018 au profit de la société chypriote WhiteTree Capital alors que les enquêteurs n'ont pas relevé de relations contractuelles avec cette société.

85. Par ailleurs, le 25 juillet 2018, M. Van Wylick a procédé au virement de 20 006 euros au profit Grantchester Equity à titre de rémunération pour des conseils en investissements selon la facture y afférente.

86. S'agissant d'Umalis, l'analyse du dossier fait apparaître les flux suivants :

- Edern a reçu une facture « *Invoice GCR-MLUMG 001 – MIRON* » datée du 24 septembre 2018 d'un montant de 93 745 euros de la société allemande Global Capital Research au titre de services de « *marketing & promotion* » du 20 août au 24 septembre 2018, réglée par 4 virements entre les 25 septembre et 3 octobre 2018. Les 10 octobre et 22 novembre 2018, Global Capital Research a effectué 2 virements vers la société Grantchester Equity pour un montant global d'environ 19 000 euros ;

- le 26 septembre 2018, M. Person a indiqué à M. Leshem par courriel qu'il était prêt à « *livrer 50 % du premier bonus en actions asap* ». À la suite de ce courriel, Mme Planche a communiqué à M. Person les coordonnées bancaires du compte de la société Fauve Capital pour le virement de 5 000 titres Umalis par courriel du 28 septembre 2018, étant précisé que près d'un mois plus tard, le 22 octobre 2018, Edern a reçu un contrat de *consulting* signé par Fauve Capital aux termes duquel 30 000 actions Umalis au maximum devaient être transférées à Fauve Capital en qualité de consultant. Le 31 octobre 2018, M. Leshem a écrit à M. Person concernant le transfert des actions Umalis vers son *broker* britannique, la société Daniel Stewart & Company Plc, avant que des demandes ultérieures à sa banque en date des 4 et 5 novembre 2018 soient effectuées au sujet du transfert de 15 000 titres Umalis vers Daniel Stewart & Company Plc au profit de Grantchester Equity. Le 12 décembre 2018, Mme Planche a relancé M. Person par courriel (dont M. Leshem était destinataire en copie) en vue d'obtenir le transfert des titres. Le même jour, à 17h06, M. Leshem a également envoyé un message de relance à M. Person. Selon les déclarations de ce dernier le transfert de titres n'a pu être réalisé pour des raisons techniques ;

- Umalis a reçu 3 factures datées des 16 octobre, 12 novembre et 26 novembre 2018 d'un montant total de 215 784,33 euros de la société turque Kaya Kuyumculuk Turizm Insaat Ltd (ci-après « Kaya ») pour des services de « *marketing & promotion »,* étant précisé qu'il résulte des déclarations en audition de M. Person que leur paiement, en complément de celles établies par Global Capital Research, correspond au règlement de la quote-part de 70 % prévue par le *term sheet*. Le 17 janvier 2019, Edern a reçu une mise en demeure du cabinet Solvaction pour le compte de Grantchester Equity de régler la somme de 50 002 euros due au titre du solde de factures émises par la société turque Kaya. Un échéancier ainsi que la reprise du contrat de « *market making program* » entre Grantchester Equity et Edern étaient également proposés dans cette mise en demeure ;



- le 12 novembre 2018, Grantchester Equity a conclu un contrat de *consulting* avec la société WhiteTree Capital (société déjà identifiée s'agissant des flux sur Gour Medical), laquelle lui a ensuite viré un montant net de 51 856,15 euros ;

- M. Leshem a adressé un courriel le 6 février 2019 à M. Person concernant un transfert vers le compte bancaire (Cyprus Bank) de la société WhiteTree Capital « *pour virement* », que M. Person a fait suivre au responsable du contrôle de gestion d'Umalis en indiquant « *RIB pour le compte CACEIS EDERN Miron* ». M. Person a confirmé avoir donné l'accès à son dépositaire CACEIS afin que M. Leshem puisse opérer directement les ventes des titres Umalis. Ainsi, entre le 13 février et le 9 septembre 2019, CACEIS a viré pour Edern 448 768 euros vers le compte de WhiteTree Capital ouvert au sein de la Cyprus Bank.

87.    S'agissant de CIOA, les investigations font ressortir qu'en parallèle de ces ventes sur le marché, la société Festival of Spirit EURL a effectué plusieurs virements d'un montant total de 472 556 euros au profit des sociétés Moelis Tech FZE et WhiteTree Capital entre le 3 octobre 2018 et le 9 janvier 2019, correspondant à 70 % du montant total des ventes nettes de Festival of Spirit Ltd (675 109 euros) sur la période étudiée.

88.    Enfin, des témoignages de particuliers sollicités pour des investissements dans les sociétés au cours des périodes de variation de cours ont été recueillis par les homologues allemand et, le cas échéant, autrichien (FMA) de l'AMF ainsi que par M. Goldner, ainsi que cela ressort du dossier comme indiqué au point 31.

89.    Il résulte de l'ensemble des éléments ci-dessus que la mise en œuvre du *market making program* à l'initiative de M. Leshem sur les titres de Gour Medical, Umalis et CIOA révèle des pratiques sensiblement similaires sur les titres de ces sociétés qui se sont traduites par les transactions susvisées et, au-delà des seules transactions, par des comportements ayant permis de :

- capter la totalité ou la quasi-totalité des ordres de vente en raréfiant le positionnement d'autres intervenants à la vente au moyen de l'obtention ou de la tentative d'obtention des engagements de *lock up* de la part des autres actionnaires des sociétés. Ainsi M. Goldner a sollicité des engagements de conservation des titres de la part des autres actionnaires de Gour Medical. De même, la documentation contractuelle et le *term sheet* signés le 5 juillet 2018 par M. Person, président d'Edern, mentionnent comme prérequis l'obtention de l'engagement de *lock up* auprès des actionnaires d'Umalis. S'agissant de CIOA, l'engagement de conservation n'a pas été conclu ou à tout le moins respecté par un actionnaire qui s'était vu attribuer des actions gratuites à hauteur de 4 % du capital lors de l'introduction en bourse de CIOA à titre de rémunération et qui refusait de conclure et d'exécuter l'accord proposé par M. Leshem.

- démarcher des investisseurs à la suite d'instructions données par Grantchester Equity à ses conseillers en investissements (« la force de vente ») dans le but de susciter des ordres d'achat des titres des sociétés.

- réaliser des opérations de cession des titres des sociétés concernées sur le marché, suivant les instructions de Grantchester Equity permettant de capter l'ensemble des ordres d'achat. S'agissant de Gour Medical, les cessions par M. Goldner au profit d'Unimatrix s'inscrivaient dans l'exécution du market making program, à charge ensuite pour Unimatrix d'assurer le rôle de Trustee et de vendre les titres sur le marché. S'agissant d'Umalis, Edern a suivi les instructions de M. Leshem avant de lui donner accès au compte-titres de la société Umalis Group chez CACEIS pour lui permettre de procéder directement à la vente de titres Umalis. S'agissant de CIOA, la famille Lucide a également reçu des instructions de M. Leshem sur la manière de procéder aux ventes de titres, notamment en passant des ordres dits « iceberg », la famille Lucide ayant par ailleurs refusé de lui donner un accès direct au compte-titres de CIOA, ce qui a d'ailleurs participé aux tensions avec M. Leshem.

- attribuer 70 % du produit des ventes de titres à Grantchester Equity (et ses partenaires) et 30 % aux vendeurs, à savoir M. Goldner, Edern et Festival of Spirit Ltd s'agissant respectivement de Gour Medical, Umalis et CIOA.

90.    Il convient d'analyser les conséquences du comportement ainsi décrit, caractérisé selon les notifications de griefs, et ainsi qu'il a été rappelé ci-dessus, par la mise en œuvre de ce qu'elles considèrent comme un schéma manipulatoire, afin d'établir s'il a fixé ou été susceptible de fixer le cours des titres des sociétés concernées à un niveau anormal ou artificiel.

- 20 -



91. Il ressort du dossier que les transactions, et plus généralement les interactions coordonnées susvisées, visaient un effet direct sur le cours et non sur la seule liquidité du titre. Ceci s'illustre notamment par les objectifs de cours stipulés expressément, ou non, dans la documentation des *market making program*.

92. Ainsi, pour Gour Medical, la documentation ne précise pas d'objectif de cours, contrairement aux programmes mis en œuvre sur les titres d'Umalis et CIOA, mais prévoit que Grantchester Equity est confortable (« *feels comfortable* ») avec le fait que la société pourra réaliser « *un produit net de 4 à 5 millions d'euros sur une période de 12 mois* ». Or une telle disposition revient à anticiper, indépendamment de toute justification économique, une forte hausse du cours du titre Gour Medical (minimum de 4,75 euros, sous réserve de la cession de l'intégralité de ses titres mais plus vraisemblablement bien supérieur à 13,3 euros) afin de générer un produit net de l'ordre de 4 à 5 millions d'euros sur 12 mois, sur la base d'une rémunération de M. Goldner correspondant à 30 % du montant des titres vendus, quote-part actée dans l'avenant du 5 mai 2018.

93. Pour ce qui concerne les *market making program* mis en œuvre sur les titres d'Umalis et CIOA, ces derniers prévoyaient expressément des objectifs de cours. S'agissant d'Umalis, le document de présentation du *market making program* et son *term sheet* signés par M. Leshem le 7 mai 2018, contresignés le 5 juillet 2018 par M. Person et modifiés par avenant du 18 octobre 2018, stipulaient *ex ante* un objectif de cours, fixé à « *12 €-14 € à un horizon de 12 mois* » et ce alors que son dernier cours s'élevait à 7,4 euros. Au demeurant, il y a lieu de relever les précisions du *term sheet* de *market making program* concernant la quantité de titres pouvant atteindre « *jusqu'à 200 000 actions ordinaires de la société pour un produit net total prévu pour la société de 600 000 euros* », ce qui implique un prix de vente de 10 euros au minimum. S'agissant de CIOA, la documentation de présentation du *market making program* signée par M. Leshem seul, en qualité de président de Grantchester Equity, fixait pour CIOA un objectif de cours de 5-6 euros sur une période de 12 mois alors que le cours du titre s'élevait le 18 septembre 2018 au prix de 2,80 euros. Par ailleurs, comme pour Umalis, le *term sheet* du *market making program,* signé par les deux parties, sans reprendre expressément l'objectif de cours défini dans la documentation, prévoyait une cession jusqu'à « *1.000.000 actions ordinaires de la société pour un produit net total prévu pour la société de 2.000.000 euros* », soit un prix de 6,60 euros environ correspondant à la rémunération de 30 % du produit de vente prévue au bénéfice du vendeur.

94. Il est ainsi établi que la mise en œuvre de ces programmes de liquidité a entraîné une forte hausse des volumes échangés ainsi qu'une augmentation des cours des titres, les investisseurs démarchés ayant ainsi été confortés dans leurs décisions d'investissement.

95. Au demeurant, l'efficacité du *market making program* sur la hausse du cours et des volumes échangés est particulièrement manifeste dans les cas d'Umalis et CIOA compte tenu de la baisse drastique des cours et des volumes de transactions constatée précisément dans les périodes de tensions rencontrées entre M. Leshem et M. Person d'une part au sujet de commissions non payées en espèces et en titres désignés « *bonus shares* », et entre M. Leshem et M. Lucide d'autre part concernant les tentatives de renégociation des commissions sollicitées par Grantchester Equity.

96. Au surplus, au regard du fonctionnement du *market making program*, il est avéré que les opérations de cession des titres Gour Medical effectuées par M. Goldner puis par Unimatrix, des titres Umalis effectuées par Edern, et des titres CIOA effectuées par Festival of Spirit Ltd, ne résultent pas, de la part de leur auteur, d'un réel intérêt vendeur mais visent à améliorer la liquidité et à obtenir une augmentation du cours des titres, respectivement, Gour Medical, Umalis et CIOA.

97. Il résulte de l'ensemble de ce qui précède l'existence en l'espèce d'un comportement caractérisé par la conception et la mise en œuvre d'un schéma manipulatoire appliqué de la même manière aux titres des trois sociétés en cause, que ce comportement résulte d'actions coordonnées d'un certain nombre d'acteurs en application d'une programmation définie à l'avance et que ce comportement s'est traduit par une augmentation artificielle de la liquidité des titres des sociétés provoquant la hausse artificielle du cours de ces titres, avec allocation du produit de leur vente, pour la plus grande part, aux concepteurs du schéma manipulatoire. Les faits de l'espèce répondent donc à la définition de la manipulation de marché figurant au ii) du a) de l'article 12.1 du Règlement MAR.



**1.2  Sur la manipulation de cours par indications fausses ou trompeuses sur l'offre, la demande, ou le cours des titres Gour Medical, Umalis et CIOA**

**1.2.1    Notifications de griefs**

98.   Selon les notifications des griefs, les sociétés Unimatrix, Edern et Festival of Spirit Ltd qui ont réalisé la majorité des ventes sur les périodes analysées, ainsi que M. Leshem, la société Grantchester Equity et la force de vente déployée ont adopté un comportement qui a donné au marché l'impression d'une liquidité disponible abondante, laquelle s'est vite révélée inexistante une fois la manipulation terminée. Elles exposent que ces comportements pourraient caractériser une manipulation de marché au sens de l'article 12.1 (a) (i) du Règlement MAR dans la mesure où les comportements décrits ont donné ou ont été susceptible de donner des indications fausses ou trompeuses en ce qui concerne l'offre, la demande ou le cours d'un instrument financier.

**1.2.2    Observations des mis en cause**

99.   Il a déjà été indiqué que M. Leshem, Grantchester Equity et M. Van Wylick n'ont formulé d'observations en réponse ni aux notifications de griefs ni au rapport du rapporteur. M. Van Wylick a répondu à la lettre circonstanciée qui lui a été adressée au cours de l'enquête, sans toutefois faire valoir d'élément relatif aux cas de manipulation de cours reprochés.

100.  Mme Planche n'a pas présenté d'observations concernant spécifiquement le manquement de manipulation de cours par indications fausses ou trompeuses. Elle conteste avoir participé à l'exécution et à la mise en place des programmes de liquidité.

**1.2.3    Textes applicables**

101.  Les faits reprochés aux mis en cause se sont déroulés entre mars 2018 et le 3 juin 2019 et seront donc examinés à la lumière des textes alors en vigueur.

102.  L'article 12 du Règlement MAR, entré en application le 3 juillet 2016, non modifié depuis, dispose : « *1. Aux fins du présent règlement, la notion de « manipulation de marché » couvre les activités suivantes : / a) effectuer une transaction, passer un ordre ou adopter tout autre comportement qui : / i) donne ou est susceptible de donner des indications fausses ou trompeuses en ce qui concerne l'offre, la demande ou le cours d'un instrument financier [...] ; [...] ; / à moins que la personne effectuant une transaction, passant un ordre ou adoptant tout autre comportement établisse qu'une telle transaction, un tel ordre ou un tel comportement a été réalisé pour des raisons légitimes et est conforme aux pratiques de marché admises telles qu'établies conformément à l'article 13* ».

103.  L'article 15 du Règlement MAR, entré en application le 3 juillet 2016, a déjà été reproduit au point 511.1.3 *supra*.

104.  L'indicateur visé au a) de l'annexe I A du Règlement MAR a déjà été reproduit au point 52 *supra*.

**1.2.4    Examen du grief**

105.  À titre préalable, il est rappelé que lorsque la poursuite soutient que les mêmes faits relèvent de la manipulation de marché au sens de l'article 12.1 du Règlement MAR et au titre de plusieurs dispositions de cet article les faits de l'espèce sont à nouveau analysés au regard des autres dispositions applicables, mais sans que la conclusion de cette analyse doive conduire à retenir, à l'égard des mis en cause, l'existence d'un manquement distinct.

106.  Il a été établi ci-dessus que l'indicateur prévu au a) de l'annexe I A du Règlement MAR est caractérisé.

107.  S'agissant de l'appréciation des faits de l'espèce au regard du i) du a) de l'article 12.1, il est renvoyé aux points *supra* s'agissant de l'analyse du comportement manipulatoire, identique pour les quatre cas présentés par la poursuite.

108.  Il sera seulement rappelé ici qu'au cœur du schéma manipulatoire, le concepteur du *market making program* a mis en place, dans les trois cas, une force de vente spécifique, déployée de manière proactive auprès de particuliers



investisseurs pour susciter de leur part, et indépendamment de toute justification économique, des ordres d'achat en (relativement) grand nombre, en organisant la rencontre, immédiatement et dans des quantités fortement comparables, de ces ordres d'achat avec des ordres de vente passés par les sociétés concernées, à savoir les *holdings* des dirigeants des sociétés et Unimatrix.

109.    Ce sont ces ordres d'achat et de ventes en grand nombre, survenant au cours de périodes précises, à propos de titres jusqu'alors caractérisés par une très faible liquidité, qui doivent être regardés comme « *susceptibles de donner des indications […] trompeuses en ce qui concerne l'offre, la demande ou le cours d'un instrument financier* » au sens du i) du a) de l'article 12.1. Ils étaient en effet de nature à inciter d'autres investisseurs, spécialement démarchés ou non et motivés par l'animation soudaine du marché, à se porter acquéreurs des titres en cause.

### 1.3    Sur la manipulation de cours par recours à des procédés fictifs ou à toute autre forme de tromperie ou d'artifice sur les titres Gour Medical, Umalis et CIOA

#### 1.3.1.    Notifications de griefs

110.    Selon les notifications de griefs, le schéma organisé par M. Leshem et déployé avec ses partenaires autour du *market making program* relève de la pratique de « *pump and dump* », et paraît également caractériser la manipulation de marché par recours à des procédés fictifs ou à toute autre forme de tromperie ou d'artifice au sens du b) de l'article 12.1 du Règlement MAR sur les titres Gour Medical, Umalis et CIOA.

111.    Elles se fondent de manière générale sur deux indicateurs, à savoir l'indicateur relatif à la diffusion de fausses informations avant ou après les transactions réalisées, et l'indicateur relatif à la diffusion ou la production de recommandations d'investissement fausses, biaisées ou influencées par un intérêt significatif avant ou après les transactions réalisées, prévus respectivement aux a) et b) de la section B de l'annexe I du Règlement MAR.

112.    Les notifications de griefs reprennent à ce sujet l'exposé des principes ainsi que de la méthode du *market making program* décrits dans la plaquette, rappelant que ce programme s'adressait à des sociétés cotées sur un marché faiblement liquide. Elles exposent la solution proposée qui consiste dans l'animation du marché par Grantchester Equity (génération de *leads*) *via* une prospection à grande échelle (par *emailing*, par campagne téléphonique ou par les réseaux sociaux) avec pour objectif d'attirer un nombre significatif d'investisseurs. Elles rappellent également les modalités de rémunération prévues par le *term sheet* et la quote-part de 70 % du produit de vente des titres sur le marché revenant à Grantchester et sa force de vente.

113.    Au titre de l'examen des indicateurs, les notifications des griefs relèvent d'abord l'efficacité de cette méthode en considération des effets sur le cours (chute immédiate) en cas de suspension des programmes sur les titres CIOA et Umalis au moment des tensions entre M. Leshem et MM. Person et Lucide respectivement. Elles relèvent ensuite la volonté de s'adresser à certains profils d'investisseurs, comme en témoignent les demandes d'accès aux sites internet CIOA et Umalis et leur traduction en allemand. Enfin, elles relèvent la diffusion par la force de vente déployée, soit le réseau de *brokers* animé par M. Leshem, de fausses informations afin d'inciter les particuliers, essentiellement allemands et autrichiens, à acheter des titres.

114.    Les notifications de griefs en déduisent que les transactions à la vente réalisées sur chacun des trois titres analysés, pour les périodes considérées, par Unimatrix, Edern et Festival of Spirit Ltd, ont été effectuées par des personnes qui sont liées à M. Leshem, à Grantchester Equity et à la force de vente mise en place, lesquels sont à l'origine de la diffusion de fausses informations et de recommandations d'investissement fausses ou manifestement influencées par un intérêt significatif dans la mesure où ils touchent plus de 70 % du profit de la vente des titres.

115.    Les notifications de griefs ajoutent que le schéma manipulatoire en cause correspond à la pratique de « *pump and dump* » au sens de l'annexe II section 2, 2 b) du règlement délégué (UE) n°2016/522 de la Commission du 17 décembre 2015 (ci-après, « **Règlement Délégué** »), qui précise l'indicateur prévu au b) de la section B de l'annexe I du Règlement MAR.



### 1.3.2.    Observations des mis en cause

116.    Il a déjà été indiqué que M. Leshem, Grantchester Equity et M. Van Wylick n'ont pas formulé d'observations en réponse aux notifications de griefs ni au rapport du rapporteur. Dans sa réponse à la lettre circonstanciée qui lui a été adressée au cours de l'enquête, M. Van Wylick conteste avoir été impliqué personnellement ou par le biais d'une de ses sociétés dans la production ou la diffusion de recommandations d'investissement fausses, biaisées ou manifestement influencées par un intérêt significatif.

117.    Mme Planche n'a pas présenté d'observations concernant spécifiquement le manquement de manipulation de cours par recours à des procédés fictifs ou à toute autre forme de tromperie ou d'artifice. Elle conteste avoir participé à l'exécution et à la mise en place des programmes de liquidité.

### 1.3.3.    Textes applicables

118.    Les faits reprochés aux mis en cause se sont déroulés entre mars 2018 et le 3 juin 2019 et seront donc examinés à la lumière des textes alors en vigueur.

119.    L'article 12 Règlement MAR, entré en application le 3 juillet 2016, non modifié depuis, dispose : « *1. Aux fins du présent règlement, la notion de « manipulation de marché » couvre les activités suivantes : / b) effectuer une transaction, passer un ordre ou effectuer toute autre activité ou adopter tout autre comportement influençant ou étant susceptible d'influencer le cours d'un ou de plusieurs instruments financiers* [...] *en ayant recours à des procédés fictifs ou à toute autre forme de tromperie ou d'artifice ;* [...] ».

120.    L'article 15 du Règlement MAR, entré en application le 3 juillet 2016, a déjà été reproduit au point 511.1.3 *supra*.

121.    La section B de l'annexe I du Règlement MAR relative aux « *Indicateurs de manipulations consistant à recourir à des procédés fictifs ou à toute autre forme de tromperie ou d'artifice* », dans la même version, énonce : « *Aux fins de l'application de l'article 12, paragraphe 1, point b), du présent règlement, et sans préjudice des formes de manipulations décrites au paragraphe 2 dudit article, les participants au marché et les autorités compétentes prennent en considération, lors de l'examen de transactions ou d'ordres, les indicateurs suivants, dont la liste n'est pas exhaustive et qui ne doivent pas pour autant être considérés comme constituant en soi une manipulation de marché : / a) si les ordres passés ou les transactions effectuées par des personnes sont précédés ou suivis de la diffusion d'informations fausses ou trompeuses par ces mêmes personnes ou des personnes qui leur sont liées ; et / b) si les ordres sont passés ou les transactions effectuées par des personnes avant ou après que celles-ci, ou des personnes qui leur sont liées, produisent ou diffusent des recommandations d'investissement qui sont fausses, biaisées ou manifestement influencées par un intérêt significatif.* »

122.    Le point 2 b) de la section 2 de l'annexe II du Règlement Délégué complétant le Règlement MAR porte sur la pratique de « *pump and dump* » parmi les « *Pratiques précisant l'indicateur décrit à l'annexe I, section B, point b), du règlement (UE) n°596/2014* », définie au point 4 c) de la section 1 de cette même annexe comme suit : « *c) fait de prendre une position longue sur un instrument financier* [...], *puis d'entreprendre d'autres activités d'achat et/ou de diffuser des informations positives trompeuses au sujet de l'instrument ou produit concerné dans le but de faire monter le cours de l'instrument financier* [...] *en attirant d'autres acheteurs. Lorsque le cours se situe à un niveau artificiellement élevé, la position longue détenue est liquidée - pratique généralement connue sous le nom de « pump and dump ».*

### 1.3.4.    Examen du grief

    ✓ *Sur les indicateurs*

123.    Les indicateurs prévus aux points a) et b) de l'annexe I B du Règlement MAR se rapportent aux informations fausses ou trompeuses ou, le cas échéant, à des recommandations d'investissement qui sont fausses, biaisées ou manifestement influencées par un intérêt significatif, émanant directement des personnes ayant effectué les transactions ou de personnes qui leur sont liées.



- 24 -



124. Afin de caractériser l'indicateur prévu au a) de l'annexe I B du Règlement MAR, il doit être démontré en premier lieu que les opérations de cession réalisées en l'espèce par Unimatrix, Edern et Festival of Spirit Ltd ont été effectuées après ou avant la diffusion d'informations fausses ou trompeuses. Il faut ensuite établir que ces informations ont été diffusées, par ces sociétés auteurs des transactions litigieuses ou des personnes qui leur sont liées.

125. Il ressort des courriels recueillis par M. Goldner ainsi que des réponses de la BAFIN et de la FMA communiquées aux enquêteurs qu'était mis en œuvre un démarchage téléphonique par des courtiers invitant des investisseurs privés à acheter des titres Gour Medical en raison notamment de l'entrée prochaine d'un investisseur au capital, avec la possibilité d'une hausse de cours vers 12 euros et de l'entrée au capital d'une grande société américaine pharmaceutique, à venir ou d'ores et déjà réalisée. L'existence d'informations fausses ou trompeuse diffusées sur le titre Gour Medical est donc établie.

126. S'agissant des titres Umalis et CIOA, les témoignages des particuliers investisseurs sont anonymes et moins détaillés puisqu'ils font seulement état de recommandations d'investir mais ils confirment le même mode opératoire, à savoir le démarchage agressif d'une « force de vente » déployée spécialement pour placer les titres en question.

127. Ensuite, la diffusion des informations en cause ne fait pas de doute au regard des pièces du dossier. Outre les témoignages mentionnés ci-dessus attestant du fait qu'elles ont été reçues, M. Leshem décrit la stratégie mise en œuvre par ses forces de vente dans un courriel du 24 octobre 2018 adressé à M. Lucide et à Mme Planche : il s'agit pour elles de *« vendre l'histoire encore et toujours »* aux clients démarchés, ce qui *« génère des ventes rapides »* et ceci sans qu'à aucun moment il ne donne d'élément vérifiable qui puisse s'intégrer dans cette histoire.

128. Enfin, s'agissant de la condition relative à la diffusion par des personnes liées aux auteurs des transactions litigieuses, il existe un faisceau d'indices montrant que la diffusion des informations sur le titre Gour Medical est bien reliée à Unimatrix, auteur des cessions sur ce titre. Le titre en question étant illiquide et n'étant suivi par aucun analyste en France ou à l'étranger (Allemagne notamment), la diffusion massive et ciblée dans le temps d'informations sur ce titre ne peut s'expliquer que par l'existence d'une stratégie manipulatoire. Il en est de même pour les titres Umalis et CIOA. Par ailleurs l'existence d'un lien entre la société Unimatrix, opérateur sur le titre Gour Medical dirigée par M. Van Wylick, et la manipulation opérée sur le titre Umalis est établie par le fait que M. Person, dirigeant de cette dernière, s'est acquitté en qualité de représentant d'Edern d'une facture émise par Global Capital Research, dirigée par M. Van Wylick. De même, ainsi que le mentionne le rapport d'enquête, l'existence d'une relation entre les sociétés Moelis Tech FZE et Unimatrix est établie par la conclusion entre elles d'un contrat pour des prestations de démarchage et l'existence de virements provenant de particuliers allemands démarchés pour acheter des titres Gour Medical, entre avril et décembre 2018.

129. Il résulte de ce qui précède que l'indicateur prévu au a) de l'annexe I B du Règlement MAR peut être considéré comme vérifié concernant les titres des sociétés en cause.

130. L'indicateur prévu au b) de l'annexe I B du Règlement MAR est relatif à l'existence de recommandations fausses, biaisées ou influencées par un intérêt significatif. Il suppose d'établir que les opérations de cession réalisées en l'espèce par Unimatrix, Edern et Festival of Spirit Ltd sont intervenues après que ces sociétés, ou des personnes qui leur sont liées, aient produit ou diffusé des recommandations d'investissement fausses, biaisées ou influencées par un intérêt significatif. Cet indicateur est illustré par la pratique mentionnée à l'annexe II section 2, 2 b) du Règlement Délégué, de *« pump and dump »* (ou « technique de la bouilloire »), à laquelle renvoient les notifications de griefs.

131. L'existence de recommandations fausses résulte des témoignages mentionnés ci-dessus, collectés par les autorités allemande et autrichienne homologues de l'AMF, et faisant état de recommandations formulées par de faux *brokers* pour inciter à acheter des titres Gour Medical, Umalis ou CIOA. De la même manière l'existence d'un intérêt significatif est caractérisée pour chacun des titres. Dans chaque cas en effet, il a été mis en évidence que 30 % du montant des ventes a été versé aux sociétés. La part restante, soit 70 % du montant des transactions litigieuses correspond à la rétribution prévue par le *market making program* exécuté sur les titres Gour Medical,



Umalis et CIOA. Il ressort ainsi du dossier que tous les acteurs précités qui diffusaient des informations - à l'instar des sociétés Moelis Tech et Kaya, lesquelles recevaient des virements de particuliers démarchés pour acheter des titres Gour Medical et Umalis, avaient bien un intérêt significatif au sens des dispositions relatives à l'indicateur.

132. S'agissant enfin des liens existant entre les *brokers* et les auteurs des transactions litigieuses, il ressort du dossier l'existence de flux des sociétés Umalis et Edern vers la société Global Capital Research et la société turque Kaya, lesquels, selon les déclarations de M. Person en audition, correspondaient au « *paiement des 70 %. C'était Miron, c'est lui qui nous envoie ces factures* ». M. Person a précisé à ce sujet que les factures émises pour des services de « *marketing et promotion* » provenaient de deux entités différentes car les centres d'appel n'étaient pas les mêmes. Il ne peut s'agir, en l'occurrence, que des plateformes d'appel mobilisées pour le démarchage. Concernant les transactions sur le titre CIOA, les éléments du dossier mettent en évidence que la société émiratie Moelis Tech FZE faisait du démarchage téléphonique et du *marketing*, et que Festival of Spirit EURL a procédé à plusieurs virements à son profit, intitulés « *Miron fact 1* [à 6] », pour règlement des factures correspondantes adressées à Festival of Spirit Ltd.

133. Concernant les transactions sur le titre Gour Medical, il ressort du dossier que la société Moelis Tech FZE était en lien avec Unimatrix, elle-même liée à M. Van Wylick et à Grantchester Equity, que Moelis Tech FZE s'occupait du démarchage et qu'il existe des virements de particuliers démarchés pour acquérir des titres Gour Medical, à destination de Moelis Tech FZE.

134.  Il résulte de ce qui précède que l'indicateur prévu au b) de l'annexe B au Règlement MAR est vérifié.

135. S'agissant de la pratique dite du « pump and dump » qui aux termes du point 2 b) de la section 2 de l'annexe II du Règlement Délégué vient illustrer cet indicateur du b) de l'annexe B de MAR, elle suppose de prendre une position longue sur un instrument financier, puis d'entreprendre d'autres activités d'achat et/ou de diffuser des informations positives trompeuses au sujet de l'instrument financier concerné dans le but de faire monter son cours en attirant d'autres acheteurs, et enfin de liquider la position longue détenue lorsque le cours se situe à un niveau artificiellement élevé.

136. En l'espèce Unimatrix a acquis 306 000 actions de Gour Medical entre le 16 mai et le 16 juillet 2018. Edern et Festival of Spirit Ltd, pour leur part, étaient actionnaires historiques respectifs d'Umalis et CIOA. Pour autant cette dernière situation de fait n'exclut pas la caractérisation d'une « prise d'une position longue » au sens de la règlementation relative à la pratique du « pump and dump ».

137. Au demeurant même si ni le Règlement MAR ni le Règlement Délégué n'apportent de précision sur la notion de « prise d'une position longue », un élément utile peut être tiré du règlement (UE) n° 236/2012 du Parlement européen et du Conseil du 14 mars 2012 sur la vente à découvert et certains aspects des contrats d'échange sur le risque de crédit, lequel définit ainsi la notion de position longue : « *toute position qui résulte de l'un ou l'autre des cas suivants : a) la détention d'une action émise par une entreprise ou d'un titre de créance émis par un émetteur souverain ; b) la conclusion d'une transaction qui crée un instrument financier ou établit un lien avec un instrument financier autre qu'un instrument visé au point a), lorsque l'effet ou l'un des effets de cette transaction est de conférer un avantage financier à la personne physique ou morale qui conclut ladite transaction en cas d'augmentation du prix ou de la valeur de l'action ou du titre de créance* ».

138. Ainsi et alors même que les dispositions précitées se rapportent à un objet différent de la pratique de « *pump and dump* », il est intéressant de noter que la position longue ainsi définie couvre la conclusion de transactions portant sur des instruments financiers dont l'un des effets de cette transaction est de conférer un avantage financier à la personne qui conclut ladite transaction en cas d'augmentation du prix ou de la valeur de l'action ou du titre de créance. En l'espèce tel est bien l'objet des transactions prévues dans le cadre du schéma manipulatoire, ces transactions devant bénéficier à la fois aux entités concernées par attribution d'une partie du produit des ventes et aux acteurs du schéma à titre de rémunération de leur intervention. Par ailleurs il a été exposé ci-dessus que la diffusion d'informations positives trompeuses est avérée sur les différents titres en cause.



139.  Enfin la liquidation de la position longue est bien intervenue dans chaque cas, à un niveau artificiellement élevé, conformément à la fois à la définition de la pratique du « *pump and dump* » et aux prévisions du schéma manipulatoire. Il résulte de ce qui précède l'existence en l'espèce d'une pratique de « *pump and dump* », laquelle vient conforter l'analyse portant sur la réunion des critères de l'indice mentionné au b) de l'annexe B du Règlement MAR.

140.  Toutefois un indicateur ne constituant pas en lui-même une manipulation de cours, il convient de déterminer si les comportements reprochés sont en l'espèce susceptibles de recevoir une telle qualification au sens de l'article 12.1 (b) du Règlement MAR.

✓  *Sur l'appréciation de la manipulation de cours par recours à des procédés fictifs ou à toute autre forme de tromperie ou d'artifice sur les titres Gour Medical, Umalis et CIOA*

141.  La démonstration du bien-fondé de cette appréciation en l'espèce découle largement des éléments apportés à propos des deux précédents cas de manipulation de cours. On rappellera seulement que l'exécution du *market making program* consiste en un démarchage téléphonique agressif avec la diffusion d'informations et de recommandations trompeuses qui donnent aux investisseurs l'envie d'acheter les titres des sociétés en cause en dehors de toute justification économique objective concernant ces sociétés. Par ailleurs l'objet du programme est de créer une illusion de liquidité abondante résultant de la rencontre entre la demande artificiellement créée par les démarchages et l'offre créée par les ordres de vente des dirigeants par le biais de leurs *holdings* patrimoniales et d'Unimatrix le cas échéant, cette situation devant elle-même renforcer la motivation des investisseurs pour acheter les titres.

142.  Il résulte de ce qui précède que la manipulation de cours des titres des sociétés concernées par recours à un procédé fictif ou toute autre forme de tromperie ou d'artifice au sens de l'article 12.1 (b) du Règlement MAR est caractérisée.

**1.4  Sur la manipulation de cours par construction d'une position dominante de nature à fixer les prix d'achat ou de vente des titres Gour Medical, Umalis et CIOA ou à créer des conditions de transaction inéquitables sur ces titres**

**1.4.1  Notifications de griefs**

143.  Les notifications de griefs exposent que le schéma mis en place et exécuté par Grantchester Equity et M. Leshem avec leurs partenaires paraît caractériser une manipulation de cours par construction d'une position dominante sur les marchés des titres des sociétés au sens de l'article 12.2 (a) du Règlement MAR. Elles relèvent qu'en suivant le protocole de vente décrit par M. Leshem, permettant de vendre les titres au fur et à mesure tout en facilitant la hausse des prix, les sociétés Unimatrix Ltd, Edern et Festival of Spirit Ltd se sont assurées une position dominante sur l'offre des titres des sociétés concernées pendant les périodes analysées.

144.  Selon les notifications de griefs adressées à Grantchester Equity et M. Leshem, ces derniers agissaient « *de concert* » avec Unimatrix, Edern et Festival of Spirit Ltd.

**1.4.2  Observations des mis en cause**

145.  Il est rappelé que M. Leshem, Grantchester Equity et M. Van Wylick n'ont ni formulé d'observations en réponse aux notifications de griefs ni au rapport du rapporteur, et que M. Van Wylick a répondu à la lettre circonstanciée qui lui a été adressée au cours de l'enquête, sans toutefois faire valoir d'élément relatif aux cas de manipulation de cours reprochés.

146.  Mme Planche fait valoir qu'elle ne s'est pas assuré une position dominante sur l'offre ou la demande d'un instrument financier.

- 27 -



### 1.4.3    Textes applicables

147.    Les faits reprochés aux mis en cause se sont déroulés entre mars 2018 et le 3 juin 2019 et seront donc examinés à la lumière des textes alors en vigueur.

148.    L'article 12 du Règlement MAR, entré en application le 3 juillet 2016, non modifié depuis, dispose : « *2. Les comportements suivants sont, entre autres, considérés comme des manipulations de marché : / a) le fait, pour une personne ou pour plusieurs personnes agissant de manière concertée, de s'assurer une position dominante sur l'offre ou la demande d'un instrument financier [...] avec pour effet, réel ou potentiel, la fixation directe ou indirecte des prix d'achat ou des prix de vente ou la création, réelle ou potentielle, d'autres conditions de transaction inéquitables ;* […] ».

149.    L'article 15 du Règlement MAR, entré en application le 3 juillet 2016, a déjà été reproduit au point 511.1.3 *supra*.

### 1.4.4    Examen du grief

150.    Le caractère illiquide du marché comme en l'espèce est de nature à faciliter la démonstration de la manipulation de cours par construction d'une position dominante en l'absence de carnet d'ordres du fait de la cotation au double *fixing*, les vendeurs se trouvant par construction en position dominante. Au surplus, au regard de leur qualité d'actionnaires largement majoritaires des sociétés concernées, M. Goldner, Edern et Festival of Spirit Ltd se trouvaient *de facto* dans une position dominante en cas de vente de leurs titres. Cette situation a été renforcée par l'exécution du *market making program* reposant sur la recherche et l'obtention par M. Goldner, Edern et Festival of Spirit Ltd d'engagements de *lock up* de la part des autres actionnaires de Gour Medical, Umalis et CIOA, de manière à raréfier le positionnement d'autres potentiels intervenants à la vente et d'être en mesure de contrôler l'émission de la plus large part des ordres émis à la vente, de sorte que les ordres de vente émis soient captés par la quasi-totalité des ordres d'achat passés.

151.    De surcroît, le caractère massif des transactions effectuées en exécution du *market making program* a déjà été relevé *supra*, les cessions effectuées par les actionnaires majoritaires ou le *Trustee* par rapport aux volumes échangés sur les périodes identifiées ayant représenté respectivement 81 % pour Unimatrix, 73 % sur la période 1 Umalis et 82 % sur la période 2 Umalis pour Edern, et 69 % sur la période 1 CIOA et 58 % sur la période 2 CIOA pour Festival of Spirit Ltd.

152.    Il résulte de ce qui précède que les personnes ayant exécuté le *market making program* en cédant leurs titres sur les marchés des trois titres concernés suivant les instructions de Grantchester Equity et M. Leshem, se sont, de manière concertée avec ces derniers, assurés une position dominante sur l'offre des titres des sociétés concernées. Il s'agit plus précisément de M. Goldner, Unimatrix et Grantchester Equity sur le titre Gour Medical, Edern et Grantchester Equity sur le titre Umalis, et Festival of Spirit Ltd et la famille Lucide, outre Grantchester Equity sur le titre CIOA.

153.    Il a d'ores et déjà été établi *supra* que le *market making program* avait eu pour effet une hausse du cours des titres des sociétés sur la durée du programme, outre l'amélioration de la liquidité, et ce sans préjudice de la connaissance par les dirigeants de ces sociétés de l'objectif du *market making program*.

154.    De surcroît, il a déjà été indiqué *supra* que le *market marking program* implique de vendre les titres des sociétés selon les instructions de M. Leshem, en fonction de l'arrivée des ordres d'achat sur le marché, de sorte que son exécution conduisait à une hausse graduelle du cours desdits titres.

155.    Au demeurant, il est rappelé que les cours des titres des sociétés ont connu des variations significatives à la hausse sur les périodes identifiées par l'effet de l'exécution du *market making program*.

156.    Par conséquent, la position dominante résultant de l'exécution du *market making program* par M. Goldner, Unimatrix, Edern et Festival of Spirit Ltd, vendeurs, en suivant les instructions de M. Leshem, a eu pour effet, réel ou potentiel, la fixation directe ou indirecte des prix d'achat ou des prix de vente des titres de Gour Medical, Umalis et CIOA.





157.    Le manquement de manipulation de cours par construction de position dominante de nature à fixer les prix d'achat ou de vente des titres des sociétés au sens de l'article 12.2 (a) du Règlement MAR est donc caractérisé.

*1.5    Caractérisation des manquements de manipulation de cours à l'égard des mis en cause*

### 1.5.1.    Notifications de griefs

158.    Les notifications de griefs développent l'appréciation de la situation pour chacun des mis en cause dans une partie consacrée à « *l'imputabilité* » des manquements de manipulation de cours qui expose la démonstration de la caractérisation desdits manquements à l'égard de Grantchester Equity, M. Leshem, M. Van Wylick et Mme Planche.

159.    Dans le cadre de l'appréciation de la situation de M. Leshem et de la société Grantchester Equity qu'il préside, les notifications de griefs relèvent que M. Leshem, avec Grantchester Equity, pourrait avoir été l'instigateur du schéma manipulatoire identifié par les enquêteurs. Elles retiennent que M. Leshem, en sa qualité de président de Grantchester Equity, a été en contact régulier avec les dirigeants des sociétés concernées pour la mise en place et l'exécution du *market making program*. Elles ajoutent que la documentation de Grantchester Equity prévoit les principes du programme en détaillant son mécanisme et les conditions nécessaires (volume, prix, durée, répartition du produit des ventes) afin de susciter des ordres d'achats auprès d'investisseurs sur les titres des sociétés grâce à une force de vente dédiée. Elles indiquent également que les modalités effectives des ventes des titres des dirigeants de ces sociétés ont été mises au point et organisées par Grantchester Equity et son président M. Leshem, lesquels ont piloté les forces de vente et maîtrisé le rythme des ventes, notamment, pour Umalis et CIOA, en suspendant l'exécution en présence d'impayés puis en relançant les campagnes de démarchage téléphonique. Les notifications de griefs exposent encore que l'ensemble des intervenants aurait été piloté par Grantchester Equity, qui aurait également organisé tout le circuit de paiement des factures adressées à Gour Medical, Umalis et CIOA par le biais de sociétés intermédiaires localisées en Turquie, à Chypre ou à Dubaï.

160.    Elles retiennent de plus que la stratégie potentiellement manipulatoire était élaborée par Grantchester Equity et M. Leshem, à titre personnel et en qualité de représentant de Grantchester Equity, qui se chargeaient également de sa mise en œuvre notamment en (i) prenant attache personnellement avec les dirigeants pour leur proposer une stratégie manipulatoire, (ii) intervenant directement sur le marché en vendant des titres Umalis ou indirectement en présentant au dirigeant de Gour Medical la société Unimatrix chargée de la vente des titres Gour Medical sur le marché et lui conseillant la stratégie de cession, notamment en passant des ordres *iceberg*, et (iii) pilotant les transferts de bénéfices retirés des ventes de titres durant les périodes manipulatoires grâce à la facturation vers des sociétés liées. Les notifications de griefs ajoutent qu'ils ont bénéficié économiquement des manipulations sur les titres Gour Medical et Umalis. Enfin, elles relèvent qu'au regard de leur implication et de leur mise en cause pour des faits similaires aux États-Unis et en Grande-Bretagne, ils ne pouvaient ignorer le caractère illicite de ces activités. Les notifications de griefs en concluent que Grantchester Equity et M. Leshem ont adopté un comportement constitutif de manipulations de cours, en méconnaissance des articles 12.1 a) et b) et 15 du Règlement MAR.

161.    Dans le cadre de l'appréciation de la situation de Mme Planche et de M. Van Wylick, les notifications de griefs relèvent qu'ils ont participé à la mise en œuvre du schéma manipulatoire identifié par les enquêteurs, mis au point par M. Leshem sur les titres des sociétés concernées. Elles en déduisent qu'ils ont adopté un comportement ayant contribué à des manipulations de cours, en méconnaissance des articles 12.1 a) et b) et 15 du Règlement MAR tels qu'éclairés par le considérant 39 du même règlement. Elles retiennent des critères similaires s'agissant de Mme Planche et M. Van Wylick tenant, d'une part, à leur connaissance de l'objectif poursuivi par le schéma en cause sur des valeurs qui sont, compte tenu du segment de marché, par nature illiquides, et, d'autre part, à leur concours actif à la mise en œuvre de ce schéma, ajoutant qu'ils ont pu retirer un bénéfice financier de ces opérations.

162.    Concernant la connaissance par M. Van Wylick de l'objectif poursuivi par le schéma manipulatoire identifié par les enquêteurs, la notification de griefs relève, tout d'abord, que M. Leshem avec lequel il était en relation l'a introduit auprès de M. Goldner. Ensuite, elle ajoute que M. Van Wylick ne pouvait ignorer le caractère potentiellement fictif ou anormal du prix des titres Gour Medical sur le marché dès lors que les titres acquis par Unimatrix hors marché auprès de M. Goldner l'avaient été à un prix fortement décoté par rapport au cours de l'époque avec une clause d'ajustement du prix à hauteur de 30 % du montant des titres. Par ailleurs, après avoir relevé sa qualité de



représentant d'Unimatrix, la notification de griefs rappelle que plusieurs contrats d'achat d'actions avec M. Goldner ont été conclus avant même que les titres Gour Medical commencent à être cédés dans le marché quand le flux acheteur est apparu. De même, un contrat avec Fauve Capital a été conclu portant sur des conseils en investissements sur des petites valeurs cotées en bourse dont l'objet était, selon la notification de griefs, artificiel dès lors que Mme Planche n'a fourni aucune sélection d'investissements ni analyse financière à Unimatrix, et que la rémunération de Fauve Capital était tributaire non pas du conseil en investissements mais du produit des ventes réalisées par Unimatrix. La notification de griefs relève également qu'ayant notamment facturé la *holding* de M. Person, Edern, *via* sa société Global Capital Research pour des services de « *marketing et promotion* », il avait manifestement connaissance des campagnes promotionnelles de démarchage téléphonique dont l'objet était de générer un flux acheteur. La notification de griefs relève encore qu'un contrat de relations investisseurs a été conclu par Unimatrix avec Moelis Tech FZE dont la rémunération correspondait à 50 % du montant des actions vendues grâce à Moelis Tech FZE.

163.    Concernant le concours actif de M. Van Wylick à la mise en œuvre du schéma en cause, la notification de griefs expose qu'il a joué un rôle essentiel par l'intermédiaire de ses sociétés Unimatrix et Global Capital Research. Plus précisément elle retient que, en premier lieu, Unimatrix est devenue l'intermédiaire unique en acquérant les titres auprès du dirigeant vendeur à un prix décoté de gré à gré (306 000 actions pour 443 900 euros) puis en les cédant au fil de l'eau sur le marché (entre le 5 juin et le 31 juillet 2018 pour 1 743 353 euros), son rôle se rapprochant de celui du *Trustee* décrit dans le document de présentation du *market making progam* concernant Gour Medical ; en deuxième lieu, par le biais du flux vendeur généré en cédant les titres Gour Medical, il a contribué à l'augmentation subséquente des prix et des volumes traités du fait de la rencontre avec le flux acheteur créé par la campagne de démarchage téléphonique ; en troisième lieu, l'implication de M. Van Wylick a été majeure dans le financement de la campagne de démarchage téléphonique et la circulation des flux financiers entre Unimatrix, Edern, Grantchester Equity, Global Capital Research, Mme Planche, Moelis Tech FZE et WhiteTree Capital, ces deux dernières sociétés étant liées à M. Leshem.

164.    Concernant la connaissance par Mme Planche de l'objectif poursuivi par le schéma manipulatoire identifié par les enquêteurs, la notification de griefs souligne, en premier lieu, sa qualité de professionnelle aguerrie des opérations financières et des marchés financiers, notamment au regard de ses fonctions au sein de GEM pour le compte duquel Mme Planche devait trouver et démarcher par courriel des sociétés cibles pour des financements PACEO (ou *equity line*) dans le monde entier. Elle ajoute, en deuxième lieu, que les opérations initiées étaient suivies par Mme Planche, ce qui est d'ailleurs confirmé par l'analyse de sa messagerie notamment sur ses échanges avec un prospect tunisien et une société roumaine. La notification de griefs relève, en troisième lieu, qu'en tant qu'« *acteur clé* » des *market making program* auprès de différents intermédiaires, autres que Grantchester Equity, dont la société allemande SGCI Gmbh, elle avait une parfaite connaissance des *market making programs* ainsi que des courriels échangés entre M. Leshem et les dirigeants des sociétés concernées sur son mécanisme, la facturation ainsi que des antécédents de M. Leshem qui avait été sanctionné par la *Securities and Exchange Commission* (SEC) dans le passé.

165.    Concernant le concours actif de Mme Planche à la mise en œuvre du schéma en cause, la notification de griefs relève qu'elle a, tout d'abord, utilisé la renommée de GEM pour démarcher et appâter les sociétés avec un possible investissement de GEM conditionné à une forte augmentation préalable de leur liquidité et de leur capitalisation boursière. Ensuite, elle relève que Mme Planche a introduit M. Leshem auprès des dirigeants des sociétés en le présentant comme capable de leur apporter de la liquidité, en toute connaissance de la stratégie potentiellement manipulatoire qu'il allait employer. Enfin et simultanément, la notification de griefs considère qu'elle continuait à s'impliquer sur certains aspects opérationnels ponctuels. Elle conclut que Mme Planche jouait un rôle majeur dans la phase d'amorçage du schéma.

### 1.5.2.    Observations des mis en cause

166.    Aucune observation en réponse aux notifications de griefs n'a été déposée de la part de M. Leshem, Grantchester Equity et M. Van Wylick. Dans sa réponse à la lettre circonstanciée qui lui a été adressée au cours de l'enquête, M. Van Wylick fait valoir qu'il n'a jamais été en contact direct ou indirect avec un investisseur. Il ajoute qu'il n'était pas informé de la nature du *market making program* et qu'il n'aurait jamais accepté de recevoir des actions ou d'effectuer des paiements s'il avait su. Il soutient qu'il a été naïf et n'a pas agi de mauvaise foi.



- 30 -



167.  Mme Planche allègue qu'aucun acte matériel réprimé par la réglementation applicable n'a été commis de son fait. Elle soutient que les justifications apportées pour démontrer ce concours sont factuellement inexactes et illogiques, juridiquement non fondées, contredites par les éléments qu'elle apporte s'agissant de la réalité des opérations des dirigeants, de sorte que son concours à la mise en œuvre du schéma n'est pas démontré et que le manquement n'est pas constitué la concernant.

168.  Mme Planche relève que la poursuite soutient que les dirigeants auraient agi uniquement parce qu'ils auraient souhaité conclure avec GEM un contrat « *d'Equity Line* », lui-même conditionné par leur participation à un programme de manipulation de cours. Or, elle affirme qu'aucun d'eux ne l'a sollicitée par la suite pour un investissement de GEM au capital des sociétés. Elle ajoute qu'il est en tout état de cause illogique de reprocher à un mis en cause d'avoir servi d'appât entre deux coauteurs d'un manquement boursier. Elle relève également l'intérêt personnel et direct des dirigeants, actionnaires ultra majoritaires des sociétés concernées, de mettre en œuvre le *market making program* leur ayant permis de céder une part significative de leurs participations illiquides avant d'expliquer les raisons pour lesquelles la liquidité n'est pas une condition préalable aux *equity lines* de GEM. Elle précise que son intérêt personnel réside dans la mise en place d'*equity line*s plutôt que dans la mise en relation avec des émetteurs.

169.  Par ailleurs, Mme Planche conteste la démonstration de sa prétendue connaissance de la stratégie manipulatoire de M. Leshem faisant valoir que les constats des enquêteurs ne sont pas établis dès lors que leur analyse sur son rôle d'acteur clé des *market making programs* est contredite par les preuves qu'ils produisent. Elle fait valoir que ses échanges, notamment avec une société roumaine, sur lesquels se fondent les enquêteurs ne se rapportent pas aux faits reprochés, dès lors que la proposition commerciale de GEM concerne des *equity lines*, non le *market making program*, de sorte qu'ils sont hors de propos.

170.  Mme Planche reprend factuellement les éléments de contexte des transactions réalisées dans le cadre du *market making program* pour démontrer que les programmes de liquidité n'avaient pas été mis en place pour répondre à son exigence mais à la demande des dirigeants des émetteurs. Elle soutient que M. Goldner n'envisageait pas de mettre en œuvre l'*equity line* proposée par GEM mais souhaitait réaliser une augmentation de capital, précisant que l'amélioration de la liquidité devait permettre de favoriser ses négociations avec les investisseurs potentiels contactés en vue de l'augmentation de capital. Par ailleurs, selon Mme Planche, M. Person souhaitait uniquement améliorer la liquidité sans mettre en place de contrat d'*equity line* qu'il a jugé trop peu favorable. S'agissant de M. Lucide, Mme Planche affirme que la mise en place du programme de liquidité résultait exclusivement de la volonté de ce dirigeant de céder sa participation illiquide et non d'une prétendue exigence de liquidité de GEM.

171.  Elle conteste également avoir la qualité de professionnelle aguerrie des marchés, faisant valoir qu'elle exerçait davantage une activité de commerciale dédiée exclusivement à un démarchage intensif d'émetteurs, sans jamais intervenir dans la mise en place technique et financière des *equity lines* de GEM.

172.  Elle rappelle qu'en application du principe de personnalité des peines seule la commission ou la tentative de manipulation de marché est réprimée, de sorte qu'elle ne peut être poursuivie pour des faits qu'elle n'a pas matériellement commis. Elle s'appuie à cet égard sur les termes du rapport d'enquête pour réfuter toute collaboration à la manipulation de cours en participant à son exécution. Elle ajoute que la notification de griefs s'appuie sur des actes qui relèvent du concept pénal de complicité, et fait valoir que le considérant 39 du Règlement MAR, lequel est d'ailleurs rédigé au conditionnel, n'a pas de force contraignante en droit français. Elle fait encore valoir qu'il est impossible de lui reprocher une manipulation de cours alors même que les trois dirigeants des sociétés concernées, qui ont directement participé à l'exécution du *market-making program*, sont désormais mis hors de cause de ce chef.

### 1.5.3.    Textes applicables

173.  Les faits reprochés, qui se sont déroulés entre mars 2018 et le 3 juin 2019, doivent être examinés au regard des textes alors applicables.

174.  Les articles 12 et 15 du Règlement MAR, entré en application le 3 juillet 2016, non modifiés depuis, ont déjà été reproduits *supra*.



175.  Le considérant 39 du Règlement MAR énonce que : « *Les interdictions d'abus de marché devraient également couvrir les personnes qui collaborent à un abus de marché. Pourraient figurer parmi ces personnes, à titre d'exemples non limitatifs, les courtiers élaborant et conseillant une stratégie de trading visant à commettre un abus de marché, les personnes encourageant une autre personne disposant d'informations privilégiées à les divulguer illicitement, ou encore les personnes développant des logiciels en collaboration avec un trader afin de faciliter un abus de marché* ».

### 1.5.4.    Examen du grief

176.  Les textes applicables concernent toute personne physique ou morale qui effectue ou tente d'effectuer une manipulation de cours, ce qui inclut non seulement l'initiateur de la manipulation, mais également, selon l'éclairage du considérant 39 du Règlement MAR cité ci-dessus, les personnes qui y collaborent.

177.  En l'espèce, les manquements de manipulation de cours sont reprochés par les notifications de griefs à MM. Leshem et Van Wylick ainsi qu'à Mme Planche au titre de leur responsabilité personnelle, indépendamment des entités auteurs des actes reprochés qu'ils président, soit respectivement : Grantchester Equity, d'une part, et Unimatrix et Global Capital Research, d'autre part, ainsi que Fauve Capital.

178.  Il convient d'apprécier ces manquements au regard du comportement personnel des mis en cause.

  ✓  *Examen de la situation de M. Leshem et de Grantchester Equity*

179.  S'agissant de la mise en œuvre du *market making program* sur les titres Gour Medical, il résulte des éléments du dossier que M. Leshem comme président de Grantchester Equity a, premièrement, transmis la documentation du programme à M. Goldner ainsi qu'il a été exposé *supra*. Deuxièmement, par le biais d'Unimatrix, il a coordonné et déterminé les modalités de cession des titres sur le marché dont il est établi qu'elles avaient été mises en œuvre en application du *market making program,* nonobstant l'absence de régularisation de la documentation. Il est rappelé à ce sujet que tant Mme Planche que M. Goldner ont déclaré qu'ils étaient incapables de distinguer Unimatrix de M. Leshem en qualité de président de Grantchester Equity. Troisièmement, il est avéré que M. Leshem en sa qualité de président de Grantchester Equity a reçu le 25 juillet 2018 la somme de 20 006,88 euros par virement de M. Van Wylick, dirigeant d'Unimatrix, ce qui correspond à un bénéfice économique.

180.  S'agissant de la mise en œuvre du *market making program* sur les titres Umalis, il résulte du dossier que M. Leshem ès-qualités de président de Grantchester Equity a, premièrement, adressé à M. Person la documentation de présentation du programme ainsi qu'un projet de *term sheet* du *market making program* signé par ses soins le 7 juin 2018 lequel a été contresigné par M. Person le 5 juillet 2018. Deuxièmement, il a coordonné et déterminé les modalités de cession des titres Umalis par Edern sur le marché, comme en atteste la signature de l'avenant au *term sheet* du 18 octobre 2019 confirmant la faculté pour Grantchester Equity d'indiquer le compte bancaire de toute société de son choix comme bénéficiaire des 70 % du produit de la vente des titres. De surcroît, il a été également établi qu'il donnait des instructions à M. Person sur les modalités de passages des ordres de vente, sollicitant même le transfert par Umalis des titres à vendre vers une société qui lui était liée, WhiteTree Capital, afin d'être en mesure de passer lui-même les ordres, ce qui a été le cas entre le 11 février et le 3 juin 2019, après que M. Person lui a communiqué ses codes d'accès au compte-titres d'Edern ouvert auprès de CACEIS. Troisièmement, M. Leshem, en sa qualité de président de Grantchester Equity a personnellement coordonné les conseillers en investissements et plus généralement la force de vente, comme l'illustre l'effet immédiat de la suspension du programme sur le cours du titre lors des tensions rencontrées entre lui et M. Person. Quatrièmement, il est établi que l'ensemble des intervenants ainsi que le circuit de paiement des factures adressées à Umalis ou Edern ont été pilotés selon ses instructions, comme en attestent notamment le règlement par Edern d'une facture datée du 24 septembre 2018 émise par Global Capital Research intitulée « Invoice GCR-MLUMG 001 – MIRON » d'un montant de 93 745 euros, Grantchester Equity ayant reçu deux virements d'un montant total de 19 000 euros de Global Capital Research. De même, les factures de la société turque Kaya reçues par Umalis ainsi que celles de Global Capital Research ont été payées, selon M. Person, au titre de la quote-part de 70 % du produit des ventes. Il résulte du dossier d'enquête qu'un contrat de *consulting* a d'ailleurs été conclu entre Grantchester Equity et WhiteTree Capital le 12 novembre 2018, avant que Grantchester Equity reçoive de la part de cette société la somme de 51 856,15 euros entre le 11 décembre 2018 et le 5 juin 2019.



Enfin, il a été exposé *supra* que Grantchester Equity n'a pas hésité à mettre en demeure Edern, par l'intermédiaire de son conseil, de lui régler la somme de 50 002 euros au titre du solde des factures de la société Kaya.

181. S'agissant de la mise en œuvre du *market making* program sur les titres CIOA, il a été établi, premièrement, que M. Leshem en qualité de président de Grantchester Equity a adressé à M. Lucide la documentation de présentation du *market making program* accompagnée d'un projet de *term sheet* daté du 4 septembre 2018. Deuxièmement, les forces de ventes et le rythme des ventes ont été coordonnés par lui, ainsi que le confirme l'effet puissant et immédiat de la suspension du programme sur le cours des titres CIOA. Troisièmement, les modalités de cession des titres CIOA par Festival of Spirit Ltd sur le marché ont été pilotées par M. Leshem en qualité de président de Grantchester Equity, celui-ci ayant, d'une part, œuvré pour trouver un accord avec un actionnaire minoritaire refusant de signer un engagement de conservation des titres, et d'autre part, demandé le transfert par Festival of Spirit Ltd de titres CIOA auprès de son *broker*, sans succès cependant. M. Leshem a également communiqué à M. Lucide des informations sur la manière de passer les ordres, notamment en quantités cachées, *via* la technique des ordres *iceberg*, après le refus de la famille Lucide de transférer les titres. Quatrièmement, l'ensemble des intervenants ainsi que le circuit de paiement des factures ont été cordonnés et pilotés par M. Leshem en qualité de président de Grantchester Equity, comme en attestent notamment les virements reçus par les sociétés Moelis Tech FZE et WhiteTree Capital entre le 3 octobre 2018 et le 9 janvier 2019 d'un montant total de 472 556 euros provenant de Festival of Spirit EURL, montant correspondant en partie aux 70 % des ventes nettes de titres CIOA par Festival of Spirit Ltd (675 109 euros) sur la période, conformément à la rémunération prévue aux termes du *market making program*.

182. Par conséquent, pour l'ensemble des titres des sociétés, il est établi non seulement que la stratégie du *market making program* a été élaborée par M. Leshem, en qualité de président de Grantchester Equity, mais encore que ce dernier a également participé à son exécution effective et à son contrôle, tout en retirant de l'ensemble de ces opérations un bénéfice économique substantiel.

183. Au demeurant, M. Leshem ayant réalisé matériellement l'ensemble des actes effectués par Grantchester Equity, tous deux ont le même degré d'implication dans les faits reprochés.

184. Au regard de ce qui précède, les manquements de manipulation de cours par fixation du cours des titres Gour Medical, Umalis et CIOA à un niveau anormal ou artificiel, par indications fausses ou trompeuses sur l'offre, la demande ou le cours de ces titres, par recours à des procédés fictifs ou à toute autre forme de tromperie ou d'artifice et par construction d'une position dominante de nature à fixer les prix d'achat et de vente de ces titres, sont caractérisés à l'égard de Grantchester Equity et de M. Leshem.

✓ *Examen de la situation de M. Van Wylick*

185. S'agissant de la mise en œuvre du schéma manipulatoire décrit ci-dessus, sur les titres Gour Medical, il a été établi *supra* qu'Unimatrix, présidée par M. Van Wylick, est intervenue comme *Trustee* au sens du document de présentation du *market making program* lors des acquisitions de 306 000 titres Gour Medical hors marché auprès de M. Goldner pour un prix décoté total de 443 900 euros, avant de les céder sur le marché conformément aux instructions de Grantchester Equity pour un montant brut de 1 743 353 euros. Par conséquent, M. Van Wylick, pour le compte d'Unimatrix, est directement intervenu sur le marché, pour générer le flux acheteur sur ces titres. Ensuite il a été exposé ci-avant que M. Van Wylick, pour le compte d'Unimatrix, est intervenu dans le cadre du financement du *market making program*, notamment par le versement de sommes au bénéfice de (i) WhiteTree Capital (société chypriote liée à M. Leshem également présente dans les dossiers Umalis et CIOA), à hauteur de 12 830 euros le 26 octobre 2018, (ii) Moelis Tech FZE entre le 7 juin et le 1er août 2018 à hauteur de 859 326, 42 euros au titre d'un contrat de conseil en investissements (rémunération de 50 % du montant des actions vendues grâce à son intervention), et (iii) Mme Planche à hauteur de 39 258,64 euros. À titre personnel, M. Van Wylick a également versé 20 006,88 euros à Grantchester Equity au titre d'une rémunération pour des conseils en investissements. Il en résulte que, M. Van Wylick, dirigeant d'Unimatrix, a concouru activement à la réalisation des manipulations de cours des titres Gour Medical.





186. L'explication avancée par M. Van Wylick, relative à la prétendue « naïveté » dont il fait état dans sa réponse à la lettre circonstanciée, est inopérante dès lors qu'il avait connaissance des conditions des transactions, en particulier des prix d'échange des titres, de sorte qu'il ne pouvait ignorer que le schéma opératoire dans lequel s'insérait son intervention reposait sur un mécanisme ayant pour objet d'impacter la formation du cours des titres Gour Medical sur le marché et d'induire en erreur les investisseurs potentiels sur leur liquidité.

187. Il en résulte que M. Van Wylick, dirigeant d'Unimatrix, doit être regardé comme ayant concouru activement et en connaissance de cause à la réalisation des manipulations de cours des titres Gour Medical.

188. S'agissant de la mise en œuvre du *market making program* sur les titres Umalis, il ressort du dossier que M. Van Wylick a joué un rôle majeur dans le financement de la campagne de démarchage et la circulation des flux financiers entre les protagonistes. Sa société Global Capital Research a en effet facturé Edern au titre de la rémunération de services de « *marketing & promotion* » pour un montant de 93 745 euros au titre de la période du 20 août au 24 septembre 2018, ce règlement correspondant en réalité, selon M. Person, au règlement de la quote-part de 70 % du produit de la vente des titres prévu par le programme. Par ailleurs il a fait virer par Global Capital Research la somme de 19 000 euros au profit de Grantchester Equity les 10 octobre et 22 novembre 2018 et il a viré personnellement 20 006,88 euros à Grantchester Equity.

189. Au regard de ce qui précède, M. Van Wylick doit être regardé comme ayant collaboré à la réalisation d'une manipulation de cours par fixation du cours des titres Gour Medical et Umalis à un niveau anormal ou artificiel, par indications fausses ou trompeuses sur l'offre, la demande ou le cours de ces titres, par recours à des procédés fictifs ou à toute autre forme de tromperie ou d'artifice et par construction d'une position dominante de nature à fixer les prix d'achat et de vente de ces titres. Le manquement est caractérisé à son égard.

✓ *Examen de la situation de Mme Planche*

190. Il résulte d'abord des éléments du dossier que Mme Planche disposait d'une expérience de plus de 8 ans au sein du fonds d'investissement GEM, dont elle gérait le bureau français à la date des faits. Il y a lieu d'en déduire qu'elle bénéficiait d'une bonne connaissance du fonctionnement des marchés financiers, de sorte qu'elle peut être qualifiée de professionnelle aguerrie en la matière.

191. S'agissant des faits de l'espèce, il a été exposé ci-dessus que Mme Planche a été à l'origine de l'introduction, auprès des trois dirigeants des sociétés concernées, de M. Leshem, instigateur du schéma opératoire constitutif de manipulation de cours.

192. Il ressort également du dossier que contrairement à ce qu'elle allègue, son intervention dans les trois cas de mise en œuvre de ce schéma ne s'est pas bornée à son activité d'apporteuse d'affaires mais a représenté un concours actif, en pleine connaissance de cause, au bon déroulement des opérations. Cette analyse découle dans chaque cas de la chronologie des faits.

193. S'agissant des opérations sur le titre Gour Medical, la mise en contact, en mars 2018, de M Leshem avec M. Goldner et la présentation à ce dernier du « *market making program* » a été suivie le 1er mai de la même année, par la signature par sa société Fauve Capital d'un contrat à conclure avec Unimatrix, la société de M Van Wylick, portant sur la fourniture de conseils en investissements contre une rémunération correspondant à 2,5 % du montant des ventes nettes effectivement réalisées. Ainsi qu'il a été exposé ci-dessus et comme le prévoyait le programme, Unimatrix a acquis auprès de M Goldner les actions de ce dernier dans Gour Medical et les a ensuite revendues sur le marché à un cours artificiellement élevé. Or concomitamment à ces ventes, entre le 28 juin et le 1er août 2018, Fauve Capital a reçu 39 258 euros, soit 2,3 % du montant des cessions réalisées par Unimatrix, conformément au contrat mentionné ci-dessus.

194. Enfin le 3 septembre 2018, Mme Planche a contacté M. Goldner en expliquant avoir constaté le retour à la liquidité du titre Gour Medical, et que de ce fait GEM (société qu'elle représentait en France, comme exposé ci-dessus) pouvait à présent considérer l'opportunité d'un investissement. Cette démarche atteste du fait qu'elle suivait de près les résultats de la manipulation.



195. S'agissant des opérations sur le titre Umalis, après la mise en contact de M. Leshem et de M. Person et la signature par eux de la documentation décrivant le déroulé des opérations, les ventes de titres sur le marché à un cours artificiellement élevé ont débuté le 5 septembre 2018. Le 26 septembre, Mme Planche recevait, conjointement avec M. Leshem, un courriel de M. Person indiquant que ce dernier était prêt à « *livrer 50 % du premier bonus en actions asap* ». Le 28 septembre 2018, par retour de ce courriel, Mme Planche adressait à M. Person les coordonnées bancaires du compte de Fauve Capital pour le virement de 5 000 titres Umalis. Le 22 octobre suivant, Edern recevait un contrat de *consulting* signé de Mme Planche, prévoyant la remise d'actions Umalis en rétribution de services de conseil. Ce contrat prévoyait notamment que Fauve Capital assisterait Edern pour « *développer la sensibilisation des investisseurs et la liquidité des actions de la société Umalis* » : or la poursuite d'un tel objectif était au cœur du schéma manipulatoire ci-dessus décrit. Manifestement Mme Planche jouait un rôle actif dans la mise en œuvre du *market making program*. Elle a par la suite relancé M Person pour activer le transfert de titres par ce dernier, à son profit comme à celui de M Leshem, en rémunération de services rendus.

196. S'agissant des opérations sur le titre CIOA, Mme Planche a, en septembre 2018, mis en relation M. Leshem avec M. Lucide en présentant le premier comme « *un acteur de l'écosystème GEM* », c'est à dire de la société américaine dont elle était la représentante en France et à propos de laquelle elle faisait miroiter, auprès des dirigeants des trois sociétés concernées, la possibilité de financement de leurs activités à condition que la liquidité de leurs titres s'améliore, ce qui était précisément l'objet du « *market making program* ». Du reste, dans son courriel du 24 octobre 2018 à M. Lucide, M. Leshem prend directement Mme Planche à témoin pour confirmer l'efficacité de ses conseillers en investissements pour générer des ventes rapides de titres.

197. Il est également établi que Mme Planche a été avertie par M. Person de la mise en cause de M. Leshem dans le cadre d'une procédure aux États-Unis devant la SEC concernant une manipulation de cours sur des *penny stocks*.

198. L'argument invoqué par Mme Planche sur le caractère plus avantageux de sa rémunération au titre des *equity lines*, à savoir une commission de 40 % représentant 80/90 % du chiffre d'affaires de Fauve Capital, comparée à sa rémunération d'apporteuse d'affaires dans le cadre des *market making programs,* à savoir une commission de 2,5 % du produit des cessions sur le marché, est sans incidence dès lors qu'elle pouvait souhaiter cumuler ces deux rémunérations. Au demeurant, la rémunération perçue au titre du *market making* program uniquement pour Gour Medical, à hauteur de 39 258,64 euros, représentait 3 % du chiffre d'affaires annuel de Fauve Capital, ce qui est significatif pour un seul des dossiers apportés. Mme Planche a cherché à bénéficier d'une rémunération significativement plus importante en demandant à la société Edern de signer un projet de contrat de *consulting* au titre de son intervention dans la manipulation du cours de l'action Umalis Group. En outre, à la différence de sa rémunération au titre des *equity lines* qui est indépendante du bénéfice réalisé par GEM sur les tirages, sa rémunération au titre du *market making program* est adossée à l'exécution du *market making program* dans la mesure où cette rémunération est corrélée au montant des titres vendus sur le marché.

199. Comme indiqué *supra*, le comportement manipulatoire résultant de l'exécution du *market making program* réside dans les interactions coordonnées des différents intervenants concernant notamment les engagements de *lock up* de la part des autres actionnaires historiques des sociétés concernées, le démarchage par des conseillers en investissements (« la force de vente » de Grantchester Equity et M. Leshem) dans le but de susciter des ordres d'achat des titres des sociétés, et la vente des titres de ces sociétés en suivant les instructions de M. Leshem afin que l'ensemble des ventes soient captées par les ordres d'achat suscités.

200. Il résulte de ce qui précède que le rôle de Mme Planche dans l'exécution de ce scénario n'a pas été seulement celui d'une apporteuse d'affaires ayant rendu possible le démarrage des opérations, mais qu'elle n'a cessé d'apporter par la suite son concours actif. Du reste, M. Person a déclaré en audition : « *La chef, c'est Aude Planche. À un moment elle a demandé un nombre précis de titres, c'est elle qui est à l'initiative de tout* ».

201. Par suite Mme Planche doit être regardée comme ayant collaboré à la réalisation d'une manipulation de cours par fixation du cours des titres Gour Medical, Umalis et CIOA à un niveau anormal ou artificiel, par indications fausses ou trompeuses sur l'offre, la demande ou le cours de ces titres, par recours à des procédés fictifs ou à toute autre forme de tromperie ou d'artifice et par construction d'une position dominante de nature à fixer les prix d'achat et de vente de ces titres. Le manquement est également caractérisé à son égard.



### 2. *Sur les griefs relatifs au non-respect de l'obligation de déclaration des opérations*

### 2.1 *Sur le grief notifié à M. Goldner*

#### 2.1.1 **Notification de griefs**

202.    Il est fait grief à M. Goldner d'avoir déclaré avec retard et de façon erronée les opérations de ventes de gré à gré de 306 000 titres Gour Medical à Unimatrix réalisées entre le 16 mai 2018 et le 16 juillet 2018, dont le montant excède le seuil de 20 000 euros, en méconnaissance des dispositions des articles 19 du Règlement MAR, L. 621-18-2 du code monétaire et financier et 223-23 du RGAMF.

203.    Après avoir rappelé le déroulement et le contexte des opérations de cession en cause au regard du schéma manipulatoire, la notification de griefs expose que les obligations de déclaration imposant aux personnes exerçant des responsabilités dirigeantes et aux personnes ayant un lien étroit avec elles de notifier à l'émetteur et à l'AMF toute transaction effectuée pour leur compte propre dans le délai de trois jours ouvrés suivant la date de transaction, étaient applicables à M. Goldner en sa qualité de président directeur général de Gour Medical à l'époque des faits. La notification de griefs relève que les dates de transaction renseignées dans les notifications envoyées à l'AMF diffèrent de plusieurs jours voire de plusieurs semaines avec les dates de livraison des titres à Unimatrix telles qu'elles ressortent des relevés du compte d'Unimatrix chez VP Bank. Elle relève également que les dates de notification à l'AMF ne respectent pas l'obligation réglementaire de trois jours ouvrés.

204.    Elle indique également que la violation de cette obligation déclarative est d'autant plus grave qu'en s'abstenant de notifier à l'AMF les transactions réalisées sur le titre Gour Medical, M. Goldner a facilité la mise en place et l'exécution du schéma potentiellement manipulatoire mis au point par M. Leshem sur ce titre. Elle ajoute que la mise en place et l'exécution du schéma manipulatoire a été facilitée et permise par la décision prise par M. Goldner de vendre à Unimatrix un nombre important de titres Gour Medical qu'il savait destinés à être revendus sur le marché en acceptant de céder 70 % de leur valeur de marché et de n'en percevoir que 30 %. Selon la notification de griefs, M. Goldner connaissait le caractère artificiel du prix des transactions réalisées avec Unimatrix et était en mesure de suspecter qu'une telle opération fût répréhensible par l'AMF. Elle fait état d'un bénéfice financier de 515 686 euros reçu d'Unimatrix par M. Goldner, précisant que ce dernier a lui-même viré un montant net de 160 700 euros sur un compte courant de Gour Medical.

#### 2.1.2 **Observations du mis en cause**

205.    M. Goldner ne conteste pas le caractère tardif des déclarations des transactions effectuées sur le titre Gour Medical mais fait valoir qu'elles ont été effectuées au cours de la période litigieuse. Il soutient avoir différé la notification des transactions en raison du risque de non-paiement par Unimatrix, précisant que les transactions en cause étaient affectées d'un délai de paiement de 30 jours au bénéfice de cette dernière. Il ajoute qu'il s'agit de manquements techniques qu'il n'a jamais commis par le passé ni réitéré et dont il n'a retiré aucun profit. Selon lui, ces manquements n'ont eu aucun effet direct ou indirect dans la fraude par ailleurs poursuivie envers d'autres personnes.

206.    Il conteste les circonstances aggravantes mentionnées dans la notification de griefs concernant sa participation au schéma potentiellement manipulatoire, selon lui dépourvues de fondement en droit comme en fait. Invoquant le principe de légalité et de prévisibilité de la sanction, il fait valoir que la règlementation applicable en l'espèce ne prévoit pas la possibilité de circonstance aggravante. Il soutient en outre que les cessions de gré à gré effectuées au bénéfice d'Unimatrix n'impliquaient pas sa connaissance du schéma manipulatoire entrepris par M. Leshem et les personnes liées à lui, faisant valoir qu'il n'a pas signé le contrat de *market making program* mais uniquement des contrats de cession dont la nature se distingue du contrat de liquidité. Il soutient également que ses déclarations sur le caractère artificiel du prix doivent être replacées dans leur contexte. Il affirme encore qu'il a été victime d'une mise en scène destinée à le tromper et à surprendre son consentement et qu'il ne peut ni se voir reprocher la complicité d'une infraction qu'il ignorait, ni se voir imputer des obligations d'investigations et de compliance qu'aucun texte ne prévoit.



### 2.1.3    Textes applicables

207. Les opérations litigieuses se sont déroulées du 16 mai 2018 au 16 juillet 2018, de sorte que les faits reprochés seront examinés à la lumière des textes alors applicables.

208. L'article 19 du Règlement MAR, entré en application le 3 juillet 2016, non modifié depuis sur ces points, dispose : « *1. Les personnes exerçant des responsabilités dirigeantes et les personnes ayant un lien étroit avec elles notifient à l'émetteur* […] *et à l'autorité compétente visée au deuxième alinéa du paragraphe 2 :* / a) *en ce qui concerne les émetteurs, toute transaction effectuée pour leur compte propre et se rapportant aux actions ou à des titres de créance dudit émetteur, ou à des instruments dérivés ou à d'autres instruments financiers qui leur sont liés ;* […] / *Ces notifications sont effectuées rapidement et au plus tard trois jours ouvrés après la date de la transaction.* […] / 8. *Le paragraphe 1 s'applique à toutes les transactions ultérieures une fois le montant total de 5 000 EUR atteint au cours d'une année civile. Le seuil de 5 000 EUR est calculé en ajoutant sans compensation toutes les transactions visées au paragraphe 1.* / 9. *Une autorité compétente peut décider de porter le seuil énoncé au paragraphe 8 à 20 000 EUR et informe l'AEMF de sa décision d'adopter un seuil plus élevé et des motifs de sa décision, en faisant spécifiquement référence aux conditions du marché, préalablement à son application. L'AEMF publie sur son site internet la liste des seuils qui s'appliquent conformément au présent article et les justifications fournies par les autorités compétentes concernant ces seuils.* »

209. L'article 3 (1) paragraphe 25 du Règlement MAR, entré en application le 3 juillet 2016, prévoit : « *1. Aux fins du présent règlement, on entend par :* […] / 25) « *personne exerçant des responsabilités dirigeantes* » : *une personne au sein d'un émetteur* […] *qui est :* / a) *un membre de l'organe d'administration, de gestion ou de surveillance de cette entité ;* […] ».

210. L'article L. 621-18-2 du code monétaire et financier, dans sa version en vigueur depuis le 3 juillet 2016, dispose : « *I. - Sont communiquées par les personnes mentionnées aux a à c à l'Autorité des marchés financiers et rendues publiques par cette dernière, dans les conditions mentionnées par le règlement (UE) n° 596/2014 du Parlement européen et du Conseil du 16 avril 2014 sur les abus de marché (règlement relatif aux abus de marché) et abrogeant la directive 2003/6/CE du Parlement européen et du Conseil et les directives 2003/124/CE, 2003/125/CE et 2004/72/CE de la Commission, les opérations mentionnées à l'article 19 du même règlement, lorsque ces opérations sont réalisées par :* / a) *Les membres du conseil d'administration, du directoire, du conseil de surveillance, le directeur général, le directeur général unique, le directeur général délégué ou le gérant de cette personne ;* / b) *Toute autre personne qui, dans les conditions définies par le règlement général de l'Autorité des marchés financiers a, d'une part, au sein de l'émetteur, le pouvoir de prendre des décisions de gestion concernant son évolution et sa stratégie, et d'autre part, un accès régulier à des informations privilégiées concernant directement ou indirectement cet émetteur ;* / c) *Des personnes ayant, dans les conditions définies par décret en Conseil d'État, des liens personnels étroits avec les personnes mentionnées aux a et b.* […] / *Le règlement général de l'Autorité des marchés financiers fixe le seuil au-dessus duquel les opérations doivent être communiquées et les modalités d'application de ce seuil* ».

211. L'article 223-23 du RGAMF, dans sa version en vigueur depuis le 20 novembre 2017, dispose : « *Conformément au dernier alinéa de l'article L.621-18-2 du code monétaire et financier, ne donnent pas lieu à déclaration les opérations réalisées par une personne mentionnée à l'article précité lorsque le montant cumulé desdites opérations n'excède pas 20 000 euros pour l'année civile en cours.* ».

### 2.1.4    Examen du grief

212. Il résulte de la lecture combinée des textes cités ci-dessus que le président directeur général d'un émetteur doit déclarer toute transaction effectuée pour son compte propre et se rapportant aux actions ou à des titres de créance dudit émetteur dans les trois jours ouvrés suivant la date de la transaction, les transactions visées étant celles dont le montant cumulé excède 20 000 euros pour l'année civile en cours.



213.    Le manquement à ces dispositions ne requiert pas la démonstration d'un élément intentionnel ni l'existence d'un
        profit.

214.    En l'espèce, M. Goldner est président directeur général de Gour Medical depuis 2017. En sa qualité de membre de
        l'organe d'administration et de gestion de Gour Medical, il était donc, au moment des faits reprochés, tenu de
        déclarer ses opérations effectuées sur le titre Gour Medical excédant le seuil de 20 000 euros pour l'année civile
        en cours dans les trois jours ouvrés suivant la date des transactions.

215.    Il est établi par les éléments du dossier et non contesté par M. Goldner que celui-ci a vendu 306 000 titres Gour
        Medical de gré à gré à Unimatrix entre le 16 mai et le 16 juillet 2018, et que ces opérations, qui excédaient ensemble
        le seuil réglementaire de 20 000 euros, ont été notifiées hors délai.

216.    La circonstance, invoquée par le mis en cause, que les notifications sont intervenues pendant la période litigieuse
        est à cet égard indifférente s'agissant de la caractérisation du manquement, de même que son argument selon
        lequel ses déclarations tardives n'ont pas concouru au schéma manipulatoire. L'argument de M. Goldner relatif au
        risque de non-paiement du prix par Unimatrix pour justifier le différé de la notification des transactions est également
        inopérant dès lors que le transfert de propriété de titres financiers résulte de leur inscription au compte-titres de
        l'acquéreur conformément à l'article L. 211-17 du code monétaire et financier, de sorte que la vente de titres, qui
        génère les obligations de déclaration, est parfaite indépendamment du paiement du prix.

217.    Ainsi, en procédant tardivement aux déclarations des transactions réalisées entre le 16 mai 2018 et 16 juillet 2018
        sur 306 000 titres Gour Medical dont les montants excèdent 20 000 euros, M. Goldner n'a pas satisfait aux
        obligations déclaratives imposées par la règlementation.

218.    Par conséquent, le manquement relatif au non-respect par M. Goldner de l'obligation de déclaration des
        transactions, prévue aux articles 19 du Règlement MAR, L. 621-18-2 du code monétaire et financier et 223-23 du
        RGAMF, est caractérisé.

### 2.2    Sur le grief notifié à M. Person

#### 2.2.1    Notification de griefs

219.    Il est fait grief à M. Person de ne pas avoir déclaré les opérations de vente de 108 467 titres Umalis, réalisées entre
        le 5 septembre 2018 et le 27 novembre 2018, puis entre le 3 février 2019 et le 3 juin 2019 *via* sa *holding* personnelle
        Edern, dont le montant excède 20 000 euros, en méconnaissance des dispositions des articles 19 du
        Règlement MAR, L. 621-18-2 du code monétaire et financier et 223-23 du RGAMF.

220.    La notification de griefs rappelle d'abord le déroulement et le contexte de ces opérations de vente au regard du
        schéma manipulatoire en cause. Ensuite, elle relève que M. Person avait la qualité de président directeur général
        d'Umalis à l'époque des faits et qu'il est président de la société Edern, sa *holding* personnelle pour laquelle il est
        intervenu en tant que donneur d'ordres pour les ventes de titres concernées. Elle en déduit que les obligations de
        déclaration imposant aux personnes exerçant des responsabilités dirigeantes et aux personnes ayant un lien étroit
        avec elles de notifier à l'émetteur et à l'AMF toute transaction effectuée pour leur compte propre, dans le délai de
        trois jours ouvrés suivant la date de transaction, sont applicables à Edern. La notification de griefs précise que
        M. Person, en sa qualité de dirigeant de la personne morale concernée, est également soumis à cette obligation.

221.    Elle relève en outre qu'il ressort du rapport d'enquête que M. Person a procédé, *via* sa *holding* personnelle Edern,
        à la vente de 50 133 titres Umalis pour un montant de l'ordre de 434 700 euros entre le 5 septembre 2018 et le
        27 novembre 2018. Elle indique que le seuil de 20 000 euros déclencheur de l'obligation de déclaration a été franchi
        le 10 septembre 2018. Elle relève encore que Edern a vendu 58 334 titres Umalis pour un montant de l'ordre de
        420 400 euros entre le 11 février 2019 et le 3 juin 2019. Selon la notification de griefs, ces transactions auraient dû
        être notifiées à l'AMF à partir du 10 septembre 2018, puis entre le 11 février et le 3 juin 2019, ce qui n'a pas été
        fait.



222. Enfin, la notification de griefs expose que la violation de cette obligation déclarative est d'autant plus grave qu'en la commettant, M. Person a facilité la mise en place et l'exécution du schéma potentiellement manipulatoire mis au point par M. Leshem sur le titre Umalis. Elle indique qu'en décidant de vendre un volume important de titres Umalis, soit directement sur le marché, soit indirectement en donnant les codes de son compte CACEIS à M. Leshem pour que celui-ci effectue directement les ventes, et en acceptant de céder 70 % de leur valeur de marché alors qu'il connaissait les antécédents de M. Leshem avec la SEC relatifs à des manipulations de cours sur des *penny stocks*, M. Person a permis la mise en place et l'exécution de ce schéma manipulatoire dont il a pu retirer un bénéfice financier. Elle ajoute que 239 000 euros net ont été perçus par Edern au terme des deux périodes de ventes analysées, ce montant ayant été vraisemblablement réinvesti par M. Person en totalité dans le compte-courant d'Umalis ouvert dans les livres d'Edern.

### 2.2.2   Observations du mis en cause

223. M. Person ne conteste pas le manquement déclaratif qui lui est reproché. Il fait valoir que ce manquement ne justifie pas le prononcé d'une sanction à son encontre dès lors qu'il est de bonne foi. Il précise qu'il ignorait, à tort, les obligations lui incombant dans ce domaine. Il indique également avoir toujours coopéré avec l'AMF dans le cadre de l'enquête.

224. Il conteste en revanche les éléments exposés par la poursuite au titre des cas de manipulation de cours qui sont par nature extérieurs aux manquements déclaratifs notifiés. Selon lui, aucune manipulation de cours ne peut lui être reprochée ni constituer une circonstance aggravante du manquement déclaratif.

225. À cet égard, il relève en premier lieu, s'agissant de la mise en place d'un objectif à la hausse *ex ante* sans aucune justification économique sous-jacente, que cet objectif, qui ne lui paraissait pas excessif, était seulement mentionné par M. Leshem dans le *term sheet* qu'il a adressé à M. Person. Il ajoute que Grantchester Equity était « confortable » avec cette hypothèse non contraignante à son égard, ses obligations étant déconnectées de la valeur de cours. En deuxième lieu, M. Person soutient qu'Edern s'est bornée à vendre les titres Umalis qu'elle détenait afin de répondre aux demandes de marché, ajoutant qu'il avait donné accès à M. Leshem, à sa demande, à son compte chez CACEIS pour lui permettre de procéder directement aux ventes des titres Umalis et d'être directement réglé des sommes lui revenant. En troisième lieu, M. Person affirme que les indices de manipulation de marché ne sont pas susceptibles de caractériser une faute à son encontre dès lors que la très forte variation des cours n'est pas caractérisée sur la période d'exécution du programme entendue comme la période de septembre 2018 à fin mai 2019 (0,06 %), et que le cours d'Umalis de 7,40 euros à fin mai 2019 n'a rien d'anormal au regard de son estimation à 10,40 euros lors de son introduction en bourse en 2014 et de sa valorisation entre 8 euros et 6,50 euros entre fin 2014 et mi-2018. S'agissant de l'indicateur relatif à la proportion importante du volume quotidien de transactions réalisées sur le titre Umalis, M. Person fait valoir que la forte baisse de liquidité observée par les enquêteurs après la forte augmentation des volumes échangés résulte d'une lecture orientée de leur part en considération, par exemple, du volume de titres échangés entre le 5 janvier 2021 et 31 mars 2021 (1 081) comparable aux volumes échangés pendant les périodes manipulatoires retenues. Il soutient également avoir souhaité limiter à 20 % du capital la quotité mise à disposition de Grantchester Equity alors que M. Leshem avait sollicité 100 % dans le *term sheet* du 6 juin 2018. M. Person relève au surplus que la traduction du site d'Umalis en allemand s'inscrit dans la logique de développement de la société, à l'instar des traductions en anglais ou en arabe qui n'ont pas fait l'objet de commentaires de la part des enquêteurs. Il affirme encore qu'aucune précision n'est donnée sur la nature des informations fausses ou trompeuses, et il n'est pas démontré qu'il serait à l'origine de la diffusion de telles informations. M. Person relève aussi la licéité d'une part, de la rémunération au titre du *market making program* portée à la connaissance de CIC et de la direction des opérations chez CACEIS Corporate Trust, et d'autre part, du règlement des factures émises par des sociétés tierces dans le cadre de l'exécution du *market making program*.

226. Par ailleurs, il fait valoir le caractère disproportionné d'une éventuelle sanction à son encontre en l'absence d'avantage retiré des opérations en cause, qui ont porté sur une faible part du capital social d'Umalis. Il ajoute que l'absence de déclaration et la déclaration rectificative du 17 janvier 2022 n'ont eu aucun effet sur le cours du titre Umalis et son carnet d'ordres. Selon lui, les manquements déclaratifs qui lui sont notifiés ne revêtent pas de gravité particulière dès lors que l'absence de déclaration des cessions effectuées par la société Edern n'a pas véritablement établi un doute quant à l'identité du cédant et n'a pas faussé la perception des investisseurs quant à la situation réelle de l'émetteur. Il relève encore qu'il n'a retiré aucun avantage personnel ni profit des manquements





qui lui sont reprochés, qu'il n'a pas commis de précédents manquements sanctionnés par la commission des
sanctions et a pleinement coopéré au cours de la procédure.

### 2.2.3    Textes applicables

227.    Les opérations litigieuses se sont déroulées du 5 septembre 2018 au 27 novembre 2018 puis du 11 février 2019
au 3 juin 2019, de sorte que les faits reprochés seront examinés à la lumière des textes alors applicables, sous
réserve de l'application rétroactive de dispositions moins sévères entrées en vigueur postérieurement.

228.    Les articles 19 et 3 (1) paragraphe 25 du Règlement MAR, L. 621-18-2 du code monétaire et financier et
223-23 du RGAMF, dans leurs versions applicables en l'espèce, ont déjà été reproduits *supra*.

229.    L'article 3 (1) paragraphe 26 du Règlement MAR, entré en application le 3 juillet 2016, non modifié depuis sur ces
points, dispose : « *1. Aux fins du présent règlement, on entend par : […] / 26) « personne étroitement liée » : :[…] /
d) une personne morale, un trust ou une fiducie, ou un partenariat, dont les responsabilités dirigeantes sont
exercées par une personne exerçant des responsabilités dirigeantes ou par une personne visée aux points a), b)
et c), qui est directement ou indirectement contrôlé(e) par cette personne, qui a été constitué(e) au bénéfice de
cette personne, ou dont les intérêts économiques sont substantiellement équivalents à ceux de cette personne ;
[…]* ».

230.    L'article R. 621-43-1 du code monétaire et financier, dans sa version en vigueur du 5 mars 2006 au 5 juillet 2018,
dispose : « *Les personnes mentionnées au c de l'article L. 621-18-2, qui ont des liens personnels étroits avec l'une
des personnes mentionnées aux a ou b du même article, sont : […] / 4° Toute personne morale ou entité, autre que
la personne mentionnée au premier alinéa de l'article L. 621-18-2, constituée sur le fondement du droit français ou
d'un droit étranger, et : / a) Dont la direction, l'administration ou la gestion est assurée par l'une des personnes
mentionnées aux a et b de l'article L. 621-18-2 ou par l'une des personnes mentionnées aux 1°, 2° ou 3° et agissant
dans l'intérêt de l'une de ces personnes ; / b) Ou qui est contrôlée, directement ou indirectement, au sens de l'article
L. 233-3 du code de commerce, par l'une des personnes mentionnées aux a et b de l'article L. 621-18-2 ou par
l'une des personnes mentionnées aux 1°, 2° 3° […]* ».

231.    Depuis le 6 juillet 2018, les termes « *et agissant dans l'intérêt de l'une de ces personnes* » ont été supprimés du a)
du 4° de l'article R. 621-43-1 précité du code monétaire et financier. Les dispositions plus récentes de l'article
R. 621-43-1 du code monétaire et financier n'étant pas moins sévères que les précédentes, il n'y a pas lieu de les
appliquer rétroactivement.

232.    L'article 221-1 du RGAMF, dans sa version en vigueur depuis le 24 décembre 2017, non modifiée depuis sur ce
point, dispose en son dernier alinéa : « *[…] Les dispositions du présent titre [titre II du livre II] sont également
applicables aux dirigeants de l'émetteur, de l'entité ou de la personne morale concernés.* ».

### 2.2.4    Examen du grief

233.    Il résulte de la lecture combinée des textes cités ci-dessus que les personnes exerçant des responsabilités
dirigeantes et les personnes ayant un lien étroit avec elles sont tenues de déclarer à l'AMF toute transaction
effectuée pour leur compte propre et se rapportant aux actions de l'émetteur dans un délai de trois jours ouvrés
après la date de transaction, les transactions visées étant celles dont le montant cumulé excède 20 000 euros pour
l'année civile en cours. La notion de personne étroitement liée avec des personnes exerçant des responsabilités
dirigeantes vise toute personne morale ou entité dont la direction, l'administration ou la gestion est assurée par ces
dernières.

234.    En outre, en application de l'article 19.7 (b) du Règlement MAR, entré en application le 3 juillet 2016, les
transactions à notifier par les personnes exerçant des responsabilités dirigeantes ou les personnes qui leur sont
étroitement liées incluent « *les transactions effectuées par des personnes qui organisent ou exécutent des
transactions à titre professionnel ou par une autre personne au nom d'une personne exerçant des responsabilités
dirigeantes ou d'une personne qui lui est étroitement liée, telle que visée au paragraphe 1, y compris lorsqu'un
pouvoir discrétionnaire est exercé* ».

- 40 -



235.  En l'espèce, M. Person était au moment des opérations de vente litigieuses président directeur général d'Umalis et président d'Edern, sa *holding* personnelle qu'il détient intégralement. Il s'ensuit qu'Edern, en tant que personne étroitement liée à M. Person exerçant des responsabilités dirigeantes au sein d'Umalis, était soumise aux obligations de déclaration prévues aux articles 19 du Règlement MAR, L. 621-18-2 du code monétaire et financier, et 223-23 du RGAMF.

236.  La circonstance invoquée par M. Person selon laquelle il aurait donné les codes de son compte CACEIS à M. Leshem pour que ce dernier effectue directement les ventes de titres Umalis à partir du 11 février 2019 est sans incidence sur l'obligation de déclaration des transactions en cause incombant à Edern, conformément à l'article 19 (7) du Règlement MAR.

237.  S'agissant des opérations en cause, il ressort du dossier que Edern a vendu 50 133 titres Umalis entre le 5 septembre et le 27 novembre 2018 pour un montant brut de 434 714 euros, le seuil réglementaire de 20 000 euros ayant été dépassé le 10 septembre 2018. Puis, Edern a vendu 58 334 titres Umalis entre le 11 février et le 3 juin 2019 pour un montant net de 417 848,89 euros, le seuil réglementaire de 20 000 euros ayant alors été dépassé le 4 mars 2019.

238.  Or, il est établi et non contesté par M. Person que ni les opérations de vente de titres Umalis réalisées par Edern à partir du 10 septembre 2018 jusqu'au 27 novembre 2018, ni celles réalisées par elle à partir du 4 mars 2019 jusqu'au 3 juin 2019 n'ont été notifiées à l'AMF.

239.  Les arguments invoqués par M. Person relatifs à sa bonne foi, à l'absence de conséquence du défaut de notification et à l'absence d'avantage personnel ou de profit sont sans incidence sur l'appréciation de la caractérisation de ce grief.

240.  En omettant de déclarer ses transactions réalisées sur 108 467 titres Umalis entre le 5 septembre et le 27 novembre 2018 et entre le 11 février et le 3 juin 2019 dont les montants excèdent 20 000 euros, Edern n'a pas satisfait aux obligations déclaratives imposées par les textes applicables.

241.  Le mécanisme d'imputabilité prévu à l'article 221-1 du RGAMF et dont l'application a déjà été retenue *supra* en ce qu'il couvre les dispositions du titre II du livre II, s'applique à la section 5 « *Opérations des dirigeants et des personnes mentionnées à l'article L. 621-18-2 du code monétaire et financier sur les titres de la société* » dudit titre II du livre II, laquelle comporte un article 223-22-A aux termes duquel : « *Les dispositions de la présente section s'appliquent aux transactions mentionnées à l'article L. 621-18-2 du code monétaire et financier* ». L'article L. 621-18-2 du code monétaire et financier, auquel renvoie l'article 223-22-A du RGAMF, prévoit l'obligation de déclaration à l'AMF des opérations mentionnées à l'article 19 du Règlement MAR. Il s'ensuit que le mécanisme d'imputabilité de l'article 221-1 du RGAMF s'applique, par renvoi de l'article 223-22-A du RGAMF, à l'obligation de déclaration, prévue à l'article L. 621-18-2 du code monétaire et financier, relative aux transactions mentionnées à l'article 19 du Règlement MAR.

242.  Par conséquent, si les obligations déclaratives prévues aux articles 19.1 du Règlement MAR et L. 621-18-2 du code monétaire et financier incombent au premier chef à Edern qui a réalisé les opérations, elles sont également applicables à M. Person en sa qualité de dirigeant d'Edern, indépendamment de la mise en cause d'Edern.

243.  Le grief tiré du non-respect par M. Person de l'obligation de déclaration des transactions, prévue aux articles 19 du Règlement MAR, L. 621-18-2 du code monétaire et financier et 223-23 du RGAMF, est donc caractérisé.

### 2.3   Sur le grief notifié à M. Lucide

### 2.3.1   Notification de griefs

244.  Il est fait grief à M. Lucide de ne pas avoir déclaré les opérations de vente de titres CIOA réalisées entre le 21 septembre 2018 et le 7 décembre 2018 *via* sa *holding* Festival of Spirit Ltd, dont le montant excède 20 000 euros, en méconnaissance des dispositions des articles 19 du Règlement MAR, L. 621-18-2 du code monétaire et financier et 223-23 du RGAMF.



245. La notification de griefs rappelle le déroulement et le contexte des opérations en cause au regard du schéma manipulatoire dans le cadre de l'examen des griefs de manipulation de cours, avant de relever que M. Lucide avait les qualités de président directeur général de CIOA à l'époque des faits et de « *Director* » de sa *holding* Festival of Spirit Ltd pour laquelle il est intervenu en tant que donneur d'ordres pour les transactions en cause. La notification de griefs en déduit que les obligations de déclaration imposant aux personnes exerçant des responsabilités dirigeantes et aux personnes ayant un lien étroit avec elles de notifier à l'émetteur et à l'AMF toute transaction effectuée pour leur compte propre, dans le délai de trois jours ouvrés suivant la date de transaction, sont applicables à Festival of Spirit Ltd ainsi qu'à M. Lucide en sa qualité de dirigeant de la personne morale concernée.

246. Elle expose qu'il ressort du rapport d'enquête que M. Lucide a vendu, *via* sa *holding* Festival of Spirit Ltd, 160 705 titres CIOA entre le 21 septembre et le 7 décembre 2018 pour un montant de 675 100 euros, le seuil de 20 000 euros déclencheur de l'obligation de déclaration ayant été franchi le 24 septembre 2018. Selon la notification de griefs, les transactions en cause auraient dû être notifiées régulièrement à l'AMF à partir de cette date, ce qui n'a pas été fait.

247. Elle ajoute que ce manquement est d'autant plus grave qu'en le commettant, M. Lucide a facilité la mise en place et l'exécution du schéma potentiellement manipulatoire mis au point par M. Leshem sur le titre CIOA. À cet égard, la notification de griefs indique qu'en décidant de vendre un volume important de titres CIOA, soit directement sur le marché soit indirectement, et en acceptant de céder 70 % de leur valeur de marché, M. Lucide a permis la mise en place et l'exécution de ce schéma manipulatoire dont il a pu retirer un bénéfice financier. Elle précise que la société française de M. Lucide, Festival of Spirit EURL, a effectué 5 virements sur le compte courant de CIOA pour un montant de 286 000 euros entre le 15 octobre et le 24 décembre 2018.

### 2.3.2    Observations du mis en cause

248. M. Lucide fait valoir que le principe de personnalité des peines fait obstacle à ce qu'il soit poursuivi et éventuellement sanctionné au titre des faits reprochés dès lors que la preuve qu'il a directement réalisé les opérations en cause n'est pas rapportée. Il affirme avoir donné mandat à un courtier dans le cadre du contrat conclu avec le président de Grantchester Equity, M. Leshem (market maker program) s'agissant de la cession des titres CIOA sur la période concernée, ce qui selon lui opère un transfert de responsabilité à l'égard de M. Leshem.

249. Il invoque en outre sa parfaite bonne foi qui devra déterminer la commission à ne pas prononcer de sanction à son encontre, relevant à cet égard qu'il a activement participé à la procédure d'enquête, en répondant à toutes les sollicitations de l'AMF, laquelle a pu avoir accès à l'ensemble des transactions concernant le cours de CIOA. Il soutient ne pas avoir été à l'initiative des opérations financières en cause dans la mesure où il a seulement répondu favorablement aux demandes de professionnels qualifiés dans le secteur boursier, tels que Mme Planche et M. Leshem, et avoir fait confiance à ce dernier pour réaliser les diligences nécessaires à la régularité des opérations. Selon lui, l'articulation entre les normes applicables aux marchés réglementés et les règles issues du Règlement MAR est particulièrement complexe, engendrant des obligations contradictoires sur ce type de marché, de sorte que la commission doit appliquer un tempérament à la règle issue de l'article 19 du Règlement MAR notamment lorsque les opérations visées n'ont pas directement été réalisées par le dirigeant. Il soutient au surplus que les émetteurs dont les titres sont admis à la négociation sur Euronext Access ne sauraient être tenus aux obligations découlant de l'admission à la négociation sur un marché réglementé. Il affirme encore n'avoir cherché aucun gain financier puisque la conclusion du mandat avec M. Leshem était notamment motivée par la recherche de liquidités afin de répondre à la condition du fonds d'investissement GEM et aux critères d'investissement fixés, comme l'atteste l'importance des commissions dues à M. Leshem, à hauteur de 70 %.

### 2.3.3    Textes applicables

250. Les opérations litigieuses se sont déroulées du 21 septembre 2018 au 7 décembre 2018, de sorte que les faits reprochés seront examinés à la lumière des textes alors applicables, sous réserve de l'application rétroactive de dispositions moins sévères entrées en vigueur postérieurement.

251. Les articles 19 et 3 (1) paragraphes 25 et 26 du Règlement MAR, L. 621-18-2 et R. 621-43-1 du code monétaire et financier, et 221-1 et 223-23 du RGAMF, dans leurs versions applicables en l'espèce, ont déjà été reproduits *supra*.



### 2.3.4    Examen du grief

252. M. Lucide était, au moment des ventes litigieuses, président directeur général de CIOA et *Director* de la société Festival of Spirit Ltd dont il détenait l'intégralité du capital social. Il s'ensuit que Festival of Spirit Ltd, en tant que personne étroitement liée à M. Lucide exerçant des responsabilités dirigeantes au sein de CIOA, était soumise aux obligations de déclaration prévues aux articles 19 du Règlement MAR, L. 621-18-2 du code monétaire et financier, et 223-23 du RGAMF.

253. En application des dispositions de l'article 19 (7) du Règlement MAR précitées, la circonstance invoquée par M. Lucide relative au mandat confié par lui à M. Leshem, même à la supposer avérée, est, en tout état de cause, sans incidence sur l'obligation de déclaration des transactions en cause incombant à Festival of Spirit Ltd.

254. S'agissant des opérations en cause, les éléments du dossier révèlent que Festival of Spirit Ltd a vendu 160 705 titres CIOA entre le 21 septembre et le 7 décembre 2018 pour un montant de 675 109,18 euros, le seuil réglementaire de 20 000 euros ayant été dépassé le 24 septembre 2018.

255. Or, il est établi et non contesté par M. Lucide que les cessions de titres CIOA réalisées par Festival of Spirit Ltd à partir du 24 septembre 2018 n'ont pas été notifiées à l'AMF.

256. Les arguments invoqués par M. Lucide sur sa bonne foi et l'absence de gain financier sont sans incidence sur l'appréciation de la caractérisation de ce grief. De même, les règles des plateformes de négociation invoquées par M. Lucide, s'agissant aussi bien d'Euronext que d'Euronext Access, sont dépourvues de valeur légale et sont, en conséquence, indifférentes.

257. Ainsi, en omettant de déclarer les transactions réalisées sur 160 705 titres CIOA entre le 21 septembre et le 7 décembre 2018 dont les montants excèdent 20 000 euros, Festival of Spirit Ltd n'a pas satisfait aux obligations déclaratives imposées par les textes applicables.

258. Pour les raisons exposées au point 242, si les obligations déclaratives prévues aux articles 19.1 du Règlement MAR et L. 621-18-2 du code monétaire et financier elles incombent au premier chef à Festival of Spirit Ltd qui a réalisé les opérations, elles sont également applicables à M. Lucide en sa qualité de dirigeant de Festival of Spirit Ltd.

259. Par conséquent, le grief tiré du non-respect par M. Lucide de l'obligation de déclaration des transactions, prévue aux articles 19 du Règlement MAR, L. 621-18-2 du code monétaire et financier et 223-23 du RGAMF, est caractérisé.

### SANCTIONS ET PUBLICATION

#### I.    Sur les sanctions

260. Les manquements retenus à l'encontre des mis en cause se sont déroulés entre mars 2018 et le 3 juin 2019.

261. L'article L. 621-15, II du code monétaire et financier, dans sa version en vigueur du 3 janvier 2018 au 23 octobre 2019, non modifié depuis sur ces points, dispose : « *II.- La commission des sanctions peut, après une procédure contradictoire, prononcer une sanction à l'encontre des personnes suivantes :* […] / *c) Toute personne qui, sur le territoire français ou à l'étranger :/ 1° S'est livrée ou a tenté de se livrer* […] *à une manipulation de marché, au sens des articles 8 ou 12 du règlement (UE) n° 596/2014 du Parlement européen et du Conseil du 16 avril 2014 sur les abus de marché (règlement relatif aux abus de marché) et abrogeant la directive 2003/6/CE du Parlement européen et du Conseil et les directives 2003/124/CE, 2003/125/CE et 2004/72/CE de la Commission ;* […] / *4° Ou s'est livrée à tout autre manquement mentionné au premier alinéa du II de l'article L. 621-14, / dès lors que ces actes concernent : / - un instrument financier* […] *négociés sur une plate-forme de négociation située sur le territoire français ou pour lesquels une demande d'admission à la négociation sur une telle plate-forme de négociation a été présentée ;* […] ».



262.	Le premier alinéa du II de l'article L. 621-14 du code monétaire et financier, dans sa version en vigueur du 11 décembre 2016 au 1er janvier 2020, non modifié depuis sur ce point, auquel renvoie le 4° du c) du II de l'article L. 621-15 du même code, dispose : « *Le collège peut, après avoir mis la personne concernée en mesure de présenter ses explications, ordonner qu'il soit mis fin, en France et à l'étranger,* […] *à tout autre manquement de nature à porter atteinte à la protection des investisseurs, au bon fonctionnement des marchés* […] ».

263.	Les manquements à l'obligation de déclarer les opérations des dirigeants et personnes liées sur les titres d'un émetteur sont de nature à porter atteinte à la protection des investisseurs et au bon fonctionnement des marchés et, partant, passibles de sanctions sur le fondement du II c) de l'article L. 621-15 du code monétaire et financier, de même que les manquements de manipulation de cours.

264.	Aux termes du III de l'article L. 621-15 du code monétaire et financier, dans sa version en vigueur du 3 janvier 2018 au 23 octobre 2019, non modifié depuis sur ces points : « *III.- Les sanctions applicables sont :* […] */ c) Pour les personnes autres que l'une des personnes mentionnées au I de l'article L. 621-9, auteurs des faits mentionnés aux c à h du II du présent article, une sanction pécuniaire dont le montant ne peut être supérieur à 100 millions d'euros ou au décuple du montant de l'avantage retiré du manquement si celui-ci peut être déterminé ; les sommes sont versées au Trésor public* […] */ Les sanctions pécuniaires prononcées en application du présent III peuvent faire l'objet d'une majoration, dans la limite de 10 % de leur montant, mise à la charge de la personne sanctionnée et destinée à financer l'aide aux victimes.* ».

265.	Il en résulte que les mis en cause encourent chacun une sanction au plus égale à 100 millions d'euros ou au décuple du montant de l'avantage retiré des manquements.

266.	Le III ter de l'article L. 621-15 du code monétaire et financier, dans sa rédaction en vigueur depuis le 11 décembre 2016, définit comme suit les critères à prendre en compte pour déterminer la sanction : « *Dans la mise en œuvre des sanctions mentionnées aux III et III bis, il est tenu compte notamment : / - de la gravité et de la durée du manquement ; / - de la qualité et du degré d'implication de la personne en cause ; / - de la situation et de la capacité financières de la personne en cause, au vu notamment de son patrimoine et, s'agissant d'une personne physique de ses revenus annuels, s'agissant d'une personne morale de son chiffre d'affaires total ; / - de l'importance soit des gains ou avantages obtenus, soit des pertes ou coûts évités par la personne en cause, dans la mesure où ils peuvent être déterminés ; / - des pertes subies par des tiers du fait du manquement, dans la mesure où elles peuvent être déterminées ; / - du degré de coopération avec l'Autorité des marchés financiers dont a fait preuve la personne en cause, sans préjudice de la nécessité de veiller à la restitution de l'avantage retiré par cette personne ; / - des manquements commis précédemment par la personne en cause ; / - de toute circonstance propre à la personne en cause, notamment des mesures prises par elle pour remédier aux dysfonctionnements constatés, provoqués par le manquement qui lui est imputable et le cas échéant pour réparer les préjudices causés aux tiers, ainsi que pour éviter toute réitération du manquement* ».

267.	Les manquements de manipulation de cours retenus à l'encontre de Grantchester Equity, M. Leshem et M. Van Wylick ont faussé le fonctionnement régulier du marché et porté atteinte à la confiance des investisseurs, de sorte qu'ils revêtent tous une particulière gravité. Ces manquements ont été répétés sur les titres des sociétés concernées sur des périodes respectives de 6 mois pour Gour Medical, 1 an pour Umalis et 4 mois pour CIOA.

268.	Il ressort en outre du rapport d'enquête que les particuliers majoritairement allemands auraient acheté pour environ 3 270 000 euros de titres (montant net des frais) sur les périodes de transactions sur les titres Gour Médical, Umalis et CIOA en exécution du *market making program*. Le préjudice total des investisseurs sur les marchés de ces titres pendant ces périodes est estimé entre un montant de l'ordre de 2 200 000 euros (moins-value latente en valorisant les titres au marché sans tenir compte de l'illiquidité) et 3 300 000 euros (moins-value latente en tenant compte de l'illiquidité et en valorisant les titres à 0).

269.	Les manquements déclaratifs retenus à l'encontre de M. Goldner, M. Person et M. Lucide sont intervenus respectivement entre le 16 mai et le 16 juillet 2018 s'agissant de M. Goldner, d'une part, le 5 septembre 2018 et le 27 novembre 2017, et d'autre part, entre le 11 février 2019 et le 3 juin 2019 s'agissant de M. Person, et entre le 21 septembre 2018 et le 7 décembre 2018 s'agissant de M. Lucide. Alors même qu'aucun manquement de manipulation de cours n'a été notifié par le collège à ces dirigeants, en omettant de déclarer leurs transactions ou en les déclarant tardivement ces personnes ont contribué à dissimuler la manipulation et ont de ce fait privé le



marché d'informations utiles, étant observé que le comportement de dirigeants de société consistant à vendre eux-mêmes ou à faire vendre les titres de leurs sociétés est par nature susceptible d'intéresser un investisseur raisonnable. Il est permis de penser que les particuliers acheteurs allemands ou autrichiens, en possession de cette information, n'auraient peut-être pas accordé la même confiance aux démarcheurs de la « force de vente » dont l'insistance à recommander l'achat des titres litigieux était fondée sur la délivrance d'informations trompeuses, telles par exemple que l'imminence d'une OPA.

270.  On observera par ailleurs, tout en admettant que la règlementation applicable en l'espèce ne comporte pas formellement la notion de circonstances aggravantes à la différence d'autres branches du droit répressif, les termes mêmes du III ter de l'article L. 621-15 du code monétaire et financier invitent à prendre en compte, pour apprécier la gravité du comportement des personnes mises en cause, toute circonstance qui leur est propre et se rapporte à l'affaire, les exemples mentionnés à cet égard par ces dispositions n'étant pas limitatifs.

271.  Les manquements déclaratifs revêtent en tout état de cause une gravité intrinsèque certaine dès lors qu'ils sont de nature à affecter le bon fonctionnement du marché tel que cela résulte notamment des considérants 58 et 59 du Règlement MAR.

### 1.  *Sur la situation de Grantchester Equity*

#### 1.1  *Sur les gains ou avantages obtenus* :

272.  Il résulte des éléments du dossier que Grantchester Equity a réalisé un profit minimal de 90 936 euros grâce à l'exécution du *market making program* sur les titres des trois sociétés concernées correspondant au virement de 20 006,88 euros effectué le 25 juillet 2018 par M. Van Wylick dans le cadre du dossier Gour Medical auquel s'ajoutent les virements de 51 856,15 euros effectués entre le 11 décembre 2018 et le 5 juin 2019 par WhiteTree Capital dans le dossier Umalis ainsi que ceux d'un montant total de 19 073,05 euros effectués par Global Capital Research.

#### 1.2  *Sur le degré de coopération avec l'AMF :*

273.  Grantchester Equity n'a communiqué aucun élément en réponse à la notification de griefs, n'a pas donné suite à la convocation à audition et ne s'est pas présentée à la séance de la commission des sanctions.

#### 1.3  *Sur la situation et la capacité financières de la mise en cause :*

274.  Aucun justificatif concernant les résultats de Grantchester Equity ne figure au dossier.

### 2.  *Sur la situation de M. Leshem*

#### 2.1  *Sur les gains ou avantages obtenus :*

275.  Les situations de M. Leshem et de Grantchester Equity ne sont pas distinguées, de sorte qu'il est renvoyé aux développements visés au point *supra* s'agissant des gains ou avantages obtenus par Grantchester Equity.

#### 2.2  *Sur le degré de coopération avec l'AMF :*

276.  M. Leshem n'a transmis aucun élément en réponse à la notification de griefs, n'a pas donné suite à la convocation à audition du rapporteur pendant l'instruction et ne s'est pas présenté à la séance de la commission des sanctions.

#### 2.3  *Sur de précédents manquements commis par le mis en cause :*

277.  En 1999 et en 2007, M. Leshem a été impliqué dans des procédures de manipulations de cours aux États-Unis devant la SEC qui lui a interdit de participer à des opérations sur des *penny stocks* et lui a infligé des sanctions pécuniaires. Par ailleurs, M. Leshem a également été mentionné dans une décision prononcée en 2011 par la *England and Wales High Court* dans une affaire d'escroquerie à la vente d'actions portée par la *Financial Services Authority*.



**2.4     *Sur la situation et la capacité financières du mis en cause :***

278.    Aucun justificatif concernant les ressources de M. Leshem ne figure au dossier.

### 3.   *Sur la situation de M. Van Wylick*

**3.1     *Sur les gains ou avantages obtenus :***

279.    M. Van Wylick a reçu un virement de 335 619 euros provenant d'Unimatrix en exécution du *market making program* sur Gour Medical, étant précisé qu'Unimatrix, dont M. Van Wylick est représentant et dirigeant, a, selon le rapport d'enquête, perçu environ 1 717 000 euros net des ventes d'actions Gour Médical (reversé à hauteur de (i) 30 % à M. Goldner, (ii) 50 % à Moelis Tech FZE et (iii) le solde aux partenaires de M. Leshem).

**3.2     *Sur le degré de coopération avec l'AMF :***

280.    M. Van Wylick a répondu à la lettre circonstanciée par courriel du 28 avril 2021, mais n'a pas donné suite à la notification de griefs, à la convocation en audition de votre rapporteur et ne s'est pas présenté à la séance de la commission des sanctions.

**3.3     *Sur la situation et la capacité financières du mis en cause :***

281.    Aucun élément concernant les ressources de M. Van Wylick ne figure au dossier.

### 4.   *Sur la situation de Mme Planche*

**4.1     *Sur les gains ou avantages obtenus :***

282.    Mme Planche a perçu 39 258,64 euros en exécution du *market making program* sur Gour Medical.

**4.2     *Sur le degré de coopération avec l'AMF :***

283.    La coopération de Mme Planche a été difficile au stade de l'enquête comme le souligne le rapport d'enquête qui fait notamment état du refus de celle-ci de se présenter à son bureau lors de la première visite des enquêteurs et de la suppression d'une quantité importante de ses courriels. Au cours de l'instruction, Mme Planche a répondu à la notification de griefs, s'est présentée à l'audition du rapporteur qu'elle avait elle-même sollicitée et a communiqué des éléments notamment concernant sa situation financière et patrimoniale à l'issue de cette audition.

**4.3     *Sur la situation et la capacité financières de la mise en cause :***

284.    À l'issue de son audition par le rapporteur, Mme Planche a transmis son avis d'imposition établi en 2022 qui fait état d'un revenu fiscal de référence de […] euros (1 part), pour un salaire net de […] euros en 2021 ainsi que d'un terrain en Dordogne d'une valeur estimée entre […] et […] euros, seul bien immobilier qu'elle détiendrait sur la base de ses déclarations.

285.    Au cours de son audition par le rapporteur, Mme Planche avait également indiqué qu'elle possédait des participations non liquides au sein de X, *startup* spécialisée dans l'agriculture cellulaire dont elle est directrice générale (environ 32 %), Y, biotech à Lille dans laquelle elle a réalisé un investissement à titre personnel, et Fauve Capital, dont elle est seule associée, laquelle détient environ 200 000 euros de trésorerie et verse en cas de besoin des dividendes à Mme Planche qui n'est pas salariée. Elle avait déclaré détenir environ 50 % de sa résidence avec son conjoint, sa participation étant évaluée à […] euros. Mme Planche avait fait état d'une rémunération versée par GEM variant de […] à […] euros selon les dossiers. Toutefois, elle n'a communiqué aucun élément pour justifier ces déclarations.



### 5.  *Sur la situation de M. Goldner*

### *5. 1    Sur les gains ou avantages obtenus :*

286.    Aucun gain ou avantage résultant des manquements déclaratifs n'est établi pour M. Goldner.

### *5. 2    Sur le degré de coopération avec l'AMF :*

287.    De sa propre initiative, M. Goldner a contacté l'AMF le 6 août 2018 afin de faire état des importantes variations constatées sur le cours de bourse de Gour Medical au cours des dernières semaines qui « *au vu des projets et de la situation actuelle de la Société, ne semblent pas justifiées* ». Il a également communiqué les témoignages recueillis auprès de particuliers dans le cadre de soupçons de manipulations de cours sur les titres des sociétés.

288.    Par ailleurs, il a été entendu par les enquêteurs et le rapporteur et a communiqué des éléments sur sa situation financière et patrimoniale, en hébreu.

### *5. 3    Sur la situation et la capacité financières du mis en cause :*

289.    En ce qui concerne ses revenus, M. Goldner a déclaré lors de son audition par le rapporteur, percevoir un salaire d'un montant entre […] et […] euros par mois. Le mis en cause a produit des bulletins de salaire de 2022 et 2023 rédigés en hébreu, qui ne sont pas exploitables sans traduction. Selon ses déclarations au rapporteur, ses revenus proviennent de son activité au sein de Gour Medical, ainsi que de prestations de conseil et de son activité d'enseignement.

290.    En ce qui concerne son patrimoine, M. Goldner a déclaré détenir avec son épouse sa résidence principale en Israël acquise en 2009, valorisée à […] euros et assortie d'un prêt d'un montant de […] euros à rembourser sur 15 ans. Il a également déclaré détenir un compte bancaire suisse sur lequel se trouvent […] euros et les titres de Gour Medical.

### 6.  Sur la situation de M. Person

### *6.1    Sur les gains ou avantages obtenus :*

291.    Aucun gain ou avantage résultant des manquements déclaratifs n'est établi pour M. Person.

### *6.2    Sur le degré de coopération avec l'AMF :*

292.    M. Person soutient qu'il a toujours coopéré avec les enquêteurs de l'AMF en répondant rapidement à l'ensemble des questions et en apportant tout son soutien à l'enquête en cours.

### *6.3    Sur la situation et la capacité financières du mis en cause :*

293.    En ce qui concerne ses revenus, M. Person, célibataire et sans enfant à charge, a produit sa déclaration de revenus pour l'année 2022 qui fait état d'un salaire net de […] euros. En ce qui concerne son patrimoine, M. Person a indiqué détenir des titres dans plusieurs sociétés et un compte-titres évalué à environ […] euros. En outre, il a indiqué qu'il ne détenait pas de patrimoine immobilier.

### 7.  Sur la situation de M. Lucide

### *7.1    Sur les gains ou avantages obtenus :*

294.    Aucun gain ou avantage résultant des manquements déclaratifs n'est établi pour M. Lucide.



**7.2    Sur le degré de coopération avec l'AMF :**

295.    M. Lucide fait valoir qu'il a participé activement à la procédure d'enquête en répondant à l'ensemble des sollicitations de l'AMF.

**7.3    Sur la situation et la capacité financières du mis en cause :**

296.    En ce qui concerne ses revenus, M. Lucide a produit son avis d'imposition au titre de l'année 2022 qui fait état d'un revenu fiscal de référence en 2021 de […] euros (pour lui-même et son épouse) et plus précisément […] euros de salaires en 2021 le concernant (sa déclaration d'impôts 2022 mentionne […] euros de salaires), et des revenus de capitaux mobiliers d'un montant de […] euros perçus en 2021. Son avis de situation déclarative établi en 2023 concernant ses revenus de 2022 fait état d'un revenu fiscal de référence de […] euros. M. Lucide a également produit un courrier daté du 13 novembre 2023 au titre duquel il a fait valoir ses droits à la retraite. Selon ses déclarations, il s'agit désormais de sa seule source de revenus.

297.    En ce qui concerne son patrimoine, M. Lucide a produit une attestation selon laquelle il ne possèderait pas en propre de biens immobiliers, mais détiendrait en revanche 44 % des parts d'une SCI familiale. Cette dernière est propriétaire d'un bien immobilier acquis courant 2022 de […] euros grâce à un emprunt bancaire de […] euros. M. Lucide atteste être locataire de cette SCI.

298.    Par un jugement en date du tribunal de commerce de Toulon du 13 septembre 2023, CIOA a été placée, à la demande de M. Lucide, en liquidation judiciaire avec cessation d'activité. La date de cessation des paiements a été fixée provisoirement au 19 juillet 2023. Par conséquent, M. Lucide a déclaré qu'il ne pouvait plus prétendre à percevoir des revenus mobiliers.

299.    En considération de ces éléments, il est prononcé les sanctions financières d'un million d'euros à l'encontre de Grantchester Equity, de deux millions d'euros à l'encontre de M. Leshem, d'un million d'euros à l'encontre de M. Van Wylick, de 400 000 euros à l'encontre de Mme Planche, de 25 000 euros à l'encontre de M. Goldner, de 100 000 euros à l'encontre de M. Person et de 100 000 euros à l'encontre de M. Lucide.

**II.    Sur la publication**

300.    Mme Planche et M. Person sollicitent l'anonymisation de la décision de la commission des sanctions.

301.    M. Person affirme qu'une publication sous une forme non anonymisée porterait gravement atteinte à sa crédibilité ainsi qu'à celle d'Umalis, dont il est le président-directeur général, alors qu'il n'est pas démontré que les investisseurs aient été lésés par l'absence de déclaration des cessions visées. Il indique qu'une publication nominative serait de nature à rendre plus difficile la poursuite du développement du groupe Umalis dans la mesure où ce dernier est publiquement associé à M. Person, en sa qualité de dirigeant et d'actionnaire majoritaire du groupe.

302.    Le V de l'article L. 621-15 du code monétaire et financier, dans sa version applicable depuis le 11 décembre 2016, dispose : « *La décision de la commission des sanctions est rendue publique dans les publications, journaux ou supports qu'elle désigne, dans un format proportionné à la faute commise et à la sanction infligée. Les frais sont supportés par les personnes sanctionnées. / La commission des sanctions peut décider de reporter la publication d'une décision ou de publier cette dernière sous une forme anonymisée ou de ne pas la publier dans l'une ou l'autre des circonstances suivantes : / a) Lorsque la publication de la décision est susceptible de causer à la personne en cause un préjudice grave et disproportionné, notamment, dans le cas d'une sanction infligée à une personne physique, lorsque la publication inclut des données personnelles ; / b) Lorsque la publication serait de nature à perturber gravement la stabilité du système financier, de même que le déroulement d'une enquête ou d'un contrôle en cours. […] ».*

303.    Les demandes de Mme Planche et de M. Person ne sont pas étayées. En tout état de cause, il apparaît que la publication de la présente décision n'est ni susceptible de causer aux personnes ayant commis les manquements



retenus un préjudice grave et disproportionné, ni de nature à perturber gravement la stabilité du système financier ou encore le déroulement d'une enquête ou d'un contrôle en cours.

304. En conséquence, la présente décision sera publiée sur le site Internet de l'Autorité des marchés financiers sans anonymisation pendant une durée de cinq ans à compter de la date de la présente décision.

**PAR CES MOTIFS,**

**Et ainsi qu'il en a été délibéré par M. Jean Gaeremynck président de la commission des sanctions, par Mme Valérie Michel-Amsellem, M. Alain David, Mme Sandrine Elbaz-Rousso, et M. Lucien Millou, membres de la 1ère section de la commission des sanctions, en présence de la secrétaire de séance, la commission des sanctions retient que :**

-    le moyen soulevé par Mme Aude Planche tiré de l'atteinte à ses droits de la défense est rejeté ;

-    le moyen soulevé par M. Christian Person tiré de l'atteinte grave et irrémédiable à ses droits de la défense est rejeté ;

-    le manquement de manipulation de cours par fixation du cours des titres Gour Medical, Umalis et CIOA à un niveau anormal ou artificiel, par indications fausses ou trompeuses sur l'offre, la demande ou le cours de ces titres, par recours à des procédés fictifs ou à toute autre forme de tromperie ou d'artifice et par construction d'une position dominante de nature à fixer les prix d'achat et de vente de ces titres, est caractérisé à l'égard de la société Grantchester Equity et de M. Leshem ;

-    le manquement de manipulation de cours par fixation du cours des titres à un niveau anormal ou artificiel, par indications fausses ou trompeuses sur l'offre, la demande ou le cours des titres, par recours à des procédés fictifs ou à toute autre forme de tromperie ou d'artifice et par construction d'une position dominante de nature à fixer les prix d'achat et de vente des titres, est caractérisé à l'égard de M. Van Wylick concernant les titres Gour Medical et Umalis ;

-    le manquement de manipulation de cours par fixation du cours des titres Gour Medical, Umalis et CIOA à un niveau anormal ou artificiel, par indications fausses ou trompeuses sur l'offre, la demande ou le cours de ces titres, par recours à des procédés fictifs ou à toute autre forme de tromperie ou d'artifice et par construction d'une position dominante de nature à fixer les prix d'achat et de vente de ces titres, est caractérisé à l'égard de Mme Planche ;

-    le manquement tiré du non-respect par M. Goldner de l'obligation de déclaration des transactions, prévue aux articles 19 du Règlement MAR, L. 621-18-2 du code monétaire et financier et 223-23 du RGAMF, est caractérisé ;

-    le manquement tiré du non-respect par M. Person de l'obligation de déclaration des transactions, prévue aux articles 19 du Règlement MAR, L. 621-18-2 du code monétaire et financier et 223-23 du RGAMF, est caractérisé ;

-    le manquement tiré du non-respect par M. Lucide de l'obligation de déclaration des transactions, prévue aux articles 19 du Règlement MAR, L. 621-18-2 du code monétaire et financier et 223-23 du RGAMF, est caractérisé.

**En conséquence, la commission des sanctions :**

-    prononce à l'encontre de M. Miron Leshem une sanction pécuniaire de 2 000 000 € (deux millions d'euros) ;

-    prononce à l'encontre de la société Grantchester Equity Limited une sanction pécuniaire de 1 000 000 € (un million d'euros) ;

-    prononce à l'encontre de M. Dirck Van Wylick une sanction pécuniaire de 1 000 000 € (un million d'euros) ;

- 49 -



- prononce à l'encontre de Mme Aude Planche une sanction pécuniaire de 400 000 € (quatre cent mille euros) ;

- prononce à l'encontre de M. Serge Goldner une sanction pécuniaire de 25 000 € (vingt-cinq mille euros) ;

- prononce à l'encontre de M. Christian Person une sanction pécuniaire de 100 000 € (cent mille euros) ;

- prononce à l'encontre de M. Léon Lucide une sanction pécuniaire de 100 000 € (cent mille euros) ;

- ordonne la publication de la présente décision sur le site internet de l'Autorité des marchés financiers et fixe à cinq ans à compter de la date de la présente décision la durée de son maintien en ligne de manière non anonyme.

Fait à Paris, le 24 janvier 2024

La Secrétaire de séance                                                    Le Président,

Martine Gresser                                                               Jean Gaeremynck

---

**Cette décision peut faire l'objet d'un recours dans les conditions prévues à l'article R. 621-44 du code monétaire et financier.**