UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

-o0o-

CAPANA SWISS ADVISORS AG, a )
Swiss corporation; AMERIMARK )
AUTOMOTIVE AG, a Swiss       )
corporation,                )
                            )   Case No. 2:23-cv-00467 TS
        Plaintiffs,         )
                            )
v.                          )
                            )
RYMARK, INC., a Utah        )
corporation; NICHOLAS THAYNE )
MARKOSIAN, an individual;   )
JOHN KIRKLAND, an           )
individual; and VICKY SMALL, )
an individual,              )
                            )
        Defendants.         )
_____)

BEFORE THE HONORABLE CECELIA M. ROMERO

---

Thursday, September 18, 2025

2:04 p.m. to 2:50 p.m.

Motion for Amended Scheduling Order

Motion to Compel Third-Party Forensic Inspection

---

Reported by:  Michelle Mallonee, RPR, CCR  (801) 209-4979
351 S. West Temple, #7.130, Salt Lake City, Utah 84101

1

APPEARANCES

For Plaintiffs:

    SARAH F. DIAMOND, ESQ.
    VENABLE LLP
    2049 Century Park East, Suite 3800
    Los Angeles, California 90067
    (310) 229-9901
    sediamond@venable.com

    ERIK A. CHRISTIANSEN, ESQ.
    PARSONS BEHLE & LATIMER
    201 South Main Street, Suite 1800
    Salt Lake City, Utah 84111
    (801) 532-1234
    echristiansen@parsonsbehle.com

For Defendants:

    CLIFFORD B. PARKINSON, ESQ.
    PARKINSON BENSON POTTER
    2750 Rasmussen Road, Suite H-107
    Park City, Utah 84098
    (415) 534-7970
    cliff@pbp.law

For Third-Party Defendants:

    ANDREW B. PERETZ, ESQ.
    LAW OFFICES OF ANDREW B. PERETZ PA
    One East Broward Boulevard, Suite 700
    Fort Lauderdale, Florida 33301
    (954) 558-8829
    aperetz@peretzlawpa.com

    CHRISTOPHER M. VAN MAACK, ESQ.
    MCNEILL VON MAACK
    175 South Main Street, Suite 1050
    Salt Lake City, Utah 84111
    (801) 823-6464
    vonmaack@mvmlegal.com

* * *

2

Thursday, September 18, 2025; Salt Lake City, Utah

2:04 a.m.

-o0o-

THE COURT:  Good afternoon.  We're here in the matter of the Capana Swiss Advisors, et al., versus Rymark Inc., et al., Case No. 2:23-cv-467.  We're here today to address two motions.  The first is ECF 297, the motion for the scheduling conference, and the second is ECF 298, the motion to compel.

If I could ask counsel to make their notice of appearance.  Who is present on behalf of the plaintiff?

MS. DIAMOND:  Good afternoon, Your Honor.  Sarah Diamond on behalf of plaintiffs.

MR. CHRISTIANSEN:  Erik Christiansen is local counsel as well.

THE COURT:  Thank you.

And who will be addressing the Court today?

MS. DIAMOND:  I will, Your Honor.

THE COURT:  All right.  And who is present on behalf of the defendants?

MR. PARKINSON:  Good afternoon, Your Honor.  Clifford B. Parkinson.  I'm present on behalf of the defendants.

THE COURT:  I see other attorneys on the line.  Are you not making an appearance?  Which is fine.  Are you

3

just watching?  I'm just trying to get clarification.

MR. PERETZ:  That's fine, Your Honor.  Good afternoon.  I'm Andrew Peretz on behalf of the third-party defendant, Miron Leshem.  And I'm here, along with -- he needs no introduction, but Christian [sic] Von Maack, who is our local counsel.

THE COURT:  Thank you for that.

All right.  Okay.  I'd like to start first with the motion for the scheduling conference, ECF 297.  And I think I will start with questioning the defendants.

So I issued an order, ECF 283, where I addressed the outstanding discovery issue.  And I granted the motions, and I ordered the parties to meet and confer no later than June 27, 2025, and ordered you to submit a proposed second amended scheduling order addressing the discovery deadlines in the motions.

I understand that was not done because a second motion to dismiss was filed.  But my order was not contingent on anything.

So it seems to me that you have not complied with the Court's order, and I want to understand why.

MR. PARKINSON:  Your Honor, my understanding -- and you'll have to forgive me.  I joined the firm two months ago, but I was who was available today.

THE COURT:  Unfortunate position for you to be in.

4

MR. PARKINSON: I know. I know. So I'll just flag it with that.

But my understanding is we did meet and confer by the deadline. We thought we had come to a consensus, and then plaintiffs proposed their scheduling order that they submitted to the Court with their briefing. We, on the defendants' side, thought that the order ought to -- since it would close fact discovery before we knew whether a third-party defendant, Miron Leshem, was going to be in the case, thought that it made sense to have some of the discovery dates be anchored in once -- be anchored into a date upon which we knew Mr. Leshem would be in the case or not. And so we proposed a counter -- a counter-calendar -- a counter-proposed scheduling order to plaintiffs along those lines. They found it to be not to their liking, and we then met an impasse. And at that point, I think they filed their motion with the Court.

THE COURT: Here's the problem that I have. You were ordered to submit a proposed second amended scheduling order. You were not ordered to meet and confer and discuss current pending motions. And so it seems to me that you have not complied with the Court order.

I have already addressed the outstanding discovery motion. No motion to stay was filed. And so in my mind, there has not been a compliance with the Court's order,

5

candidly.

Now, there's no motion for sanctions before the Court, and so at this point I'm not considering it. But, candidly, I'm not happy that the Court's order was not complied with. No other motion was stayed, asking for permission to not comply with my order.

So the question that I have for you is, the plaintiff submitted in the reply updated deadlines. Do you have concerns with those deadlines?

MR. PARKINSON: We do, Your Honor. The updated deadlines that they indicated in their -- in their motion would have fact discovery ending at the end of this month. We would not know at that point. We still have not received a reply brief in Miron Leshem's pending motion to dismiss. And I understand that that was not a contingency.

But that is -- our concern would be that fact discovery would close before we would be able to take any -- any discovery from Mr. Leshem.

THE COURT: All right.

Ms. Diamond, did the deadlines that you've proposed in your reply -- so I understand you had some initial ones, and then it clearly took the Court too long to address this, and so you submitted updated ones in the reply. Candidly, my order came out in June. The scheduling order was supposed to come out in June, and so the Court had

6

anticipated over the summer discovery to be taking place. It did not take place.

So do these deadlines work, from your perspective? And if they don't, how much time is needed?

MS. DIAMOND:  Thank you, Your Honor.  I would say we would probably need to push them all out one month, kind of just because of the time that has passed.

And just to follow up with regard to Mr. Parkinson's statements.  We were very close in reaching amended dates, and then abruptly, defendants' counsel said, No, we can't set any of these dates.  We have to wait, as Mr. Parkinson said, until after the Court decides the pending motion to dismiss.

And our position is we've been waiting a long time.  We wanted discovery to be closed in January.  And, you know, frankly, I don't see much that has happened with regard to any discovery in this additional time that has passed.

We did serve some additional discovery, the deadline of which ranges -- some of it's already passed, and the defendants have taken a position that the discovery is closed and that they don't need to respond unless they are ordered to do so.  But the remaining discovery that we've served, their responses would be due up to October 10th. And so I think another -- you know, if we push all of these

7

dates out 30 days, that should bring us current with regard to the current timing.

THE COURT:  All right.  Thank you.

Mr. Parkinson, is 30 days enough time, from your perspective?

MR. PARKINSON:  From our perspective, we will not have initial disclosures from -- respectfully, we won't have initial disclosures from Mr. Leshem.  We feel that we'll be prejudiced and at a disadvantage because we will not be able to get discovery out of him.

THE COURT:  So here is the tension that I have with that position, Mr. Parkinson.  You have done nothing on the docket to preserve your right to make those objections. You were ordered to comply by a certain deadline, and your client has failed to do so, which the Court is very concerned with.

And I want to make it clear going forward:  It will not tolerate that behavior again.  When the Court orders you to take action, you and your client had better do it to avoid sanctions.  And I need to make sure that you take that message back to your client and anyone else on this line.

So the Court is prepared to issue a ruling as follows with respect to the scheduling motion --

MR. PERETZ:  Your Honor, let me -- maybe this is

8

or is not an appropriate time, depending on what you're going to say.

THE COURT:  So Mr. Peretz, you said you were a spectator here.  So why are you --

MR. PERETZ:  I'm a spectator, and I'm happy to wait and just reserve a moment in light of your decision, because I want to, obviously, protect the record as it pertains to Mr. Leshem.

But that being said, I thank you, Your Honor.

THE COURT:  Thank you.  All right.

So the Court has already ruled on the issue of extending discovery deadlines in ECF 283, as I noted.  And the Court ordered the parties to meet and confer and to submit a proposed amended scheduling order consistent with the Court's ruling.  Although the defendants point to the recently filed motion to dismiss, ECF 301, there is no motion to stay pending before the Court.  There is no modification of the Court's order at ECF 283.

Moreover, this Court has held that the mere filing of a potentially dispositive motion based on jurisdictional grounds does not provide a basis for the Court to grant a stay of discovery.  That comes from the *Classic Aviation Holdings LLC v. Harrower* case.  That can be found at 2021 WL 633587, a District of Utah case from February 18th, 2021.  Defendants have provided no authority to justify the

9

staying of discovery because of a pending motion.

For these reasons, the Court grants the motion for the scheduling order, and, consistent with the representations here today, the Court orders the deadlines that have been submitted with the reply to be extended out by 30 days.  And no later than Friday, the parties are to get that order into the Court, and the Court will have it executed.

All right.  That covers the first motion.  Are there any questions on the Court's ruling with respect to that issue?

Mr. Parkinson?

MR. PARKINSON:  No question, just a comment, Your Honor.  And this probably won't change the way you viewed the situation.

But we read the order to mean that we needed to meet and confer and try and reach an agreed-to scheduling order.  And I think both parties in our conference agreed that our job was to meet and confer.  So we -- our apologies for misunderstanding the intention of the Court.  Did not mean to not fulfill an order.

THE COURT:  So I'm looking at the language.  I read it to you once, but I'm going to read it to you again.  "The court ORDERS the parties to meet and confer and no later than June 27, 2025 submit a proposed second amended

10

scheduling order addressing the discovery deadlines in the Motions." So to me, that order was clear. If there was any uncertainty, you could have certainly reached out to chambers, and we would have clarified anything that needed to be clarified. But a simple reading of this was very clear, that an order was supposed to come in by that deadline. So it was the Court's expectation and the understanding that discovery was taking place between that deadline and whatever deadlines would come in. So that hasn't happened. I've given my ruling. I appreciate the clarification. But I do want to make sure the parties are clear going forward: When the Court orders something, you are to comply with it.

All right. Was there anyone else -- sorry, did I ask, Ms. Diamond, was there any confusion that you had or anything I need to address on the scheduling motion issue?

MS. DIAMOND: No, Your Honor. Thank you.

THE COURT: All right.

And then, Mr. Peretz, was there something that you wanted to say relative to that issue?

MR. PERETZ: Again, I'm just here to protect Mr. Leshem. We did file the motion to dismiss, as Your Honor knows. We were served quite late in this case. We were added quite late in this case. Mr. Leshem has not engaged in the discovery process. No discovery has been

11

forthcoming to Mr. Leshem.  So that's why we're really here -- and the characterization is accurate -- as spectators, because I believe this discovery fight and what you're apparently focusing on relates to the parties, plaintiff and defendant, and not to Mr. Leshem.  So obviously, I don't want to run into the wake of what just occurred, Your Honor.  But respectfully, politely, gingerly, I just wanted to make sure that it's understood.

And I did speak to Ms. Diamond yesterday, and we understood there may be a different track that Mr. Leshem will be on.  Because at some point when the motion is adjudicated, our reply is due -- coming next week -- we just want to make sure everything you just said is just applying between plaintiff and defendant.  And perhaps we can have another scheduling order -- or conference like this, rather, at the appropriate time.

So, look, he may not be in the case in 30 days. He obviously could be in the case, but no one has asked him for discovery, although he did appear for a depo under a subpoena.  He's not involved, with the quotes around that, at this juncture.

Just wanted to make it clear so that there's -- I don't want to be on the -- on the end of what just occurred and want to be quite respectful to Your Honor.

THE COURT:  Thank you for that information.

12

All right.  Now what I'd like to do is turn to the motion to compel, ECF 298.

And let me tell you what I generally understand, and then, candidly, I have some confusion, and so I have a number of sort of questions to help me get up to speed.  I have read everything.  I've looked at everything.  But as I understand it, discovery requests went out per requests for documents.  Documents were, in fact, produced.  Documents were then supplemented.  Then third-party subpoenas went out.  And when those records came in, it appeared that records that should have been caught in the initial production were not produced.  And then discussions started.

And I think from the pleadings, what I gathered is the defendants didn't disagree that certain documents that came from the third-party subpoenas were not part of the initial production from the defendants.  But then they went to their forensic accountants and asked the accountant to figure out what happened.  And then, candidly, after that it's a little bit murky.

But what I'm understanding that you're asking the Court to compel a forensic inspection of is -- and I always -- my clerk always corrects me on the name, and I think I'm getting it right, but then I may have it wrong -- is it "Markosan's" iPhone?  Am I saying that right?

MS. DIAMOND:  Markosian.

13

THE COURT:  Markosian.  That's what it was.  I always miss a syllable.  I'm sorry.  Markosian's iPad; iPhone; Microsoft Exchange mail server; Rymark's Microsoft Exchange mail server; Markosian's personal email accounts, and there's two accounts listed; and then Rymark's Slack messaging channel.

So the first question that I have, Ms. Diamond, is:  Those are the categories of information that you're looking for; do I have that right?

MS. DIAMOND:  We would say Mr. Markosian's iPhones.  We don't know if it's singular or plural.  And part of our -- the problem is the questions that we still don't have answers that are set forth in ECF No. 298 on pages 3 and 4.  There's a list of seven enumerated questions that we don't have the answers to.  So that goes hand in hand with regard to the categories that we need to have searched.  So, and the only other --

THE COURT:  So I do understand all that.  So I understand you're saying iPhones and iPads, because you don't know.  But let me ask you.

So the reason I asked you if that's the list is, so were requests made for production that covered all of those categories?  Because you didn't include, for example, the request.  So I couldn't figure out what was requested versus what was produced.

14

I do recognize that there seemed to be an agreement, I think, and I'll hear from the defendants in a minute.  But yes, there were some documents not produced.

But were requests made for each of these categories that I just covered with you in written discovery requests?

MS. DIAMOND:  And just to add, on the Microsoft email servers and back-up files, that's a very important aspect of the email server request.

And so to answer your question, yes, with regard -- you know, the term "documents" clearly includes all of those -- all of those categories.  And that was only in the very beginning of our discovery request.

You know, it's now been nearly two years of meet and confers and additional RFPs.  And so there's no question that there are -- you know, we've made the request for these documents across all platforms, and we've expressly asked for them, including defendants' prior counsel.

THE COURT:  Okay.  So I just want to make sure I understand.  Requests were made, written requests for documents were made over the course of the last two years in all of these categories.  And then the next --

Is that a yes?

MS. DIAMOND:  Yes, Your Honor.

THE COURT:  And then the next thing I want to ask

15

is the defendants come back, and they say, Look, we did search terms.  We're talking about a lot of documents, a significant time period, so we came up with search terms. We then disclosed those search terms to you all, I think. And then you all added search terms to the searches, and so that is what we searched.

Is that consistent with your understanding?

MS. DIAMOND:  So the first time we conferred with the prior counsel for defendants was December 2023.  They produced 300 documents and said, That's about it.  And then we reviewed the third-party production, and we started to see a number of documents that Markosian was copied on that were not produced.  And these are not just, you know, documents that were missed in the flow of discovery.  I mean, these were very critical documents that completely contradicted statements in defendants' pleading.

THE COURT:  Ms. Diamond, I do understand all of that.  But here's the reason why I need my question answered.  Because it is not uncommon in a big case where there's lots of different technology to search that the parties agree to search terms.  And what I'm trying to figure out is if, in fact, there was an agreement to search terms.  And in your papers, you don't directly address what the defendants say, that these search terms were used.  And so I need to understand if there was, in fact, an agreement

16

on search terms, or if there was not an agreement on search terms.  I understand that documents were missing.  I understand they're material documents.  I understand those came from third parties.  But what I need to understand is if, from your perspective, these searches were done pursuant to a search term agreement.

It seems nobody used the word "agreement."  They didn't use the word "agreement" either, and so I'm trying to understand, from your perspective, what that means.

MS. DIAMOND:  Thank you, Your Honor.  It's difficult.  I don't mean to evade your question.  It's just kind of difficult because, yes, that's correct, they initially produced 300 documents, forgot -- you know, didn't produce everything.  Then we had an exchange with search terms.  And we did agree to a set of search terms.

Then if Your Honor recalls, they did what we termed in our prior pleadings a "document dump," where they dumped 100,000 documents on us that have no relevancy, nothing to do with this case, their prior counsel admitted that he did not even review, and that we had to then spend time kind of culling through.  But simultaneously, there were key emails with key people, Whitetree, Gysi & Partners, that were not produced.  And we repeatedly asked them in multiple meet and confers, Okay, can you check for communications with these parties?

17

And that's --

THE COURT:  So let me just -- so then the search terms that -- so they did the 300 documents.  Then you said, Okay, we need search terms, right, because you're not picking up what we need.

Did those search terms that were given, then, include -- would that have triggered these documents that were not produced, from your perspective?

MS. DIAMOND:  I mean, it should have, yes.  And the issue is that they had only -- you know, it wasn't just the search terms, it was a deficient email box search.  You know, there was a number of different emails, a number -- you know, iPads, the Slack exchanges.  And so maybe they're searching, you know, two email boxes or three email boxes, right, and these terms.  But repeatedly, documents that are critical were not produced.  And then we would go back after they would say that, Oh, these documents don't exist, then they would find them.  And this most recent production that was made by defendants' new counsel in May is another example where they've now produced documents that they said didn't exist, which are highly critical.

And it makes us -- you know, we just need more information.  And this is not just something that we're going through just to cause a burden.  Like, these are very critical, important documents.  And so that's why we need

18

answers.

Like, if I may, Your Honor, we need answers to these seven questions.

THE COURT:  Okay.  Let me ask you about those seven questions.

So why wouldn't you have issued -- so once it became clear that there was a problem, why wouldn't you have issued those seven questions through requests for interrogatories?  And let me tell you why I'm asking that question, actually.  Two reasons.

So the defendants say, look, the plaintiffs took depositions early on before everything was produced, and now the deadlines for that discovery have come and gone.  And perhaps the Court's ruling today changes that, I don't know.  And so they should have asked that in an interrogatory, or they could have asked it at the deposition.  They didn't.  And so this is an end run around these timelines that they're bound by.  And so that's the concern that I have there and why I'm asking the question for why they didn't come in an interrogatory.

Candidly, I'm trying to think logistically if I have ordered outside of discovery requests these questions to be answered.  Why not just go through the discovery process to have them answered?

MS. DIAMOND:  So, Your Honor, I think the timeline

19

is of key importance with regard to my response.

So Ms. Small and Mr. Markosian's statements after depositions that were last August, they contradict information that we've only learned since this belated May 2025 production. So we were told there's no other documents, that defendants gave us everything. Then abruptly, we get this production, May 22nd, 2025, and it shows communications which completely contradict some of the deposition testimony made by Ms. Small and made by Mr. Markosian.

So then we reach out to defendants' counsel. We engage in a meet and confer. We tried -- we submitted questions to defendants' counsel. They gave us, you know, what we deemed is insufficient, incomplete responses. And then we went back and forth. You know, we retained our own experts to look at some of these documents. And the answer is -- you know, the result is we are left where we were this summer, where we did propound additional discovery, asking for information about this.

And so we simply didn't have the information. You know, we got this belated production, and it only led to more unanswered questions.

THE COURT: So let me interrupt you there, because I think I just heard you answer my question, which is: Recently, in the recent discovery that you submitted, you

20

did, in fact, propound discovery to address these four topics; is that correct?

MS. DIAMOND: Yes, we did. I mean, they're not verbatim. But yes, they are requesting documents and information that go to these questions.

THE COURT: Okay. And that's the discovery, I think, at the start, where you mentioned that they've not responded to that, in light of the position that they had taken on the outstanding motion to dismiss; is that right?

MS. DIAMOND: We served a number of discovery responses. It was interrogatories and requests for admission and requests for production. Only three of those discovery requests had been due. And of those three, defendants responded that, you know, their position was that discovery was closed and they would not respond until the Court, you know, told them that they needed to.

THE COURT: So with my ruling today, though, they would have an obligation to respond to those categories, correct?

MS. DIAMOND: Yes, that's my understanding.

THE COURT: All right. And so in light of that, in light of the fact that there are still questions in my mind, and it sounds like in your mind, in what they did and what was searched, wouldn't it be prudent to know the answers to that before I evaluate whether or not it's

21

appropriate to order the forensic examination in the way that you've requested?

MS. DIAMOND:  If I may, Your Honor.  I would -- my view is that it would be best for them to provide a written response to the seven questions set forth in ECF 298. Because, as I said, it's not exactly, you know, what -- some of it largely would overlap.  I would say we didn't copy and paste these seven questions into interrogatories.  So I would say that it would be best if they had to sort of provide a response to those seven questions prior to being ordered to produce their inspections for -- their devices for inspection.

THE COURT:  So you're disagreeing with me, right? You're saying, no, we think you should order them to answer this and not go through the discovery process; did I hear that right?

MS. DIAMOND:  Well, yeah, that's our position. Because, again, this was a motion to compel, and this was information that we needed in connection with our ability to assess the scope of any inspection of their devices.  And so yes, I would say that we would ask for an answer.

I mean, frankly, my position is that they should have responded to these questions in full during the meet and confer process, but they refused to do so, leaving us to have to seek redress from the courts.  So yes, I would say

22

that our preference and our position would be provide a response to these seven questions so that we can decide and better understand if the motion for inspection is necessary, and, if so, what the scope of that inspection should be.

THE COURT:  All right.  Thank you, Ms. Diamond. At this time I don't think I have any further questions for you.  I plan to question Mr. Parkinson and then come back to you for the final word.

But is there anything you want me to know before I turn to him?

MS. DIAMOND:  No.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

So Mr. Parkinson, so I was confused by your response, because your response does seem to acknowledge that documents were not produced.  But then it also hedged in my mind a little bit on exactly where you looked. Because in some categories, I thought you said, well, we don't think there was anything responsive there, so we didn't search there.

And so help me understand from your perspective. I guess the first question I have is:  Is it your understanding that document requests were issued to cover these six categories of outstanding information?  And then did you respond to these categories?  Because you do seem to recognize documents were missing.

MR. PARKINSON:  Yeah, Your Honor, I'll do my best to answer that, not having been with the firm, from prior counsel, and just being here today.  But --

THE COURT:  I have to tell you, Mr. Parkinson, I am sympathetic to the position that you're in.  But, candidly, you're the second set of counsel that I've heard this from.  And so at some point, I've got to have the answers, right?

MR. PARKINSON:  Yes, Your Honor.  No, I completely understand.

My understanding -- and plaintiffs' counsel can correct me if I'm wrong -- is that an RFP went out for documents, generic.  It didn't go into the granularity/specificity of what's being asked for now.  I am happy to be corrected on that.

But I noted, as you did, that the requests weren't attached to the motion.  And in what I've been able to review in my short time, I haven't seen, like, a request directly for Slack in anything but meet and confer questions.  There haven't been written requests for them in meet and confer letters.  But defendants don't see that as quite the same thing as a request for production under the federal rules.  But as I said, I'm happy for plaintiffs' counsel to correct me on that.

I do understand that there was initial production

24

a couple years ago that was very small and that was looked at again, and then was -- then was improved upon immensely. My understanding is that there was a letter that's attached to our briefing on this matter, where prior counsel indicated, Here are the 74, 75 search terms that we are -- that we are using. And then plaintiffs' counsel said, Those are great. We'd ask you to add these additional 34. We did that as a courtesy.

My understanding from the deposition attached -- or, excuse me, the declaration attached -- well, let me not get too ahead of myself.

My understanding is the emails of the three custodians, Vicky Small, Nicholas Markosian, and John Kirkland, were all searched for. Efforts were made to search for another custodian, Eric Gardiner. For whatever reason, he left the company back in 2017. And so going back those nearly ten years, emails did not, for whatever reason, show in those searches.

THE COURT: So let me ask you. So it sounds like you think, you're not sure, that the requests were made, but you think maybe they were not made. And I couldn't tell from your response -- because, for example, on the Slack, I thought you said in your response, Well, we asked people, and they said it wasn't used, and so we didn't search it.

Do I have that wrong?

25

MR. PARKINSON:  Yes, that -- no, that's correct.

THE COURT:  And so does that -- but now you have proof, it sounds like, from third parties, if I'm understanding correctly, that, in fact, it was used; is that right?

MR. PARKINSON:  It was used for the sole purpose, and the exhibits that plaintiff had put forward demonstrate -- and I should recharacterize what our client said when asked if there would be responsive messages in Slack.  They indicated it was only used for car sales purposes, and the exhibits that plaintiffs attached all say, Create a Slack channel so that Nick will know when this type -- this and such of a car is for sale, or this and such.  So though Slack was used --

THE COURT:  Right.  So the documents that they produced do seem to indicate it that it was used for more than what your client told you, right?

MR. PARKINSON:  No.  Well, our client told us it was used only for car sales and not -- car sales and car sales-related purposes.  And that's what we've seen, as far as the third-party production indicates.

THE COURT:  But if there were search terms -- so candidly, Mr. Parkinson, and, again, I recognize the position you're in.  As a litigator, I was in it myself many times.  It's not a comfortable position.

26

MR. PARKINSON:  Sure.

THE COURT:  We have had problems and concerns that have been brought to the Court with your clients' production that I have dealt with previously.  You can look at the docket and see that for yourself.

MR. PARKINSON:  I have seen...

THE COURT:  And so the problem that I have with what you're telling me is, I have orders and rulings that I've issued where we recognize that there's been problems, that motions have had to be filed to produce things.  And there was -- I think, if I recall, there was confusion admitted, perhaps is a nice way to say it, on clients' behalf about what was and was not supposed to be produced.

So the tension that I have is I have that history, right?  And I now have a request to compel you to turn over your clients' technology, which I understand is somewhat of an extraordinary remedy.  Certainly, there's case law that provides for it.  And I'm trying to be sensitive as I weigh these things.

But it seems to me that if there was an agreement to do search terms, and your client did not do those search terms on all these databases that the defendants say were requested, then that's a problem.  And you're not telling me -- you're telling me, Well, my client said that we didn't use it.  They're saying, No, we think there's communications

27

that suggest that they did.  But if there was an agreement to search it, why wasn't it searched?

MR. PARKINSON:  And I don't -- I wouldn't go so far to say there was an agreement.  There was correspondence where we said, These are the 75 search terms we're using.  And they'd come back and said, Use 34 more.  They didn't inquire into what was being looked at, and what was being looked at was emails.

And then it was recognized that additional information was coming forward.  And that's the point at which a forensic expert was hired to go through the PST files for the email accounts and for two iPads that Mr. Markosian had in his possession.

And this was particularly over this Whitetree communication that defendants attached as Exhibit 6 to their motion.  We received that, all parties received that via snail mail from Europe without metadata as a printout.  And so we were unable to find that, and that gave defendants pause.  They hired a forensic expert specifically to look for that, that missing email, because it is the position of our client that he didn't know about Whitetree.  And that didn't show up in any of the PST files or the iPads that were searched by our forensic expert.

And so our position at this point is we have -- we may not have searched Slack, but I'm not sure that we were

28

asked to search -- there was no agreement to search all these channels.  Those became requests in meet and confers, and we've responded as we have.  Your Honor may disagree with the way that we have, and we'll see what to do about that.  But we feel that, despite a rocky start, at this point, we've hired third-party experts.  We've supplemented production.  We've tried really hard to be straightforward and provide documents.  And this Whitetree document that plaintiffs really need for their case just isn't showing up.  And every time it doesn't show up, it feels as if they're asking for us to look somewhere else and change the terms of their request.

THE COURT:  So you agree that this document that came from a third party didn't show up.  You hired your forensic accountant to go out and try to figure out why.  It sounds like there's no explanation for why, but you can confirm that you searched for that particular document.

MR. PARKINSON:  Correct.

THE COURT:  I see you shaking your head in the affirmative, so I see that.  But it sounds like there are other documents as well.  I recognize that's one of the important documents.  But they are also talking about other documents.

Let me ask you this.  I do understand that you indicated, Look, these seven questions that they want us to

29

respond to are not part of an interrogatory.  In light of the Court's ruling, in light of the other concerns that I have expressed today about the past, which I recognize does not have to burden your clients going forward -- absolutely, counsel changes and positions change, I understand that -- would it be prudent for you to answer these seven questions?

MR. PARKINSON:  I think we would answer them if served to us in an interrogatory, if it's still open, like -- we would.  And I will note that plaintiffs and plaintiffs' parties have served, I think no fewer than 18 in the last three weeks or one month -- five weeks of requests for production, requests for admission, requests for -- or interrogatories.  And none of them have been these.

THE COURT:  Okay.  So you have a different perspective from what Ms. Diamond said.  She said certainly they're not word for word, but she thought some of them did cover these categories.

But you don't think they do; is that right?

MR. PARKINSON:  I think they cover the categories. I don't think it's a perfect overlay.  And I am troubled that, rather than cut and paste them into one of the 18 requests they've sent us, they have done something else.

THE COURT:  Okay.  Let me just look at my questions.

All right.  Is there anything else that you want

30

me to know, Mr. Parkinson?

MR. PARKINSON:  Yeah.  I would just note that the cases that have been cited in the District of Utah that allow for forensic imaging or forensic inspection do have a pretty high threshold.  I mean, one of them is where someone indicates in a deposition that he purposefully didn't provide his documents from his computer because he didn't think the other side deserved them.  I don't see anything like that in this case.

The other one is that Denton [sic] case, where an individual said, Oh, I have a recording about -- with all the inculpatory evidence in a safety deposit box.  Oh, I actually don't have a safety box, it's in my friend's safety deposit box.  Actually, it's in a box at my friend's house. So the story changed so much that the Court was like, We have a problem here.  Let's just turn over the machinery for forensic inspection.

I don't feel like we are to that threshold.  I think a great place to start is what Your Honor suggested, answering these questions, which we'd love to do in an interrogatory.  We have felt like some of the way this case has worked is discovery has been sought and interrogatories have been tried to be snuck in in the meet and confer process, by asking questions like this that are more appropriate in a federal rule, recognized interrogatory, or

31

something along those lines.

And so we've resisted those to -- until we thought there was a scheduling order in place.  We now recognize that we're -- we recognize where the Court stands on that now.

But I think it would be a much more appropriate -- I think that a much more appropriate first step would be answering these questions in a properly served interrogatory.

THE COURT:  Thank you.

All right.  Ms. Diamond, candidly, the tension that I had in your motion was I didn't have the requests, so I couldn't tell exactly what was requested and what was not requested.

It does seem that there is a consensus that certain things weren't produced, because you could compare it up with the third-party subpoenas.  But then Mr. Parkinson today and in his brief said, We didn't always understand that certain categories were requested.

So for that reason -- and I'm sort of telling you what I'm leaning to do to give you an opportunity to respond -- it seems to me that your motion is premature. When I looked at the *Podium* case, *Navajo* case, *Denson* case, *Eagle Air* case, *Jacobson* case, it seemed to be more clear-cut.  And here, I still have confusion on what was

32

requested versus what was produced.  And so I do think that it seems prudent to have you issue, especially in light of my ruling on the scheduling order today, interrogatories that cover these categories so that we can make sure to match it up.  That's how I'm inclined to proceed forward.

I want to give you the opportunity to tell me, perhaps, why you disagree.  So now is your time.

MS. DIAMOND:  Thank you, Your Honor.  I first will say that's fine, we're happy to propound new interrogatories that trace these seven questions.  That's something that we can, you know, agree to.  And so we will get those served straight away.

My only point, you know, with regard to -- we discussed about agreements about search terms.  This dispute has to do with search platforms.  You can have all the best search terms in the world, but if they're not searching on key platforms -- and we don't know the platforms that they're searching.  And we know that documents that Markosian was copied on have not been produced by defendants.  It's obviously, you know, creating a serious issue that we've been trying to contend with for, as we said, nearly two years.

Also, hard copy documents.  A key aspect of this case are signed documents that were scanned from Mr. Markosian's scanner in his office, sent to third parties

33

in Europe.  Where are these hard copy documents?  You know, again, all the discussions about UCI is not answering the question of, where are these hard copy documents?

We have copies that we received, but defendants have not produced their own sets, which are very important with regard to the allegations that some of them, you know, have been thrown around with regard to forgery.

So I just would leave that, you know, let's not forget the importance of hard copy documents and the totality of these search platforms that we're asking for.

But we will propound additional interrogatories that go to these questions.  And again, we're always trying to meet and confer with defendants' counsel to avoid wasting your time and the time of the court in general.

THE COURT:  And Ms. Diamond, I do understand that you're asking about platforms.  But I think the reason I indicated I was leaning in the direction that I told you was because it seems to me that there's a disconnect between what Mr. Parkinson thinks he has to search and what you think that you've requested.

And so what I think needs to happen, just going forward, in my mind, so that you all understand my expectation, so I will order you -- well, let me do it this way.

I will grant in part and deny in part your motion

34

to compel, ECF 298.  It is granted only to the seven categories of information that you're asking be responded to.  But I will order that these come through written interrogatories so that they can be certified in terms of the responses.  And so I'll order you to issue those in written interrogatories so they can be addressed by the defendants.

And then as part of meet and conferring, because I assume Mr. Parkinson, in response to, for example, Request No. 1, will look at what platforms were searched and provide that response.  And if Slack is not identified, for example, as one of those platforms, or if Markosian's personal email accounts, for example, are not identified as one of those platforms, it is my expectation -- and I understand that this has been a long road, and there's been different sets of counsel and it's not been easy.  But I think the rules require you, then, to say, Okay, nope, this request is what covers that, this request is what covers that, so that you guys can meet and confer and get that out of the way so that it's clear that it was requested.  And if that's true, then he understands he needs to produce those documents.

Does that ruling make sense?

Do you have any questions there, Ms. Diamond?

MS. DIAMOND:  No questions.  Thank you, Your Honor.

35

THE COURT:  Anything else further from your perspective?

MS. DIAMOND:  No.  Just that we'll get all of these served shortly.

THE COURT:  All right.

And then, Mr. Parkinson, any questions on my ruling there in terms of the Court's expectation?

MR. PARKINSON:  No, Your Honor.  Thank you.

THE COURT:  Anything further from your perspective?

MR. PARKINSON:  No, thank you.

THE COURT:  All right.  And so I've already given you the timeline for when the scheduling order should come into my chambers.

With that, I thank you for your time and attention, and we will conclude and be in recess.  Thank you.

MS. DIAMOND:  Thank you, Your Honor.

MR. PARKINSON:  Thank you, Your Honor.

(The matter concluded at 2:50 p.m.)

36

COURT REPORTER'S CERTIFICATE

State of Utah            )
                         ss.
County of Salt Lake  )

   I, Michelle Mallonee, a Registered Professional Reporter in and for the State of Utah, do hereby certify:

   That the proceedings of said matter was reported by me in stenotype and thereafter transcribed into typewritten form;

   That the same constitutes a true and correct transcription of said proceedings so taken and transcribed;

   I further certify that I am not of kin or otherwise associated with any of the parties of said cause of action, and that I am not interested in the event thereof.

   WITNESS MY HAND at Salt Lake City, Utah, this 1st day of October 2025.


_____
Michelle Mallonee, RPR, CCR
Utah CCR #267114-7801
Expires May 31, 2026

37